UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| KALIN G. DIMITROV, | Civil action |
| Plaintiff | - CV - |
| -against- | JURY TRIAL DEMANDED |
| THE UNITED STATES OF AMERICA, THE CITY OF NEW YORK, TOWNSHIP OF TEANECK, MARLENE DULA, JOHN DOE (Ap.B2), RAPHAEL PIMIENTA, AS WELL AS NUMBER OF JANE AND/OR JOHN DOE (DECISION-MAKERS) Defendants. | |

# COMPLAINT

I, Kalin G. Dimitrov ("Plaintiff"), proceeding *pro se* for my complaint against the Defendants named above (collectively "Defendants") allege as follows:

1.  This action arises under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. As well as under 42 U.S.C. §§1981, 1983, 1985, 1986, Federal Tort Claims Act (28 U.S.C. §2671, *et seq*.), the Constitution of the State of New York, and state and common law of the State of New York and the State of New Jersey.

## I. JURISDICTION AND VENUE

2.  This Court has subject matter **jurisdiction** over Plaintiffs' claims under 28 U.S.C. §§1331, 1332(a), 1343(a), and 1346(b). This Court has supplemental jurisdiction under 28 U.S.C. §1367(a) over Plaintiff's claims arising under the state law of the State of New York and the State of New Jersey. The Court has also jurisdiction under 28 U.S.C. §1361 to compel an officer or employee of the United States or any agency thereof to stop and/or prevent further violations of Plaintiff's rights.

3.    The Court may grant injunctive and declaratory relief for the constitutional violations alleged here pursuant to 5 U.S.C. §702 (which waives the sovereign immunity of the United States with respect to any action for injunctive relief under 28 U.S.C. §1331), 28 U.S.C. §2201 (which confers jurisdiction to issue declaratory judgments), and Federal Rules of Civil Procedure 57 and 65. Furthermore the Court has the authority to hold unlawful and set aside Defendants' actions under 5 U.S.C. §706 as Defendants' actions are contrary to Plaintiff's constitutional rights, an abuse of discretion, not supported by evidence and unwarranted by the facts, and not in accordance with the law.

4.    This Court is a proper **venue** for this action under 28 U.S.C. §1391(b), (e)(1), and under 28 U.S.C. § §1402(b) because significant part of the acts or omission complained herein occurred in this district.

## II. PARTIES

5.    Plaintiff Kalin G. Dimitrov is a heterosexual male, born and raised in Bulgaria, Bulgarian as ethnicity and ancestry, and at all relevant times: a legal alien till 4/13/2016 and a citizen since then. Plaintiff is a resident of Bergen County, NJ, not a member of any party or any action/front organization of a political party. Plaintiff is established advertising Art Director, with more than 15 years experience, some of which in the offices of big international advertising agencies as Publicis, TBWA, and more.

6.    Defendant the United States of America ('USA' or 'US') is the federal government, the proper defendant under 28 U.S.C. §2671, *et seq.* for Plaintiff's claims arising from acts and omissions of the FBI and JTTF agents and officers as stated in the Complaint (JTTFs' policy and program management, its oversight and review are the responsibility of FBI, and its operational activities are supervised by FBI Supervisors).

7.   Defendant the City of New York ('NYC') is a municipality organized and existing under the laws of the State of New York. Defendant City of New York maintains the New York Police Department ('NYPD'), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the New York City Charter and Administrative Code, acting under the direction and supervision of the City of New York.

8.   Defendant the Township of Teaneck ('Teaneck') is a municipality organized and existing under the laws of the State of New Jersey. The government of Township of Teaneck is managed and supervised by its Council and Manager, and includes Teaneck Police Department ('TPD'), Teaneck Board of Education (the supervisor of Teaneck public schools), and more.

9.   Defendant Marlene Dula ('Dula') is NYPD officer in a Joint Terrorism Task Force ('JTTF') occupying the apartment in Teaneck above Plaintiff (ap.B2), and the person involved in the activities against Plaintiff since the beginning.

10.  Defendant John Doe (ap.B2) is a man present in ap.B2 almost every day at least since 2016, and active participant in the activities against Plaintiff. According to Plaintiff's knowledge and belief that man most probably is Lloyd Swaby (ap.B6), self-identified FBI agent, who stated to Plaintiff he was with Dula in ap.B2 in a few occasions.

11.  Defendants Raphael Pimienta ('Ralph', ap.D3) is NYPD officer and active participant in the activities against Plaintiff since about 2016.

12.  The unspecified number of Defendants Jane Doe and John Doe (decision-makers) are persons at Defendants USA/FBI, NYC, and Teaneck who  are making policy and practice decisions about Plaintiff.

## III. ADMINISTRATIVE PREREQUISITES

13. Plaintiff filed Administrative claims under the Federal Tort Claims Act dated 8/29/2024 with the FBI via certified mail. The Administrative claims were received by the FBI Headquarters, 935 Pennsylvania Avenue, NW Washington, D.C. 20535-0001 on September 3, 2024.

14. Plaintiff received on 3/12/2025 the FBI denial of his Administrative claims dated 3/6/2025.

## IV. STATEMENT OF FACTS

15. This case is about the outrageous abuse of the Defendants' law enforcement and counterterrorism powers used to harm, degrade, provoke and entrap Plaintiff in the last 13 years and ongoing. Plaintiff have become a subject of Defendants' activities (overtly since 2012) because FBI/JTTF agents considered him a 'Bulgarian fagot', a 'threat'. After they threatened to kill him and threw pebbles at his windows Plaintiff recorded them and on 9/11/2012 filed a report with Teaneck police. In retaliation Defendants escalated the case characterizing Plaintiff falsely as 'Bulgarian criminal/terrorist/spy/fagot' hitting police, and since then have acted in violation of the US Constitution and laws to 'suppress' and 'destroy' him with the knowledge that there is neither criminal nor anti-government activities on his side.

16. In response Plaintiff initiated a legal action against Defendants: *Dimitrov v The United States et al*, 23-cv-6451 (S.D.N.Y. 7/25/2023) (ECF[1] No.1) (referred bellow as '*Dimitrov I*'), but after more than two years Judge Rearden's decision on the Report and recommendation (ECF No.7) and Plaintiff's objections (ECF No.8) is still pending. Meanwhile Defendants' abuse continue without remedy, their efforts to 'suppress' and 'destroy' Plaintiff now include the obstruction of *Dimitrov I,* and their conduct since the initiation of *Dimitrov I* is the reason for this litigation. Because Defendants' actions are continuation of their activities addressed in *Dimitrov I*, all relevant facts since 2012 are relevant to this action.

---

1  Here and bellow ECF refers to the electronic case filings in *Dimitrov v. The United States of America et al,* 1:23-cv-6451 (S.D.N.Y., 7/25/2023)

17.  Since 2013 Defendants policies, practices, customs in regard to Plaintiff are (a) consistent, widespread, and continue for many years, which implies the constructive knowledge and endorsement by their policy-making officials; (b) Defendants policy-makers have never ceased or investigated the violations Plaintiff complained about, and they continue with their approval; and (c) Defendants policy-makers are deliberately blind to Plaintiff's rights, and/or fail to train and supervise their subordinates.

18.  Defendants' use of communities, schools, and other parties to 'suppress' Plaintiff shows that they utilize CVE[2] and/or similar programs to disrupt his economic prospects, discredit him by disseminating false narrative(s) (including that he is a criminal)[3], subjecting him to many-years-long campaign intended to cause mental pain and suffering and provoke reaction[4], and more.

19.  Defendants act in concert[5], aiding and abetting each other in their pursuit of harming Plaintiff, and are jointly liable as co-conspirators, including for the acts of other parties acting in agreement and coordination.

---

2  "Countering violent extremism (CVE) is usually understood to be "an approach intended to preclude individuals from engaging in, or materially supporting, ideologically motivated violence" (Williams, 2017)". *Deradicalisation in Germany: preventing and countering violent extremism*, Daniel Koehler, Revista CIDOB d'Afers Internacionals, Issue 128 (September 2021), pp. 59-78. "[W]e view community-based problem solving as an effective model of organizing communities and government to counter violent extremism in the homeland." *Empowering Local Partners to Prevent Violent Extremism in the United States*, August 2011, White House. Schools and youth agencies, according to Department of Justice's Comprehensive Gang Model, are among the organizations "responsible for addressing gangs" incorporating "state-of-the-art practices in gang prevention, intervention, and suppression" with the support of "integrated Federal, state, and local resources". *Id.* The federal government (the FBI, NCTC and DHS) have provided education about countering violent extremism in education. One of the DHS programs which "was cosponsored at different times by DHS, DOS, and the US Department of Defense... funded university students to create campaigns to counter extremist narratives." *Practical Terrorism Prevention: Reexamining US National Approaches to Addressing the Threat of Ideologically Motivated Violence*, Homeland Security Operational Analysis Center, RAND 2019. See also ECF No.8-1 at 839 *et seq.*.

3  "The first phase of a CVE intervention is the formulation of effective counter-narrative messaging... CVE measures need to undermine the legitimacy, credibility and appeal of violent extremists, for instance, by highlighting their involvement in criminality". *Effectiveness in Counter-Terrorism and Countering Violent Extremism: A Literature Review*, Joshua Sinai, Jeffrey Fuller, Tiffany Seal, PERSPECTIVES ON TERRORISM, Vol. 13, Issue 3, June 2019

4  "The end-goal is to enable counter-narratives to "control the battlefield and force your adversary to respond, not the other way around." (Maan and Cobaugh, 2018, pp. 23, 34)". *Id.*.

5  *The FBI's Counterterrorism Program Since September 2001*, Report to the National Commission on Terrorist Attacks upon the United States, FBI, April 14, 2004 ("Our preventive mission requires a high level of engagement with state and municipal law enforcement, other federal agencies, members of the Intelligence Community, and our international counterparts.")

20.     Defendants' activities against Plaintiff are framed as an FBI/JTTF preventive investigation[6]: (a) they present Plaintiff as a threat (a gloss of legitimacy on their discriminatory and retaliatory animus, and malice toward him); (b) Defendants investigate Plaintiff[7] for 13 years (and ongoing) without criminal or anti-government grounds – the duration alone shows that this is framed, at least in part, as counterterrorism measures[8] which are under the purview of the FBI and its JTTFs; (c) they make significant efforts to entrap Plaintiff and/or to 'exclude and remove' him from the USA by fabricating links to crime, and subjecting him to regular provocations, discrimination,, degrading treatment, and influence campaigns ('messages', social pressure, and similar) to radicalize him; and (d) based on the totality of facts Defendants' overarching goal is the disruption of Plaintiff[9] by getting him in prolonged conflicts, incapacitate him with unresolved problems, and keep him in a state of frustration and distress.

## 1. The Federal Bureau of Investigations is a leading party in the activities against Plaintiff.

21.     Defendants have demonstrated to Plaintiff that the activities against him are FBI (and its JTTFs) activities by (a) identifying themselves or other participants as FBI; (b) showing the FBI

---

6   Since 9/11 we are in the era of FBI preventive investigations – "priority is to stop another attack like we saw on September 11th. To do that, we have to enter into an age of preventive investigation." Robert Mueller, Dir., Fed. Bureau of Investigation, *Address at Stanford Law School: Terrorism in a Post-9/11 World* (Oct. 19, 2002), as quoted in *National Security and Local Police*, Michael Price, Brennan Center For Justice, 2013. "[T]he ultimate goal of these investigations is to prevent an attack, not to secure an arrest or conviction or to verify facts. Thus, any errors should be made on the side of safety and violence prevention." *Protective Intelligence & Threat Assessment Investigations: A Guide for State and Local Law Enforcement Officials*, Fein and Vossekuil, 2000, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice.

7   *The Department of Justice's Terrorism Task Forces*, June 2005, Office of the Inspector General Evaluation and Inspections Division, Report Number I-2005-007 ("OIG 2005") ("Since September 11, 2001, the FBI has changed its counterterrorism investigative strategy from emphasizing criminal prosecutions to developing intelligence. [T]he FBI defines the primary purpose of its counterterrorism investigations as "developing intelligence regarding the subject or the threat."")

8   OIG 2005 ("[A] terrorism investigation may continue for a much longer period than a traditional criminal investigation and will not demonstrate immediate measurable results."). See also relevant *Final Report of The Select Committee to Study Governmental Operations with Respect to Intelligence Activities*, Book II, United States Senate, April 26 (legislative day, April 14), 1976 ("Intelligence investigations often continued, despite the absence of facts indicating an individual or group is violating or is likely to violate the law, resulting in long-term [decades-long] government monitoring of lawful [] activity.") ("Church Report 1976")

9   OIG 2005 (""The MOST successful intel effort in this regard would be absolute disruption…""). *New Oxford American Dictionary*, 3d Ed. 2010 ("disruption… disturbance or problems that interrupt an event, activity, or process")

support/approval; (c) the apparent nature and participation in the activities are under the authorities, responsibilities, and organization of the FBI and its JTTFs; and (d) the FBI is deliberately blind to the violations Plaintiff reported – showing at minimum support and approval of those activities.

*(a) FBI agents and participants identifying themselves or other parties as 'FBI', 'agents' or 'feds' act in concert against Plaintiff.*

22.    FBI agents and officers overtly acted against Plaintiff when he visited the FBI New York Field Office building on 11/8/2017 (see ECF No.1 at 62, and ECF No.8-1 at 45-46); or on 11/10/2022 when FBI agents instructed officers at the building to "Delay Kalin." Later an FBI officer ('FBI' written on his bullet-protection vest) asked a plain clothes agent while Plaintiff talked with his colleagues "Tell me what you need..." The agent directed to "Stop. Reframe", and later "Don't accept [what Plaintiff was saying]." They successfully thwarted Plaintiff's efforts to file in person his Administrative claims under the FTCA. (See ECF No.1 at 62; and ECF No.8-2 G).

23.    Multiple parties in the activities against Plaintiff have identified themselves or others as 'feds', 'FBI agents', or 'agents', showing an FBI-collective-identity. See examples in ECF No.1 at 24; and 223, and in ECF 8-1 at 18 ("All agents hear this. All (agents)." 9/7/2012); Id. 34 ("FBI. What's the trouble?" Man approaching police officers under Plaintiff's windows in the night of 10/13/2013); 810 (Swaby responded to Plaintiff under his windows on 3/25/2016 "We are FBI."; at 50 (Defendants talked under Plaintiff's windows about him, his 'arrest', and the 'New York police' on 10/4/2019 saying it is "hard to be an agent."); 53 (Defendants in ap.A3 talked about Plaintiff on 12/15/2019 "FBI push.".. "FBI considered it. Wanted []".. "I called out the police we were involved."); 178 (agents in ap.G2 in 2021); 408 ("You couldn't get all agents." to Plaintiff in Votee Park, Teaneck, NJ on 5/9/2022)). See also ECF No.8-2 at 2075; 2078 (stating that Plaintiff is "talking to FBI" and talked about an "agent"); and 5920 ("Kalin to harass agent." in the building of the FBI New York Field Office).

24.    That demonstration of an FBI-identity has continued after the start of *Dimitrov I* as for example on 7/26/2023, the day after Plaintiff filed his *Dimitrov I* complaint, when Defendants talked near him that they are 'FBI'. First at 9:04PM in the corridor Defendants' John Doe from ap.B2 (Swaby?) talked with Pimienta "FBI. We can't stop." A minute later Defendants woman near Plaintiff's windows also talked (in apparent coordination) about "FBI… stop." See also events on 8/2/2023; 9/14/2023 (Pimienta in ap.B2 "FBI… Kalin will going to stop."); 9/24/2023 (Defendants in ap.B2 "FBI … We don't stop."); 9/27/2023 (while Plaintiff worked on FBI materials Defendants' Dula in ap.B2 at 10:36AM "FBI stopped. Really."); 9/28/2023 (Dula in ap.B2 "Tell Kalin … arrest… FBI".); 10/6/2023 (9:13AM Defendants' man in B2 "Can't believe.. FBI []."); 10/8/2023 (Defendants' man in B2 "Kalin lost…. Stop. FBI []."); 2/2/2024 (Defendants in ap. G2 "FBI []. Tell Kalin …"); 2/21/2024 (Dula on loudspeaker in B2 "FBI... didn't stop."); 6/7/2024 (between 1PM-7PM Plaintiff worked on the DE – EMF report for his case in Phelps Park, Teaneck, NJ. Tennis players talked about him. "FBI… We didn't stop him." Then a couple sat next to Plaintiff, the man was unusually loud "This has high energy. High energy." They looked simultaneously at Plaintiff for reaction. After they left Defendants' woman talked nearby about "Activating Kalin." Tennis players again talked about Plaintiff "They put him in the microwave.");

9/7/2024 (Defendants stated next to Plaintiff's windows "We are FBI." and left); 10/6/2024 (Defendants' Dula in B2 "Kalin.. Dula don't stop that. … FBI to stop… Can't harass." "Say Kalin… Kalin set up []."); 10/23/2024 (11:38AM Defendants woman in building corridor "Can't stop." A bit later she and a man were under Plaintiff's windows "We can't stop. FBI [can't stop]."); 11/21/2024 (at about 7:34PM while Plaintiff was working on FBI report Defendants' woman in building corridor talked near his door "You won't forget about us." When later he got in toilet Dula in B2 commented "He knows we can't pursue him."); 11/30/2024 (after 10:20AM while Plaintiff was in toilet Defendants in B2 commented not loud "FBI wants him to believe we stopped."); and more.

*(b) Defendants have shown to Plaintiff that the activities against him are FBI activities or are supported / approved by the FBI.*

25.    For example on 9/10/2020 at about 8:45PM Plaintiff was transcribing a recording from 9/7/2012 (ECF No.8-1 at 17-18) and commented in his apartment "Pleasure to meet you my friends. Since the very beginning the mighty FBI is playing games with a jerk from Bulgaria." Defendants and partners' agents under his windows responded "Can not believe that."... "Bullet proved Bulgarian." which is implicit confirmation. See examples of such confirmation in ECF No.1 at 102 ("The FBI wants him."); 164 ("Kalin not forgive.".. "FBI will find and catch [him]."); 170 ("CIA, FBI-- can't stop him."); 171 ("FBI stopped."); and at 185 ("[Plaintiff] won't stop FBI."). See also examples of strong reaction from Defendants in ap.B2 when Plaintiff researched and analyzed FBI materials as, for example, on 12/4/2022 when (a few hours after he wrote comments on books about FBI, and less than a month after Plaintiff filed Administrative claims with the FBI in which he stated that Marlene Dula (ap.B2) is a NYPD officer in Joint Terrorism Task Force) Dula and John Doe in ap.B2 commented "FBI." Dula got in building corridor saying loud "Am I Joint?" On 12/16/2022 Friday at 5:45PM Plaintiff was studying an FBI-related article when Defendants and partners in ap.B2 knocked on his ceiling, and later John Doe in ap.B2 commented "You lost, we lost. OK?… FBI approved." Apart from showing the constant surveillance of Plaintiff (talking about FBI soon if not immediately after Plaintiff worked on FBI related materials, knocking on Plaintiff's ceiling while he was working), those reactions even without the whole context of the activities against Plaintiff show close nexus with the FBI – per statements alone certain acts are 'approved' by the FBI, Dula questions what Plaintiff stated about her (she being a JTTF officer) in his FTCA claims with the FBI suggesting knowledge of their content. Also strong are the reactions when Plaintiff works on JTTF materials – see below recent examples of retaliation with directed energy.

26.    Plaintiff was referred as an FBI's "product" in the building of FBI New York Field Office on 11/8/2017 (ECF No.8-1 at 45-46); and then by Marlene Dula (NYPD/JTTF) and other Defendants' agents referring to him as a "half-product", "product" (11/21/2022, ECF No.8-2 at 5956); or as a "famous product" (1/29/2023, *Id.* at 6087).

27.    A few of the examples above showing parties identifying themselves as FBI also identify the activities as FBI activities – they show knowledge about the FBI actions in regards to Plaintiff, or coordination, support and/or approval of those actions by the FBI. Examples since the initiation of *Dimitrov I* include also the events on 7/16/2024 (3:36PM-4:16PM, the super Cesar Naranjo and others, including parties in pre-scheduled Best Pest's visit to sanitize the building, talked about Plaintiff before, during and after the terminators' visit in his apartment. They talked about the "FBI", the "agents" "caus[ing] disruption", and made explicit statements that they "harass" Plaintiff (apart from naming him, they referred to him

as "Bulgarian" and "fagot"). "How do you want arrest?"..."Press Kalin (they) have to arrest him."... "They have to give him to stop.".. "He must be stopped."); 12/2/2024 (in Best Buy Plaintiff talked with staff member who told him to wait, and commented Plaintiff with another man "FBI is involved with this guy."); 3/7/2025 (6:19PM Defendants woman and three boys came under Plaintiff's windows commenting he is "afraid of FBI.. Don't believe we stopped."); or the events on 3/16/2025, four days after Plaintiff had received the FBI denial of his Administrative claims (at 3:04PM Ralph and Defendants woman wearing a badge talked loud at the corner of Red Road and Cedar lane under Plaintiff's windows "Don't stop." "FBI [gives] no money." After that Defendants' Ralph stayed provocatively against Plaintiff's windows on the opposite side of Red Road (3:15PM).)

*(c) The apparent nature and participants in the activities against Plaintiff show they are under the authority, responsibility, and coordination of the FBI and its JTTFs.*

**(i) Defendants activities against Plaintiff are framed as counterterrorism investigation.**

28. Defendants falsely designate Plaintiff as a threat: as a (potential, suspected) terrorist and/or suspect for related crimes (see IV.7). FBI is the primary agency investigating such threats.[10] The duration of Defendants' activities also shows that they are framed as counterterrorism measures (see above n.8).

29. "[T]he FBI is authorized to coordinate an intelligence, investigative, and operational response to terrorism. By virtue of that same authority, the FBI formed JTTFs composed of other federal, state, local, and tribal law enforcement agencies acting in support of the above listed statutory and regulatory provisions.*"[11]* "Today, Joint Terrorism Task Forces (JTTFs) led by the FBI play the chief role in coordinating federal counterterrorism investigations across the United States..."[12] "The JTTFs also develop partnerships among law enforcement; the intelligence community; the military; and federal, state, and local government".[13]

---

10  *Prepared Statement of Hon. Wray, Commerce, Justice, Science, and Related Agencies Appropriations for Fiscal Year 2019.* May 16, 2018, U.S. Senate, Subcommittee of the Committee on Appropriations, Washington, DC. ("Wray 2018") (The FBI is "a threat-focused... national-security and law-enforcement organization that uses, collects, and shares intelligence in everything [it does]".)

11  *Joint Terrorism Task Force Standard Memorandum of Understanding Between the Federal Bureau of Investigation and (the "Participating Agency")*, III., Exhibit 37713, 2/19/2015, part of PSF-7.02 - Joint Terrorism Task Force - Memorandum of Understanding, Portland (https://www.portland.gov/policies/public-safety/joint-terrorism-task-for…) (referred bellow as "JTTF Standard MOU").

12  *Domestic Federal Law Enforcement Coordination: Through the Lens of the Southwest Border*, Jerome P. Bjelopera, Kristin Finklea, Congressional Research Service, R43583, Updated June 3, 2014 (referred as "CRS R43583")

13  OIG Report 2005. See JTTFs members in OIG Report 2005, and the members of NJTTF at *National Joint Terrorism Task Force (NJTTF) Maritime Security Program (MSP) Information Sharing*, Presentation slides, 2012 Joint Conference of Harbor Safety Committees and Area Maritime Security Committees (referred as "MSP 2012")

**(ii) FBI investigations are usually conducted in concert with other agencies, or by JTTFs or other joint task-forces.[14] Many of the other participants in the activities against Plaintiff are traditional JTTF members or partners such as police, USPS, sheriff departments, private security, utility companies, universities, and more.**

30.     FBI and the other parties have been in contact and act in coordination against Plaintiff. As many

of the participants are members or partners with JTTFs they had been and are in established

contact and coordination within the framework of FBI's JTTFs, and/or within the framework of

the existing anti-gang or CVE programs. For example USPS is member of the national JTTF;

NYPD is substantially involved in JTTF New York (furthermore the NYPD actions in New

Jersey is well known); and sheriff departments, private security, utility companies, universities

are regular members or partners with JTTFs.

**(iii) Defendants' efforts to 'exclude and remove' Plaintiff from the apartment and the US are measures under the FBI/JTTF authority. (See IV.8(b)(2)(iii))**

**(iv) The methods Defendants use against Plaintiff (including violations of the constitution) are a modernized form of the FBI methods from COINTEL era.**

31.     "Even more disturbing was the frequent testimony that the law, and the Constitution were simply ignored. [] there was a general attitude that intelligence needs were responsive to a higher law. Thus, as one witness testified in justifying the FBI's mail opening program: "It was my assumption that what we were doing was justified by what we had to do.. the greater good, the national security." [Branigan, 10/9/75, p. 41.]" *Final Report of The Select Committee to Study Governmental Operations with Respect to Intelligence Activities*, Book II, United States Senate, April 26 (legislative day, April 14), 1976 U.S. Government Printing Office

32.     "The Church Committee's findings led to reforms that placed constitutional checks on the FBI's national security and intelligence operations and required reasonable criminal predicates to launch investigations. [] After 9/11, however, they all but dismantled them." *Disrupt, Discredit, And Divide: How The New FBI Damages Democracy*, Mike German, The New Press 2019. Introduction.

33.     "The FBI taught its agents that they could sometimes "bend or suspend the law" in their hunt for terrorists and criminals." *FBI Taught Agents They Could 'Bend or Suspend the Law'*, Spencer Ackerman, Wired. Mar 28, 2012

---

14 "A significant number of FBI investigations are conducted in concert with other law enforcement agencies or as part of joint task forces." https://www.fbi.gov/about/faqs/what-are-the-primary-investigative-functions-of-the-fbi as accessed in 2022. "The JTTFs are squads within the FBI's field offices... headed by the FBI[. The] members are assigned taskings and managed by an FBI Supervisory Special Agent." *The Department of Justice's Terrorism Task Forces*, June 2005, Office of the Inspector General Evaluation and Inspections Division, Report Number I-2005-007 (referred bellow as "OIG Report 2005")

**(v) The retaliation to Plaintiff's legal actions is in accord with long-time existing FBI practices to silence anyone who "dares to question its motives or performance", and to place "higher value on maintaining image rather than rooting out wrong."[15]**

**(vi) In further support – the FBI New York / JTTF New York had conducted operation on Plaintiff's street months before he moved in[16].**

*(d) Despite its "authority and responsibility to investigate all violations of federal law that are not exclusively assigned to another federal agency"[17], and "its responsibility to uphold and protect the civil rights"[18] the FBI remains deliberately blind to the violations Plaintiff reported verbally om 11/8/2017, and in his two Administrative claims with the FBI on 11/10/2022 and 8/29/2024. That is at minimum support and approval.*

34.  The FBI has duty to guarantee Plaintiff's rights under the US constitution and laws[19] including by ceasing, investigating and providing effective remedy for the violations. The FBI has failed to intervene with the ongoing constitutional violations in the activities against Plaintiff, and FBI's supervisors have failed specifically in regards to the FBI and JTTF's activities despite Plaintiff's repeating complaints (see IV.8, IV.9). Similarly the FBI failed to investigate, and to bring to justice the violators regardless of the variety of applicable and relevant US criminal statues. At minimum this is conscious avoidance because FBI should have investigated its own activities, and/or activities it approved (even if only by allowing them to continue for years, let alone its own role in them). See IV.9(b).

---

15  Senator Chuck Grassley as quoted in *Disrupt, Discredit, And Divide: How The New FBI Damages Democracy*, Mike German, The New Press 2019 ('The New FBI, 2019') Part I, 1.

16  ECF No.8-3. *Man Arrested in Red Road FBI Raid* by Noah Cohen, posted on May 10, 2011 which refers to a statement of Special Agent James Margolin, then a spokesman for the FBI's New York Field Office.

17  *Domestic Investigations and Operations Guide*, FBI, Updated Sept. 28, 2016 ("DIOG 2016"), Preamble.

18  *Commerce, Justice, Science, and Related Agencies Appropriations for Fiscal Year 2019*, Wednesday, May 16, 2018, U.S. Senate, Subcommittee of the Committee on Appropriations, Washington, DC. The FBI Answers to questions submitted by Senator Dianne Feinstein, McCabe Memos ("The mission of the FBI's Civil Rights program is to enforce Federal civil rights statutes and to ensure the protected rights of all persons are not violated. [] As part of its responsibility to uphold and protect the civil rights of the American people, the FBI takes a number of steps to combat hate crimes.").

19  *U.S. reservations, declarations, and understandings, International Covenant on Civil and Political Rights*, 138 Cong. Rec. S4781-01 (daily ed., April 2, 1992) II.(1). ("the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination.")

**2. The NJ State and Teaneck Municipality's knowledge and participation in the activities against Plaintiff.**

35.    Plaintiff is not a public person, but both the NJ State (Bergen County) and Teaneck Municipality knew him and his grievances before his Notice of claims to Township of Teaneck (11/11/2022). This by itself shows their knowledge and participation of Defendants' activities against him.

36.    In that regard a few events are notable: Teaneck Council members and Township Manager Dean Kazinci knew Plaintiff ("The Cedar lane problem." 10/29/2019), the NJ Assemblyman Gordon Johnson knew Plaintiff (2/26/2020); Bergen County Sheriff's deputies/staff participated in the activities against Plaintiff for example on 6/9/2021, 11/27/2022, and 9/11/2024; a New Jersey State government employee threatened to extradite Plaintiff on 4/2/2024; the NJ Congressman Josh Gottheimer's staff acted in concert with Defendants against Plaintiff (8/13/2024); Teaneck firefighters and ambulance/first responders "Suspect Kalin." (3/29/2025).

37.    10/29/2019, Plaintiff attended a public Teaneck Municipality Council meeting. When he got next to the Municipality building's entrance 3 persons, who later on the meeting were referred by Councilwoman Rice as 'some of the Youth' Advisory Board, were walking towards him and the 2 young women said to him in unison "Loser." Plaintiff did not respond. When Plaintiff was waiting for the meeting hall to open, a group of Council members and Township Manager Dean Kazinci passed by him and one of the group said nodding toward Plaintiff "The Cedar lane problem." At the meeting no Cedar lane problem was discussed. ECF No.8-1 at 51.

38.    Teaneck Firefighters arrived soon after Plaintiff building's alarm started at 11:27AM, 12/5/2019, and discussed Plaintiff "to humble him". Later he heard persons in the building's corridor talking about mocking him, and at 1:55PM he saw a group including uniform first responders who, after exchanging greetings with him, continued the discussion. For the short period Plaintiff was in the corridor they mentioned his name "Kalin" a few times, as well as "provoke" and "kill". They also said a few words in Bulgarian as for example in the exchange: "Театър [Theater]" "At least Kalin listen." "Soon he'll believe in []." Plaintiff did not respond, left the building and went to Teaneck clerk's office to request Teaneck police policies manual. The officer there commented Plaintiff "I don't want him here", gave him a business card - Doug Ruccione, acting clerk, and advised him to go to the police. In police Plaintiff was told to file a formal request, and taking the forms he left. ECF No.8-1 at 52.

39.    On 2/26/2020 Plaintiff attended anniversary meeting – 125 years Teaneck Municipality. Plaintiff was late and just a couple of seats were free, so he sat at the first raw next to Assemblyman Gordon Johnson who waved and showed him the seat38. After that Mr. Johnson slapped Plaintiff on his left leg, and later spoke in the corridor about Plaintiff that "He is self-made." The other person responded "Don't talk." After the official part a few of

the persons in the room repeated Plaintiff's name "Kalin" but nobody spoke with him and he left. ECF No.8-1 at 54.

40.   On 6/9/2021 since about 8:40PM a Teaneck Police car was parked on Cedar lane opposite to Plaintiff's windows, about 40 minutes later a sheriff's car arrived. Defendants' agent[20] under Plaintiff's windows: "Shoot." When Plaintiff started working on Teaneck Municipality materials the same person commented "Can't stop." Later Defendants woman in ap.A6 (Emily Brautigam?) reacted "Wow, Kalin fights?" ECF No.8-1 at 242.

41.   On 11/27/2022 Teaneck police cars were frequently under or next to Plaintiff's windows. At 5:04PM one of the police cars returned with a small truck branded Sheriff of Bergen, Crime Scene Unit, and officers entered Plaintiff's building. At 5:38PM Defendants person made photos of Plaintiff's windows. Followed knocks from Defendants in ap. B2, loud repeating pipe bangs (9 times), and Defendants threw a pebble at Plaintiff's windows. The sheriff's truck left at about 8:30PM, police cars had left earlier. See ECF No.8-2 at 5962.

42.   When on 8/14/2023 Judge Cave's Report and Recommendation to dismiss Plaintiff's case was filed Defendants' woman with Bergen County t-shirt participated in the efforts to stop and deter Plaintiff from pursuing his legal action ("He didn't believe." "We got him." and after Plaintiff made photos "Can't persuade. Kalin will never stop."). See ECF No.14, p.2.

43.   On 4/2/2024 at about 1:50PM Defendants' man in conversation with the Defendants' agents in the building threatened near Plaintiff's apartment that they "will extradite Kalin … Hitting the bad guy". After that the man entered a blue-green Ford Explorer parked right under Plaintiff's windows on Red Road registered to the New Jersey State government. See ECF No.14, p.4.

44.   5/8/2024, Plaintiff attended Teaneck Leadership – conflict resolution. When leaving he found his name tag on the postal box was displaced. Plaintiff asked a few questions at the meeting, and one of the attendees – Defendants man - commented "He wants to solve it." After the meeting ended Plaintiff was leaving the Municipality building, when the same man came after him singing "Too late baby." He was alone and there was no one else then at the area.

45.   6/17/2024, 7PM-9:30PM Plaintiff attended Teaneck Leadership. In the break the Teaneck's Clerk and a board of education member talked about Plaintiff "We are no evil. Teaneck is not evil." "He sue them?" "No. He just failed."

46.   On 8/13/2024, about 1PM Plaintiff got on the benches at Cedar lane and Garrison Ave, Teaneck, NJ to work on his GQ logs (Multi-filed EMF Meter he uses to detected electric, magnetic, electromagnetic radiation in his apartment) preparing charts as exhibits for the Defendants' use of DE (directed energy) against him. Defendants interfered almost immediately – 5 minutes later Defendants man sat next to him singing and talking to himself, and 20 minutes later a group of camera team came – bags with cameras, a clipper with written on it: Gottheimer. They stayed for hours and a half mostly right behind Plaintiff despite the available benches and free space, and some sat right next to Plaintiff and opposite to him. Multiple times they talked about Plaintiff ("What's his case?"… "He knows we [].") among other topics as politics, movies and similar. Plaintiff kept working on the EMF materials without response. One of the men talked on a phone about Plaintiff ("We have to increase the power. I don't think that's a permanent solution. … Kalin [].") Gottheimer came and they shot a clip with him, meanwhile a Defendants man who previous days had

---

20   Here and bellow unless explicitly specified that Plaintiff means an FBI or other agency employee, 'agent' is used as reference to any party acting in concert with Defendants, and with the meaning as in *Manual of Model Civil Jury Instructions for The District Courts of the Ninth Circuit*, update Dec. 2022, 4.4 which defines agent as "a person who performs services for another person under an express or implied agreement and who is subject to the other's control or right to control the manner and means of performing the services. [] [One may be an agent without receiving compensation for services.] [The agency agreement may be oral or written.]"

intimidated Plaintiff came too, and talked mostly in Spanish about a "handgun". 3:22PM Gottheimer and the shooting team left. Defendants man returned talking about Plaintiff ("Kalin"), he again came close to Plaintiff and back. Apart from a woman on other benches there was no one else – plenty of space. The Defendants man came next to Plaintiff again and talked behind Plaintiff only a few yards behind. Later when Plaintiff walked back home he passed another Defendants' man (shirtless) at the bus stop who said to him "They are worried about you." Plaintiff did not respond. Later Defendants woman commented "We didn't suppress him." A patrolling Defendants man going back and for the under Plaintiff's windows on Cedar lane talked under the windows "This guy shot dead." Plaintiff made a video. The man returned at 11:55PM talking about Plaintiff: "Kalin… Do you know how much access he has to us?"

47.    9/11/2024, 3:40PM a uniformed Bergen Sheriff's deputy talked at the corner of Red Road and Cedar lane opposite to Plaintiff's windows walking back and forth "He can't continue." Plaintiff made photos from inside of his apartment, and the deputy commented "… compromised." 3:47PM he played on speaker "Trying to stop." and left walking on Cedar lane.

48.    3/29/2025, 12:30AM ongoing alarm from the next building. About 12:35AM firefighters, and first responders arrived under the windows "Suspect Kalin."

### 3. Teaneck police is one of the main parties in the activities against Plaintiff.

49.    Teaneck police participation began with Plaintiff's report from 9/11/2012. A few points

demonstrate the police involvement: (a) the police did not investigate Plaintiff's report from 2012

and concealed the events; (b) till 2024 Teaneck police did not investigate any report Plaintiff filed

with them, and in 2024 Plaintiff filed two reports which police only superficially addressed; (c)

since 2013 uniform police officers overtly participate in the activities against Plaintiff; (d)

multiple parties in the activities identified themselves or others as police; (e) Defendants stated

Teaneck police' participation in the activities; and (f) Teaneck police does not enforce the law in

regards to those harming Plaintiff and to his case.

*(a) Teaneck police didn't investigate and concealed the events Plaintiff reported on 9/11/2012 (see ECF No.1 at 26, and No. 8-1 at 20).*

50.    Plaintiff went to Teaneck police in the morning of 9/7/2012 after the events on previous day. The

officer he spoke with said that police had not authorized such activities, and requested a proof

from Plaintiff. Later same day Plaintiff recorded his first audio recording of Defendants, in which

they said that all law enforcement agencies will join them, including the police in three days.

When Plaintiff filed police report on 9/11/2012 (four days later) his report has never been investigated, the materials he provided to police – audio recordings, sketches, handwritten statement – were not entered in police system, but for officer's misleading description of a small part of Plaintiff's complaint.

51.    9/7/2012 "All LEA [Law Enforcement Agency] will joins us?" "Back us." "Police say they []." "Three days to join us?" Exhibit Transcript of 1st_recording.mp3.

52.    9/11/2012 Plaintiff filed a report for organized harassment and threats with Teaneck police. While he was walking toward the police a few persons talked to him on the street "don't go, don't go". That report has never been investigated.

53.    In the beginning of 2013 police officers did not gave him a case number when Plaintiff requested it 2 or 3 times. And to Plaintiff's offer for full cooperation one of the police officers responded that he is "knocking on wrong door", and at the last of those visits the officer at the desk just laughed.

54.    10/16/2019, Plaintiff requested from Teaneck police Records Bureau the materials related to his report, and found that the audio recordings, his written statement, sketches he provided then to the police were not in Teaneck police records, but for a police officer's misleading description of a small part of what Plaintiff complained.

*(b) Teaneck police did not investigate any report Plaintiff filed till 2024. Furthermore with exception of the report from 1/9/2019 neither Plaintiff's handwritten statements nor the other materials he provided to police were entered in the police records system,. After the initiation of Dimitrov I Plaintiff filed two reports with the police in 2024. In both cases police was not willing to investigate further, and ignored (didn't even saved) some of the records Plaintiff provided as evidence.*

55.    After Plaintiff filed a report with Teaneck police on 9/11/2012 for threats and organized harassment (ECF No. 8-1 at 20), he filed reports with Teaneck police on 11/20/2014 (stolen delivery, ECF No. 8-2 at 1837, 2014); on 10/10/2016 (hacked laptop, personal and financial information accessed, deleted thousands of files, ECF No. 8-1 at 957, No.8-2 at 2015); on 1/9/2019 (fraud – contract impersonating him, officers' commented Plaintiff receives 'special treatment', ECF No. 8-2 at 1980, 2018, ECF No. 1 at 263); on 3/5/2020 (stolen check, fraud, ECF No. 8-2 at 2019, 2059); and on 2/23/2022 (broken delivery, stolen drugs, ECF No. 8-1 at 333). (See also ECF No. 1 at 64, 136). Those reports have never been investigated, and no detective was appointed to any of them.

56.    After the initiation of *Dimitrov I* Plaintiff filed a report with Teaneck police (# 24-031055) on 4/26/2024 about a group of 5-6 high school boys who had talked under his windows about playing 'roles' to 'break' him, threw a rock under his windows on Red Road, and when Plaintiff opened his window starting a video one of them threw a rock toward him. When Plaintiff asked him "My friend what are you doing?" the student told him to "Shut up." (ECF, No.14, p.4). On May 2, 2024 in relation to that report Plaintiff sent an email to officer Garland with draft transcript and link to two audio records showing planning between Defendants (police involvement also shown, threats to arrest) and students to act against Plaintiff – according to WeTransfer notification those records have never been downloaded.

On 7/2/2024, 12:13PM Plaintiff spoke with Teaneck police detective about his report from 4/26, who claimed the students were not recognized. Soon after that Defendants man near Plaintiff's windows commented that Plaintiff "didn't believe it." Two weeks later, on 7/16/2024 another group of high school boys shouted under Plaintiff's windows and at him, falsely accused him of exposing himself, one of them got a rock and threatened to throw it at Plaintiff while he was on a call with the police (case #24-051726). The Teaneck police lieutenant, who was one of the responding officers, ignored Plaintiff's statements that this is not an isolated incident and forcefully claimed that it is unrelated even to Plaintiff's previous police report from 4/26/2024. Plaintiff sent email including the email with draft transcripts to the Township Clerk, the Township Manager, and officer Strickland, but there were no further actions in regards to that report too. Plaintiff sent another email to the Town Manager, the Clerk, and officer Strickland on 9/25/2024 with a new recording (from 9/24/2024) and draft transcript of students and Defendants planning to threaten Plaintiff attached. There was no response. See Exhibit Emails.

*(c) Teaneck police overtly participate (with uniform officers) in the activities against Plaintiff since 2013.*

57.  Plaintiff has had more than 24 direct encounters with uniform Teaneck police officers since 2012, and many indirect (when uniform officers talked about him but not with him). Apart from his police reports examples include more than 15 visits to police – Plaintiff offered his full cooperation at the beginning of 2013 (ECF No. 1, n.7, ECF No. 8-1 at 20, 2005), checked for any development on his reports, and visited a few times Teaneck police Records Bureau and requested copies of the materials in their system related to the reports he filed (that is how he knows what is entered in the police system and can compare that with what he provided to the police for example on 9/11/2012 as stated in (1) above). About those events see for example ECF No. 8-1 at 647 (10/14/2019), 52 (12/5/2019), 132 (3/12/2020), and at 246 (7/12/2021).

58.  Furthermore uniform Teaneck police officers rang on Plaintiff's doorbell and/or knocked for example at 1:50AM on 9/19/2013 "Just to check"; and at 7AM and at 7:20AM on 9/21/2013 Sunday, "Wrong address." (ECF No. 8-2 at 1921). An important for the Plaintiff's claims example are the events from 1/20/2023, two months and one week after Plaintiff filed his Notice of claims, in which uniform Teaneck police officers used a call to 911 as a pretext to bang on his door, to enter his apartment, and then talked about him with the "squad"– see ECF No. 8-1 at 81 *et seq.*, and ECF No.1 at 34, 55, and 111).

59.  Examples of Plaintiff's indirect contacts with uniform Teaneck police officers include the events under his windows on 10/13/2013 at 2AM (about 6 uniform Teaneck police officers, 3 police cars, and persons who presented themselves as 'FBI' awakened Plaintiff talking under his windows about him, about Gyro (before Plaintiff had a meeting with Gyro set through a recruitment agency), said prepared phrases in Bulgarian, and more. ECF No. 8-1 at 34, 1802, 2142); on 3/4/2020 (officers and an FBI person talked "Now (recording) police." "Not according to the FBI." … "I'll mock Kalin.. Don't believe..." "[] police devise." "Got you scared.. homicide []." FBI: "Get Kalin heard that.".. "Investigating threat." ECF No. 8-1 at 55, 2075); on 5/10/2022 (ECF No. 8-1 at 80, 410); on 8/29/2022 (ECF No. 8-2 at 3969); and on 11/27/2022 (2 police cars, a truck branded Sheriff of Bergen, Crime Scene Unit parked near his windows, person made photos of Plaintiff's windows with flash light on, ECF No. 8-2 at 5962). Officers also have gotten in Plaintiff's building and talked in its corridor about him as for example on 4/11/2020 ('Bulgarian', ECF No. 8-1 at 480). Or got close to him in

public areas as for example on 7/4/2022 (on Cedar lane street officer in police car "That is Kalin. He had backpack." ECF No. 8-2 at 2227); and on 7/28/2022 (officer and a family talking at public area "Kalin… Have to push…" ECF No. 8-2 at 2940 *et seq*.).

60.    A prominent example of Teaneck police participation are the events on 1/20/2023, about two months after Plaintiff filled Notice of claims with Teaneck – see ECF No. 8-1 at 81 *et seq*., and ECF No. 1 at 34, 55, and 111.

61.    For examples of Teaneck police participation in 2023-25 see bellow, IV.4.(c)(vi). Exhibit Timeline of events, and more.


### (d) Defendants in plain clothes identified themselves or other parties as police.

62.    3/7/2021 Sunday, 7:34PM Sarah in ap.A3 commented Plaintiff's talk with Cesar Naranjo "Did not expect Kalin would fight.." At 8:07PM Dula in ap.B2 also commented talking to Plaintiff "Talking to police.. You know that.." ECF No.8-1 at 227.

63.    5/26/2021 at about 10:30PM men who had helped Dula spoke about Plaintiff near his windows. After Plaintiff made photos they came under his windows "Apologize.. We are police officers." ECF No.8-1 at 62.

64.    11/20/2021, Defendants in ap.G2 "We are police." ECF No.8-1 at 183.

65.    6/9/2022, after knocking on Plaintiff's door Cesar Naranjo talked with another man outside that Plaintiff "Didn't believe I am police." ECF No.8-1 at 424.

66.    6/29/2022, 9:40PM after multiple times person(s) entered and left building (entrance door sounds) Defendants talked on an upper floor "We got a hold it. In case he did []." "He knows we are police." ECF No.8-1 at 444.

67.    1/19/2024, 4:18PM right after Plaintiff worked on timeline of events – graphic, specifically on police visit on 1/20/2023 Defendants' man in building's corridor commented that Plaintiff "fucked police... Kalin gets [it]."

68.    1/14/2025, Anna Saraglia from ap.B3 came downstairs, then talked with Dula on B level about Plaintiff "He knows we are police."


### (e) Parties acting in concert against Plaintiff stated Teaneck police participation.

69.    Teaneck police works with Teaneck Public Schools – see ECF No. 8-1, 839 et seq.. - and events for example on 11/14/2018 (ECF No. 8-1, at 859), and 9/30/2021 (officer warned students about "Bulgarian", ECF No. 8-1, at 867) show they are in contact, act in coordination, and under police' direction in regards to Plaintiff (for example on 5/10/2017 Teaneck High School students followed Plaintiff on his street and after he stopped walking they commented "Kalin stop." "Call the police.." "Move three seconds. Hear me now?" "Yea." "They'll tell you what-ta (persuade)." ECF No. 8-1, at 852).

70.    Ralph talking about meeting Teaneck's Chief of police on 6/23/2020

71.    On 11/21/2022 Monday Dula: "Get him to do it. Ambushing this. How we to deploying to sleep? Do not say Kalin to do it." "Have to press."... Ralph: "Get police. You don't stop." "We lost. Police having that thing?".. Dula: "Police harass Kalin. Няма лошо ['Nothing bad is done' in Bulgarian]." ECF No.8-2 at 5959.

72.    4/6/2024, 4:37PM USPS carrier talked about Plaintiff in corridor ("Kalin"). Then under his windows "Police fight him."

73.    4/26/2024, 3:35PM a group of students came talking under Plaintiff's windows "He got police."

74.  6/26/2024, 4:38PM USPS carrier in building corridor "*Полиция* ['police' in Bulgarian] fights Kalin." Later she talked about the "recording".

75.  7/21/2024, 12:30AM Defendants talked in front of the entrance of the building (near the windows) "Fight. You think police would fight?" "Fight." Later while Plaintiff was in toilet they continued "Photoshop.. It's fucking scam. Fight." "Gay []." 1:23AM Defendants' woman in front of the pub on Cedar lane "Can really fight []." Later at 1:51AM "Fight Kalin.." "Won't stop."

76.  8/10/2024 "Police is scared he will do it."

77.  8/14/2024, 2:44PM Defendants' woman on speaker continued "Police will have him stop." "Kalin.. police … take advantage."

78.  8/25/2024, 6:38PM group of Defendants talked loud on the alley next to Plaintiff "Kalin fighting police."

79.  5/7/2025, about 9:55AM when Plaintiff passed Teaneck High School on his way to Votee Park, he passed a truck of Board of Education. The man inside said to him "Kalin… Police will stop."

80.  See more examples bellow, and at Exhibit Timeline of events.

*(f) Teaneck police does not enforce the law in regards to activities in regards to Plaintiff, including the local law. See IV.8.*

## 4. The participation of Teaneck Public Schools and their students[21], and Defendants' abuse of CVE, anti-gang and/or another similar program.

81.  Teaneck schools participation in the activities against Plaintiff is demonstrative since 9/6/2012 when a whole class of high school students came under his windows (ECF No.8-1 at 15) acting then in coordination with the FBI/JTTF New York – see IV.7(b)(i). The students' participation increased significantly since 2017 (see IV.4), and again after Plaintiff filed his Objections to Report and Recommendations (ECF No.8) on 8/28/2023, but in general has been low in the summers – further confirmation that students' actions against Plaintiff are both school-related and Defendants-related activity.

82.  The schools and other youth organizations involvement is shown also by the participation of Teaneck High School football coach and assistants (7/2/2024), Teaneck Youth Advisory board (10/29/2019, ECF No.8-1 at 51), Board of Education staff (6/17/2024, 5/7/2025 man in a Board of Education truck "Kalin… Police will stop."), and that is significant as Plaintiff has no contact otherwise with any of them. Although Teaneck Municipality with its boards, including Teaneck

---

21  See also ECF No.8-1.C.6.

Board of education, has been under formal notice (Plaintiff sent Notice of claims on 11/11/2022) they not only have never ceased schools and students' participation (notably Defendants used also students not from Teaneck – see for example 4/26/2024 (if what Teaneck police detective said on 7/2/2024 is true)) but, as shown in the examples above, participated in those activities.

83. According to the US strategy, schools and youth agencies are among the organizations responsible for addressing gangs and countering violent extremism (CVE) with local implementation of "state-of-the-art practices in gang prevention, intervention, and suppression" with the support of "integrated Federal, state, and local resources".[22] Defendants provide intervention training, and offer opportunities to students to develop "intervention skills".[23]

84. Teaneck schools and their students have no reason to act against, or even interact with Plaintiff (especially that frequently) other then as part of the Defendants activities against him. Plaintiff's building is not associated with the schools, he has not attended the schools or any of their events, he visited Teaneck High School buildings only to vote, and he has not been in contact with students apart from the harassment and provocations he is subjected by them.

---

22  *Empowering Local Partners To Prevent Violent Extremism In The United States*, August 2011, White House
23  *A Framework for Prevention and Intervention Strategies*, Greater Boston region, Feb. 2015. See more bellow.
See also *Countering Violent Extremism in the United States*, Bjelopera, Congressional Research Service.
R42553. Feb. 19, 2014.

*(a) Teaneck Public School students' actions against Plaintiff are framed as anti-gang, and/or CVE training.*

**(1) Defendants frame in part the activities against Plaintiff as training exercise(s) and their statements suggest that activities with participation of students are CVE and/or anti-gang training[24].**

85.    Notable in that regard are the events on 4/22/2024 when three students commented Plaintiff

"Gay… Have no shame.." "Is that Kalin?"; or on 3/12/2025 when a schoolboy talked "I don't

know the message. I don't know." In both cases it is apparent that students have no personal

agenda or knowledge in regards to Plaintiff, but 'shame' him or have (forgotten) 'message' to him

– demonstration that that is a planned activity in which they are told what to say to Plaintiff.

86.    Defendants referred to Plaintiff in 2013 as a 'training subject'. ECF No.8-1 at 845. On 6/30/2019, 8:34PM in response to Plaintiff challenging Defendants from inside his apartment to "come and talk" Defendants' agent responded under his windows "We are studying here." ECF No.8-1 at 845. Defendants further confirmed that some activities are 'training exercises' on 10/14/2022, when a few Defendants' agents next to Plaintiff's windows commented him while he made a video. Plaintiff: "And here arrived firefighters." "I can get Kalin to stop." "False alarm.".. "He can send a policeman []." Plaintiff: "Another training exercise I guess." "Washington won't forget." "Full stop. Kalin heard [that]." ECF No.8-2 at 5585-5595.

87.    Teaneck High School class had, for example, an 'inspiration day' next to Plaintiff's windows under the supervision of an officer on 2/28/2017 Tuesday. Then for about half an hour a group of students and Defendants talked about Plaintiff ('Bulgarian') and provoked him, while the officer and Defendants in the building commented that "It's a shift game.." "Pushing." ECF No.8-1 at 851. Or on 5/10/2017 when students and Defendants followed Plaintiff on the streets of Teaneck "All right. I think we can push.." "Can I push?" ECF No.8-1 at 852. Asking for permission shows structure, organization, and planning.

88.    4/22/2024, about 4PM when Plaintiff got in Phelps Park, Teaneck three students – a girl and two boys commented him "Gay… Have no shame.." After Plaintiff didn't react and sat at the tables they talked not loud "Is that Kalin?"

89.    3/12/2025, 12:43PM schoolboy came under Plaintiff's windows "I don't know the message. I don't know."

---

24  See *A Framework for Prevention and Intervention Strategies*, Greater Boston region, February 2015 (listing as a solution "Provide students, families and all school staff with on-going bullying prevention and intervention training as well as resources that are available both in and out of school." See also there the statement of Carmen M. Ortiz, US Attorney, District of Massachusetts "I have worked with nontraditional partners, like schools, service providers and academia, to find ways to reduce gun and gang violence [and] these innovative strategies are not only effective, but necessary in order to develop a framework to counter violent extremism..."); *Practical Terrorism Prevention: Reexamining US National Approaches to Addressing the Threat of Ideologically Motivated Violence*, Homeland Security Operational Analysis Center, RAND 2019 (the federal government (the FBI, NCTC and DHS) have provided education about countering violent extremism in education. One of the DHS programs which "was cosponsored at different times by DHS, DOS, and the US Department of Defense ... funded university students to create campaigns to counter extremist narratives.").

**(2) Defendants' activities represent in part a CVE intervention – they disseminate derogatory counter-narratives to discredit Plaintiff, suppress him with demonstrative surveillance, subject him to messaging campaigns with the participation of students and other community parties intended to influence him, and more.**

(i) Defendants' formulation and dissemination of false narrative(s) about Plaintiff apparently aim to discredit him, and resembles the first step in a CVE intervention – formulation of a narrative which 'undermine the legitimacy, credibility and appeal' of its target[25].

90.    Based on the Defendants' frequent use of of related concepts their prevalent narrative about

       Plaintiff is that he is a Bulgarian criminal / terrorist / spy (see IV.7(b)(ii)(2)(A), IV.12, and more),

       Bulgarian 'fagot' (IV.8(a)(2)) who hits the police/government (2773 et seq.) and holds Defendants

       hostage. Defendants' narrative about Plaintiff falsely paints him as an anti-government radical, as

       a legitimate subject of Defendants' counterterrorism and CVE activities. Defendants' conduct is

       intended to force Plaintiff to respond.[26]

(ii) Defendants' demonstrative surveillance of Plaintiff with the participation of schools/students and community parties is by definition one of the CVE and anti-gang strategies for social control. The US CVE strategy utilizes the OJJDP anti-gang model which includes as a suppression strategy the close monitoring or supervision of its targets by government agencies, schools, and community-based agencies.[27]

91.    In addition to their demonstrative surveillance of Plaintiff Defendants have explicitly stated that

       they aim to suppress Plaintiff in a few occasions. Defendants' goals are obvious as it is well

       known that people change their behavior in response to external expectations, monitoring and

       evaluation.[28]

---

25  "The first phase of a CVE intervention is the formulation of effective counter-narrative messaging... CVE measures need to undermine the legitimacy, credibility and appeal of violent extremists, for instance, by highlighting their involvement in criminality". *Effectiveness in Counter-Terrorism and Countering Violent Extremism: A Literature Review*, Joshua Sinai, Jeffrey Fuller, Tiffany Seal, PERSPECTIVES ON TERRORISM, Vol. 13, Issue 3, June 2019

26  "The end-goal is to enable counter-narratives to "control the battlefield and force your adversary to respond, not the other way around."" *Effectiveness in Counter-Terrorism and Countering Violent Extremism: A Literature Review*, Joshua Sinai, Jeffrey Fuller, Tiffany Seal, Perspectives on Terrorism, Vol. 13, Issue 3, June 2019

27  "Suppression: Formal and informal social control procedures, including close supervision or monitoring of gang youth by agencies of the criminal justice system and also by community-based agencies, schools, and grassroots groups." *Countering Violent Extremism in the United States*, Bjelopera, Congressional Research Service. R42553. Feb. 19, 2014 (quoting National Gang Center, "About the OJJDP Comprehensive Gang Model").

28  "Referred to as the "Hawthorne effect," individuals may re-arrange their priorities to meet external expectations when they are aware of being observed (Adair 1984). … Monitoring has long been theorized as a potent form of social control (Foucault 1995:201-02). Its power lies in its latent potential to shame those who are revealed to "underperform." When it is regularized and ongoing, targets may internalize the regime and potentially self-regulate." *Politics by Number: Indicators as Social Pressure in International Relations*, J. Kelley and B. Simmons, American Journal of Political Science 59:1 (January 2015) 55-70

92.    Students' role in that regard is to demonstrate the surveillance by making remarks on Plaintiff's activities (at home or other locations), following him on the streets (in a few occasions under the direct supervision of Defendants), or responding / retaliating to his actions. Among other thing this shows that the information about Plaintiff's actions is accessible in real time to students – either directly or indirectly – which is another demonstration of the coordination between Defendants and Teaneck schools' students.

<u>(iii) Defendants' social pressure campaign against Plaintiff follows CVE 'mosaic of engagement' approach.</u>

93.    Defendants subject Plaintiff to many-years-long messaging campaigns, which are planned to persuade him that he can't sue Defendants (IV.9(a)(2)), that he has to stop (IV.9(a)(4)), move out of his apartment and the US (IV.8(b)(2)(iii)), and more. They are construed on well-known psychological mechanisms for building a mental schema/brand[29] by repetition of messages organized around a central concept[30], and using conditioning to create desired attitude and response – an approach consistent to CVE's "mosaic of engagement" approach[31] (see IV.7).

---

29  See *Visual identity: trappings or substance?* Baker and Balmer, European Journal of Marketing, Vol. 31 Iss 5/6 pp. 366 – 382 ("everything an organization says, makes and does will "communicate". Gray (1995) notes the importance of corporate communications by pointing out that corporate communications is the aggregate of sources, messages and media by which the corporation conveys its uniqueness, or brand.."), *Brand Concepts and Advertising*, Dean M. Krugman and Jameson L. Hayes, in Advertising Theory, Editors Rodgers and Thorson, Routledge 2012 ("Basically, a brand is a promise (Kotler, 2005; Landor Associates, 2010) and much of that promise is conveyed via advertising [] used to disseminate the message."). See also *Assessing the Long-Term Impact of a Consistent Advertising Campaign on Consumer Memory*, Braun-LaTour, and LaTour, University of Nevada Las Vegas (2014 - PDF date) ("as the general purpose of the advertisements is to add to consumer's knowledge about the brand, those episodic events [contact with the brand] become linked in storage with other information related to the brand. The resulting network is referred to as a brand schema or mental model (Thorndyke 1984). These schemas influence how we process incoming information; for instance, they guide our recognition process by providing expectations of what should occur.")

30  *Visual Identity: Systems and Semiotic*s, Steven Skaggs, The American Journal of Semiotics 34.3–4 (2018), 313–330. ("Establishing a brand requires establishing a familiar, trusted pattern of interaction between a host institution and a public.. [] consistent repetition [] ensures the visual experience of the brand becomes a familiar one."); *Knowledge Does Not Protect Against Illusory Truth,* Lisa K. Fazio, Nadia M. Brashier, B. Keith Payne, Elizabeth J. Marsh, Journal of Experimental Psychology: General, Manuscript version © 2015, American Psychological Association. ("Research on the illusory truth effect demonstrates that repeated statements are easier to process, and subsequently perceived to be more truthful."); *Assessing the Long-Term Impact of a Consistent Advertising Campaign on Consumer Memory*, Braun-LaTour, and LaTour, University of Nevada Las Vegas (2014 - PDF date) ("Advertising repetition is thought to build on the schematic structure, making the brand schema and its associated linkages stronger (Edell 1993).")

31  In advertising context that means that "'every corporate action, every corporate decision, every corporate communication will be seen as a clue – as one of those all important scraps and straws from which people build brands' (Bullmore, 2001: 5)." *Brand Tone of Voice: a linguistic analysis of brand positions*, Judy Delin, Journal of Applied Linguistics. jAL (print) issn 1479–7887, doi : 10.1558/japl.2005.2.1. "[I]ndividuals assemble their

94.    Defendants and parties in concert ('Defendants') use a CVE messaging approach which utilizes "direct person-to-person efforts" and is mostly "one-way (or "broadcast only")".[32] Students have been delivering threats, provocations and other messages to Plaintiff in that way, and at one occasion a student explicitly stated that she is "not broadcasting. I am genuine." ECF No.8-1 at 370). Because all messages to Plaintiff are intended as one-way communication all interactions with Plaintiff are generally evaded (as for example on 12/20/2016, 2/27/2017, 2/15/2018, 11/14/2018, 8/19/2021, 11/8/2021. See Defendants' directions in general "Do not interact." 3/22/2025). If evasion was not possible communicated message was denied (for example on 3/1/2017, or 8/5/2025) or Plaintiff's questions ignored (see March 2022 or 8/5/2025). Those actions show among other things the malice expressed in the planned systematic harassment, psychological abuse and provocations of Plaintiff.

95.    Defendants have been explicit that they give messages to Plaintiff, and their actions are at least in part intended as a 'message' to him. For example:

96.    10/18/2016 Tuesday, 10:52AM Defendants commented "He didn't get the message."

97.    11/13/2017 Monday, 6:00AM Defendants awakened Plaintiff. He noticed they turned off his PC Eee / Blue Iris, and Defendants in B2 commented "He got it." 9:00AM strong knocks near Plaintiff's windows, trucks, noise – road workers. About 12:15PM Defendants / workers said under his windows "Get the message?"

98.    11/8/2017 when Plaintiff was in the FBI New York Field Office Defendants talked about him "They study and than prepare.. They are just in.. communication." ECF No.8-1 at 45-46.

99.    6/24/2019, 2PM persons in Tower Management t-shirts replaced kitchen shelves from ap.G2 (noise under Plaintiff's apartment). When Plaintiff looked they commented under his windows "He didn't get the message." ECF No.8-2 at 2055.

100.    9/11/2020, 6:00PM Defendants in ap.B2 knocked on Plaintiff's ceiling and walked heavily. A bit later commented "Get the message." ECF No.8-1 at 658.

101.    7/13/2021 Tuesday, About 2:30PM while Plaintiff was watching a TV show Defendants' woman under his windows: "How to give messages?"

102.    9/15/2021 Wednesday, after awakening Plaintiff Defendants made repeating slams, talked near him, attacked him with short strong beams for an hour and a half. Then commented at 10:12AM in building corridor "I don't know why he didn't get the message." Followed strong knocks on Plaintiff's ceiling from ap.B2.

attitude towards a brand from various contact points with the brand". *8. Everybody's darling? The target groups of a brand*, Meyer, Brudler and Blümelhuber in *Handbook on Brand and Experience Management*, Edited by Bernd H. Schmitt and David L. Rogers, 2008 Edward Elgar Publishing Limited

32  *Practical Terrorism Prevention: Reexamining US National Approaches to Addressing the Threat of Ideologically Motivated Violence*, Homeland Security Operational Analysis Center, RAND 2019

103.    11/14/2021 Sunday, when at 5:33PM Plaintiff opened the file of a recording from 10:30AM same day Defendants came under Plaintiff's windows on Cedar lane and commented that he "Got the message." ECF No.8-1 at 271.

104.    4/1/2022 Friday, 3:15PM a school girl yelled close to Plaintiff's windows, and commented "I am not broadcasting. I am genuine." "Yea." At 3:29PM students returned under Plaintiff's windows, and the same girl yelled again. Twenty minutes later, about 3:50PM, the same girl came again and commented that she "know how to do it." ECF No.8-1 at 370.

105.    6/21/2023 Wednesday, 6:30PM Plaintiff was working on advertising materials when Dula commented "You receive this. You don't move forward. We are sending messages." ECF No.8-2 at 8310.

106.    7/19/2023 Wednesday, about 8:15PM Plaintiff worked on timeline of events. While Plaintiff was in the restroom young man came under his windows and commented "Yea. It's good that he got the message though."

107.    5/20/2024 Plaintiff attended Teaneck Leadership – the presentation of Chief of Teaneck police, who among other things said Teaneck police is using minors for sting operations – for example buying vipers. Plaintiff made a photo of the Defendants man who earlier provoked him. The man commented he is "getting the message through".

108.    6/10/2024, about 1:05PM Plaintiff passed 2 men on a bench in Teaneck Creek Park who commented him "He gets the message." Plaintiff sat nearby they continued "working.. hiding.."

109.    3/12/2025, 12:43PM pushes continued, Plaintiff detected at that spot 1031 V/m max. School boy under Plaintiff's windows "I don't know the message. I don't know."

110.    5/12/2025, Plaintiff worked on complaint to UN till 9:09PM. At 7:42PM schoolgirls came under his windows "We are the message." "How does it spell?"

111.    Students are regular participants in Defendants' messaging campaigns to Plaintiff. See more details bellow, as for example at IV.8.

*(b) Defendants subject Plaintiff to regular provocations / sting operation(s) in a few of which students act as his enemies and/or potential victims.*

112.    In order to 'develop evidence/intelligence' incriminating Plaintiff Defendants have been provoking him and using 'sting' operations to encourage and create the conditions for him to commit offense[33] (they manufacture the conditions for radicalization since 2012). In that regard Defendants deliberately create conflicts (overtly 'fighting' Plaintiff, or claiming that Plaintiff fights them, which is FBI disruption – see 114), fabricate 'enemies' to Plaintiff (see 2769), challenge him with fighting words (see IV.11), and more. Defendants' intent to provoke Plaintiff

---

33  The "facilitative [operations] encourage the commission of an offense, either through strengthening suspects or by weakening potential victims [and the] role that undercover agents play ... depends on whether they are posing as accomplices or as easy victims... as decoys for assaults [or other offense]." *Breaking the Law to Enforce It: Undercover Police Participation in Crime*, Elizabeth E. Joh, Stanford Law Review (2009), Vol. 62, Issue 1 p.155

to respond is explicit in many of their statements (as for example 'he didn't hear', 'he didn't respond', and more. On 9/12/2020 around 4:45PM Plaintiff turned his TV on after a group talking under his windows passed a few times. "Nothing happened." A guy "That's the hard part. You expect him to react.").

113.    It is well known that school students are used as decoys in sting operations "when 'police create the situation[,] the opportunity [for the subject] to commit a crime and in that kind of operations 'juveniles are often used as surrogates or "minor decoys"... because of their special status as juveniles.'[34] Teaneck police works in close cooperation with Teaneck schools, mentors high school students, hosts Police Academy in the summer.[35] In his presentation at Teaneck Leadership on 5/20/2024 Chief of Police McGurr stated that Teaneck police indeed uses students as decoys in its sting operations.

**(1) Defendants' deliberate efforts to create conflicts between Plaintiff and certain parties.**

114.    Defendants deliberately create conflicts between certain parties and Plaintiff which, among other things, further supports that the FBI has leading role in the activities against Plaintiff because creation of conflict(s), hostility and discontent has been known for a long time as one of the purposes of FBI operations and are used to disrupt the targets.[36]

115.    Defendants for many years try to manufacture conflicts for Plaintiff with police, the government in general, students, and/or certain certain persons who they explicitly referred to as 'enemies' or 'threats' to Plaintiff (7/16/2024 "We developed threat." after Plaintiff filed police report against

34  Graeme R. Newman, Kelly Socia (2007), *Sting Operations*, Office of Community Oriented Policing Services, US Department of Justice
35  See ECF No.8-1 at 840, Township Manager's 2020 Annual Report
36  ""[O]ne of the purposes of the counterintelligence Program is to foster factionalism and discontent..."" (COINTELPRO) Black Extremist 100-448006, Fed. Bureau of Investigation, ("FBI 100-448006"), page 53-57: Letter 3/18/1968. "In other words, it is hoped that the dissemination of this [information] will result in internal strife, distrust and disorder within the NOI itself." Id., p.57, Memorandum 2/21/1968. "In July 1968, the field offices were further prodded by FBI headquarters to: (2) instigate "personal conflicts or animosities" between New Left leaders;.. (9) exploit the "hostility" between New Left and Old Left groups;" *Church Report* 1976, p.89. "The Bureau also encouraged "gang warfare" between violent groups." Id., p.217. By definition 'disrupt' means to cause problem and interrupt activity or process, or to drastically alter or even destroy the structure (*New Oxford American Dictionary*, 3d Ed. 2010).

group of students. See more at 166). Or they stated that Plaintiff is a threat to them. Defendants do not talk overtly about that but there are a few examples of such statements.

116.    Defendants' apparently manufactured 'enemies' (they have no meaningful contact and no reason to be hostile toward Plaintiff other than as taking part in Defendants' activities) include but are not limited to (1) Ralph Raphael Pimienta (see ECF No.8-1 at 638 *et seq.* and more); (2) Teaneck Public Schools / students (although there were certain periods in which individual students were regularly engages, in general they act as a group with collective identity ('we'). See also ECF No.8-1 at 839 *et seq.*); (3) Defendants' agents in apartments adjacent to Plaintiff's – although they share walls with him, which could be interpreted as a continuous contact with Plaintiff, they regularly and deliberately make noise to harass, attack him or allowed their premises to be used to attack Plaintiff with DE, provoke him, and more. That includes Marlene Dula and other in ap.B2, Defendants in ap.G2, in ap.A3, and ap.A1; (4) the police and the US government in general (see bellow explicit statements of Defendants intent police to be a threat to Plaintiff, and more); (5) large and anonymous group of parties in the activities against Plaintiff that harass, threaten, and otherwise attack Plaintiff regardless of the location – their acts are result of Defendants' dissemination of false and defamatory information about Plaintiff as a threat, a Bulgarian criminal/terrorist/spy/fagot/crazy hitting police, and holding Defendants hostage.

**(2) Teaneck students play the role of enemies to Plaintiff – they threaten, assaulted, and mocked him.**

117.    Defendants aim to make students as a group (they usually harass Plaintiff in groups, and talk often from collective identity position - "we") an 'enemy' and threat to Plaintiff. Defendants explicitly stated "We developed threat." (7/16/2024) after Plaintiff filed police report against group of students who threatened to throw a rock at him and falsely accused him of showing his privates. In the context of events that has two meanings: the threat of students attacking Plaintiff,

and/or police believing students false accusations. In both cases the purpose is Plaintiff to be scared, to fear.

118.    In relation to that students participate in Defendants degrading treatment of Plaintiff. To humiliate and degrade Plaintiff Defendants and parties in concert ('Defendants') referred to him among other things as a "bitch". For example students said that on 4/2/2017, 8/19/2022, 4/20/2023, 7/26/2023, 4/5/2024, and 5/28/2024. Defendants involved students in the so called "shut up game" (5/14/2017). For example students told directly or indirectly Plaintiff to 'shut up' on 11/3/2017, 8/17/2021, 8/17/2023, and 4/26/2024. The events on 4/26/2024 are noteworthy: then one of the students threw a rock toward Plaintiff, and told Plaintiff to 'Shut up' (see 154). In a few occasions students deliberately threatened to call police on Plaintiff. And more.

**(3) Students also serve as decoys provoking Plaintiff's response.**

119.    Students are regular participants in Defendants messaging campaigns as for example the social pressure to push Plaintiff out of his apartment and the US. IV.8.

*(c) Teaneck schools and their students act against Plaintiff in coordination and agreement with Defendants.*

120.    Students act in coordination, agreement, and under the supervision of Defendants; and push points from their defamatory narrative about Plaintiff.

121.    10/20/2021 Wednesday, 10:32PM after loud talking, two Defendants' persons at the corner under Plaintiff's windows "Bulgarian" "School obey every day"

122.    8/7/2023 Monday, schoolgirls on school field training, when finished they moved (some of them) closer to Plaintiff. The woman-teacher/trainer loud "Remember we can not fight." 2-3 of the girls 'played' behind Plaintiff. Similar on 8/13/2025, 8/20/2025, 8/22/2025 (see bellow). And more.

123.    9/30/2023 Saturday, 10:27AM detected 984 V/m at his back, A tinnitus ongoing. While Plaintiff was in toilet a kid shouted at some distance "You have to stop." 6:00PM the man in A6 came commenting "Kalin can't stop." and "We can't push." After that Defendants' woman talked in building's corridor about "recruiting high school". In A6 man shouted "You call me to complaint about this mess." 6:04PM the same 'couple' talked in corridor "We can't talk it. My mistake."

124.    The coordination and agreement with Defendants is clear from the timing of students'

participation increased. For example students became very involved in Defendants' activities

against Plaintiff in 2017, then again after Plaintiff filed his Objections to Report and

Recommendation (ECF No.8) on 8/28/2023 (see also 8/18/2023, "Gave Kalin the assault."), and

during 2024 when Plaintiff kept working on his case. Especially notable in that regard are the

evens in 2024 presented bellow in IV.4.(c)(vi).

**(1) Defendants give instructions to students in regards to Plaintiff.**

125.    Defendants instructed students what role to play, what to threaten ("threat Kalin that we are going

to arrest (him)."), and more. All of that demonstrating that students act under the direction of

Defendants. For example:

126.    5/10/2017, Defendants gave directions to students "Start the impressive [game]." "Go on."
Two high school girls and a boy who were already on Red Road started to follow Plaintiff on
the street and harassed him. ECF No.8-1 at 852.

127.    2/8/2024, Defendants next to windows seemingly in front of the entrance commented "They
will play []." "He knows we can not stop." Schoolgirl came under Plaintiff's windows, sang,
and kicked rocks.

128.    5/2/2024, Defendants near Plaintiff's windows (including two schoolgirls) talked about him,
his letter to Judge Rearden, and gave directions to students, the roles to play to stop him."He
play role []." "Don't let police stop." "Do letter give strategy?" "Nooo…" "threat Kalin that
we are going to arrest (him)." "We have Kalin (can't sleep)." "Then you have this. []."…
"Good by them. Set all." "The rest play.".. "You have to stop (him)." "You know (the role)."
"Totally. I have this []." "Trying to stop. Arrest []." "Tell police [] Kalin to arrest him."

129.    9/25/2024, see bellow.

**(2) Coordination of messaging between students and Defendants.**

130.    Defendants' verbal conduct shows the coordination between them and parties in concert – all use

the same narrative about Plaintiff at different locations by different parties. That is demonstrative

dissemination of the false narrative about him, and Plaintiff's identity information.

<u>(i) In order to create conflict with police Defendants (students included) repeatedly threatened to call police on Plaintiff.</u>

131.    One of Defendants' goals in terms of creating conflict was to convince Plaintiff that police is a threat to him – see explicit statement from 1/20/2023 ("Do not bite police [is] still a threat." a uniform police officer after visiting Plaintiff. ECF No.8-1 at 81 *et seq.*). Multiple times Defendants and parties in concert explicitly said in Plaintiff's presence that they would call, and in a few cases called police on him, however with exception of 1/20/2023 in those occasions police did not approach him. In a few cases Defendants and/or parties in concert followed the same pattern – students (2/27/2017, 5/10/2017) or families(?) (5/10/2017) followed Plaintiff on the streets talking about him, and when he stopped they threatened to 'call police'.

132.    In 2017 students activities against Plaintiff increased. They followed him on the streets of Teaneck (including under overt direction by Defendants) and threatened to contact  police in regards to Plaintiff.

133.    2/27/2017 at about 6PM a group of THS students followed Plaintiff on Cedar lane, Teaneck, he stopped and waited for them to pass. Students: "Should we call the police?" "He doesn't care." Plaintiff: "If you have something to say say it directly." They run away talking "...police.." "You're ruining [it] up." "Got you with (police)." See ECF No.8-1 at 850.

134.    5/10/2017, Defendants instructed students to follow Plaintiff on Red Road, Teaneck: "Start the impressive [game]." "Go on." Two high school girls and a boy who were already on Red Road started to follow Plaintiff. Plaintiff stopped for a couple of minutes, students stopped too and spoke "Kalin stop." "Call the police.." "Move three seconds. Hear me now?" "Yea." "They'll tell you what to (persuade)." ECF No.8-1 at 852.

135.    12/3/2017, about 9:00PM Defendants commented "Have to push." "Call police." 9:55PM Teaneck police car parked under Plaintiff's windows.

136.    6/23/2020, Plaintiff worked on transcripts when Defendants in building corridor "Call police. Stop." ECF No.8-1 at 58.

137.    7/10/2021, before 6PM Plaintiff was walking toward Stop and Shop. At the corner of Queen Anne and Cedar lane 2 families there were talking. When Plaintiff crossed the Queen Anne one of the women followed him and commented he is "malicious. Should we call somebody?" and then returned to others. ECF No.8-1 at 115.

138.    11/10/2022, Plaintiff got in the FBI New York Field Office building at 26 Federal Plaza, New York, NY 10278-0004, FBI/JTTF officers "*Още там* ['while he is there' in Bulgarian] arrest."... "Have police to push."… "Arrest to meet him []." "Call police of (threat)."… "Do I hatch Kalin?" ECF No.8-2 at 5910 *et seq.*.

139.    8/29/2024, 2:09AM when Plaintiff got home he could not unlock his door. He went to the laundry room on G level and was there till about 6:30AM. In that period Defendants Jason in ap. G2 talked with persons on loudspeaker all night – significant portion of that was about

Plaintiff. For example at 2:53AM "You report but []. Kalin won't stop. Rather dead then [].
Shoot the fucker." Later "They know []. Call the police."

**(3) Students participate in the degrading, distressing Plaintiff. For example on:**

140.    4/30/2024, 1:41PM while Plaintiff was working on the letter to Judge Rearden (ECF No.14)
Defendants' woman talked under the windows "We lost. Don't have to lie…" 3:37PM while
Plaintiff was still working on the letter listing relevant events a schoolboy came under
Plaintiff's windows "Somebody lied. Set all…" 3:45PM the same boy returned under the
windows "He said that. He said that."

**(4) Demonstrative surveillance and coordination**

141.    Teaneck High School students overtly followed and provoked Plaintiff on the streets, as for

example on 2/27/2017 (ECF No.8-1 at 850), 3/1/2017 (Id. at 904), 4/2/2017 (Id., 905), 5/10/2017

(Id., 852), or provoked, shouted, screamed, threw rocks, and more under his windows as on

1/27/2017 ("Come and get me." Id., 902), or on 3/31/2017 (a group of students shouted and

screamed for about 10 minutes only under Plaintiff's windows). In a few of those occasions the

coordination with and/or the directions from Defendants were explicit as for example on

2/27/2017 (notable is that then, after Plaintiff made a note about the students, Defendants

threatened him for keeping record on relevant events "You'll get real problems."), or on

5/10/2017. On 2/28/2017 Defendants' officer supervised the students under Plaintiff's windows,

talked with Defendants' person in the building, while another on speaker was explicit about their

intention to "Destroy one Bulgarian." (ECF No.8-1 at 851). On 6/5/2017 students demonstrated

that they yell under Plaintiff's windows under Defendants' direction – they came under the

windows "We have to say something loud." and shouted "Hey." About 10 minutes later they

returned and shouted "Hey" again. The intention students to interfere and provoke Plaintiff was

overt: "Give up.".. "Fight Kalin." (students on 3/20/2017 while Plaintiff worked on a video

exhibit of Defendants' yelling).

142.    3/6/2024, 10:24AM Plaintiff challenged in the apartment "You want to destroy me physically
and psychically, provoke illegal reaction, to radicalize me. Who would believe you want to

stop? You are complete failure to manage the situation." When he got in toilet Defendants man in B2 responded "Don't stop." … 11:53AM Defendants man came and stayed for a while at the corner under Plaintiff's windows talking seemingly on phone. "Can't destroy.. Fucked up." A group of students passed under windows talking occasionally loud. On 3/7/2024 at 11:55AM school boy talked under the windows on Cedar lane "Destroy you. I []."

143.    4/15/2024, after Plaintiff sent two emails to experts in regards to his legal case against Defendants previous day, at 6:58AM Defendants' Gerrardo Rossel, supposedly from ap. A1, talked in building corridor "We want to stop." At 11:40AM three schoolboys came under Plaintiff's windows "Have to stop that. How to stop… I stopped TU. They moved away." Later other(?) students mentioned Plaintiff's name "Kalin" (11:50AM), and commanded him "Stop. Consider it done." (12:18PM).

144.    5/16/2024 About 11:40AM while Plaintiff was working on court statistics students under Plaintiff's windows commented he is "Going after the Judge." 4:50PM when Plaintiff was writing about court assigning of a Judge to Plaintiff's case against Gyro in 2018 school girl on Cedar lane under the windows "May be they knew we are fighting him." 4:56PM Defendants man in building corridor "May be should stop digging. Stop." NOTE phrase similarity.

145.    7/2/2024 Plaintiff challenged in his apartment "Settle the case and move on." He read and male notes on FBI book, when at 12:10AM Defendants woman under his windows commented "She is trying to make money." 12:36AM from a car near Plaintiffs windows on Cedar lane "Everybody has a shot." "Guy needs to settle." The car left. 12:40AM man with a dog under the windows "A lot of people will get angry, so line up." 1:56AM Defendants man laughed loud under Plaintiff's windows on Cedar lane. About 7AM-8AM Defendants man on recording in ap. B2 "Can't stop. He didn't believe." 2PM Defendants men at Yola food truck next to Plaintiff's windows "We really have no budget." "He have to stop." Yola man hid behind bushes. Plaintiff stared Tascam DR07 they commented "Right now recording.." (2:02PM) "He will never respond." Man with hoody. 2:07PM "Kalin have to [] people." 2:13PM "We are responsible. He is fucking crazy."

**(5) Students participate in Defendants' coordinated efforts to awaken Plaintiff.**

146.    For example on 2/14/2024, about 11:50AM after Plaintiff was awakened students shouted under his windows but didn't move. Defendants in B2 commented "He didn't hear." About 12:16PM Ralph was loud in building's corridor "Hey how are you?"

147.    And more.

**(6) The escalation of the harassment and Plaintiff's two reports against students with Teaneck police in 2024.**

148.    After Plaintiff filed his Objections to Report and Recommendations (ECF No.8) on 8/28/2023 in

retaliation Teaneck Schools' students activities against Plaintiff significantly increased in parallel

to Teaneck police and other Defendants' conduct, and continued till about end of July 2024. In

that period Plaintiff filed two reports against groups of students with Teaneck police – on

4/26/2014 and 7/16/2024 – for similar conduct. At that time students played 'roles', and assaulted Plaintiff – threw a rock toward him (4/26/2024), threatened to 'punch' him (5/28/2024), 'slap' him (5/29/2024), to make Plaintiff 'feel the threat' (4/26/2024). Teaneck police officers also threw rock(s) under Plaintiff's windows (5/24/2024). Defendants implied that the "the entire [police] station" came to fight Plaintiff on 5/31/2024 after challenging him to fight ("Wanna fight?").

149. The organization and planning of the assaults on Plaintiff by students was demonstrated by their abrupt stop since 6/1/2024. On 6/6/2024, 1:15PM students came under Plaintiff's windows saying "We stopped. We stopped." "Can't believe." "Oh my god." Then the activities restarted on 6/11/2024. Students and Defendants in the building had the same message "We didn't stop." (6/11/2024 students), "Pressure can't stop." (6/12/2024, 9:20AM Defendants). On 6/12/2024 Defendants' Ralph and others reacted after Plaintiff made a video of the students "They fucked." A bit later students (on bicycles) "They lost." and rode back and forth under Plaintiff's windows.

150. Among other things Defendants used group(s) seemingly from different town to harass Plaintiff (on 6/13/2024 they didn't know where they are, but knew and fished Plaintiff: "Careful. Takes you hostage." "He is the guy." "Careful."... "We couldn't fish him."). After that students' participation again reduced significantly till 7/2/2024 when Teaneck police detective in call with Plaintiff told him that the students he filed report against on 4/26/2024 were not recognized, so nothing can be done. Same day, 7/2/2024, Defendants' assaults with the participation of students started again. Then Teaneck High School football coach and his assistants(?) talked about Plaintiff "Alone he can be harmed." About an hour later the coach and three men talked behind Plaintiff that "he has no protection. No protection." They stayed behind Plaintiff for a while, then went to the football field.

151. The coordinated efforts between the Defendants and students to assault, scare, and provoke Plaintiff to respond ("He never fights back." 5/30/2024; "Wanna fight?" 5/31/2024; "He needs to

fight." 6/3/2024; "Can't ask you to fight." "Dumb ass. Dumb ass." "Fight." 6/12/2024; "We

couldn't fish him."..."He didn't believe. They did body around because of you.".. "Pussy."

6/13/2024; "Fight. Shot that []." 7/2/2024), and eventually to arrest him are obvious ("Can't

arrest." 6/14/2024).

152. After students threatened to 'slap' Plaintiff (5/29/2024) Defendants in Votee park, Teaneck

threatened him to "pick a place he visits many times and do it to stop him." Then a schoolgirl

asked Plaintiff in the park "Are you not afraid?" Their knowledge in advance of the threats to

Plaintiff (which happened at another place not long before that), who he is is another

demonstration of planning and coordination between students and Defendants in their activities

toward Plaintiff. Defendants woman commented in the park "Kalin fights many people." -

demonstrative surveillance and dissemination of Plaintiff's information (5/29/2024)

153. Coordination and supervision over students by Defendants is shown also by Defendants' woman

patrolling nearby during the time students were next to Plaintiff (4/26/2024), Holy Name guard

watching in front of the building on both 4/26/2024 and 7/16/2024 when Plaintiff filed police

report.

154. 4/26/2024, 1:04PM a group of 5-6 students came under Plaintiff's windows talked for about
a minute while Plaintiff was in toilet "Have to break this one. Pretty bad." "They thought []."
1:12PM students returned under the windows talking about "the role they have." "Like a
shadow." They threw a rock under the windows. Plaintiff started video recording with his
Sony opening the window, and one of them threw a rock toward him. When Plaintiff asked
him "My friend what are you doing?" the student told him to "Shut up." After Defendants
woman talked to them they left saying "Have to stop this fight." The Holy Name neighbor
sat in front of the entrance at that time. Plaintiff called police and talked till about 2PM with
the officer. He filed a report Case # 24-031055. 2:05PM Defendants women talked near
Plaintiff's windows "We got to stop." 2:14PM the same woman passed Plaintiff's windows
walking on Cedar lane challenging "What's the point?" 3:35PM a group of students came
talking under Plaintiff's windows "He got police.".. "He is oold. Old." 3:56PM two school
girls under Plaintiff's windows commented "That guy feels the threat." A group of school
boys followed under the windows shouting and screaming. Plaintiff challenged inside his
apartment "That is all you got?" 3:57PM Defendants woman under Plaintiff's windows on
Cedar lane (not in camera view) challenged "This guy is the evident threat." Passed by –
wearing sun glasses. 4:59PM USPS carrier and the woman on speaker commented in
building's corridor "Kalin must []." 5:24PM Plaintiff sent an email to Mr. Gill in regard his

litigation against Defendants. 5:25PM Defendants talked in front of Plaintiff's door "Can't provoke." They seemed to entered ap. A1. Plaintiff stated for record the date and time and they laughed "Reversal."

155.   5/2/2024 (see above).

156.   5/24/2024, 8:16AM a group of uniform and plain clothes officers, Teaneck police stopped for a while at the corner of Cedar lane and Red Road – next to Plaintiff's windows talking "How to stop this?" "Have to stop." "… arrest…" Woman "People have to stop (him)." "Kalin…" Plain clothes officer crossed repeatedly Cedar lane – again doing traffic sting under Plaintiff's windows. 8:29AM police radio "Let Kalin… They energize him. May be []." 8:37AM officers "Why they don't get him?" "Investigate…" 8:40AM they kept talking about Plaintiff "Kalin.." Plaintiff's left knee was dislocated – DE attacks. 8:41AM officers threw rocks under Plaintiff's windows. The lieutenant moved out of camera view. 8:56AM Plaintiff noticed one of police car s parked under his toilet window. 9:11AM the police lieutenant returned under the windows commenting "He survey." "He didn't pursue.." 9:30AM the police car under Plaintiff's windows left, after another police car passed by. 9:38AM Plaintiff noticed one of the black SUVs parked on Cedar lane was actually US Marine Corps car.

157.   5/28/2024 Plaintiff went to work in Votee Park, Teaneck. When he got out of the building group of students passed him "Can't believe we can do nothing but pray for these people." He waited in front of the building looking at them. Students shouted under Plaintiff's windows and turned to him. Plaintiff started a video recording on his phone, schoolboys waved to him, while girls threatened "I'll punch this bitch."

158.   5/29/2024 About 11:30AM Plaintiff left his building when two school girls passed talking about him "Kalin…" One shouted. Behind them a large group of students walked toward Plaintiff talking about "slapping" and commented "Seems they have no balls to do it." In Votee Park Defendants woman, man and girl talked loud to "pick a place he visits many times and do it to stop him." They returned next to Plaintiff. Than for the third time got next to Plaintiff, but only the woman and a girl that time talking "to sue.." About 1:21PM girl challenged Plaintiff "Are you not afraid?" Woman commented "Kalin fights many people." A woman with a baby sat next to Plaintiff and spoke on the phone about him in Spanish – repeating "Kalin".

159.   5/30/2024, 7:56AM Plaintiff didn't sleep and was playing chess when Defendants woman in building corridor commented "Kalin got that right." After Defendants in ap. B2 hammered on Plaintiff's ceiling (8:26PM) Defendants came under Plaintiff's windows talking loud, then commented (8:34PM) "He never fights back." Defendants woman continued talking in Spanish about Plaintiff ("Kalin").

160.   5/31/2024, 12:50PM Defendants man under windows "Wanna fight?" Minutes later a student came under Plaintiff's windows and shouted "No." At 3:02PM Defendants posing as clients to Yolo food truck on Cedar lane talked about Plaintiff "Bulgarian..." That continued for more than an hour after 5:40PM when two Defendants men talked at Yolo about Plaintiff ("Kalin") and the "set up… fight…" Plaintiff made photos, and Defendants in ap. B2 hammered on his ceiling. They were loud "Closing on negar. Closing on []. Ha, ha.."... "Settle []. Can you hear?" "Play all night." Plaintiff did that a few nights – see above. At 6:18PM Defendants shouted "They set up." 6:22PM "May be Kalin wants to settle." "Really can't press." 6:36PM "Kalin..." At 6:39PM they continued loud "Stop." then commented not loud "Can't believe." "The entire station…" Defendants men left at about 6:50PM.

161.   6/3/2024About 1:34PM Defendants couple, the woman at Yola "He needs to fight."

162.   6/11/2024 about 1PM students came under Plaintiff's windows on Cedar lane "No chance he would survive." They returned 10 minutes later and stayed there for about 5 minutes

provoking Plaintiff "Recording? Hope he got high quality." When they were leaving "We didn't stop."

163.    6/12/2024, 9:20AM Defendants men in building corridor "Pressure can't stop." While Plaintiff was scanning women under his windows commented "We are watching." 9:46AM Defendants under Plaintiff's windows ".. pursuing that. And don't believe []." Ralph one of the persons talking. After Plaintiff made a video of three school boys on bicycles they commented "They fucked." 10:05AM the boys returned talking at distance on Cedar lane "They lost." Came at the corner, one went back and forth in front of Plaintiff's windows. Boys and Defendants talked partially in Spanish. About 12:50PM students came under Plaintiff's windows challenged "Can't ask you to fight." then "Dumb ass. Dumb ass." They made loud noise as of keys clanks, walked on the rocks under the windows – evading the camera. Again "Fight." 1:19PM school girl under Plaintiff's windows "He's right here. They just confirmed." Plaintiff made a note, while he was writing Defendants in ap. B2 hammered on his ceiling. 1:31PM Plaintiff detected 9-16 V/m on the floor behind desk varying. In front of the mirror floor was charged 55 V/m varying, 32 cm up 24-39 V/m varying. In front of the wardrobe floor was 53 V/m, 4 cm up 26-36 V/m varying. Wardrobe's door near floor was charged 58 V/m, and about 60 cm up – 53 V/m. 2:25PM when Plaintiff was working on EF above his floor Defendants men talked about Plaintiff under his windows "Kalin.. Can not stop him."About 2:30PM school boy came under the windows loud "What did you do?" This was repetition from earlier and seems by the same boy. 3:06PM Defendants women at distance from the windows "Kalin… We have to stop." Plaintiff went shopping at Target Hackensack. When Plaintiff was next to Target security his radio got on, man commented "This is the bad guy." Later when Plaintiff was paying, he noticed price was different and asked the staff. Man behind him commented/challenged "Save dollars."

164.    6/13/2024, 8:22PM Defendants came next to Plaintiff's windows in three cars. Talked loud pretending they don't know where they are, but provoking Plaintiff "Careful. Takes you hostage." "He is the guy." "Careful." 8:27PM they left commenting "We couldn't fish him." 8:35PM Defendants man in ap. A6 commented "He didn't believe. They did body around because of you." After Plaintiff started Olympus recording the man stopped being loud. 8:46PM Defendants woman on Cedar lane under Plaintiff's windows "Can't stop." When Plaintiff went to look through his window they turned on Rd Road and talked in mix Spanish-English "putta… on the street." 8:57PM near Plaintiff's windows girls/women commented "He didn't believe." 8:59PM Defendants man in ap. A6 "Kalin stopped that." About 9:08PM Defendants man on Red Road "Pussy." 10:24PM while Plaintiff was reading in preparation for an email regarding his case Defendants in B2 hammered on Plaintiff's ceiling. 10:30PM Plaintiff sent the email to Ruth Blackeley. About11:25PM while Plaintiff was downloading articles about psychological torture Defendants woman at distance commented "Kalin believe."

165.    7/2/2024, 12:13PM Plaintiff called Teaneck police, spoke with a detective about the report from 4/26/2024 against students. Detective claimed the students one of who threw rock at Plaintiff were not recognized. 12:54PM Defendants man at Yola food truck commented "He didn't believe it." Till 5:50PM Plaintiff worked at Votee Park. Four-five Defendants talked about him ("Kalin"). Two Defendants women passing Plaintiff in the park "Kalin… Can't harass." Plaintiff moved to a table under a ceiling next to building at center of the park. About 5 minutes later the whole football team came at the tables. Very loud. About 40 minutes later their coach came talked "Alone he can be harmed." They left leaving some stuff. On the table there were four Spanish speaking persons. They became very loud and played music very loud. After Plaintiff made a video of them they left. About an hour later

the football coach and three men talked behind Plaintiff that "he has no protection. No protection." They stayed behind Plaintiff for a while, then went to the football field. 11:04PM Defendants men on Cedar lane under Plaintiff's windows "Fight. Shot that []."

166.  7/16/2024 another group of high school boys shouted under Plaintiff's windows and at him, falsely accused him of exposing himself, one of them got a rock and threatened to throw it at Plaintiff while he was on a call with the police (case #24-051726). The Teaneck police lieutenant, who was one of the responding officers, ignored Plaintiff's statements that this is not an isolated incident and forcefully claimed that it is unrelated even to Plaintiff's previous police report from 4/26/2024. Same day Plaintiff sent an email to officer Strickland, Teaneck Mayor Dunleavy (through the clerk), and the township manager. Plaintiff received no response at all.

167.  9/25/2024, Plaintiff sent another email about the ongoing harassment and coordination between Defendants and students to Ms Hashmat (the Town Manager), the clerk (addressing the Mayor), and officer Strickland with audio recording attached. In it Defendants directed students to "Use that."… "You got this." … "Double [that] Kalin expressed []." ... "Use to threat [him]." Students responded "We got this." They were explicit their goal is "to get Kalin". That email also was ignored, Plaintiff received no response.

## 5. The regular participation of USPS carrier(s) in the activities against Plaintiff.

168.  The United States Postal Services is a federal government agency, a member of the national JTTF[37]. It has its own police and secret units (see the news in May 2025 about USPS police actions against immigrants), and monitors social media.

*(a) USPS carrier(s) serving Plaintiff's building intentionally disturb and provoke him.*

169.  Especially notable are the events between 1/11-1/27/2025 when different persons wore USPS uniform and rang regularly Plaintiff's doorbell (one of them a Teaneck police officer Plaintiff knew by face) in an apparent sting operation to provoke Plaintiff's adverse reaction.

170.  1/11/2025 USPS man rang only on Plaintiff's doorbell. Not the usual carrier.

171.  1/13/2025, 6:35PM Plaintiff's doorbell rang, but he did not open the door. Later USPS woman in corridor "Sorry. Sorry about that." Man in corridor not loud "They want Kalin to []." Plaintiff started Olympus recording. Dula got out of B2 and talked with the USPS "carrier".

172.  1/14/2025, 2:20PM Defendants' man in USPS uniform – third different person in three days – officer under cover per Plaintiff's belief and knowledge who rang only on Plaintiff's doorbell. Plaintiff waited to see what would happen. The man after a minute or more rang other doors. Plaintiff opened the door for him. Man claimed Cesar Naranjo did not gave keys for the entrance, and Plaintiff gave him the Cesar's phone number. Anna Saraglia from ap.B3

---

37 *National Joint Terrorism Task Force (NJTTF) Maritime Security Program (MSP) Information Sharing.* Presentation slides, 2012 Joint Conference of Harbor Safety Committees and Area Maritime Security Committees

came down, and after that talked with Dula on B level about Plaintiff "He knows we are police."

173.   1/27/2025, about 3:05PM, and later 3:12PM Defendants rang Plaintiff's doorbell, then Ralph talked in corridor about him "Kalin". After Plaintiff started Olympus Ralph, and women (USPS carrier included) talked loud. 3:22PM USPS carrier in the corridor of the building talked about "police". More students came under Plaintiff's windows and talked loud. One of them stated "[] to stop."

*(b) USPS carrier(s) are in contacts with Defendants in the building, act in coordination with Defendants, and regularly talk about Plaintiff.*

174.   USPS carrier(s) are in regular contact with Defendants' Pimienta ('Ralph'), Dula, and others in regard to Plaintiff, and talked about him in building corridor (Plaintiff's floor) at least since 2019 and ongoing.

175.   As for example USPS carrier was in contact with Ralph on 12/20/2019 (ECF No.8-1 at 648), 6/23/2020 (ECF No.8-1 at 58), 8/5/2020 (ECF No.8-1 at 59), 9/7/2021 (ECF No.8-1 at 675), 1/19/2022, 2/10/2022, 2/23/2022, 4/20/2022, 4/25/2022, 5/17/2022, 10/20/2022, 1/26/2023, 9/9/2023, 8/1/2024, 1/27/2025, 1/30/2025. Note that during all relevant time Plaintiff has had very limited contact with either of them.

176.   Similarly USPS carrier(s) are in contact with Defendants' Dula, talking about Plaintiff as for example on 1/7/2022, 2/10/2022, 2/11/2022, 4/20/2022, 5/17/2022, or 1/13/2025.

177.   The USPS carriers' conversations near Plaintiff are demonstration of the coordination between the parties acting against him (see for example the comment on Plaintiff's behavior and Dental Center of Hackensack on 2/22/2025 and 2/24/2025), of the dissemination of information from Plaintiff's surveillance, and are intended to harass, intimidate, and provoke him. Plaintiff is the person who was the most frequently mentioned (if any other was mentioned at all) in the USPS calls/conversations regardless of the fact that he rarely has been in contact with the carriers. That by itself is demonstration of the USPS participation in the activities against Plaintiff.

178.   7/19/2017 Wednesday, about 3:30PM USPS carrier woman talked in building's corridor that Plaintiff "spy", and when he got in the corridor with his phone she commented "He got us on tape." Swaby in security uniform was also there.

179.   "Cops… they'll hold on for a while." 12/20/2019 At the evening Ralph and USPS guy talked in building corridor. Postal guy

180.   On 6/23/2020 after 5:34PM multiple persons, including Ralph Pimienta and USPS woman - Ana, spoke about Plaintiff in his building's corridor. They mentioned a few times Plaintiff's name "Kalin", his ethnicity and national origin "Bulgarian"[38], and said in Bulgarian FBI –

---

38  9 times "Kalin", 4 times "Bulgarian"

"ФБР". In that period Plaintiff had filed a few and was preparing a few more FOIA requests to federal agencies -most of them denied information in response (using Glomar language), there were procedural problems or agencies just did not address the requests. That context reveals additional relevance of statements as "Their power to get justice [] to oppose. All the way out." and "We want Kalin to forget." They spoke about police as for example in the exchange: "Bulgarian (will) screw us." Ralph "They [] police. O'Reilly[39] met us." "They don't stop." Ralph "Believe that.".. "Have the police to push." Those persons were very explicit about the harassment and misleading of Plaintiff: "Do not arrest." "Harass.".. "Harass to get [].".. "Call police stop." "New York push."… "Deceive []. They choose []." Ana "That's the best Bulgarian talk." They spoke about direct energy ('hot ray') used against Plaintiff and his research about that: "Can't harass him." "Woo." "Done a research." Ralph "Ana how even []?" Ana "Hot ray?" Ralph "All that. Got us." They also referred to Plaintiff's study and practice of Buddhism as provocation: "Do it, a religious test."... Ana "Follow the Zen."

181. At the late evening of 8/5/2020 multiple persons, including Ralph Pimienta, and an USPS woman (Ana), had a short talk about Plaintiff in his building's corridor. They repeated Plaintiff's name "Kalin", spoke about "advertising"[40], and mentioned advertising agencies related to Plaintiff as for example in "Dentsu is forgetting"[41] and later "Publicis"[42]. They stated about Plaintiff "Police purse him", and repeated about 8 times "arrest him". Ralph stated "All day police car." and later: "We don't trust you… We got prisoner, [] CIA." They explicitly referred to radio frequency (RF) beams targeting Plaintiff and Plaintiff's use of RF detectors. Ralph: "Eight [of] those is going to do the antenna." And a man stated: "Kill the RF." They made explicit their intention to push Plaintiff out of his apartment: Ralph: ".. they're ad for a rent to be risen."… "Get out." "Can't fish him?".. Ana: "Kalin []." "Death threat." "(One) can't refuse.".. "Can't evict him."

182. 9/30/2020 Plaintiff started working on Due process materials and a USPS woman in the building's corridor: "Can't believe we can't fight him for that."

183. 11/21/2020 Plaintiff was working on Congressional Reports and Patriot Act provisions when at 4:50PM USPS woman talking in building's corridor:"Can't suppress."

184. 2/17/2021 Wednesday, 6:04PM USPS man "Screw all people.."

185. 2/26/2021 Friday, 4:01PM A ray from above with peak more then 10 mW/m2 detected. Same time talking in the building's corridor by USPS staff and other person 3:58PM knock from B2. Plaintiff: "Stop. Right thing to do is to turn yourself." "We hear that too."

186. 6/12/2021 Saturday, 7:15PM near Plaintiff's windows two men: "They don't want to throw it away. We have to push him.." Plaintiff saw a black guy in USPS uniform, the other entered the building as they stopped.

187. 6/30/2021 Wednesday, 7:16PM USPS woman continuously talking on phone about Plaintiff ".. people to act.. just a gay.."

188. 7/8/2021 Thursday, 3:41PM After quiet period sudden loud noises. USPS woman came and talked with A1: "Can't fight…" Then talking about the name on the post box of A1 – very unusual.

189. 7/14/2021 Wednesday, 3:52PM USPS woman in building corridor in a call with phone speaker on. "We can't harass him." The 'speaker-side' two times mentioned Plaintiff "Kalin"

---

39  Glenn M. O'Reilly is the Chief of Police in Teaneck at that time (2020 Manager's Annual Report).
40  Plaintiff is an advertising art director for about 20 years.
41  Dentsu was a party in Plaintiff's suit against Gyro and party in the settlement.
42  Plaintiff worked in Publicis Bulgaria before moving to New York.

190.    7/28/2021 Wednesday, Plaintiff was in building corridor when an USPS woman came in and had some small talk, but when Plaintiff asked for any mail for A2 the woman stopped responding.

191.    8/16/2021 Monday, 4:08PM USPS talked about the "suppression", followed by a slam of the USPS truck's door under Plaintiff's windows.

192.    9/7/2021 Tuesday, 4:48PM Ralph talking with USPS woman "everybody.." "He keeps us hostage."

193.    10/7/2021 Thursday, about 4PM USPS carrier in building's corridor "Bulgarian… Kalin… hiding… problem…" Under Plaintiff's windows 2 Teaneck police cars parked. 2 men under the windows.

194.    11/10/2021 Wednesday, Plaintiff was working on 8/29/2021 transcript when at 3:44PM in building corridor Loomer and USPS carrier talked "Don't talk."

195.    11/17/2021 Wednesday, 3:47PM USPS carrier in corridor "Have to push.." "Why can't?"

196.    1/7/2022 Friday, About 7:20PM Dula and USPS woman talk in corridor "He [] it was obvious."

197.    1/19/2022 Wednesday, 10:20AM after Plaintiff placed an order for free COVID tests with USPS loud talking in Spanish and English in the building's corridor – Ralph and others talking about free tests and ordering on website.

198.    2/10/2022 Thursday, 4:15PM Dula, Ralph and USPS woman carrier in building corridor.

199.    2/11/2022 Friday, 5PM Dula talking with USPS carrier.

200.    2/23/2022 Wednesday, 4PM Ralph, Cesar, USPS woman carrier, A3's Leah talking in corridor. Plaintiff's package from parents in Bulgaria was teared open.

201.    2/28/2022 Monday, 4:17PM USPS woman carrier (same one from the talk when package Plaintiff reported was delivered) "I didn't do it... police… I am sorry."

202.    4/15/2022 Friday, 4:11PM USPS carrier and Peter Loomer in building's corridor "He []." "They want [] lost."

203.    4/20/2022 Wednesday, 5:11PM Ralph, USPS carrier lady, Dula in corridor "Telling Kalin [] war."

204.    4/25/2022 Monday, 4:20PM yelling in the building's corridor a woman and child. Then Ralph and USPS carries woman also talked "Can't fight them." "Crazy."

205.    5/17/2022 Tuesday, about 4:55PM in building's corridor Dula, Ralph, USPS carrier woman talking loud about Plaintiff ("Kalin").

206.    10/4/2022 Tuesday, 4:25PM USPS carrier in the building talked about Plaintiff ("Bulgarian"), person on speaker "They lost." They kept talking on foreign language. Women laughed when Plaintiff was next to his door and commented him ("he"..).

207.    10/20/2022 Thursday, 5:02PM minutes after Plaintiff worked on examples with Ralph and USPS woman USPS carrier in corridor: "We thought that's all." Ralph entered A1.

208.    10/28/2022 Friday, 5:49PM USPS carrier talked in foreign language in building's corridor. The person on speaker said Plaintiff's name "Kalin" 2 times. USPS truck #2217008

209.    11/19/2022 Saturday, 5:40PM while Plaintiff was working on EMF and human body USPS carrier entered the building and stated "Got to feel []."

210.    12/12/2022 Monday, about 6:05PM USPS carrier woman talked in building's corridor about "FBI".

211.    12/24/2022 Saturday, about 5:10PM USPS carrier in corridor commented "They know how to do it. [] They lost."

212.    1/4/2023 Wednesday, 4:57PM USPS and another woman talked about Plaintiff "Bulgarian"

213.    Plaintiff is "still fighting" (1/24/2023 Tuesday, 4:10PM USPS carrier-woman stated in building's corridor. After Plaintiff started Olympus – she talked about a letter.

214. 1/26/2023 Thursday, About 5:12PM Ralph loud in front of Plaintiff's door, talking with USPS carrier in mixed Spanish/English.

215. 2/16/2023 Thursday, 4:20PM USPS carrier (the truck parked under Plaintiff's windows) talking in building's corridor about Plaintiff "Kalin"

216. 3/16/2023 Thursday, 4:35PM while Plaintiff was in the restroom USPS carrier talked under the windows "We do not need legal power to do that."

217. 4/17/2023 Monday, 3:39PM USPS in building's corridor talked about Plaintiff – 'Kalin'

218. 4/28/2023 Friday, about 6PM the intercom buzzer continuous – apparently broken. USPS carrier got in the corridor, Cesar Naranjo, super, also came, the carrier talked about Plaintiff (at about 6:15PM). Earlier while Plaintiff was in the corridor person pressed the button – the intercom buzz was on. "Kalin". Cesar responded "Set up."

219. 5/24/2023 Wednesday, When Plaintiff got back home USPS carrier entered talking about 'fighting'.

220. 5/31/2023 Wednesday, 4:59PM USPS carrier and another person talked in building's corridor "They want to push. They can't []." They stopped talking after Plaintiff started Olympus.

221. 6/9/2023 Friday, 5:37PM USPS talking with another woman on speaker "Kalin…" Plaintiff was working at that moment on material including that USPS carrier. Plaintiff started Olympus she responded "Kalin [] recording. But can you use it?" 5:40PM USPS carrier spoke on foreign language but again mentioned Plaintiff's name "Kalin".

222. 6/28/2023 Wednesday, 4:23PM USPS carrier said under Plaintiff's windows on Red Road "Can't fight."

223. 6/29/2023 Thursday, 4:28PM USPS carrier "Kalin have []."

224. 7/7/2023 Friday, 4:51PM USPS carrier woman continued in foreign language. 4:55PM woman she talked on loudspeaker commented when USPS carrier was outside under the windows "police". "Kalin [] karma []."

225. 7/12/2023 Wednesday, 6:02PM USPS carrier in corridor of the building talked then outside "Kalin []." "New York to send email."

226. 7/27/2023 Thursday, 12:10PM USPS carrier passed on the street talking to "destroy".

227. 8/25/2023 Friday, 6:24PM a person on speaker in corridor. Plaintiff saw USPS carrier sitting on the stairs and talking on phone."Kalin"

228. 9/9/2023 Saturday, 6:55PM Plaintiff was playing online Command and Conquer when USPS woman commented in building's corridor "Kalin became fanatic." Plaintiff started a bit before that recording with Olympus. Woman on speaker talked about "Kalin … police will tell." Then again 'Kalin' 'police', Ralph came and said to her something quietly USPS carrier stopped talking for a while then "May be arrest." Ralph knocked on A1's door, then shouted inside A1, and again came to talk with USPS woman at first for delivery, then quietly, then "Don't say to anyone." "You get your warrant?" "Yes." "Have a nice weekend."

229. 9/27/2023 Wednesday, 5:12PM after Plaintiff filed with ECF a letter-motion for extention of time to serve summons in Dimiitrov v. the USA a USPS carrier talked about Plaintiff in building's corridor ("Kalin") later stating "Kalin []. They estimated that."

230. 9/28/2023 Thursday, 5:42PM USPS carrier first talked about Plaintiff in building's corridor, then near the windows outside "Kalin"… "Got to stop."

231. 10/14/2023 Saturday, about 6:00PM while Plaintiff was taking a bath USPS person talked in corridor "Harass him." A3 started knocking light but right next to Plaintiff, when Plaintiff at one point knocked in response there was exchange of knocks.

232. 10/16/2023 Monday, 5;40PM in building's corridor USPS carrier talked about Plaintiff (repeated "Kalin") with a woman on speaker "It is Kalin."

233. 2/9/2024, 5PM USPS carrier woman and a woman on speaker talked about Plaintiff."Kalin"

234.  3/6/2024, 5:28PM USPS carrier woman and a woman on speaker in building's corridor "Can't press." Plaintiff started Olympus. Talking continued on irrelevant topics, but at some point they talked about Plaintiff again "Kalin."

235.  3/12/2024, 4:40PM earlier students under the windows talked "Have to stop." USPS carrier in corridor commented "He doesn't care."

236.  3/12/2024, 4:45PM USPS came under the windows talking "We really want to stop." Plaintiff made photos – two USPS carriers – one the regular Indian woman who pointed at Plaintiff when he got to his windows.. "He has to stop." 4:56PM Defendants woman on speaker under the windows "He got to stop."

237.  3/20/2024, about 5PM while Plaintiff was in toilet playing on his phone Defendants talked about him "Kalin". It was USPS carrier, speaking with person on speaker "This is New York. Not []." "It is criminal." Then talked in Spanish.

238.  3/21/2024, 4:48PM USPS carrier with woman on speaker again talked about Plaintiff. "Kalin… New York.."... "You think Kalin can hit it right?"

239.  3/23/2024, 6:15PM Defendants man from ap.B2 talked in building's corridor. USPS carrier also talked. "We can't harass."

240.  4/6/2024, 4:37PM USPS carrier talked about Plaintiff in corridor ("Kalin"). The under his windows "Police fight him."

241.  4/11/2024, 5:05PM the USPS carrier woman again talked with a woman on speaker about Plaintiff ("Kalin"). He started Olympus. "Don't know what to expect."

242.  4/19/2024, 5:03PM USPS carrier again talked about Plaintiff in building corridor ("Kalin").

243.  4/20/2024, 5:46PM the USPS carrier talked about Plaintiff ('Kalin') and the "police". The woman on speaker at 5:50PM "OK. Tell the police []."

244.  4/26/2024, 4:59PM USPS carrier and the woman on speaker commented in building's corridor "Kalin must []."

245.  5/4/2024, about 4:20PM USPS carrier came commented under Plaintiff's window "What Kalin does []."

246.  5/14/2024, 4:55PM while Plaintiff was working on timeline of events USPS carrier commented in building corridor "All our talk." She stopped talking after Plaintiff started Olympus.

247.  5/17/2024, 4:50PM USPS carrier under Plaintiff's windows with woman on speaker talking "They can not stop." "They are not dated."

248.  "Let Kalin []." (5/23/2024, 1:45PM USPS carrier man – not the usial carrier – played on speaker in the building corridor

249.  6/26/2024, 4:38PM USPS carrier in building corridor "Полиция ['police' in Bulgarian] fights Kalin." Later she talked about the "recording".

250.  7/17/20244:44PM USPS carrier commented under Plaintiff's windows "Fight. We can't fight." 4:46PM Defendants in ap. G2 hammered on Plaintiff's floor – about 5 knocks.

251.  8/1/2024, 4:21PM Ralph, another Defendants man, and USPS carrier talked in corridor about the "fight". Then Ralph asked about a "profile".

252.  8/7/2024, about 4:30PM Plaintiff was in toilet playing on his phone. USPS carrier under his window commented "Have to punish Kalin. Sue if he is such a high braw." She entered the building talking.

253.  8/9/2024, about 4:25PM USPS talked under Plaintiff's windows "We've got to get him out of the property."

254.  8/15/2024, 2:52PM USPS carrier entered the building corridor talking "We can not stop. Harass." After Plaintiff started Olympus "Can't stop." and left the building.

255.    10/9/2024, about 3:30PM Plaintiff went to USPS Teaneck on Palisade Avenue to send copy of his AG letter to the FBI Headquarters and to NSD DOJ. In the USPS office Defendants man asked the staff about Plaintiff. She responded "He has done nothing crazy so far." After Plaintiff sent the letter she did not say 'bye' or something else as usual.

256.    1/13/2025, 6:35PM Plaintiff's doorbell rang, but he did not open the door. Later USPS woman in corridor "Sorry. Sorry about that." Man in corridor not loud "They want Kalin to []." Plaintiff started Olymous recording. Dula got out of B2 and talked with the USPS "carrier".

257.    1/14/2025, 2:20PM Defendants' man in USPS uniform – third different person in three days – officer under cover per Plaintiff's belief and knowledge who rang only on Plaintiff's doorbell. Plaintiff waited to see what would happen. The man after a minute or more rang other doors. Plaintiff opened the door for him. Man claimed Cesar Naranjo did not gave keys for the entrance, and Plaintiff gave him the Cesar's phone number. Anna Saraglia from ap.B3 came down, and after that talked with Dula on B level about Plaintiff "He knows we are police."

258.    1/27/2025, about 3:05PM, and later 3:12PM Defendants rang Plaintiff's doorbell, then Ralph talked in corridor about him "Kalin". After Plaintiff started Olympus Ralph, and women (USPS carrier included) talked loud. 3:22PM USPS carrier in the corridor of the building talked about "police". More students came under Plaintiff's windows and talked loud. One of them stated "[] to stop."

259.    1/30/2025, 2:27PM Ralph and USPS carrier in corridor.

260.    2/22/2025 USPS carrier woman – after Plaintiff got his delivery talked with woman on phone speaker "He didn't say hi." Indeed Plaintiff nodded to USPS carrier. SEE a few days later that comment was referred in Dental Center of Hackensack.

261.    And more.

## 6. Other known parties in the activities against Plaintiff.

262.    Task forces are bodies with participation of multiple government agencies with different jurisdiction, and the subjects of their activities consequently face large variety of agencies acting against them. Accordingly there are multiple agencies acting in concert against Plaintiff which are not named here as their direct participation in the activities was limited, but they are included in the factual history.

263.    Defendants a few times talked about CIA as a participant in the activities against Plaintiff. CIA is a traditional member of JTTFs and as such part of the activities. However Plaintiff has no evidence for the CIA direct participation other than statements by the Defendants. To the extend Plaintiff has claims against CIA, because Defendants didn't investigate his reports and complaints they have prevented him till now to discover any.

264.    Known, recognized and/or mentioned by name in the complaint participants include (but not limited to):

265.    Peter Loomer (ap.B1) who identified himself as Teaneck police (officer?) in the period 2013-2014, before Plaintiff even knew his name. ECF No.8-1 at 717 *et seq.*. He moved out from the building on or about 10/23/2023 – two months after the initiation of *Dimitrov I.*

266.    Marlene Dula, named tenant in ap.B2 was identified by others as an officer, as CIA (ECF No.8-1 at 752), she was jointly identified by Swaby as FBI, and acted in coordination with FBI New York for example on 11/9-11/10/2022. Defendants in B2 were referred as 'evaluation team' in 2013, and she indirectly identified herself as NYPD and JTTF officer (ECF No.8-1 at 206, No.8-2 at 5930). Considering the multiple characteristics Plaintiff per personal knowledge and believe states that she is a JTTF officer. See ECF No.8-1 at 205 *et seq.*.

267.    John Doe, man in ap.B2 who is regularly present, talk inside the apartament and apparently participate in all activities against Plaintiff from ap.B2. Swaby was regular in ap.B2 at least in 2016 and is the most probable person to be John Doe in ap.B2

268.    Swaby (ap.B6) identified himself as FBI ("We are FBI." ECF No.8-1 at 810), Plaintiff saw him in uniforms of Public Safety Officer, and of a security guard at Frederick Dickinson University. See ECF No.8-1 at 809 *et seq.*.

269.    Raphael Pimienta (Ralph) was identified by others as police officer, per Plaintiff's knowledge and belief he is a NYPD officer acting under cover. ECF No.8-1 at 638 *et seq.*.

270.    John Doe 2, regularly in a Holy Name security guard uniform, living in Plaintiff's building for several years. He regularly monitored the students activities under Plaintiff's windows, including in both incidents in 2024 when Plaintiff filed reports with Teaneck police. He became active in 2024 when Ralph reduced his overt actions against Plaintiff.

271.    Cesar Naranjo, super of the building since 2020, identified himself to Plaintiff as local

government employee (a second job, see ECF No.8-1 at 745), ECF No.8-1 at 737 *et seq.*.

**7. Defendants identify and investigate Plaintiff as a threat at first motivated (at least in part) by overt discriminatory animus ("Bulgarian fagot", see ECF No.8-1 at 13, 18), and since 9/11/2012 also in retaliation to his petitions and legal actions.**

272.    Investigation[43] means "systematic examination", "systematic inquiry"[44] intended to gather and analyze evidence[45], which includes planning "to obtain the necessary evidence [] in order to reach a conclusion"[46], but in the context of prevention "the FBI defines the primary purpose of its counterterrorism investigations as "developing intelligence regarding the subject or the threat.""[47]

273.    With their actions Defendants aim to 'develop' Plaintiff to become the threat they falsely claim

him to be. See for example Defendants' statements in that regard on 9/7/2012 "He got to feel the

octopus. Shadow over time. He is no threat." "Push [Plaintiff] to stay threat." (Transcript of

1st_record.mp3 at 0:31-0:34, and 0:40); or on 7/16/2024 "We developed threat."

*(a) Defendants' threat assessment and management of persons who are potential threat. "[A]nyone who challenges the government's theories or tactics [is] a potential target of its counterterrorism efforts."[48]*

274.    "Threat assessment and management (TAM) [] primary objective [] is to detect and disrupt acts of violence before they occur."[49]

275.    "FBI policy requires that each threat or suspicious incident be reviewed, documented, and assessed. [C]ounterterrorism assessments are the initial investigative actions that the FBI takes to evaluate a potential terrorism subject. [There are] threat indicators that must be

---

43  Defendants' conduct may have been called at different periods a threat assessment, preliminary investigation, a program, or else – regardless of the name they use 'investigation' as used by Plaintiff refers to their entire conduct toward him.

44  Merriam-Webster Dictionary

45  See *Best Practices in Investigating and Prosecuting Corruption: Using Financial Flow Tracking Techniques and Financial Intelligence. A Handbook*, APEC Anticorruption and Transparency Working Group (ACTWG), September 2015 ("ACTWG 2015"), *The interpretation and exploitation of information in criminal investigations*, E. Barrett, School of Psychology, The University of Birmingham, July 2009; *Evidence in Context: Bayes' Theorem and Investigations*. J. Pete Blair and D. Kim Rossmo. Police Quarterly 2010; 13; 123 ("Several researchers of the investigative process have argued that one of the primary tasks for detectives is the interpretation of the available information (Kuykendall, 1982; Rossmo, 2004; Sanders, 1977)")

46  ACTWG 2015

47  OIG 2005

48  *Disrupt, Discredit, And Divide: How The New FBI Damages Democracy*, Mike German, The New Press 2019. ("Insidiously, the identification of "grievances" as an indicator of radicalization paints anyone who challenges the government's theories or tactics as a potential target of its counterterrorism efforts.")

49  Simons (FBI), Meloy, *Foundations of Threat Assessment and Management*, 2017, in Handbook of Behavioral Criminology

evaluated [and i]f a nexus to terrorism is identified during the assessment, the FBI may open a preliminary or full investigation."[50] "If [a person] had been the subject of a full counterterrorism investigation, FBI policy would have required that he be watch-listed as a known or suspected terrorist."[51] "As is true for all FBI programs, we investigate specific individuals when we have specific evidence that they are engaged in unlawful activity or pose a threat to national security."[52]

276.    Who "pose a threat to national security" is not clear. "Everyone is potentially dangerous, of course, so who the FBI chooses to focus its disruption methods on is often based on innate prejudices—racial, ethnic, religious, or ideological—that distinguish the "us" that need protecting from the "them" who might pose a threat."[53] In that regard **targeting innocent** is supported because "it is [the FBI's] obligation to err on the side of safety".[54] This is the FBI policy from COINTEL era – if there is doubt that a person is a threat then he is a threat[55]. "The danger in this loss of accuracy lies in the fact that threat perception and not threat truth dictates national security policy decisions."[56]

277.    FBI adopted 'guilty till proven innocent' theory for investigations without any factual base, as for example against Dr. Martin Luther King (but "it should not be forgotten that the Bureau carried out disruptive activities against hundreds of lesser-known American citizens.")[57], against the due process.[58] "In an interview with PBS's Frontline, Cummings [FBI counterterrorism official] said that the FBI's new intelligence-driven terrorism-

---

50    *Audit of the Federal Bureau of Investigation's Efforts to Identify Homegrown Violent Extremists through Counterterrorism Assessments*, DOJ, OIG, Audit Division 20-030, March 2020 ("OIG 2020")

51    *Terrorist Watch List Screening and Background Checks for Firearms,* Congressional Research Service Report, R42336, Updated May 1, 2013 (referring to DOJ, Office of the Inspector General, *Federal Bureau of Investigation's Terrorist Watchlist Nomination Practices*, Report 09-25, May 2009, p. 11).

52    *Securing the U.S. Research Enterprise from China's Talent Recruitment Plans*, John Brown, Assistant Director, Counterintelligence Division, Federal Bureau of Investigation, Statement before the Senate Homeland Security and Governmental Affairs Committee, Permanent Subcommittee on Investigations, Washington, D.C. November 19, 2019

53    *Disrupt, Discredit, And Divide: How The New FBI Damages Democracy*, Mike German, The New Press 2019.

54    John J. Miller, Assistant Director, FBI. *FBI Response to Rolling Stone Magazine Article on Joint Terrorism Task Forces (JTTFs)*, Washington, D.C., Feb. 25, 2008, FBI National Press Office (https://archives.fbi.gov/archives/news/pressrel/press-releases/fbi-respon… as accessed on 9/10/2024). See also the statements Mr. Berenson, former assistant to Attorney General Gonzales, in *Detention and Interrogation of Captured 'Enemies': Do Law and National Security Clash*, The Brookings Institution, Washington, D.C. 20036 December 12, 2005 ("when you are at war and you have a suspected adversary across from you, you're entitled to kill that person with no due process or advance warning whatsoever. Indeed, it's your obligation to do that... Obviously, there is going to be an error rate. When you're on the global battlefield trying to identify and capture terrorists, you're not going to be correct a hundred percent of the time. [] Surely, there are people there who don't deserve to be [at Guantanamo]. But our objective is not to protect suspected enemies in time of war. It's to protect our own people, and we have to understand that that is going to mean sometimes hurting innocents in the process."); *Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, S. Report 113–288, Dec. 9, 2014, Findings and Conclusions, #17 (""The Director [of CIA] strongly believes that mistakes should be expected in a business filled with uncertainty," and "the Director believes the scale tips decisively in favor of accepting mistakes that over connect the dots against those that under connect them." [Congressional notification, CIA Response to OIG Investigation Regarding the Rendition and Detention of German Citizen Khalid al-Masri, October 9, 2007.]")

55    Church Report 1976, p.47 ("The [1960 FBI] Manual added, "Where there is doubt an individual may be a current threat to the internal security of the nation, the question should be resolved in the interest of security and investigation conducted.").

56    *The Shaping of Threat Through Narration,* Carl Ciovacco Virginia Tech, Journal of Strategic Security, Vol. 13, No. 2 (2020): 48-63.

57    Church Report 1976 ("While there may not be any evidence that -------- is a Communist neither is there any substantial evidence that he is anti-Communist. [Memorandum from FBI Headquarters to New York Field Office 4/24/64, re CPUSA, Negro question.] Id., p.7).

prevention model represented a major change in the way FBI agents approached terrorism investigations: "The old paradigm was, we have no information in our records to show that they're engaged in terrorism. The new paradigm is, we have [no] information to show they're not engaged in terrorism. That is a significant paradigm shift. You basically investigate it and collect against it until you can make a deliberate and informed judgment that they are not involved in terrorism." [Frontline interview with Arthur Cummings, posted October 10, 2006, pbs.org/wgbh/pages/frontline/enemywithin/interviews/cummings.html.] Of course, proving a negative—that someone was not a terrorist—is all but impossible."[59]

**(1) Threat indicators used for an assessment are part of threat assessment / radicalization models which shifted the law enforcement focus on 'intent'[60], at a point before any criminal activity occurred[61].**

278.     There are multiple radicalization models such as the influential NYPD model 2007-9, the FBI model as of 2011[62], the "pathway to violence" (Calhoun & Weston, 2003; Fein et al., 1995; Meloy, Hart, et al., 2014), or TRAP-18, which combines different approaches, including the 'pathway to violence', and is in use by the JTTFs (ECF No.8-1 at n.3).

279.     In most of the radicalization models two stages/main factors for radicalization are always present in some form – grievance and identity crisis, so they are presented in more detail bellow.

Grievance also corresponds to the drivers for violent extremism as per the FBI[63].

---

58   "In both federal and state prosecutions, the presumption of innocence is an essential aspect of the constitutional requirement of due process.." *Initial reports of States parties due in 1993: United States of America*. 24/08/94. CCPR/C/81/Add.4. at 404.

59   *Disrupt, Discredit, And Divide: How The New FBI Damages Democracy*, Mike German, The New Press 2019.

60   "If the post-September 11th world has taught us anything, it is that the tools for conducting serious terrorist attacks are becoming easier to acquire. Therefore intention becomes an increasingly important factor in the formation of terrorist cells. This study is an attempt to look at how that intention forms, hardens and leads to an attack or attempted attack using real world case studies." Raymond W. Kelly, Police Commissioner of the City of New York, in *Radicalization in the West: The Homegrown Threat*, Silber and Arvin Bhatt, Senior Intelligence Analysts, NYPD Intelligence Division, 2007.

61   "Where once we would have defined the initial indicator of the threat at the point where a terrorist or group of terrorists would actually plan an attack, we have now shifted our focus to a much earlier point—a point where we believe the potential terrorist or group of terrorists begin and progress through a process of radicalization." *Radicalization in the West: The Homegrown Threat*, Silber and Arvin Bhatt, Senior Intelligence Analysts, NYPD Intelligence Division, 2007

62   "Not only has the NYPD Report been adopted by several of the state and local law enforcement agencies that are touted as the front lines in our defense against homegrown terrorism, it also appears to have greatly influenced the FBI's thinking on radicalization. ... Although the FBI concedes that not every individual will go through each step of the radicalization process, it tries, like the NYPD, to identify early indicators for those who demonstrate a potential for violence." *Rethinking Radicalization*. Faiza Patel 2011 Brennan Center for Justice, referring to multiple testimonials of officials before the Senate Committee, reports, including CRS Report, R41416, American Jihadist Terrorism: Combating a Complex Threat (2010)  See also Simons (FBI), Meloy, *Foundations of Threat Assessment and Management*, 2017, in Handbook of Behavioral Criminology.

63   "The FBI classifies domestic terrorism threats into four main categories: racially motivated violent extremism, anti-government/anti-authority extremism, animal rights/environmental extremism, and abortion extremism. The drivers of these domestic violent extremists include perceptions of government or law enforcement overreach,

<u>(i) Perceived grievance and injustice – the first phase or one of the factors for radicalization.</u>

280.    "Calhoun and Weston (2003) [] model suggests that attackers first develop a profound grievance, a sense of anger and resentment at an undeserved injustice that is perpetrated upon the subject by a person or institution. [But u]ndoubtedly many persons of concern experience a profound grievance and harbor ideas of violence without actually moving on to commit a violent act."[64] "[P]ersonal frustration at perceived social injustice and other grievances can prompt individuals to reassess their accepted worldview and be more open to alternative perspectives—some of which espouse violence."[65] "Radicalization in the West often starts with individuals who are frustrated with their lives or with the politics of their home governments".[66] Similarly in the context of existing conflict with the state in-group-radicalization includes "a sense of moral outrage at an egregious state aggression against one's political community."[67] "It is likely that the catalyst for any given individual becoming a terrorist will be a combination of different factors particular to that person" including a "sense of grievance and injustice," "a sense of personal alienation or community disadvantage," and the "exposure to radical ideas.""[68] "A report by the Change Institute, based on an analysis of terrorist movements, concluded that 'grievances, real or perceived, inform the employment of violence'. However, there is so much injustice in the world and there are, relatively speaking, so few terrorists, that grievances alone cannot explain radicalisation to terrorism. It needs a trigger event or 'cognitive opening' linking grievances to an enemy who is held responsible for them or who is deemed to stand in the way of removing the cause of the grievance."[69]

---

socio-political conditions, and reactions to legislative actions, and they remain constant." *Confronting the Rise of Domestic Terrorism in the Homeland*, Statement Michael C. McGarrity Assistant Director, Counterterrorism Division, FBI, May 8, 2019. See also FBI Oversight, Christopher Wray, Director of the FBI, Statement Before the House Judiciary Committee, Washington, D.C. Feb. 5, 2020 ("Trends may shift, but the underlying drivers for domestic violent extremism—such as perceptions of government or law enforcement overreach, socio-political conditions, racism, anti-Semitism, Islamophobia, and reactions to legislative actions—remain constant.")

64  Simons (FBI), Meloy, *Foundations of Threat Assessment and Management*, 2017, in Handbook of Behavioral Criminology

65  *Roots of Violent Islamist Extremism and Efforts to Counter It: Hearing Before the S. Comm. on Homeland Sec. and Gov'tal Affairs*, 110th Cong. 2 (2008) (statement for the record by Michael E. Leiter, Dir., NCTC) as quoted in *Rethinking Radicalization*, Faiza Patel 2011 Brennan Center for Justice

66  *Radicalization in the West: The Homegrown Threat*, Silber and Arvin Bhatt, Senior Intelligence Analysts, NYPD Intelligence Division, 2007

67  *Making sense of political violence: an interview with Marc Sageman*, Mitja Sardoc (2020) Small Wars & Insurgencies, 31:3, 670-679.

68  *Modeling Terrorist Radicalization The New Face of Discrimination: Muslim in America*, Aziz Huq. Duke Forum For Law & Social Change Vol. 2:39 2010 (quoting Prime Minister and Sec. of State for the Home Dep't, Countering Int'l Terrorism: The United Kingdom's Strategy, 2006-07, Cm. 6888) "A 2008 Prevent strategy paper picks out five "interlocking factors" with causal links to "violent extremism":... (5) perceived and actual grievances against nation and government." Id.

69  *Radicalisation, De-Radicalisation, Counter-Radicalisation: A Conceptual Discussion and Literature Review*, Dr. Alex P. Schmid. International Centre for Counter-Terrorism – The Hague (ICCT) Research Paper, March 2013

(ii) Identity[70] crisis and new self-identification – the second phase in NYPD and FBI models, related to the second phase in ICJ model: Social pressure.

281.    "Radicalisation seems to be related directly to a crisis in identity and, specifically, to a feeling of not being accepted or not belonging. This is itself the result of a range of factors, which may include the experience of discrimination and inequalities, racism, recent migration and more generally a lack of affinity with and disconnect from family, community and state."[71]

282.    "Self-Identification is the phase where individuals, influenced by both internal and external factors[] gradually gravitate away from their old identity and begin to associate themselves with like-minded individuals and adopt this ideology as their own. The catalyst for this "religious seeking" is a cognitive opening, or crisis, which shakes one's certitude in previously held beliefs and opens an individual to be receptive to new worldviews. There can be many types of triggers that can serve as the catalyst including: • Economic (losing a job, blocked mobility) • Social (alienation, discrimination, racism – real or perceived) • Political (international conflicts involving Muslims) • Personal (death in the close family)"[72]

(iii) Anti-Terrorism Advisory Council at the U.S. Attorneys' Offices, DOJ, compiled a set of pre-incident indicators.

283.    "1. Surveillance. The first sign is someone trying to monitor or record activities. [] Any of these surveillance type acts MAY be an indicator that something is not right and should be reported immediately. Nothing is too insignificant.

284.    2. Elicitation/ Seeking Information. The second sign is the attempt to gain information through inquiries. This includes anyone attempting to gain information about a place, person or operation. []

285.    3. Tests of Security. Tests of security or probing are techniques terrorists would use to attempt to gather data. These are usually conducted by driving past or even penetrating the target, moving into sensitive areas, and observing security or law enforcement response. []

286.    4. Acquiring Supplies. This may be a case where someone is purchasing or stealing explosives, weapons or ammunition. []

287.    5. Suspicious People Who Do Not Belong Another pre-incident indicator is observing suspicious people who just don't belong. [] It could be someone in a workplace, building, neighborhood or business establishment who does not fit in because of their demeanor or unusual questions he/she is asking, or statement they make. This does not mean we should profile individuals, but it does mean we should profile behaviors.

---

70  See *Analyzing the Growing Islamic Radicalization in France*, Virginia Ruth Brommer, 2016 ("Ego identity refers to the "awareness of the fact of that there is a self-sameness and continuity in the ego's synthesizing methods and that these methods are effective in safeguarding the sameness and continuity of one's meaning for others." [] Collective identity, which refers to the sense of belonging to a group, allows people to find meaning in their lives, a sense of coherent structure, and a stable social role to occupy. The final theory, social identity theory, occurs when individuals strive to maintain or enhance their self-esteem, often through social groups or categories."); Meloy, Mohandie, Knoll, Hoffman, *The Concept of Identification in Threat Assessment,* 2015 ("identification is the process by which normal identity is formed: "experiences of oneself as unique, with clear boundaries between self and others; stability of self-esteem and accuracy of selfappraisal; capacity for, and ability to regulate, a range of emotional experience" (APA, 2013, p. 823); it is a core element in the alternative DSM-5 model for personality disorders (APA, 2013).")

71  House of Commons, Communities and Local Government Committee, *Preventing Violent Extremism*, Sixth Report of Session 2009–10

72  *Radicalization in the West: The Homegrown Threat*, Silber and Arvin Bhatt, Senior Intelligence Analysts, NYPD Intelligence Division, 2007

288.     6. Dry Run/Trial Run. Another sign to watch is for "dry runs." Before the execution of the final operation or plan, a practice session would be run to work out the flaws and unanticipated problems. [] Multiple dry runs may be conducted at or near the target to gain intelligence.

289.     7. Deploying Assets/Getting Into Position. The seventh and final sign to look for is someone deploying assets or getting into position. [] it is extremely important to document every fragment of information, no matter how insignificant it may appear, and forward this information to the Federal Bureau of Investigation, Joint Terrorism Task Force at 414-276-4684"[73]

### (2) Management of a threat includes controlling/containing the person of concern, using in that regard the existing social systems and community policing.

290.     "As eloquently described by the US Secret Service and the US Department of Education in Threat Assessment in Schools (Fein et al., 2002), the management of these situations comprises three related functions: 1. Controlling/containing the situation and/or person of concern in a way that will prevent the possibility of an attack; 2. Protecting and aiding possible targets; and 3. Providing support and guidance to help the person of concern deal successfully with his or her problems. (p. 63) … Each intervention impacts and influences the subject and thereby modifies the original threat assessment. The ongoing management of a person of concern necessitates that the TAM professional continuously monitor and consider the impact the threat management strategy has upon the subject."[74]

291.     "Effective case management is aided by a systems perspective [-] investigators should identify existing social systems that might help them manage persons who are potential threats. Social systems that might work cooperatively with the investigator to engage, neutralize, and redirect the potential attacker include the following: • Criminal justice system (prosecutors, courts, probation officers, correctional officials). • Health and mental health care organizations (managed care organizations, public mental health agencies, local hospitals). • Social services organizations. • Religious organizations to which the subject belongs or in which the subject is interested. • Community organizations. • Family and friends."[75]

292.     "Non-Confrontational [Threat Management Strategies]: [1] Take no Further Action at This time; [2] Watch and wait: Passive [or] Active; [3] 3rd party control or monitoring; [4] Subject interview: Information gathering, Refocus or assist, Warning or confront. Confrontational [Threat Management Strategies]: [1] Civil order; [2] Admin Actions; [3] Mental health; [4] Arrest"[76]

293.     "Usually, repressive tools [] are most commonly associated with counterterrorism aiming to contain a given security threat [and] includ[e] "community policing" (meso-social level)".[77]

---

73  *Pre-incident Indicators*, Anti-Terrorism Advisory Council, US Attorney's Office, Eastern District of Wisconsin, https://www.justice.gov/usao-edwi/anti-terrorism-advisory-council as accessed on 3/6/2021

74  Simons (FBI), Meloy, *Foundations of Threat Assessment and Management*, 2017, in Handbook of Behavioral Criminology

75  *Protective Intelligence & Threat Assessment Investigations, A Guide for State and Local Law Enforcement Officials*. Fein and Vossekuil, 2000, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice.

76  *Preventing School Violence: Identifying, Assessing, and Managing Potential Incidents of School Violence*, Calhoun and Wilson, presentation 2012

77  *Deradicalisation in Germany: preventing and countering violent extremism*, Daniel Koehler, Revista CIDOB d'Afers Internacionals, Issue 128 (September 2021), pp. 59-78.

*(3) Radicalization is highly disputed concept but despite that is used widely in FBI and other agencies' threat assessment and management, and CVE programs.*

294.    The fundamental problem is, as Marc Sageman, renown ex-CIA expert, pointed, that "the government's predictive judgments are necessarily unreliable, and the risk of error associated with them is extremely high, because the events they attempt to predict—violent acts of terrorism—are exceedingly rare."[78] "Drowning in this ocean of potential threats and false alarms, analysts have trouble identifying truly unusual occurrences indicative of an actual threat.... Throwing more analysts at the problem compounds the issue as it creates more false leads for analysts who err on the side of security."[79]

295.    ""Profiling" terrorists has "failed resoundingly". Scholars studying violent radicalization processes agree that these processes are highly complex and individual, and connected to a range of drivers, influences, and pathways. [] the interconnection between radicalization and violence has largely been disputed in the literature… Risk-assessment is a contested topic within the academia, and the lack of empirical support and evidence resulting in questionable predictive validity is usually and correctly pointed out.[66] A recent literature review of the risk factors associated with terrorism concluded that "there is insufficient evidence (...) that any of these variables are empirically supported risk factors" and that "some widely accepted "risk" factors have limited empirical support for their association with terrorism".[67] Nevertheless, structured professional judgment tools, such as the Violent Extremism Risk Assessment (VERA2-R) or the Extremism Risk Guidance (ERG 22+) have been introduced and used widely in counterterrorism and are making their way into CVE and deradicalization activities as well."[80]

296.    The risk of error when designating a person as a threat is very high, and even in the face of an apparent errors the US resists changing its activities. Recent and popular example is the case of *Kilmar Armando Abrego Garcia et al., v. Kristi Noem*, No.: 8:25-cv-00951-PX (D.C.Mer., 3/31/25) Dkt No.11 where government admitted "an administrative error" but deported him regardless. Other examples in that regard include:

297.    "Of the 119 known detainees, at least 26 were wrongfully held and did not meet the detention standard in the September 2001 Memorandum of Notification (MON). [] Detainees often remained in custody for months after the CIA determined that they did not meet the MON standard." S*enate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, S. Report 113–288, Dec. 9, 2014

298.    "The government [] recommendation reflects its inability or refusal to assess the real threat [a person] posed. [See Sageman, supra, at 22 (observing generally that, in "trying to prevent a repeat of 9/11, [the U.S. government] has again and again let its imagination run wild and

---

78  *Declaration of Marc Sageman in Opposition to Defendants' Cross-Motion for Summary Judgment*, Latif, et al., v. Loretta E. Lynch, et al., 3:10-cv-00750-BR (D. Oregon, 8/7/2015) Dkt. No.268 at 20.

79  *The Stagnation in Terrorism Research*, Marc Sageman (2014), Terrorism and Political Violence, 26:4, 565-580.

80  *Knowing What to Do: Academic and Practitioner Understanding of How to Counter Violent Radicalization*, D.Koehler and V. Fiebig, PERSPECTIVES ON TERRORISM, Vol. 13, Issue 3, June 2019

responds to worst-case scenarios without objectively assessing the real threat.")...]" *USA v. Muhtorov*, No. 12-cr-00033-JLK (D.Col. Aug. 30, 2018)

*(b) Defendants designated and keep unreasonably to designate Plaintiff and his activities as threat.*

**(i) Before his report with Teaneck police on 9/11/2012 Defendants identified Plaintiff as a threat at least in part because of his Bulgarian ethnicity and national origin, and because they perceived him as a gay.**

299.    Plaintiff registered a trade name, and in August 2012 left East House Creative with intention to start a business. Then Defendants significantly increased their actions against him referring to him as a "threat" and 'Bulgarian fagot'. ECF No.8-1 at 11 *et seq.*. To the extend Plaintiff's intention to start business incited the Defendants' activities – this is apparently arbitrary in comparison to the treatment of any other person starting legal business in the US. To the extend in 2012 Defendants acted in pursuit of permissible goals (fighting crime and terrorism) their conduct was excessive and unlawful (threats to kill Plaintiff, throwing pebbles at his windows...).

300.    On 9/6/2012 at about 11PM, right after Plaintiff got in bed, the FBI / JTTF New York staged a police raid – they created the impression that police is coming to his apartment. A few cars stopped under Plaintiff's windows, multiple people talked "Did you get the police tag?" "Hey John get in line." One of them yelled "We got you. Turn yourself in. Game is over." Plaintiff did not react and after a period of silence they departed. Till then Plaintiff had not suspected that the activities against him are government activities, and accordingly that the government consider him a threat. The next day Plaintiff went to Teaneck police (then police denied any knowledge and participation). ECF No.8-1 at 15-18.

301.    On 9/7/2012 after Plaintiff went to Teaneck police, the FBI/JTTF New York agents came under his windows and talked about involving "local powers", that "they have helped the agent." They claimed they still had not 'launched' community actions against Plaintiff but got the agreement of 'all LEA [Law Enforcement Agency]', including from the 'police' and 'CIA' to join them. Note

that one of the agents/officers explicitly said that Plaintiff is "no threat", while another that they

have to "push [him] to stay threat." See ECF No.8-1 at 17-18. Transcript of 1st_record.mp3.

302.　w1 "Community to catch []." … m4 "Community (gets) []" mB "The launch has stopped."
w1 "We will. Don't release the threat." m5 "We forgive. (Most) of it." m2 "Arrest []." m7
"Kill him []. Post." m1 "He got to feel octopus. Shadow over time." m7 "He did them." m1
"[] our time. He is no threat." … m8 "Push to stay threat." m5 "He is Bulgarian []." … m1
"All LEA [Law Enforcement Agency] will joins us?" m2 "Back us." m4 "Police say they []."
m1 "Three days to join us?" Transcript of the 1st_record.mp3 at 0:06, 0:25-0:34, 0:40-0:41,
and 1:03-1:06.

303.　Later same day in the late evening Defendants again came under Plaintiff's windows saying that

he is a "threat [because] he went straight to police", talking about being "agents" from "different

state", and referred to him as a "Bulgarian enemy", and "fagot". ECF No.8-1 at 18.

304.　In support that the activities then were FBI / JTTF New York activities (in addition to the events

that followed) is the fact that the FBI New York (JTTF) arrested a man on his street about 3

blocks away months before Plaintiff moved in (ECF No.8-3).

305.　From the above it is clear the FBI/JTTF New York continued acting with the knowledge that

Plaintiff is not a threat, and identifying him by his ethnicity, national origin and perceived sexual

orientation showing that these, plus retaliation, were significant factors for their actions.

**(ii) Since Plaintiff's report with Teaneck police on 9/11/2012 Defendants deliberately
'develop intelligence' that he is a threat – acting not only with discriminatory animus, but
also in retaliation and with malice. Since then Defendants disseminate false and/or
derogatory information about Plaintiff, including false accusations of serious crimes,
fabricated statements on his behalf, demonstratively survey, harm, and provoke him while
denying him protection under the law with apparent intention to manufacture
incriminating response(s), and more.[81]**

306.　Using "the enormous scale of resources devoted to the search for domestic terrorists, the virtual

nonexistence of constraints on the conduct of investigations and the gathering of evidence, and

the disposition [] to err on the side of arresting and charging the innocent"[82] Defendants

significantly expanded their actions against Plaintiff. Based on their conduct which continue for

---

81　See also ECF No.8-1 at 814-838, and n.4 about Defendants' efforts to radicalize Plaintiff.
82　*REVIEW: Trapped in the War on Terror, Ian S. Lustick*, Charles Peña, University of Pennsylvania Press, 2006
　　(quoting Trapped in the War on Terror, Ian S. Lustick)

13 years and ongoing Defendants' 'compelling' or 'significant interest' in Plaintiff's case is not reduction of crime, and fighting terrorism, but under the disguise of legitimate interests to degrade and discredit him in retaliation, discrimination, and malice, and to prevent Plaintiff to make public their violations of the US constitution and laws.

307.   Since his report on 9/11/2012 Defendants and parties in concert ('Defendants') have initiated a few many-years-long and ongoing campaigns against Plaintiff with apparent continuity (see bellow). Defendants' approach in regards to Plaintiff is, or is the same as, the CVE 'mosaic of engagement' approach – they act with local community partners, share information about the status of the program, and focus on the 'programmatic continuity'.[83] However the fact that Defendants act opposite to key points of a CVE intervention as, for example, to "enhanc[e] trust in the authorities"[84], is just another evidence for their animus and malice toward Plaintiff.

(1) Defendants designate Plaintiff as a threat but admitted in a few occasions that they "made him". They have also shown that the threat at least in a few occasions is Plaintiff's preparation, work, and filing of legal actions.

308.   Since Plaintiff's police report on 9/11/2012 Defendants have demonstratively and falsely framed Plaintiff and his actions as threat. That includes even Plaintiff's playing of chess, as for example on 12/15/2012. Plaintiff was playing chess on his notebook when a group of Defendants came under his windows and threatened him "What he's playing? This is not a game. I'll shoot him through."... "Secured the perimeter." (ECF No.8-1 at 119).

---

[83]   "To be effective at preventing the spread of violent extremism, therefore, CVE interventions need to adopt a "mosaic of engagement" approach at the community level. This requires effectiveness in providing sufficient funding; defining the criteria for programmatic success, including sequencing of a program's phases; information sharing on programs' status; selecting appropriate local partners, including public-private partnerships, with community engagement based on the notion of mutual responsibility; and an overall focus on sustainability in terms of programmatic continuity. (Jackson, Rhoades, Reimer, Lander, Costello, and Beaghley, 2019; Jerard and Nasir, (Eds.), 2015; Kenney, 2018, p. 235; Mullins, 2016; Southers, 2013, pp. 104-115)" *Effectiveness in Counter-Terrorism and Countering Violent Extremism: A Literature Review*, Joshua Sinai, Jeffrey Fuller, Tiffany Seal, Perspectives on Terrorism, Volume 13, Issue 3, June 2019

[84]   *Women and Preventing and Countering Violent Extremism Interventions,* Dr Erika Brady and Dr Sarah Marsden, Oct. 2021 CREST, funded by the UK Home Office and supported by the Centre for Research and Evidence on Security Threats (ESRC Award: ES/V002775/1). See also *Knowing What to Do: Academic and Practitioner Understanding of How to Counter Violent Radicalization*, D.Koehler and V. Fiebig, Perspectives on Terrorism, Vol. 13, Issue 3, June 2019 (""Secondary prevention" aims at averting the consolidation of risk factors (e.g., societal alienation, development of specific grievances, loss of personal significance) or radicalization processes in the early stages.")

309.    Based on all relevant events per Plaintiff's knowledge and belief Defendants falsely frame his

lawful evidence gathering as surveillance (threat indicator IV.7(a)(1)(iii). See also 1776 *et seq.*),

and his petitions as demonstrated intention to attack the government[85].

*(A) Defendants overtly referred to Plaintiff as a threat, but admitted that they 'made him'.*

310.    Defendants explicitly stated that Plaintiff is a 'security threat' (see 7/30/2016 – although negative

the statement shows consideration of him as a 'security threat', 10/17/2019), and that meaning of

threat is implicit when uniform NYPD officers (2014-March 21, 2016) or Teaneck police and the

FBI (3/4/2020) talked about Plaintiff as a threat, or when Defendants talked explicitly about law

enforcement measures as to 'investigate', or 'arrest' Plaintiff (3/4/2020, 1/8/2024, 10/10/2024).

That meaning is further emphasized by labeling Plaintiff an "enemy" (6/21/2017 ("cop enemy"),

9/7/2019 ("New York enemy"), 12/1/2019, 12/30/2019, 7/19/2020, 2/17/2021, 3/12/2021,

8/24/2023), or "terrorist" (11/30/2017, 12/30/2024 (note almost the same phrasing in 7 years

distance)).

311.    Defendants were clear in a few occasions that by 'threat' they meant Plaintiff's work and/or

filings for his legal actions with S.D.N.Y. (6/21/2017, 2/17/2021, 9/7/2021 ("He become a

massive threat."), 7/24/2023, 8/24/2023).

312.    Defendants are developing Plaintiff as a threat. As their statements demonstrate they "made him."

(9/5/2017, 10/9/2021 (indirectly), 4/15/2022, 6/21/2024, 10/24/2024), "We created him."

(9/7/2016), "They created him." (3/22/2017), "They started all this." (3/24/2020), "We made it."

(7/16/2021, 8/31/2021). Especially notable are the events on 7/16/2024 when Defendants were

explicit that (a) they deliberately "developed threat" (whether Plaintiff as a threat to students, the

opposite, or police as a threat to Plaintiff as they "believed" the students), and (b) that this threat-

development was known and monitored by other parties "They don't think that. Have to game."

85  See *In the Shadow of 9/11.* PBS Frontline document movie in which a federal prosecutor stated in regards
    investigation of 'terrorists' "Prove they are willing to do those things. Not that they do them… You may be not
    guilty, but you are still guilty for the US." Deputy Director of the FBI "They are not terrorists" but to deter "put
    out persons with bed intentions."

313.  2014-March 21, 2016 going to work and back home Plaintiff regularly passed by two NYPD officers located next to the entrance of Port Authority Buss Station in Manhattan and the stairs leading to Downtown-bound A, C and E trains' platform. Many times those officers commented Plaintiff 'This one is on the list', 'He is a threat', and similar.

314.  In the summer of 2015 Gyro's office moved to 114 Broadway, Manhattan, NY 10006, right next to Trinity Church and Wall St., and since then in his launch breaks Plaintiff regularly passed by NYPD officers located in front of the New York Stock Exchange, and officers guarding the Federal Reserve and several banks. Those officers referred to him a few times as "a threat", and some stated that "He hits Wall Street." At one occasion one of them showed to Plaintiff his rifle imitating squeezing the trigger, which was both ominous and very shocking. (ECF No.8-1 at 35, 37)

315.  7/30/2016 CVS Teaneck staff commented Plaintiff "The guy just look odd. Not a security treat." ECF No.8-2 at 2171.

316.  9/7/2016 Wednesday, 9:30PM-9:38PM (about 10 days since Plaintiff started working on his case against Defendants) Defendants near his windows talked about him "We must get within. We created (him)."… "One Bulgarian."

317.  3/22/2017 Wednesday, 1:35PM Defendants commented in regards to Plaintiff "They created (him)."

318.  6/21/2017 Defendants and staff in Derek Smith Law Group's office in Manhattan asked about Plaintiff "That's a cop-enemy?" ECF No.8-2 at 2107.

319.  9/5/2017, 1:34PM when Plaintiff was transcribing the recording of Teaneck police officers and FBI from 10/13/2013 Defendants commented "We made him."

320.  11/30/2017 Defendants commented Plaintiff in Manhattan, NYC "He wants to be a terrorist." ECF No.8-1 at 102.5.

321.  9/7/2019 Defendants in ap.A3 referred to Plaintiff as a 'New York enemy', 'communist', and a "project". ECF No.8-1 at 476.

322.  10/17/2019 when Plaintiff attended an event in Lincoln Center Manhattan, organized by NY Public Library two Defendants men sat behind Plaintiff and commented that "He is security threat." ECF No.8-1 at 102.5.

323.  12/1/2019 Defendants in ap.A3 talked about Plaintiff "Don't know how to fight the enemy."… "Kalin []." ECF No.8-1 at 480.

324.  12/30/2019 USPS carrier in Plaintiff's building talked about him as a "strong enemy". ECF No.8-1 at 102.5.

325.  3/4/2020 uniform Teaneck police officers and FBI agent talked about FBI 'fighting Bulgarian'. "Get Kalin heard that."… "Investigating threat". ECF No.8-1 at 55.

326.  3/24/2020 after 9:01PM Defendants in ap.A3 "They started all this." ECF, No.8-1 at 480.

327.  7/19/2020 Defendants came under Plaintiff's windows and talked "Hold together.. enemy.." ECF No.8-1 at 102.5.

328.  11/3/2020, 5:27PM Defendants under Plaintiff's windows: "Assassinate the threat." Id.

329.  2/17/2021, 9:53PM while Plaintiff was working on surveillance materials Defendants in ap.A3 talked about him as a "real enemy". ECF No.8-1 at 102.5.

330.  3/12/2021 two Defendants men tried to violently entered his apartment without knocking, or ringing, and broke the lock. A bit later students under Plaintiff's windows: "Hit the enemy." See related ECF No.8-1 at 751.

331.  5/25/2021 Defendants came under Plaintiff's windows and teased him "He thinks we are the enemy." ECF No. 8-1 at n.11.

332.  7/16/2021 Friday, 12:53AM Plaintiff was working on time line of events when Defendants came under his windows saying loud one sentence: "We made it."

333. 8/31/2021 Tuesday, 9PM after Plaintiff worked on JTTF materials Defendants came under the windows "We made that []. He wants to destroy []."

334. 9/7/2021 Tuesday, Plaintiff worked on relevant history till 10:16PM. At 6:11PM Plaintiff was at the bathroom when a family/group passed under his windows and a woman commented "He become a massive threat." Same woman returned under the windows at 9:46PM (Plaintiff was still working on relevant facts) ECF No. 8-1 at 675

335. 10/9/2021 Saturday, 7:17PM after Plaintiff copied a line from draft transcripts of recording from 8/3/2013 "We have made him", Defendants agent in building's corridor "We are not the same team." ECF No.8-1 at 140.

336. 4/15/2022 Friday, Plaintiff had been working on Teaneck public schools when at 6:49PM Defendants' man came under his windows and said "We made him." ECF No.8-1 at 384.

337. 2/1/2023, 3:36PM-3:51PM Defendants (including Dula, Ralph, and Loomer) talked in building corridor about Plaintiff. "(We) get to []. We have to do []." "Only stop threat." "How did they stop?" "They can't stop." D "How to get stop?" "Get him to [] to fight. Won't get enough." "They don't oppress." Exhibit Transcript.

338. 7/24/2023, 5:06PM-5:35PM, a day before Plaintiff filed the complaint in *Dimitrov I*, Defendants, including Dula, Ralph, Cesar Naranjo, and Peter Loomer talked about Plaintiff under his windows. "Really Kalin have to regret.".. "You are calming threat." See exhibit Transcript.

339. 8/24/2023 Thursday at 12:24AM while Plaintiff was working on his Objections to Report and Recommendations (ECF No.8) Defendants in front of the pub on Cedar Lane, Teaneck, NJ nearby talked about him ("Kalin"), the "enemy… Fight."

340. 9/28/2023, 9:04PM-10:05PM after Plaintiff filed a Request for Summons as to the US, NYC, and Teaneck in *Dimitrov I*, Defendants gathered in ap.B2 and talked (among other things) about setting Plaintiff as a threat. Participants included Ralph Pimienta, and Peter Loomer. R "They can either acting the way you can--" L "To let this stop." R [simultaneously] "Ah-- we have to see a threat. They have to call." m6 [quiet] "Stop bringing that." R "You have to set a []. They better believe me." Exhibit Transcript

341. 1/8/2024, between 10:45AM and 11:00AM Defendants talked in building corridor about Plaintiff. "Kalin is threat to []." … "They have to push Kalin." "Kalin confessed." "Bulgarian threat." "Arrest. Full stop." Exhibit Transcript.

342. 4/26/2024, 1:04PM a group of 5-6 students came under Plaintiff's windows and talked for about a minute in regards to Plaintiff "Have to break this one. Pretty bad." "They thought []." 1:12PM they returned under the windows talking about "the role they have." "Like a shadow.", and threw a rock under the windows. Plaintiff started a video recording opening his window, and one of the students threw a rock toward him. Plaintiff: "My friend what are you doing?" the student told him to "Shut up." Defendants woman talked to them and they left saying "Have to stop this fight." The Holy Name guard - neighbor sat in front of the entrance during that time. Plaintiff called Teaneck police and talked till about 2PM with the officer who came (a report # 24-031055). 2:05PM Defendants' women came near Plaintiff's windows and commented "We got to stop." 2:14PM the same woman passed Plaintiff's windows walking on Cedar lane challenging "What's the point?" 3:35PM a group of students came talking under Plaintiff's windows "He got police.".. "He is ooold. Old." 3:56PM two school girls under Plaintiff's windows commented "That guy feels the threat." A group of school boys followed under the windows shouting and screaming. Plaintiff challenged inside his apartment "That is all you got?" 3:57PM Defendants' woman under Plaintiff's windows on Cedar lane (not in camera view) commented "This guy is the evident threat."

343.    6/21/2024, 2:16PM Defendants man in apartment A3 "Kalin expressed []." After Plaintiff started Olympus the man talked about how "to frame" (2:17PM) "We made him. Now you make on your own." (2:18PM) He left ap. A3 at 2:22PM talking very loud with Lea, ap. A3 about Starbucks, and about 'suing'.

344.    7/16/2024 after Plaintiff worked on FBI book till 3:37AM, at about 12:30PM students cane and assaulted him. Plaintiff filed a police report. At 3:36PM-4:16PM Defendants, including Ralph, and Cesar Naranjo, talked in building corridor about Plaintiff "We developed threat. They don't think that. Have to game." "He have to go." See Exhibit Transcript. More about 7/16/2024 at 2071.

345.    10/10/2024, between about 5:47PM-5:58PM Defendants, including a few students, came near Plaintiff's windows. "How police set threat?" "Can't believe []." "Kalin []." See Exhibit Transcript.

346.    10/24/2024, 7:26AM Holy Name guard and Defendants woman talked near Plaintiff's windows "We fight to []. To stop." When Plaintiff made photos the guard was alone and immediately left. The woman was out of sight but commented "We made him."

347.    About Defendants' deliberate misrepresentation of Plaintiff as a criminal threat see bellow false accusations of serious crimes IV.7(b)(ii)(2)(A).

   *(B) Demonstrating their interest in Plaintiff Defendants color him a threat.*

348.    Defendants deliberately demonstrate their interest in Plaintiff in his presence. For example they questioned the persons who Plaintiff had spoken with which, apart from ruining his standing in society (implying that it is dangerous to talk with Plaintiff, or that he himself is dangerous), is very provocative – demonstrative efforts to isolate and alienate him, and surveillance.

349.    4/18/2015, 3:18PM Defendants about Plaintiff "We got this. Get away from him."

350.    1/6/2018 after Political Forum meeting in Manhattan Plaintiff spoke with a participant. Immediately after that Defendants' woman asked him "Why you talk with him?" (ECF No.8-2 at 2157).

351.    2/9/2018, Plaintiff was attending event at NY Historic Society meeting in Manhattan. Defendants' man warned others "Better stay away from this person." (ECF No.8-2 at 2159) 5/10/2019, immediately after Plaintiff ordered a medicine Defendants man behind him commented his request and stated to CVS staff to "override – FBI." (ECF No.8-2 at 2095)

352.    3/1/2023, after Plaintiff talked with Christina, from Jamaican Food truck parked under his windows Defendants' man came and talked with her "Careful who you talk with." (ECF No.8-2 at 6635)

353.    3/11/2023, immediately after Plaintiff a Defendants' man asked the same bank clerk at Chase bank, Teaneck, NJ whether he had any 'problems' with Plaintiff. (ECF No.8-2 at 6807)

354.    9/10/2023, immediately after Plaintiff bought a movie ticket Defendants man on phone speaker asked the girl on the check at Teaneck Cinemas on Cedar lane "Tell me what Bulgarian []."

355.    10/9/2024, about 3:30PM Plaintiff went to USPS Teaneck on Palisade Avenue to send copy of his AG letter to the FBI Headquarters and to NSD DOJ. In the USPS office Defendants

man asked the staff about Plaintiff. She responded "He has done nothing crazy so far." After Plaintiff sent the letter she did not say 'bye' or something else as usual.

356. Defendants demonstrate their interest in Plaintiff by publicly saying that they pursue / investigate Plaintiff. See for example ECF No.8-1 at 27 listing a few Defendants' statements in that regard made till October 2022. More recent examples are bellow:

357. 11/19/2022 Saturday, 8:17AM Defendants awakened Plaintiff with DE / heat – he was feeling burning rays at his kidneys; had his right eye, nose and mouth dry and irritated; and his ears were ringing. Plaintiff detected more than 10 mW/m2 peaks floor level from ap.A3 parallel to corridor. Defendants' woman commented in ap.A1(?) "Non stop pursuing that. I'll tell Kalin." ECF No.8-2 at 5951.

358. 2/13/2023 Monday, 4:26PM Defendants' man came near Plaintiff's windows on Cedar lane and talked about the 'investigation'. ECF No.8-2 at 6365.

359. 6/18/2023 Sunday, about 10:15AM two Defendants' men came under Plaintiff's windows "Fuck them. Fuck them all. Investigating []" ECF No.8-2 at 8256.

360. 1/10/2024, 3:13PM Plaintiff was working on Exhibits for *Dimitrov I* when Defendants' man from 12:08PM talked again in building corridor "He has to get (investigating) []." Student came under Plaintiff's windows and shouted.

361. 3/14/2024, after 9:55PM Defendants in ap.B2 talked on speaker about Plaintiff (playing recording?). Dula "Kalin... We don't stop... pursue... We all screw up. New York screw up." At 10PM after saying among other things his name again ("Kalin") Defendants in B2 knocked sharply on Plaintiff's ceiling.

362. 5/24/2024, 8:16AM a group of uniform and plain clothes Teaneck police officers came at the corner of Cedar lane and Red Road – under Plaintiff's windows – and for about an hour did traffic sting while talking about Plaintiff. "How to stop this?" "Have to stop." "… arrest…" Defendants' woman "People have to stop (him)." "Kalin…" 8:29AM police radio "Let Kalin… They energize him. May be []." 8:37AM officers "Why they don't get him?" "Investigate…" 8:40AM they kept talking about Plaintiff "Kalin.." At 8:41AM officers threw rocks under Plaintiff's windows (see 148 *et seq.* about Plaintiff's reports with Teaneck police about students throwing or attempting to throw rocks at him), and the lieutenant moved out of camera view. 8:56AM Plaintiff noticed one of police cars parked under his toilet window. 9:11AM the police lieutenant returned under Plaintiff windows on Red Road commenting "He survey." "He didn't pursue.."

363. 6/12/2024, 9:20AM while Plaintiff was scanning for DE Defendants men (Ralph one of them) in building corridor teased "Pressure can't stop." Defendants' women under Plaintiff's windows commented "We are watching." A bit later under the windows ".. pursuing that. And don't believe []."

364. 7/29/2024, 4:05PM when Plaintiff started working on tortuous interference a group with kids gathered on benches next to him. One of the kids asked loud "What's the stressor?" They left for a while then returned staying nearby not at benches. 4:39PM the same group passed Plaintiff talking loud "Why don't pursue him?" A bit later (about 4:45PM) Defendants' women commented "We have to stop." … "Kalin…"

365. 11/21/2024 at about 9:30PM Plaintiff continued working on FBI material. Later when he got in toilet Defendants' Dula in ap.B2 commented "He knows we can't pursue him."

366.   Apart from their related verbal conduct Defendants have been acting toward Plaintiff as a threat in public since 2012. For example they (a) do test runs on his apartment, (b) demonstratively survey Plaintiff, or (c) call police on him.

367.   Defendants have done a few times test runs on Plaintiff's apartment. The first time was when FBI/JTTF New York created the impression of a "police" raid on 9/6/2012 (see above 300). In 2013 there were a few test runs done with uniform Teaneck police officers – see police checking on Plaintiff in the night of 9/19/2013 (ECF No.8-1 at 33), or the events in the night of 10/13/2013 when police awakened Plaintiff with several police cars parked under his windows, about 6 uniform police officers, and a few FBI agents (Id. at 34). Most recent was Teaneck police run on 4/22/2025, 11:28PM when 5 police cars came under Plaintiff's windows on Cedar lane and Red Road for about a minute, officers got out, and then left. As there was no reason, no incident, as the duration also shows this was a try-run, a training intended to intimidate Plaintiff.

368.   Defendants deliberately demonstrate the surveillance on Plaintiff and do it in public. Since his police report from 9/11/2012 Defendants for example have overtly followed Plaintiff in New York City, New Jersey, and in his flights to Bulgaria. Defendants in almost every location Plaintiff goes demonstrate they know him and/or know his relatives, profession or employment history; they develop the false accusations and degrading narrative about him while following the same verbal constructs (repetition of key words, playing certain psychological "games"), and/or include bits of his recent activities. Examples are many.

369.   Defendants called or stated they will call police on Plaintiff (see IV.(c)(2)(i)). Notable is the 911-call which was the pretext for Teaneck police intrusion in Plaintiff's apartment on 1/20/2023 (ECF No.8-1 at 81 *et seq.*).

*(C) Defendants portrait Plaintiff as a threat under the purview of the FBI / JTTF.*

370. The duration of Defendants' activities against Plaintiff and other facts (see for example bellow IV.7(b)(ii)(2)(a)) show that at least in part the activities are framed as counterterrorism measures which are under the purview of the FBI and its JTTFs.

371. FBI is the primary agency for "collecting and analyzing intelligence pertaining exclusively to domestic terrorists and domestic counterterrorism investigations".[86] "[T]he FBI is authorized to coordinate an intelligence, investigative, and operational response to terrorism. By virtue of that same authority, the FBI formed JTTFs composed of other federal, state, local, and tribal law enforcement agencies*"[87]*, and "[t]oday, Joint Terrorism Task Forces (JTTFs) led by the FBI play the chief role in coordinating federal counterterrorism investigations across the United States".[88] "The JTTFs also develop partnerships among law enforcement; the intelligence community; the military; and federal, state, and local government".[89]

372. To the extend part of Defendants' activities against Plaintiff are framed as anti-gang actions, they also are under the purview of the FBI.

373. "[T]he FBI is often seen as one of the primary agencies involved in investigating gangs".[90]

(2) Defendants fabricate legitimate reasons to keep treating Plaintiff as a threat.

374. In absence of factual base for Defendants' actions against Plaintiff, their 'intelligence development' is fabrication of reasons to designate and treat him as threat. This is based on their conduct: (a) Defendants have invented what Plaintiff said or did, (b) they interpreted with bad faith what he actually said or did, and/or (c) set him up to manufacture verbal and/or other response which could justify their activities. All of that has been ongoing for more than 13 years.

---

86  *DHS' Role in Nominating Individuals for Inclusion on the Government Watchlist and Its Efforts to Support Watchlist Maintenance*, Department of Homeland Security, Office of Inspector General OIG-11-107 September 2011 (Revised)

87  *Joint Terrorism Task Force Standard Memorandum of Understanding Between the Federal Bureau of Investigation and (the "Participating Agency")*, III., Exhibit 37713, 2/19/2015, part of PSF-7.02 - Joint Terrorism Task Force - Memorandum of Understanding, Portland (https://www.portland.gov/policies/public-safety/joint-terrorism-task-for…) (referred bellow as "JTTF Standard MOU").

88  *Domestic Federal Law Enforcement Coordination: Through the Lens of the Southwest Border*, Jerome P. Bjelopera, Kristin Finklea, Congressional Research Service, R43583, Updated June 3, 2014 (referred as "CRS R43583")

89  OIG Report 2005. See JTTFs members in OIG Report 2005, and the members of NJTTF at *National Joint Terrorism Task Force (NJTTF) Maritime Security Program (MSP) Information Sharing*, Presentation slides, 2012 Joint Conference of Harbor Safety Committees and Area Maritime Security Committees (referred as "MSP 2012")

90  *Coordination: Through the Lens of the Southwest Border*, Jerome P. Bjelopera, Kristin Finklea, Congressional Research Service, R43583, Updated June 3, 2014 ("CRS R43583")

*(A) According to Defendants' false narrative about Plaintiff, he is a radical individual (as it is defined by the FBI – one "who encourage, condone, justify, or support the commission of a violent act or other crimes against the U.S. government, its citizens".[91]), and they accused him of serious crimes.*

375. Defendants falsely claimed for example that Plaintiff wants to 'destroy' them (implying that this is what Plaintiff said), and that he even gave them a death warning (9/7/2019, 1/13/2023). Both Dula (3/13/2023) and students (9/11/2024) claimed that Plaintiff wants to destroy *them* (using the same language "He wants to destroy us."), and similarly unrecognized Defendants talked under Plaintiff's windows (6/30/2013), but they were more inclusive in another occasion "That guy wants to destroy all." (6/17/2024).

376. The timing of a few Defendants' statements shows what they mean by 'destruction' – Plaintiff working on JTTF and/or FBI materials (8/31/2021, 11/10/2021), or saving court materials (7/26/2023 – the day after he started *Dimitrov I*, 8/5/2023).

377. 6/30/2013, 10:09AM Defendants came under Plaintiff's windows and said: "It's crazy that Bulgarian can destroy us." "No one can destroy (us)." "They'll get him." "Bulgarian is a crazy one." "Crazy one." ECF No.8-1 at 100.

378. 9/7/2019 after 10:30PM Defendants in ap.A3 (next to Plaintiff's) said to Plaintiff through the wall: "Kalin abuse? They know Kalin problem.".. "I mean you used to get we get you.".. "Don't you got us a dead warning?" "New York." "He believe that." Transcript of 190907_6786.mp3 at 9:37, 9:44, and 17:21-17:23.

379. 8/31/2021 Tuesday, 9PM after Plaintiff worked on JTTF materials Defendants came under the windows "We made that []. He wants to destroy []."

380. 11/10/2021 Wednesday, Plaintiff worked on FBI materials, and records. At 8:47PM Defendants' person came under his windows on Cedar lane and provoked "Crazy bad-ass. You think could destroy all?" ECF No. 8-1 at 268.

381. 5/9/2022 Monday, when Plaintiff entered the Park a man next to him "You couldn't get all agents." ECF No.8-1 at 408.

382. 1/13/2023, group of students stayed at the corner under Plaintiff's windows talking that Plaintiff 'want us dead'. (3:18PM) and when Plaintiff started a video recording (they were outside security camera view) they left. ECF No. 8-2 at 6009.

383. 3/13/2023 Monday, about 7:45PM Plaintiff was working on recording 2/17/23 when Dula in ap.B2 commented "He wants to destroy us." ECF No.8-2 at 6827.

384. 7/1/2023 Saturday, 10:35AM Defendants' man and woman rang on Plaintiff's doorbell. Plaintiff on intercom "Who is it?" Man "Forgot my keys. Room 4." Plaintiff opened the entrance through the intercom – they entered the corridor and the woman commented "He

---

91 *Rethinking Radicalization*, Faiza Patel. 2011 Brennan Center for Justice, quoting Violent Islamist Extremism: Gov't Efforts to Defeat It: Hearing Before the S. Comm. on Homeland Sec. and Governmental Aff., 110th Cong. 2-3 (2007) (written statement of John Miller, Ass't Dir., Office of Pub. Affairs, Fed. Bureau of Investigation)

wants to destroy [].” They entered apartment on Plaintiff's floor – ap. A4. ECF No.8-2 at 8470.

385.    7/26/2023 Wednesday, day after he started *Dimitrov I* Plaintiff have just downloaded from ECF the filed Complaint and Motion when at 11:16PM two Defendants' men came near his windows and commented “He wants to destroy.” “Survey.” They talked about “Metadata..”, a Defendants' woman talked about the “warhouse”.

386.    8/5/2023 Saturday, about 3:35PM Plaintiff was saving dockets from S.D.N.Y. Jan. 2023-May 2023 when Defendants' man in ap.B2 commented “He wants to destroy [].”

387.    6/17/2024, 11:56PM Defendants came under Plaintiff's windows on Cedar lane and said “That guy wants to destroy all.” “Kalin [].”

388.    9/11/2024, about 11:20AM group of students came under Plaintiff's windows, stayed for a few minutes there, and talked “He wants to destroy us… Harass.”

389.    To the extend Defendants incite Plaintiff to use such language in order to manufacture incriminating response (that is among the FBI tactics[92]) this shows their efforts to entrap him.

390.    Defendants and parties in concert (jointly referred as 'Defendants') falsely accuse Plaintiff of serious crimes in public and in his presence since 2013. Bellow are listed examples from 105 days in which Defendants made such statements, however most of the collected evidence hasn't been processed.

391.    Defendants accused Plaintiff of **murder**, claiming he is involved in 'homicide' (see bellow), and even that he “shot/killed police officer” (10/13/2013, 5/20/2017, 11/4/2020). Such claims were made on 10/13/2013 (first recorded instance) by uniform Teaneck police officers and FBI, but Defendants stopped making those accusations since September 2024 (last noted instance was from 9/25/2024). The related narrative that Plaintiff is 'hitting police' is presented at 509 *et seq.*. Defendants talked about Plaintiff as a murderer predominantly under or near his windows (10/13/2013, 11/9/2016, 11/30/2016, 6/8/2017, 9/2/2017, 5/2/2018, 6/27/2021, 7/17/2021, 8/14/2021, 8/28/2021 (“Found the body.. Can't arrest.”), 7/23/2023, 8/10/2023, 9/28/2023), but also in Stop and Shop, Teaneck, NJ (5/16/2015), in his building corridor (10/19/2021, 11/9/2022), in Phelps Park, Teaneck, NJ (5/20/2017), and in ap.B2 (9/25/2024).

---

92    “the FBI attributes the success of its prosecutions to the use of the fraudulent sales pitches the agents helped devise as evidence against the telemarketers” *Increasing Use of Undercover Stings in White-Collar Investigations*, R. Morvillo and R. Anello, New York Law Journal, Dec 3, 2002 Vol. 228—No. 105

392.    Defendants claimed that Plaintiff is '**Bulgarian mob/mobster**'. That accusation was used mostly between September 2012 and the end of 2013.

393.    Defendants accused Plaintiff of being a '**terrorist**', 'lone wolf' (summer 2013), who holds them '**hostages**' (first mentioned by Teaneck police officers on 10/13/2013) after Boston marathon bombing. In one occasion Defendants even referred to Plaintiff as a 'ticking bomb' (2/18/2022). After 2013 Defendants rarely referred to Plaintiff directly as 'terrorist' (11/30/2017, 4/24/2023, 12/30/2024), or 'wolf' (12/1/2016), but have significantly developed the theme of being held "hostages", especially in relation to Plaintiff's use of Blue Iris security software, and his other means to record relevant events (photos, audio, video recordings, handwritten log), as well as in regards to his work on the legal cases. In that regard Defendants commented that they 'talk too much' as for example on 11/14/2016, 3/23/2017, and more. Related to being hostage is Defendants' accusation that Plaintiff "blackmail" them. (3/7/2024).

394.    Defendants persistently talk that Plaintiff holds them "hostage" in different locations and for many years. Defendants talked about that predominantly under or near his windows (summer 2013, 10/13/2013, 1/3/2015 1/15/2015 10/21/20168/21/2017, 7/24/2019, 8/30/2021, 11/6/2021, 1/31/2022, 5/8/2022, 3/24/2023 8/27/2023 9/21/2023 9/22/2023 9/28/2023 3/19/2024, 6/13/2024, 7/25/2024, 8/15/2024, 1/25/2025, 1/30/2025); in the building corridor (1/20/2023, 2/22/2024); Defendants said that in ap.A3 (3/5/2021, 2/28/2021, 3/24/2020, 4/14/2021, 4/29/2021, 3/10/2022,12/18/2022); in ap.B2 (4/18/2021, 3/6/2022, 5/2/2022, 7/2/2022, 9/23/2023, 10/10/2023, 6/23/2024); in parks (6/18/2021, 8/10/2024); in offices next to East House Creative (4/26/2016); or in the FBI New York Field office building in Manhattan (11/8/2017).

395.    Recognized parties talking about "hostages" include uniform Teaneck police officers (10/13/2013, 10/21/2016, 1/20/2023), FBI / JTTF officers (11/8/2017, 1/20/2023), Defendants'

Marlene Dula (4/18/2021, 5/2/2022, 7/2/2022, 10/10/2023); Defendants' Ralph Pimienta

(9/7/2021, 3/6/2022, 3/10/2022); students (9/28/2023); Defendants' Peter Loomer (11/6/2021).

396.    Defendants also referred to Plaintiff as a **spy**, and try to link him to Russia. See IV.8(a)(1)(ii).

397.    Defendants claimed that Plaintiff is a '**bank robber'** or '**robber**' in general mostly in 2013, the

last time Plaintiff noted such claim against him was on 6/30/2020.

398.    Defendants repeatedly accused Plaintiff of **theft**. They talked about that next to Plaintiff's

windows (8/3/2013, 6/17/2024, 3/17/2025), in ap.B2 (11/21/2022), next to him when he was

outside (10/28/2017, 8/15/2020, 7/28/2024) including in Target, Hackensack, NJ (7/5/2016,

7/21/2018). In a few cases accusations were made by students (10/28/2017, 6/21/2023,

6/17/2024, 3/17/2025).

399.    Defendants accused Plaintiff of being/committing **fraud** (12/17/2012, 9/22/2020 ("Bulgarian

fraud"), 7/12/2024, 9/6/2024), and made related accusations as for example that Plaintiff has fake

ID (or imply that by unnecessary checks of his ID) (3/15/2015, 6/21/2017, 1/7/2022), or created

'problems' with Plaintiff's SSN (11/21/2013, 1/28/2016, 9/1/2017).

400.    In a few case there was a pattern – Defendants made the accusations, and when Plaintiff did not

react they commented that he 'didn't believe' (9/2/2017, 8/28/2021, 11/9/2022).

401.    12/17/2012 after Plaintiff sent money to Bulgaria with Money Gram Teaneck High School
students said it was a "fraud". ECF No.8-1 at 99.5.

402.    12/28/2012 Defendants followed Plaintiff while he flied to Bulgaria referring to him as
"Bulgarian mobster". ECF No.8-1 at 29.

403.    At the beginning of 2013 Defendants repeatedly referred to Plaintiff as a "bank robber" in
public, and acting in concert with security at Chase bank Cedar lane office, Teaneck, NJ
(now closed). One time immediately after Plaintiff used the ATM the guards and technicians
checked the ATM in his presence, and commented his transaction – "he was actually
depositing, not withdrawing". In the same period Plaintiff used RedBox kiosk in Stop and
Shop, Teaneck, NJ, which was next to an ATM and uniform officers and bank technician
arrived to check the ATM in his presence, and referred to Plaintiff as a "bank robber" and a
"suspect". ECF No.8-1 at 99.2.

404.    In the summer of 2013 Defendants talked about Plaintiff as "werewolf", "lonely wolf",
"suspect", and in that relation about "massacre". ECF No.8-1 at 99.7.

405.    7/13/2013 NYPD officers at All Stars Charity concert at Central Park, Manhattan knew and
commented Plaintiff while he had his ticket and backpack checked: "Bulgarian mob." "Have

to stop the massacre." "He just looks bad." A plain clothes woman on the line behind Plaintiff said to them that she had been "working on Bulgarian for a whole year now". ECF No.8-1 at 32.

406.    8/3/2013 Defendants came next to Plaintiff's windows and talked "It's him." "He's hiding at []." … "Kalin believe.".. "They could believe." "He steal []." … "They don't believe." "That's how we fucking prove." "We will get him." See more at ECF No.8-1 at 1822.

407.    10/13/2013 uniform Teaneck police officers and FBI talked that Plaintiff is a 'bank robber' and about the "hidden hostages." They also said that "He shot police." ECF No.8-1 at 34. Transcript of PoliceUnderMyWindowTeaneck.MP4,

408.    In the week of October 14-20, 2013 Plaintiff worked at the NJ based multimedia agency Intermedia Post, Paramus, NJ (now IMP Digital Studios) as a gig set by Creative Circle recruitment agency. While he was in their office the staff talked about him as a "Bulgarian mob". "I can't believe he is a mob boss." "I guess things are different now days." He did not receive another project from them. ECF No.8-2 at 2141.

409.    On 11/21/2013 Plaintiff received a mail from Chase that there is a problem with his SSN, but when he visited the Chase office on Cedar Lane, Teaneck, NJ, they told him there is no problem. ECF No.8-2 at 1975.

410.    1/3/2015 Saturday, Defendants commented "He keeping us hostage." while Plaintiff was using Blue Iris security system with camera showing the area under his windows.

411.    1/15/2015 Thursday, 7:30AM-8:41AM Defendants came under Plaintiff's windows "He holds us hostage." During that period Defendants (in ap.G2?) repeatedly knocked.

412.    3/15/2015 Defendants claimed Plaintiff has "fake ID." ECF No.8-1 at 102.1.

413.    1/28/2016 Aethna's website issued a warning that Plaintiff's SSN is not correct. After a phone conversation with an Aetna representative Plaintiff found no problems with his SSN. The site however continued to show the warning. ECF No.8-2 at 1977.

414.    4/26/2016 when Plaintiff was at East House Creative office (Englewood Cliffs, NJ) Defendants came in the neighbor office talking loud about Plaintiff. Including about him holding "hostages".

415.    5/11/2016, 8:08PM Defendants talked about being 'hostage'.

416.    5/12/2016 Defendants again talked of being 'hostages'.

417.    5/16/2015 schoolgirls in Teaneck's Stop and Shop pointed at Plaintiff: "He did homicide." ECF No.8-2 at 2171.

418.    5/18/2016, about 3:20PM Defendants commented "Can't really believe we're held hostage."

419.    7/5/2016 Plaintiff was at the check out in Target Hackensack, NJ when Defendants person right behind him spoke loud: "What's going on? He stole an item." ECF No.8-2 at 2171.

420.    10/6/2016 Thursday, 12:58PM Defendants referred to Plaintiff as robber "Bulgarian []." "Robbing a robber is needed." See Timeline of events.

421.    Since 10/20/2016 Teaneck police officers have been under Plaintiff's windows doing traffic sting for a few days and talking about him ("He won't turn on unless we strike him.".."Can't find a new job." "We can offer." "Come on..", after Plaintiff made a few photos "He keeps on fighting.".. "Got on video camera..".. "Make video."). On 10/21/2016 Friday1:04PM Teaneck police officers under or next to Plaintiff's windows again: "He will not survive." "Getting hostages."

422.    11/8/2016 after Plaintiff signed retainer with Derek Smith Law Group about his case against Gyro et al Defendants commented "He holds them hostage."..."Hitting the US."

423.    11/9/2016, 9:50PM while Plaintiff was transcribing a recording he wrote about Defendants talking for a "homicide". A bit later Defendants came under his windows and talked about "homicide".

424.  11/14/2016, 11:54AM Defendants talked about being "hostages".

425.  11/30/2016, 9:30PM-9:38PM Defendants in B2 commented that Plaintiff "used to believe we stopped a homicide."

426.  12/1/2016 Defendants in Stop and Shop Teaneck "We have a wolf."

427.  3/19/2017 Sunday, about 2:10PM Defendants man patrolling under Plaintiff's windows "Next stop – rob." When he returned under the windows "Fucking nerd."

428.  3/23/2017 Thursday, 4:38PM "Hostages.."

429.  5/14/2017 when Plaintiff confronted Defendants in ap. G2 about slamming the young man from G2 responded "Than rob us." See more about the event at ECF No.8-1 at 163, and Transcript of 170514_4354.mp3

430.  5/20/2017 Saturday, Defendants followed Plaintiff to Phelps Park, Teaneck, NJ and talked "We don't forget Kalini kill." They made a few times statements that Plaintiff 'killed police officer' as in: "Kalin killed []." "Police." "Knowing [] forget. Killed police officer." "Police assumed []." ECF No.8-1 at 113.

431.  6/8/2017 Thursday, 1:50PM after Plaintiff challenged in his apartment Defendants responded near his windows he is "total mess" and talked about "murder".

432.  6/21/2017 Defendants and staff in DSLG Manhattan "checked" Plaintiff's name. ECF No.8-1 at 102.1.

433.  8/21/2017, 9:33PM, and at 9:50PM while Plaintiff was working on recording from the meeting with Wisniewski Defendants near Plaintiff's windows commented they are "Hostages."

434.  9/1/2017 when Plaintiff received an email that his SSN had been updated – something he hadn't done – he went to a Chase bank office and found that there was no change/update of his SSN. ECF No.8-2 at 1976.

435.  9/2/2017, 11:00AM Defendants talked under Plaintiff's windows about "homicide". "No response team." A bit later "He doesn't believe it."

436.  10/28/2017 in a Teaneck park schoolgirls with an adult looking at Plaintiff commented that he "looks like a thief." Later Plaintiff went to Stop and Shop, Teaneck, NJ where Defendants commented that he "looks disgusting." The repetition of the verbal construct implies coordination.

437.  11/8/2017 at FBI New York Field office "They [the police] are the hostage." ECF No.8-1 at 46.

438.  11/30/2017 Thursday, when Plaintiff was in B&H store on 9th Ave Manhattan the staff commented him after he asked for help "He wants to be a terrorist."

439.  5/2/2018, 11:45AM Defendants under Plaintiff's windows talked about him ('Bulgarian') and that he is "crazy". "Homicide." Exhibit Timeline of events. ECF No.8-1 at 102.4.

440.  7/21/2018 Defendants in Target Hackensack, NJ commented at electronics department that Plaintiff ('faggot') is "stealing".

441.  7/24/2019 Defendants came under Plaintiff window talking about "hostages" and shouted.

442.  3/24/2020 after 9:01PM Defendants in ap.A3 "Worth fighting." and "They started all this." and at 10:11PM "Bulgarian.. hostages police." ECF, No.8-1 at 480.

443.  6/30/2020, 6:08PM under Plaintiff's windows Defendants' Ralph and woman talked about Plaintiff "Bulgarian []." "Neighborhood []. What? Rob me?" ECF No.8-1 at 653.

444.  8/15/2020, Plaintiff was in Philadelphia with his cousin Tereza, who said that he "plays a thief." When Plaintiff returned home Defendants in ap.A3 knocked on his wall and provoked: "Have to push." Later in corridor (6:57PM) "Bulgarian… make it possible." Later Defendants came under Plaintiff's windows talking "Figure how to push." (10:21PM). Events were partially presented at ECF No.8-1 at 1823.

445.    9/22/2020 Tuesday, after talking with Plaintiff Cesar Naranjo, the super, went upstairs on B level and talked with another Defendants' man about Plaintiff "It's a thousand-dollars report. So-- it's good. We need that." and about the FBI, police, the "Bulgarian fraud", and that they should "fight Kalin". ECF No.8-1 at 746.

446.    11/4/2020, 3:40PM Defendants' woman patrolling near Plaintiff's windows talked he "Killed police. -- Yea, right here." Plaintiff was working on file structure of his case. The same woman returned at 3:53PM "Build up [a case]."

447.    2/28/2021 Sunday at 7:58PM in A3 there was talking related to Plaintiff and his work. A few things mentioned were: "Stay alert. Kalin… Bulgarian… hostages." Plaintiff finished his work for that day on NYPD materials at 9:26PM.

448.    3/5/2021 Friday at 10:18PM in A3 Sarah said to another woman: "Now it's your turn." After that women in A3 talked among other things in relation to Plaintiff: "Hostages… Kalin.." "Have to stop." "May be Kalin to find.." "How to stop?"

449.    4/14/2021, Sarah Gomish in ap.A3 stated: "He holds us hostage." ECF No.8-1 at n.71.

450.    4/18/2021, 9:27PM while Plaintiff was working on counterterrorism reports from Congressional Research Service Dula in ap.B2: "Can't pursue him.. We are hostages." ECF No.8-1 at 210.

451.    4/29/2021, 6:10PM Slam from A3. Repeated at 6:11PM. 6:15PM Loud talking and knock from A3 on the wall. 6:18PM Plaintiff was in his corridor and heard a woman on speaker: "Hostages... pretending…" 6:23PM Sarah A3: "Cant push him." 10:40PM Plaintiff restarted Olympus in his corridor. Sarah: "Did he fight?" A woman: "Whatever.." ECF No.8-1 at 232.

452.    5/17/2021, 11:47PM Plaintiff was working on counterterrorism materials Defendants came under Plaintiff's windows: "How [to] stop? You know what we're doing.."

453.    6/18/2021 in Votee Park, Teaneck, NJ Defendants women passing by Plaintiff played on a phone's speaker a recording saying "hostage". ECF No.8-1 at n.71.

454.    6/27/2021 Sunday, 6:30PM Defendants in a car parked under Plaintiff's bathroom window: "homicide.. can't prove it." After that, showing they see the content of Plaintiff's screen on which he was working, Defendants entered ap.A3 and knocked on his wall, then talked about the FBI under his windows. See ECF No.8-1 at 63.

455.    7/17/2021 Saturday, 11:05PM Defendants came near Plaintiff's windows and talked about "homicide… stop.."

456.    8/14/2021 Saturday, 9:49PM schoolgirls came under Plaintiff's windows "That guy killed people." ECF No.8-1 at 924.

457.    8/20/2021 Friday, 9:40PM the same white SUV again on Red Road, Defendants talked about "hostages", then a person from the car entered the building.

458.    8/28/2021, 11:17PM Defendants at earshot distance to Plaintiff "Found the body.. Can't arrest.".. "Can't believe." "You killed []. You are dead. You are dead." ECF No.8-1 at 102.4.

459.    8/30/2021 Monday at about 1AM Plaintiff was awakened by very strong energy beam at the left side of his head and heart. Later (1:38AM) Defendants came under his windows talked about him ("Kalin") and the "hostages", and laughed.

460.    9/7/2021 Tuesday, Plaintiff worked on relevant history till 10:16PM. At 3:28PM there was a slam in B2, a bit later (3:50PM) under Plaintiff's windows woman commented "Have to stop.", and at 4:45PM a pebble at Plaintiff's window. Minutes later Ralph was talking with USPS woman carrier "Everybody []" "He keeps us hostage." ECF, No. 8-1 at 675

461.    10/19/2021 Tuesday, 6:28 Defendants' Ralph and woman talked in building's corridor about Plaintiff ("Bulgarian") and a murder. Then Ralph entered ap.A1. ECF No.8-1 at 263.

462.  11/6/2021 Saturday, Plaintiff worked till 2:03AM on the events related to his Verizon order(s) for Fios in 2020 (see 2070 et seq.). At 2:46PM Peter Loomer and another person commented under Plaintiff's windows "Hostage [] big organization []." ECF, No. 8-1 at 724

463.  11/23/2021 Tuesday, 1:32AM heater knocks. Defendants' woman on Cedar lane nearby "We are hostages."

464.  1/7/2022, Defendants and Holy Name staff at a site for COVID-19 vaccination asked 3 times Plaintiff for his name and for verification – only him. ECF No.8-1 at 286.

465.  1/31/2022, after earlier Plaintiff challenged in his apartment at 11PM Defendants man came under his windows talking about being "hostage". Plaintiff worked on police-pursuit till 1:04AM, 2/1/2022. ECF No..8-1 at 310.

466.  2/18/2022 Plaintiff worked on relevant history till 2:15AM, 2/19. Defendants in that period threatened under his windows "Call them. Set by now the Bulgarian gonna lose." They said Plaintiff is "for sale. Hit Kalin." "I did prove it. Bullet must []." A bit later they stated they will "punish mob". Between 9:11PM and 9:41PM in freezing temperatures outside multiple Defendants' persons (men and women) talked about Plaintiff under his windows "But really don't Kalin--" "(Arrest.)." "Ticking bomb we hear." ECF No.8-1 at 328.

467.  3/6/2022 Sunday, 3:45PM Defendants' man (Ralph?) in ap.B2 commented "Getting us hostages. Can't talk." ECF No.8-1 at 344.

468.  3/10/2022 Thursday, 3:44PM Cesar Naranjo and Ralph Pimienta talked in ap.A3 about Plaintiff ("Bulgarian"), the "hostages", and made loud 'drilling' noise. ECF No.8-1 at 348.

469.  5/2/2022 Monday, Plaintiff was working on undercover activities' materials when at about 6:50PM Dula in B2 commented that he "holds us hostage." ECF No.8-1 at 401.

470.  5/8/2022, 11:30AM Defendants came under Plaintiff's windows on Cedar lane "Got hostage." "Already did." ECF, No. 8-1 at 407

471.  7/2/2022 Saturday, 5:29PM Dula responded in ap.B2 "Bulgarian []. … They are hostages." ECF, No.8-2 at 2204.

472.  7/11/2022 Monday, Defendants' Ralph "Gotta shut up." "We are the hostage." ECF, No.8-2 at 2441 et seq.

473.  11/9/2022 Wednesday, 4:22PM Plaintiff was working on radicalization when Loomer and Ralph commented "Haven't killed []" "Police fights." Plaintiff started Olympus recorder and they quietly got upstairs. One of them "Don't believe."

474.  11/21/2022 about a week after Plaintiff filed Notice of claims with Teaneck, NJ and NYC, and Administrative claims with the FBI Defendants gathered in ap.B2 in regards to him. Among other things they said Plaintiff "stole that. Arrest him []." Loomer: "Arrest the fag." ECF No.8-2 at 5952 et seq..

475.  On 12/18/2022 Sunday at 10:49AM Defendants' woman in ap.A3 commented Plaintiff have them 'hostage [] have to back off.' ECF, No.8-2 at 5989.

476.  1/20/2023 Teaneck police officers and Defendants agents in the building talked Plaintiff "got new hostages." (see more at ECF, No.8-1, at 81 et seq.).

477.  3/24/2023 Friday, 3:56PM minutes after Plaintiff wrote a line in the transcript of 230120_0202.mp3 'Got new hostages' Defendants woman came under his windows and talked about 'hostages'. ECF No.8-2 at 7013.

478.  4/24/2023 Monday, Spanish speaking woman talked behind Plaintiff about 'terroristo', a man commented "Hide." ECF No.8-2 at 7518.

479.  6/21/2023 about 2:30PM when Plaintiff got out of the building three high school boys followed him "Freak. This shirt is freaky." "He probably stole it." ECF No.8-2 at 8307.

480.  7/23/2023 Sunday, 2:25AM Defendants in front of the pub continued "He is trying to stop." "[] lets hope." 2:27AM "We can not let go." 2:28AM "Bulgarian.." a woman "Set up."

2:34AM they talked about "Gyro". Plaintiff made photos the man responded "Shot gun.. I am still paranoid."

481.   8/10/2023 Thursday, 8:28PM Defendants man in front of the pub on Cedar lane talked about "Gyro". Later talked that Plaintiff "did homicide".

482.   8/27/2023 Sunday, 6:12PM Defendants woman came near Plaintiff's windows and talked about "hostages", while Plaintiff was working on a brief about 2d Circuit.

483.   9/21/2023 Thursday, 6:01PM-6:40PM while Plaintiff worked on S.D.N.Y. legal cases Defendants' man in a car parked under his windows talked with Defendants' Thai woman on speaker about Plaintiff ('Kalin' 6:14PM), holding "hostage", and the "United States".

484.   9/22/2023 Friday, after Plaintiff made photos of Defendants' patrolling agent eating under his windows, at 1:57PM Defendants' man came under the windows talking about "hostage". "New York [] got in control."

485.   9/23/2023 Saturday, 6:36PM Defendants in B2 talked about being "hostage" while Plaintiff was working on FBI and AG guidelines in relation to his FTCA charges.

486.   9/28/2023, 10:51PM 2 Defendants' men on the opposite to Plaintiff side of Cedar lane talked about him "Mother fucker killed you man, and have to go to prison." "Tell Kalin []."

487.   9/28/2023 Thursday, 11:28AM students came under Plaintiff's windows talked about him ("Bulgarian"), and a bit later 11:37AM schoolgirl talked about being a "hostage".

488.   10/10/2023 Tuesday, 2:46PM knocks on the pipe. Plaintiff was working on timeline of events – graphics. Dula commented Defendants are "hostage".

489.   2/22/2024, 11:02AM Defendants woman in building's corridor talked about "hostages". "Can't believe. We have settled []." (11:51AM Defendants woman in ap. A3).

490.   3/7/2024, about 3:30PM students came under Plaintiff's windows "Kalin… blackmail." And at 3:36PM "He has to stop."

491.   3/19/2024, 1:56PM Defendants woman under his windows while Plaintiff was working on frivolous legal brief talked about "hostage.. Don't push."

492.   6/13/2024, 8:22PM Defendants came in three cars next to Plaintiff's windows. Talked loud pretending they don't know where they are, but provoking Plaintiff "Careful. Takes you hostage." "He is the guy." "Careful." When leaving they commented "We couldn't fish him."

493.   6/17/2024, after working outside at about 12:10AM Plaintiff got home and continued working on defamation charges. Then two school boys came under his windows talking "He stole it." "He can't survive." And made three thuds.

494.   6/23/2024, 11:06PM just after Plaintiff stopped working on EF from Defendants in ap. B2 Defendants' woman commented "Hostages...That's the problem."

495.   7/12/2024, 9:38AM Defendants men under Plaintiff's windows "You've been on this field before?" "Can't fight." 9:48AM toward Plaintiff "You learn to fraud. Your mother would []."

496.   7/25/2024, 2PM (a day after Plaintiff filed a letter to Judge Rearden) Defendants man who kept staying with his back toward Plaintiff, returned near his windows and talked with a couple – still with his back toward Plaintiff. "How to fight him?" "We are hostages."

497.   7/28/2024, 5:17PM Plaintiff was working outside in Teaneck when large group passed and commented him (looking at him) "He stole my ID." and later "Put the knife. Put the knife []"

498.   8/10/2024, 4:50PM family passed Plaintiff at the benches next to Rocklin's on Cedar lane, Teaneck, NJ, woman commented in regards to Plaintiff – "hostages". 6:03PM Defendants' man talked mostly in Spanish said that "all die". He got close to Plaintiff talking in Spanish, whistled very loud, and again got very close to Plaintiff in apparent intimidation – no one else was nearby. After Plaintiff started video he retreated talking. 6:05PM he commented that Plaintiff is 'Making a video…'

499.  8/15/2024, 2:39PM Defendants' woman at Jamaican food – see the context of Defendants' activities that day "Taking hostage…"

500.  9/6/2024 Plaintiff was working on JTTF materials when at about 9:30PM Defendants' man came under his windows and said "You forgive it out. Now all you have to do is talk to []. Fraud."

501.  9/25/2024 about 10:13AM Teaneck police officers in the building corridor "We lost that fight." Ambulance arrived at about 10:19AM. 10:23AM Defendants Dula in B2 "He killed Americans. Can't stop."

502.  12/30/2024 about 2PM Plaintiff was walking on Cedar lane and met two men and a woman. One of them looked at Plaintiff and commented "You know he wanna be a terrorist." The other man responded "No."

503.  1/25/2025, 10:56AM Defendants' woman with two kids came under Plaintiff's windows on Cedar lane and talked about "security… He holds us hostage."

504.  1/30/2025, 11:30AM-11:44AM while Plaintiff was working on interference with cases students were loud under his windows "They will settle…" "Federal shit.." "Forget.." 12:22PM Defendants in ap.B2 talked about Plaintiff "Kalin.." after a bit earlier a woman under Plaintiff's windows talked about "hostages".

505.  3/17/2025, 11:35AM students came under Plaintiff windows, a girl was loud "Oh my god." "He stole it." A bit later they returned under the windows "Keep going." In building corridor Holy Name guard neighbor commented "Nobody stopped []."

506.  Defendants have made all those accusations with the knowledge of their falsity. For example they know the purpose of Plaintiff's records, but falsely claim Plaintiff holds them hostage.

*(B) Defendants deliberately misinterpret Plaintiff's words and actions in detrimental to him way – an expression of their animus and malice toward Plaintiff.*

507.  The purpose of <u>Plaintiff's lawful search, collection (including lawful record of relevant events), and dissemination of case-relevant information</u> is well known by Defendants at least due to his petitions which are overtly based on that information (including his police reports, legal notices, lawsuits, and other petitions since 9/11/2012). Furthermore Defendants have demonstrated that they know the purpose of these activities (see for example their explicit statements that Plaintiff 'can't sue them' at IV.9(a)(2)) but interpret them apparently intentionally as terrorism, as Plaintiff holding them 'hostage' (see their false accusations at 390 *et seq*.). Defendants' repressive actions escalated in retaliation to Plaintiff's regular documentation of relevant events, his use of Blue Iris-based security system, and his preparations, work on, and filing of petitions – additional proof that this is what they interpret as a threat. In relation to that see for example the 1st and 2s

pre-incident indicators, "monitor or record activities" and "seeking information" (283-284), which are broad, and can be used to interpret lawful acts as indication for terrorism/crime when there is animus and/or malice).

508. Defendants' conduct after Plaintiff had filed a report with Teaneck police on 9/11/2012 is framed (at least in part) as counterterrorism measures, and that infers that they misinterpreted his police report and his recording as attack on the government (which is further supported by their later narrative that he 'hits police' and more). After Plaintiff's police report from 9/11/2012 Defendants not only did not ceased, but did the opposite – they amplified their unlawful actions against Plaintiff, and later reaffirmed again and again his designation as a threat.

509. Defendants have explicitly presented Plaintiff as a cop-enemy hitting police without factual basis and with deliberate misinterpretation of his preparations for lawsuit(s) against Defendants since 2016. This is related of their narrative that Plaintiff 'holds [them] hostages', and illustrates that they frame him as an anti-government radical to justify their abuse. This is also part of Defendants' methods to disrupt Plaintiff – to create conflicts in this case with police (see 131 et seq.).

510. Different parties have explicitly said in regards to Plaintiff and in his presence that he "hits/fights/sues police", including uniform Teaneck police officers (8/24/2016, 5/29/2020), students (5/14/2018, 6/18/2018, 5/15/2020, 10/2/2021 (together with Defendants)), Defendants' Pimienta ('Ralph') (1/8/2024), and multiple unknown to Plaintiff Defendants' agents/officers or parties in concert. That shows dissemination of the information about Plaintiff (they know him), coordination of the messages to him, and among other things that activities against him are 'police' activities.

511. In terms of location Defendants have made such statements under or next to Plaintiff's windows (8/24/2016, 5/14/2018, 6/17/2018, 3/6/2020, 5/15/2020, 5/29/2020, 1/13/2022, 7/24/2023,

8/31/2023, 9/8/2023), in ap.A3 – neighbor to Plaintiff (12/31/2019, 4/20/2020, 6/5/2020,

8/26/2021), in building corridor on Plaintiff's floor (3/2/2021, 1/8/2024), in Derek Smith Law

Group's office in Manhattan, NYC (6/21/2017), in Sears, Hackensack, NJ (1/27/2018), in the

airport in Munich, Germany (3/9/2018), in Phelps Park, Teaneck, NJ (6/18/2018, 10/2/2021), in

the NYC Sheriff's Office (8/7/2018), in Target, Hackensack, NJ (3/21/2022), next to Provident

bank on Cedar lane, Teaneck, NJ (6/19/2022).

512.    Notable is that, after on or about 3/27/2022 Plaintiff drafted a paragraph (which later became

paragraph 102.6 in ECF No.8-1) listing examples of Defendants statements that he 'hits police'

Defendants no longer say that in his presence. Just before (7/24/2023) and after Plaintiff initiated

*Dimitrov I* Defendants commented again that he "fights police" (8/31/2023, 9/8/2023) with one

notable variation – that he "fights the government" (1/8/2024), but since 1/8/2024 Plaintiff

haven't noted another instance of Defendants talking about him hitting/fighting police or

government even though they continue to use "hit" and "fight" in regards to him). This is another

demonstration of the coordination between parties – their verbal conduct toward Plaintiff is

planned.

513.    8/24/2016, Teaneck police officer in a car under Plaintiff's windows when he started working for the first time on materials related to his case against Defendants "Which guy try to hit us?" ECF No.8-1 at 124.

514.    6/21/2017, in Derek Smith Law Group's office in Manhattan Defendants and staff commented Plaintiff "That's a cop-enemy?" ECF No.8-2 at 2107.

515.    1/27/2018 a staff member in Sears, Hackensack, NJ said about Plaintiff "He hit an officer." ECF No.8-1 at 102.6.

516.    3/9/2018 in the airport in Munich, Germany Defendants commented Plaintiff that "He hits police." ECF No.8-1 at 959.

517.    5/14/2018, 1:15PM students came under Plaintiff's windows and said he "Fights the police." ECF No.8-1 at 847

518.    6/17/2018, Defendants came under Plaintiff's windows while he was working on his case against Gyro et al. "He fights New York police." ECF No.8-1 at 48.

519.    6/18/2018, children in uniforms in Phelps Park, Teaneck "He watches police." ECF No.8-1 at 102.6.

520.    8/7/2018, in the NYC Sheriff's Office "He wants to sue the police." ECF No.8-1 at 49.

521.    8/2/2019, in Teaneck, NJ: "Have to punish him. He hits police." ECF No.8-1 at 102.6.

522.    12/31/2019, Defendants in ap.A3 or ap.A6 "[He] hits police." ECF No.8-1 at 649.

523.   3/6/2020, Defendants came under Plaintiff's windows "Fights police." ECF No.8-1 at 484.

524.   4/20/2020, Defendants in ap.A3 while Plaintiff was working on DHS materials: "We thought he wants to hit the police". ECF No.8-1 at 480.

525.   5/15/2020, 1:30PM students came under Plaintiff's windows "Why he fights the police?" ECF No.8-1 at 847.

526.   5/29/2020, while Plaintiff was reading DOJ Civil Rights Division's report about police Teaneck police officer in a car parked under Plaintiff's windows "Sue the police.". ECF No. 8-1 at 119.

527.   6/5/2020, after Plaintiff knocked in retaliation to a knock from A3 Defendants in ap.A3 commented he is "hitting police". ECF No.8-1 at 480.

528.   3/2/2021, while Plaintiff was dancing in his apartment at 4:10PM Defendants in the building's corridor "As if he doesn't fight police.." Ralph: "Don't stop.." ECF No.8-1 at 663.

529.   8/26/2021, while Plaintiff was working on relevant history Defendants in A3 said he "destroy cops". ECF No.8-1 at 102.6.

530.   10/2/2021, Defendants in Phelps Park, Teaneck "[He] hits police. How to provoke him?" Plaintiff sat on a bench and a bit later two mid school boys stomped behind him and yelled "fight". ECF No.8-2 at 2168.

531.   1/13/2022, 12:11PM Defendants' woman came near the windows on Cedar lane and commented Plaintiff is "hitting police. You crazy shit… my life." ECF No.8-1 at 292.

532.   3/21/2022, in Target commented Plaintiff "He hits police." ECF No.8-1 at 701.

533.   6/19/2022, about 8PM a family next to Plaintiff who was working on a bench next to Provident bank on Cedar lane, Teaneck, NJ. "He fights police." Plaintiff looked at them and the oldest girl "What are you looking at?" ECF No.8-1 at 434.

534.   7/24/2023 at 12:34AM, a day before Plaintiff initiated *Dimitrov I*, he was working on battery count, and listed names on neighbors as NYPD/JTTF when Defendants' man nearby "Ha, ha.. Fight police. Fight."

535.   8/31/2023 Thursday, 6:08PM Defendants' man at Jamaican food truck near Plaintiff's windows "fight… fights police".

536.   9/8/2023 Friday, 12:05AM woman on speaker "Can not sleep… Tell Kalin." Defendants in front of the pub "Fights police… Kalin []."

537.   1/8/2024, before 10:58AM Ralph loud in building's corridor talked with Defendants' woman about Plaintiff ("Kalin"): "He don't believe we stopped." "He hit the government. Have to go. In about a week they will decide."

538.   A few direct examples show Defendants' intentional misinterpretation of Plaintiff's conduct.

539.   As for example the events on 12/15/2012 when Plaintiff was playing chess on his notebook Defendants came under his windows and threatened "What he's playing? This is not a game. I'll shoot him through."... "Secured the perimeter." ECF No. 8-1 at 119.

540.   Defendants' bad faith interpretation of Plaintiff's complaints is mirrored in his lawsuits. See example IV.10(b)(ii)(2).

*(C) Defendants set Plaintiff up to manufacture verbal and/or other response which could justify their activities. That includes demonstratively harming Plaintiff to make him hostile toward the US and its agencies, and to develop him as a threat by deliberately creating the conditions for his radicalization.*

541. In addition to harming and provoking Plaintiff for many years (see for example IV.8, IV.11, IV.12) Defendants have made multiple demonstrative statements showing that the pain and suffering he has been experiencing are caused by them or with their approval, aid and support. Obviously Defendants aim in that way to fuel Plaintiff's "perceptions of government or law enforcement overreach, [while damaging his] socio-political conditions" – two of the main drivers for extremism according to the FBI (see n.63) – and make him hostile toward the US and its agencies. Furthermore, Defendants regularly expose Plaintiff to violent narratives ('terrorize him' – 2392 *et seq.*; 'fight', 'kill him' and more at 2600 et seq.), which is a radicalization factor.

542. "Narratives which reduce complex, real-world phenomena to simplistic, violence-promoting propaganda can activate the necessary mechanisms for violent radicalisation to occur. … an individual's perception of this means-end [means of achieving certain goals] configuration can be manipulated through the use of persuasive propaganda; deliberate, systematic attempts to manipulate cognitions, and shape behaviour, in line with the desired intent of the propagandist. In cross-disciplinary research, there is a growing body of evidence demonstrating that narratives such as [means-end, "Doomsday" or "End of Times" narratives] are among the most effective forms of persuasion, and attitude-change, likely due to their ability to impede counter-arguing, and, therefore, resistance to persuasion. In this way, violent extremist narratives can achieve attitude-change through a process of persuasion, serving as violent radicalisation "triggers"." *Counter-narratives for the prevention of violent radicalisation: A systematic review of targeted interventions*, Carthy, Doody, Cox, O'Hora, Sarma, The Campbell Collaboration, Homeland Security, Wiley, 2020 (references omitted)

543. "The first condition is an escalation of the conflict between the in-group and the state along with a parallel rhetorical escalation, which uses war metaphors. The use of such extremist language on both sides decreases the threshold for violence." *Making sense of political violence: an interview with Marc Sageman*, Mitja Sardoc (2020) Small Wars & Insurgencies, 31:3, 670-679)

544. See *Radicalisation, De-Radicalisation, Counter-Radicalisation: A Conceptual Discussion and Literature Review*, Dr. Alex P. Schmid, International Centre for Counter-Terrorism – The Hague (ICCT) Research Paper, March 2013 ("In recent years the role of radical narratives – how terrorists see the situation – has emerged as an important dimension in explaining radicalisation."); Huq, *Modeling Terrorist Radicalization The New Face of Discrimination: Muslim in America*, Duke Forum For Law & Social Change Vol. 2:39 20102010 ("A key part of the "radicalization" path, Secretary Chertoff explained, is that "people have to be persuaded" and "presented with a comprehensive world narrative."")

545.    As illustration to their demonstrative intention to harm and provoke Plaintiff Defendants

explicitly stated their intention to torture, terrorize, harm and oppress him, and were explicit that

this is at least in part retaliation to Plaintiff's petitions (for example they commented "They want

him straggle." on 8/30/2024 – the day after he had sent his second Administrative claims to the

FBI), and inducement of illegal response by Plaintiff ("We don't stop. Fight." 3/20/2025). In

some occasions the timing of such statements shows that by torture they mean Defendants' sound

attacks on Plaintiff (slams, knocks, shouting, loud music, and similar next to him) as on

3/29/2016, 3/30/2016, or 3/11/2022. Defendants have increased a lot their sound attacks on

Plaintiff in retaliation to him considering a lawsuit in the end of March 2016, and a bit later on his

work on petitions. See 2584 *et seq.*. In almost all other occasions when Defendants talked overtly

about the 'torture' it meant punishment for Plaintiff's work on case materials (9/14/2024), or for

his documentation of events (7/4/2024), or was used as a threat to disrupt his work on petitions.

Related to that is Defendants explicit statement in regards to Plaintiff to "Make him

uncomfortable." 11/13/2021.

546.    3/29/2016, 9:40AM "Can't even torture him." 10:22AM "Can't even harass him."
547.    3/30/2016, "How we terrorize him?" "Mock. Mock." ECF No.8-1 at 1823.
548.    11/2/2016, 11:27AM "Make him suffer."
549.    12/1/2016, about 6:55PM Plaintiff watched Game of Thrones. Defendants came under his windows and threatened "When we get you we'll torture you like this." ECF No.8-1 at 213.
550.    11/3/2017 Friday, about 12:40AM Defendants came under Plaintiff's windows "Believe. Torture that guy." "Do not talk."
551.    12/11/2017, 12:20PM Plaintiff called Horizon NJ for a primary care physician. 1:06PM students came under Plaintiff's windows "Why suffer?"
552.    4/21/2018, 9:58AM "Torture him." ECF No.8-1 at 1823.
553.    11/13/2021 Saturday, 8:51PM after Plaintiff watched Colony, a movie with Ema Watson, and was working on CIA interrogation when Defendants' woman came in building corridor "Make him uncomfortable." After Plaintiff started Olympus Defendants commented "He is listening." and stopped talking. ECF No.8-1 at 270.
554.    3/11/2022 Friday, Plaintiff transcribed an audio recording with pipe bangs till 4:56PM. In that period Defendants made pipe bangs at 2:39PM, 2:42PM, 2:43PM (2 times). At 2:52PM Leah(A3) and another woman came under Plaintiff's windows "We couldn't make him []." and talked in Russian. Pipe bangs continued at 2:55PM (2 times), 2:56PM, 3:18PM (strong), 3:30PM, 4:22PM, and 4:23PM. Later at 8:56PM Defendants' women in ap.A3 and in

building corridor talked about Plaintiff "Have to hit him really hard." "That person spy.." ".. he suffer.. Suffering…" ECF No.8-1 at 349.

555.  1/20/2023, Teaneck police officers and Defendants in the building talked about Plaintiff after an officer entered Plaintiff's apartment. "Sufferer we show the []." An officer loud "Forget all pain." ECF No.8-1 at 87.

556.  6/19/2024, while Plaintiff was scanning five Defendants' men posing as clients of Yola food truck near Plaintiff's windows talked about him "[] wants to stop." After Plaintiff put his camera on window they responded "See that? We are in trouble." At 12:35PM they continue "Suffer. Want you to suffer." Plaintiff called Dental Center of Hackensack complained about strong pain. Defendants woman in building corridor challenged "You lost the game." While Plaintiff was walking toward the Dental center they called him two times but he didn't hear them. Plaintiff got to the center, and while waiting for hour(s) the staff commented "Kalin is waiting. We couldn't stop him." Dr. Malouhi spent one minute with Plaintiff, she knew what's the problem and repeated Plaintiff's words he said to his parents – tooth was cut in the filling preparation "too deep". She said "I'll not make you suffer more. Root canal." The Dental center recommended Dr. maria Rozenblum, endodontist – Plaintiff had painful history with her – see 2019. After the visit Plaintiff went to CVS on Cedar lane near his apartment. The pharmacists looked at the screen and commented with another staff member "Just to disrupt" before giving him the medicine.

557.  7/4/2024, Plaintiff made photos of his lease renewal and was preparing a PDF file to sent to his landlords when at 5:50PM Defendants' woman came in building corridor and commented him in a call "Want to destroy this. His science project. Yes. A lot of people got disappointed." 5:59PM she continued "Have to shoot. Torture him." Plaintiff stopped his TV. "Destroy him." Defendants' patrolling man came under Plaintiff's windows, and crossed Cedar lane. 6:04PM Defendants' man at distance "We have to crush him."

558.  8/30/2024 (the day after Plaintiff had sent his second Administrative claims to the FBI) Defendants at Jamaican food truck near his windows talked at 6:34PM-6:39PM "Police stopped.. police… Kalin fight… They want him to straggle."

559.  9/14/2024, 3:56PM Defendants' men in Votee Park, Teaneck talked about Plaintiff including about "Little pushing…" "Torture."

560.  3/20/2025, 9:18AM Plaintiff challenged inside his apartment "You are sick. If you do not cause me pain and suffering you have no reason to be here. You can not stop." 11:33AM Defendants' man loud on Cedar lane "We don't stop. Fight."

561.  And more – see Timeline of events.

562.  In similar way Defendants overtly directed, planned, and threatened to 'push / press / suppress / hit' Plaintiff, and acted on their threats. See 880 *et seq.*. Such demonstrative conduct apparently aims to provoke Plaintiff and make him hostile toward Defendants.

563.  Defendants deliberately obstruct the legal means for resolution of Plaintiff's grievances. They interfere with Plaintiff's petitions, deny him protection under the law (see IV.8-9), and that has significant role in their design to radicalize Plaintiff.

564.    "The second condition [for radicalization] is disillusionment with the effectiveness of peaceful means to resolve political grievances." *Making sense of political violence: an interview with Marc Sageman*, Mitja Sardoc (2020) Small Wars & Insurgencies, 31:3, 670-679

565.    "Radicalization is the process by which an individual, group, or mass of people undergo a transformation from participating in the political process via legal means to the use or support of violence for political purposes (radicalism)... When these feelings of frustration go unresolved through productive or legal means and are left to fester they can manifest in acts of violence motivated by, but not always directed toward, the governing body (Gurr, 1970)." *Radicalization: Relevant Psychological and Sociological Concepts*. C. Crossett and J. Spitaletta, The Johns Hopkins University, Applied Physics Laboratory U.S. Army Asymmetric Warfare Group, 2010

566.    In regards to Defendants' deliberate setting of conditions to radicalize Plaintiff see also IV.10-12, IV.8.

*(c) Defendants abuse threat assessment and management processes in regards to Plaintiff.*

567.    Because Defendants have designated Plaintiff as a threat since 2012, their activities against him are in essence threat management (see above IV.7(a)(2)). However it is apparent that the functions of threat management – to control / contain a person of concern using existing social systems and community policing, and to provide support and guidance to help the person of concern – are either abused or ignored in regards to Plaintiff. The broad definitions of threat indicators, Defendants' policy 'to err on a side of safety' (768) which permits targeting innocent, and similar, make possible such abuse.

568.    To the extend Defendants' activities against Plaintiff aim to control and contain him – Defendants use existing social systems and community policing to suppress his legal activities, and deny him fundamental rights protected by the US constitution and laws, including the international law – see IV.8, IV.10-11, and more.

569.    To the extend that Defendants claim they really believe/d Plaintiff is a person of concern – they have never engaged in any activity that resembles 'support and guidance to help' him for 13 years and ongoing. That is another evidence for their animus and malice without even considering the fact that they deliberately harmed and keep harming Plaintiff / creating more grievances.

570.    Furthermore Defendants have implemented in regards to Plaintiff threat management strategies with the highest level of pressure available before taking law-enforcement action – arresting him. Based on Defendants' conduct they use both '3rd party control or monitoring', and 'warning or confront' strategies (see above 292).

*(d) Defendants unreasonably designate Plaintiff as a threat for many years.*

571.    Defendants' use of false accusations, their efforts to set Plaintiff up and to eventually entrap him, and more, for 13 years and counting clearly show that they have no legitimate reasons to designate him as a threat  (see 390 *et seq.*, IV.8, and more). To the extend Defendants use Plaintiff's grievances as a reason, they deliberately misuse the radicalization models which provide a range of opportunities for abuse (see above (a)(3)). Grievances are not the sole factor for radicalization, otherwise each political party in opposition, for example, should be considered as a threat to the government / subjects to counterterrorism operations because of their opposition to (certain) actions by the party in charge. The means used to address those grievances separate those who are threat from those who exercise their legal rights, but that is true only if we follow the rule of law.

*(e) Defendants has always aimed to disrupt Plaintiff because he is Bulgarian legal resident, who they considered to be gay, because they held malice against him, and escalated their action as punishment for his petitions and other lawful actions.*

572.    Based on the totality of circumstances Defendants' overarching goal has always been the disruption of Plaintiff by subjecting him to regular disturbance, continuous unlawful pressure, degrading treatment, and inciting prolonged conflicts, frustration and distress (IV.8, IV.11-12). Defendants have not aimed to resolve any legitimate problems, as Plaintiff has not created any, but they do the opposite – they create problems for him, then prevent or obstruct his legal means to address the grievances, and repeatedly provoke him in apparent effort to incite illegal response(s) (see IV.9-10, and more).

**8. Defendants have been acting in concert to subject Plaintiff to unlawful oppression, and selective treatment motivated, at least in part, by discriminatory and/or retaliatory animus, and malice since 2012.**

573.   Defendants' conspiracy(s) to deprive Plaintiff from equal protection under the law, and to deprive him from residency in the US, to entrap him, and/or to oppress him otherwise, started in or about the summer of 2012 and was initially between FBI, NYPD/JTTF New York, and Teaneck public schools (Defendants referred themselves as 'agents', indicating they are law enforcement agents ("Arrest must stop?") from a 'different state' who would involve 'local powers'; while students amplified Defendants' threats to 'kill' Plaintiff) (IV.7(b)(i), ECF No.8-1 at 15 *et seq*.). The number of parties acting in concert increased significantly after Plaintiff filed a report for organized harassment and threats with Teaneck police on 9/11/2012 (ECF No.8-1 at 20-21, see above IV.1-6), and since then Defendants' acts in pursuit of those unlawful goals have never ceased. Defendants act consciously, and in agreement about their general purpose even though they might perform different functions, or different parts of the plan.

*(a) Defendants' activities against Plaintiff are motivated, at least in part, by his race, ethnicity, national origin, sex, perceived sexual orientation, citizenship status, and are in retaliation to his protected under the constitution and laws conduct.*

574.   Defendants' persistent, widespread and regular derogatory remarks about Plaintiff's protected characteristics clearly show their discriminatory animus, the dissemination of information, and the coordination between parties. Defendants' remarks are not based on their personal knowledge of Plaintiff: he is socially isolated – especially since 2020 (COVID-19), not a public figure, he does not identify himself in public verbally or otherwise as a Bulgarian (unless specifically asked about his origin), nor manifests deliberately in any way his other protected characteristics, nor he knows vast majority of the parties. Remarks are apparently based on disseminated in advance information, and Defendants' choice of information to spread – Plaintiff's Bulgarian ethnicity and

national origin, legal alien till 2016, perceived as gay – shows the significance of these characteristics for their perception of Plaintiff.

575.    Defendants retaliation to Plaintiff's exercise of his rights – to his preparation and filing of petitions, including lawful search for evidence and similar expressive conduct – is also explicitly shown in multiple occasions. Defendants have talked about the 'punishment' of Plaintiff, 'the lesson' he has to learn, their whole 'stop' campaign and similar. See bellow IV.8(a)(4).

**(1) Plaintiff is a white Eastern European with Bulgarian ethnicity, ancestry and national origin. As Bulgarian he grew up with specific culture, language, history, music, and customs.**

(i) Defendants regularly identify Plaintiff by his ethnicity/national origin regardless of the location, and make derogatory remarks in that regard such as 'Bulgarian fagot', 'Bulgarian mob', 'Bulgarian enemy' (see for example ECF No. 8-1 at 18, 29, 32, 328; and ECF No.8-2 at 2141).

576.    Defendants' persistent and frequent use of "Bulgarian" as reference to Plaintiff demonstrates the importance of his race/ ethnicity/national origin for their perception of him. Since the initiation of *Dimitrov I* the use of 'Bulgarian' in Plaintiff's presence has significantly decreased, but when Defendants used it it was almost always in negative context. For example Defendants talked to the effect of 'Catch the Bulgarian' (8/18/2023, 11/18/2024), 'arrest Bulgarian' (9/28/2023, 7/16/2024), 'Bulgarian is bad ass' (9/13/2023), 'Bulgarian fagot' (7/16/2024), 'Bulgarian harass' (3/7/2024), 'Bulgarian lost.' (4/9/2024), or 'Sick Bulgarian.' (11/9/2024). See Exhibit Timeline of events 2023-2025

577.    For example on 8/18/2023 Friday at about 11:33AM while Plaintiff worked on exhibits for a filing in *Dimitrov I* Defendants near his windows commented, and provoked him "We can't stop. He has to [stop]."... "If they stop pressing []."... "Kalin" … "destroy… Bulgarian []. Catch him."

578.    9/10/2023 Sunday, about 6PM Plaintiff went to Teaneck Cinemas on Cedar lane and bought a ticket. Immediately after that in a call a man on speaker talked with the girl at cashier "Tell me what Bulgarian [wanted]." among other things deliberately showing Defendants' surveillance of Plaintiff.

579.    9/13/2023 Wednesday, 1:40PM Defendants came near Plaintiff's windows "Bad ass." "Bulgarian []."

580.    9/28/2023 Thursday, Plaintiff filed Request for summons in *Dimitrov I* and was working on legal cases when Defendants' Dula commented in ap.B2 "Kalin won't forget. Tell Kalin … Bulgarian… Arrest."

581.    9/29/2023 Friday, 12:57PM students came under Plaintiff's windows and talked about "Bulgarian… We stopped."

582.    10/1/2023 Sunday, 10:27AM Defendants' man and Dula talked in B2 "He is going to continue.." "New York []." "Bulgarian ... Kalin.."

583.    10/10/2023 Tuesday, 3:36PM students came under Plaintiff's windows "Bulgarian to fight. Why you want to fight?

584.    10/20/2023 Friday, 5:30PM Dula in building corridor "See how he will respond to that." She entered B2 talking "Bulgarian…"

585.    1/6/2024, 7:47PM talking in ap.B2 on speakers "Completely lost… Stop…" 7:52PM "Bulgarian stopped…" "We lost."

586.    2/25/2024, 10:06AM Dula on speaker in ap.B2 "Bulgarian… Can not stop. Do You []? They stopped. You can't believe."

587.    3/7/2024, 12:41PM a bit earlier Defendants' man talked on radio under the windows. Defendants in ap. B2 commented "Bulgarian harass… Can't believe."

588.    4/9/2024, 1:02AM Ralph in building's corridor "Bulgarian lost."

589.    5/17/2024, 5:36PM Defendants' woman on speaker in building corridor "Bulgarian…" After Plaintiff started Olympus she talked about 'falsifying'.

590.    7/16/2024, Defendants talked "Bulgarian ... fagot".."Press Kalin (they) have to arrest him."

591.    8/24/2024, 9:50PM Defendants commented while Plaintiff was working on FBI materials "How can we fight that?" "Can't talk. Bulgarian…"

592.    9/6/2024, about 1:17PM Defendants man at Jamaican food truck from the windows "How Bulgarian stop this []?".. "He doesn't believe."

593.    10/6/2024, 9:09AM Defendants in ap. B2 hammered on Plaintiff's ceiling. Defendants man in B2 "Can not believe cannot stop (him)." And later talked about "Bulgarian… Kalin believe …"

594.    11/9/2024, 3:05PM Defendants' Swaby and the Holy Name guard-neighbor talked near Plaintiff's windows "They send []. Sick Bulgarian."

595.    11/18/2024, 6PM Defendants' woman in building corridor commented "Bulgarian … Catching []."

596.    11/26/2024, 11:14AM Defendants' men (workers) on Cedar lane "Bulgarian is []. It doesn't matter if he gonna stay." When Plaintiff stopped TV talking stopped.

597.    1/6/2025, about 6:30PM after Ralph(?) said to the effect of "How to stop the Bulgarian?" Defendants in building corridor commented "Have to stop."

598.    2/4/2025, about 2PM when Plaintiff left his apartment (shopping at Target) Defendants in ap.A3 commented "He will never stop." "How to stop Kalin?" … "Bulgarian.."

599.    3/2/2025, 10:41AM Plaintiff detected... Defendants man in ap. B2 commented not loud "We lost. Can't stop." "Don't believe."..."He believe []. Bulgarian []."

600.    3/4/2025, 11:50AM Defendants' man in ap. B2 "Bulgarian stop []." 12:02PM man in B2 "… to stop.. If Bulgarian stops we can stop."

601.    3/29/2025, 2:55PM Defendants in B2 talking on loudspeaker "Kalin believe FBI…" "Know Bulgarian… Bulgarian… We do harass."

<u>(ii) Defendants have implied / fabricated links between Plaintiff and Russia, and referred to him as 'communist' in relation to Bulgarian history and culture. In that regard Defendants also referred to Plaintiff's lawful collection of evidence as 'spying', and to him as a "spy".</u>

602.    Defendants talked about Russia and Russian(s) in relation to Plaintiff multiple times (4/2/2018, 3/4/2020, 12/21/2021, 4/24/2022, 8/10/2022, 11/10/2022, 2/18/2022, 8/12/2023, 8/13/2024, 9/14/2024), implied a connection with the "Russian mob" (4/2/2018, 12/18/2022 (explicitly "fish[ing]" a response from Plaintiff)), they put a Russian speaking 'neighbor' in ap.A3 since 2021, and talked in Russian to him directly or indirectly (3/4/2020, 3/11/2022, 7/16/2022, 10/8/2022, 7/14/2023).

603.    4/2/2018 Defendants referred to Plaintiff at Stop and Shop Teaneck as the "Russian mob." ECF No.8-2 at 2171.

604.    3/4/2020 Verizon representative / Defendants' gent said to Plaintiff "have the same sting that *может* ['can' in Russian] available at your location" (ECF No.8-2 at 2074). Later Defendants' man at the background provoked "Russians don't pay me so Kalin []." (ECF No.8-2 at 2075, that is related to a challenge which Plaintiff had made a few times inside his apartment: that Defendants do Russia's work in destroying the rule of law in the US – see ECF No.8-1 at 124, 164).

605.    12/21/2021, about 4:30PM students came under Plaintiff's windows and commented that he is "Not Russian at least." ECF No.8-1 at 877.

606.     3/25/2022, 1:35PM "Did you heard? Russian wouldn't believe.."

607.    4/24/2022 Sunday, Defendants' men in ap.A4, including a person on speaker, commented Plaintiff's conversation with his Bulgarian relatives: "He knows we survey, why talk for Russia?" ECF No.8-2 at 2069.

608.    8/10/2022, 6:49PM Plaintiff was watching PBS Newshour when Cesar Naranjo, super, and Defendants' woman talked about Plaintiff ("Kalin") and the Russians ("Have Russians []."). ECF No.8-2 at 3327.

609.    11/10/2022 Defendants referred to Plaintiff as Russian in FBI New York Field Office building "We have the Russian." … "The Russian outlet." "Some easy kill []." ECF No.8-2 at 5913.

610.    12/18/2022, talking about Plaintiff Loomer said "Russian mob... Got [to] fish him []." Dula: "We call this one." Loomer: "Get Russian." About 20 minutes later Defendants continued the Russian theme. "Than it means arrest to [] to get a Russian.".. Dula: "You lost Kalin (arrest). … Get him. Stop Russian. Then arrest to stop." ECF No.8-2 at 5983.

611.     8/12/2023 after Plaintiff watched DW video about Prigojin, Youtube's algorithm loaded a video about Putin. Defendants' Dula came on Plaintiff's floor in building's corridor and commented "Russia, Russia, always Russia."

612.    8/13/2024, 1:22PM Defendants' men commented Plaintiff "What's his case?" "I got it." ".. purple.. purple.." … "Russian access.." See 46, NJ State participation.

613.    9/14/2024, about 5:41PM after Defendants in Votee Park commented a few times Plaintiff they talked about the "Russian", and showed nexus to police "Police called. I have to go."

614.    In relation to that Defendants asserted that Plaintiff is a 'spy'. Assertions were made by different parties, including Teaneck Public Schools' students, Defendants' agents from Plaintiff's building (as for example the named Defendants in *Dimitrov I* Dula and Pimienta), and others.

615.    In significant number of occasions the timing of Defendants' assertions that Plaintiff is a spy shows that they are in response to his gathering and working on evidence. For example Defendants called Plaintiff spy after he worked on timeline of case-relevant events (2/8/2022, 5/14/2024), transcripts (3/11/2022, 9/25/2024), on security camera videos – whether archiving or collecting/preparing them for exhibits (6/13/2023, 12/12/2024), on an exhibit (9/22/2024), or while he made photos (2/17/2022, 8/11/2023). That points also to the demonstrative surveillance of Plaintiff, and the coordination between Defendants. Especially notable in that regard are the events on 9/25/2024 – the reaction was about 20 minutes after Plaintiff had sent by email an audio recording of students and Defendants planning an action against him, and its draft transcript to the Teaneck's Town Manager, the clerk and to Teaneck police officer Strickland.

616.    Explicit public statements about Plaintiff as a 'spy' were made for example on:

617.    4/13/2018 at 3:30PM students "Spy on neighborhood." ECF No.8-2 at 1896.

618.    7/19/2019, 12:10PM, students came under Plaintiff's windows "Spy on us." ECF No.8-1 at 915.

619.    6/5/2021, while Plaintiff was working in Votee Park, Teaneck, NJ Spanish speaking group yelled toward him "Spy. Spy." ECF No.8-1 at 757.

620.    2/8/2022, 5:58PM while Plaintiff was working on timeline of events students under the windows commented he is "spying". ECF No.8-1 at 318.

621.    2/17/2022, while Plaintiff made photos students came stomping loud under his windows "He did spy.." ECF No.8-1 at 327.

622.    3/11/2022 till 4:56PM Plaintiff transcribed a recording. In that period Defendants made at least 11 pipe bangs ('water hammer'), Leah (ap.A3) and another woman talked under Plaintiff's windows "We couldn't make him []." and talked in Russian. In the evening they talked in ap.A3 about Plaintiff "Have to hit him really hard." "That person spy.." ECF No.8-1 at 349.

623.    3/29/2022, 4:56PM mid school girl came under Plaintiff's windows "Spy [] spy." Later Defendants in corridor "Clear this mother fucker." "The enemy." ECF No.8-1 at 367.

624.    8/18/2022, about 6:15PM when Plaintiff was in Votee Park he went to water closet. There were 2 high school boys and 2 girls. They commented Plaintiff is "spying on us". ECF No.8-2 at 3645.

625.    6/2/2023, 11:49AM school girls yelled "You are lying… Spying." ECF No.8-2 at 7965.

626.  6/13/2023, 7:02PM Plaintiff archived files from his security cameras, while working on the complaint for *Dimitrov I* when Defendants' man came under his windows "You spy." ECF No. 8-2 at 8170.

627.  8/11/2023 Friday, 11:32PM after Plaintiff made photos Defendants in front of the pub near his building commented he "wants to spy."

628.  8/29/2023, 3:41PM three high school boys (one of them probably college) on bicycles came again under Plaintiff's windows. They saw Plaintiff who started Tascam 2 "Scary guy. Nasty. Spy." "Do it." 5:18PM the same 3 passed under the windows again. When Plaintiff was preparing to leave the apartment they came again under his windows and shouted very loud. Plaintiff got outside and saw two of them looking at his windows. They left when they saw him, one said quietly passing by Plaintiff on his bicycle "You are lucky guy."

629.   9/2/2023 Saturday, while Plaintiff worked in Phelps park, at about 6:02PM two families(?) commented him to the effect of to "secure.. They want to help him.".. "He spy on them." "Kalin..." After Plaintiff made a video they kept talking about him ("Kalin") and commented that he is 'not afraid'.

630.  4/6/2024, 10:54AM Dula in ap.B2 "We got spy. I know. He has to go." and a bit later "Kalin didn't perceive… Didn't stop."

631.  5/14/2024, 8:15PM about 10 minutes after Plaintiff stopped working on timeline of relevant events Defendants' Dula talked in building corridor "How to stop him?" She came under the windows on Cedar lane and talked about Plaintiff "spying."

632.  5/18/2024, 11:04AM while Plaintiff was looking for swellings in result to the Defendants DE attacks Defendants man "Catch them all." Then while he was scanning Defendants under his windows challenged "Spy on us."

633.  6/6/2024, 2:58PM schoolboys came under Plaintiff's windows "Spying." "Won't believe."

634.  8/21/2024, 3:09PM Defendants' woman at Jamaican food truck "Can't stop… Psych." "Psych.. Kalin." "Spy. They had control." 3:15PM still talking "Bad Kalin. Bad." Then talked about the "big fight." "Fight Kalin. Can't stop." ... "Fight." Notable is that in the period between 8/19/2024 and 8/24/2024 Plaintiff worked on JTTF materials.

635.  8/30/2024, 9:16PM after Plaintiff worked on torture materials Defendants' Ralph and two women in building corridor talked "Kalin spy on us.." "Kalin…" They moved and continued talking in the lobby to the effect of "Why don't we [get him]?" "Because he is innocent."

636.  9/22/2024, 5:59PM Plaintiff was working on an exhibit for *Dimitrov I* when two Defendants' men passed by and said next to him "Watch it. We have a spy."

637.  9/25/2024, 4:35PM about 20 minutes after Plaintiff sent an other email to the Town Manager, the Clerk, and officer Strickland with a new recording (from 9/24/2024) and draft transcript of students and Defendants planning to threaten him, Christine, Jamaican food, said loud toward Plaintiff "Spying on us right now.. You heard this."

638.  12/7/2024, 11:05PM a few hours after Plaintiff worked on FBI materials Defendants came near his windows threatened "That guy spy on us.. Evict him." and entered the building.

639.  12/12/2024, 4:38PM while Plaintiff was collecting security camera videos from 2023 in preparation for an exhibit Defendants' men, one of them Holy Name guard-neighbor, came nearby and talked "Cannot stop." "Spy []. Spy on (us)." "He didn't respect us."

640.  Also related to the above is that Defendants referred to Plaintiff as a "communist" at least in two occasions: on 6/21/2017 at the Derek Smith Law Group's office in Manhattan ("Bulgarian is a communist." ECF No.8-2 at 2107); and on 12/15/2019 in Plaintiff's building ("Communist."

"They're not found. Get it." "If I shoot Kalin promise that Kalin *материали* ['materials' in Bulgarian]-- They []?"... " [] don't forget: communist." Transcript 191215_7035.mp3 at 13:58-59, and 14:33. ECF No.8-1 at 53).

**(2) Plaintiff is a strait male.**

641.    Defendants regularly challenge Plaintiff's masculinity by referring to him as a woman and 'fagot' in demonstration of how they perceive him and of their animus. Despite the significant decrease since Plaintiff has started to document regularly relevant events (Defendants seemingly instructed to mock Plaintiff with 'non-gay' remarks as, for example, on 11/21/2022) they have kept making diminishing remarks about his masculinity, including by referring to him in public as 'she', 'bitch', 'darling', 'fagot', 'fag'', 'freak', in apparent effort to ridicule, shame and humiliate him. Till about the end of 2022[93] Defendants also used feminized version of Plaintiff's name "Kalini" (see examples in ECF No.8-1 and 8-2), commented that he is 'girly' (12/15/2019, 9/17/2020, 9/3/2022), or "feminine" (7/5/2016). Defendants have sent on Plaintiff's address women's magazines addressed to Megan Cooper (landlord's staff member) as for example on 6/3/2015 (about four years after Plaintiff moved in). Notable is the same treatment of Plaintiff in Bulgaria (see 5/25/2022). See also the events on 7/16/2023 (days before Plaintiff filed the complaint in *Dimitrov I*) at ECF No.8-2 at 2636 *et seq*.; 8/31/2023; or on 5/14/2025 in Votee park, Teaneck in which Defendants implied that what Plaintiff is doing is feminine, not what a 'real man' would do (see Timeline of events).

642.    Among other things Defendants and parties in concert referred to Plaintiff as a "bitch" multiple times at different locations, as for example under or next to his windows (5/15/2016, 8/18/2022, 8/23/2022, 9/9/2022, 4/20/2023, 7/26/2023, 5/28/2024), when following him in Teaneck, NJ (4/2/2017, 4/5/2024), in ap.G2 (6/23/2017), in building corridor (8/22/2022), in Teaneck parks or

---

[93]  Plaintiff filed Notice of claims and Administrative claims with Defendants NYC, Teaneck, FBI New York on or about 11/10/2022.

benches in public (8/19/2022, 5/25/2024, 5/28/2024, 8/14/2024). Different parties made such

statements – for example students said that on 4/2/2017, 8/19/2022, 4/20/2023, 7/26/2023,

4/5/2024, and 5/28/2024.

643. 8/3/2013, Defendants under Plaintiff's windows "We do not kill this one." "May be fuck, man. Ha, ha.." ECF No.8-1 at 1822.

644. 10/13/2013 at 2:30AM about 6 uniform Teaneck Police and FBI/JTTF officers They referred to Plaintiff as a "fagot", a "bank robber" who "shot police". ECF No.8-1 at 34.

645. 5/15/2016, 3:30PM after Plaintiff challenged in his apartment Defendants responded under his windows "Shut up bitch."

646. 7/5/2016, in Stop and Shop Teaneck teenage girls were giggling looking at Plaintiff, and commented him: "He looks feminine." After that when Plaintiff was going home from a passing him car a person yelled at him: "Doll." ECF No.8-2 at 2171.

647. 4/2/2017, Plaintiff was walking on Cedar lane, Teaneck, when THS students yelled behind him. Three minutes later they run stomping after him and talking "Pursue that bitch." A bit later again a student run behind Plaintiff, passed him and stopped at a buss stop about 10 yards away. There was no buss coming. ECF No.8-1 at 938.

648. 5/20/2017 Plaintiff went to Phelps Park, Teaneck, NJ Defendants threatened "Arrest that freak." ECF No.8-1 at 113.

649. 6/23/2017, 5:10PM Defendants in ap.G2 slammed, and knocked on Plaintiff's floor "Bitch, get out."

650. 8/10/2017, Defendants at the Manhattan office of lawyer Robert Wisniewski referred to Plaintiff "[] fagot does. Kalin have proof." ECF No.8-2 at 2109.

651. 11/9/2017, after Plaintiff's visit to the FBI New York the previous day, Defendants/staff acting in concert in Stop and Shop Teaneck, spoke about him: "Can't fight this fagot. Just watch him closely." ECF No.8-1 at 46.

652. 4/13/2018 Friday, Plaintiff went to park Teaneck, NJ sitting on table. A young man came behind him "You want it in the ass." His group went to the basketball field. Plaintiff went there too. They commented "He's like forensic []." "Rape and kill him." Plaintiff made a video of them with his tablet and they left. ECF No.8-2 at 2166.

653. 6/19/2018 when Plaintiff took a photo of envelope outside postal boxes addressed to G3: "Freak got the feds." ECF No.8-1 at 102.6.

654. 9/7/2019, Defendants in ap.A3 referred to Plaintiff as a 'fagot'. ECF No.8-1 at 476.

655. 12/15/2019, in his building's corridor. For more than 30 minutes Defendants spoke about Plaintiff (they repeated Plaintiff's name 60 times, his ethnicity / national origin "Bulgarian" 13 times) referring to him as a "communist", a "fagot", "girly" or "gay man", and used female version of his name as for example in "Let Kalini push." ECF No.8-1 at 53.

656. 12/20/2019 in Stop and Shop staff at the checkout commented Plaintiff as "that freak". ECF No. 8-2 at 2171.

657. 2/25/2020 at a regular Advanced Debaters Toastmasters meeting Philip Kao slapped Plaintiff's shoulder - the only one he touched – and talked with Mary Johnson about the "gay." Plaintiff asked why they referred to him as a 'gay' they both denied talking about him or mentioning "gay" at all. ECF No.8-2 at 2132.

658. 3/6/2020, Defendants near Plaintiff's windows "Don't test Kalin". "The fagot believe." ECF No.8-2 at 2078.

659.    6/30/2020, 2:34AM Defendants came under Plaintiff's windows: "Records anyone." "Freak." ECF No.8-1 at 653.

660.    7/30/2020, 5:13PM Ralph and women talking in the building's corridor: "Kalin []. report to police." Defendants' woman in ap.A3 together with strong knocks responded: "Fagot didn't []. Scared." ECF No.8-1 at 655.

661.    9/17/2020, Oscar Bermudez, super, called Plaintiff 'girly'. ECF No.8-1 at 744.

662.    1/9/2021, 6:25PM Defendants' man and a woman got out from ap.A6 mocking Plaintiff (he spoke earlier with his relatives in Bulgaria): "Freak.. talks like my nana." ECF No.8-1 at 791. At 10:57PM just after Plaintiff sat at his desk, actually kneeling on the seat, Defendants' man came under his windows: "Kneel baby, kneel. Oh man.." Id. at 119.

663.    5/27/2021 at 11:50PM Plaintiff was sitting on a bench close to his apartment (visible through Plaintiff's windows). Three men crossed Cedar lane next to Plaintiff talking: "Is it him?" "Looks like a woman." Nobody else was there but Plaintiff. ECF No.8-2 at 1995.

664.    7/1/2021 Thursday at about 11:20AM a group of people (one of which Ralph Pimienta) knocked and talked in building's corridor about, among other things, the "fagot" (repeating "fagot" a few times). ECF No.8-1 at 581.

665.    10/8/2021 Friday at 12AM a very loud group passed under Plaintiff's windows. After the movie which Plaintiff was watching ended they returned under the windows. Plaintiff prepared to make a video, and a man from the group commented "You don't need to do this." "Fagot." ECF No.8-1 at 259.

666.    4/25/2022, 12:41PM Plaintiff was watching Jonny Depp's testimony, under his windows Defendants' man "Masturbating freak." A woman "Yea." ECF No.8-1 at 394

667.    5/20/2022 Friday, in Vienna's airport Defendants' persons talked about Plaintiff "This is the big gay." ECF No.8-1 at 961.

668.    5/25/2022 Wednesday, in Bulgaria Defendants awakened Plaintiff during the night with DE. At about sunrise feeling rays Plaintiff discovered a swelling at the right cheek of his butt. Later his parents' neighbors on 5 Stefan Karadja Str., Pernik, Bulgaria had a gathering in the open. One of them work(ed) in local police. They talked about Plaintiff as 'fagot' mentioning his name "Kalin… Kalin…" ECF No.8-1 at 967.

669.    6/25/2022, about 5:30PM a man stopped kids to play next to Plaintiff in Phelps park, Teaneck "Get away from that table." He apologized and Plaintiff thanked him for the care. Young man in background commented Plaintiff's response "freaky". ECF No.8-1 at 440.

670.    7/12/2022, students followed Plaintiff on the street "Can't suppress the fagot." ECF Np.8-2 at 2536.

671.    8/13/2022 Saturday, Plaintiff was walking on Red Road when two men walked toward him playing music on a loudspeaker. At the moment they were next to Plaintiff one of them said loud "Do you want a boyfriend like me?" while the other was recording a video of the encounter with his phone. ECF No.8-1 at 3474.

672.    8/18/2022 Thursday, 12:11AM Defendants' woman at distance talked about Plaintiff ("Kalin") mentioning in his regard "bitch". The same woman earlier was loud under Plaintiff's windows, entered the building, and in corridor also talked about the "bitch". 12:20AM Defendants' man in front of the pub also talked loud about the "bitch." ECF No.8-2 at 3631-32.

673.    8/19/2022 Friday, Plaintiff was working on the table in Votee when at about 5:45PM loud group of school boys and girls came and sat next to him. They talked loud and repeated "bitch", "fuck", "dick" and similar, played loud music in apparent effort to interrupt and provoke him (for example when Plaintiff plugged a power bank to charge his chromebook, a girl commented "Charger, do you have a charger?" Later after three school girls were very

loud on the alley when next to Plaintiff, one of them commented "Stop it. He don't want to fight."). ECF No.8-2 at 3697, 3721-22.

674. 8/22/2022 Monday, 8:49PM Plaintiff just started reading through relevant history file when Defendants agent in building corridor reacted "Son of a bitch. We tried to stop." ECF No.8-2 at 3818.

675. 8/23/2022 Tuesday, about 11PM Defendants' woman from previous night came again under Plaintiff's windows and referred to him "That son of a bitch." ECF No.8-2 at 3849.

676. 9/3/2022, 11:34PM under Plaintiff's windows on Red Road Dula(?) yelled "Girly." A man responded "Bulgarian []." ECF No.8-2 at 4190.

677. 9/9/2022 Friday, 11:16PM two Defendants women returned under Plaintiff's windows, and agents from the building (one of them was Cesar Naranjo) directed them to stay ("Have to stay. (Kalin) [].") The women performed while Plaintiff made a video saying among other things "I bet that Kalin []" … "And she is a fucking bitch. I get it." and after Plaintiff got inside his phone they commented "Set up []." "Can't prove--" Although not a clear referral to Plaintiff, their talking about the 'bitch' was intended to Plaintiff to hear. ECF No.8-2 at 4393, 4365, 4373. 4398, 4401-02.

678. 11/21/2022 Monday, Loomer: "Arrest the fag []." … "How to mock?" "Non-gay []." ECF No.8-2 at 5958.

679. 12/18/2022, instruction to not use 'gay' after Defendants woman referred to Plaintiff as a "gay." "Don't use this." Loomer: "Came to repair him." ECF No.8-2 at 5988.

680. 1/20/2023 (more than two months after Plaintiff filed his Notice of claims) An officer asked Emily if Plaintiff is a gay (he pointed to Plaintiff) "Sodom. Do you believe that?" ECF No.8-1 at 85.

681. 2/21/2023, 9:53AM Ralph was loud in corridor talking with Defendants' woman. "Got shot." "Gay could hear. I know." ECF No.8-2 at 6504.

682. 4/20/2023, 3:20PM a student came under Plaintiff's windows and yelled "Fucking bitch." ECF No.8-2 at 7447.

683. 6/2/2023, 1:20PM schoolboy said in regards Plaintiff 'He is everyone's project… Only thing they know is that he is gay. Once gay always gay.' ECF No.8-2 at 7972.

684. 6/21/2023, about 2:30PM when Plaintiff got out of the building 3 Jewish high school boys walked behind him and commented "Freak. This shirt is freaky.""He probably stole it." "Hope he gets this." ECF No.8-1 at 8307.

685. 6/25/2023, 12:47AM two men getting in the pub one looked right at Plaintiff "Fucking freak." ECF No.8-2 at 8364.

686. 7/3/2023 Monday, 2:09AM Plaintiff was working on equal protection charge when a man shouted under his windows "[] protecting. I don't know darling." ECF No.8-2 at 8511.

687. 7/11/2023, "Kill yourself. Fagot does." ECF No.8-2 at 8680.

688. 7/23/2023 Sunday, 12:02AM Defendants in front of pub talked about Plaintiff and "FBI" and "police". Later "Hear []. I have gay man baby."

689. 7/26/2023 Wednesday (a day after Plaintiff started *Dimitrov I*) at 8:13PM two schoolboys with bicycles came and shouted under Plaintiff's windows "Bitch." When Plaintiff looked he noticed a young woman staying close to the building's wall next to G-level entrance – all of them outside of camera view. Boys commented 'Can't hear it. Can't hear it.' Defendants woman responded "I don't know."

690. 8/15/2023 Tuesday, in the park 5 students with bicycles 3 of them stayed next to Plaintiff "Shame him." "He looks like []." "Gay."

691. 8/31/2023 Thursday, 9:32PM loud boys returned under Plaintiff's windows "Showing my ass on TV. Tell Kalin."

692.    4/5/2024, 3:30PM-4:30PM Plaintiff went to Chase bank to deposit a check. In front of the entrance two high school girls. Shouted "Bitch." Plaintiff looked around - there was no one else but him. Girls commented behind him "He knew it's about him. This is why he turned."

693.    4/22/2024, about 4PM when Plaintiff got in Phelps Park, Teaneck three students – a girl and two boys commented him "Gay… Have no shame.." When Plaintiff sat at the tables they talked not loud "Is that Kalin?"

694.    5/25/2024, 8:54PM and 8:31PM Defendants' man yelled something about Plaintiff "suing… I'll kill him." The same man returned shouting "Bitch. Looking to fuck. Suck my dick fagot. You don't even look at me." After that he left again.

695.    5/28/2024, Plaintiff went to work in Votee Park, Teaneck. When he got out of the building group of students passed him, and shouted under his windows. Plaintiff was looking at them, and started a video recording when they turned to him. Schoolboys waved to him, girls reacted "I'll punch this bitch."

696.    6/22/2024, 12:06AM Defendants woman in front of the pub "We could not suppress.." and later "He is a gay."

697.    7/6/2024, 2:17PM Defendants' couple in A6 "Kalin…" "Ready?" They yelled in building corridor "Kalin (is gay)."

698.    7/16/2024, 3:36PM-4:16PM the super Cesar Naranjo and other parties talked near Plaintiff's apartment about him apart from naming him, they referred to him as "Bulgarian" and "fagot".

699.    7/21/2024, 12:30AM Defendants talked in front of the entrance of the building (near the windows) "Fight. You think police would fight?" "Fight." Later while Plaintiff was in toilet they continued "Photoshop.. It's fucking scam. Fight." "Gay [].".

700.    8/14/2024, 3:39PM Defendants man passing by Plaintiff repeated loud "bitch". After 7:30PM Plaintiff worked next to Teaneck High School. Defendants challenged him "Fagot." "Make a video."

701.    9/6/2024, 1:03AM Defendants' man talked under Plaintiff's windows "We didn't wanna do this." 1:06AM "… He is a gay.." When Plaintiff got to the windows he got hidden.

702.    10/17/2024, 11:40AM students came under Plaintiff's windows and shouted while he was in toilet. Then talked not loud "Harass." Defendants' man said to them "Move it up." They left. But again shouted under the windows. A bit later at distance "Fagot."

703.    1/6/2025, 4:44PM two young men walked back and forth under Plaintiff's windows on Cedar lane "He is obviously bullshit…" later "fagot". Plaintiff tried to make a video but they walked away and stayed at some distance – apparently not having other goal, but talking under the windows.

704.    3/18/2025 when Plaintiff passed by Ralph and three Defendants' women in front of the building they commented him "He does look scary." "He is a freak right?" Ralph responded quietly.

705.    5/14/2025, 1:46PM Plaintiff was working on table at Votee Park. Defendants' man (the same who engaged with Plaintiff on 7/16/2023, 1AM-2AM) sat nearby, and in staged event addressing Plaintiff talked with a second mostly silent man for about one hour and fifteen minutes: about the "real man". "Women are weak, so they manipulate." and similar. At 3:01PM in a call the first man said "Kalin won't stop. Fucker []." 3:08PM he threw something in the garbage bin with loud bang and a bit later they left.

**(3) Plaintiff was a legal alien since he arrived in the US on 2/6/2011, and became a citizen on 4/13/2016.**

706.    Defendants' animus based on Plaintiff's citizenship status is intertwined with their animus based on his Bulgarian race, ethnicity, national origin (see above IV.8(a)(1)), and is shown also in their deliberate efforts to alienate and push Plaintiff out of the US (see bellow (b)(iii)). A few more examples of Defendants explicitly saying that Plaintiff does 'not belong here', and should not 'move from Bulgaria' are given bellow.

707.    4/16/2016, about one month after Plaintiff was laid off by Gyro, Plaintiff's apartment had no heating since the morning. Defendants in neighboring apartments (ap.G2 and B2) knocked on Plaintiff's floor and ceiling many times during the day. At 10:02PM Defendants' women commented "He feels it. He don't belong here." Earlier Plaintiff talked about Bulgarian tourism logos with his relatives in Bulgaria – he had read the previous day about those and Defendants then commented "Fucking Bulgarian."

708.    1/27/2017, 12:52PM high school students came under his windows "Get out." Later Defendants in ap.G2 warned Plaintiff "Don't move from Bulgaria." "Nobody is paying. We don't believe you." ECF No.8-1 at 161.

709.    8/19/2017, 10:33PM after shouting earlier under his windows "Fucking Caucasian." Defendants warned "You don't belong here." In that period lawyers were not responding to Plaintiff, or refused to take his Gyro case.

710.    9/28/2017, 10AM-10:20AM Defendants talked under Plaintiff's windows about "alienating" him, and left when Plaintiff put camera on his window. One of them was the Holy name security guard neighbor.

**(4) Defendants' actions against Plaintiff are at least in part punishment in retaliation to his lawful conduct and exercise of constitutional rights.**

711.    Defendants' conduct is punishment of Plaintiff without judicial adjudication of guilt (Fifth Amendment of the US Constitution)[94], and on that basis alone is unlawful. Defendants explicitly talk about their activities against Plaintiff as punishment. For example on 9/7/2019 Defendants gathered in ap.A3 and talked about Plaintiff for about an hour saying among other things that they

---

[94] "To be sure, treatment amounting to punishment (let alone, cruel and unusual punishment) generally cannot be imposed on individuals who have not been convicted of crimes. [] this prohibition flows from the Fifth Amendment... See Wolfish, 441 U.S, at 535 2.16, United States v. Salerno, 481 U.S. 739, 746-47 (1987). See also infra note 26." *Memorandum For John A. Rizzo Senior Deputy General Counsel, CIA Re: Application of United Sates Obligations Under Article 16 of the Convention Against Torture to Certain Techniques that May Be Used in the Interrogation of High Value al Qaeda Detainees*, Office of Legal Counsel, DOJ, May 30, 2005, n.23. "The Court in Bell [] noted that a detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." 441 U. S., at 535." *Sandin v. Conner*, 515 U. S. 472 (1995)

"Have to punish [him]." And that they are, and they should "Be the punishment." ECF No. 8-1 at 476. Transcript of 190907_6786.mp3 at 0:14, and 9:28.

712.    Defendants acted in coordination and demonstratively talked about punishing Plaintiff in his presence, as for example on 5/14/2017 (coordination between ap.G2 and other parties, Teaneck police timely appearance), 5/17/2017 (organized overt surveillance of Plaintiff by multiple persons), 9/7/2019 (coordination between ap.A3 and other parties, including the man who later became regular in ap.A6), 3/11/2021 (coordination between ap.A3 and B2 (Dula), noise harassment), 4/22/2021, 7/11/2021 (coordination between ap.B2 and Defendants under Plaintiff's windows), 5/11/2022 (coordination between Verizon workers, and Teaneck police officers), 6/4/2023 (talking from the position of collective identity – "we", "FBI", coordination between ap.B2 and Defendants under Plaintiff's windows), 7/29/2023 (coordination between parties in a car and Defendants' patrolling agent under Plaintiff's windows), 4/15/2024 ("we"), 5/20/2024 ("we"), 7/6/2024, 1/19/2025 ("we"). In relation to that Defendants supervised and explicitly directed parties to "punish" Plaintiff (5/14/2017, 9/7/2019, 11/29/2024 (implying that the FBI is saying that to police)).

713.    In a few occasions Defendants were explicit about the reasons to punish Plaintiff – because Plaintiff is 'hitting/fighting police' (8/2/2019, 2/22/2020, 3/6/2020); or, as the timing of Defendants' statements shows, because he was working on case-related or legal materials, or filed complaint (9/13/2020, 3/11/2021, 7/11/2021, 2/17/2022, 2/18/2022, 2/24/2022, 3/28/2022, 8/17/2022, 7/25/2023, 5/8/2024, 5/20/2024, 7/6/2024). And in a few occasions Defendants immediately or very soon after their statements punished Plaintiff by knocking on his walls (ap.A3), slamming door(s) (ap.G2), or hammering/hitting/dropping something heavy on his ceiling or playing loud music (ap.B2) as for example on 5/14/2017, 3/6/2020, 3/11/2021, 7/12/2021, 6/13/2022, 5/20/2024, 7/1/2024, 11/14/2024, and 1/19/2025.

714.  5/14/2017, Plaintiff talked about slamming with Defendants in ap.G2. Jean (G2) came outside the building and Plaintiff made a photo of her. Defendants agents said to her "You have to punish this one." "Have to punish that." … "Arrest him." "Shut up game." "Stop." "Punish him." See more at ECF No.8-1 at 163.

715.  5/17/2017, Defendants followed Plaintiff on Cedar Lane, Teaneck, NJ. Another Defendants' man simultaneously gave directions "First threat Kalin." "Kalin forget []."... "Arrest." After Plaintiff passed those who waited him in front the others continued following him "Still got []." "We forgot to punish []." ECF No.8-1 at 112.

716.  8/2/2019 in Teaneck, NJ: "Have to punish him. He hits police." ECF No.8-1 at 102.6

717.  9/7/2019, 10:30PM-11:28PM, multiple persons gathered in ap.A3 "Can not prove. Have to punish." … "Be the punishment." ECF No.8-1 at 476.

718.  2/22/2020 at 10:05PM Defendants in ap.A3 talked about 'police' and to 'punish' Plaintiff; ECF No.8-1 at 106.

719.  3/6/2020, after Plaintiff called Verizon and spoke among others with security, at 1:42PM Defendants under his windows commented "Punish him." "Fights police." Later started knocks on Plaintiff's walls from ap.A3. ECF No.8-1 at 484.

720.  7/18/2020 at 7:55PM Defendants near Plaintiff's windows talked to "punish… psych.. fight.."; ECF No.8-1 at 106.

721.  9/13/2020 at 11:30PM after Plaintiff sent an email-response to a Noise Violation letter Defendants in ap.B2 commented they have to 'punish' him; ECF No.8-1 at 210.

722.  3/11/2021 Thursday, Plaintiff worked on legal materials during the day. At 12:22PM Dula (B2) and another woman commented under Plaintiff's windows: "Can't stop him. Have to punish." "Mayday.." During the day Defendants in B2 knocked on Plaintiff's ceiling at 12:26PM, slammed at 6:35PM, and knocked again at 7:04PM. Meanwhile Defendants in ap.A3 knocked on Plaintiff's wall at 6:58PM. At 10:19PM obviously intentional heavy walking in ap. B2, and Defendants' man in B2 commented: "He completely reversed it." At 11:40PM Defendants in ap.B2 knocked again. ECF No.8-1 at n.74.

723.  4/22/2021, Ralph: "Did he receive []? They punish him." ECF No.8-1 at 106.

724.  In the evening of 7/11/2021 Sunday Plaintiff worked on Teaneck Notice of claims till 2:22AM, 7/12/21. Meanwhile at 9:53PM Defendants' persons under his windows warned "Have to punish… We don't forget." And laughed. Later (10:59PM) they stated "Can't believe we fight []." From ap.B2 started loud music at 11:06PM, then repeated knocks at 11:14PM. ECF No.8-1 at 245.

725.  7/15/2021 at 11:48PM Defendants outside: "Try to punish." ECF No.8-1 at 106.

726.  12/13/2021 at 12:56PM after Plaintiff was awakened by strong ray and heat Teaneck High School's students came under his windows "Can't start punishing him."; ECF No.8-1 at 106.

727.  2/17/2022 at 7:36PM after Plaintiff did internet research on Teaneck Board of education Defendants' man came near his windows on Cedar lane and warned about 'punish[ing]' him; ECF No.8-1 at 327.

728.  2/18/2022, between 9:11PM and 9:41PM in the freezing temperatures outside multiple Defendants' persons talked about Plaintiff. "Easy to prove. Bulgarian everyday--..." "Have to stop (us)." "Then to stop Kalin." Among other things they said that they will "punish mob". Plaintiff worked on relevant history till 2:15AM, 2/19/22. ECF No.8-1 at 328.

729.  2/24/2022, after Plaintiff filed police report for torn delivery, medicine missing previous day, student came under his windows at 11:06AM ans stated "Have to punish [Plaintiff]." ECF No.8-1 at 334.

730.  3/28/2022 at 9:07PM Plaintiff was working on NYPD/JTTF/FBI materials when Defendants' man in corridor commented "Punish him."; ECF No.8-1 at 366.

731.    5/11/2022 Plaintiff worked on EMF materials till 3:29AM. At 9:33AM Verizon workers and police officers workers kept talking about him, loud at moments "Kalin [] believe." At 9:37AM Plaintiff put his Olympus recorder on his window and they commented "We've got to punish him. There is a lot of social media here in New Jersey." "Yea." "You saw the man."... "He got to believe." ECF No.8-1 at 410.

732.    6/13/2022 at 10:02AM serial not loud knocks from ap.B2 10:10AM loud talking in building's corridor "[] figure how to punish." 10:17AM slam in ap.B2 ECF No.8-1 at 428.

733.    8/17/2022, about 11:20PM Plaintiff was working on relevant history when Defendants' woman contemplated "How to punish?" ECF No.8-1 at 106.

734.    8/21/2022 at 10:49AM ap.B2 "punish and that's it." "Kalin []." ECF No.8-1 at 106.

735.    9/5/2022, 1:39PM "Punish him. (Here) to stop." ECF No.8-1 at 106.

736.    3/1/2023 Wednesday, 9:14AM three garbage workers at the opposite to Plaintiff side of Cedar lane talked about 'police', 'hostage', 'punish'. ECF No.8-2 at 6623.

737.    6/4/2023 Sunday, 8:27PM person outside talked about 'FBI'. Then – a pipe bang. 8:53PM Defendants' man in B2 commented "We can't punish him." ECF No.8-2 at 8026-8027.

738.    7/25/2023 Tuesday, 2:01PM Plaintiff was downloading forms and documents to start his litigation when Defendants' woman came near his windows on Cedar lane commenting "punish. I don't know.". Later same day he filed his complaint for *Dimitrov I*.

739.    7/29/2023 Saturday, 9:53PM the Defendants' persons who had been next to Plaintiff in the night (12AM) were in a white car parked under his window on Red Road. While Plaintiff was in restroom girls inside talked "Punish him." Car left, then returned on Cedar lane. Defendants' man who has been patrolling under the windows also walked on the street back and forth and talked with them (the car stopped at Cedar lane behind the building next to Plaintiff's building).

740.    1/26/2024, after Plaintiff had worked on transcript of recording from 1/8/2024 previous day, at about 8:13AM Defendants awakened Plaintiff, he was with dry eyes, and splashed water. Defendants' man in B2 commented "Couldn't believe. Can't punish him."

741.    4/15/2024, about 10:20AM while Plaintiff was playing chess online Defendants man in B2 commented "We can not punish him."

742.    5/8/2024, about 4:02PM after Plaintiff watched a recording from his case materials Defendants woman under Plaintiff's windows talked about the "game.. punish.."

743.    5/20/2024, 12:38AM Plaintiff was reviewing materials about undercover operations when Dula in ap.B2 directed "We have to punish. We stopped." A bit later Defendants in ap. B2 hammered on Plaintiff's ceiling.

744.    7/1/2024, 8:53PM Defendants' man from ap. A6 "Can't stop him." "Definitely going to vote for Biden." "Can't punish." He knocked.

745.    7/6/2024, 10:51PM Defendants' women in front of the pub talked about Plaintiff "We have to stop (him). Punish." "To stop." ... "Kalin.. Have to push." Plaintiff worked on First Amendment legal cases till 1:42AM, 7/7/2024.

746.    7/17/2024, 4:11PM while Plaintiff was preparing a post on X/twitter asking public to recognize the participants in the incident in 4/26/2024 Defendants' woman commented "Punish that." Plaintiff did not posted that. 4:44PM USPS carrier commented under Plaintiff's windows "Fight. We can't fight."

747.    8/7/2024, about 4:30PM Plaintiff was in toilet playing on his phone. USPS carrier under his window commented "Have to punish Kalin. Sue if he is such a high braw."

748.    9/15/2024, 2:27PM when Plaintiff got next to Providence bank Defendants' man who posed as homeless was there, and talked about "punishing … to stop." Plaintiff worked in handwritten on AG guidelines. 2:31PM the man continued "Survive that. A survivor.."

749.    10/5/2024, 8:55AM while Plaintiff was in toilet Defendants' man in B2 "Punish [him]. He got to leave." 9:31AM Dula in B2 "We lost that. We can not push… Stay []."

750.    11/14/2024, 5:18AM Defendants in ap. B2 hammered on Plaintiff's ceiling when Plaintiff got to sleep. About 5:30AM Dula started talking in B2 "How to punish? Can't believe []."

751.    11/29/2024, 1:10PM Defendants in corridor talked about the FBI. After Plaintiff started Olympus the man in corridor switched to Spanish, but the man on speaker continued "FBI… police have to punish."

752.    1/19/2025, 8:38AM Defendants' Ralph was loud in building's corridor then talked "We couldn't stop him." While Plaintiff was starting Olympus recording another man responded "We have to punish. He has to submit." After that Ralph changed drastically the subject and talked about Tik Tok. 9:05PM sharp pops/drop B2 above bathroom. 9:18PM Defendants' woman in building's corridor "We got to punish him." When Plaintiff stopped the TV and started Olympus recording she stopped and went upstairs.

753.    Defendants also explicitly said that they will 'make [Plaintiff] regret it' in a couple of occasions, and even talked about the 'revenge':

754.    1/20/2023, after Plaintiff worked on relevant history Teaneck police officers visited him under the pretext of 911-call, then they and Defendants in corridor talked "Touch that. How to revenge? What's now?" "Now stop.".. "Make Kalin regret that." Transcript of 230120_0202.mp3, at 5:45-5:53. ECF No. 8-1 at 87.

755.    2/23/2024, Plaintiff was working on forensics materials when at 8:49PM Defendants' man in A6 commented "Kalin []. Make him regret it."

756.    Defendants' persistent talking about punishing Plaintiff, and their conduct show that this is Defendants' policy / practice in regards to Plaintiff and his lawful activities. The supervisors and policy-makers knowledge and reaffirmation of Plaintiff's 'punishment' was especially notable after Plaintiff had sent Notice of claims to New York City and Township of Teaneck, and Administrative claims with the FBI New York on or about 11/10/2022. On 11/21/2022 Defendants themselves were expecting that their activities against Plaintiff would be stopped – Dula said in regards to Plaintiff "To oppress the man []. It could be the last they fucking talk." Transcript 221121_9990.mp3 at 3:12-14. But the activities continued without any remedy.

(i) Defendants' retaliation to Plaintiff's exercise of his rights aims to inhibit his rights. That was also explicitly demonstrated by their 'stop-Plaintiff' social influence campaign and more. See IV.9-10.

*(b) Defendants have singled out, and treat Plaintiff selectively in comparison to other similarly situated for 13 years and counting.*

757.    Defendants treat Plaintiff differently from other similarly situated persons without legitimate rational basis. Furthermore Defendants reaffirm and continue that treatment for 13 years and counting despite Plaintiff's complaints, petitions and legal actions, and precisely because of the adverse effects on him. Among other things this shows their intention to injure him.

758.    Plaintiff has neither witnessed nor knows another person who Defendants subject to such systematic oppression, regardless of whether he compares himself to a person who lived or still lives in his building, in his community, neighborhood, town or area in more than 14 years since he has been in the US. All Defendants' decision-makers and supervisors know about the selective treatment of Plaintiff (undeniably since his Notice of claims, administrative claims, legal actions, and other petitions). Furthermore, Defendants' policies/practices aim to produce such different treatment. They are in contact and act in coordination with each other, use common methods, follow the same policies/ practices depriving Plaintiff from his rights under the US Constitution and laws, and more – all of that in demonstration of an organized conspiracy.

**(1) Similarly situated to Plaintiff comparators.**

759.    (i) In regards to Plaintiff's rights, benefits, and privileges under the US Constitution and laws: in all relevant time any law abiding citizen or legal alien in the US who is not Eastern Europeans, not Bulgarians as ethnicity, ancestry, and national origin, nor strait males who are considered feminine and/or gay, is similarly situated to him.

760.    All US persons who petition the government, and are not Bulgarians as ethnicity, national origin, or strait males who are considered feminine and/or gay, or were/are legal aliens or naturalized

citizens, are similarly situated to Plaintiff. Including all victims of crime who reported it to the police, the FBI and/or other relevant agency.

761.    Plaintiff is similarly situated to all private persons in the US who lawfully monitor their property – business or residential, and/or the adjacent public area because of concerns for crime by using any of the existing security systems, and are not Bulgarians as ethnicity, national origin, or strait males who are considered feminine and/or gay, or were/are legal aliens or naturalized citizens. As for example Plaintiff's landlord JC Realty, who have cameras toward the corridor and the entrance of the building including the pedestrian area and street visible though the glass.

762.    Plaintiff is similarly situated to all US persons who lawfully gather / record information as evidence for the government agencies or before a court of law, or for dissemination to the public by other means, and who are not Bulgarians as ethnicity, national origin, or strait males who are considered feminine and/or gay, or were/are legal aliens or naturalized citizens, are similarly situated to Plaintiff. For example any such party in a lawsuit, a journalist, researcher, or artist (a photographer or writer for example) is similarly situated in that regard to Plaintiff.

763.    (ii) In regards to the enjoyment of legal rights, benefits, and privileges under the local law, and to the enjoyment of services of the local government, similarly situated to Plaintiff are all residents in Teaneck, NJ, and all persons in the jurisdiction of Teaneck municipality and the police who are not Eastern Europeans, not Bulgarians as ethnicity, ancestry, and national origin; nor strait males who are considered feminine and/or gay; nor legal aliens (at least during the time Plaintiff had that status). Per Plaintiff's knowledge based on statistics not available at present there were about 17 Bulgarians (from about 40,000 residents) in Teaneck, NJ in or about 2013.

764.    (iii) Similarly situated to Plaintiff in regards to his residency in the building on 805 Red Road, Teaneck, NJ (contractual obligations, conditions, legal rights, and similar) are all residents in his building in Teaneck who are not Eastern Europeans, not Bulgarians as ethnicity, ancestry, and

national origin, nor strait males who are considered feminine and/or gay, nor legal aliens (at least during the time Plaintiff had that status). (Note that a few of them are Defendants' agents or acting in concert with Defendants). For example no one in Plaintiff's building has been subjected to such treatment by Defendants other than him – neither, for example, the long-time Plaintiff's neighbor Emanuel Ajaz (Indian ethnicity, a tenant in ap.A1 for about 9 years (till 2021)), nor Ms Robin Wilson (African-American, a tenant in ap.A3 for about 8 years (till 2019)) (apart from Plaintiff none is white Eastern Europeans with Bulgarian ethnicity, ancestry, and national origin).

**(2) Defendants deliberately and systematically treat Plaintiff differently than similarly situated others by (i) not providing police protection; (ii) orchestrating the hostile to Plaintiff environment, including repeated attacks on him and his reputation regardless of the location; (iii) conspiring to deprive Plaintiff from residence in the US; (iv) to entrap him, and/or (v) do not hold accountable to law those acting against him.**

(i) Defendants' law enforcement agencies deny protection to Plaintiff by (a) not enforcing the law in regards to his petitions and complaints with their policy / practice to not investigate (in majority of cases) and/or to obstruct, minimize, misrepresent his petitions; and (b) not protecting Plaintiff against intentional discrimination and retaliation.

(ii) For many years Defendants act in concert to create hostile to Plaintiff environment regardless of the location.

765. Defendants and parties in concert ('Defendants') have created severe and pervasive hostile environment based on Plaintiff's Bulgarian ethnicity, ancestry, and national origin; his sex; citizenship status; and as retaliation to his lawful activities. Defendants' everyday conduct significantly altered the conditions of his life, his enjoyment of his tangible and intangible properties, and includes, but is not limited to, verbal abuse and intimidation (threats, derogatory remarks, provocations, dissemination of defamatory narrative (see IV.12, IV.7 (b)(ii)(2)(A), ECF No.8-1.C.2, and more), assaults, regular sound attacks (knocks on Plaintiff's walls/ceiling/floor, threw pebbles at his windows, yelled under the windows or next to Plaintiff when outside, directed energy beams at him and his apartment (charging among other things Plaintiff's body up to 1036 V/m), and more. See IV.11.B; ECF No.8-1.D and No.8-2.E.1.1.

(iii) Defendants conspire to deprive Plaintiff from residence in the US.

766.  Abusing their powers Defendants cause physical and mental suffering and pain to Plaintiff for many years (see IV.11), at least in part with intention to exclude and remove him from his apartment and the US.

767.  FBI / JTTF investigations can take "measures [such as] excluding or removing persons involved in terrorism or espionage from the United States".[95] An FBI/JTTF preventive investigation is "successful" when its subject is pushed out of the US, and targeting suspects in that regard (regardless of their actual innocence or guilt) is approved.

768.  See for example the statements of Special Agent Holley, a supervisor of a JTTF Squad: ""Can we consider that a success because we didn't put him in jail?" Holley asks. "Absolutely. This guy is no longer here. He is not a threat to one person in the United States." "Was he ever a threat?" I ask. "We opened up an investigation." "But isn't that a circular argument?" "Was he a bomb-thrower?" Holley concedes. "Probably not. Did he want to go into a mall and attack? No."".[96] Targeting a person who is innocent is OK according to John J. Miller, Assistant Director of the FBI, because "it is [the FBI's] obligation to err on the side of safety"[97]

769.  Police strategies to prevent crime such as person-based predictive policing can also aim to "extract individuals likely to commit crimes from certain areas" and subject them to "punitive attention" in all relevant time.[98]

---

95  *Attorney General guidelines for domestic FBI operations*, 2008, Introduction, A.21.
96  *The Fear Factory*. Guy Lawson, Rolling Stone, Feb. 7, 2008
97  *FBI Response to Rolling Stone Magazine Article on Joint Terrorism Task Forces (JTTFs)*, Washington, D.C., Feb. 25, 2008, FBI National Press Office. (https://archives.fbi.gov/archives/news/pressrel/press-releases/fbi-respon… as accessed on 9/10/2024).
98  *Law Enforcement Use of Predictive Policing Approaches: Proceedings of a Workshop*. National Academies of Sciences, Engineering, and Medicine. 2025. https://doi.org/10.17226/28036

*(A) Defendants pressure Plaintiff to 'go away', 'move out' from his apartment and the US.*

770.   In parallel to their other activities Defendants have engaged in social pressure[99] campaign to push

Plaintiff out of his apartment in Teaneck, NJ, and from the US since he started working on legal

cases in 2016. Defendants have made many explicit statements with the same message Plaintiff to

'get out', 'go away' (see 770 *et seq.*), or that they will 'evict', 'extradite' him (as on 8/5/2020,

4/2/2024, 12/7/2024). That message was delivered by different parties at different locations –

demonstration of the planning and organization behind the messaging (see CVE mosaic of

engagement 307). See above (a)(3), and IV.11. They were explicit that they act to extradite

Plaintiff because of his petitions (9/6/2023). At least in a few occasions that was intended also as

provocation – this is demonstrated by Defendants' comments on lack of response by Plaintiff ('he

didn't believe/perceive/see/get it') as for example on 7/25/2018, 4/20/2022, 1/21/2023,

6/15/2023, 9/22/2023, 4/6/2024.

771.   Most frequently Defendants' agents who talked about that were unknown to Plaintiff. Teaneck

public schools' students are the second most-frequent party delivering that message (12/12/2017,

2/15/2018, 4/10/2018, 11/25/2019, 6/18/2021, 2/10/2022, 2/14/2022, 4/20/2022, 10/14/2022,

9/8/2023, 9/22/2023, 10/17/2023, 2/26/2024, 5/11/2024, 1/21/2025, 3/14/2025, 3/28/2025).

Notable are the statements by a NJ state government agent (4/2/2024), Defendants' Raphael

(Ralph) Pimienta (8/5/2020, 1/8/2024, 9/14/2024, 10/30/2024), or Marlene Dula (4/6/2024).

772.   Defendants and parties in concert have made such statements in Washington, D.C (4/29/2017), on

the streets in Teaneck, NJ (5/17/2017, 9/22/2023), under or near Plaintiff's windows (10/6/2017,

12/12/2017, 2/15/2018, 4/10/2018, 11/25/2019, 9/19/2020, 3/1/2021, 4/29/2021, 11/3/2021,

---

99   Social pressure is "the exertion of influence on a person or group by another person or group [and] includes
rational argument and persuasion (informational influence), calls for conformity (normative influence), and
direct forms of influence, such as demands, threats, or personal attacks on the one hand and promises of rewards
or social approval on the other (interpersonal influence)." *APA Dictionary of Psychology*,
https://dictionary.apa.org/social-pressure, as accessed on 8/3/22, 10:54 PM; see also *Partisans use emotions as
social pressure: Feeling anger and gratitude at exiters and recruits in political groups*, Delton, Kane, Petersen,
Robertson, Cosmides, Party Politics, June 2021 ("Delton et al., 2021") ("Social pressure encompasses rewarding
or punishing others, arguing with them, or appealing to emotions."). Pear pressure is a recognized radicalization
factor – see Bartlett, Birdwell, King, *The edge of violence, a radical approach to extremism*, Demos, 2010.

2/10/2022, 2/14/2022, 4/20/2022, 9/3/2022, 10/14/2022, 6/15/2023, 6/16/2023 9/14/2023,

9/21/2023, 10/17/2023, 2/26/2024, 4/29/2024, 5/11/2024, 6/6/2024, 6/21/2024, 7/25/2024,

9/14/2024, 10/3/2024, 11/29/2024, 1/21/2025 3/14/2025 3/28/2025), in ap.G2 (7/6/2016,

5/14/2017, 7/4/2018), Defendants in ap.A3 (in 2020 they were referred as 'extraction team', ECF

No.8-1 at 148) (1/3/2021, 4/14/2021 6/21/2024), in ap. B2 (4/6/2024, 10/5/2024), in building

corridor (8/5/2020 3/4/2022, 4/20/2022 1/21/2023. 9/14/2024, 1/8/2024, 4/2/2024, 10/30/2024),

Defendants in parks/public benches (6/18/2021 9/8/2023 8/23/2024 9/14/2024), or in Stop and

Shop, Teaneck, NJ (7/25/2018).

773.   7/6/2016 after many knocks and slams Defendants in ap. G2 ("feds") commented that Plaintiff "don't even think of moving." ECF No.8-1 at 156.
774.   4/29/2017 Defendants when Plaintiff was in Washington: "You should get out.";
775.   5/14/2017 Defendants from ap.G2 under Plaintiff's windows, and others hidden on G level: "Get rid of him.".. "Get out of here." ECF No.8-1 at 163.
776.   5/17/2017 when Plaintiff was walking on Cedar Lane, Teaneck, NJ Defendants followed him. At some moments they addressed their statements directly to him "Police stopped you." "Can't stay []." "*Всички* ["everybody" in Bulgarian] []." and later "You have to leave." ECF No.8-1 at 112.
777.   10/6/2017, about 9:40AM Defendants "Can't hide here. Leave."
778.   12/12/2017, about 3:10PM, students came under Plaintiff's windows "Why are you staying in US?" ECF No.8-1 at 907.
779.   2/15/2018 at 11:40AM students came under Plaintiff's windows and said "You have no business here." ECF No. 8-1 at 856.
780.   4/10/2018, 2:25PM, students came under Plaintiff's windows "Leave the US" and later shouted "Go." ECF No.8-1 at 909.
781.   7/4/2018, Defendants in ap.G2 "Stop, go to different place." ECF No.8-2 at 2029.
782.   7/25/2018, in Stop and Shop Defendants' man next to Plaintiff "Leave Teaneck." Later at the check out a staff members "This is the one." "Did he see you?" "He is frustrating."
783.   11/25/2019, 2:32PM a student came under Plaintiff's windows "Get the fuck out of here." later "Kalin … Kalin … Kalin". ECF No.8-1 at 919.
784.   8/5/2020 at about 11PM group of Defendants in building's corridor, including Ralph Pimienta talked about Plaintiff. "Get out.".. "Can't evict him." "Can't fish him?".. "Kalin []." "Death threat." ECF, No. 8-1 at 59.
785.   9/19/2020 at about 4:20PM a group of black men under Plaintiff's windows on Cedar lane talked "Bulgarian won't leave. We have to drag him out." ECF No.8-1 at 499.
786.   1/3/2021 at 6:10PM Defendants in ap.A3 scratched loud Plaintiff's wall, and talked loud among other things that Plaintiff is "activated" at 6:54PM "He didn't move a lot." and later about a 'detective' and 'warrant'. ECF No.8-1 at 510.
787.   3/1/2021 at 1:30PM Defendants' group talked under Plaintiff's windows about a "community meeting". Among other things they expressed concerns about Plaintiff's work on legal and public materials after he settled his case with Gyro et al. about 2 years before that, and

referred to one of their goals to force Plaintiff to move out: "Last 2 years it gets worse.. Moving.." "They didn't challenge him." ECF No.8-1 at 61.

788. 4/14/2021, Defendants' Sarah warned in ap.A3: "Get the hell out of here." ECF No.8-2 at 2125.

789. 4/29/2021, Defendants' man cursed, then returned under Plaintiff's windows at 2:28PM and stated "You got hit every day. Get out of here." ECF No. 8-1 at 232.

790. 6/18/2021 football players yelling at Plaintiff in Votee Park, Teaneck, NJ "Get out of my room" and later "Get out of here."

791. 11/3/2021, 8:36PM Defendants' woman: "We thought fighter would go."

792. 2/10/2022, 3:30PM students came under Plaintiff's windows: "Go away."

793. 2/14/2022, 12:23PM students yell under Plaintiff's windows "You can't stay."

794. 3/4/2022, 10:36AM Peter Loomer talked very loud in the corridor mentioning "fighting" Plaintiff, and a woman responded "Have to leave." ECF No.8-1 at 731.

795. 4/20/2022, 1:30PM student came under Plaintiff's windows "Move out." Plaintiff did not react. Ralph in building corridor commented "He didn't believe." ECF No.8-1 at 389.

796. 8/11/2022, Defendants warned Plaintiff "Have to leave." ECF No.8-2 at 3352.

797. 9/3/2022 Saturday, 1:50AM Defendants women in front of the pub on Cedar lane. "Get out of here." Earlier Defendants there talked repeatedly about Plaintiff "Bulgarian..." (12:30AM) "Yes, police []. Can't fight." (1:24AM) "Do Kalin lie?" (1:26AM)

798. 10/14/2022 Friday, 3:42PM a group of mid school boys and a girl yelled under Plaintiff's windows acting under the direction of Defendants. "Get out of my property." Two of them entered the building shouting. See ECF, No.8-2, 5509-5632.

799. 1/20/2023, one of the Teaneck police officers and Defendants in the building said among other things "Till I have Kalin leave." ECF No.8-1 at 90 (81 *et seq.*).

800. 1/21/2023. Plaintiff was working till 8:11PM on a supplement to his Notice of claims (never filed) when Defendants' man stated in corridor on his floor "We have police to remove this shit." When Plaintiff started recording the man became quiet, got upstairs and there were noise upstairs (5:01PM). Later Defendants in ap.B2 knocked a few times and commented "he didn't perceive". ECF No.8-2 at 6014.

801. 6/15/2023 Thursday, about 7:20PM Defendants man patrolling under Plaintiff's windows when he was working on argument for his first amendment charge against Defendants, with white t-shirt. "Then move." Later the same man returned under the windows "He can't believe." (8:54PM). ECF No.8-2 at 8205.

802. 6/16/2023 Friday, 4:52PM Defendants' woman wearing white t-shirt came under Plaintiff's windows "Get out of here." She entered the building. Defendants continued after Plaintiff challenged in his apartment "Do you think that will convince me? Face me. Why are you hiding?" 5:01PM Christine (Jamaican food truck – her name phonetically) responded "Stop playing with me." 5:21PM Christine talking with another woman "He can't move them. Stop." "Ha, ha, ha.." 5:22PM "Can't forget." ECF No.8-2 at 8216-20.

803. 8/9/2023 Wednesday, 2:35PM Christina, Jamaican food truck, and Defendants' woman talked about Plaintiff "Get him out." 2:39PM "Won't stop. Don't come back.. mother fucker."

804. 9/6/2023 Wednesday, 12:44PM Defendants' woman at Lomo food truck nearby talked about Plaintiff "Kalin to stop. Yea, that's the second mission." Plaintiff opened his window wider and made photos she commented "While writing [] not aloud to stay."

805. 9/8/2023 Friday, after police officer passed by, at 3:17PM a schoolgirl came next to Plaintiff in Votee park, Teaneck, NJ and said "He has to leave." All students nearby sat next to Plaintiff and talked about him ("Kalin" 3:44PM, 3:58PM).

806.  9/14/2023 Thursday, 11:18PM Defendants' woman walking on Cedar lane was loud only under Plaintiff's windows "Get the fuck out of it."

807.  9/21/2023 Thursday, 4:49PM Defendants' woman 'client' of Jamaican food truck which is near Plaintiff's windows talked very loud "We want you to leave home. There is no conspiracy, no nothing." Then talked quieter with Jamaican food's Christine. At 4:59PM they talked "Kalin", "have legal. You gotta go." Christine "That game."

808.  9/22/2023 Friday, large group of students shouted behind Plaintiff when he passed them "Get out of the street." "He didn't get it."

809.  10/17/2023 Tuesday, 4:30PM two schoolgirls under Plaintiff's windows talked "This guy is learning Islam." "Why don't leave the apartment?" Plaintiff threw his garbage, when they saw him they quickly left and sat at the building entrance. Plaintiff "Hello ladies. How are you?" "Good." Plaintiff "You don't sound very happy." Plaintiff entered the building. Behind him girls talked about "the FBI" and laughed.

810.  1/8/2024, before 10:58AM Ralph loud in building's corridor "He don't believe we stopped." "He hit the government. Have to go. In about a week they will decide." A woman repeated at least 2 times Plaintiff's name "Kalin."

811.  1/14/2024, talking with parents in Bulgaria – they urged Plaintiff to go back in Bulgaria.

812.  1/21/2024, 10:39AM Defendants in ap.G2 talked about Plaintiff "Kalin didn't stop." "Thinks of us as an investment. Million dollars. Think of it as a long-term investment. Follow the money." .. "He spend all day on computer" … "Kalin [] . Can't stay."

813.  2/26/2024, about 11:30AM student came under Plaintiff's windows and shouted "Got to go."

814.  4/2/2024 at about 1:50PM Defendants' man in building corridor "[Defendants] will extradite Kalin … Hitting the bad guy" He entered after that a New Jersey State government car. See ECF, No.14, p.4.

815.  4/6/2024, 10:54AM Dula in ap.B2 "We got spy. I know. He has to go." Later "Kalin didn't perceive… didn't stop."

816.  4/29/2024, Plaintiff started working on a letter to Judge Rearden 3:11PM Defendants woman / girl came under Plaintiff's windows "He got to leave."

817.  5/11/2024, between 6PM-7PM back at home Plaintiff took a bath. A group of students walked under Plaintiff's window on the rocks talking "Move on. Can't stay here." They threw 2 rocks challenging "I got to snap." Defendants' man talked with them.

818.  6/6/2024, about 5:40PM Defendants' group came near Plaintiff's windows "May be he has to leave the house?" At 5:54PM they returned under windows: "Hit him stronger."

819.  6/21/2024, 5:51PM Cesar Naranjo, super, came in ap. A3 and talked with Lea. "We didn't []." "Kalin leave []."

820.  7/19/2024, 11:51PM Plaintiff got out again and while walking started a new recording. Defendants' man in a car on Red Road said when passing Plaintiff "You have to go back motherfucker." The car stopped in front of a house on Red Road, but no one got out. When Plaintiff passed by it another man was talking on a loudspeaker, not intelligible.

821.  7/25/2024, 1:50PM Defendants' man came at Jamaican food truck near Plaintiff's windows keeping his back toward the windows (an awkward position apparently to evade photos) talked about Plaintiff "Have to stop." Christine, Jamaican food, "Have to leave."

822.  8/9/2024, about 4:25PM USPS talked under Plaintiff's windows "We've got to get him out of the property."

823.  8/23/2024 Friday, Plaintiff sat next to Provident bank, Cedar lane, Teaneck, NJ, and worked on conditioning and learned helplessness. Different Defendants came nearby talked indirectly to him, some returned a few times. At 4:33PM a man said among other things 'Leave the house'.

824.    9/14/2024, about 2:10PM while Plaintiff was in toilet Ralph talked about him in building corridor (two times mentioned "Kalin"), and got under the windows. Plaintiff was preparing to leave the apartment. Right after that a car started playing loud music with lyrics mostly "You have to move." Plaintiff saw Blue Iris restarted remotely. Ralph came under the windows at the corner of Cedar lane and red Road. "Where is he? Where is he?" Ralph moved toward the entrance "Have to push." Music from the car stopped. Woman talking in Spanish entered ap. A1. Plaintiff left the apartment and the building (through back door – throwing his garbage) Ralph was not visible around. About 2:35PM when Plaintiff got in Votee all tables were taken, private barbecue, He sat on the meadow in the middle of the park and worked on handwritten drafts. Persons on table commented, teased him "He is the chosen one." … "Ha, ha, ha.. No where to go. He got papers only." After Plaintiff made a video they reacted "Shh." See Exhibit Timeline of events 2024.

825.    10/3/2024, 5:18PM Christine, Jamaican food truck, shouted "You got to leave."

826.    10/5/2024, 8:55AM while Plaintiff was in toilet Defendants' man in B2 "Punish [him]. He got to leave."

827.    10/30/2024, 2:34PM Defendants' Ralph "He has to move out." When Plaintiff started Olympus recording he left the building.

828.    11/29/2024, about 10:55AM Defendants awakened Plaintiff. Engine working under his windows, a man shouted "It is easy. Go home. Go. All night []. They left."

829.    12/7/2024, 11:05PM Defendants near Plaintiff's windows "That guy spy on us.. Evict him." After that a person entered the building.

830.    1/21/2025, about 11:50AM school girl screamed under Plaintiff's windows on Cedar lane. "Go away. Fuck you."

831.    3/14/2025, 5:46PM DE at Plaintiff's head, tingling. He put aluminum plate over himself. Schoolgirls under Plaintiff's windows going back and forth and talking "We tell you to go back." Two loud pipe bangs followed.

832.    3/28/2025, about 3:30PM schoolboy came under Plaintiff's windows "Go out."

### (B) Defendants interfered with the contracts between Plaintiff and his landlords.

833.    Defendants interfered with the contracts between Plaintiff and his landlords (Tower Management till February 2020, and JC Realty since March 2020), and act in concert with the landlords to disrupt and push him out of the apartment and the US (see ECF No.8-2 at 2053 *et seq.*). In result landlords do not carry out the contracts with Plaintiff in good faith, or directly violate the contractual promise of "quiet enjoyment". Landlords' participation is more subtle since the initiation of *Dimitrov I* but for the statements of the super and other JC Realty staff.

834.    (1) In relation to Defendants' sound attacks on Plaintiff Tower Management / supers removed the noise insulation between Plaintiff and Defendants in ap.G2 (ECF No.8-1 at 172) and ap.A3 (Id. at 474). Plaintiff made a few times requests to landlords to install sound insulation but his requests

were ignored – see 9/13/2020 (in a letter to JC Realty sent by email), 9/17/2020 (ECF No.8-1 at 744), 9/22/2021 (Id. at 777), and more. At the same time JC Realty in practice ignored Plaintiff's notices of noise violations by Defendants in ap.B2 (5/7/2021 (ECF No. 8-1 at 452), 6/5/2023 (Exhibit email)) and A3 (10/27/2020, ECF No.8-1 at 506). JC Realty's Michele referred the mater to Cesar Naranjo, the super, who instead tried to convince Plaintiff that the noise was not from ap.B2 – continuation of Defendants' blatantly false denials. Considering the super's remarks they didn't take or took only proforma actions in response. ECF, No.8-2 at 2046. Furthermore landlords participated in the noise harassment of Plaintiff with repeated noisy "repairs" in the neighboring apartments almost always without giving notice to him. ECF, No.8-2 at 2030 *et seq.*.

835. (2) Defendants utilize building's pipe system to harass Plaintiff with noise (pipe clanks, bangs (water-hammer), water-running noise) – all that with the knowledge and support, if not with the participation of the landlords. For example when this kind of harassment started in 2015 Tower Management, the landlord then, ignored Plaintiff's complaints for repeating for hour(s) pipe clanks with almost exact frequency (for example once every 4 minutes and 30 seconds or similar), claimed no one else heard that despite the audio recordings of the noise which Plaintiff made and sent to them (2/17/2015. ECF No.8-2 at 1914) – the landlord followed Defendants' practice of shocking denial of apparent facts (see Defendants' denials of the slams and knocks by ap.G2 and B2 in 2016 and later, and even blaming Plaintiff). See ECF No.8-2 at 1910 *et seq.*.

836. (3) Defendants utilize the building utilities to disrupt (disturb and create problems for) Plaintiff. Defendants' manipulation of temperature – turning the heating or the hot water on/off, extremes in both direction: very hot or cold – is a known tactic of degrading treatment – see IV.11. See ECF No.8-2 at 2048 *et seq.*. For example Defendants manipulated the heating in his apartment: there was no heating on 11/9-11/10/2017, 11/12/2017, and 12/3/2017, then heating was very strong (12/5/2017). On 12/29/2017 Defendants: "We can't let him continue. We have to destroy

[].” They turned off the heating in Plaintiff's apartment (ECF No.8-2 at 2051). In the beginning of 2018 no heating for three days – temperature inside was 50F (1/5-1/7/2018 Id.), then heating was very strong – 82F floor level with the window open (1/12/2018 Id.). And more.

837.    (4) Defendants and landlords act in coordination to disrupt Plaintiff's rent payment and/or push him out of the building and the US. See ECF No.8-2 at 2058 *et seq.*.

838.    For example in March 2020 Defendants stole and modified Plaintiff's check for his first payment of rent to JC Realty that has become the owned of the building since then. Furthermore Defendants interfered with Citibank in regards to that check despite Plaintiff's timely reaction on the day he found out 3/4/2020 – he canceled the transfer, called JC Realty, called Citibank security, changed his account, filed a police report with Teaneck police, which has never been investigated. On 2/29/2020 when Plaintiff was putting his check to JC Realty (in envelope) in the postal box when Defendants came next to him and commented that he is "fighting all police". ECF No.8-2 at 2059. On 3/4/2020 Plaintiff found the theft and fraudulent modification of his check, and the next day he filed a report with Teaneck police. Id. Police did not investigate the report despite the information Plaintiff provided – copies of the original and falsified check which contained info about the recipient, the bank where it was deposited, and more. The police also did not referred or contacted DHS USSS in that regard – in their FOIA response to Plaintiff dated May 14, 2020 USSS wrote "The U.S. Secret Service FOIA Office searched all Program Offices and computer systems that were likely to contain potentially responsive records, and no records were located." On 3/9/2020, 4:09PM Cesar Naranjo, super, commented in front of Plaintiff's door "Police hit him." Id.

839.    In addition to Defendants ongoing activities against Plaintiff in late spring and the summer of 2021 JC Realty changed a few times Plaintiff apartment's account on Click Pay (online platform for payments), and then did not update his rent for September 2021 (when a new amount a rent / new one-year lease started). On 9/2/2021 Plaintiff paid the rent as posted on ClickPay and sent email to JC's Michele in regards to the amount of rent. On 9/3/2021 JC warned him by emails from JC' Yvette and Roxana Lopez that he did not paid the full rent (another "step", "creating a record" by deliberately creating situation in which Plaintiff was in error). In response Plaintiff sent an email which reads "I called JC office, was put on hold twice and I spoke with Yvette, who told me I should sent a money order for $25 with USPS or come to the office and pay cash. Considering that this situation was not created by me, I find it remarkable that I received neither explanation nor apology for the inconvenience. I write to you to protest the treatment, and I hope that we'll restore quickly our good relations." Later same day Michele responded "I spoke with Yvette, the error is with ClickPay. Please call them to resolve." Plaintiff sent the remaining $25 rent as money order with USPS on 9/3/2021, but on 9/9/2021 he received a receipt from JC Realty pointing that $25 remained unpaid. Plaintiff showed the letter to his security camera and Defendants in ap.B2 (Dula) commented: "We can not push this. We can not start. [] whole team." Plaintiff wrote to ClickPay. On 9/10/2021 after receiving the response from ClickPay Plaintiff wrote to JC Realty's Michele: 'ClickPay responded that any problem with the amount of rent on my account is not created by them. They wrote among other things that "the balance reflected on your ClickPay profile is what we received directly from your management company. We do not have a way of updating it.." … Also I acknowledge that an apology for the problem and

related distress was intentionally not given to me. In the light of all of the above this situation seems deliberately created. Why?' JC Realty did not responded – yet another example of the special treatment he receives. The different treatment of Plaintiff is apparent when compared to the JC' apology for the inconvenience which tenants would experience calling to the office instead to Cesar, the super, in July 2022. ECF No.8-2 at 2060.

840. About two weeks later, on 9/22/2021, 3:10PM Plaintiff was working on events from 9/7/2019 (persons in ap.A3 talked about "proofs") when Cesar Naranjo and other Defendants in building corridor commented "They didn't anticipate.." Cesar "They really thought Kalin can't prove anything." Defendants' woman in A3 "We lost New York." Cesar also entered ap.A3 and checked building's intercom system for a while. At 3:40PM Plaintiff requested inside his apartment "Fix this my friend. Put insulation back. Whoever you put in ap.A3 problem is easy to predict. You intentionally create problem." Cesar responded in A3: "We have a problem." Plaintiff: "Even if they are NYPD and JTTF members." Cesar: "He got the idea." and later "I'll take Kalin out." ECF, No. 8-2 at 2054.

841. See ECF No.8-1 and 8-2, and more.

842. (5) Landlords ignored Plaintiff's complaints against Defendants in ap.B2, A3, and ap.G2 (note the cover Cesar offered for the Defendants in ap.G2 then).

843. Plaintiff filed noise complaints against ap.A3 (10/26/2020) and ap.B2 (5/7/2021, 6/5/2023) with JC Realty, and made a few verbal complaints to Cesar Naranjo (the super) with just temporary or no effect at all. And the building supers personally knew and participated in the noise. For example Cesar witnessed the knocks from ap.A3 on 9/17/2020 but minimized them talking to Plaintiff 'give it a chance. See what it is 'cause she just moved." And later on 9/20/2020 stated to Plaintiff "you can not prevent people make a now different bit noise". ECF No.8-2 at 2046.

844. 6/24/2021 at 4:31PM Defendants in G2 knocked on Plaintiff's floor. At 10PM Plaintiff went downstairs to speak with G2's "tenant" about EF and EMF emitted from the apartment, but nobody answered. While on G-level Plaintiff started scanning for EF, EMF in the corridor when Cesar Naranjo, the super, entered the building. He said that the tenant in ap.G2 is in the hospital, and claimed all pipes should be grounded when Plaintiff complained to Cesar of being electrocuted and about feeling very strong electric "sparks". Plaintiff detected at the building's main water pipe 50 mG showing electric current present. ECF No.8-1 at 179.

845. 12/17/2022 Saturday, 11:07AM Plaintiff called Cesar Naranjo (super) to complain about the ongoing dog-barking from ap.G2 (noise harassment practice which started about two weeks after Plaintiff filed his notice of claims / administrative claims from 11/10-11/11/2022). Cesar said he knows about the dog-barking, heard it, made a video and informed the office (JC Realty). Dog barking in ap. G2 continued without change and was everyday activity for about a year, and still continue although not as often.

846. And more.

847. (6) Cesar Naranjo, super of the building since March 2020, acts as agent of the Defendants – he participates, provide support and access, for example, to Teaneck Public Schools' students to harass Plaintiff in the building (as for example on 2/17/2023). ECF, No.1 at 260. In demonstration

of his association and coordination with Defendants he talked multiple times about police, the

FBI, and CIA in regards to Plaintiff. As for example on:

848.    3/9/2020, 4:09PM Cesar Narajo talked in front of Plaintiff's door about him ("Police hit him.") a few days after his check was stolen and modified. ECF No.8-1 at 787.

849.    9/22/2020 Tuesday, about 3:10PM Cesar Naranjo, the super, came to Plaintiff's apartment to see the cracks around a window. After that Cesar went upstairs on B level and spoke with another Defendants' man about Cesar's talk with Plaintiff "It's a thousand-dollars report. So-- it's good. We need that." They talked also about the FBI, police, "Bulgarian fraud" and that they "fight Kalin". ECF No.8-1 at 746.

850.    8/4/2021 Wednesday at 3:12PM Cesar Naranjo talked in front of Plaintiff's door and in ap.A1 about the FBI. "I want to hit [].", there were a few slams, and boxes moved in A1. ECF No.8-1 at 769.

851.    10/23/2021 Saturday, there have been repeating knocks on Plaintiff's floor from ap.G2 since 2:21PM. At 2:36PM Plaintiff asked inside his apartment: "My friend what are you doing?" Cesar responded from ap.G2 "No worry I am []." P "Cesar is it you?" C "That's me." P "OK." The knocks continued, and Cesar commented in G2 at one point "only option.. can't reverse that… FBI.."

852.    2/10/2022 Thursday, 4:43PM Cesar Naranjo and Oscar came for fixing the kitchen sink and windows. They spoke mostly in Spanish, but mentioned a couple of times "CIA".

853.    7/16/2024, 3:36PM-4:16PM the super Cesar Naranjo and the other Defendants talked near Plaintiff's apartment about him before, during and after the Best Pest terminators' visit in his apartment mentioning the "FBI", the "agents", talked about "caus[ing] disruption", and made explicit statements that they "harass" Plaintiff (apart from naming him, they referred to him as "Bulgarian" and "fagot"). "How do you want arrest?"..."Press Kalin (they) have to arrest him." ... "They have to give him to stop.".. "He must be stopped."

854.    The coordination between Cesar Naranjo and Defendants is apparent: he participates in the

defamatory narratives about Plaintiff as Bulgarian criminal/terrorist/spy who holds Defendants

hostage, in the pressure on Plaintiff to stop, in threats that police 'will get rid of' him (6/20/2024),

and more. For example on:

855.    9/20/2020, 7:20PM Plaintiff called the super about knocks on the pipe system, and the strong knocks from ap.B2. During the call a woman (Dula?) commented "We stopped." Cesar said he would talk with Dula  (B2) about the noise. At the end of the call Defendants' man in ap.B2 commented "We lost." After that Plaintiff met Cesar and they talked till 7:50PM, but before that Cesar spoke with other Defendants (B2) close to Plaintiff's windows who instructed him about the meeting: "Go get him." "Have to move. Have (this) to stop. … That's it. Do what you can." The man from ap.B2 instructed "You stop believing him. He wants to forget []. … Kalin believe []." The woman commented "Kalin to stop. He just forget it. [] talk about the []. Don't believe." When Cesar and Plaintiff met Cesar stated among other things: "I work for public. My regular job working for the public." He stated "I know Ms Dula, if she is the one who makes the noi[se] she know she has a (crock). And she for some reason, and I know this because I come to apartment two times already to fix a couple

of things [have] not only the regular rug, she come more rugs on top. Trying to prevent noise." Cesar told a few stories and ended talking about fixing the cracks Plaintiff complained about. After that Defendants commented: "Coming through crazy cop game []." "Hacking Bulgarian []." "Kalini stopped. FBI. Kalini lost." ECF No.8-1 at 745.

856.   4/20/2021, 3:57PM in building corridor, Ralph, Cesar Naranjo, a woman (Dula) talked about Plaintiff. Ralph said after Dula left "CIA... I have received several email from her..."

857.   6/30/2021 Wednesday, 3:14PM Talking in Spanish and key-noise – persons entering A1. Cesar talked with a woman from C2 (as claimed), she came under Plaintiff's windows and commented he "didn't fight.. Not good." Cesar in the corridor: "He didn't believe."

858.   7/20/2021 Tuesday, 2:39PM Defendants in ap.B2 commented: "He won't stop. We lost all that." 5:15PM Cesar Naranjo came under Plaintiff's windows on Red Road looked at his camera and commented a bit later "He won't stop."

859.   9/4/2021 Saturday, 11:32AM Cesar and Defendants' woman in A3 talked about Plaintiff and police. In the afternoon started pipe bangs at 4:18PM, 4:27PM, 4:49PM loud, 4:50PM. Meanwhile at 4:45PM Cesar and Oscar(?) talked in ap.A3 "Bulgarian.. push Kalin."

860.   11/25/2021 Thursday, 6:39PM Plaintiff was working on a transcript of recording with Cesar's participation. Cesar in corridor commented "I am fired." Defendants' woman responded "We wont let him."

861.   1/31/2022 Monday, 3:52PM Plaintiff challenged inside his apartment "Don't tell me FBI is afraid of me. Come and speak. Bring back the students – now it is suspicious." Cesar responded at about 5PM "Guy should have a problem." At 5:23PM Ralph and two Defendants' women talked in building corridor. R: "Got to shoot." and when getting upstairs "All heard that? What they said?"

862.   3/10/2022 Thursday, 3:44PM loud 'drilling' in A3. Two men (Cesar Naranjo and Ralph Pimienta) talked inside ap.A3 about being "hostages... Bulgarian..."

863.   6/9/2022 Thursday, 9:31AM Cesar came to Plaintiff's apartment but as he was not prepared he asked for 5 minutes delay. Cesar commented with another Defendants' man (plumber) "Didn't believe I am police." At 9:39AM after having a look at Plaintiff's shower both Cesar and the plumber left talking in corridor in Spanish "bandito".

864.   8/10/2022 Wednesday, 6:49PM Plaintiff was watching PBS Newshour when Cesar and Defendants' woman in the corridor commented him ("Kalin") "Have Russians []."

865.   9/13/2022 Tuesday, 8:28PM Cesar Naranjo and other Defendants under Plaintiff's windows on Red Road talked about him "Can't forget anything." "Can't surprise him." "Tell Kalin stop doing []."

866.   3/22/2023 Wednesday, 3:45PM Cesar talked about Plaintiff's 'surviving' in corridor.

867.   4/28/2023 Friday, about 6PM the intercom buzzer run continuously – seemingly broken. USPS carrier and Cesar Naranjo came in corridor and talked about Plaintiff ("Kalin"). Cesar responded it is a "Set up." (at about 6:15PM).

868.   8/1/2023 Tuesday, Plaintiff took bathtub, and a shower. At about 8:24PM when he stopped the neighbor Holy Name guard came under his window "All units []. Over their heads." Plaintiff made time statement, and Cesar commented under the window "He records... I said to them he won't stop." A bit later Plaintiff made a video but then only Ralph and Hole name guard were visible in front of building's entrance.

869.   3/2/2024, 11:20AM Cesar Naranjo talked about Plaintiff ("Kalin") "to make him stop."

870.   6/20/2024, 3:11PM Cesar and another Defendants' man in building corridor talked about Plaintiff and 'police'. Cesar "Don't worry. They will get rid of this guy."

871.   9/9/2024, about 3:20PM Cesar Naranjo entered ap. A3 and a bit later stated "We harass."

*(C) Defendants' efforts to 'evict' and/or 'extradite' Plaintiff, include installing their agents[100] in his building and/or acting in the adjacent apartments.*

872.    Defendants' actions against Plaintiff from the neighboring apartments and/or inside the building are at least in part intended to push him out of the apartment and the US.  They have put their agents in the building and either replaced or secured his neighbors' cooperation and participation (see for example the participation of Ajaz (ap.A1) in the last years before he moved out). Defendants have rent under cover ap.G2 (apartment under Plaintiff), their 'evaluation team' in ap.B2 (apartment above) moved in the building at about the same time as Plaintiff, and after Ms Robin moved out Defendants put their agents in A3 (one of the two apartments next to Plaintiff). See ECF No.8-1 at 148 *et seq.*. Defendants' direct energy and sound attacks on Plaintiff, and other kinds of harassment and provocations from those apartments are briefly addressed in IV.11, Exhibits about EF, MF, and EMF, Exhibit Hammering from B2 2021-3/1/2025, and more.

873.    In addition to identifying themselves as FBI, CIA, police, and similar, or being identified as such by others, Defendants in the building were referred as 'unit(s)' ("there are four units in the building" 2013; "all units fucked up you... Don't move from Bulgaria." 1/27/2017; "All units []. Over their heads." 8/1/2023; "all units" 10/3/2023; or 5/2/2024), 'the squad' ("I believe to help this squad." 1/20/2023; "The squad []. I warned him – go back from where he [came]." 8/17/2023), as an 'evaluation team' (Defendants in ap.B2 in 2013), or 'extraction team(s)' (Defendants in ap.A3 in 2020, and later 1/20/2022)[101], and more. See ECF No.8-1 at 86, 100, 148, 161, 299; Timeline of events and more. All of those show the organization and coordination between the parties in the activities against Plaintiff, as well as their common goals including to push him "back from where he [came]".

---

100 Note that Plaintiff uses 'agent' here and elsewhere in its general meaning of Defendants employee or party acting in coordination with, under the direction of, or under the control of Defendants.

101 In a few occasions 'team(s)' seem to mean both the Defendants in the building and outside. For example "Lets set up [] get []. Set up. We can not let him (go)." "How to [] the team?" (7/24/2023 – the day before Plaintiff started Dimitrov I); "We got a team []." (7/25/2023); "The whole team. []." (8/17/2023); "Sunday team." (2/4/2024).

*(D) There is no exception that can justify Defendants' denial (in practice) of Plaintiff's right to freely chose residence by their activities pushing him out of his apartment and the US.*

874.  As Plaintiff's residence do not pose any threat, the Defendants' activities to push him out of his residence in Teaneck and the US in general are by nature punitive acts. Even only on that ground those activities are unlawful because they constitute extrajudicial punishment before adjudication of guilt in accord to the due process of law. And considering the lack of any legitimate threat from Plaintiff any Defendants' action against Plaintiff's freedom of movement and residence is obviously not proportional.

875.  To the extend Defendants claim that the interference with Plaintiff's right to free movement and choice of residence is due to national security they apparently misconstrue (a) his legal activities (as for example his preparation for, and filing petitions with government agencies) as threat or attack on the government, or (b) those activities are threat because of Plaintiff's status (race, national origin, ethnicity, sex, ect.), or (c) combination of the previous two. Any one of these considerations is unlawful and unreasonable. How Plaintiff's free movement and choice of residence endanger the US existence, the US capacity to protect its territory, political independence, and state secrets? Note that the activities started long before Plaintiff started working on his legal cases, but quickly escalated since then.

876.  To the extend Defendants raise the argument that Plaintiff is threat to the public order – how his conduct of following the law (filing petitions, and similar lawful activities) can be against the public order, considering that the public order is based on the laws and respect of human rights?

877.  To the extend Defendants raise the argument for public safety how exactly Plaintiff is "real and significant risk to the safety of persons (to life or security of person) or a similar risk of serious damage to property"? If Defendants claim Plaintiff did something illegal, engaged in criminal activity, this is a fabrication, misrepresentation, or combination of those. If they claim those are true why they didn't charge Plaintiff?

878.    To the extend Defendants bring any legitimate purposes that make necessary the US activities against Plaintiff's residence at his Teaneck's apartment, and in the US in general – there are either not applicable to Plaintiff's case (Plaintiff's residence is in residential area, no military objects nearby (per Plaintiff's knowledge)), or are either fabrications, misrepresentations, or some combination of those two.

879.    There is simply no true and legitimate answer to the questions how the exclusion of Plaintiff will make the public more safe, how the national security will be protected, or how the US activities to push him out of the US are appropriate in order to achieve any legitimate purpose.

(iv) Defendants have been acting in coordination to entrap Plaintiff for 13 years an ongoing.

880.    Entrapment is abuse of the process of detection and enforcement by government officials who instigate an illegal act on the part of otherwise innocent persons in order to lure them and punish them.[102] Because undercover activities can easily be misused to entrap an innocent, the Attorney General's guidelines explicitly prohibit that for the FBI / JTTFs undercover operations and/or their confidential informers.[103]

881.    Defendants' efforts to entrap Plaintiff have been obvious since 2013. In order to link him to crime, and/or to incite him to act illegally Defendants deliberately harm and provoke Plaintiff, including by developing and disseminating false accusations of serious crimes, degrading him, creating conflicts, and at the sane time preventing or obstructing his petitions and denying him protection under the law for many years and ongoing. See IV.7, IV.12. To the extend Defendants

---

[102] *U.S. v. Díaz-Maldonado*, 727 F.3d 130 (1st Cir. 2013) quoting *Sorrells v. United States*, 287 U.S. 435, 448, 53 S.Ct. 210, 77 L.Ed. 413 (1932). See also for example *Jacobson v. United States*, No. 90-1124, 503 U.S. 540 (1992), or *U.S. v. McGill*, 754 F.3d 452 (7th Cir. 2014) (listing multiple Supreme Court's cases in support)

[103] "Most experienced undercover agents I knew recognized that our techniques were extraordinarily intrusive and could easily be misused to entrap the innocent. We weren't shy about acknowledging the deceitful nature of the work. One undercover school instructor liked to start each class by saying, "Our job is to establish deep, trusting relationships and then betray them, and if that makes you uncomfortable, leave now."" *Disrupt, Discredit, And Divide: How The New FBI Damages Democracy*, Mike German, The New Press 2019. See Attorney General's Guidelines on Federal Bureau of Investigation Undercover Operations, 2002, IV.H(3); AG Guidelines Regarding the Use of FBI Confidential Human Sources, 2006 V.B.3.iii (additionally prohibiting any obstruction of justice Id. V.B.iii.C).

are not successful in that direction entrapment is used as a frame to analyze their due process violations.

*(A) Plaintiff is an innocent person – he has no criminal history, nor he was engaged in criminal activities before or when Defendants started their inducement. And after 13-years-long and ongoing Defendants' pressure and provocations Plaintiff has still not committed a crime – a demonstration that he has never been 'ready to commit crime' at the first place.[104]*

882.  See Plaintiff's sworn statement at 40-41, part of his Application for Immigrant Visa and Alien Registration filed on or about 5/17/2010 with the US Department of State; and Plaintiff's Non-conviction Certificate No.7170, issued on 9/27/2010 by Pernik District Court, Bulgaria – a few months before Plaintiff arrived in the US.

*(B) Defendants' inducement of Plaintiff to commit crime[105] is abuse of their powers: they not only create opportunities for Plaintiff to commit a crime (for example by giving him 'enemies'), but play psychological games to manipulate and provoke him to do that, create the conditions for his radicalization, and their efforts in that regard far exceed the two-years period which the courts considered improper.[106]*

883.  Based on totality of facts the goals of the Defendants' activities against Plaintiff can be viewed in three levels of abstraction: Defendants' end goal is to radicalize Plaintiff and provoke incriminating action which would be sufficient evidence by itself or in accumulation to prosecute him (apart from the case facts, that is also supported by the general definition of an investigation as 'gathering evidence to prosecute', or 'developing intelligence' to otherwise incapacitate the

---

104 "Our cases [] take into consideration the past and current criminal activities of the defendant. … Our cases have often looked as well to how eagerly and actively the defendant himself participated in the current crime charged, often if not always finding this an important and decisive factor." *U.S. v. Dyke*, 718 F.3d 1282 (10th Cir. 2013); "[R]eady commission of the criminal act can itself adequately evince an individual's predisposition and thus provide sufficient evidence to support a jury's finding that the defendant was predisposed to commit the offense" *U.S. v. Gamache*, 156 F.3d 1 (1st Cir. 1998) (quote and quotation marks omitted)

105 "Inducement may include persuasion, false statements, or other governmental conduct that creates a risk of causing an otherwise unwilling person to commit the crime charged." *U.S. v. Gamache*, 156 F.3d 1 (1st Cir. 1998) ""persuasive overtures" that go beyond those ordinarily present in a drug transaction." *U.S. v. Glover*, 153 F.3d 749 (D.C.Cir. 1998) "inducement requires a showing of at least "persuasion or mild coercion"." *United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985)

106 See *U.S. v. Gamache*, 156 F.3d 1 (1st Cir. 1998) ("[However] eagerness alone, when coupled with the "extra elements" present in this sting operation, is not sufficient to remove the predisposition question from the jury's purview. … Rather, that sting combined an ordinary opportunity with certain "extra elements" so that there was a "risk of catching in the law enforcement net not only those who might well have committed the crime elsewhere (in the absence of the sting), but also those who (in its absence) likely would never have done so." *Gendron*, 18 F.3d at 961. We then identified three such "extra elements." First, the Government's operation "reflected a psychologically `graduated' set of responses to Jacobson's own noncriminal responses, beginning with innocent lures and progressing to frank offers." Id. at 962. Second, the Government's solicitations appealed to alternative motives (i.e., anti-censorship motives), see id., which suggested that the illicit conduct was "something the [defendant] ought to be allowed to do," *Jacobson*, 503 U.S. at 553, 112 S.Ct. 1535. Third, the Government's efforts stretched out over two years. Id.")

target). Absent any factual base for investigation of Plaintiff Defendants have been setting the conditions to develop him as a threat (the case facts match Defendants' radicalization models in reverse – models are used to create, not to detect a threat). The second level goals are for setting those conditions which include (a) developing profound grievances, (b) inducing identity crisis, (c) induction of constant stress and frustration, (d) expose him to regular violent narratives, and more. And the third-level goals are related to Defendants' concrete policies and practices in regards to Plaintiff intended to develop (a) profound grievances – demonstratively harming and provoking Plaintiff for many years, subjecting him to systematic degrading treatment, alienation and discrimination, sabotage of his social activities, disrupting his economic prospects, and more; (b) to induce identity crisis – subjecting Plaintiff to years-long social pressure campaigns utilizing social influence strategies, attacks on Plaintiff's reputation, his sex and sexual orientation, suppression of his personal narrative, imposing criminality and homosexuality and labeling him accordingly, setting identity problems, and more; (c) to induce stress and frustration – subjecting Plaintiff to systematic degrading treatment with different levels of intensity[107], and regular provocations utilizing psychological reactance strategies, conditioning[108], or induction of cognitive dissonance; or (d) to expose regularly Plaintiff to violent narratives – subjecting him to messaging campaigns which include repetition of threats, fighting words, and more, and among other things utilize psychological priming[109]; and (e) to provoke Plaintiff's illegal response –

---

107 "the memo recommended the "imaginative but legal use of non-lethal psychological techniques (i.e., battlefield noises/chaos, barking dogs, etc.)" as well as stress techniques such as sensory overload (shouting, gun shots, white noise, machinery noise) and manipulation of the environment (hot, cold, wet. windy, hard surfaces)… "environment - cold, heat, wet and discomfort" and "psychological deception leading to learned helplessness and increase compliance." … "sensory overload - loud music or temperature regulation"." *Inquiry Into the Treatment of Detainees in U.S. Custody*. Report of the Committee on Armed Services, United States Senate, Nov. 20, 2008

108 "Learning is the process by which new knowledge, behaviors, attitudes, and ideas are acquired. Learning can occur through both unconscious and conscious pathways. Classical conditioning is one of those unconscious learning methods and is the most straightforward way in which humans can learn. Classical conditioning is the process in which an automatic, conditioned response is paired with specific stimuli." *Classical Conditioning*. Ibraheem Rehman; Navid Mahabadi; Terrence Sanvictores; Chaudhry I. Rehman, NCBI Bookshelf. A service of the National Library of Medicine, National Institutes of Health, Last Update: August 22, 2022

109 "Priming is a phenomenon whereby exposure to one stimulus influences a response to a subsequent stimulus, without conscious guidance or intention.[1][2] For example, the word NURSE is recognized more quickly following the word DOCTOR than following the word BREAD." *Priming (psychology)* – Wikipedia

precluding all legal means for resolution and relief by preventing, obstructing, retaliating to his legal actions in response to Defendants' activities, and setting him up with 'enemies'.

884.    Those practices and strategies overlap in time and are not necessarily different as they aim to achieve certain higher-level goal(s) in combination. For example Defendants' demonstrative harmful conduct toward Plaintiff which continue for years, apart from causing physical and/or mental suffering, is obviously intended to make him hostile toward the government and to "develop a profound grievance, a sense of anger and resentment at an undeserved injustice", which is the first phase or one of the fundamental factors for radicalization, and a driver for extremism according to the FBI[110]. See Defendants' overt participation in IV.1-6, IV.11-12, or their explicit statement on 10/8/2016 ("Keep him hostile."). And at the same time that conduct can be punishment for Plaintiff's legal actions, provocation, and more.

885.    Defendants' demonstrative conduct includes variety of behaviors as for example (1) the demonstrative surveillance and dissemination of information about Plaintiff, which apart from suppressing him is apparently provocative; (2) explicit statements about the harassment of Plaintiff (IV.11.C); (3) regular attacks on Plaintiff's identity – imputing homosexual orientation, treating his as a woman (IV.8), imposing false narrative of him as criminal and more (390 *et seq.*) while suppressing / replacing his personal narrative/identity with theirs, destroying his career as advertising Art/Creative Director (IV.12(b)(5)), and more; (4) demonstrative interference and sabotage of Plaintiff's job opportunities, social life including events for his expressive actions, search for legal and expert counsel (1718 *et seq.*); or (5) overt entrapment – Defendants talked in Plaintiff's presence they will 'set up', 'frame' him, setting conflicts, and more (IV.8, IV.12).

886.    Defendants deliberately develop Plaintiff's 'perceptions of government or law enforcement overreach' with explicit statements and conduct, including with active prevention and/or obstruction of his petitions (see IV.9-10). That among other things apparently aim to either 'crush'

---

110 See above 280 *et seq.* grievance, FBI

Plaintiff (see 2510 *et seq.*), or to provoke illegal reaction (psychological reactance theory). Defendants' use of controlling language and high magnitude threats, their explicit persuasion efforts, and negative categorization of Plaintiff for many years (even positive categorization arises reactance, let alone negative)[111] – all those are factors increasing the reactance. See for example Defendants' categorizations of Plaintiff in their false accusations of crime at 390 *et seq.*, or their messaging campaigns as for example the one to 'stop Plaintiff' (1307 *et seq.*).

887.  Because Plaintiff is not involved in any illegal activities Defendants' investigation uses a range of covert techniques "designed to link [him] to the criminal enterprise"[112]. Defendants make false accusations of serious crime (390 *et seq.*), provoking Plaintiff by creating conflicts and 'enemies' for him to engage with (IV.12), including by deliberate demonstration that he is subject of government activities (see FBI/JTTF/police and more), and more.

888.  Based on the above Defendants use their radicalization / threat assessment and management models, and related psychological strategies and tactics to 'develop' and radicalize Plaintiff – they deliberately set the conditions for him to develop the perceptions, and motivations which are drivers for extremism, and/or factors for radicalization.

889.  Defendants' 13-years-long and ongoing inducement is outrageous abuse of power by its duration alone[113], but is especially outrageous in the totality of circumstances in Plaintiff's case (his lack of

---

111 "[N]umerous [] studies indicate that in a range of situations, threats of high magnitude arouse greater reactance than threats of lower magnitude (e.g., Organ, 1974). Additionally, people's perception that a threatening agent is explicitly trying to persuade them will increase reactance arousal (Brehm, 1966)… anything that impedes, but does not eliminate, freedom is a threat (e.g., attempted social influence, Brehm, 1966). … researchers established that strongly worded messages would consistently arouse reactance. … Miron and Brehm (2006) indicated that group categorization could threaten people's freedom to identify or behave as they please. Indeed, even positive categorizations (e.g., "mother," p. 9) can induce reactance people feel a stereotype limits their behavioral freedom in a way that is important to them." *A 50-year review of psychological reactance theory: Do not read this article*. Rosenberg, B. D., & Siegel, J. T. (2016) Motivation Science, 4(4), 281–300.

112 *Practice Advice On Core Investigative Doctrine*, Second Edition, 2012, Produced on behalf of the Association of Chief Police Officers by the National Policing Improvement Agency. ECF No.8-1 at n.87.

113 *See Worthy v. Phenix City*, No. 17-14718 (11th Cir. July 18, 2019) ("*Mackey*, 443 U.S. at 12 ("The duration of any potentially wrongful deprivation of [] interest is an important factor in assessing the impact of official action on the private interest involved.")".)

criminal history and of predisposition to crime, his exercise of constitutional rights in response to Defendants' actions, their active prevention of his petitions, and more)[114].

*(C) Defendants' explicit verbal conduct shows their intent to entrap Plaintiff.*

890.    Defendants do not just create opportunities for Plaintiff to commit offense but provocatively demonstrate to him that their activities are intended to push, press, suppress and get him – they have repeated many times in his presence that they 'have to push/press/oppress/suppress' him since 2012. Among other things that conduct explicitly shows their intentional selective treatment of Plaintiff, as well as the intent to entrap him.

891.    Defendants' verbal conduct alone is demonstration that Plaintiff's oppression and provocation is their policy / practice. Defendants have explicitly stated in his presence, and repeated for years that they 'terrorize', 'harass', 'push', 'press', 'oppress', 'set up', 'frame' Plaintiff, and similar (see IV.7 (b)(ii)(2), IV.11.C).

892.    Defendants talked overtly about pushing Plaintiff frequently since about April 20th, 2017 – the time of Defendants' deletion of Plaintiff's emails with lawyers, Derek Smith Law Group's new position that they do not want to bring Plaintiff's suit in federal court in May 2017, and more. Their talking decreased since then, but in March 2020 Defendants again started talking frequently and overtly about pushing Plaintiff (in March 2020 multiple Defendants' activities intertwined: their efforts to evict Plaintiff, including the stolen check with his rent, the increased price of his Internet by Optimum, the sabotage of his installation of Verizon FIOS, and more). Defendants further increased their prompts to push Plaintiff in September 2022 when Plaintiff worked to finalize his notice of claims and administrative claims to the FBI, and again since 7/12/2023 till the end of September 2023 when Plaintiff finalized, filed his complaint for Dimitrov I (ECF

---

114 *See U.S. v. Dyke*, 718 F.3d 1282 (10th Cir. 2013) ("what qualifies as outrageous governmental conduct depends on an appreciation of the "totality of the circumstances"… What's outrageous conduct by the government depends in part on who the government is dealing with: "[e]xtreme government inducement is more troubling when it targets the nonpredisposed ..."" (quoting Buretta, supra, at 1982))

No.1, 7/25/2023), and then worked and filed his Objections to Magistrate Judge Cave Report and Recommendation to dismiss the case (ECF No.8, 8/28/2023).

893.    Similar increase of prompts to push Plaintiff happened when he was finalizing his second administrative claims with the FBI, sent them to the FBI Headquarters (8/29/2024), and Defendants explicit 'push' continued till the end of October 2024.

894.    Defendants' demonstrative conduct is intended to provoke Plaintiff and 'get him'.  "We have to push him." .. "We'll have to get him." (4/20/2017), "Push him till (death)." (5/20/2017), "Blame." (4/23/2018), (3/6/2020), "Push." "Go get him." (7/12/2022), "Have to get him." (9/10/2022), "We've got to push. [] is by oneself." "Suppress him." (9/17/2022), "Everyday push. He is taking hostages." (7/23/2023, two days before start of *Dimitrov I*), "We need to push back." (3/19/2024, Plaintiff was working on a letter to experts. Same on 6/26/2024, ), "You got to understand. We got to push." (8/16/2024), "He got to stop… Fight." ... "Can't stop him… Jail." "Can push that on some level." (9/12/2024), "Little pushing…" "Torture." (9/14/2024), "We all push." (12/1/2024),

895.    In a few occasions Defendants' sting was obvious: kids (8/31/2024) or student(s) (2/20/2024) came under Plaintiff's windows and provoked him, while Defendants watched all that including Plaintiff's reactions, and commented the 'push'; or on 9/14/2024 when Ralph demonstratively partnered with others to meet Plaintiff when going outside with song repeating "You have to move."

896.    In the occasions Defendants talked overtly about pushing Plaintiff they were explicit that FBI/CIA/police/New York push Plaintiff (4/21/2017) "They [FBI, CIA] can kidnap." "We've already pushed (that)." (9/7/2019), (10/14/2019), "Have the police to push.".. "New York push." (6/23/2020), "New York pushed him." "New York will get him."… "Bulgarian []." "They hate him." "The FBI love." (8/25/2021), (11/2/2021), "So FBI push." (11/14/2021), "Push police to get []." (7/12/2022), (10/4/2022), "Harder push him." "Have police to push." (11/10/2022 at FBI

New York), "He got police. [] shot." "We don't push that." (7/18/2023, a week before Plaintiff

started *Dimitrov I*), "We didn't push []." ... "Getting enforcement. Got police." (8/18/2023), "We

have police stop." .. "New York []." .. "Let Kalin believe. We want []. We pushed a lot. May be

[]." "FBI []... Kalin will going to stop." (9/14/2023), "We push.. Kalin won't forget. Tell Kalin …

Bulgarian []. Arrest." Talked about the FBI, then: "We didn't push… Can't stop (him). Kalin []

New York." (9/28/2023), (2/12/2025), and more.

897.  Defendants threatened that they push Plaintiff in order to create reason to 'kill him' (9/7/2012)

898.  Defendants hacked Plaintiff to push him (8/20/2024).

899.  Defendants were explicit that they push Plaintiff by harassing him (for example on 4/20/2017,

11/8/2017, 2/9/2024), or prompting to push Plaintiff they used DE against him (for example on

1/1/2018, 6/3/2021, 9/5/2021, 4/7/2022, 8/15/2022), or explicitly deprived him of sleep

(3/10/2025). Defendants in ap.A3 knocked on Plaintiff's wall, slammed door(s), and prompted to

push him (for example on 3/26/2020, 4/11/2020, 4/11/2020, 8/15/2020, 4/19/2021, 8/25/2021),

Defendants in ap.B2 hammered on Plaintiff's ceiling, knocked, and/or made other noise and

commented that they push Plaintiff or provoked that they "can't push him" (as for example on

1/15/2024, 1/16/2024, 2/9/2024, 3/15/2024, 5/11/2024, 8/22/2024, 12/20/2024), Defendants' man

from ap.A6 slammed the door talking about 'pushing' Plaintiff (8/26/2024), Defendants and

parties in concert also shouted next Plaintiff and commented "That's how to push him."

(9/3/2023), (8/16/2024), "Stop" and commented to the effect of "Kalin already have that. So why

we need to push?." (9/18/2024).

900.  Defendants were explicit that at least in part they push Plaintiff to stop his work on case-related

and legal materials "We need to push." "He didn't stop." (6/9/2022),  "Push. Stop that." "If we

can't destroy it []." (10/1/2024).

901.    9/7/2012 Friday, "We gotta push him."... "We have to kill him." "Under right push." ECF
No. 8-1 at 17-18.

902.    1/28/2017 Plaintiff was shopping in Teaneck's Stop and Shop a staff member got next to him and said while arranging vegetables: "We thought we pushed you enough." ECF No.8-2 at 1992.

903.    2/28/2017, 12:46PM THS students with an officer came close to Plaintiff's windows "It's a shift game." "Pushing []." ECF No. 8-1 at 851.

904.    4/20/2017, "Start pushing harder.." "Harass him.".. "Pushing Bulgarian []." "Bulgarian can't push that." .. "We have to push him." .. "We'll have to get him." ECF No.8-2 at 1823.

905.    4/21/2017 "Tease him." "Bulgarian qualified that." .. "Crush (him)." "Have the police to push." ECF No.8-2 at 1823.

906.    5/10/2017, Defendants followed Plaintiff on the streets of Teaneck "All right. I think we can push.." "Can I push?" ECF No. 8-1 at 852.

907.    5/14/2017, Plaintiff spoke with Defendants in ap.G2 and other commented. "We have to push him." "We don't forget this." "Bulgarian have to blame himself." "Ready to push. Ready to talk." … "Get out of here."..."He believed that push." ..."We compare little legal push." "We get slow his power. Always trigger him." … "Have to push him."163.

908.    5/20/2017, "Push him till (death)." ECF No.8-2 at 1823.

909.    6/21/2017, DSLG's office in Manhattan at 30 Broad Str., 35th floor, New York, NY 10004 "Let the Gyro push him." ECF No. 8-2 at 2107.

910.    11/8/2017, "Harass. Let's push." "Harass him." ECF No. 8-1 at 825.

911.    1/1/2018 Monday, Defendants came and shouted under Plaintiff's windows, and targeted Plaintiff's eyes with very strong DE beams between 1:10-2AM. At about 1:30AM Defendants in ap.B2 commented "Have to push." At about 9:30AM Defendants awakened Plaintiff with strong focused beams and later commented at about 11AM "Don't know how to push [him]." ECF No. 8-1 at 211.

912.    4/23/2018, after Plaintiff filed his complaint against Gyro et al. with S.D.N.Y. he passed by the FBI New York Field Office building on Broadway, Manhattan. Defendants followed him "Let me stop Kalin." "Stop the police." "Try push stop." "Push him []." "Blame." ECF No. 8-1 at 114.

913.    9/7/2019, Defendants in apartment A3 – next to Plaintiff stated explicitly among other things that "They [FBI, CIA] can kidnap." "We've already pushed (that)." "Kalin has to believe." ECF No. 8-1 at 475. n.48

914.    10/14/2019 Plaintiff went to the Records desk in Teaneck Police Department but it was closed. When he was to enter the police building hiding persons commented him "It's all good?" "They have their push." "That's him." "Have to say []." "Go (get him)." ECF No. 8-1 at 647.

915.    3/6/2020, "It's the how push the man.".. "Push him []." "Not to catch him?" ECF No. 8-2 at 2078.

916.    3/26/2020, after Plaintiff sat behind his desk at 8:23PM Defendants in ap.A3 (Maya) shouted ("Stop it. Grrr..") and started knocking. After that they talked about Plaintiff ("Bulgarian") and "Kalin push". ECF No. 8-1 at 486.

917.    3/29/2020 Sunday, 10:24AM awakened with 2 small red spots/swellings on his hand. Defendants in ap.B2 commented: "We lost. We pushed too much."

918.    4/11/2020, Plaintiff was working on materials for a FOIA request when Defendants in ap.A3 knocked on his wall and woman prompted to "Figure how to push him." ECF No. 8-1 at 56. At about 7:15PM after Plaintiff attended Advanced Debaters Toastmasters' meeting Defendants in ap.B2 commented "They couldn't push him." ECF No. 8-1 at 210.

919.    6/23/2020, after 5:34PM multiple persons in building's corridor discussed Plaintiff "Have the police to push.".. "New York push." ECF No. 8-1 at 58.

920. 8/15/2020, Defendants in ap.A3 knocked and prompted "Have to push." Later Defendants came under Plaintiff's windows: "Figure how to push [him]." ECF No.8-2 at 1823.

921. 11/24/2020, 11:55AM Defendants' woman came under Plaintiff's windows "We have to push." ECF No. 8-1 at 660.

922. 3/21/2021 Sunday, 3:08AM Defendants in ap.A3 "Bulgarian []." "I am not afraid. Apologize.." "Kalin []." "How to push[]?" ECF No. 8-1 at 516.

923. 4/4/2021, Plaintiff worked on case related materials till 7:07PM. At 3:56PM Ralph under Plaintiff's windows on Cedar lane commented: "Fight [] push him []." Plaintiff opened the window, and Ralph stopped talking for a while, then said: "Bulgarian []." and entered the building from the back door without passing into Plaintiff's camera view. ECF No. 8-1 at 665.

924. 4/6/2021 at 6:32PM Defendants in corridor "Figure how to push him." ECF No.8-2 at 1823.

925. 4/19/2021, Defendants in ap. A3 slammed a door at 4:10PM, 4:13PM, 4:17PM. Plaintiff reacted in his apartment "Stop knocking. Be a good girl." Defendants' Sarah in A3 responded "We can't push him." ECF No. 8-1 at 520.

926. 4/29/2021, Plaintiff worked on legal cases, and during the day there were many slams in ap.A3 (for example at 5:25PM, 5:27PM,5:29PM, 5:46PM, 5:48PM, 5:53PM, 5:59PM, 6:10PM, 6:11PM), at 5:48PM woman in ap.A3 spoke about "Bulgarian" and at 6:23PM "Can't push him." ECF No. 8-1 at 526.

927. 6/3/2021, about 12:55AM, Defendants' man in ap.B2 "We need to push." (After that for about 10 minutes there were repeating peaks of a RF beam from ap.B2 (>10 mW/m2)), ECF No. 8-1 at 210.

928. 7/11/2021 Sunday, 7:21PM Plaintiff was working on PSYOP materials when Defendants under his windows commented: "Can't believe… Right. That's very true. Very true.." A bit later (7:26PM) in building corridor "We have to push." ECF No. 8-1 at 587.

929. 7/14/2021 Wednesday, 5:09PM Defendants' person prompted "Push [Plaintiff]. Can't believe." ECF No. 8-1 at 766.

930. 7/17/2021 Saturday, 7:53PM Plaintiff was working on surveillance materials when Defendants in ap.A1 knocked for a while right behind him. After Plaintiff went and spoke with the new 'neighbor' in ap.A1 Defendants' man in ap.B2 commented "We have to push." ECF No. 8-1 at 210

931. 7/11/2021, Plaintiff was working on case materials Defendants came under his windows "We have to push." Two hours later they returned "Have to punish [him]. We don't forget." and at 10:59PM "Can't believe we fight []." ECF No.8-2 at 1823

932. 8/25/2021, Plaintiff was working on timeline of events when Defendants in ap.A3 knocked strong on his wall at 9:37PM. Plaintiff commented inside his apartment "You stated it – you want to slow me, not stop me." Defendants near his windows responded "Do not press." "May be Kalin []."..  "New York pushed him." "New York will get him."… "Bulgarian []." "They hate him." "The FBI love." ECF No. 8-1 at 533.

933. 9/4/2021 Saturday, in the afternoon Plaintiff was working on relevant history (he worked till 7:07PM) when Cesar and Oscar(?) talked about him in ap.A3 at 4:45PM "Bulgarian".. "push Kalin." ECF No. 8-1 at 674.

934. 10/11/2021 Monday at 12:14PM Defendants' person commented in corridor "We really pushed him a lot." 10:12PM Dula prompted "may be start to push him." ECF No. 8-1 at 260.

935. 10/16/2021 Saturday at 5:09PM Defendants' woman came under Plaintiff's windows on Cedar lane "How to push?" Later Plaintiff was working on psychological abuse in human trafficking context when a woman in ap.A6 laughed loud and commented "That's what we do." ECF No. 8-1 at 262.

936.  9/5/2021, Defendants' man talked in ap.G2 since 8:12PM. A few minutes later Plaintiff challenged "I don't understand it. It is not loud enough." G2 responded "We got to push. Really. ... Can't harass. ... Kalin []." ECF No. 8-1 at 180.

937.  11/2/2021 Tuesday, 10:55PM while Plaintiff was watching a movie Defendants' man came under his windows "Police [] got to push". ECF No. 8-1 at 72.

938.  11/3/2021, Ralph entered ap.A3 and talked there "How to even push? Bulgarian []." "Iron man." ECF No. 8-1 at 546.

939.  11/14/2021, Plaintiff had worked on counterterrorism materials till 12:41AM. In the morning, since about 10AM for about an hour Defendants (among them Ralph Pimienta and Cesar Naranjo) have talked about Plaintiff under his windows. "So FBI push." "Let's game." [Strong slam]. "Push the [] game." "As of Bulgaria stop." "Who is the (victim)?" "It's all []." "CIA." ECF No. 8-1 at 680.

940.  11/17/2021, at 3:47PM USPS carrier spoke in building's corridor "Have to push [Plaintiff]." "Why can't?" ECF No. 8-1 at 548.

941.  2/5/2022 Saturday, 5:02PM pipe bangs while Plaintiff was working on audio recording(?) Followed knocks and heavy walking in ap.B2 at 5:25PM, and a lot of activity in ap.A6 at 5:49PM. "Have to push." ECF No. 8-1 at 315.

942.  2/15/2021 Monday, Defendants in ap.A3 commented "We push a lot." ECF No. 8-1 at 567.

943.  4/7/2022 Thursday, Defendants' woman came under Plaintiff's windows "Have to push." A bit later at 11:46AM Defendants awakened Plaintiff again with pressure and short strong ray at his heart and head/shoulders. ECF No. 8-1 at 376.

944.  4/8/2022 Friday, 4:03PM a man on Cedar lane close to Plaintiff's windows "We need [] push button." ECF No. 8-1 at 377.

945.  5/15/2022 Sunday, Plaintiff was working on State terrorism when at 12:12AM Defendants in ap.G2 knocked. Twenty minutes later (12:31AM) a couple under Plaintiff's windows commented "Bull []." Plaintiff challenged "Return and repeat." They(?) returned at 12:33AM "Have to push." ECF No. 8-1 at 199.

946.  6/9/2022 Thursday, Plaintiff was working on relevant history when at 3:01PM Ralph and Dula spoke in building's corridor "We need to push." They entered ap.B2 "He didn't stop." ECF No. 8-1 at 711.

947.  6/12/2022 Sunday, while Plaintiff worked next to Provident bank on Cedar lane, Teaneck, NJ a Spanish speaking family sat on benches next to him. At one point they provoked "How you learn to speak Bulgarian?" "Have to push." ECF No. 8-1 at 427.

948.  6/14/2022 Tuesday, about 10:04PM after Defendants' women said "Have to push." Defendants in ap.B2 slammed door(?). ECF No. 8-1 at 429.

949.  7/4/2022 Monday, "Should ID him." "But I am going to push." ECF No. 8-2 at 2247-48.

950.  7/12/2022 Tuesday, "Push police to get []." … "Push." "Go get him." ECF No. 8-2 at 2523, 2546-47.

951.  7/16/2022 Saturday, 12:35AM Defendants in front of the pub near Plaintiff talked about him ("Kalin") and to "push" him. ECF No. 8-2 at 2642.

952.  7/28/2022 Thursday, "(Police) stopped." "Have to push." ECF No. 8-2 at 2953-54.

953.  8/11/2022 Thursday, "Don't talk, we push."... "We pushing that psych." ECF No. 8-2 at 3355, 3424.

954.  8/15/2022 Monday, 9:26AM Defendants' man stated in building corridor "Push him non stop." Plaintiff felt rays at his right knee, and after Plaintiff moved it – the ray followed. Till 11:58AM the man talked 4-5 times stating among other things "Non stop push." "Try to push stop." "Bulgarian didn't stop." ECF No. 8-2 at 3504, 3508, 3512, 3514.

955.    9/8/2022 Thursday, after 11:20AM students came under Plaintiff's windows "Have to push to stop." Plaintiff felt burning which increased gradually as strength at head then at hip. ECF No. 8-2 at 4304.

956.    9/10/2022 Saturday, Defendants in front of the pub continued talking about Plaintiff. 12:05AM "Have to get him." 12:12AM "Have to push." 12:26AM "Kalin [] set up." ECF No. 8-2 at 4406.

957.    9/11/2022 Sunday, 1:36AM Plaintiff was working on EMF part of relevant history when a woman commented "We got to push." ECF No. 8-2 at 4487.

958.    9/15/2022 Thursday, 12:05AM "Kalin []" a man "[] to push." ECF No. 8-2 at 4626.

959.    9/16/2022 Friday, 2:48AM Defendants' man in ap.B2 commented "We did push him a lot." ECF No. 8-2 at 4660.

960.    9/17/2022, Plaintiff worked on relevant history when at 10:04PM Defendants' agents talking in front of the pub commented "It's a lie." ... "Bulgarian have that." "Fine. Investigate him." Later they stated "We've got to push. [] is by oneself." "Suppress him." ECF No. 8-1 at 1818.

961.    9/18/2022 Sunday, 12:04AM "May be push back." "Police stay." ECF No. 8-2 at 4697.

962.    9/19/2022 Monday, 8:53PM Defendants' woman commented close to Plaintiff's windows "Can't push Bulgarian. Stop." ECF No. 8-2 at 4741.

963.    9/23/2022 Friday, "Have to push. Completely stop that." "You can't push him." ECF No. 8-2 at 4907.4916.

964.    10/4/2022 Tuesday, 6:59PM Dula "Kalin will []. Kalin []. I got to push. … New York [] lost." ECF No. 8-2 at 5215.

965.    11/10/2022, Plaintiff went to hand-deliver his Notice of claims with the FBI New York. "Harder push him." "Have police to push." ECF No. 8-2 at 5913. 5920.

966.    11/21/2022 Monday, "Have to push. Don't stop that." … Dula: "To oppress the man []. It could be the last they fucking talk." "Have to push stop." "Have really to punish. She has that the script-- then []." "Steady. Kalin []." ECF No. 8-2 at 5952-53.

967.    12/3/2022 Saturday, Defendants in ap.B2 admitted "We did push." ECF No. 8-2 at 5966.

968.    12/14/2022 Wednesday, Loomer "How I to push Kalin?" ECF No. 8-2 at 5977.

969.    12/18/2022 Sunday, "Fight to stop." "Gotta pushing him." ECF No. 8-2 at 5985.

970.    1/20/2023, Ralph [at background] "[] we push Kalin."… "Get to move. Going to press []. Pushing they (arrest). The power to [arrest]." ECF No. 8-1 at 87.91.

971.    2/6/2023 Monday, 11:56PM Plaintiff still working on DE when there was a knock on his window on Cedar lane. ap.B2 commented "Have to push." ECF No. 8-2 at 6253.

972.    2/16/2023 Thursday, 9:57AM man in ap.B2 "Have to push. Never believe him." ECF No. 8-2 at 6412.

973.    5/31/2023 Wednesday, 4:59PM USPS carrier and another person talked in building's corridor "They want to push. They can't []." They stopped talking after Plaintiff started Olympus. ECF No. 8-2 at 7932.

974.    6/3/2023 Saturday, 5:01PM loud persons got off a car under Plaintiff's windows. A man "He's gotta push." 10:08PM a man in front of the pub on Cedar lane "Can't believe we can not push him." ECF No. 8-2 at 8004.8008.

975.    6/30/2023 Friday, 2:31PM a man "We wanna push." A woman "We have to have []." ECF No. 8-2 at 8457.

976.    7/12/2023 Wednesday, 11:46AM man in B2 (about 5 minutes ago) talked quietly near the building "He can't forget. Can't push." When Plaintiff looked no one was visible. ECF No. 8-2 at 8693.

977.  7/16/2023 Sunday, 10:47PM Defendants' men in front of the pub on Cedar lane "Can't fight. Can't push that." ECF No. 8-2 at 8777.

978.  7/18/2023 Tuesday, 9:10PM 2 women "He got police. [] shot." "We don't push that." "Crazy" Plaintiff tried to see them – they were hidden.

979.  7/20/2023 Thursday, 11:24PM "Trying to get []. Having Kalin to push."

980.  7/23/2023 Sunday, 10:17PM Defendants' man commented: "Everyday push. He is taking hostages."

981.  8/18/2023 Friday, 2:45PM two Defendants' women threatened "Gave Kalin the assault." and continued in Spanish. Plaintiff made videos they commented "And for this, can't forget to push." Defendants' man at Lomo food truck near Plaintiff's windows watched the whole thing and commented "They can't stop him." Plaintiff made some photos and Defendants continued "Can't stop." 3:00PM Plaintiff was working on exhibits for his Objections (ECF No.8) Defendants kept talking about him ("Kalin"), to "Stop" him. At 3:18PM they said "We didn't push []." ... "Getting enforcement. Got police."

982.  9/2/2023 Saturday, 11:29PM Defendants' man talking with persons in a car parked on Red Road opposite to Plaintiff's windows: "Can't believe it." "Got to push." "Can't stop."

983.  9/3/2023 Sunday, 8:36PM after Plaintiff stopped his TV Defendants' man in B2 commented "We can not push." 8:44PM students returned under Plaintiff's windows and were loud only there, then commented "That's how to push him." "You did it yourself."

984.  9/14/2023 Thursday, 8:47AM Ralph warned in ap.B2 "Have to stop. " Defendants in B2 kept talking about Plaintiff "Can't stop." "Kalin stop." .. "We have police stop." .. "New York.." 8:52AM "Kalin [] stop…" 8:53AM "Won't stop. Let Kalin believe." 8:54AM Dula in ap.B2 "Let Kalin believe. We want []. We pushed a lot. May be []." 8:55AM "FBI []… Kalin give. Kalin will going to stop."

985.  9/28/2023 Thursday, 9:07PM Dula commented Plaintiff "He wants to stop." and talked about "firearms. That could bring respect." She kept talking "Can't harass… Can't stop… Kalin stopped." later "We push.. I don't believe. Kalin won't forget. Tell Kalin … Bulgarian []…. Arrest." At 9:33PM Dula moved above Plaintiff talking about the FBI. 9:37PM man in B2 commented "We didn't push… Can not hear… Can't stop (him). Kalin [] New York."

986.  1/15/2024, 9:23PM Defendants in ap.B2 hammered on Plaintiff's ceiling. Dula in B2 commented "We pushed before that."

987.  1/16/2024, after awakening Plaintiff with thud, at about 9:58PM Dula commented in B2 "We can not push."

988.  2/9/2024, 6:06PM Plaintiff was working on investigation when Dula in B2 repeated exactly what he was writing at that moment "push, press…" then talked about "harass[ment]". 6:31PM Dula "He… to stop." and hit the Plaintiff's ceiling.

989.  2/20/2024, 1:07PM student came under Plaintiff's windows. Defendants' Ralph in building corridor challenged Plaintiff "Kalin… Did you call it? … Push."

990.  2/23/2024, 1:55PM Plaintiff saw three men (later fourth man showed), one of them the JC Realty 'plumber' they commented "Have to push." "He hardly sleeps."

991.  3/11/2024, 11:54PM after commenting quietly "We can not push." Defendants in ap. B2 hammered on Plaintiff's ceiling.

992.  3/15/2024, 9:46AM Defendants awakened Plaintiff, and he scanned for DE. Followed slams, and Defendants' man commented "We have to push."

993.  3/19/2024, 6:14PM while Plaintiff was working on a letter to relevant experts and reading materials Defendants' man and woman talked in building's corridor "We need to push back." When Plaintiff moved Olympus in his corridor talking stopped. Then at about 6:25PM "They stopped."

994.   5/11/2024, 2:20PM Defendants in ap. B2 hammered on Plaintiff's ceiling. Defendants in G2 commented "Can't push." "They don't stop."

995.   5/12/2024, 1:15AM Defendants' man in B2 quietly "We didn't push him."

996.   5/27/2024, about 6:45AM while Plaintiff was in toilet Defendants' man in B2 "We couldn't push him." Followed pipe bangs, and a few knocks from B2.

997.   6/26/2024, about 10:55AM Defendants on Cedar lane under Plaintiff's windows "We got to push back."

998.   7/6/2024, 10:51PM Defendants women in front of the pub talked about Plaintiff "We have to stop (him). Punish." "To stop." 10:54PM "Kalin.. Have to push."

999.   7/25/2024, 1:34PM two men at Jamaican food truck talked loud "They want to stop." After Plaintiff started Tascam DR07 they hid behind bushes, but did not stop talking. "Everything stashed.. Crazy like []." "That guy [] to stop." 1:39PM when Plaintiff made photos "Yea, can't push him."

1000.  7/30/2024, 9:47PM while Plaintiff was researching on Internet section 1981 in regards to charges against federal actors Defendants' man and woman on Cedar lane talked under windows passing "Push.. I have no power."

1001.  8/16/2024, 8:34AM Defendants' man in ap. B2 "Have to push. Completely stop the []." 9:28PM Defendants man was loud only under Plaintiff's windows on Red Road and Cedar lane "You got to understand. We got to push." He returned under the windows talking not intelligible. 9:49PM he came under windows again.

1002.  8/20/2024, 11:50AM Ralph and Dula(?) "All []. Hacking did not work." Dula entered quietly ap. B2. "Have to push.".. "Fight."

1003.  8/22/2024 Thursday, 2:04PM Defendants' man near Plaintiff's windows "We have to push." Defendants in ap. B2 knocked while Plaintiff was writing the note.

1004.  8/26/2024, about 12:10PM Defendants' man in ap. A6 "Can't push." Followed three consecutive slams. The man was very loud in building corridor and slammed the entrance door. Defendants in ap. B2 after that dropped something – thuds on Plaintiff's ceiling. While Plaintiff was scanning Swaby(?) and a woman in building corridor talked at one point about Plaintiff "Have to push… Kalin []."

1005.  8/29/2024, Defendants' Jason talked in ap. G2 all night. 2:30AM-2:37AM "Kalin… It's going national." "Kalin won't forget." Later at 2:39AM "OK. I'll write a motion…" 2:48AM "See if we can push." Later same day 7:06PM Christine, Jamaican food and Defendants woman "We got to stop him. Every day []." "They are watching." "We got to push."

1006.  8/31/2024, after 5PM a group of very loud kids came under Plaintiff's window, stayed there and talked something not meaningful. After they moved back and forth under window Defendants' woman prompted "We have to push." Defendants' person threw a rock under the window. 7:06PM two Jewish men staying opposite to Plaintiff's windows commented not loud "He didn't fight. It's not working."

1007.  9/6/2024, 7:44PM Defendants' man "How to push stop? [] suspect."

1008.  9/12/2024, 2:09PM the same man from 1:46PM again came near Plaintiff's windows loud "He got to stop… Fight." 2:11PM "Can't stop him… Jail." 2:13PM "Can push that on some level."

1009.  9/14/2024, about 2:10PM while Plaintiff was in toilet Ralph talked about him in building corridor (two times mentioned "Kalin"), then got under Plaintiff's windows. Plaintiff started preparing to leave the apartment, and a car started playing loud music with lyrics repeating "You have to move." Plaintiff saw Blue Iris restarted remotely. Ralph came under the windows at the corner of Cedar lane and Red Road. "Where is he? Where is he?" Ralph

moved toward the entrance "Have to push." 3:56PM the men continue talking about Plaintiff "Little pushing…" "Torture."

1010.   9/18/2024, 5:47PM Plaintiff was working on DE report in the park when Defendants' man on the alley shouted "Stop" next to him. When Plaintiff applauded the man waved to him. Plaintiff made a video of him but pressed pause by mistake so video is very short. While Plaintiff was writing this note two Defendants' women behind him commented to the effect of "Kalin already have that. So why we need to push?."

1011.   9/24/2024, 1:05PM student came under Plaintiff's windows "Push."

1012.   10/1/2024, 5:24PM after Plaintiff stopped working on a recording for the case Defendants' man and woman in building corridor "Push. Stop that." "If we can't destroy it []."

1013.   10/5/2024, 9:31AM Dula in ap. B2 "We lost that. We can not push… Stay []."

1014.   10/27/2024, 10:34AM Defendants' man in B2 on speaker again. "Push him."

1015.   10/31/2024, 1:36PM Plaintiff was working for a short time on DE attacks when two Defendants' men walking on Cedar lane came under Plaintiff's windows "We got to push him back. Take that shit back." "Lets play." Dula in ap. B2 quietly commented "He didn't believe." 4:33PM two school girls came near by. "We have to push." they left at 4:57PM.

1016.   11/22/2024, 8:29AM very loud pipe bang – third time since Plaintiff got up. While Plaintiff was in toilet Defendants woman talked not loud under his window "They []. They care. They push."

1017.   12/1/2024, 2:26AM Defendants' man in building corridor "We all push."

1018.   12/7/2024, 11:18PM group of Defendants were loud only under Plaintiff's windows "Push." "You woman []."

1019.   12/13/2024, 3:56PM construction workers and two Teaneck police officers next to Plaintiff's windows "Have to stop." 3:59PM "Have to push." "How long they []?" … "Kalin..."

1020.   12/20/2024, 11:05AM Defendants in ap. B2 hammered on Plaintiff's ceiling awakening him. Defendants' man in B2 "Can't push him..."

1021.   2/3/2025, 12:39PM Defendants commented "He don't get it. We have to push."

1022.   2/12/2025, 9:22AM Defendants' man in B2 "We got to push." And later talked about 'police'.

1023.   3/10/2025, about 9:45AM while Plaintiff was in toilet Defendants' man in B2 not loud "He didn't sleep. We can't push him."

1024.   And more.

1025.   Defendants talked about FBI's, or 'police set up' in regards to Plaintiff. "We set up.." "Enough with that. We can't protect []." "Now (recording) police. []." "Not according to the FBI." (3/4/2020), "Kalin []." "[] police set up." (9/6/2024), "FBI to stop… Can't harass." "Say Kalin… "Set up... to set arrest." (10/6/2024).

1026.   Defendants have made multiple statements that they set Plaintiff up to stop him (for example on 4/23/2018, 9/13/2022, 11/21/2022, 1/20/2023, "How to set him up to stop?" 4/8/2024, 4/9/2024).

1027.   Defendants were explicit about their intention to entrap him on 11/3/2024 "The only way we could do is to set up.", and their verbal conduct indirectly shows that they have no factual base

for the actions against Plaintiff. Notable is that Defendants stopped talking (there is no noted instance at least till April 2025) about setting Plaintiff up since his letter to Attorney General on 10/7/2024.

1028.    Defendants demonstrated complete disregard about the truth and with the knowledge of the falsity of their accusations, they blamed Plaintiff with "all sort of blame" (5/10/2017), or expressed willingness to lie (1/20/2023). Defendants overtly talked to frame and/or blame Plaintiff in order to 'completely stop' Bulgarian (4/20/2017).

1029.    Defendants' intention to entrap Plaintiff was clearly shown. "Try to frame [Plaintiff]." "We have (that)." ... "They said forget anything []. He is Bulgarian []." (8/11/2022), Defendants talked that they 'have to stop' Plaintiff, and schemed to frame him on a fictitious accusation that Plaintiff 'hurt a student'. (12/14/2022. See in that regard provocations on 8/31/2024, 2/20/2024 or the students' assaults on 4/26/2024 and 7/16/2024), Notable are the Teaneck police officers statements on 1/20/2023 who said to Defendants in the building that it is OK to set Plaintiff up (see also 5/11/2024).

1030.    Defendants explicitly stated their intention to 'stage' and fabricate crime on behalf of Plaintiff to "get him" since the very beginning (9/7/2012).

1031.    In the evening of 9/7/2012 Defendants came under Plaintiff's windows talked "We have to stage it. We have to stage it." "The homicide one." "Fucking stage it." "We can't believe him." "We're losing him." "Police job." "We'll get him. Subpoena job []." "Tease him.."Bulgarian enemies." ECF No.8-1 at 18.

1032.    4/20/2017, about 4:08PM Defendants' men "Bulgarian to frame []." "(To) completely stop."

1033.    5/10/2017 Defendants followed Plaintiff on the streets of Teaneck, and when he took a right turn on Red Road they gave directions to three students who followed and commented him. "You have Bulgarian." "We don't forget." "Don't talk." "All sort of blame." "There is one generic (problem)." "The Bulgarian push []." ECF No.8-1 at 852.

1034.    6/7/2017 Wednesday, Defendants' agent patrolled under Plaintiff's windows, and talked about "Stage game." (12:50PM).

1035.    4/23/2018 after Plaintiff filed his complaint against Gyro et al. with S.D.N.Y. he passed by the FBI New York Field Office building on Broadway, Manhattan. Defendants followed him and talked "Have to embarrass him." "Stop Kalin []." "Set up []." "Push him []." "Blame." "Just nobody. Stop." "Can I have the role []?" "Go get him."… "Spare a bullet. Let him go.".. "Witness Bulgarian []." "Bulgarian []" "New York forgive." ECF No.8-1 at 114.

1036.  3/4/2020 between 12:09-12:20PM Teaneck police officers and a bit later a police car were under Plaintiff's windows and Defendants' agent talked about Plaintiff "He press us." "We set up.." "Enough with that. We can't protect []." "Now (recording) police. []." "Not according to the FBI." ECF No.8-2 at 2975.

1037.  11/3/2021 Wednesday, 2AM Defendants in ap.B2 repeated a line from the Transcript of 170420_3199.mp3 (6:53) Plaintiff was working on "Bulgarian to frame." ECF No.8-1 at 211.

1038.  4/23/2022 Sunday, 11:30PM while Plaintiff was working on public materials about counterintelligence Defendants' man came under Plaintiff's windows and said "Set up to touch him." ECF No.8-1 at 392.

1039.  8/8/2022 Monday, 6:40PM a loud group of schoolboys came near Plaintiff, talked and screamed as girls. Defendants' man and a woman commented Plaintiff. "Kalin framed []." ECF No.8-2 at 3265, 3268.

1040.  8/11/2022 Thursday, 8:35PM Defendants group in building corridor talked about Plaintiff "Try to frame []." "We have (that)." "[] say to push. How []?" "They said forget anything []. He is Bulgarian []." ECF No.8-2 at 3430-3433.

1041.  9/13/2022 Tuesday, 8:28PM Cesar Naranjo talked with persons in a car parked under Plaintiff's windows on Red Road. "Tell Kalin stop doing []." "You lost." "Tell him (stop)." "(Force) stop." "(How) Kalin stop." "[] to school him." "Set up." ECF No.8-2 at 4560-4571.

1042.  10/8/2022 Saturday, about 3:30PM Plaintiff have just entered Votee Park when Defendants' person at distance commented "Don't blame Kalin." Then persons talked in Russian next to Plaintiff. On his way back home at about 5:40PM again persons talked in Russian next to Plaintiff. ECF No.8-2 at 5369.

1043.  11/21/2022 Monday (about 10 days after Plaintiff filed his Notice of claims with NYC, Teaneack, and administrative claims with the FBI New York) Defendants in ap.B2 and outside repeatedly talked about setting Plaintiff or setting some events in regards him ('arrest' him) – 'set/setting' was repeated 16 times in about 7 minutes. For example in the exchange Loomer asked "Do you want to shoot [him]?" "How?" "Arrest []. .. Can't stop harassing." "Set up talk." "You have said []." Ralph: "Set a []." "Get him stop." Ralph: "Your beat." "Can't stop (beating) []." Loomer: "Get to stop." ECF No.8-2 at 5954.

1044.  12/14/2022 Wednesday, Plaintiff worked on public national security materials till 5AM. At about 8AM Defendants awakened him – Dula ('D') and about 6 other Defendants agents talked in building corridor that they 'have to stop' him, and schemed to frame him on a fabricated plot that Plaintiff 'hurt a student'. Loomer "How I to push Kalin?".. Ralph "That was not Kalin." D "Have to talk. Harass him.".. "They wanna fights." "We lost (stop). Kalin lost.".. "We call Gyro..." "He hurt student []." Ralph "Don't have that." ECF No.8-2 at 5977.

1045.  1/20/2023, uniform Teaneck police officers and Defendants' agents in the building threatened to 'lie' and 'frame' Plaintiff. Defendants' woman from ap.A1 explicitly said they should "Blame Kalin." Later Defendants' man in ap.A6 "I can blame him." Police officer "Set the fucker." Defendants' woman in ap.A6 "He just get to free []. And then I lie. Frame." They repeatedly talked about 'arresting' Plaintiff, 'setting' him "Stop. Really suppress Kalin []." "Set up. They allow to [set up]." ... "All have to set []." … "[Talking in Spanish] Kalin []." "They do not. Kalin spot him." "Stop the assault. Set your opponent. Set up."… Dula "Set up." ECF No.8-1 at 81, 86, 89, 91.

1046.  4/8/2024, 1:54AM while Plaintiff was playing chess online Defendants man under his windows on Cedar lane "How to set him up to stop?"

1047.  4/9/2024, 11:13PM Defendants (one of them Lea from ap.A3) talking in building in corridor "Kalin won't stop." Woman on speaker "We are the people. How we arrest that..?" At 11:35PM they continued "It's a set up."

1048.    4/30/2024, 3:37PM Plaintiff was working on the letter to Judge Rearden when a schoolboy came under his windows and challenged "Somebody lied. Set all…"

1049.    5/11/2024, 2:32PM Defendants' man with a kid came under Plaintiff's windows and talked "Police… Trying to frame." "Why?"

1050.    5/31/2024, 6:18PM Defendants shouting "They set up." … "May be Kalin wants to settle." … "Really can't press." 6:36PM "Kalin..."

1051.    6/5/2024, 1:06PM Defendants' man and woman in building corridor talked about the "smear campaign. People like him." Man commented "Set up."

1052.    6/21/2024, 2:16PM Defendants' man in apartment A3 "Kalin expressed []." and talked how "to frame". "We made him. Now you make on your own."

1053.    8/8/2024, 1:16PM while Plaintiff was in toilet Defendants' man came under the window threatening "It's not a game. We are [] to set up."

1054.    8/23/2024 Friday, 3:08PM Defendants' man behind Plaintiff challenged "No sleep. No sleep… I set up. Is set up []." Later at 4:12PM Defendants' woman repeated loud "Set up. Set up. Why we are doing this?" At 6:39PM Defendants' man and woman sat on benches next to Plaintiff: "Set up. Waiting…"

1055.    8/29/2024, 8:18AM while Plaintiff was checking the FBI website (he sent his second administrative claims to FBI Headquarters later) Defendants' man came near Plaintiff's windows and challenged "Set up." Defendants in B2 slammed the door.

1056.    9/6/2024, 6:46PM Christine, Jamaican food, and Defendants' couple talked "Kalin []." "[] police set up."

1057.    10/6/2024, Defendants in B2 talked about Plaintiff ("Kalin"). At 9:55AM Dula said "We don't stop that." … "FBI to stop… Can't harass." "Say Kalin… You say …" 9:59AM Defendants' man in B2 talked about a "Set up." 10AM Dula responded "Kalin set up []." And later "Kalin to set up []. New York []." ".. to set arrest."

1058.    11/3/2024, about 7:25AM just after Plaintiff stopped working on a transcript Defendants' man came under his windows and commented "The only way we could do is to set up."

1059.    11/8/2024 Defendants' couple from A6 talked in front of Plaintiff's door "They blame you." "They don't []."

1060.    And more.

(v) Defendants do not enforce nor follow the law, do not hold and prevent Plaintiff to hold accountable to the law the US persons, institutions and entities that violate the Constitution and laws with the authorization, support, acceptance, and/or implementation of the activities against him.

*(A) Defendants' activities against Plaintiff are unlawful – they violate the US Constitution (First, Fourth, Fifth, and Fourteenth Amendments), the UN conventions ratified by the US such as CCPR, CAT, and CERD, and multiple federal and local laws for more than 13 years and ongoing. See bellow (B).*

1061.    There is general problem with counter-terrorism laws because the absence of a UN definition of

terrorism has led to an obvious and deliberate misuse of the term and violation of human rights

by states[115], and many of the state counterterrorism measures are "clear threat to the enjoyment of

---

115 See *Human Rights, Terrorism and Counter-terrorism*, Office of the United Nations, High Commissioner for Human Rights, Fact sheet 32, GE.08-41872–July 2008–7,820 ("Overly vague or broad definitions of terrorism

human rights"[116]. The US has downgraded the human rights concerns in regards to its anti-terrorism measures, and accepted and even supported hurting innocent by "over connect[ing] the dots" in its anti-terrorism measures[117]. After 9/11 the FBI adopted in practice 'guilty till proven innocent' theory (see 277) regardless of the fact that the presumption of innocence of those criminally charged is a fundamental principle[118], and essential aspect of the due process (Fifth and Fourteenth Amendments of the US constitution)[119].

1062.    To the extend the presumption of innocence and procedural rights mentioned above are in regards to criminal Defendants, the Defendants' treatment of Plaintiff is worse than those formally

---

may be used by States as a means to cover peaceful acts to protect [] human rights ...[n.86 ... see Castillo Petruzzi et al. v. Peru (para. 121). ["Ambiguity in describing crimes creates doubts and the opportunity for abuse of power, particularly when it comes to ascertaining the criminal responsibility of individuals and punishing their criminal behavior with penalties that exact their toll on the things that are most precious, such as life and liberty."]]").

116 *Note by the United Nations High Commissioner for Human Rights*, E/CN.4/2005/103, 7 February 2005

117 *CIA Response to OIG Investigation Regarding the Rendition and Detention of German Citizen Khalid al-Masri*, October 9, 2007 in *Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, S. Report 113–288, Dec. 9, 2014. See also *From Nuremberg to Guantanamo Bay: Uses of Physicians in the War on Terror*, Sondra S. Crosby, and Gilbert Benavidez, AJPH, January 2018, Vol 108, No. 1 ("A total of 780 men have been detained in Guantanamo Bay, most of them for years; in 2017, 41 remained there. Of those 780 detainees, 731 were released without charges, and many of them were subjected to torture or to cruel, inhuman, and degrading treatment.")

118 "Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law." *CCPR*, Art. 14.2. "The presumption of innocence, which is fundamental to the protection of human rights, imposes on the prosecution the burden of proving the charge, guarantees that no guilt can be presumed until the charge has been proved beyond reasonable doubt, ensures that the accused has the benefit of doubt, and requires that persons accused of a criminal act must be treated in accordance with this principle. It is a duty for all public authorities to refrain from prejudging the outcome of a trial, e.g. by abstaining from making public statements affirming the guilt of the accused.[Communication No. 770/1997, Gridin v. Russian Federation, paras. 3.5 and 8.3.]" *General Comment No. 32: Article 14: Right to equality before courts and tribunals and to a fair trial*. Human Rights Committee, CCPR/C/GC/32, 23 August 2007, 30.

119 *Initial reports of States parties due in 1993: United States of America*. 24/08/94. CCPR/C/81/Add.4. ("The U.S. Supreme Court has explained that "[t]he principle that there is a presumption of innocence in favour of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law". Coffin v. United States, 156 U.S. 432, 453-54 (1895) (reversing convictions and remanding for a new trial where trial judge had refused to instruct jury that the Defendants were entitled to the presumption of innocence). The Court went on to define the presumption of innocence as "a conclusion drawn by the law in favour of the citizen... an instrument of proof created by the law in favour of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created." Id. at 458-59. ... the presumption of innocence does not limit the right of the government to arrest a person charged with a crime, to detain the person pending trial, or to govern conditions of pretrial detention. In accordance with this view, the Supreme Court has also upheld the constitutionality of pretrial detention of indicted persons if no conditions of release will reasonably assure his or her appearance at trial and the safety of any other person and the community. United States v. Salerno, 481 U.S. 739 (1987). The federal statute that governs decisions regarding pretrial detention or release explicitly provides that "[n]othing... shall be construed as modifying or limiting the presumption of innocence". 18 U.S.C. section 3142(j).")

charged with crime. The Defendants' open-ended counterterrorism investigation[120] of Plaintiff continue for more than 13 years and counting, disregards his actual innocence, and apparently misuse the US position in regards to innocent casualties in the War on terror to intentionally harm an innocent[121] because of their discriminatory and retaliatory animus and malice.

1063.  Even if Defendants activities were or are based on law at certain time period they are motivated at least in part by Plaintiff's race/national origin and his other protected characteristics, and are retaliation to his exercise of rights guaranteed under the Constitution, all that in violation of US constitution (First, Fourth, Fifth and Fourteenth Amendments), and laws (including international).

*(B) Defendants fail to cease, investigate, remedy, and/or prevent the violations of the US Constitution and laws (including the international laws) in Plaintiff's case, and are deliberately indifferent to the violations of Plaintiff's rights.*

1064.  As the US courts have clearly established, Defendants have no discretion to violate the constitution[122]. Furthermore, Defendants have obligation to intervene with constitutional violations for example under 42 U.S.C. 1983, or 42 U.S.C. 1986 (obligation to interfere in a conspiracy to violate civil rights), have obligations under CCPR, CAT, CERD and the UN Charter[123], and can prosecute criminally the violations of some civil rights. In regards to Plaintiff's rights under international law those rights "are already guaranteed as a matter of U.S. law, either by virtue of constitutional protections or enacted statutes"[124].

---

120 Investigation for the purposes of this Complaint means Defendants' planned and systematic action to provoke and collect information.

121 Despite their demonstration that they considered Plaintiff a Bulgarian criminal/spy/terrorist and more Defendants have not formally charged him with any crime because there has never been factual basis to find him guilty of any of that.

122 See for example *Loumiet v. U.S.*, 828 F.3d 935 (D.C.Cir. 2016) (listing cases in support that discretionary-function exception in FTCA case context is not applicable when the conduct violates the constitution. "The government "has no `discretion' to violate the Federal Constitution; its dictates are absolute and imperative." *Owen v. City of Independence*, Mo., 445 U.S. 622, 649, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).").

123 As a UN member the US is obligated to respect and observe human rights and fundamental freedoms. And as a State Party in CCPR, CAT, and CERD the US has obligation to guarantee the rights recognized in them. See CCPR, Art. 2.1 ("Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."). The rights under CERD and CAT are part of CCPR (Art. 2, and Art. 7 respectively).

124 *Initial reports of States parties due in 1993: United States of America.* 24/08/94. CCPR/C/81/Add.4, at 8 (the report also listed multiple federal statutes which criminalize violations of some civil rights). See also *U.S.*

1065.    By the US law Defendants' supervisors have duty to supervise and ensure that their "department, agency, or element has adequate procedures to receive, investigate, respond to, and redress complaints from individuals who allege such department, agency, or element has violated their privacy or civil liberties". 42 U.S.C. 2000ee-1(a)(3). The FBI, CIA, and other US agencies are required to have at least one senior officer who "periodically investigate and review [their own] actions, policies, procedures, guidelines, and related laws and their implementation to ensure that [they are] adequately considering privacy and civil liberties in its actions". Id.(a)(2).

1066.    The international law also states explicitly that essential part of Defendants' obligations is "to ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy" and to "enforce such remedies when granted". CCPR, Art. 2.3.[125] The effective remedies include cessation of the violations, and investigation.[126]

1067.    Defendants' failure to cease, investigate, remedy and prevent future violations of Plaintiff's rights is apparent violation of these duties.

1068.    As pointed above despite the petitions Plaintiff filed with Defendants they are deliberately indifferent and fail to investigate the violations of his rights under multiple **federal criminal and civil statutes**. Consequently no one was brought to justice in that regard. For example:

---

*reservations, declarations, and understandings, International Covenant on Civil and Political Rights*, 138 Cong. Rec. S4781-01 (daily ed., April 2, 1992) II

125 See for example Fei v. Colombia, Communication No. 514/1992, Human Rights Committee, 4 April 1995, at 10 (stating that effective remedy is a judgment in favor of Plaintiff, "and that the State party [must] ensure that the terms of the judgements in the author's favour are complied with. The State party is under an obligation to ensure that similar violations do not occur in the future.")

126 "Cessation of an ongoing violation is an essential element of the right to an effective remedy… [F]ailure to investigate, failure to bring to justice perpetrators of such violations could in and of itself give rise to a separate breach of the Covenant. These obligations arise notably in respect of those violations recognized as criminal under either domestic or international law, such as torture and similar cruel, inhuman and degrading treatment (article 7)". *General Comment No. 31 [80] The Nature of the General Legal Obligation Imposed on States Parties to the Covenant.* Adopted on 29 March 2004 (2187th meeting) Human Rights Committee, CCPR/C/21/Rev.1/Add. 13, at 15 and 18. Without reparation and appropriate compensation to victims of rights violations the State Party "obligation to provide effective remedy [] is not discharged." *Id*., at 16. "[V]iolations of Covenant rights still take place [even if there is appropriate remedy, when there is] failure of the remedies to function effectively in practice." *Id*., at 20. "Overall, the United States strongly agrees with the Committee with respect to the importance of effective remedies under the Covenant." *28. U.S. observations on Human Rights Committee General Comment 31.* U.S. Dep. of State (Dec. 27, 2007) at 35.

1069.    Neither the FBI, nor any other law enforcement agency (jointly referred in this section as 'LEA')

investigated under 18 U.S.C. §241 the criminal conspiracy to injure, oppress, threaten, or

intimidate Plaintiff in regards to his free exercise or enjoyment of rights protected by the US

Constitution and laws. Plaintiff's petitions to Defendants in which he complained about being a

victim of such conspiracy include his first report with Teaneck police 9/11/2012 (he filed a

handwritten statement for being a subject of organized harassment and threats, and 2 audio

recordings. See Transcript of 1st recording.mp3.); his Notice of claims to New York City and

Township of Teaneck filed on or about 11/11/2022; his Administrative claims with the FBI sent

on 11/10/2022 and 8/29/2024; *Dimitrov I*; and more.

1070.    LEA failed to investigate under 18 U.S.C. §242 Plaintiff's complaints for criminal deprivation of

his rights under color of law, which he made in his petitions mentioned above (Notice of claims,

Administrative claims, Dimitrov I, and other). Plaintiff also attempted to file in person a report,

and verbally complained about the police involvement in the violations of his civil rights to the

FBI officers in FBI New York on 11/8/2017 but then the FBI/JTTF deliberately thwarted his

attempt and chilled him out. Plaintiff also verbally complained about the police knowledge and

participation to Teaneck police officers as for example on 7/16/2024.

1071.    LEA failed to investigate under 18 U.S.C. §249(a) Plaintiff's complaints about the deliberate

injuries caused by Defendants, or for their attempts to injure him, at least in part because of his

actual or perceived race, ethnicity, national origin ("Bulgarian"), gender, or perceived sexual

orientation ("fagot", "freak"). Plaintiff complained for such injuries and attempts in his Notice of

claims, Administrative claims to the FBI, *Dimitrov I*, and other petitions.

1072.    LEA failed to investigate under 18 U.S.C. §1001(a) Plaintiff's complaints about the Defendants'

materially false, fictitious, and fraudulent statements and representations about him as a

Bulgarian criminal, spy, terrorist, fagot hitting police (see *390 et seq.*); about Defendants'

fraudulent contract with Verizon on behalf of Plaintiff on 1/9/2019; about the counterfeiting his check to the landlords on 3/5/2020. Plaintiff complained about that in his Notice of claims, Administrative claims to the FBI, *Dimitrov I*, and filed reports with Teaneck police in that regard on 1/9/2019 (Case # 19-001685) and 3/5/2020 (Case # 20-013543).

1073.    LEA failed to investigate under 18 U.S.C. § §1341 Plaintiff's complaint about Defendants' taking and altering of his check to his landlords sent with the Postal Service. Plaintiff filed a report with Teaneck police on 3/5/2020 (case # 20-013543) which has never been investigated (furthermore Defendants implied that this was done by police ("Police hit him.")). See ECF, No.8-2 at 2019 and 2059; and No.8-1 at 741; and similarly about    Plaintiff's report with Teaneck police in regards to the interference with and the harm to a USPS delivery to him on 2/23/2022 (ECF No. 8-1 at 333).

1074.    LEA failed to investigate under 18 U.S.C. §1512 Plaintiff's complaints about (1) Defendants' use of force, their attempts, and threats to use force in order to "influence, delay, or prevent [his] testimony" Id.(a)(2)(A) in the court proceedings of his legal cases, or to "hinder, delay, or prevent [his] communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense". Id.(a)(2)(C). See IV.10 Plaintiff's Objections to R&R, his letter to Judge Rearden, his email to officer about torn delivery; (2) Defendants' intimidation, threats, and their other efforts to persuade him with the same intentions in regards to his testimony Id.(b)(1), or his communication to a law enforcement officer or Judge Id.(b)(3); and (3) about Defendants' deliberate harassment of Plaintiff with intention to hinder, delay, prevent, or dissuade him from testifying, or reporting to a law enforcement officer or judge. Id.(d).

1075.    LEA failed to investigate under 18 U.S.C. §1513 Plaintiff's complaints about Defendants (1) deliberately harming him and his properties, and their threats to do so, in retaliation to his

participation as a party in court proceedings, in which he testify and produce relevant documents, and records in regards to Defendants' federal offenses (Id.(b)); or (2) his complaints about Defendants' intentional and harmful interference with his past employment and job opportunities in retaliation to Plaintiff's petitions to police and the FBI (thwarted on 11/8/2017) for federal offenses (Id.(e)); or (3) about the conspiracy to retaliate to Plaintiff in one of those ways (Id.(f)).

1076.    LEA failed to investigate under 18 U.S.C. §1519 Plaintiff's complaints about Defendants destroying his communications, documents on his computer with intent to impede, obstruct, or influence the investigation or administration of mater under the jurisdiction of the US agencies or departments as DOJ; or about Defendants covering up, concealing Plaintiff's complaints and evidence by making misleading entries as Teaneck police in regards to Plaintiff's first report from 9/11/2012, and later.

1077.    LEA failed to investigate under 18 U.S.C. §1621 Plaintiff's complaints for Defendants who for the purpose of suppressing and punishing him willfully subscribe as true material matter which they do not believe to be true but is necessary for the continuation of Defendants' activities against Plaintiff. This, at least in part, is perjury, regardless whether it is committed by non-governmental employees, because such false statements, misrepresentations and fabrications are made to and result in executive actions against Plaintiff. The US knows the falsity but continue their conduct without remedy.

1078.    LEA failed to investigate under 18 U.S.C. §2261A Plaintiff's complaints for Defendants' agents placing him under surveillance and traveling interstate with intent to injure, harass, or intimidate him; and in the course of their conduct Defendants have placed Plaintiff in reasonable fear of death, or serious bodily injury, and caused to him substantial emotional distress. Plaintiff complaint about that in his petitions mentioned above, including his very first report with Teaneck police on 9/11/2012.

1079.    Defendants activities violate **the local law**. For example Teaneck Township Code ('TTC'), Sec. 26-22 reads: "No person shall utter any loud, profane, obscene, indecent, lewd, abusive or offensive language in any public place." Defendants regularly violate that, and continue to do so after Plaintiff's petitions mentioned above. See for example May 17-20, 2025 Timeline of events.

1080.    The FBI/JTTF' policies and/or customs in regards Plaintiff violate **the Attorney General's Guidelines for Domestic FBI Operations**, 2008 ('AG Dom.'), the **Attorney General's Guidelines on Federal Bureau of Investigation Undercover Operations**, 2002 ('AG UO'), and the **Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources**, 2006 ('AG CHS').

1081.    Showing the importance of the point that all FBI activities must be lawful and reasonable, the AG guidelines not only stated that at its second paragraph (AG Dom., Intro.), but repeated three times that all FBI activities (and by extension JTTF activities) must be consistent with the constitution and laws (Id. Intro.C, I.C.3, and I.D.3). In relation to that no undercover activity/operation (jointly referred bellow as 'UO') must be authorized before considering the "risk of invasion of privacy[,] any potential constitutional concerns or other legal concerns" AG UO, IV.A(3). Any such risks will make the UO sensitive, and must be approved by the FBI Headquarters ('FBI HQ') Id. IV.C(2)(n). Furthermore the application to FBI HQ for approval of such UO must explain "how any potential constitutional concerns and any other legal concerns have been addressed" Id. IV.F(2)(ii).

1082.    AG guidelines require the FBI to avoid "unnecessary intrusions" (AG Dom., Intro.), and to choose "the least intrusive method" feasible in a situation (Id., I.C.2a). Similarly the AG UO points that there should be minimal intrusion by an undercover operation to the extend necessary to obtain an evidence. Id. IV.B(1)(c)

1083.    The FBI/JTTF intrusion in Plaintiff's case is not warranted first, because there is no legitimate

need for such, and second, even if intrusion was/is needed the FBI/JTTF has had 13 years and

counting to consider, choose, and use less intrusive methods, but they chose to continue at each

point of time (including at the reviews and/or reauthorization of those activities, or after

Plaintiff's petitions) without remedy.

1084.    According to the guidelines before starting undercover activity an FBI official must carefully

consider the risks of personal injury (for example damage to reputation, financial losses, or else),

risks of civil liability, invasion on privacy, use of restricted illegal conduct (violence, entrapment,

unlawful investigation methods), and appropriateness. AG UO, IV.A. Approval of an undercover

operation requires written determination that it is under applicable DOJ guidelines, and will be an

effective way to get evidence / information. Id. IV.B(1)(a)-(b). Undercover activities in general

shall be "carefully considered and monitored" AG UO, I, see also AG CHS, V.B.4 ("Whenever

the FBI has authorized a Confidential Human Source to engage in Otherwise Illegal Activity, the

FBI must take all reasonable steps to: a. monitor closely the activities".). Despite that the

FBI/JTTF deliberately damaged Plaintiff's reputation, caused loss of income and profits,

victimize and harm him, their activity constitute severe intrusion on his privacy, and they use

unlawful investigative methods, including ongoing efforts to entrap him.

1085.    In predicated investigations after authorization the FBI/JTTF can undercover engage in

'otherwise illegal activity' – that is any undercover "activity that would constitute a violation of

Federal, state, or local law" AG UO, IV.H; that violates federal criminal laws in criminal

investigation context (AG Dom., V.C.1), or constitute a felony or lesser crime "under federal,

state, local, or tribal laws" (Id. V.C.3a); and include FBI/JTTF informant's activity "that would

constitute a misdemeanor or felony under federal, state, or local law if engaged in by a person

acting without authorization" AG CHS, I.B10-11. However there can be no authorization of

violence, nor use of unlawful investigative methods (AG Dom., V.C.4, giving as example for unlawful methods Fourth Amendment violations "such as illegal electronic surveillance or illegal searches"). Similar prohibitions are in AG UO, IV.H(3) (adding also a prohibition of activities that constitute entrapment), and AG CHS V.B.3.iii (additionally prohibiting entrapment, and any obstruction of justice Id. V.B.iii.C). Although not stated explicitly – violation of the constitution can not be authorized.

1086.    If the FBI/JTTF illegal activities against Plaintiff were authorized and reauthorized they violate the guidelines because among other things they violate the constitution, they are unreasonable, and intended to entrap him. To the extend those violations were not authorized the FBI knew about them (even if FBI supervising agent(s) failed to report the violations they are known to the FBI from Plaintiff's petitions), and the violations should have been stopped and investigated.

*(C) Defendants actively prevent Plaintiff to hold them accountable in a court of law. See IV.9-10.*

*(D) Defendants act with apparent malice against Plaintiff.*

1087.    Defendants have explicitly stated their intention to harm Plaintiff many times since 2012, which by itself shows that this is Defendants' policy / practice. They said that they want Plaintiff to 'suffer', and that they will 'torture', 'terrorize' (see 2392 *et seq.*), 'destroy', 'kill', 'crush', 'harass' (see 2600 *et seq.*) and 'brake' him, and repeated that for years. All those concepts are related and express their intent to 'create and maintain a state of extreme fear and distress' in Plaintiff, to make him experience pain, illness, 'overwhelming disappointment or embarrassment' in order to 'crush [his] emotional strength, spirit, or resistance', and 'put an end to [his] existence' or to his activities 'by damaging or attacking' them. (New Oxford American Dictionary, 3d Ed., 2010). See IV.11.

1088.    Defendants deliberately injured, and continue to injure Plaintiff despite his petitions. And they do this demonstratively while provoking Plaintiff he 'can't stop' them. (1143 *et seq.*).

*(E) Defendants' conduct described above demonstrates that the law is not enforced equally in Plaintiff's case. Furthermore there is a breach of the fundamental fairness and the equality before the law because the persons, institutions and entities that violate CCPR, CAT, CERD, the US Constitution and laws in Plaintiff's case are the agencies (the FBI, NYPD, Teaneck police), or are acting in concert with the agencies which are supposed to investigate such kind of violations, and as such they have significant stake in the case.*

1089.   The FBI / JTTF have duty to guarantee Plaintiff's rights under the US constitution and laws[127] including by ceasing, investigating and providing effective remedy for the violations. However, despite Plaintiff's repeating complaints about the ongoing violations of his rights (see IV.9) FBI did nothing of the above. At minimum this is conscious avoidance because FBI should have investigated its own activities, and/or activities it approved (even if only by allowing them to continue for years).

   (vi) Defendants have no legitimate basis for their treatment of Plaintiff (see the argument at (b)(2) (iii)(D).

## 9. Defendants conspire to interfere with and deprive Plaintiff from his right to petition the government.

1090.   Since 2012 Plaintiff have prepared and filed multiple petitions to the government such as formal reports with Teaneck police; administrative claims with the FBI (11/10/2022, 8/29/2024); FOIA requests which Plaintiff asked to be also considered as reports (to the FBI (in his appeal filed 8/6 2020), to DHS ICE (5/18/2020), US Secret Service (5/11/2020), and to Interpol (7/15/2020)); written request to NYC Sheriff's Office in regards service of process for *Gyro et al.* (10/15/2018, ECF No.8-2 at 2013); Notice of claims to New York City (on 11/11/2022 via eCLAIM (Claim Number: 2022PI032188), acknowledged on 11/14/2022), and to Township of Teaneck (on 11/11/2022 via email to Township of Teaneck's Clerk Office, acknowledged on 11/14/2022); the legal actions *Dimitrov v. Gyro et al*, 18-cv-3600 (S.D.N.Y. 2018) and *Dimitrov I* (7/25/2023); emails to Teaneck Manager, the Mayor, and officer Strickland on 7/16/2024 and 9/25/2024 in

---

127 *U.S. reservations, declarations, and understandings, International Covenant on Civil and Political Rights*, 138 Cong. Rec. S4781-01 (daily ed., April 2, 1992) II.(1). ("the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination.")

relation to Plaintiff's police reports from 2024, and the ongoing organized harassment; a letter to Attorney General Garland about the violations of the FBI/JTTF from 10/7/2024 (same day he personally delivered a copy to the USDA Office in Manhattan, NYC); online complaints with OIG DOJ on 10/11/2024 and 11/1/2024 related to Plaintiff's AG letter; emails to DOJ NSD (one of supervising agencies of the FBI) on 10/8/2024 and 11/1/2024, and to DHS Office for Civil Rights and Civil Liberties on 10/11/2024 (DHS is member of JTTF) related to AG letter; a letter to DOJ NSD from 11/1/2024 which also included his letter to AG from 10/7/2024. In all occasions Plaintiff followed the rules and procedures in regards to the proper way to file a petition, including being in the designated areas in the working hours of Defendants (when he visited Defendants in person), or using designated communication channels.

1091. Plaintiff's reports with Teaneck police till 2024 were not investigated, nor the handwritten statements and evidence he had provided were entered in the system (with exception of his 2019th report). In 2024 Teaneck police minimized his reports (see 148 *et seq.*). Apart from denying Plaintiff's second Administrative claims (misrepresenting the substance – see Exhibit) the FBI has never responded in regards to Plaintiff's complaints. The Attorney General, NSD, OIG, DHS Office for Civil Rights and Civil Liberties, the New York City and Township of Teaneck (apart from acknowledging his Notices), NYC Sheriff's Office, Teaneck Manager and Teaneck Mayer, have never responded or contacted otherwise Plaintiff in regards to his petitions.

1092. Since 2013 Defendants policies, practices, customs in regard to Plaintiff's petitions are (a) consistent, widespread, and continue for many years, which implies the constructive knowledge and endorsement by their policy-making officials; (b) Defendants policy-makers have never ceased or investigated the violations Plaintiff complained about, and they continue with their approval; and (c) Defendants policy-makers are deliberately indifferent to Plaintiff's rights, and/or fail to train and supervise their subordinates.

*(a) Defendants and parties in concert ('Defendants') act consistently to disrupt Plaintiff's preparation, work, or filing of petitions since the end of March 2016. See IV.8, IV.10, IV.9(a) pressure campaigns, Timeline of events.*

**(1) Defendants' demonstrative surveillance of Plaintiff as suppression and deterrence.**

1093.    Defendants' surveillance of Plaintiff has been overt for a long time and is implicit in all of their actions against him, but its demonstration since the end of March 2016, when he started to prepare lawsuit(s), is apparently intended to suppress[128] and deter him[129] (as well as to intimidate and/or provoke him). See the concept of 'punitive attention' as police strategy.

1094.    Defendants have demonstrated the surveillance on Plaintiff with explicit statements in that regard (such as "Keep watching him." 4/11/2016, "Watch Bulgarian." 12/12/2016, "He knows we survey him." 12/16/2016, "Just watching him all day." "Leave this to CIA." 2/13/2017, "We watch a Bulgarian." 11/8/2017 at FBI New York, and more); by giving him timely warnings (for example "You can not pursue them." 3/25/2016, ECF No.8-1 at 41, "You can't sue them." 9/8/2016, "He got the warning. Sue the United States." 12/27/2016); by commenting Plaintiff's work on the cases (for example "We are watching how we lose." 1/1/2017, "We didn't heard that." when Plaintiff was transcribing 2/27/2017); or commenting his conduct at home (for example "He didn't complain." when on 3/30/2016 Plaintiff found he had no hot water, and later same day "We didn't know that about the President." while Plaintiff was reading about President in preparation for citizenship exam; "Bulgarian paused." 1/6/2017; "Keeps surveying." Defendants in ap.B2 when Plaintiff put a camera on his windows on 2/25/2017). In 2017 Defendants included Teaneck High School students in their overt tracking and provocation of Plaintiff in public areas, as for

---

128 "Suppression: Formal and informal social control procedures, including close supervision or monitoring ..." *Countering Violent Extremism in the United States*, Bjelopera, Congressional Research Service. R42553. Feb. 19, 2014 (quoting National Gang Center, "About the OJJDP Comprehensive Gang Model"). The demonstrative surveillance shapes how Plaintiff and Defendants "order and understand the world". *'The footage is decisive': Applying the thinking of Marshall McLuhan to CCTV and police misconduct*, Richard Evans. 2015 Surveillance & Society 13(2): 218-232.

129 "[S]urveillance measures, threats of serious sanctions and criminalisation [] serve as deterrence strategies." *How to silence the lambs? Constructing authoritarian governance in post-transitional Hungary*, Veronika Nagy, Surveillance & Society 2017, 15(3/4): 447-455

example on 2/27/2017 (ECF No.8-1 at 850), 5/10/2017 (Id., 852), 5/17/2017 or 5/20/2017 (Id., 112-113). See more examples bellow (for example 'can't sue them' and 'stop-Plaintiff' campaigns at 1096 *et seq.*), at ECF Nos.8-1 at 110 *et seq.*, and more.

1095.    Defendants' demonstrative surveillance has never stopped and continue at present.

**(2) Defendants orchestrate a social pressure campaign to persuade Plaintiff that he can not sue them, and to deter him from working on or filing petitions.**

1096.    In addition to their other activities Defendants have started a messaging campaign[130] that Plaintiff 'can't sue' them. Initially by 'them' they meant Gyro (although they implied that suing Gyro is 'fighting police' ("He definitely knows how to fight police." 4/1/2016)), and later 'them' apparently meant the FBI, police and Defendants in general (for example on 7/25/2023, 6/17/2024, 3/26/2025). Defendants were explicit that 'can't sue them' is a 'warning' to Plaintiff (12/27/2016).

1097.    Demonstrating the surveillance Defendants explicitly talked about Plaintiff's intention to sue Gyro (11/17/2016, 11/8/2017 at FBI New York), or to sue them, saying that he would 'sue the United States' (not New Jersey, New York City, or Teaneck) (12/27/2016, 8/14/2017, 10/14/2021) which further supports that they are federal agents. After Plaintiff had started working on case materials about the Defendants, they mocked him suggesting to "Sue Gyro" (11/17/2016), "Sue us all." (11/24/2016). Defendants talked about Plaintiff suing police (11/24/2017, 8/7/2018, 5/29/2020, 6/22/2023), and suggested Plaintiff to sue "the agency." (8/21/2020), his landlord (1/24/2023), or a neighbor (6/14/2023). Since Plaintiff named in the complaint's title a few Defendants (about a month before he initiated *Dimitrov I*) they have stopped making such comments, and after Plaintiff started *Dimitrov I* on 7/25/2023 threatened "Fucker thinks police can not kill him. Same day."

---

[130] Note that Defendants' pressure campaigns are distinguishes as message, but in practice overlap, and continue in parallel.

1098.    Since Plaintiff started working on his cases Defendants have talked explicitly about his intention to sue, or about his lawsuits in at least 44 days at different locations (including at FBI New York building). In addition Defendants disseminated the information that Plaintiff prepares lawsuits (as shown for example on 4/13/2016 at Newark USCIS, 8/7/2018 New York Sheriff's Office, or on 1/15/2025 at Dental Center of Hackensack).

1099.    4/13/2016, while Plaintiff was waiting for a citizenship interview in Newark USCIS, three Defendants' men or parties in concert sat nearby, and commented looking at him "He is trying to sue them."

1100.    4/26/2016 at about 7AM Defendants awakened Plaintiff with a door slam, and warned in ap.B2 "Can't sue them."

1101.    9/8/2016 Louis Morrison, a Manhattan based employment lawyer, called Plaintiff in response to his voice mail from previous day (then Defendants commented that "Case is closed."), and discussed his case against Gyro. She said that Plaintiff "have a case" but refused to take it. Defendants agent came under Plaintiff's windows and warned "You can't sue them." ECF No.8-2 at 2103.

1102.    9/10/2016 Saturday, about 12:10PM while Plaintiff was doing his laundry Defendants' woman commented on G-level of the building "Thought he will sue us."

1103.    10/26/2016, a day after Plaintiff signed a retainer with Derek Smith Law Group for his case against Gyro et al, between 11:00PM and 11:05PM Defendants in ap.G2 slammed a door multiple times, and later commented that Plaintiff "Intend to sue us."

1104.    11/17/2016, 9:55AM when Plaintiff was transcribing records of Defendants from October 2016 they challenged "Sue Gyro."

1105.    11/24/2016, 9:30PM Defendants in ap.B2 repeated what Plaintiff had just transcribed (from 10/19/2016) "Sue us all."

1106.    12/27/2016, 11:25-30AM Defendants talked loud in ap.G2, and Plaintiff challenged in his apartment "If you want to say something to me you know where to find me." G2 responded "He got the warning. Sue the United States.".. "When the show is off we'll see." While Plaintiff was taking a shower Defendants in ap.G2 slammed the door three times, and Jean (ap.G2, name is phonetic) commented "He didn't get it." About 12:15PM Defendants in G2 talked "Let me fight him." A bit later they came under Plaintiff's windows and warned "You will never find a new job. I promise you." ECF No.8-1 at 121. During the day Plaintiff kept transcribing records from October 2016.

1107.    6/10/2017 Saturday, 12:03AM Defendants in ap.G2 laughed very very loud. At 10:24AM after Plaintiff removed his earplugs G2 played loud music for one minute and stopped. He opened a window and Defendants' men came at 10:26AM and provoked "Try to push that."... "Can't sue." "Ha, ha. ha."

1108.    6/24/2017, 5:10PM "You can not sue us."

1109.    6/25/2017, about 4:05PM "Sue us."

1110.    7/18/2017 Tuesday, Defendants commented at about 3:40PM "He thinks he can sue us."

1111.    8/14/2017, 3:25PM Defendants near the windows "He intends to sue the United States."

1112.    10/8/2017 Sunday, 4:36PM Defendants' man shouted under Plaintiff's windows "Sue them."

1113.    11/8/2017, while Plaintiff was in the FBI New York Field office building in Manhattan multiple officers and plain clothes agents talked about him "Kalin без глас ['Kalin is

voiceless' in Bulgarian]", "Let Gyro have him.".. "Can't sue them." ECF No.8-1 at 45. Note the similar language in Derek Smith Law Group office on 6/21/2017 ("Let the Gyro push him.")

1114.   11/24/2017 Friday, Plaintiff visited Flowers by Lyn on Cedar lane, owned by Bulgarians. While there Scot and the owners talked. Stepan and Scot commented while Plaintiff was talking with the father of Stepan "He tried to sue them but--" "Fucking police are everywhere."

1115.   12/15/2017, while Plaintiff was in Stop and Shop, Teaneck staff members talked about him "He wants to sue us." "Really sweet guy." ECF No.8-1 at 854.

1116.   2/21/2018, three days after Plaintiff had started working on the complaint for *Dimitrov I*, at 3:22PM students came under his windows "Sue everybody.." "Have to track everybody." ECF No.8-1 at 879.

1117.   6/15/2018 Friday, 10:19PM Defendants came under Plaintiff's windows "He wants to sue." At 11:59PM again under the windows "We only mock." and laughed.

1118.   8/7/2018, while Plaintiff was in the New York Sheriff's Office they commented him inside: "He wants to sue the police." ECF No.8-1 at 49.

1119.   5/29/2020, 11:41AM "Sue the police." a police officer in a car parked under Plaintiff's windows at the corner of Cedar lane and Red Road. ECF No.8-1 at 119.

1120.   8/21/2020, 10:41PM Defendants came under Plaintiff's windows: "Sue the agency." ECF No.8-1 at 493.

1121.   10/14/2021 Thursday, 11:45PM Defendants yelling distant. "Work all night. They guy will not talk." "Sue United States." "Oh my God! Pull out of it. Pull out." "No one believe." "One person." ECF No.8-1 at 141.

1122.   7/12/2022 Tuesday, 6:04PM while Plaintiff was walking on Queen Ann Rd. high school boys got from Teaneck High School and walked behind and in front of him talking about him "Kalini sue []." ECF No.8-2 at 2541.

1123.   8/17/2022 Wednesday, about 11:20PM Plaintiff was working on relevant history when a woman commented at distance "How to punish?" At 11:29PM she came under the windows and challenged "Sue." ECF no.8-2 at 3629-3630.

1124.   9/2/2022 Friday, 11:52PM a group of Defendants' agents, Ralph included, came under Plaintiff's windows and talked about him ('Kalin') till about 12:10AM, 9/3/2022, including about "sue[ing]". ECF No.8-2 at 4165-4167.

1125.   10/4/2022 Tuesday, groups passed under Plaintiff's windows talking about him. At 8:27PM (minutes later) Jewish families(?) passing under Plaintiff's windows on Cedar lane commented "He didn't fight." Plaintiff made a video of one of them. 8:33PM another group passed on Cedar lane and commented "He wants to sue []." ECF No.8-2 at 5256, 5271. This is a month before Plaintiff filed his Notice of claims.

1126.   1/24/2023 Tuesday, Plaintiff worked on a supplement to his Notice of claims (never filed). At 5:51PM a minute after he moved his camera to point at his room Defendants' man came under his windows on Red Road and challenged "Sue the landlord." ECF No.8-2 at 6017.

1127.   1/31/2023 Tuesday, 5:13PM Plaintiff was working on First Amendment materials when Defendants' man in corridor commented "He (is) suing.." A woman on the speaker: "We don't believe." The man came under Plaintiff's windows and repeated "I don't believe he wants to sue us." ECF No.8-2 at 6132.

1128.   2/25/2023, 9:41AM Defendants in ap.B2 played a recording or talked on loudspeaker for more than 10 minutes "[] to stop [] can't arrest [] can't believe [] trying to stop [] He can't sue. [] want to stop. Can't believe…" ECF No.8-2 at 6564.

1129.    3/29/2023 Wednesday, 6:22PM Plaintiff read legal materials and started working on FTCA charges when Ralph warned not loud "Don't sue. How to stop?" ECF No.8-2 at 7118.

1130.    6/2/2023 Friday, 3:53PM Plaintiff made video recording(s) while working next to Teaneck High School. Defendants' man on the street nearby commented he 'wants to sue.. that's the way it is.' ECF No.8-2 at 7988.

1131.    6/14/2023 Wednesday, 9:43AM Defendants' couple came under Plaintiff's windows. The man "Sue a neighbor." ECF No.8-2 at 8182.

1132.    6/22/2023 Thursday, 10:45AM Defendants' man was loud under Plaintiff's windows on Cedar lane "Sue all. That response to police." ECF No.8-2 at 8322.

1133.    6/27/2023 Tuesday, 2:48PM Defendants came under Plaintiff's windows on Red Road while he was working on charges "Playing games. Playing games. Please hear. You want to sue []." ECF No.8-2 at 8401.

1134.    7/25/2023 Tuesday, 4:18PM Plaintiff filed his complaint of *Dimitrov I* with an email. 5:31PM Defendants' woman commented at distance "Do you believe? … He can not charge them." At 7:06PM three Defendants' men crossed Cedar lane under Plaintiff's windows, one was loud "Fucker thinks police can not kill him. Same day." In that period one of them regularly patrolled under Plaintiff's windows.

1135.    8/9/2023 Wednesday, 9:34AM Defendants' group came under Plaintiff's windows talking about him "sue[ing]". They entered the building and after Plaintiff started Olympus talked quietly about the "fighting". Meanwhile Defendants in ap.B2 slammed a door above Plaintiff a few times including while he was writing this note.

1136.    5/28/2024, 8:28AM Defendants man in building corridor commented that Plaintiff "Want to sue all."

1137.    5/29/2024, about 11:30AM when Plaintiff left his building two schoolgirls talked about him ("Kalin") and shouted. A large group of students followed, walking toward Plaintiff, and talked about "slapping" him. Then commented "Seems they have no balls to do it." In Votee Park Defendants' woman, man and girl talked loud near Plaintiff to "pick a place he visits many times and do it to stop him." They returned next to Plaintiff, and later for the third time but only the woman and a girl who talked then "to sue.."

1138.    6/17/2024, 7PM-9:30PM Plaintiff attended Teaneck Leadership. In the break the Teaneck's Clerk and a board of education member talked about Plaintiff's case "We are no evil. Teaneck is not evil." "He sue them?" "No. He just failed."

1139.    9/7/2024, 6:26PM Defendants in ap. B2 hammered on Plaintiff's ceiling. 6:39PM Defendants' man "Trying to sue. Not a cool guy."

1140.    11/4/2024, 11:16AM three Defendants' men talked about Plaintiff "He wants to sue." and "Have to stop." Started drilling noise. After Plaintiff started Tascam DR07 they switched to Spanish.

1141.    1/15/2025, Plaintiff had an appointment with Dental Center of Hackensack. When he got there he made photos of the certificates on the wall in the waiting room. A woman in side commented that "he prepares to sue."

1142.    3/26/2025, about 8:50AM Defendants awakened Plaintiff, and after he moved Defendants in ap.B2 started talking "Can not sue them… He don't believe." Talking continues not loud and mostly not intelligible.

**(3) Since Plaintiff filed his Notice of claims/Administrative claims on or about 11/10-11/11/2022 Defendants have started a messaging campaign that his petitions 'can't stop' them, and that they 'won't stop'.**

1143.    Despite Plaintiff's reports, complaints and other petitions Defendants have never stopped the violations of his rights under the US constitution and laws, and since his notice of claims from 11/10/2022 they have been explicit that they 'won't stop'. Apart from the obvious meaning: that Plaintiff can do nothing to stop Defendants, and they will continue to torture, harass, and degrade him in other ways, this is demonstration of control, of their intention to keep him incapacitated, and in a state of conflict, distress, and uncertainty, or said in the FBI language – to disrupt him. Defendants have never made any effort to resolve the issues, nor took any positive steps which threat management advises (for example to prevent accumulation of radicalization factors) because their goal is the opposite. The apparent outcome Defendants pursue is to convince Plaintiff that there is no legal means to resolve his grievances, and after developing 'profound grievance, a sense of anger and resentment at an undeserved injustice', to trigger him by 'linking [the] grievances to an enemy who is held responsible', and entrap him.

1144.    Defendants persistently repeat in Plaintiff's presence that they/we 'can't / won't / don't stop'. In the last about two years and a half (since 11/12/2022) there are more than 150 days in which Defendants made such statements. See more examples in 1307 *et seq.*.

1145.    In a few occasions the meaning of Defendants' statements is or can be interpreted as disapproval of Plaintiff's acts which they want him to stop but he didn't (enhancement of the 'stop-Plaintiff' campaign). Specifically Defendants repeatedly talked they 'can't stop' while Plaintiff was scanning for DE, as for example on 12/1/2022, 10/23/2023 2/25/2024, 6/14/2024, 7/4/2024, 11/18/2024. Similarly Defendants repeated 'can't stop' in relation to Plaintiff's recording, working or doing something else about his cases (7/11/2023, 7/22/2023 8/2/2023 8/16/2023 8/18/2023 8/27/2023 8/28/2023 9/2/2023 9/11/2023 9/28/2023 9/30/2023 2/19/2024, 2/28/2024, 4/30/2024, 6/16/2024, 10/17/2024, 1/30/2025, 2/5/2025, 2/8/2025, 3/14/2025, 3/25/2025).

1146.    The occasions mentioned above are in addition to the Defendants' statements in which the meaning, because of the timing or more, is apparently provocation to Plaintiff who can't stop their sound attacks / hammering as for example on 11/21/2022, 12/3/2022 – very provocative, 12/21/2022 (mixed with DE), 7/6/2023, 7/23/2023, 8/17/2023, 10/8/2023, 10/18/2023, 10/21/2023, 1/8/2024, 3/12/2024, 3/14/2024, 5/11/2024, 6/16/2024, 7/5/2024, 8/10/2024, 8/26/2024, 9/8/2024, 11/28/2024, 12/20/2024, 12/27/2024, 12/29/2024, 1/26/2025, 2/10/2025. Or provoking him that Defendants won't stop the DE attacks (implicit admission of Defendants' use of DE) as for example on 11/12/2022, 12/4/2022, 12/5/2022, 12/8/2022, 12/18/2022, 12/21/2022 (mixed with noise), 1/19/2023, 5/26/2023, 6/4/2023, 7/2/2023, 10/23/2023, 1/13/2024, 2/25/2024, 2/28/2024, 5/4/2024, 6/12/2024, 6/14/2024, 7/4/2024, 7/21/2024, 8/26/2024, 12/24/2024, 2/18/2025, 3/25/2025.

1147.    In a few occasions Defendants were explicit that Plaintiff can't stop FBI, or that FBI won't stop (12/21/2022 7/26/2023, 9/24/2023, 6/7/2024, 10/23/2024, 3/16/2025). Related is the statement that Plaintiff will not stop the United States, which Defendants' Dula made on 4/1/2024.

1148.    In a few occasions Defendants were explicit about not stopping the harassment of Plaintiff (11/21/2022, 7/21/2023, 1/5/2024, 1/8/2024, 5/3/2024, 5/13/2024, 8/15/2024, 3/18/2025), and in some occasions they provoked they "can't stop" in response to Plaintiff's requests to them to stop knocking (7/5/2024).

1149.    Defendants intention to provoke Plaintiff is clear when, after challenging Plaintiff, they explicitly urged him to 'fight', or referred to their activities as 'fight' as for example on 12/1/2022, 4/27/2023, 8/18/2023, 9/10/2023, 10/21/2023, 3/16/2024, 4/12/2024, 7/21/2024, 7/26/2024, 9/11/2024, 9/25/2024, 10/12/2024, 3/20/2025. In addition to the teasing that Plaintiff can't stop them Defendants have talked about getting approval (7/9/2023) or a warrant (1/23/2023) – apparently to intimidate him, and increase the effect of provocation.

1150.    The coordination between parties is apparent by their persistent delivery of the same message to Plaintiff for about two years and a half. Furthermore coordination between parties in specific occasions was demonstrative in a few examples. As for example on 11/21/2022 (when Dula, Ralph, man from B2, Loomer and others planned to set up Plaintiff, involving police), 6/2/2023 (Teaneck high school student said that they were told that they can't stop Plaintiff), or on 3/6/2024 (in about 50 minutes period multiple parties (about 10 persons) came near Plaintiff's windows and had the same/similar message ('stop/ can't stop') in response to Plaintiff's challenge he made inside his apartment).

1151.    The parties that are among the most frequent participants in that campaign are Defendants in ap. B2 (Dula and John Doe) and the students. There were a few cases when Ralph and Dula were together in the events which included such message to Plaintiff. For example Defendants' man in B2 talked about 'can't / won't / don't stop' on 6/10/2023, 7/11/2023, 7/21/2023, 9/4/2023, 10/4/2023, 2/25/2024, 3/6/2024, 5/2/2024, 5/4/2024, 5/13/2024, 10/13/2024, 10/18/2024, 11/18/2024, 11/28/2024, 12/21/2024, 1/3/2025, 2/21/2025, 3/18/2025, 3/24/2025. Dula said that for example on 11/21/2022, 12/4/2022, 9/28/2023, 10/4/2023, 10/4/2023, 1/13/2024, 2/19/2024, 2/25/2024, 3/8/2024, 3/14/2024, 4/1/2024, 4/30/2024, 5/4/2024, 6/16/2024, 9/25/2024, 10/13/2024, 10/18/2024, 12/24/2024, 1/21/2025, 1/30/2025, 3/18/2025. Ralph (Raphael) Pimienta on 11/21/2022, 4/2/2023, 7/18/2023, 8/30/2023, 1/8/2024, 2/25/2024, 3/12/2024, 10/12/2024, 10/17/2024, 3/16/2025. Students talked about 'can't / won't / don't stop' on 11/21/2022, 12/5/2022, 3/17/2023, 4/2/2023, 6/2/2023, 9/6/2023, 9/18/2023, 2/5/2024, 3/6/2024, 3/14/2024, 3/15/2024, 4/30/2024, 5/14/2024, 6/14/2024, 9/11/2024, 9/25/2024, 9/27/2024, 10/17/2024, 12/7/2024, 3/14/2025.

1152.    11/12/2022 Saturday, Defendants' woman challenged under Plaintiff's windows "(We) won't stop. Do you stop me?" (9:40AM) Later after Plaintiff was targeted by DE beams at his head (586 V/m on the hand he put there) Defendants' man and woman in building corridor talked "Can't stop. We have each other." (10:12PM). ECF No.8-2 at 5950.

1153.    11/21/2022, students challenged under Plaintiff's windows "Can't stop." and hit something outside (11:35AM). Later Defendants in ap.B2 (including Ralph, Dula, Loomer, John Doe from B2) talked about Plaintiff. Loomer asked "Do you want to shoot [him]?" "How?" "Arrest []... Can't stop harassing." "Set up talk." "You have said []." Ralph: "Set a []." "Get him stop." Ralph: "Your beat." "Can't stop (beating) []." Ralph: "Get police. You don't stop." "We lost. Police having that thing?".. Dula: "Police harass Kalin. Няма лошо ['Nothing bad is done' in Bulgarian]." ECF No.8-2 at 5952, 5954, and 5959.

1154.    12/1/2022, Defendants' men spoke about Plaintiff in building corridor "We don't have to file. We don't stop." "It has to happen." (11:38AM) "Kalin knows. Have to fight." (11:48AM). Later Plaintiff felt ray at his heart and detected there 640 V/m (1:34PM), and 34419 mW/m$^2$ (1:46PM). While Plaintiff was scanning a man in corridor commented "He won't stop." ECF No.8-2 at 5964.

1155.    12/3/2022, after Plaintiff started reading Michel German's book about the FBI Defendants attacked him with DE rays at his back and head, and he put aluminum plate as a shield (6:37PM). Since then in apparent effort to disrupt him ap.B2 started knocking on Plaintiff's ceiling (6:37PM, 6:39PM, 6:47PM, 6:48PM, 6:52PM (Plaintiff requested "Please stop doing this."), 6:54PM, 6:55PM (strong)), at 6:46PM there was dragging noise from B2, and at 7:02PM a woman challenged under Plaintiff's windows on Cedar lane "Can't stop this." She entered ap.A3 and started knocking on Plaintiff's walls (7:09PM, 7:12PM, 7:13PM (together with loud drop of something metal)). At 7:17PM person(s) threw rocks under Plaintiff's windows and the same woman challenged Plaintiff again "You can't (fight) that." Followed a slam and heavy walking in ap.B2 (7:25PM). ECF No.8-2 at 5966.

1156.    12/4/2022 Sunday, Defendants awakened Plaintiff with focused short rays from ap.B2 at his right kidney (773 V/m at 8:32AM). He put the scanner over the area pointing to ap.B2 and rays from ap.B2 stopped, but rays from G level started targeting his kidneys (detected there 350 V/m). Dula commented "Can't forgot. We don't stop." (8:42AM). ECF No.8-2 at 5967.

1157.    12/5/2022 Monday, Defendants awakened Plaintiff at about 12:28PM with laser-focused short ray at his right calf. Defendants' man and woman talked in building corridor "We can't stop." Later while Plaintiff was making notes on Michael German's book about FBI a student came under his windows and yelled (3:40PM). Defendants in ap.A3 targeted him with a strong focused ray at his head (burning feeling, detected there 1021 V/m at 3:54PM). Later he was working on materials about the effect of electricity on human body when Defendants attacked him with focused rays at his right thigh (1019 V/m there at 6:23PM), followed a slam in B2, and persons in ap.B2 and outside the building threatened attacks are "Non stop." (6:58PM) ECF No.8-2 at 5968.

1158.    12/8/2022 Thursday, after Plaintiff worked on German's book for FBI till 4:57AM, Defendants awakened him with directed energy beams at 9:06AM. While he was scanning ap.B2 commented "We can't [stop]." ECF No.8-2 at 5971.

1159.    12/18/2022 Sunday, Plaintiff worked till 12:47AM on recording from 12/14/22. During the night Defendants awakened him at least three times with knocks from ap.A3, or with electric shocks. At 8:52AM Defendants in ap.B2 commented "We can't stop." ECF No.8-2 at 5980.

1160.    12/21/2022 Wednesday, after Defendants awakened Plaintiff at 10:23AM person in building corridor stated "Won't stop FBI." Since then Defendants targeted Plaintiff repeatedly with laser focused rays (left eye in particular), dog was barking in ap.G2 till about 10:30AM, at 11:47AM when Plaintiff moved Defendants knocked strong in building's corridor and the man with Indian accent teased "Can't stop us." ECF No.8-2 at 5992.

1161.    1/7/2023, after Plaintiff watched PBS Frontline documentary about governments using Pegasus surveillance software, Defendants in ap.B2 teased "Can not stop." (8:27PM).

Plaintiff started working on recording of his visit to FBI New York, and ap.B2 slammed a door above Plaintiff and commented "Can't believe." ECF No.8-2 at 6004.

1162. 1/19/2023, Defendants in building's corridor talked about Plaintiff. Loomer loud "Kalin [] security check" (12:03PM). A3's woman "Don't believe that. [] to stop.", talked about "survival", played music for a short time (12:06PM). After Plaintiff scanned for MF, the woman in ap.A3 directed "Tell Kalin won't stop." (12:37PM). ECF No.8-2 at 6012.

1163. 1/23/2023, while he was working on a supplement to his notice of claims Defendants' woman came under Plaintiff's windows on Cedar lane and threatened to "Get a warrant. Can't stop." (11:47AM). ECF No.8-2 at 6016.

1164. 1/29/2023, 10:00AM Defendants' woman in ap.A3 "We can't stop him. Can't receive it." After Plaintiff started Olympus recorder in building corridor Defendants' person commented "Can't talk." Since then there was no talking. ECF No.8-2 at 6094.

1165. 2/12/2023 Sunday, 10:09AM woman in ap.A3 "Can't harass. [] Kalin." "We can not stop." Plaintiff put Olympus near the wall she stopped talking. ECF No.8-2 at 6337.

1166. 3/6/2023 Monday, 7:59AM a woman and kid came under Plaintiff's windows "We won't stop. They are worried.." ECF No.8-2 at 6726.

1167. 3/17/2023 Friday, about 2:50PM Plaintiff was working on 1/20/2023 when a schoolgirl came under his windows and challenged "Can't stop that." ECF No.8-2 at 6891.

1168. 4/2/2023 Sunday, 6:27PM a student in building's corridor talked about 'police'. Plaintiff moved his Olympus recorder and stated date and time. The person commented "Can't stop it." Plaintiff was still working on the transcript. 7180.About 6:48PM Ralph commented "We have to stop." ECF No.8-2 at 7179.

1169. 4/27/2023 Thursday, 7:28PM Plaintiff wrapped his work on 1/20/2023 when a woman in Jamaican food truck (Christina) talked near his windows about the 'fight'. 'Don't stop.' ECF No.8-2 at 7585.

1170. 5/2/2023 Tuesday, 8:34AM Loomer near Plaintiff's windows "We don't stop." ECF No.8-2 at 7672.

1171. 5/26/2023 Friday, 10:13PM Plaintiff was working on FTCA charges, when feeling pressure at heart detected there 882 V/m, and a DE ray from ap.A1. He moved in front of the sink. While Plaintiff was writing the note Defendants' man returned under the windows for the second time challenging "can not stop." ECF No.8-2 at 7853.

1172. 6/2/2023 Friday, Plaintiff was working next to Teaneck High School. At 1:07PM schoolgirl 'Can't stop. We can't stop him. That's what persons said.' ECF No.8-2 at 7970.

1173. 6/4/2023 Sunday, about 5:30AM Plaintiff put aluminum plates under and above himself to sleep. Defendants in B2 commented "Can't stop." ECF No.8-2 at 8014.

1174. 6/10/2023 Saturday, about 2AM right after Plaintiff lied down in front of the mirror Defendants' man in B2 commented "Whole New Jersey [] and he did all by himself. Can't stop." ECF No.8-2 at 8121.

1175. 7/2/2023 Sunday. 10:04AM while Plaintiff was scanning in RF mode a man commented on the upper floor of the building "We can't stop." and entered ap.B2. ECF No.8-2 at 8484.

1176. 7/6/2023 Thursday at 11:40AM slam, at 11:54AM two slams, walking on high hills in ap.A3. At 11:45AM woman in A3 "We can't stop." ECF No.8-2 at 8569-71.

1177. 7/9/2023 Sunday, 12:50AM Defendants' man commented "Can't stop... Got approval." ECF No.8-2 at 8625.

1178. 7/11/2023 Tuesday, 9:11AM Plaintiff was working on charges when Defendants' man in B2 commented "Can't stop," ECF No.8-2 at 8676.

1179. 7/13/2023 Thursday, about 11:50AM Leah from A3 talked under Plaintiff's windows on Red Road with a woman in a car parked there "Can't stop." Then quiet. ECF No.8-2 at 8708.

1180.  7/18/2023 Tuesday, 11:30AM Loomer(?) and Ralph "We can't stop that." "Crazy." 11:39AM a woman in building's corridor "Don't need to be scared of him. Justice []."

1181.  7/19/2023 Wednesday, 2:40PM Plaintiff sent photos of his renewal to JC by email, Defendants' man teased under his windows on Cedar lane "Won't stop."

1182.  7/20/2023 Thursday, about 11:30AM after talking for a while persons stated "Can't stop." "We police." "He kept recording." 11:20PM "Kalin []. They thought Gyro []." 11:21PM "Blackmail." "Can't stop." 11:23PM "Can't believe it. []."

1183.  7/21/2023 Friday, 7:56AM after awakening Plaintiff again Defendants' man in B2 commented "We can't stop." At 9:41AM awakening Plaintiff again, 2 pipe bangs, the man in B2 challenged "We never stop."

1184.  7/22/2023 Saturday, 10:07PM after Plaintiff made photos of Defendants. "Can't stop." "They have to have (him)."

1185.  7/23/2023 Sunday, 3:12PM Defendants' man in ap.B2 "We don't stop." followed four knocks. 5:14PM(?) A6 couple returned. The man commented: "Can't stop that. That means that [] hostages."

1186.  7/25/2023 Tuesday. 10:35AM Plaintiff was finalizing Relevant History file, when in corridor woman on speaker said "Kalin []. We can't stop." Plaintiff started Olympus recording – talking stopped.

1187.  7/26/2023 Wednesday (the next day after Plaintiff filed *Dimitrov I*), 9:04PM in corridor man from B2/Swaby talked about "FBI. We can't stop. We lost." 9:05PM a woman outside "FBI." ... "Stop."

1188.  8/2/2023 Wednesday, 12:01AM Defendants' man at distance "Can't stop." Later same day Plaintiff printed summons and went to NYC. When he was back home at about 7:00PM a woman at Jamaican food truck commented "Can't stop.."

1189.  8/9/2023 Wednesday, 2:35PM Christina, Jamaican food truck, and Defendants' woman talked "Can't stop that." "Know []. How to stop? I lost my []. Next year []." "Get him out." 2:39PM "Won't stop. Don't come back.. mother fucker."

1190.  8/12/2023 Saturday, 12:50AM Defendants in front of the pub talked about Plaintiff ("Kalin"). "Can see right. Can see right." A woman and a man from the group came under Plaintiff's windows. Plaintiff was working on timeline of events. The persons continued saying at 1:39AM that he "Can't stop." "Can't prove."

1191.  8/16/2023 Wednesday, 12:40PM Teaneck police officers with bullet-proofed vests and open guns parked under Plaintiff's windows on Red Road, and went to Lomo food truck. Plaintiff reacted "Wow." 1:50PM Defendants' man spoke with Jamaican food's Christina under Plaintiff's windows on Cedar lane that "bullet-proofed vests didn't change anything. Bring all the equipment. Can not stop." 11:55PM Plaintiff was copying files in preparation to prepare Exhibits for his Objections to the Report when a woman at distance (pub) "Can not stop that."

1192.  8/17/2023 Thursday, 8:19PM a boy came near the windows on Red Road challenged "Can't stop." and shouted.

1193.  8/18/2023 Friday, Defendants at Lomo talked about Plaintiff for hours (see bellow stop-messages). When at 12:39PM Plaintiff started working on the second exhibit for his Objections Defendants at Lomo continued "Can not push. Try to stop." 12:40PM "Can't really stop. He can't (believe)." 2:37PM the same man continued. "Can't stop." "Didn't fight." "No." At 2:51PM the man commented "They can't stop him." Canon photos. 2:57PM "Can't stop." Plaintiff kept working on the exhibits while they kept talking about him ("Kalin") and that "Can't stop." 4:00PM.

1194.   8/27/2023 Sunday, 1:50AM a bit after Plaintiff stopped working on his Objections Defendants' woman and a man commented "Can't stop. We suppress that."

1195.   8/28/2023 Monday, Plaintiff filed his Objections with ECF (No.8). Later Defendants at distance "We can't stop that." About 8:20PM hammering from B2.10:07PM Defendants' men in front of the pub "We can't brake him. Gotta break him."

1196.   8/30/2023 Wednesday, about 1:30PM Ralph in building's corridor "He didn't receive it. Can't stop." 3:32PM Jamaican food's Christina looked at Plaintiff then "Can't stop… Sitting here hear []." 3:48PM Defendants' man posing as client of Jamaican food: "Can't stop."

1197.   8/31/2023 Thursday, 10:46PM while Plaintiff was in the restroom Defendants' woman came under his windows and said "Can't stop."

1198.   9/2/2023 Saturday, 11:29PM Defendants' man talking with persons in a car parked on Red Road opposite to Plaintiff's windows: "Can't believe it." "Got to push." "Can't stop." Plaintiff made video and photos of them. They talked about a "backup", and horned 2-3 times. 11:43PM three more persons came to the car "Kalin []." "How to stop that?" The three left, and a bit later the car also left.

1199.   9/3/2023 Sunday, when Plaintiff was leaving his apartment heard from A1 "Kalin []" "Can not stop him."

1200.   9/4/2023 Monday, about 9:00AM Defendants' man in B2 (on recording?) "Can not stop."

1201.   9/6/2023 Wednesday, 1:04PM schoolboy came next to Plaintiff's windows "Won't stop." then commented quietly that Plaintiff(?) is 'activated'.

1202.   9/7/2023 Thursday, 11:30PM Defendants' persons in front of the pub talked about Plaintiff "Stuck." "We can not stop."

1203.   9/10/2023 Sunday, 3:04AM Defendants' persons at pub "Can't stop." "[] fight []." "Come and get him."

1204.   9/11/2023 Monday, 1:09PM Plaintiff worked on timeline of events and legal materials in Votee Park. Two Defendants' women "We can't stop him." they continue in Spanish when came next to Plaintiff. 1:14PM they returned talking in Spanish another woman when at some distance "Can't push."

1205.   9/18/2023 Monday, 1:04PM students came under Plaintiff's windows "Can't stop [us]."

1206.   9/24/2023 Sunday, 9:09AM Defendants in ap.B2 "FBI … We don't stop. We can't (press)." (repeating 7/26/2023)

1207.   9/28/2023 Thursday, earlier Plaintiff filed with ECF proposed Summons to New York City, Township of Teaneck, and the USA, and was working on legal cases when Dula commented at 9:11PM "Can't harass… Can't stop… Kalin stopped." 9:37PM man in B2 commented "We didn't push… Can not hear… Can't stop (him). Kalin [] New York." At 9:46PM Defendants in B2 hammered on Plaintiff's ceiling – right above him – and commented "We lost. If he don't stop []."

1208.   9/30/2023 Saturday, after evading for a long time Plaintiff's cameras, and despite exiting the parking lot from the distant exit Plaintiff managed to photograph the man from ap.A6 and his pickup truck. About half an hour later, at 6:00PM the man from A6 returned commenting "Kalin can't stop." and "We can't push."

1209.   10/4/2023 Wednesday, since about 8:30AM Defendants' man in B2 was on recorded monologue about Plaintiff – 9:02AM "Kalin…He can not hear it. We lost." 9:06AM "New York []. We lost police." 9:15AM Dula "They won't stop."

1210.   10/8/2023 Sunday, 8:57AM Defendants awakened Plaintiff with knocks from ap.B2 (at least 6-7). They teased "We can't (stop)."

1211.   10/13/2023 Friday, 8:53AM Plaintiff started Olympus recording after hearing woman on speaker in building's corridor stating "They don't stop." Persons continued talking in mixed

English-Spanish. "Kalin…" "They don't lose." ".. another candidate.." One of them Lazarus B5 (Check the name as spelling).

1212.  10/14/2023 Saturday, 1:26AM after Plaintiff worked on timeline of events Defendants' persons from the pub talking loud came under the windows walking on the rocks and stated "Can not stop." They stopped talking entirely when passed the windows.

1213.  10/18/2023 Wednesday, Plaintiff was working on privacy legal cases when at 10:28PM Dula in B2 "Can't stop. Kalin did []." After Plaintiff started Olympus she moved and talked above him. 10:30PM Defendants in B2 dragged something above Plaintiff, and Dula kept talking about him ("Kalin"). At 10:34PM "Don't stop." Slam in B2, and dragging noise again.

1214.  10/21/2023 Saturday, 7:54PM knock on the wall. Plaintiff reacted in his apartment "Hey my friend, stop knocking." Then till about 8:10PM Defendants' woman talked under Plaintiff's windows, walking on the rocks. 8:13PM "Can't stop that. Fight."

1215.  10/23/2023 Monday, about 9:00AM Defendants awakened Plaintiff with pushes at heart from G2 direction, electric shocks and pressure (994 V/m). Defendants in B2 talked "Can't stop… He didn't stop.."

1216.  1/5/2024, 12:18PM while Plaintiff was working on exhibit – graphic of hammering two women with a child cart came under his windows and talked for a while "Harass… Can't stop.." "Apologize."

1217.  1/8/2024, since about 10:45AM Ralph and Defendants' woman talked loud in building corridor, while other Defendants commented / directed quietly. "Don't stop." "Can't stop. Arrest." … "Get him non-stop.".. "You pass to Kalin." "Non stop we harass." Transcript of 240108_0739.mp3.

1218.  1/13/2024, 10:40AM due to DE attacks Plaintiff found multiple swellings on his body. While Plaintiff was making photos (in bathroom) Duila in B2 commented "Can't believe… Can't stop. .." Plaintiff started Olympus recording – talking reduced, but at 10:46AM Dula threatened to "Knock Kalin []."

1219.  1/22/2024, about 12:40PM after Plaintiff started working on investigation materials Defendants came under the windows on Cedar lane and threatened "We'll never stop."

1220.  2/5/2024, 11:43AM Plaintiff got up and stopped the alarm. Defendants man under his windows challenged "We can't stop." After quietly talking that Plaintiff "can't hear" school boys were loud under his windows "How the fuck do you []?" 5:09PM Plaintiff had issues with entering the Citibank website with FireFox. He used Chrome and entered without problems. After paying his rent Defendants man in B2 commented "we can't stop that."

1221.  2/8/2024, between 1PM and 3PM Plaintiff took a bath. During that time Defendants came next to his windows (seemingly in front of the entrance) and talked about him "They will play []." "He knows we can not stop."

1222.  2/19/2024, 8:53PM Plaintiff was working on legal cases when Dula in B2 commented "Can't stop."

1223.  2/24/2024, 1:10 AM Defendants' men shouted under Plaintiff's windows in Spanish, but finished with "We won't stop." At 7:49AM Defendants in ap.B2 awakened Plaintiff with strong knock on the ceiling, and started playing / talking on loudspeaker for about an hour: "Can't stop. .. Can't believe… Have to stop… Kalin…" Meanwhile there were strong knocks from ap.B2 on Plaintiff's ceiling above his corridor.

1224.  2/25/2024, 8:25AM Plaintiff was scanning when Defendants' man in B2 commented "Can't stop." 8:48AM Ralph? in ap.B2 "Kalin won't stop." Later at 10:06AM Dula was on speaker in B2 "Bulgarian… Can not stop. Do you []? They stopped. You can't believe."

1225.  2/28/2024, 9:11AM Plaintiff was scanning when Defendants in A3 commented "Can't stop." About 11:40AM the same repeated ("Can't stop.")

1226.   3/4/2024, 11:03AM Defendants man in ap. B2 quietly talking about Plaintiff "We lost. We can't stop." 11:31AM "Kalin...".

1227.   3/6/2024, 10:24AM Plaintiff challenged inside his apartment "You want to destroy me physically and psychically, provoke illegal reaction, to radicalize me. Who would believe you want to stop? You are complete failure to manage the situation." When he got in toilet Defendants' man in B2 responded "Don't stop." 11:04AM Defendants' man and woman talked under windows "stop." 11:10AM two women with kids cards crossing Red Road under Plaintiff's windows said "We don't stop it till []." At 11:56AM students came under Plaintiff's windows and also talked "to stop."

1228.   3/7/2024 see bellow.

1229.   3/8/2024, after midnight Defendants in ap.B2 knocked on the pipes, slammed door, and Plaintiff challenged in his apartment "I thought you stopped." In response at 1:03AM Defendants in ap. B2 hammered on his ceiling. Plaintiff responded "I believe you already. You stopped." 1:09AM Defendants' man in G2 commented "Really can't harass." Later at 1:45PM Dula in B2 not loud "Can't stop."

1230.   3/12/2024, about 10:30AM Defendants awakened Plaintiff with knocks, pushes at his right hip. Ralph and a woman talking in corridor "He believes we don't stop." 10:31PM Plaintiff started working on a brief for frivolous standard when Defendants' woman under the windows challenged "Can not stop." A black SUV parked under Plaintiff's windows, headlights on, a few times horned, the same woman laughed.

1231.   3/13/2024, about 12:20PM Defendants awakened Plaintiff with repeated thuds from Defendants in B2. A woman in building's corridor "From all people you can hear.. don't buy it." She continued in Spanish, slammed the door. About 12:30PM the same woman came under Plaintiff's windows "We can't stop."

1232.   3/14/2024, 12:06PM two schoolboys came under Plaintiff's windows "Won't stop." Later since 9:55PM Dula talked in B2 "Kalin… We don't stop… pursue… We all screw up. New York screw up. Kalin..." hen Defendants in B2 knocked sharply on Plaintiff's ceiling.

1233.   3/15/2024, about 3PM students came under the windows "We won't stop."

1234.   3/16/2024, 11:24AM while Plaintiff made photos of the swelling on his legs and hands Defendants in ap. B2 hammered on the ceiling. Then Defendants' woman commented first in building's corridor then under Plaintiff's windows "We will never stop fighting." "Don't believe we pressed that." When Plaintiff went to toilet the same(?) woman commented "We have that." Later she returned under the windows again and Plaintiff made photos.

1235.   3/19/2024 – see bellow.

1236.   4/1/2024, 8:02PM Dula in building's corridor "Psycho… Won't stopping.." Plaintiff started Olympus she stopped talking for a while. Then "Not stopping the United States..."

1237.   4/12/2024, 12:18PM Defendants' man came under Plaintiff's windows on Cedar lane "Don't stop fighting. Kalin heard that."

1238.   4/30/2024 (four days after Plaintiff filed police report against group of students after one of them threw a rock toward him), 11:10AM Plaintiff was watching the video he made at about 12AM when Defendants' man in ap. B2 threatened "He [] police. We can't stop." 3:37PM while Plaintiff was working on a letter to Judge Rearden (later filed as ECF No.14) with recent examples on Defendants conduct a schoolboy came under his windows and said "Somebody lied. Set all…" Minuted later he returned under the windows "He said that. He said that." 4:23PM the same boy again(?) came walking on the rocks under Plaintiff's windows (evading the camera) and said "Don't stop.". 5:47PM Dula in ap. B2 commented "Have to stop."

1239.    5/2/2024, 8:35AM Defendants' man in B2 "He will never believe we stopped… We lost."
12:25PM women at Jamaican food truck, Christina, Jamaican food truck challenged
"Kalin… Go, go, go get him." Plaintiff made photos inside his apartment, she responded
"Can't convince him. That's OK. That's OK." 12:28PM "They are also playing…" 12:32PM
Defendants' man came and they became quieter. Christine entered the truck. 12:35PM the
man commented "They won't stop. They got to []."

1240.    5/3/2024, about 11PM Defendants in front of the pub on Cedar lane "Can't stop Kalin…
Harass []." 11:23PM "We can't stop."

1241.    5/4/2024, about 1AM while Plaintiff was downloading the GQ log Defendants' man in B2
commented "Can't stop.. Don't believe." 5:25AM Plaintiff challenged inside his apartment
"Hey you can't stop even for a few hours. No trust can be build in that way." About
10:00AM Defendants in ap. B2 hammered on Plaintiff's ceiling. 11:35AM two Defendants'
men on Cedar lane came under Plaintiff's windows talked loud "Hey how are you doing my
friend?" They were mocking Plaintiff - not only repeating the verbal construction of his
challenge, but also there was no one else nearby. 3:44PM Plaintiff was taking a bath when
Dula and a man came under his windows and talked "Do not stop." "I won't. I'll make it
happen."

1242.    5/11/2024, 2:20PM Defendants in ap. B2 hammered on Plaintiff's ceiling. Defendants in G2
commented "Can't push." "They don't stop."

1243.    5/13/2024, 9:13AM Defendants awakened Plaintiff with a loud slam in building corridor, his
eyes and nose dry, irritated. The same man from previous days (since about Saturday) talked
loud under Plaintiff's windows "Don't stop. Can't stop. He stages.. Can't stop." Defendants'
man in B2 also talked "Kalin…" 9:44AM before the truck under Plaintiff's windows left
Defendants' woman on Cedar lane "Can't stop. Have to harass."

1244.    5/14/2024, about 1PM students talked loud under Plaintiff's windows. "They won't stop.
They want the guy []." The same schoolboy returned under the windows two more times.
1:26PM the same guy(?) threw two rocks under Plaintiff's windows.

1245.    5/17/2024, 4:50PM an USPS carrier came under Plaintiff's windows talking with a woman
on speaker "They can not stop."

1246.    6/3/2024, 9:37PM while Plaintiff was working on defamation charges Defendants' woman
and a man talked at the corner of Cedar lane and Red Road under Plaintiff's windows "We
cannot stop." After Plaintiff started recording with Tascam DR07 they stopped.

1247.    6/7/2024, 10:27AM while Plaintiff was in toilet Defendants' men talked under his windows
"Can not stop that." "Lying." "We are lying." 1PM-7PM Plaintiff worked on the DE – EMF
report for his case in Phelps Park, Teaneck, NJ. Tennis players talked about him. "FBI… We
didn't stop him."

1248.    6/12/2024, 9:20AM when Plaintiff scanned for DE Defendants' men in building corridor
warned "Pressure can't stop."

1249.    6/14/2024, 12:30AM while Plaintiff was searching in Internet formulas to convert V/m
Defendants' man in a car parked on Red Road challenged "We can't stop." About 12:48PM
Defendants' woman (Christine from Jamaican food truck?) said "Tell Kalin.. Can not fight."
A schoolgirl came under his windows "Oh my god." After Plaintiff scanned at 12:55PM the
woman "We don't stop."

1250.    6/16/2024, Defendants' man in ap. B2 challenged not loud "We won't stop." About 10PM
while Plaintiff was taking shower three young men in white t-shirts shouted nearby "Can't
stop us." "Can't stop." They returned later under Plaintiff's windows shouted and left again.
10:34PM Defendants' woman in a car parked on Cedar lane near Plaintiff's windows
challenged "We don't stop. You look desperate." 10:46PM Plaintiff was preparing to go work

outside when Defendants' man on Cedar lane came under Plaintiff's windows and repeated "Can't stop." Dula in ap. B2 commented "We lost."

1251. 6/19/2024, about 11:40AM Defendants awakened Plaintiff, the man in ap.B2 talked "We don't stop." (11:46AM).

1252. 6/20/2024, 11:49AM Defendants' woman on Cedar lane "Can't stop. Let go." 12:01PM the same woman returned under Plaintiff's windows "They [] won't stop."

1253. 6/26/2024 – see bellow.

1254. 7/2/2024, about 7AM-8AM Defendants' man on recording in ap. B2 "Can't stop. He didn't believe."

1255. 7/4/2024, 11:40AM when Plaintiff scanned for DE Defendants' man in ap. B2 commented "Can't stop."

1256. 7/5/2024, at 4:39PM, 4:40PM, 4:52PM, 5:53PM, 5:03PM, and 5:20PM multiple knocks on Plaintiff's floor from Defendants in ap.G2. Plaintiff "Please stop." 6:08PM man in ap. A6 "Can't stop. Kalin []."10:58PM Defendants in front of the pub on Cedar lane "Kalin… Can't stop."

1257. 7/6/2024, about 3:20PM Defendants' man from ap.A6 returned "Shit." "I don't care if he listens." 3:29PM A6 challenged "Can't stop."

1258. 7/7/2024, 11:07AM Defendants' women came under Plaintiff's windows and talked not loud "Can not push him." "We can not stop."

1259. 7/21/2024, 1:23AM Defendants' woman in front of the pub on Cedar lane "Can really fight []." Later at 1:51AM "Fight Kalin.." "Won't stop." 11:46AM Defendants' man from ap.A6 talked upstairs with the Holy Name guard-neighbor. "That's where the material is." "Can't stop." While Plaintiff was downloading EMF logs they moved under his windows and commented "Delete."

1260. 7/26/2024, 6:25PM Defendants' woman at Jamaican food "We couldn't suppress." A man "We can't stop. Fight." About 7:10PM Deborah (member of Dharma Drink) in response to Plaintiff said that Edi (Dharma Drink organizer) told her about Plaintiff getting violent about the meaning. After the end of the meeting at about 9:15PM Defendants in front of the pub mocked "It was live, ha, ha, ha.." and later "Can't stop."

1261. 8/10/2024, 10:08AM Defendants in ap. B2 hammered on Plaintiff's ceiling. About 10:30AM Defendants' man under Plaintiff's windows on Cedar lane "Can't stop."

1262. 8/15/2024, 2:52PM USPS carrier entered the building corridor talking "We can not stop. Harass." After Plaintiff started Olympus she challenged "Can't stop." and left the building. 6:10PM Defendants man and woman "He didn't even hear it." and to the effect of "We have to stop it."

1263. 8/23/2024 Friday, Plaintiff was working on learned helplessness when at 7:35PM man talked with Defendants' 'homeless' guy "You can't stop. You can't stop." "Yea. Yea I already see that."

1264. 8/25/2024, 7:20PM Defendants' woman on the alley near Plaintiff "We can't stop."

1265. 8/26/2024, 11:19AM Plaintiff was scanning for DE when Defendants in ap. B2 hammered on his ceiling. Light. 11:50AM after Defendants threw a pebble at Plaintiff's windows Defendants man in ap.B2 "We can not stop. .. Lost." Plaintiff felt a few laser-focused rays at his feet.

1266. 9/8/2024, 2:13AM loud group came under Plaintiff's windows "Can't stop." They entered a car parked near Plaintiff's windows and left.

1267. 9/11/2024, 12:15PM schoolboys returned under Plaintiff's windows "Can not fight." "Don't stop bro."

1268. 9/14/2024, 9:56PM Defendants' man at distance commented "Didn't stop. Can't crush him."

1269.    9/21/2024, 10:38AM Defendants' women and a man on speaker in building corridor "Kalin.." Plaintiff started Olympus "That's a different angle.." "Bad day." "We won't stop." (the second woman came downstairs joining the woman with the phone). They left the building.

1270.    9/25/2024, 10:23AM Defendants' Dula in B2 "He killed Americans. Can't stop." 1:07PM students came under Plaintiff's windows "We can't stop." "Fight."

1271.    9/27/2024, 3:21PM Christine, Jamaican food truck near Plaintiff's windows "You want to stop." 3:51PM schoolboy came under Plaintiff's windows "We won't stop."

1272.    10/6/2024 see bellow.

1273.    10/12/2024, 1:29PM Ralph and Defendants' woman in building corridor "Fight… We are not gonna stop."

1274.    10/13/2024, 9:15AM Defendants awakened Plaintiff with focused pressure at top of his head. Dula and Defendants' man in B2 talked "Kalin.. Can't stop."

1275.    10/17/2024, 12:00PM group of students came again under Plaintiff's windows "We have to stop." "Yea." 7:02PM soon after Plaintiff started working again on the recording-transcript Defendants' Ralph in building corridor loud "Cannot stop."

1276.    10/18/2024, about 9:50AM when Plaintiff got up Defendants' Dula started talking "Don't stop. Can't stop." 9:59AM Defendants' man in B2 talking on loudspeakers "Don't believe. Can't push." ... "Kalin.."

1277.    10/23/2024, 11:38AM Defendants' woman in building corridor "Can't stop." A bit later she and a man came under Plaintiff's windows "We can't stop. FBI []."

1278.    11/18/2024, when Plaintiff was scanning at about 9AM Defendants' man in B2 talked "We lost… We can't stop."

1279.    11/27/2024, 8:57AM Defendants' man on Cedar lane "You can't stop now. Can't stop." He stopped talking after he passed Plaintiff's windows. Seems he came form a garbage truck parked on Cedar lane.

1280.    11/28/2024, 10:00AM two sharp knocks from A3 direction, but Defendants' man in B2 talked not loud above Plaintiff "[] to stop. We don't stop..."

1281.    12/7/2024, 6:49PM while Plaintiff was working on FBI brief Defendants in building corridor "Do not stop." Students under Plaintiff's windows "Bad, bad guy.."

1282.    12/20/2024, 12:57PM Defendants in ap. B2 hammered on Plaintiff's ceiling. Not loud. 1:11PM the man from B2 got under Plaintiff's windows "We won't stop that." When Plaintiff went to look through his windows the man was not visible.

1283.    12/21/2024, 10:25AM Defendants' man in B2 "Don't stop. Can't believe we lost."

1284.    12/24/2024, about 6:15AM Defendants awakened Plaintiff with repeating pushes at head, shoulder and hand. Defendants man in B2 challenged "Can't stop that." The DE burning beam moved to Plaintiff's back. About 7AM hammering from B2 and ongoing talk "Can't believe…" 7:26AM the B2 man in building corridor "Kalin can't believe… Police was threatened..." After Plaintiff started Olympus the man returned in ap. B2. Dula(?) talked in B2 "[] to stop." The man talked above Plaintiff's corridor.

1285.    12/27/2024, 10:46AM Defendants in G2 knocked on Plaintiff's floor and challenged "Don't stop. Hospital []."

1286.    12/29/2024, till 11:01AM Plaintiff was reading in toilet, when Defendants in B2 knocked, then a woman came under the windows and talked not loud "Kalin have us. It is us. It is us." Plaintiff started Olympus, she continued "We won't stop." When Plaintiff got to window to make a video she was hidden. Defendants in B2 hammered on the ceiling while Plaintiff was writing the note about the events. 1:40PM Defendants woman under Plaintiff's windows "We (want) to stop...Thank you." She entered the building, and stomped on the stairs. 2:07PM

Plaintiff was working on urticaria materials when Defendants man in ap. A6 commented "We can't stop."

1287.  1/2/2025, 10:24PM Defendants' man on Cedar lane "I didn't said that. Can't stop."

1288.  1/3/2025, about 12:28AM Defendants' man and woman commented near Plaintiff's windows "Can't stop. That's all we got." 6:17AM Defendants' man in B2 talked "Can't provoke [] stop... We can't harass."

1289.  1/13/2025, 6:29AM Defendants man under the windows on Cedar lane challenged "We don't stop. How do you []?" Plaintiff was working on timeline of events from 2017.

1290.  1/21/2025, 10:48PM Dula and man in B2 "He didn't believe… Harass. Can't stop… Kalin…" Talking continued till 11:30PM not intelligible in significant part.

1291.  1/25/2025, 4:12PM Defendants' man came under Plaintiff's windows on Cedar lane "You can not stop us."

1292.  1/26/2025, Defendants in ap.B2 hammered on Plaintiff's ceiling not loud when he was making this note. Plaintiff started Olympus. Defendants "We can't stop." 5:49PM "Kalin believe. We have to stop."

1293.  1/30/2025, 9:42AM Defendants' women under Plaintiff's windows "Don't stop." 10:05AM Dula in B2 "Kalin hear []." Plaintiff lade photos of garbage trucks parked under his windows on Cedar lane. Dula commented "Don't stop."

1294.  2/5/2025, about 2:50AM while Plaintiff was working on Complaint to UN Defendants yelled at distance "We don't stop. Don't stop."

1295.  2/8/2025, 7:30PM while Plaintiff was downloading NJ Criminal Code Defendants man in building's corridor "We can't stop."

1296.  2/10/2025, loud music from ap.B2. At about 9:15AM Defendants' woman came under Plaintiff's windows "Can't stop."

1297.  2/18/2025, about 3:10PM after Plaintiff set aluminum plates and started working on his table Defendants woman came under the window "We won't stop."

1298.  2/21/2025, about 9:59AM Defendants' man in B2 started talking minutes after Plaintiff removed his earplugs. "Can't stop."

1299.  2/24/2025 – see bellow.

1300.  3/3/2025, 11:05AM Holy Name guard and Defendants' woman talked near Plaintiff's windows on Cedar lane and next to the back door exit of the building. "Arrest.." Plaintiff opened the window. "Can't stop." "What people can do?"

1301.  3/14/2025, 11:35AM after Plaintiff wrote the previous note Defendants in B2 challenged "We can't stop. He won't believe." About 3:30PM students came under Plaintiff's windows (testing messages) "They don't stop." "May be try a different version." "May be apologize."

1302.  3/16/2025, 3:04PM Ralph and Defendants' woman with a badge talked loud at the corner of Red Road and Cedar lane – under the windows but away from camera view. "Don't stop." "FBI…" "No money []." "There are people with no green card…" After that Ralph stayed against Plaintiff's windows on the opposite side of Red Road (3:15PM).

1303.  3/18/2025, 9:57AM Defendants' man in B2 "Kalin []." 10AM in ap.B2 Dula? "Stop to harass []. We don't stop."

1304.  3/20/2025, 11:33AM Defendants' man loud on Cedar lane "We don't stop. Fight."

1305.  3/24/2025, 3:08PM Plaintiff noticed an email from Google about deletion of an email account which Plaintiff did not created. While he was checking Defendants' man in B2 commented "Can't stop."

1306.  3/25/2025, 1:25AM while Plaintiff was working on UN complaint – argument for privacy violations – Defendants targeted his back with burning rays. Defendants' man in ap.B2 commented not loud "Can't stop."

**(4) Defendants' pressure campaign to persuade Plaintiff to 'stop' preparing, working on, or filing petitions.**

1307.    Defendants explicitly said that one of their missions is to stop Plaintiff ("Kalin to stop. Yea, that's the second mission." 9/6/2023 Wednesday, 12:44PM).

1308.    Defendants frequently talk to Plaintiff to "stop" since he started working on legal cases in 2016. After his Notice of claims and Administrative claims dated 11/10/2022 there have been more than 350 days in which Defendants said to Plaintiff to stop (that is in addition to the above (3)). And since 7/23/2023 (two days before he started *Dimitrov I*) 'stop' was Defendants' message to Plaintiff almost everyday till the end of October 2023. Among other things it shows Defendants' surveillance of Plaintiff as on 8/13/2023, 8/15/2023, 8/19/2023, 9/12/2023, 9/21/2023, 9/27/2023, 10/3/2023, 1/4/2024, 2/13/2024, 3/5/2024, 8/18/2024 (almost real time dissemination), 10/3/2024, 1/10/2025, 3/15/2025. In regards to the surveillance Defendants were explicit after Plaintiff had sent his second Administrative claims with the FBI Headquarters that "They are watching." (8/29/2023).

1309.    Although in significant part Defendants' 'stop' campaign pressures Plaintiff to stop gathering evidence, working on, or filing petitions to government, it is expression of their efforts to disrupt him in general[131] (the meaning of what to stop is context dependent). And the timing of Defendants' warnings / directions / comments Plaintiff 'to stop' shows their intent to stop specific Plaintiff's activities.

1310.    For example Defendants apparently want to stop Plaintiff's work on case-related materials and frequently say that he has to stop (as for example on 11/24/2022, 12/10/2022, 12/11/2022, 12/14/2022, 12/22/2022, 12/24/2022, 12/28-12/29/2022 – explicit, 2/5/2023, 2/13/2023, 2/28/2023, 3/2/2023, 3/13/2023 (reaction to federal agents being liable), 3/29/2023, 4/17/2023, 5/25/2023, 7/7/2023, 7/16/2023, 7/18/2023, 8/1/2023, 8/13/2023, 8/15/2023, 8/18/2023,

---

131 For example Defendants want to stop Plaintiff from playing chess online. See 4/8/2024, 10/3/2024.

8/19/2023, 8/31/2023, 9/26/2023, 10/2/2023, 10/3/2023, 10/20/2023, 1/8/2024, 2/4/2024, 2/19/2024, 5/16/2024, 10/1/2024 (threatened to destroy the recording/transcript), 10/17/2024, 11/5/2024, 11/7/2024, 12/7/2024, 1/6/2025, 1/22/2025, 2/17/2025, 2/23/2025, 2/28/2025).

1311. Similarly Defendants said to Plaintiff to stop his scanning for DE, making notes or photos relevant to his cases (as for example on 1/5/2023, 1/12/2023, 2/3/2023, 2/8/2023, 2/24/2023, 3/3/2023, 3/29/2023, 5/22/2023, 7/28/2023, 8/14/2023, 9/2/2023, 9/22/2023, 10/8/2023, 10/21/2023, 10/22/2023, 10/23/2023, 1/3/2024, 2/16/2024, 2/17/2024, 3/5/2024 ("He doesn't stop monitoring."), 3/7/2024, 3/12/2024, 3/18/2024, 3/24/2024, 4/6/2024, 4/10/2024, 5/1/2024, 7/25/2024, 8/18/2024, 8/22/2024, 9/11/2024, 10/25/2024, 11/9/2024, 12/8/2024, 1/6/2025, 1/10/2025, 3/2/2025, 3/29/2025).

1312. On 11/4/2024 Defendants overtly talked about preventing Plaintiff to file a second lawsuit against them ("He wants to sue." .. "Have to stop.") after he sent letter/email to NSD DOJ from 11/1/2024, and earlier had filed second administrative claims with FBI (8/29/2024), letter to Attorney General with copy to USDA Office in Manhattan (10/7/2024), emails to Brennan Center for Justice, Human Rights Watch, and more (10/10/2024-10/11/2024).

1313. Defendants have repeatedly said that they fight Plaintiff to stop him, or just that they are fighting him in combination with message to 'stop', and in a few occasions they were explicit they do that to provoke him (see in that regard their comment on 6/25/2023, 8/25/2024, or on 8/28/2024 "No reaction."). For example Defendants talked about the fight on 1/18/2023, 2/5/2023, 3/8/2023, 6/25/2023 ("He didn't fight me."), 7/24/2023, 8/18/2023, 9/13/2023, 10/23/2023 ("Fight to stop."), 1/12/2024, 2/16/2024, 4/26/2024, 5/16/2024 ("May be they knew we are fighting him."), 6/22/2024, 7/13/2024, 7/23/2024, 7/25/2024 (day after Plaintiff filed letter to Judge Rearden, ECF No.14), 8/21/2024 ("Fight Kalin. Can't stop."), 8/25/2024 ("Fight." "He didn't fight."), 8/29/2024 (after Plaintiff sent second Administrative claims to the FBI. "Come to fight. Fight

this."), 8/30/2024 ("Kalin fight…"), 9/6/2024, 9/26/2024, 9/12/2024 ("He got to stop… Fight."),
9/13/2024, 9/26/2024 ("Fight Kalin. Have to stop."), 9/28/2024, 10/6/2024 ("Kalin… Stop
fighting you man."), 10/24/2024, 10/31/2024, 12/13/2024, 1/6/2025, 2/23/2025.

1314.    Defendants have also explicitly said that they harass Plaintiff to stop him (apparently as way to
fight him) as for example on 12/18/2022 ("Let police harass to get him."), 1/18/2023, 5/24/2023,
9/28/2023, 1/8/2024 ("Non stop we harass."), 1/12/2024, 2/9/2024, 2/21/2024, 3/12/2024,
5/11/2024, 5/20/2024 (notably suggested Plaintiff to "hang himself."), 6/28/2024, 6/30/2024
("We have to stop that. Harass. Have to stop."), 7/8/2024, 7/13/2024 (giving instructions "Stop
there and harass."), 8/11/2024, 8/29/2024, 8/30/2024, 8/31/2024, 10/6/2024, 12/12/2024 (talking
about the sleep deprivation "Can't sleep. That you got to feel."), 2/18/2025, 3/4/2025 ("We can
not stop harassing… Stop Kalin…"), 3/16/2025 (cognitive dissonance), 3/18/2025.

1315.    Defendants' sound attacks (knocks, hammering, slams, shouting and similar) are specific form of
harassment used to stop Plaintiff. This is among the things shown by the timing of their
statements – they interrupt Plaintiff with noise in combination with a direct or indirect command
or remark to stop. In a few cases they were overtly provocative – see for example Dula (B2) who
made noise (loud pipe bans, repeatedly dragging something heavy) and demonstrated that that
was to provoke Plaintiff's reaction on 10/20/2023 ("See how he will respond to that.
Bulgarian…"); or see the cases of intentionally inducing cognitive dissonance – saying opposite
(we stopped, we don't provoke) to what they do (making noise and provoking). The timing of
Defendants' statements shows that they harass Plaintiff with noise to stop him, as for example on
12/6/2022, 12/10/2022, 12/11/2022, 12/22/2022, 1/18/2023, 1/24/2023, 2/10/2023, 2/14/2023,
2/17/2023, 2/27/2023, 3/3/2023, 7/11/2023, 8/2/2023, 9/22/2023 (cognitive dissonance),
10/23/2023, 12/5/2023, 1/11/2024, 2/24/2024, 3/2/2024, 3/5/2024, 4/5/2024, 5/1/2024, 5/6/2024,

5/7/2024 (dissonance), 6/20/2024, 7/1/2024, 7/16/2024, 10/9/2024, 11/9/2024, 12/12/2024,

2/8/2025, 2/23/2025, 3/4/2025, 3/16/2025 (dissonance).

1316.     Similarly Defendants' directed energy (DE) attacks are one of specific forms of harassment used

to stop Plaintiff – the timing of the DE attacks in combination with Defendants' direct or indirect

command or remark to stop shows that. See for example 12/1/2022, 12/6/2022, 12/10/2022,

2/3/2023, 2/8/2023, 2/14/2023 (cognitive dissonance), 3/1/2023 (dissonance), 7/7/2023,

8/16/2023, 9/17/2023, 9/22/2023, 10/8/2023, 10/23/2023, 4/6/2024, 8/30/2024, 8/31/2024.

1317.     The coordination between the multiple parties in Defendants' stop-campaign is clear – they are in

contact and act in concert. This is shown by Defendants' remarks, for example, after Plaintiff

checked ECF on 8/9/2023 ("I told them he won't stop."), or after he sent an email to DOJ NSD,

and filed complaint with DOJ OIG on 11/1/2024 ("I told them he will not stop." in the morning

next day), and more.

1318.     Defendants' coordination is also shown by ongoing repetition of the same messages to Plaintiff

by different (mostly unknown to him) parties at different locations for years. For example

Defendants repeated "We have to stop…" in regards to Plaintiff on 6/12/2024 (under windows),

6/25/2024 (in ap.B2), 6/30/2024 (under windows), 7/6/2024 (in front of the pub), 7/29/2024 (in

Teaneck park), 8/1/2024 (on speaker), 9/26/2024 (Dula in B2), 10/17/2024 (students under

windows), 11/26/2024 (under windows), 12/30/2024 (students under windows), 1/10/2025 (under

windows), and more. Another example of that kind of coordination is Defendants' repetition of

questions in regards to Plaintiff such as "How to stop him?" "How do we stop him?" "How to

make him stop?" They asked such questions for example on 12/11/2022 (in front of the pub),

1/12/2023 (ap.B2), 2/3/2023 (ap.A3), 2/27/2023 (B2), 3/3/2023 (ap.G2), 3/8/2023 (in corridor),

3/29/2023 (Ralph), 4/12/2023 (Ralph in corridor), 5/22/2023 (B2), 6/3/2023 (B2), 6/18/2023

(near the windows), 7/1/2023 (Thai-woman in corridor), 7/7/2023 (apartment nearby), 7/11/2023

(in front of pub), 7/24/2023 (under the windows), 8/9/2023 (near the windows), 9/2/2023 (near the windows), 9/14/2023 (near the windows), [Note the pause in messaging], 4/8/2024 (under the windows), 4/15/2024 (students under windows), 5/14/2024 (in corridor), 5/24/2024 (under windows – police officers), 6/22/2024 (in front of the pub), 7/23/2024 (under windows), 7/25/2024 (near windows), 8/14/2024 (near windows), 8/25/2024 (near the windows, Teaneck police came and parked there), 8/28/2024 (students under the windows), 9/6/2024 (near windows), 9/12/2024 (near windows), 10/3/2024 (near windows), 10/10/2024 (near windows), 10/31/2024 (under the windows), 12/9/2024 (under windows), 1/6/2025 (in corridor), 1/21/2025 (in corridor), 1/27/2025 (in ap.G2), 2/4/2025 (A3), 2/23/2025 (under windows), 3/26/2025 (students under the windows).

1319.    In addition Defendants' conduct in many occasions shows the coordination between the parties. As for example the events on 11/21/2022 when Defendants (Dula, Loomer, and others) gathered in ap.B2 to talk about Plaintiff (after he had sent Notice of claims and Administrative claims on or about 11/10-11/11/2022) showing contact and coordination with Gyro and police; on 12/1/2022 Defendants (Ralph, Loomer, A1's woman and others) talked in corridor about Plaintiff, then Loomer got out and talked with person(s) in a car under the windows about the status; on 2/17/2023 Defendants (including Cesar Naranjo) acted in coordination with a group of students who shouted under Plaintiff's windows and in corridor; on 7/24/2023 Defendants (Dula, Ralph, and others) talked under Plaintiff's windows repeating statements about him made earlier during the night in front of the pub; or on 8/25/2024 parties in a car and parties under the windows talked about FBI and Plaintiff, then Teaneck police car came and a woman spoke with the officer.

1320.    Especially notable are Defendants' statements in regards to the FBI and its role in the activities, which show that either the speaker is FBI agent, or that (s)he is in contact with and knows the FBI actions (acts in concert). For example that the "FBI stopped. Really." (9/27/2023, Dula),

"Stop FBI." (10/8/2023, man in ap.B2), "FBI… Didn't stop." (2/21/2024, Dula in ap.B2), "FBI" the "agents … caus[ing] disruption". "Press Kalin (they) have to arrest him." (7/16/2024, Cesar Naranjo and others), "FBI to stop…" (10/6/2024, man in ap.B2), "We can't stop. FBI []." (10/23/2024), "FBI wants him to believe we stopped." (11/30/2024, ap.B2), "Afraid of FBI.. Don't believe we stopped." (3/7/2025). Also notable is the participation of uniform Teaneck police officers (5/24/2024, 9/7/2024, 9/16/2024, 12/13/2024), and a uniformed Bergen Sheriff's deputy (9/11/2024).

1321.   Although it is obvious that Defendants have never stopped – neither the surveillance, the demonstration of the surveillance, nor 'units' engaged with Plaintiff, including those delivering the message, not the attacks – they have tried to convince Plaintiff that they stopped. The intended message to Plaintiff seems to be 'stop working on petitions as we stopped' but, considering the apparent falsity this is more a provocation creating cognitive dissonance than a persuasion effort. Defendants have made such attempts for example on 2/3/2023, 2/14/2023, 3/1/2023, 3/3/2023, 3/7/2023, 6/6/2023, 8/1/2023, 8/13/2023, 2/25/2024, 3/5/2024, 3/30/2024 ("He has to believe we stopped."), 3/31/2024, 4/20/2024, 8/31/2024 (2d day after Plaintiff sent his second administrative claims with the FBI) "Police stopped.", 9/5/2024 "They want to stop.", 9/6/2024 "Fighting stopped." "We were trying to stop.", 10/7/2024 "Police stopped.", 10/10/2024 "But we stopped.", 10/11/2024 "Have to stop. The police stopped.", 11/26/2024 "We have to stop. We lost.", 11/30/2024 "FBI wants him to believe we stopped.", 1/29/2025, 2/1/2025 "We want to stop.", 2/2/2025, "He don't believe we stopped.", 2/6/2025, 2/22/2025, 2/28/2025, 3/7/2025, 3/19/2025, and more. Notable in that regard is the repetition of "Completely stopped." by Defendants in ap.B2 (in a few cases on loudspeaker) as for example on 2/14/2023, 7/10/2023, 8/18/2023, 9/17/2023, 2/15/2024, 5/27/2024, 8/2/2024, 8/11/2024, 8/16/2024, 10/19/2024, 2/20/2025.

1322.    Significant as direct evidence that the Defendants' activities are retaliation to Plaintiff's petitions is the remark by Defendants' man in B2 "If Bulgarian stops we can stop." 3/4/2025.

1323.    11/21/2022, Defendants in ap.B2 talked about Plaintiff. Loomer "Got to stop." "Kalin don't have--" "We stop that. To (op)press."… "He has to stop."... "Have to push. Don't stop that." … Dula: "To oppress the man []. It could be the last they fucking talk." Loomer: "Get to stop." "Gyro have saved Kalin. Completely stop their (push)." "Call Gyro. Can't believe." … "Can you stop []?" "Gyro have that. Gyro have (that)." "He wasn't going to stop." Dula: "To have stop that. Police have that." ECF No.8-2 at 5952, 5954, and 5957-58.

1324.    11/24/2022, when Plaintiff started working again on EMF materials Defendants' man in ap.B2 commented "He didn't stop." ECF No.8-2 at 5961.

1325.    12/1/2022, Plaintiff felt DE ray at his heart (1:46PM). While he was scanning Ralph and Defendants' man in building corridor commented "He won't stop." "See, I was telling (you). Have full stop." (1:52PM) A bit later A1's woman joined them. R "I told you." they talked in Spanish about the night ('noches'). Then Loomer got under Plaintiff's windows on Red Road and spoke with a person in a car parked there about the "status" and to "stop" (2:05PM). ECF No.8-2 at 5964.

1326.    12/6/2022 Tuesday, Plaintiff had worked till 2:49AM on articles about health attacks and in that period Defendants targeted him with laser-focused DE rays, knocked on his wall from A3's direction (12:44AM). Later Defendants' woman and a man talked in corridor about Plaintiff ("Kalin") "Somebody have to complain. Why waiting?" (11:21AM). Defendants in ap.A6 commented "He will not forget." "Have to stop. He has a lot of data." (11:40AM). ECF No.8-2 at 5969.

1327.    12/10/2022 Saturday, Plaintiff worked on EMF effects on human body till 4:29AM. Defendants awakened him and talked in building's corridor "Have to stop." (9:32AM), "New York forgive. We must stop." (9:44AM). Then after pushes at Plaintiff's left thigh from ap.B2 they continued in the corridor they "really can't [stop]". Followed strong slams (9:49AM, 9:52AM, 10:01AM – 4 times). ECF No.8-2 at 5973.

1328.    12/11/2022, Plaintiff worked on public national security materials till about 2:41AM. During that time Defendants slammed a door 4 times in a minute (12:11AM), a group of men passed under Plaintiff's windows, loud only then (1:25AM), returned in front of the pub and talked about Plaintiff's work "How to stop that?" (2:13AM). ECF No.8-2 at 5974.

1329.    12/14/2022 Wednesday, Plaintiff worked on public national security materials till 5AM. Plaintiff was awakened at about 8AM by Dula and about 6 other who talked in building's corridor that they 'have to stop' him. D "Have the real problem." "I don't. Have to get him stop." A man on speaker "Get arrest." ... "Got to stop Kalin []." ECF No.8-2 at 5976-77.

1330.    12/18/2022, Defendants (Dula, man from ap.A6, and others) talked in corridor about Plaintiff "Make Kalin to stop."... "We don't do stop." "Let police harass to get him." ECF No.8-2 at 5981.

1331.    12/22/2022 Thursday, Plaintiff worked on national security public materials till 1:35PM. During that Defendants in ap.B2 knocked (at 8:53AM and 8:54AM), and the man there commented "We needed to stop. Have to stop." (9:12AM). ECF No.8-2 at 5993.

1332.    12/24/2022 Saturday, Defendants' man in building's corridor "You caught us. Now stop." ECF No.8-2 at 5994.

1333.    12/28/2022 Wednesday, Plaintiff did not work on case materials that day. In the morning of 12/29/2022 ap.A3 person commented "He stopped." When later Plaintiff worked on public

national security materials Defendants' man came under his windows on Cedar lane and said "Stop man. Stop." (1:39PM). ECF No.8-2 at 5997.

1334.    1/5/2023, while Plaintiff was scanning Defendants' man in B2 commented "He didn't stop." Later when Plaintiff made a note ap.B2 knocked on his ceiling and commented "We lost that." (11:19AM). ECF No.8-2 at 6002.

1335.    1/12/2023, while Plaintiff was scanning at about 9:04PM a man in ap.B2 asked "How to stop?" ECF No.8-2 at 6008.

1336.    1/17/2023, Plaintiff started working on his Supplement to his Notices of claims. Returning home he passed Shell gas station on Cedar lane and the staff talked with a person in black car "We couldn't suppress him. Have to stop." ECF No.8-2 at 6010.

1337.    1/18/2023, Ralph and Holy name guard neighbor talked in corridor. After a few slams and talking "harass.. to stop." (12:39PM) Ralph strongly knocked in building corridor for about 10 minutes (12:50PM). In the evening Defendants' woman came under Plaintiff's windows and talked about the "fight" and "Has to stop." (7:21PM). A bit later she returned under windows again. Defendants in ap.B2 knocked on Plaintiff's ceiling (7:30PM, and at 9:06PM –3 knocks). ECF No.8-2 at 6011.

1338.    1/24/2023, students talked under Plaintiff's windows about "local police... have to stop." (11:35AM). Defendants in ap.B2 slammed and knocked on Plaintiff's ceiling (12:52PM – loud, 1:32PM, 3:07PM, 3:17PM). Students kept talking about Plaintiff. At 3:40PM a student shouted under Plaintiff's windows on Cedar lane. Then a group of students passed challenging "Can't stop. Probably should die." ECF No.8-2 at 6017.

1339.    2/3/2023, 8:49AM after Defendants awakened Plaintiff with DE rays he scanned. Later Defendants in ap.A3 commented "Don't believe we stopped. How to []? He don't believe." ECF No.8-2 at 6183.

1340.    2/4/2023 Saturday, 9:17PM Defendants' man came under Plaintiff's windows on Cedar lane talking about "pushing" and "stop them". ECF No.8-2 at 6216.

1341.    2/5/2023 Sunday (a day after Plaintiff started working on the complaint for *Dimitrov I*), about 5PM Defendants' person threw a rock under Plaintiff's window and said "Stop." And later "How to fight?" ECF No.8-2 at 6231.

1342.    2/8/2023 Wednesday, 9:38AM when Plaintiff was making photos of red spots (effects due to DE attacks on his body) Dula in ap.B2 warned "Stop." ECF No.8-2 at 6269.

1343.    2/10/2023 Friday, 10:13AM Defendants' Thai woman and a man talked under Plaintiff's windows "They stopped." and slammed loud the entrance door. ECF No.8-2 at 6303.

1344.    2/11/2023 Saturday, 2:15AM Plaintiff stopped working on 1st Amendment materials and a man in ap.B2 commented "He still don't stop." ECF No.8-2 at 6314.

1345.    2/13/2023 Monday, after Plaintiff worked on psychology of interrogation till 1:34AM, at about 10:40AM Defendants in ap.B2 commented "He'll never stop." ECF No.8-2 at 6361.

1346.    2/14/2023 Tuesday, after midnight Plaintiff did internet research on messaging strategies and Defendants in ap.B2 commented "Completely stopped." During the night Defendants awakened Plaintiff with slams, and DE attacks. At 8:41AM Dula commented "He believed that. He believes we stopped." ECF No.8-2 at 6376, 6382.

1347.    2/17/2023 Friday, 3:49PM student came near Plaintiff's windows and shouted "Never stop. I love you." While Plaintiff was making a note Defendants in ap.B2 knocked on his ceiling, and Defendants' woman at distance commented he "Didn't hear." At 5:28PM an adult and kids run yelled under Plaintiff's windows. "Hold the []." Then shouted in building corridor "Stop. Stop." Cesar and other Defendants with a group of students. ECF No.8-2 at 6442, 6447.

1348.    2/24/2023 Friday, 10:19AM when Plaintiff was scanning for DE Defendants' man (Ralph?) and a woman in corridor commented "Have to stop him." "[] to forget." "Rehearse." ECF No.8-2 at 6550.

1349.    2/25/2023 Saturday, 9:41AM ap.B2 playing a recording of a man talking for more than 10 minutes "[] to stop [] can't arrest [] can't believe [] trying to stop [] He can't sue. [] want to stop. Can't believe…" ECF No.8-2 at 6564.

1350.    2/27/2023 Monday, 9:23AM Defendants' man in ap.B2 "How to stop that?" Followed two loud pipe bangs. ECF No.8-2 at 6599.

1351.    2/28/2023 Tuesday, 2:53AM Plaintiff was working on swellings when Defendants' man in ap.B2 commented "Have to stop." ECF No.8-2 at 6609.

1352.    3/1/2023 Wednesday, 2:38AM Plaintiff was awakened by DE laser-focused rays, and while he was scanning Defendants' man in ap.B2 commented with laugh "He thinks we stopped." After Plaintiff started working on transcript (and did IChing) at about 5:55PM a student came under his windows and shouted "Stop." ECF No.8-2 at 6621 and 6639.

1353.    3/2/2023 Thursday, Plaintiff was transcribing 1/20/2023 recording when at 12:54AM Defendants' man and woman in ap.G2 "Have to stop." "I couldn't believe that." ECF No.8-2 at 6647.

1354.    3/3/2023 Friday, 3:40AM Defendants' man in ap.G2 commented "No power… How to stop?" Plaintiff started Olympus and talking stopped, a bit later a 'lid' was slammed on the floor under Plaintiff's heater. After Plaintiff did EMF testing of his appliances, at about 7:10APM Defendants played in ap.B2 a record "He don't believe we stopped." Later at about 12PM Defendants in ap.B2 commented "He didn't stop." At about 4:14PM Plaintiff edited Relevant history file. A bit later, at 4:50PM students came again under Plaintiff's windows on Cedar lane and commented "He did stop." After Plaintiff went to the restroom (he played on his phone there) very loud pipe bangs and knocks, students and others came under his window shouted "Smells like ass." The man who shouted entered the building and ap.A6 commenting "He didn't stop." Plaintiff played on his phone in restroom till 6:30PM. ECF No.8-2 at 6664 *et seq.*.

1355.    3/7/2023 Tuesday, 1:40AM Defendants awakened Plaintiff, the man in ap.B2 commented "He can't hear we stopped." ECF No.8-2 at 6737.

1356.    3/8/2023 Wednesday, 8:42PM Defendants' woman entered the building talking about Plaintiff ("How to stop this fight?") and about 'security'. Then Dula and a man talked "I was assigned that case. And that's a lot." ECF No.8-2 at 6764.

1357.    3/13/2023 Monday, 12:05PM Plaintiff was working on Statutory charges ('federal officers are liable' under 1985 (2) and (3) when Dula in ap.B2 commented "He has to stop. OK?" ECF No.8-2 at 6822.

1358.    3/16/2023 Thursday, about 5:02PM multiple persons talked in the corridor about the "pervert" then ap.B2 commented "He wants to stop." About 5:10PM while Plaintiff was in the restroom Cesar came under his window and said "Stop." ECF No.8-2 at 6869-70.

1359.    3/19/2023 Sunday. about 10:35AM Defendants' man in ap.B2 commented "He will never stop." ECF No.8-2 at 6915.

1360.    3/21/2023 Tuesday, 11:35AM a group of students came under Plaintiff's windows and said among other things "Stop. You are insane." ... "We'll get him on our way back." ECF No.8-2 at 6953.

1361.    3/27/2023 Monday, 10:14AM Defendants in ap.B2 commented "Have to stop." Plaintiff detected 959 V/m at the back of his head. ECF No.8-2 at 7072.

1362.    3/29/2023 Wednesday. 8:48AM while Plaintiff was scanning and making a note about the results Dula commented "Stop." 6:22PM Plaintiff was working/reviewing legal materials and

then started working on FTCA charges. Ralph commented not loud "Don't sue. How to stop?" ECF No.8-2 at 7116.7118.

1363.  3/30/2023 Thursday, 10:15AM after Plaintiff's alarm rang Defendants' man in ap.B2 commented "We didn't stop him." ECF No.8-2 at 7125.

1364.  4/12/2023 Wednesday, 12:14PM Ralph and Dula talked about Plaintiff. Ralph "Don't know how to stop him." Dula "Go to war man... Get rid of this one. This one?" Ralph knocked on ap.A1's door. Dula entered ap.B2 – cracks on ceiling. ECF No.8-2 at 7322.

1365.  4/17/2023 Monday, 12:35PM while Plaintiff was scanning Defendants in ap.B2 commented "Have to stop." 6:27PM Plaintiff was still working on depositions when students came under his windows, and a girl said "Please stop. Please." ECF No.8-2 at 7405.7391.

1366.  4/26/2023 Wednesday, 11:03PM heavy steps from ap.B2 after Dula and a man in ap.B2 commented Plaintiff "He stopped." ECF No.8-2 at 7568.

1367.  4/29/2023 Saturday, 8:53PM feeling pressure at head Plaintiff detected 665 V/m. Defendants in ap.B2 commented he "Haven't stop." ECF No.8-2 at 7633.

1368.  5/22/2023 Monday, 3:29AM Defendants' man and a woman in ap.B2 commented after Plaintiff made a note about bangs "How to stop?" "Kalin []" 3:36AM "Kalin stop []. Kalin []." ECF No.8-2 at 7761-62.

1369.  5/24/2023 Wednesday, 4:18AM Defendants awakened Plaintiff, while he was scanning Defendants' man and woman in ap.B2 "He won't stop." 11:44AM loud students came under Plaintiff's windows "harass… will not stop." A schoolgirl screamed. ECF No.8-2 at 7793.7797.

1370.  5/25/2023 Thursday, 1:00AM Defendants' man in ap.B2 "Kalin to stop… Can't []. .. Couldn't stop.. He wants to []." About 11:30AM Ralph and a man "We got to stop." 4:01PM Plaintiff was working on consumer journey materials when Defendants' man threatened loud under Plaintiff's windows on Cedar lane "We not gonna forgive. We're not gonna forget. Have to stop." ECF No.8-2 at 7815.7816.7828.7832.

1371.  5/28/2023 Sunday, 9:37AM two young Jewish men came under Plaintiff's windows "I didn't realize that they want to stop." ECF No.8-2 at 7879.

1372.  6/1/2023 Thursday, 5:48PM Defendants' woman as client and Jamaican food-truck Christina: "Have to stop. Can not stop him. Can not talk." "let him []. Let him []." "Let him obsess. Police []." ECF No.8-2 at 7950.

1373.  6/3/2023 Saturday, 5:16PM a man talked to kids "Go ahead. Go ahead. You'll do it yourself later." Plaintiff started Tascam DR-07. Defendants' man in ap.B2 commented "How to make him stop doing it?" ECF No.8-2 at 8006.

1374.  6/6/2023 Tuesday, about 5:50AM after Plaintiff looked at the clock Defendants in ap.B2 commented "He didn't believe we stopped." ECF No.8-2 at 8047.

1375.  6/16/2023 Friday, Plaintiff challenged "Do you think that will convince me? Face me. Why are you hiding?" 5:01PM Christine (Jamaican food truck – name phonetic) responded "Stop playing with me." 5:21PM Christine talking with another woman "He can't move them. Stop." "Ha, ha, ha.." 5:22PM "Can't forget." ECF No.8-2 at 8217-20.

1376.  6/17/2023 Saturday, 9:26AM persons under Plaintiff's windows "Didn't stop him. They have to." That is repetition of one of the points Plaintiff worked in the complaint at night. 10:02PM Defendants' man passing by Plaintiff 'Make it stop.' ECF No.8-2 at 8229.8247.

1377.  6/18/2023 Sunday, 1:56PM a man near the building "How to stop?" ECF No.8-2 at 8263.

1378.  6/21/2023 Wednesday, about 9:30AM talking under Plaintiff's windows on Cedar lane "Don't believe we can't stop the legal battle." "Gyro didn't." "They [] upgrade." ECF No.8-2 at 8302.

1379.    6/24/2023 Saturday, 11:18AM Dula in B2 "We lost. Kalin stopped." 2:45PM two Jewish boys on Cedar lane "Wait him to stop that effort." ECF No.8-2 at 8346.8354.

1380.    6/25/2023 Sunday, 12:36AM Defendants persons in front of pub on Cedar lane "Have to stop.. Can not forget." The same persons returned under Plaintiff's windows, Plaintiff looked at them through the window, the woman looked back and responded "Yea. Right there in house." 9:31PM Defendants' man was loud only under Plaintiff's windows "Oh shit... He didn't fight me." He stayed under the windows for a while next to a car. Woman got in. "Can't stop." The car left. ECF No.8-2 at 8361.8370.

1381.    6/27/2023 Tuesday, 10:16AM Defendants' man with Indian accent came on Red Road near Plaintiff's windows "Stop that." ECF No.8-2 at 8395.

1382.    6/28/2023 Wednesday, about 11:45PM after Plaintiff had been watching TV for 2 hours Defendants near the windows "Stopped him. Congratulations." ECF No.8-2 at 8429.

1383.    7/1/2023 Saturday, 8:30AM Dula and Thai-woman talked in building's corridor "power.. How to stop him?" Person outside the building commented "He want me to stop." Plaintiff tried to see them. Man in B2 commented "He don't believe." 9:25AM women under Plaintiff's windows "I've being lying to stop this." About the same time Plaintiff detected repeated peaks of beam from Red Road – more than 10 mW/m2. ECF No.8-2 at 8466-67.

1384.    7/2/2023 Sunday, 3:09PM 3 Jewish persons commented while passing Plaintiff on the alley: a man "[] stop." a woman 'How we to do that?' 3:25PM same kids on bicycles returned – a girl "Stop talking." 10:38PM man in B2 commented "Have to stop." ECF No.8-2 at 8495-96, and 8508.

1385.    7/5/2023 Wednesday, 6:13PM Ralph and a woman in building's corridor "He wants to stop." "We lost." "You won't need me." ECF No.8-2 at 8554.

1386.    7/7/2023 Friday, 2:27PM woman "Have to stop." Plaintiff was working on timeline of events. 2:29PM man "Stop. We heard this." Plaintiff felt pushes at left side of his neck. 5:35PM man (the same) in the apartment on the same floor "Hope to stop. How to (stop)?" 9:17PM man on Cedar lane "I don't know if we got to stop." ECF No.8-2 at 8590-91, 8594. and 8607.

1387.    7/10/2023 Monday, 11:35AM very strong peaks detected with RF detector. MF is bellow 1 mG, and while Plaintiff was scanning man in B2 commented "Completely stopped." ECF No.8-2 at 8651.

1388.    7/11/2023 Tuesday, 10:36PM persons in front of the pub on Cedar lane (earshot distance) commented "Nightmare.. Kalin made it stop.. Let Kalin begin []." 10:37PM woman there "How to suppress him? Again []." 11:04PM man "Got to stop." 11:16PM slam in B2. ECF No.8-2 at 8683-86.

1389.    7/12/2023 Wednesday, 12:50AM woman in front of the building's entrance "How do we stop that?" "[] sedated." Plaintiff's doorbell rang but persons entered an apartment on Plaintiff's floor without waiting response. ECF No.8-2 at 8688.

1390.    7/16/2023 Sunday, 3:59PM Plaintiff was working on Complaint when a woman commented "Can't believe. We didn't stop []." 8:04PM Plaintiff was working on relevant history when a man under the windows commented "Have to stop." ECF No.8-2 at 8768.8774.

1391.    7/17/2023 Monday, 11:05AM Defendants' woman "Have to stop him." Plaintiff opened the window saw 3 persons getting in a car parked on the opposite side of Red Road in front of the building. 4:15PM a woman under Plaintiff's windows "I don't mean we stop but []."

1392.    7/18/2023 Tuesday, 5:43PM Plaintiff kept working on timeline of events when Defendants' person warned him "Stop."

1393.    7/23/2023 Sunday, 2:25AM Defendants' persons continued talking about Plaintiff "He is trying to stop." "[] lets hope." 2:27AM "We can not let go." .. "Bulgarian.." "Set up."

1394.    7/24/2023 Monday, 10:26AM woman in car parked under Plaintiff's windows after Plaintiff made a video "He didn't stop." 12:48PM Plaintiff was working without sleeping on Complaint. Raphael Pimienta, Marlene Dula, John Doe and others talked near Plaintiff's windows:"Lets set up [] get []. Set up. We can not let him (go)." "How to [] the team?" "Not []. Used to fight []. Cancel meeting." "Can't lose." "We need strike this stuff.".. "The camera convey that this is []." "Unless forget it." "We love you. Can't []. The (lotus) find []. [] to stop. Don't arrest []." "Let Kalin to push.".. "Kalin stop."

1395.    7/27/2023 Thursday (second day after the initiation of *Dimitrov I*), Defendants' man in B2 commented Plaintiff "He'll never stop working on that."

1396.    7/28/2023 Friday, Plaintiff heard person leaving the building (door) and started a video. Loomer exited the building, a man directed him "Try to stop Kalin." Loomer turned to walk toward Plaintiff, and Plaintiff got inside the room before Loomer reached his windows.

1397.    7/29/2023 Saturday, 2:35AM Defendants' man on Cedar lane "He stopped." "Yea. Because he is afraid." 2:42AM Defendants in front of the pub commented "Kalin stopped. No can touch." "Can not talk. Police []."

1398.    7/31/2023 Monday, 5:02PM a police(?) parade passed under Plaintiff's windows (on the drum – a logo of Police Pipes and Drums, Bergen County, NJ), two of the pipe players commented next to windows "They [] stop." "Yea. Ha, ha, ha.."

1399.    8/1/2023 Tuesday, 5:42PM Plaintiff was working on transcript from 12/14/22 when Defendants' man came on Cedar lane and directed "Stop that." Later at 8:24PM after Plaintiff stopped the shower the neighbor Holy Name guard came under his window and said "All units []. Over their heads." Plaintiff made time statement, and Cesar Naranjo commented near Plaintiff's window "He records… I said to them he won't stop." After that Plaintiff made a video – then only Ralph and Hole name guard were visible in front of building's entrance. 8:36PM two Defendants' men came under Plaintiff's windows on Cedar lane and directed "Stop []." "We stop." 9:57PM two girls came under the windows "Can't stop." Plaintiff was playing online Command and Conquer when at about 11:00PM at distance a Defendants' woman "Can't stop."

1400.    8/2/2023 Wednesday, about 9:33AM Defendants' woman in building corridor said "We are trying to stop." And slammed a door. About 12:57PM Defendants at Lomo food truck near Plaintiff's windows talked about "backup". 1:01PM "Non stop. Ha, ha, ha.." ... "He didn't stop." ... "Kalin []." ... "He stopped." Plaintiff was preparing to go to NY, printed summons, putting on clothes.

1401.    8/5/2023 Saturday, 7:05PM Defendants' woman came nearby on Red Road and said about Plaintiff "Have to stop."

1402.    8/9/2023 Wednesday, Plaintiff received unusual notification from ECF that his request for issuance of summons to Marlene Dula, Raphael Pimienta and the United States of America (ECF No.4 filed on 8/7/2023) in *Dimitrov I* was transferred to Pro Se Assistants, he was checking that matter when at 2:11PM Swaby (B6) came under his windows on Cedar lane Swaby and talked with Jamaican food's Christina (the truck was parked there). "I told them he won't stop. We'll never stop. [] that." 2:20PM Christina and a woman in NY Yankees outfit talked "How to stop? Stop." 2:35PM Christina and a woman talked "How to stop? I lost my []. Next year []." "Get him out." 2:38PM "Stop." 2:45PM the same woman (wearing New York Yankees outfit) came under Red Road windows talking "Stop." A driver in a car at the corner of Cedar lane and Red Road looked at her, she said "That to stop." The driver looked at Plaintiff's camera and commented "Yea. It's a viral []." He left.

1403.    8/10/2023 Thursday, 2:03PM Defendants' man talking with person inside white car parked under Plaintiff's windows on Red Road "Try to stop."

1404.  8/11/2023 Friday, 3:03PM school girls shouting at Plaintiff from distance "You fucking stop. You are []." then they got behind the corner of the building.

1405.  8/13/2023 Sunday, about 10PM the woman (same one with the kid?) commented Plaintiff "He thinks we stopped and stopped." Since 3:34PM Plaintiff did not work on his case that day. 11:01PM Defendants' men in a car on Red Road "Fucking stopped." "Yea."

1406.  8/14/2023 Monday, 10:25AM while Plaintiff was scanning Ralph talked in corridor with a woman "We stopped Kalin. Really. I don't get []." That is before Report and Recommendation of Judge Cave to dismiss *Dimitrov I* was published on ECF. 12:48PM two men in Amazon branded vests talked near the windows "Can you stop that? They [] stop." at Lomo food truck. Later mentioned Plaintiff's name (12:54PM) "Kalin". 12:59PM in building's corridor a person talked about "stop". Plaintiff looked and made a video of a person sitting in front of entrance. While he wrote the note Ralph outside stated "[] stop." 2:11PM Defendants' person "Try to stop."

1407.  8/15/2023 Tuesday, 1:56PM Defendants' man in B2 commented "He can't believe we stopped." Plaintiff went to work in Phelps Park, Teaneck. On his way there on Segamore Ave's t-shaped crossroad hidden person teased "They stopped. They stopped."

1408.  8/16/2023 Wednesday, 12:20AM Plaintiff searched in Google 'directed energy' in regards his Objections to the Report and Recommendation (ECF No.7). Made screen photo of Google Scholar search result stating there are "About 4,850,000 results". About 12:21AM Defendants' persons loud in front of the pub "mistake … Kalin make it." … "Mexican stop." Plaintiff splashed many times water as his eyes were blurry, irritated by DE rays. He kept a hand in front of his eyes. Right eye with secretion.

1409.  8/17/2023 Thursday, 1:14AM girls came on Cedar lane "Have to stop." "Oh []." While Plaintiff was writing the note they mentioned his name "Kalin [].". They returned a minute later and shouted "Shut up."

1410.  8/18/2023 Friday, 1:08AM Defendants' man in B2 "Completely stopped." Plaintiff didn't feel rays after that, eyes are working perfectly. 11:27AM Defendants at Lomo talked about Plaintiff for hours: "They can not say no." "Have him stop. He didn't go []." "Can not say []." "We are the middle man." 11:31AM "Kalin" and "fight"... 12:39PM Plaintiff started working on the second exhibit for his Objections when talking at Lomo continue "Can not push. Try to stop." 1:26PM Lomo again commented "gotta stop." 3:30PM "Scared. Trying to stop." 3:33PM "Non stop []." 3:37PM "Stop []." 4:32PM Lomo's man "We need to stop." 5:10PM a woman on speaker "He didn't stop. We can't got []." A bit later Plaintiff saw a woman in the car in front of the truck. 9:30PM a man in front of the pub on Cedar lane stated "Got to stop." 10:13PM a woman under Plaintiff's windows "She [] Have to stop."

1411.  8/19/2023 Saturday, 8:11PM after working on his legal argument Plaintiff started preparing dinner. Defendants' man on Cedar lane commented "The fucker stopped." 11:38PM Defendants in front of the pub "Stop []. (Police) []."

1412.  8/23/2023 Wednesday, 3:18PM Defendants' woman at Lomo "Crazy []. Care to stop []. Your name is []."

1413.  8/26/2023 Saturday, Defendants' woman with a dog passed next to Plaintiff and said only "You gotta stop."

1414.  8/31/2023 Thursday, 9:26PM Plaintiff was working on records/notes when a loud boy came under his windows saying "Stop." At 9:57PM persons in front of the pub "Let Kalin stop."

1415.  9/1/2023 Friday, 8:28PM Plaintiff was playing online Command and Conquer when Defendants' person came under his windows "We want to stop. Not a game."

1416.  9/2/2023 Saturday, 9:15PM three men at the buss stop "Couldn't []. We stop that. Believe." 9:25PM at distance (pub) "Tell Kalin []." 10:40PM two men walking on Cedar lane under

Plaintiff's windows "Have to stop." "Police forget. She []." 11:29PM a man talking with persons in a car parked on Red Road opposite to Plaintiff's windows: "Can't believe it." "Got to push." "Can't stop." Plaintiff made video and photos of them. They talked about a "backup". Pressed car's horn 2-3 times. 11:43PM three more persons came to the car "Kalin []." "How to stop that?" They left, and a bit later the car also left.

1417.    9/3/2023 Sunday, 10:20AM while Plaintiff was scanning Defendants in B2 played on loudspeaker "stop … don't believe…" 11:15AM Defendants' man "Stop. You already stopped right?" 8:40PM three students loud "Complete jerk." "You mail that." Adults commented: "[] Kalin []. We should stop that."

1418.    9/5/2023 Tuesday, 10:04AM when Plaintiff scanned his body Defendants' man in B2 "We stopped." 10:35AM man in B2 "We do not stop." When Plaintiff was walking on Red Road a man on bicycle at distance talked about "stopping him". When he got next to Plaintiff he said "I'll clear that."

1419.    9/6/2023 Wednesday, 12:44PM Defendants' woman - Lomo client talked about Plaintiff "Kalin to stop. Yea, that's the second mission." Plaintiff opened his window wider and made photos she commented "While writing [] not aloud to stay."

1420.    9/7/2023 Thursday, 11:57AM two schoolboys commented Plaintiff on Red Road "They were not prepared. Not American." A girl "Have to stop."

1421.    9/8/2023 Friday, 11:25AM very heavy step in B2. Lomo parked at its usual spot, a Defendants' woman commented "New York stopped."

1422.    9/9/2023 Saturday, 4:33PM Defendants' man in a car on Cedar lane talked "Kalin to stop." 6:24PM a man near Plaintiff's windows "Tell him to stop." 7:52PM Plaintiff was still playing Command and Conquer when man and a woman in front of the pub "Let Kalin stop." 7:55PM "We used to stop []." About 9:02PM men in front of the pub "Kalin fucking stopped." Then "Didn't hear it."

1423.    9/11/2023 Monday, 6:10PM Defendants' man commented near Plaintiff's windows "Have to stop." 6:11PM school boys came "Stop. Yes. I know."

1424.    9/12/2023 Tuesday, 11:34AM a student "Can't believe we stopped." Plaintiff went to NJ MVC to renew his driver license, but was told only with appointment or online/mail. On his way toward there a man shouted next to him turned after a car(?) "Stop that. Stop what are you doing." 8:33PM two school boys just before Plaintiff opened his window "We don't stop him." 8:37PM men in building's corridor "We can't forgive him." "We stopped. We all stopped." "Take a shower." Plaintiff was preparing to take shower after returning home.

1425.    9/13/2023 Wednesday, 12:01PM Plaintiff's eyes irritated, Plaintiff detected 360 V/m at his left cheek. Student came near Plaintiff's windows "Having to stop." 1:53PM another Lomo client "Trying to stop." "Fight." 10:47PM person on speaker in a car parked under Plaintiff's windows on Red Road "Kalin arrest. Stop []."

1426.    9/14/2023 Thursday, 8:47AM Ralph stated in B2 "Have to stop. " 8:48AM "Can't stop." "Kalin stop." 8:49AM "We have police stop." 8:50AM "New York.." 8:52AM "Kalin [] stop…" 8:53AM "Won't stop. Let Kalin believe." 8:54AM Dula "Let Kalin believe. We want []. We pushed a lot. May be []." 8:55AM "FBI []… Kalin give. Kalin will going to stop." 9:42AM two men talked near the windows – voices similar to the voices a bit earlier in ap.B2 "Figure how to stop. Kalin []." Plaintiff made a video. In response "Get him."

1427.    9/16/2023 Saturday, 9:50AM Defendants' man in B2 commented "Have to stop."

1428.    9/17/2023 Sunday, 10:03AM Defendants awakened Plaintiff with laser-focused rays. Man in B2 as if on record played "Kalin believe. Can not stop []. Completely stop… We lost."10:31AM after walking in B2 man in B2 "Kalin to stop." 10:33AM man in building's corridor "Tell the police to stop."

1429.   9/21/2023 Thursday, 10:12AM Defendants' man in building's corridor talked "have to stop." and "goa fantasy to win". Leah A3 left. When Plaintiff looked in the corridor - multiple card boxes near A3's door. When Plaintiff returned inside Defendants commented that he is "tracking people."

1430.   9/22/2023 Friday, 11:51AM Defendants awakened Plaintiff again with short very strong rays, multiple knocks, dragging noise, and he detected at his hands about 650-756 V/m, about 740 V/m on his right forearm. While Plaintiff was scanning man in B2 commented "He can't believe we stopped."

1431.   9/26/2023 Tuesday, 10:59AM louder hammering from B2 – about 20 hits. Defendants' man in B2 commented "Got to stop… believing []." 3:38PM while Plaintiff was working on recordings for the case a loud pipe bang, students came under his windows "Stop." "Kalin …"

1432.   9/27/2023 Wednesday, 10:35AM Plaintiff looked materials from Brennan Center of Justice for FBI and CVE. Dula in B2 commented "Kalin [] FBI did []… Have to stop." 10:36AM "FBI stopped. Really."

1433.   9/28/2023 Thursday, 5:42PM USPS carrier in building's corridor again talked about Plaintiff ("Kalin") and then near the windows outside "Got to stop." 9:07PM Dula commented "He wants to stop." and about "firearms. That could bring respect." 9:11PM "Can't harass… Can't stop… Kalin stopped." later "We push.. I don't believe. Kalin won't forget. Tell Kalin … Bulgarian []…. Arrest." While Plaintiff was in toilet B2 continued ("Kalin" … "stop").

1434.   9/29/2023 Friday, 11:44AM Plaintiff was making a video of red spots and swellings in his restroom while Defendants came under his windows and commented: "They can forget arrest." "You got to stop."

1435.   9/30/2023 Saturday, 10:27AM detected 984 V/m at his back, A tinnitus ongoing. While Plaintiff was in toilet a kid shouted at some distance "You have to stop."

1436.   10/2/2023 Monday, 3:19PM students under Plaintiff's windows "You want to stop." "You []." Plaintiff had not worked on his case till then.

1437.   10/3/2023 Tuesday, 12:50AM Defendants' man talked in building corridor how "to stop Kalin." but stopped after Plaintiff started Olympus. In the morning at 9:04AM a blower near Plaintiff's windows awakened him, in combination with focused pressure at his right thigh. Defendants' man in B2 warned "Have to stop." Plaintiff didn't work on his case that day. At 3:33PM students came under Plaintiff's windows and teased "We stopped him. Really."

1438.   10/4/2023 Wednesday, 11:21PM and earlier Defendants' persons in front of the pub on Cedar lane (earshot distance) "Kalin wants to stop." Then Thai woman talked under Plaintiff's windows on Red Road. Defendants' patrolled under the windows, a man lied on the meadow but got up when Plaintiff prepared to make a photo.

1439.   10/8/2023 Sunday, after Plaintiff made the previous note focused ray targeted his left knee. Defendants commented "Have to stop. He can't []." 8:09AM man in B2 commented "Kalin lost." mentioned "police". 8:11AM man in B2 "Stop FBI…" monologue on recording? This practice of morning monologues started regularly since about a month ago

1440.   10/17/2023 Tuesday, 12:57PM THS students came under Plaintiff's windows and talked "Kalin stop".. "unprotected"… "Exactly. Exactly."

1441.   10/20/2023 Friday, about 2:30PM Defendants' woman came near Plaintiff's windows on Cedar lane "You have to stop." At 4:50PM when Plaintiff started working in handwritten on privacy cases. Defendants in B2 dragged something above him, and a bit later Dula in B2 "Can't talk." She walked heavily above Plaintiff. "We believed he stopped." 5:02PM, 5:07PM loud pipe bangs. 5:22PM Dula in B2 "… that he might stop." Again dragging noise from B2. 5:30PM Dula in building corridor "See how he will respond to that." She entered

B2 "Bulgarian…" 11:45PM Plaintiff worked on 9/28/2023 recording-transcript when Dula and Defendants' man in B2 talked "Stop.."

1442.   10/21/2023 Saturday, 11:02AM Plaintiff scanned for DE. 11:14AM Dula in ap. B2 "He never stops." Defendants in B2 hammered on Plaintiff's ceiling – more frequently than usual.

1443.   10/22/2023 Sunday, 10:01AM Plaintiff was scanning when Defendants' man in B2 commented "He never stops."

1444.   10/23/2023 Monday, about 9:00AM Defendants awakened Plaintiff with focused pushes at his heart from ap.G2 direction, electric shocks and pressure. While Plaintiff was scanning Defendants in B2 talked "Can't stop… He didn't stop.." About 11:05AM 3-4 sharp knocks above Plaintiff, then Defendants man "Fight to stop." The man got outside the building, but when Plaintiff made a video he immediately entered the building again. 11:11PM in ap.B2 "We stopped.." 11:16PM "Fucking []. Stop it." 11:18PM dragging and rolling noise from B2.

1445.   10/24/2023 Tuesday, about 12:35AM Plaintiff was working in handwritten on first amendment right to record police in public areas, right after that Defendants' man in B2 commented "He is allowed to record." 1:36AM Defendants man in B2 "We could have stopped them."

1446.   12/5/2023, about 8:14AM Defendants in B2 hammered on Plaintiff's ceiling. "Have to stop him."

1447.   1/3/2024, about 12:52PM after Plaintiff scannap.ed Defendants' woman commented under the windows "assuming he will not stop..." 12:54PM students came under Plaintiff's windows and commented he "Have to stop." "Got the middle man."

1448.   1/4/2024, 7:28PM woman commented under windows while Plaintiff was watching Pod save America "Kalin stopped." For two days Plaintiff did not work on his case. He played online most of the day. 8:02PM Ralph and others were very loud in building corridor. Plaintiff reacted. 8:14PM they again were very loud, talking about Plaintiff "Kalin"… "They didn't expect Kalin will stop on his own." Later getting upstairs one of them "I can't believe it."

1449.   1/6/2024, 7:47PM Defendants talking on speakers in B2 "Completely lost… Stop…" "Bulgarian stopped…" "We lost."

1450.   1/8/2024, since about 10:45AM while other Defendants quietly commented Ralph and Defendants' woman talked loud in building corridor. "How do (you prepare) to stop?"… "Don't stop." "Can't stop. Arrest." … "Get him non-stop.".. "You pass to Kalin." "Non stop we harass." Transcript of 240108_0739.mp3 11:02PM Plaintiff was working on timeline of events and FOIA requests man in B2 commented "We have to stop (him)." 11:32PM hammering from B2 on the ceiling.

1451.   1/9/2024, 12:32AM Defendants' man in B2 talked about Plaintiff "Kalin [] to stop []." 12:52AM same(?) man talked in ap.G2 "to stop"… 12:56AM "Kalin"

1452.   1/11/2024, 1:45PM hammering from Defendants in B2. 2:13PM hammering from B2 again. Defendants' man in B2 commented "He don't stop." 2:20PM Dula and a man on speaker in B2 "Kalin.." In building's corridor Ralph and Lazarius (not correct name) talking. 2:24PM Ralph "They got to do what they got to do. .. Police shut the []."

1453.   1/12/2024, 1:29AM Thai-woman yelling under Plaintiff's windows on Red Road "Fight.. harass … to stop…" Man commented "Have to stop." 3:29PM Plaintiff was working on threat assessment materials students? came under his windows on Cedar lane "Not afraid." "[] to stop."

1454.   1/14/2024, 7:41PM Defendants came under Plaintiff' windows on Cedar lane "How we get stop?"

1455.   1/16/2024, about 12:30PM students came under Plaintiff's windows. While he was in restroom one screamed, others commented "Don't. They []." The group returned under the

windows threw snowballs at the corner. Plaintiff put camera on the windows. Students commented "to stop" "Don't stay." 12:45PM.

1456. 1/17/2024 at about 9:00AM talk in B2 "Can't hear it. We stopped." "Can't believe."

1457. 1/19/2024, 9:57AM Defendants awakened Plaintiff with hammering on his ceiling from B2, dry eyes. Plaintiff detected at his eyes 923 V/m. And earlier 34419 mW/m2 was detected. B2 commented "Have to stop." About 10:02AM hammering while Plaintiff was in restroom.

1458. 1/21/2024, 10:39AM talking in ap.G2 about Plaintiff "Kalin didn't stop. " "Thinks of us as an investment. Million dollars. Think of it as a long-term investment. Follow the money." .. "He spend all day on computer" … "Kalin [] . Can't stay."

1459. 2/4/2024, about 7AM after Plaintiff worked on police materials till 6:39AM Defendants in B2 continuous talking repeating a few times "stop".

1460. 2/8/2024, 11:35AM school boy was loud only under Plaintiff's windows on Red Road "We all stop."

1461. 2/9/2024, 3:09AM Plaintiff was working on EMF logs and emails when Defendants man on Cedar lane under the windows teased "Why don't just stop? Stop."6:06PM Plaintiff was working on investigation when Dula in B2 repeated exactly what Plaintiff was writing then "push, press…" then talked about "harass[ment]". 6:31PM Dula "He… to stop." and hit the Plaintiff's ceiling.

1462. 2/12/2024, 6:49PM after Plaintiff moved his camera from the windows and continued playing online Defendants' man under his windows "Stop playing. Stop doing that."

1463. 2/13/2024, about 6:08PM Defendants men, one of them Holy Name guard talked in building's corridor "He stopped." Plaintiff has not worked on the case since the previous day.

1464. 2/15/2024, about 2AM while Plaintiff was working on advertising materials Defendants I G2 commented "to stop". About 9:10AM Defendants in B2 hammered on Plaintiff's ceiling. While Plaintiff scanned for DE Defendants in B2 seems playing audio record on speaker "Completely stop."

1465. 2/16/2024, 10:59AM Plaintiff detected 9-16 V/m on the floor behind desk varying. In front of the mirror floor was charged 41-50 V/m varying, 2 cm up 24-36 V/m varying. In front of the wardrobe floor was 45-50 V/m, 2 cm up 24-36 V/m varying. Wardrobe's door near floor was charged 34-46 V/m, and about 60 cm up – 53 V/m. Defendants' man in B2 commented "He didn't stop." About 11:50AM students under Plaintiff's windows on Cedar lane talked "How do you fight that?"

1466. 2/17/2024, 10AM-10:20AM Defendants in B2 again playing on loudspeaker messages among other "Can't stop. Don't believe." 10:59AM Plaintiff was scanning when Defendants in B2 commented "he didn't stop."

1467. 2/19/2024, 8:53PM Plaintiff was still working on legal cases when Dula in B2 commented "Can't stop." 9:04PM B2 after dragging something above Plaintiff "Don't stop."

1468. 2/21/2024, 8:48PM Dula on recording played on loudspeakers in B2 "FBI… Didn't stop. … Can't harass now."

1469. 2/24/2024, 1:10AM Defendants men yelling under Plaintiff's windows in Spanish. Finished with "We won't stop." 7:49AM awakened by strong knock on the ceiling from Defendants in B2. Since then started for about an hour playing on loudspeaker in B2 "Can't stop. .. Can't believe… Have to stop… Kalin…" Also there were strong knocks from B2 on Plaintiff's ceiling above his corridor.

1470. 2/25/2024, 10:06AM Dula on speaker in B2 "Bulgarian… Can not stop. Do you []? They stopped. You can't believe."

1471.   3/2/2024, 11:20AM Cesar Naranjo, super, talked about Plaintiff ("Kalin") not loud talking "to make him stop." Mixed English and Spanish. 7:07PM Defendants in ap. B2 hammered on Plaintiff's ceiling. Three serials. Defendants' man in B2 talked about "[] to stop."

1472.   3/3/2024, 3:45AM Plaintiff was playing online when Defendants man in G2 commented "He'll never stop."

1473.   3/5/2024, 11:08AM while Plaintiff was working on security video loud drilling noise started near Plaintiff's windows. Men talked next to white van "Can't stop. Kalin survey." Followed knocks in building's corridor. 8:48PM "Why they don't stop doing this? We moved. Stopped." 8:50PM Defendants in ap. B2 hammered on Plaintiff's ceiling. Not loud. 8:51PM B2 "He doesn't stop monitoring." Plaintiff challenged inside his apartment "You are crazy. Speaking on loudspeakers and saying simultaneously you stopped, and you will never stop." Talking in B2 stopped.

1474.   3/6/2024 – see above.

1475.   3/7/2024, 8:21AM Plaintiff was scanning when Defendants man on loudspeakers again "Can't stop… Kalin believe…" 9:20AM Defendants man talking loud on Cedar lane under Plaintiff's windows "Can't arrest. Won't stop." He went to the buss stop. Garbage truck with running engine parked under the windows. About 3:30PM students talked under Plaintiff's windows "Kalin… blackmail." And at 3:36PM "He has to stop."

1476.   3/12/2024, 1:33PM Defendants woman in A3 (or B2 talking above A3) talked not loud "Can't believe… to stop." Then talked about the "FBI". Then at 1:35PM "Kalin… Can't (harass)."4:40PM earlier students under the windows talked "Have to stop." USPS carrier in corridor commented "He doesn't care." 4:45PM USPS came under the windows talking "We really want to stop." Plaintiff made photos – two USPS carriers – one the regular Indian woman who pointed at Plaintiff when he got to his windows.. "He has to stop." 4:56PM Defendants woman on speaker under the windows "He got to stop."

1477.   3/14/2024, 9:25AM Defendants banged loud. "Have to stay… Kalin… Have to stop." 10:13PM Defendants in ap.B2 "Kalin… stop…"

1478.   3/18/2024, 11:20AM while Plaintiff was scanning Defendants' man in ap. B2 on loudspeaker "Stop... Kalin []."

1479.   3/19/2024, after Plaintiff scanned a student came under his window and yelled "Stop." 6:14PM while Plaintiff was working on a letter to relevant experts and reading materials Defendants man and woman talked in building's corridor "We need to push back." When Plaintiff moved Olympus in his corridor talking stopped. Then at about 6:25PM "They stopped."8:20PM Defendants man in ap. B2 not loud "He won't stop." 8:24PM again "Won't stop."

1480.   3/20/2024, 6:12PM a woman with a kid on Cedar lane under Plaintiff's windows "That guy has to stop." 6:20PM Defendants' man in building's corridor "He has to stop."

1481.   3/24/2024, about 8:25AM while Plaintiff was making photos Defendants' man in B2 "He has to stop." And a man under his windows commented "Can't crush." and entered a car parked under Plaintiff's windows.

1482.   3/27/2024, 2:30AM different than the usual man in B2 "Stop." When Plaintiff started Olympus he stopped talking.

1483.   3/30/2024, 5:51PM Defendants man in ap.B2 "He has to believe we stopped."

1484.   3/31/2024, till 12:16AM Plaintiff worked on surveillance materials. About 12:18AM Defendants in B2 "We stopped.' 12:30AM Defendants man under Plaintiff's windows "He didn't prove that." Then men in front of the pub on Cedar lane "Kalin..."

1485.   4/1/2024, 7PM Defendants in building's corridor "We have to stop that man." Plaintiff started Olympus "I could do that here or I could do that home. Prove." 7:50PM the same man

returned under Plaintiff's windows "You have to stop." 8:02PM Dula in building's corridor "Psycho… Won't stopping.." Plaintiff started Olympus she stopped talking for a while. Then "Not stopping the United States..."

1486.  4/5/2024, 4:12AM after not loud knock on Plaintiff's floor Defendants' woman in ap. G2 "[] to stop."

1487.  4/6/2024, after Plaintiff scanned for DE and made photos of swellings due to DE attacks at 11:25AM Dula in ap.B2 commented "Kalin didn't perceive.. .didn't stop."

1488.  4/8/2024, 1:54AM while Plaintiff was playing chess online Defendants man under his windows on Cedar lane "How to set him up to stop?"

1489.  4/9/2024, 11:13PM Defendants (one of them Lea from ap.A3) talking in building in corridor "Kalin won't stop." Woman on speaker "We are the people. How we arrest that..?"

1490.  4/10/2024, 11:09AM while Plaintiff was writing the previous note Lea, ap. A3 talked in building's corridor "Have to stop. They call New York.." Plaintiff started audio recording on his phone Fusion Z, she stopped talking and entered ap.A3 quietly.

1491.  4/15/2024, 6:58AM Defendants' Gerardo Rosell, supposedly from ap. A1, talked in the building's corridor "We want to stop."11:40AM three school boys talked under Plaintiff's windows "Have to stop that. How to stop… I stopped TU. They moved away." Later students "Kalin…" (11:50AM), 12:18PM students talked under Plaintiff's windows "Stop. Consider it done."

1492.  4/17/2024, 11:49AM Students talked "Stop… [] to stop." Stayed talking under the windows for a while.

1493.  4/20/2024, 8:38PM after talking in building's corridor Dula entered B2 and continued talking "We stopped."

1494.  4/23/2024, 7:01PM when Plaintiff started working on criminology Defendants in ap. G2 responded "How we can stop him?" Defendants man in G2 "He didn't believe."

1495.  4/24/2024, 1:03PM while Plaintiff was in toilet Defendants' woman under the window "We are trying to stop."

1496.  4/26/2024, 1:12PM students returned under the windows talking about "the role they have." "Like a shadow." They threw a rock under Plaintiff's windows. (see more about the incident at 56). After Defendants woman talked to them they left saying "Have to stop this fight." The Holy Name neighbor sat in front of the entrance at that time. Plaintiff called police and talked till about 2PM with the officer. He filed a report Case # 24-031055. 2:05PM Defendants women talked near Plaintiff's windows "We got to stop."

1497.  4/27/2024, 11:35AM Defendants' man on Cedar lane under Plaintiff's windows "Have to stop."

1498.  4/28/2024, 10:53AM after Plaintiff scanned Defendants' Dula in B2 commented "Have to stop. Can't touch him…. Kalin … "

1499.  4/30/2024 – see above.

1500.  5/1/2024, 10:54AM while Plaintiff was scanning Defendants' Dula and man in ap. B2 commented "Can't stop." and knocked on Plaintiff's ceiling. 11:04AM they kept talking. "…to stop." "Have to stop?" 8:12PM when Plaintiff got back home Defendants man in G2 "We didn't stop Kalin." Talking in G2 continued – record playing monologue most probably.

1501.  5/3/2024, about 9:14PM Defendants' Dula in B2 "We stopped."

1502.  5/6/2024, 12:22AM Defendants in ap. B2 hammered on Plaintiff's ceiling while he was working on crowd sourcing. Man in ap. B2 commented "He didn't stop."

1503.  5/7/2024, 3:39PM and 3:41PM Defendants in ap. B2 hammered again. Dula in B2 talked "He won't stop. New York…" 3:43PM "...police.." 3:45PM B2 knocked on ceiling again,

second serial stronger. Dula continued "And we don't provoke." 3:46PM strong knock on the ceiling.

1504. 5/10/2024, after Plaintiff downloaded materials about electric stimulation and urticaria Plaintiff went to toilet. Defendants' woman commented under the window "Trying to stop us."

1505. 5/11/2024, 10:52PM Defendants in ap. B2 hammered on Plaintiff's ceiling three serials awakening him. Defendants' man on speaker in B2 commented "He didn't believe.. We harass. He wants [] to stop."

1506. 5/14/2024, 8:15PM Dula in building corridor "How to stop him?" She left the building, and while walking on Cedar lane talked about "spying."

1507. 5/16/2024, about 6:40AM Defendants awakened Plaintiff. Defendants man in ap. B2 seems recorded "Let Kalin pursue it… We did stop." 4:50PM when Plaintiff was writing about court assigning of a Judge to Plaintiff's case against Gyro in 2018 school girl on Cedar lane under the windows "May be they knew we are fighting him." 4:56PM Defendants man in building corridor "May be should stop digging. Stop."

1508. 5/17/2024, 11:45AM school boy very loud under Plaintiff's windows "Stop. They lost." 7:51PM woman under Plaintiff's windows talked about him "Kalin", and threw/kicked a rock. 8:09PM again a woman under the windows talking about "to stop" Plaintiff. 8:21PM Defendants man in building corridor again talked with a woman on speaker "I can't believe we stopped." "Let Kalin []." Plaintiff was playing online. 8:50PM Dula in B2 "You don't want to stop." After Plaintiff moved Olympus closer "I've got to work all these years…" Defendants threw pebble at Plaintiff's windows on Cedar lane. 8:55PM Dula "He wants to stop."10:27PM Defendants' woman near Plaintiff's windows "No. I am all right. Stop the animal." She crossed Cedar lane and went into the pub on Cedar lane.

1509. 5/20/2024, 12:38AM Dula in B2 "We have to punish. We stopped." 3:13AM Plaintiff looks at undercover materials. Defendants man in B2 "Don't stop that." 9:50PM Defendants men "Do you need backup?" when Plaintiff got in front of his building entrance. "They want to stop." "Can't harass… hang himself."

1510. 5/21/2024, 10:23PM while Plaintiff was working on injunction Defendants man returned under his windows "You have to stop."

1511. 5/22/2024, about 11:50PM students talked near Plaintiff's windows at some distance on Cedar lane "You have to stop." "You are lawyer."

1512. 5/23/2024, 1:04PM Defendants man at Jamaican food truck talked while Plaintiff was playing online "He believe we don't game." Defendants woman in building corridor "Have to stop tracking." After Plaintiff started Olympus she stopped talking and left. The man returned to Jamaican food talked "Stop."

1513. 5/24/2024, 8:16AM a group of uniform and plain clothes officers, Teaneck police stopped for a while at the corner of Cedar lane and Red Road – next to Plaintiff's windows talking "How to stop this?" "Have to stop." "… arrest…" Woman "People have to stop (him)." "Kalin…" Plain clothes officer crossed repeatedly Cedar lane – again doing traffic sting under Plaintiff's windows. 10:19AM while Plaintiff was working on case-relevant recording Dula in ap.B2 commented "Have to stop that. We lost." Later Plaintiff was walking toward Aldi Hackensack, when he got in front of Teaneck cinemas young man and two women suddenly started shouting "Stop. Stop."

1514. 5/25/2024, 11:34AM Defendants man at distance "I can't believe we can't stop him." Only delivery man in view. 12:33PM Defendants in ap. B2 hammered on Plaintiff's ceiling while he was on Skype with relatives. 2:12PM Defendants woman under Plaintiff's windows "Have to stop." A woman on speaker talked about Plaintiff "Kalin". While Plaintiff worked

in handwritten next to Rocklins at about 5:40PM two Defendants women came, sat on a bench next to Plaintiff's and repeatedly talked about "stop". A man joined them commented "He is just looking at the computer."

1515.   5/27/2024, 8:35AM Dula in B2 "We lost. Stop." 8:52AM Defendants in ap. B2 hammered on Plaintiff's ceiling. 11:50AM Defendants man in ap. B2 "Completely stopped."About 8:25PM while Plaintiff was in toilet Defendants woman said near him "You have got to stop. You are fucked up." Two women talked about Plaintiff "Kalin..."

1516.   5/29/2024, in Votee Park Defendants woman, man and girl talked loud to "pick a place he visits many times and do it to stop him." They returned next to Plaintiff. Than for the third time got next to Plaintiff, but only the woman and a girl that time talking "to sue.."

1517.   5/31/2024, 6:18PM Defendants posing as clients to Lomo (food truck next to Plaintiff's windows) shouted "They set up." 6:22PM "May be Kalin wants to settle." 6:23PM "Really can't press." 6:36PM "Kalin..." 6:39PM they continued loud "Stop." then not loud "Can't believe." "The entire station…"

1518.   6/6/2024, 1:15PM students came under Plaintiff's windows "We stopped. We stopped." "Can't believe." "Oh my god." Person entered ap. A1 at 1:17PM. 2:24PM Defendants at Jamaican food truck talking laud with Christine "That guy over there start complaining." After Plaintiff stopped his TV she talked about 'stopping' then about enjoying France.

1519.   6/8/2024, 4:38PM mother shouted at kids near Plaintiff, and after that no more shouting. She commented "Have to stop" not loud.

1520.   6/9/2024, till about 9:10PM Plaintiff worked on transcript on bench next to Teaneck High School. Two Defendants men talked about him behind bushes "Have to stop Kalin."

1521.   6/10/2024, about 11AM while Plaintiff was in toilet Defendants' man from ap. B2 (?) came under the windows "Have to stop." another man "No power." 7:39PM Defendants' group (Ralph was one of them) talked in building corridor "Cannot stop Kalin." "Ha, ha, ha.." Plaintiff stopped his TV and started Olympus recording. They kept talked about him ("Kalin"), a person on speaker also talked about him – "Kalin..." but were not loud anymore. Followed a slam.

1522.   6/11/2024, about 1:10PM the students returned under the windows and stayed for about 5 minutes provoking. "Recording? Hope he got high quality." When they were leaving "We didn't stop."

1523.   6/12/2024, 2:25PM when Plaintiff was working on EF above his floor Defendants men talked about Plaintiff under his windows "Kalin.. Can not stop him." 3:06PM Defendants women at distance from the windows "Kalin… We have to stop."

1524.   6/13/2024, 8:46PM Defendants woman on Cedar lane under Plaintiff's windows "Can't stop." When Plaintiff went to look through his window thru turned on Rd Road and talked in mix Spanish-English "putta… on the street."8:57PM near Plaintiff's windows girls/women commented "He didn't believe." 8:59PM Defendants man in ap. A6 "Kalin stopped that." About 9:08PM Defendants' man on Red Road "Pussy."

1525.   6/14/2024, 4:44PM Defendants' women at Jamaican food "Stop." 4:51PM Defendants man in ap. A6 "Don't stop." and laughed very loud. When Plaintiff was starting Olympus he left the building. The man at Jamaican food was also laughing at the same time. 5:30PM "[] to stop." 11:19PM Defendants woman "Can't stop. Kalin []." 11:20PM "Kalin never (stops)." 11:53PM Defendants "Stop. Get over it."

1526.   6/19/2024, 12:17PM While Plaintiff was scanning five Defendants men as clients of Yola "[] wants to stop." While Plaintiff was walking toward the Dental center they called him two times but he missed the calls. Plaintiff got to the center, while waiting for hour(s) staff commented "Kalin is waiting. We couldn't stop him." Dr. Malouhi spent one minute, knew

what's the problem repeating what Plaintiff told his parents – tooth was cut in the filling preparation "too deep". She said "I'll not make you suffer more. Root canal." The Dental center recommended Dr. maria Rozenblum, endodontist – Plaintiff had painful history with her – see 2019. After the visit Plaintiff went to CVS on Cedar lane near his apartment. The pharmacists looked at the screen and commented "Just to disrupt" before giving him medicine.

1527.   6/20/2024, 11:52PM Defendants' man in apartment near Plaintiff's "Trying to stop that."11:53PM loud noise and slam again.

1528.   6/21/2024, 3:48PM again Defendants' man in apartment near Plaintiff "Tell Kalin stop." 5:28PM Defendants man near Plaintiff's windows "Can not stop him." "Activated.."7:28PM Defendants woman on Cedar lane under Plaintiff's windows "If you want [] you got to stop."

1529.   6/22/2024, 12:06AM Defendants' woman in front of the pub "We could not suppress.." 12:23AM (same?) woman "He is a gay." 1:11AM Defendants' woman "How to make him stop? [] arrest." Plaintiff worked on NYPD and JTTF materials till 1:53AM with some pauses. 2:36AM woman "Having Kalin to stop.." 3:18AM Defendants in front of the pub "Kalin to stop.." "I don't know." 3:25AM "Fight."

1530.   6/23/2024, 6:57PM while Plaintiff was working on EF from ap. B2 in 2022 Defendants woman on Cedar lane under Plaintiff's windows "Have to stop that."

1531.   6/24/2024, 6:08PM Defendants' Ralph and a woman talked in building corridor. "We should have stopped earlier." After Plaintiff started Olympus they moved out. Defendants Dula in ap. B2 "You should stop that." After Plaintiff started Olympus again she continued "Really stop."

1532.   6/25/2024, 10:31AM Defendants' man in B2 "We have to stop []."

1533.   6/26/2024, 11:54AM Defendants' men "Can't stop." And when they git under the windows "It's time to stop."

1534.   6/27/2024, about 9:10PM Cesar talked under Plaintiff's windows "They really stopped."

1535.   6/28/2024, about 11AM Defendants' woman on speaker "Can't stop… Harass." from Yola (food truck replacing Lomo) direction. After Plaintiff started Tascam DR 07 talking stopped.

1536.   6/29/2024, about 9:20PM Defendants' man under Plaintiff's windows "I want you to stop."

1537.   6/30/2024, 6:50PM while Plaintiff was in toilet Defendants man near his window "We have to stop that. Harass. Have to stop."

1538.   7/1/2024, 5:03PM Plaintiff did not respond to the knocks and Defendants commented "Can't believe he stopped." 6:57PM after strong knock on Plaintiff's floor from Defendants in G2 Plaintiff reacted "Please stop knocking." Defendants came under his windows and responded not loud "Have to stop." 8:53PM Defendants' man from ap. A6 "Can't stop him." "Definitely going to vote for Biden." "Can't punish." He knocked.

1539.   7/2/2024, 2PM Defendants' men at Yola food truck next to Plaintiff's windows "We really have no budget." "He have to stop."

1540.   7/6/2024, 10:51PM Defendants' women in front of the pub talked about Plaintiff "We have to stop (him). Punish." "To stop." 10:54PM "Kalin.. Have to push."

1541.   7/7/2024, 1:31AM while Plaintiff was working on First Amendment materials with aluminum plate over himself Defendants men in front of the pub on Cedar lane "Have to stop." "Ha, ha, ha.." 5:58PM the man continued "Got to stop."

1542.   7/8/2024, 10:59PM Defendants' woman on Cedar lane under Plaintiff's windows "Kalin stop."11:30PM Plaintiff got on Broad street and worked on Nuisance but sitting on the grass as there were 2 girls on the benches where he usually works. And it is related to the street light for his keyboard. 11:37PM the girls they talked quietly about Plaintiff "Kalin.. can't

harass." 11:40PM a bit louder " bullet…" "Kalin didn't [] stop. Bye, bye." 11:41PM "I…
stop." "Won't stop." 11:53PM "Kalin…" 11:54PM "All Teaneck is soo []. Soo []. Kalin ..."

1543.  7/9/2024, 12:29AM the 2 girls were still on benches on Broad Str. In front of Jewish Center
Teaneck, still talking "Kalin won't stop." Later Defendants under Plaintiff's windows "They
will never stop." 8:37PM Defendants woman under Plaintiff's windows "Can't stop… Why
we even []?" When Plaintiff started a video recording she moved away commenting "Fucked
up." 9:27PM Defendants' woman in building corridor commented "That didn't worked."

1544.  7/11/2024, about 11:47AM school boys and girls came under Plaintiff's windows talking
"Have to stop." "Kalin…"

1545.  7/13/2024, 10:40AM Dula talked on speaker in B2 ongoing monologue "Can't harass."
10:49AM "To stop… He didn't believe." 10:48AM "We lost. Can't believe." 11:05AM after
Plaintiff stated date and time for the record Defendants woman with a kid under Plaintiff's
windows commented "Can not stop."11:21AM Defendants in B2 not loud "Completely out
of character. Kalin…" Defendants' man under Plaintiff's windows "Stop there and harass."
11:23AM the woman "Can not fight." 11:25AM men "Stop. Have to believe." "Stop" and
"believe" were repeated a few times. About 7PM when Plaintiff stopped his shower
Defendants man under his window commented "Stop… Die []. Area…"

1546.  7/16/2024, 3:36PM-4:16PM the scheduled for the same day Best Pest's visit to sanitize the
building. The super Cesar Naranjo and the other parties talked near Plaintiff's apartment
about him before, during and after the terminators' visit in his apartment mentioning the
"FBI", the "agents", talked about "caus[ing] disruption", and made explicit statements that
they "harass" Plaintiff (apart from naming him, they referred to him as "Bulgarian" and
"fagot"). "How do you want arrest?"… "Press Kalin (they) have to arrest him." ... "They
have to give him to stop.".. "He must be stopped." They knocked loud on Plaintiff's door
repeatedly – first the super, then the two terminators one after another – demonstration of the
special treatment Plaintiff received as he didn't hear such repeated and loud knocks on any
other apartment's door but for his own.

1547.  7/17/2024, 2:30AM while Plaintiff was working on transcript of recording from the previous
day Defendants' man at distance commented "Can't stop."

1548.  7/20/2024, 11:32AM after Plaintiff scanned Defendants in B2 not loud "He won't stop."

1549.  7/22/2024, 2:33PM after Plaintiff stopped working on transcript of 7/16/2016 he worked on
draft of an email to JC Realty – noise complaint against Defendants in ap.A1. Ralph came
under his windows and said "Stop." 5:28PM Ralph talked in building corridor "He don't
stop." Plaintiff started Olympus. Ralph and women (one was a girl?) continued "Can't
continue." "We stopped." They got out and returned inside quietly.

1550.  7/23/2024, 10:29AM Defendants' man with a kid in cart talked under Plaintiffs windows
"How to destroy?" 2:06PM women/girls under windows "Stop. Stop. Stop." "How to fight?"

1551.  7/25/2024, 1:34PM two men at Jamaican food truck talked loud "They want to stop." After
Plaintiff started Tascam DR07 they hid behind bushes. 1:38PM they did not stop talking.
"Everything stashed.. Crazy like []." "That guy [] to stop." 1:39PM when Plaintiff made
photos "Yea, can't push him." 1:41PM talking with woman at Jamaican food, taking the
order. Christina "What do I say?" "You don't say anything." 1:42PM instructions "Stay…"
Men stayed for a bit, then got in a car and left. 1:50PM another Defendants' man came at
Jamaican food with his back toward Plaintiff's windows (stayed that way for a while – an
awkward position, apparently to evade photos). "Have to stop." Christine "Have to leave."
"We don't organize him." Plaintiff did not saw him taking anything – no order – when he left
walking near the building, behind bushes. 2PM the man returned talking with a couple there
– still back toward Plaintiff. "How to fight him?" "We are hostages." he hid again.

1552.   7/29/2024, about 4:45PM Plaintiff was working on legal argument when Defendants' woman "We have to stop." … "Kalin"

1553.   8/1/2024, about 2:50PM Defendants' woman passed under Plaintiff's windows playing on speaker "We have to stop that."

1554.   8/2/2024, about 8:45PM Defendants' man in B2 "Completely stopped."

1555.   8/5/2024, 8:30PM Defendants' man talked next to a car parked on Red Road "We can't stop him."

1556.   8/7/2024, 8:16AM again. Plaintiff was working on FBI materials when Defendants in B2 commented "Can't believe.. Can't stop.."8:34AM the man in B2 moved right above Plaintiff "Can't believe."

1557.   8/11/2024, 11:26AM Dula(?) in ap. B2 sounding as on loudspeakers "Completely stop that. Harass..."

1558.   8/14/2024, 11:52AM truck loud puff. Drilling noise. Defendants' woman on Cedar lane near the windows "How to stop him?" "May be he will self-(disrupt)." Plaintiff got next to Provident bank, Cedar lane, Teaneck, NJ. People on each bench. 2:44PM woman on speaker continued "Police will have him stop." 2:45PM "Kalin.. police … take advantage." Fusion video. 2:51PM Defendants left the bench and Plaintiff moved to that bench. There was a young woman sitting. She also left.

1559.   8/16/2024, 8:29AM Defendants in ap. B2 hammered on Plaintiff's ceiling. Not loud. 8:34AM Defendants man in ap. B2 "Have to push. Completely stop the []." 10:05PM Defendants man under Plaintiffs windows "We stopped."

1560.   8/17/2024, 2:47PM Defendants' men in front of the building entrance "He wants them to stop." "He won't believe them." Plaintiff stopped TV, preparing to leave.

1561.   8/18/2024, in Votee Park, Teaneck while Plaintiff was working at 4:28PM the same group from 2:50PM passed Plaintiff again, stopped and stayed nearby on the grass next to the alley. A few minutes after Plaintiff wrote the previous sentence as note in his Chromebook – a man from the group responded loud "Yes, we stopped."

1562.   8/20/2024, Plaintiff stopped working on JTTF materials (about 5:12PM). At 6:05PM a schoolboy came under his windows on Cedar lane and talked "[] to stop."

1563.   8/21/2024, 3:09PM Defendants' woman at Jamaican food truck talked about Plaintiff "Can't stop… Psych.." "Psych.. Kalin." "Spy. They had control." 3:15PM still talking "Bad Kalin. Bad." Then talked about the "big fight." 3:16PM "Fight Kalin. Can't stop." .. "Fight." 3:19PM Defendants' man was patrolling under Plaintiff's windows, when he passed for the second time he seemed to give instructions to set something "like Kalin did [that]." 3:20PM Christine from Jamaican food commented loud with Defendants' woman "Police can not even arrest him. All big bad." … "[] to stop." "Try to stop Kalin." 3:26PM Christine again "I went to control. I want to expand []." The patrolling man was leaving "[] to stop, right?" Later at 9:20PM while Plaintiff was working on JTTF materials Defendants came under Plaintiff's windows on Red Road and commented "Kalin gets it." 9:56PM man came on Cedar lane under windows and talked about "[] to stop."

1564.   8/22/2024 Thursday, 2:04PM Defendants' man near Plaintiff's windows "We have to push." Defendants in ap. B2 knocked while Plaintiff was writing the note. After Plaintiff scanned for DE he saw the man talking at Jamaican food truck. The man "Stop. Make love."

1565.   8/24/2024, 11:26AM Defendants' man was loud on the bus stop on Cedar lane nearby "[] to stop. We don't have to." Plaintiff was in toilet but got and started Tascam DR07. The man reduced significantly the loudness of his voice. This is the same man who was shirtless a few days ago, and talked to Plaintiff.

1566.    8/25/2024, Defendants' men talked not loud "You have to stop.".. "Disrespect… He will survive." "FBI…" 1:07PM "Fight." "He didn't fight." 1:08PM "How to stop?" 1:10PM "[] to stop." "Classified.." One of the man went to talk with persons in a car parked at the corner near Plaintiff's windows. After that talking continued but with reduced loudness till about 1:52PM when the whole group – 4 men left silently. Minutes later a Teaneck police car came, a woman went to talk with the officer. The car returned and parked on Cedar lane in front of Plaintiff's windows.

1567.    8/28/2024, about 8:10PM Plaintiff back in home in toilet when two school boys came under the windows "How do we stop him?" "We hate []." After that Plaintiff went again next to Providence bank on Cedar lane and worked on Administrative claims, addressing them to the FBI Headquarters. About 10:28PM group of high school boys yelled opposite to Plaintiff, then commented "No reaction." "We didn't threaten."

1568.    8/29/2024 (the day Plaintiff sent second Administrative claims to the FBI Headquarters) Defendants' Jason in ap. G2 talked all night. 2:30AM-2:37AM "Kalin… It's going national." "Kalin won't forget." Later 2:39AM "OK. I'll write a motion…" 2:48AM "See if we can push." 2:51AM "Shot over []." "Kalin hear.." 2:53AM "You report but []. Kalin won't stop. Rather dead then []. Shoot the fucker." Plaintiff went to Manhattan and sent the Administrative claims with USPS at the USPS office next to Metropolitan square Garden. While there Defendants talked about him "Kalin… Kalin…" Plaintiff went to S.D.N.Y. Records management and worked on dockets of civil rights cases till 2:39PM. For the first time security of the court building made no remarks in regards to Plaintiff. When he got in Records Management a staff member, a man inside talked about Plaintiff ("Kalin") as the "poor bastard" who "have to stop". While Plaintiff was still writing the previous note Defendants' man at Jamaican food truck was very loud for short period talking about the "bus". Plaintiff made photos as the man walked back and for the toward Plaintiff's windows – he was uniformed with marshal-like star on the chest. 6PM he kept talking "Kalin… police…" 6:07PM after woman (Christine?) talked about "harass[ment]", the man "Have to really stop." 7:06PM Christine, Jamaican food and Defendants' woman "We got to stop him. Every day []." "They are watching." "We got to push." Then talked loud about Trump and "border". Christine "Acting like a cop." About 9:30PM schoolboys came and shouted under Plaintiff's windows. "Oh, oh." Defendants in ap. G2 'drilled' for about 30 seconds. School boys "Come to fight. Fight this." "[] to stop." talking not loud further.

1569.    8/30/2024, 12:57PM after Plaintiff scanned for DE Defendants' man (Jason from ap. G2) under Plaintiff's windows "If you want to stop harassment []." 6:32PM again Defendants at Jamaican food "Can't stop…" 6:34PM "Police stopped.. police…" 6:37PM "Kalin fight…" 6:39PM "They want him straggle." 7:56PM Defendants' woman under Plaintiff's windows "Tell police to stop that." Same woman has been under windows a few times earlier. She entered the building after that.

1570.    8/31/2024, 7:52AM after awakened Plaintiff with DE attacks – strong pressure at head, burning on his hands he put there, Defendants' man under Plaintiff's windows talked at first in Spanish then not loud "Can't hear []." "Has to stop. Kalin…" Since about 10AM Defendants' man in B2 talked "Kalin…" He was still on at 11:27AM "We can't harass. .. to stop Kalin… Harass… to stop." 11:32AM he moved above Plaintiff's corridor. Between 3:30PM and 6:05PM Plaintiff took a bath, and during that Defendants talked near his windows "He has to stop." They entered the building after that. 8:38PM Defendants' men in building corridor "Police stopped." They repeated that louder. Plaintiff stopped his TV and started Olympus. One of them left. "I usually set []." 11:20PM Defendants came near

Plaintiff's windows on Cedar lane "Ha, ha.. To stop that. Have to stop." When Plaintiff looked through his windows they were not visible.

1571.  9/2/2024, Plaintiff saw in front of the entrance Ralph and Defendants' woman and started a video recording. When he passed them the woman said "Arrest stopped." Walking on Queen Ann a woman shouted at Plaintiff from a car passing by "[] Shot the fuck up." In Votee Park a group of schoolgirls waited for Plaintiff on the alley, and when he was getting close they talked "Get ready." Plaintiff started a video recording which seems ruined their set up, after he passed them one of them said not loud "Have to stop."

1572.  9/5/2024, 1:05PM Defendants in corridor said "They want to stop."

1573.  9/6/2024, 12:58PM students came under Plaintiff's windows, a boy "Kalin can't hear it." About 1:03PM "Fighting stopped." not loud on Cedar lane near the windows. About 1:17PM Defendants' man at Jamaican food truck from the windows "How Bulgarian stop this []?" .. "He doesn't believe."About 3:25PM the same man from 1:17PM returned. Christine said "We ended like this. We were trying to stop." 7:44PM Defendants man "How to push stop? [] suspect."

1574.  9/7/2024, 11PM Plaintiff was working on JTTF materials, when he heard and then saw Teaneck police officers talking with Defendants in ap. A1 "He has to stop."

1575.  9/9/2024, 3:46PM kicking rocks under the windows "Have to stop."

1576.  9/10/2024, 8:19AM Defendants in B2 talking on loudspeaker "Have to stop.." 11:23AM Defendants' woman "Stop… He didn't hear you."

1577.  9/11/2024, 12:10PM schoolboys came under the windows "To stop.."

1578.  9/11/2024, 3:40PM a uniformed Bergen Sheriff's deputy talked at the corner of Red Road and Cedar lane opposite to Plaintiff's windows walking back and forth "He can't continue." Plaintiff made photos from inside of his apartment, and the deputy commented "… compromised." 3:47PM he played on speaker "Trying to stop." and left walking on Cedar lane.

1579.  9/12/2024, 11:47AM the same boys from earlier for the third time came under the windows "to stop.." 1:46PM Defendants' man at Jamaican food truck loud "How to stop that?" 2:09PM the same man from 1:46PM again came near Plaintiff's windows loud "He got to stop… Fight." 2:11PM "Can't stop him… Jail." 2:13PM "Can push that on some level." Plaintiff stopped his TV.2:32PM another man "Responsive… Stop..."6:23PM Defendants at Jamaican food again "Can't we stop? What to do?" They returned again "Stop right now." 6:48PM Christine, Jamaican food, "Asking him to stop."

1580.  9/13/2024, 7:19PM Plaintiff just got back home, when in building corridor Defendants woman talked about the "fight", and "fighting". "Can not pretend. There is no way he will stop."

1581.  9/15/2024, 2:27PM when Plaintiff got next to Providence bank Defendants' 'homeless' man was there. Talked about "punishing" … "to stop." Plaintiff worked in handwritten on AG guidelines. 2:31AM the man "Survive that. A survivor.."

1582.  9/16/2024, 12:36PM Plaintiff sat to work in handwritten on AG guidelines next to Provident bank. Sheriff's car and two PSEG trucks there. After that they talked behind Plaintiff about the "assassination". "Can't stop."Till 6:20PM group of Teaneck police officers collected road cones from the parking lot of the Municipality and commented Plaintiff "He didn't stop."

1583.  9/17/2024, about 12:50PM Defendants in B2 hammered on Plaintiff's ceiling. The man in B2 "He has to stop."

1584.  9/18/2024, 5:47PM Plaintiff was working on DE report when Defendants' man on the alley shouted "Stop." next to him. When Plaintiff applauded the man waved to him.

1585.  9/19/2024, about 12:50PM Defendants man in ap. B2 "We lost. Can't stop."

1586.    9/23/2024, 11:41AM students "Have to stop." "We []."
1587.    9/26/2024, about 8:20AM Defendants' Dula entered ap.B2 talking "We have to stop."
8:26AM Defendants man in B2 "Kalin..." After Plaintiff started Olympus they stopped
talking. 11:57AM schoolgirls came "Fight Kalin. Have to stop."
1588.    9/27/2024, 3:21PM Christine, Jamaican food truck near the windows "You want to stop."
3:51PM schoolboy under Plaintiff's windows "We won't stop."
1589.    9/28/2024, 10:31AM Dula in B2 "We keep pressing.. He doesn't receive it. We got to stop
it…. To fight.." "He didn't []. Set up." About 10:40AM after Plaintiff flushed the toilet Dula
"We can't stop Kalin." 11:32AM he kept talking "Arrest him. But we won't stop." and at
11:33AM "Kalin..."
1590.    10/1/2024, 5:24PM after Plaintiff stopped working on a recording for the case Defendants'
man and woman in building corridor "Push. Stop that." "If we can't destroy it []."
1591.    10/3/2024, 2:39PM Dula in ap. B2 talking not loud "[] to stop. We lost.. Kalin …" Plaintiff
was playing chess online when at 3:17PM Christine, Jamaican food, was loud "How to play
[]? [] to stop." She was looking at Plaintiff staying at the door of food truck, when Plaintiff
got his camera she immediately got inside. About 4:55PM Defendants woman "They want
him to stop."
1592.    10/6/2024, Defendants in B2 talked. Dula "Kalin.." 9:55AM "We don't stop that." … "FBI to
stop… Can't harass." "Say Kalin… You say …" 9:58AM Dula "Kalin.." 9:59AM
Defendants man in B2 "Set up." 10AM Dula "Kalin set up []." 10:20AM Dula on
loudspeaker "Kalin to set up []. New York []." 10:23AM "We won't stop.. Arrest... "We lost
Kalin… We lost that." 10:33AM "New York []. Let Kalin stop." 10:34AM Dula "We don't
stop."10:36AM "Kalin… Stop fighting you man." 10:41AM Plaintiff detected 53-54 V/m on
the floor behind desk varying, 10 cm up 28-32 V/m varying. Dula in B2 "Trying to stop.
Kalin set []." Dula talking above the room then ".. to set arrest."
1593.    10/7/2024, about 8:20AM while Plaintiff was preparing to send his letter to the Attorney
General Dula "Can not stop him. .. police." 8:49AM Defendants man in B2 "Police stopped."
10:15AM garbage truck near the windows. Talking "Kalin… Stop." After Plaintiff started
Olympus talking switched to Spanish.
1594.    10/9/2024, 8:19AM B2 slammed. Defendants' man on loudspeaker in ap. B2 repeated "stop".
1595.    10/10/2024 (after Plaintiff sent emails with his letter to Attorney General to Brennan Center
for Justice, Human Rights Watch and more) at 1:55PM students came under Plaintiff's
windows and talked "case…" "But we stopped." They stayed at the corner of Cedar lane and
Red Road away from camera view. "I am sorry." "I don't care." "Don't blame []." "Acting
like a girl." About 5:50PM Plaintiff was taking a bath. Defendants talked nearby "How to
make him stop?"
1596.    10/11/2024, about 10:48AM when Plaintiff scanned for DE Defendants' man in B2 repeating
what Plaintiff worked on the previous day- transcript. "Have to stop. The police stopped."
1597.    10/15/2024, 1:22PM student "Have to stop."
1598.    10/17/2024, 12:00PM group of students came again under Plaintiff's windows talking not
loud "We have to stop." "Yea." 7:02PM soon after Plaintiff again started working on the
recording-transcript Defendants Ralph in building corridor loud "Cannot stop."
1599.    10/19/2024, about 9AM Defendants awakened Plaintiff. Defendants' man in B2 on speaker
"We lost. Completely stop." talking is ongoing till 9:35AM, Dula also participate.
1600.    10/21/2024, 9:58PM Defendants "Can't believe we can't stop (him)."
1601.    10/23/2024, 8:47AM for about an hour Defendants in B2 played recording which repeated
among other thing "We lost." The talking included usual lines "to stop", "Can't believe."

11:38AM Defendants woman in building corridor "Can't stop." A bit later she and a man were under the windows "We can't stop. FBI []."

1602. 10/24/2024, 7:26AM Holy Name guard and Defendants woman near windows "We fight to []. To stop." When Plaintiff made photos he was alone and left immediately. The woman commented (not visible) "We made him."

1603. 10/25/2024, 8:57AM while Plaintiff was scanning Defendants' man in B2 "Have to stop." 11:23AM Plaintiff was playing online when Defendants near the windows "You got to stop that."

1604. 10/26/2024, 7:40AM Defendants awakened Plaintiff and he scanned for DE. Defendants' man in B2 ongoing talking – recording? "To stop.." 7:56AM "Kalin push it to stop.."

1605. 10/31/2024, 9:11PM back in home Plaintiff was working on 9/7/2012 recording when Defendants in a car parked under his windows on Cedar lane "Can't arrest. Stop.. Fight." They stopped talking when Plaintiff started video recording. 10:08PM Plaintiff still working on the transcript when three Defendants' women under the windows "How to stop?"

1606. 11/2/2024, after on previous day Plaintiff had sent an email to NSD DOJ with his letter to AG, transcript of the first audio recording from 9/7/2012 and a link to a video transcription (with the audio), at 10:25AM Defendants' Ralph and woman in building corridor commented "Pass him.." "Kalin.." After Plaintiff started Olympus the woman said "I told them he will not stop." and left.

1607. 11/4/2024, 8:37AM Defendants' man in B2 on speaker "Can't believe. Can't stop him." Talking ongoing. 11:16AM three Defendants' men "He wants to sue." and "Have to stop." Started drilling noise. After Plaintiff started Tascam DR07 they switched to Spanish. 11:28AM "He can't hear you."

1608. 11/5/2024, 8:48AM Plaintiff was working on Exhibit about hammering when Defendants' woman in building corridor "We need to press the []. Receive []." She stopped talking when Plaintiff started Olympus. 9:07AM Defendants' man and Dula in B2 "Have to stop." 9:58AM Defendants' woman on speaker in building corridor "They should stop."

1609. 11/7/2024, 9:32PM while Plaintiff kept working on the EF exhibit Defendants' woman on Cedar lane under his windows "You don't stop. Have to []."

1610. 11/9/2024, 8:31AM when Plaintiff was writing previous note Dula in ap. B2 commented "Can't believe. He wants to stop." About 10:45AM after Defendants' man in ap. A6 commented "Can't believe they can't stop that." the person from 8:20AM again talked under Plaintiff's windows "They told us to crush (him)." 9:48PM Defendants under Plaintiff's windows knocked. "Have to stop."

1611. 11/13/2024, about 7:40AM while Plaintiff was in toilet Defendants' Dula in B2 "How do you stop? We will never stop."

1612. 11/14/2024, 7:48PM after Plaintiff did not work on the case during the day Defendants woman loud under Plaintiff's windows "Coming [] they to stop."

1613. 11/17/2024, 10:25AM Defendants' woman near Plaintiff's windows after Plaintiff's alarm "Want to stop."

1614. 11/23/2024, about 8PM when Plaintiff opened some case files Defendants in B2 commented "He won't stop."

1615. 11/25/2024, after 1:09PM Plaintiff was in toilet when three schoolgirls came under his window and raised their voices "We want to stop." 2:58PM Defendant man under Cedar lane windows "He didn't stop." Then talked about being "hostages... Death []." When Plaintiff prepared to make a video he immediately got in a pickup truck and left.

1616.  11/26/2024, 11:30AM men on Cedar lane talked but not loud "[] to stop." 11:34AM "Stop." 11:38AM "Can not arrest.." 11:40AM "Don't stop." 12:50PM Defendants' woman talked with the workers: "We have to stop. We lost."

1617.  11/29/2024, 12:02PM Defendants' man on Cedar lane (same?) "He won't stop. Stop."About 5:10PM Defendants' man in B2 "He won't stop."

1618.  11/30/2024, after 10:20AM while Plaintiff was in toilet Defendants in B2 not loud "FBI wants him to believe we stopped."

1619.  12/1/2024, about 12:12AM when Plaintiff started working on materials about the torn by Defendants delivery in 2022 Defendants commented "He didn't stop."

1620.  12/2/2024, 11:27AM schoolgirl came under Plaintiff's windows "Trying to stop. What? Yea what?"

1621.  12/7/2024, 7:16PM when Plaintiff stopped working on the FBI brief students(?) came under his windows again "Now stop."

1622.  12/8/2024, about 8:25AM Defendants in ap. B2 hammered on Plaintiff's ceiling awakening him. When Plaintiff scanned for DE Defendants in B2 repeating "Stop… to stop…" 1:49PM Defendants' men loud. Plaintiff started Tascam. They responded "Have to stop."

1623.  12/9/2024, 1:27AM after awakening Plaintiff who got up Defendants in B2 "He never stopped." 10:10AM SUV came and replaced the truck. They played on speaker "How to stop?"

1624.  12/12/2024, 7:15AM after Plaintiff was awakened Defendants' woman came under his Red Road windows "Can't sleep. That you got to feel." "Stop." 11:07AM Defendants' man in B2 "Have to stop." Knocks on the Plaintiff's ceiling from B2. 4:38PM Defendants' men, one of them Holy Name guard-neighbor talked about Plaintiff "Cannot stop." "Spy []. Spy on (us)." "He didn't respect us."

1625.  12/13/2024, 3:56PM construction workers and two Teaneck police officers next to Plaintiff's windows "Have to stop." 3:59PM "Have to push." "How long they []?" … "Kalin..." "Can't stop." 4:06PM "Fight." 4:09PM "Kalin…" 4:12PM "Stop."

1626.  12/16/2024, Defendants in B2 on loudspeaker at 9:28AM "Stop..." 9:31AM "Completely lost…" 9:35AM Plaintiff turned his TV on talking in B2 stopped.

1627.  12/18/2024, about 7:44AM while Plaintiff was working on materials for the events on 1/20/2023 under his windows Holy Name guard-neighbor "If you need a job you need a job." Woman talked about "police". Then Defendants' man in B2 commented "Don't stop. He can't believe." 9:04AM pipe bang. Defendants' man in B2 record(?) "Kalin… Can't stop..." 9:07AM "Kalin… He believe..." Noise – unusual 'drilling' noise.

1628.  12/19/2024, 8:24AM Defendants' man in B2 "Kalin… Stop… Can't believe…" Later at 6:01PM when Plaintiff started working on FBI materials Ralph and another Defendants' man talked in building corridor "Kalin don't stop." They continued in mixed English-Spanish. "Kalin… Hot water. All building has no hot water." They called Cesar Naranjo, super. Two women also came in the corridor. "Called company.."

1629.  12/25/2024, 2:51PM Defendants' Ralph and a woman on Cedar lane came under Plaintiff's windows then moved on Red Road and talked about "espionage… All of that." When Plaintiff went to toilet Ralph commented "He didn't hear that. He got to stop

1630.  12/28/2024, 9:05AM Defendants in B2 started talking "He doesn't believe. Have to stop." Hammered while Plaintiff was writing the note and commented "Kalin.."

1631.  12/30/2024, 8:55AM students(?) cameunder Plaintiff's windows "We have to stop." "What happened?" "We twisted that arm. I don't know."

1632.  1/2/2025, 9:58AM Defendants in B2 commented "He never stops."

1633.   1/6/2025, 9:35AM when Plaintiff was in toilet truck horned a few times next to the window. Defendants' Dula in B2 "We are willing to stop." Just before that Plaintiff was working on court statistics. 9:44AM Dula in ap. B2 "How do we sue? ...Stop…", and later "Stop calling… police []." "Want to stop… Kalin []." After Plaintiff started recording with Olympus the talking in ap. B2 "That's not how we are fighting." Talking continued till 9:56AM. 10:40AM Dula in B2 again "recording… to stop []." About 6:30PM Defendants talked in building's corridor "Have to stop." after earlier Ralph? Talking to the effect of "How to stop the Bulgarian?"

1634.   1/10/2025, about 10:40AM 'Public work' branded truck parked under Plaintiff's windows. While Plaintiff was scanning Defendants in building's corridor commented "He didn't (stop)," "They didn't []." 10:50AM temperatures started to increase rapidly. Plaintiff was making photos with his phone when Defendants' man under windows on Cedar lane commented "We have to stop." then "He is on phone." "Sure, sure." And stopped talking.12:40PM Defendants' man in ap. B2 commented "He don't stop. Couldn't believe." About 8:50PM multiple persons talking in ap. B2 and in corridor "Can not stop him." One of them the Holy Name guard who left the building.

1635.   1/15/2025, 3:30PM Plaintiff was back home. Schoolgirl came under Plaintiff's windows and said "He didn't stop." About 3:40PM same girl returned talking about the "people".

1636.   1/16/2025, 12:06PM schoolgirl came walking on the rocks under Plaintiff's windows (evading the camera) and said "Try to stop. We have []." 1:11PM loud group of schoolboys "You should just stop."

1637.   1/17/2025, about 11:47AM students came under Plaintiff's windows "You wanna stop." "Destroy []."

1638.   1/19/2025, 8:38AM Defendants' Ralph was loud in building's corridor then talked "We couldn't stop him." While Plaintiff was starting Olympus recording another man responded "We have to punish. He has to submit." After that Ralph talked about Tik Tok. About 6:20PM Defendants' man under Plaintiff's windows on Cedar lane "Stop."

1639.   1/21/2025, 1:05PM Defendants in building's corridor "We don't know how to stop all this." Plaintiff was working on timeline of events and interference with his legal cases. After he started Olympus they talked about finding a job.

1640.   1/22/2025, 12:04PM the same schoolgirl from previous day came under Plaintiff's windows. Then a schoolboy "Fucking stop." Plaintiff worked till then on timeline of events. 4:32PM Defendants' man in B2 loud "Stop. It is not []. Stop." Plaintiff was working on Defendants' interference with his legal cases.

1641.   1/24/2025, 12:59PM and later ongoing talking in B2 "Can't believe… Have to stop."

1642.   1/27/2025, 3:22PM USPS carrier in the corridor of the building talked about "police". More students came under Plaintiff's windows and talked loud. One of them stated "[] to stop." 4:30PM Defendants in G2 talked for a couple of minutes about Plaintiff "Kalin…" "How to stop?"About 6PM while Plaintiff was in toilet under his windows Defendants' woman "He has to stop."

1643.   1/29/2025, 11:36AM spam call. Defendants in ap.B2 commented "Can't believe we stopped." 1:10PM Defendants man and woman in building's corridor "We can't stop him." "Guy gets rich. See how []."11:25PM while Plaintiff was working on interference with cases Dula talked loud in ap. B2 "We stopped.. Don't believe.." Defendants' woman in building's corridor "Have to forget."

1644.   1/30/2025, about 7:49AM Defendants awakened Plaintiff again. B2 commented "We thought he stopped."

1645.  2/1/2025, 10:36AM Defendants in G2 "We want to stop." Plaintiff started Olympus. They commented "Thought you can hear this."

1646.  2/2/2025, 9:37AM Dula in ap. B2 "To stop…" A bit later after Plaintiff was in toilet "Have to stop." 10:12AM Dula again "He don't believe we stopped."

1647.  2/3/2025, 12:37AM Plaintiff found a swelling on his left arm. Defendants in G2 talked about "stop[ing]".

1648.  2/4/2025, about 2PM when Plaintiff left his apartment (shopping at Target) Defendants in ap.A3 commented "He will never stop." "How to stop Kalin?" … "Bulgarian.."

1649.  2/6/2025, 8:00AM Defendants awakened Plaintiff, loud talking in ap.B2 on loud speaker "We stopped. Lost [] Kalin stopped." After Plaintiff looked at the clock / phone volume reduced,.

1650.  2/8/2025, 3:17PM Defendants' Ralph yelled in front of Plaintiff's door, knocked on A1's door. Ralph talked loud in A1, then in building's corridor, then next to Plaintiff's windows. Defendants' woman at distance "Have to stop." Defendants in ap. A1 slammed a few times. All that till 3:38PM. At 6:51PM Defendants' man and woman next to back door of the building on Cedar lane "Kalin doesn't stop." 7:30PM while Plaintiff was downloading NJ Criminal Code Defendants' man in building corridor "We can't stop." and continued talking about 'stopping'.

1651.  2/12/2025, 9:16AM B2 on loud speaker "to stop… stop…" 8:52PM Defendants' man in B2 "To stop..."

1652.  2/13/2025, 11:49AM Defendants' man talked with students on Cedar lane "They won't permit… Want to stop.." He entered the building talking not loud though.

1653.  2/17/2025, 8:33PM Plaintiff was archiving files, when both of his laptops raised their temperature: points to external cause, DE beams. After Plaintiff continued archiving Defendants in ap.B2 commented "He didn't stop."

1654.  2/18/2025, about 10:30AM while Plaintiff was searching information for the graphic card of his Lenovo Idea Centre PC, and calling Best Buy Defendants' man in B2 commented "We wanted to stop []." 3:28PM Plaintiff was working on UN conventions under his windows "Kalin to stop." About 9:50PM while Plaintiff was working on the complaint – torture – Defendants talked on loudspeaker for a while in ap. B2. At about 9:56PM "harass"… 9:58PM "Kalin.." 10:04PM "Can't stop. Can't believe it." 10:18PM "Kalin.." "We lost. He don't believe."

1655.  2/20/2025, 10:29AM Defendants in B2 commented "He believe…" "We [] to stop []." Later at 10:33AM "Completely stopped." 11:38AM student shouted under windows. Man talked with them "Stop."

1656.  2/21/2025, 10:36AM Defendants in ap. B2 on loudspeaker "Kalin will stop."

1657.  2/22/2025, about 1:55PM Defendants in ap. B2 talked "We can not surrender. He'd not believe we stopped." At 2:23PM continued "We want it to stop."4:40PM while Plaintiff was mounting the new computer parts on Idea Center 310S Defendants under the windows commented "We didn't stop that."

1658.  2/23/2025, 9:42AM Defendants' man and woman came under Plaintiff's windows on Cedar lane "It doesn't look like [stopping]." "How to stop?" When Plaintiff looked through the windows 2 cars under the windows, cable between them. After that they commented "We lost." "… fighting." The man left with one of the cars. 10:11AM Plaintiff started working on the complaint, and Dula in apB2 commented "He didn't stop." About 3:00PM while Plaintiff was taking a bath Defendants' man near the windows "He thinks this is a game. He won't stop." ".. solutions…" After that Defendants in B2 knocked above Plaintiff. 10:30PM drilling noise from Defendants in G2. Plaintiff was working on the complaint – terrorism.

1659.   2/24/2025, 11:17PM-11:27PM Defendants' group came under Plaintiff's windows talked not loud. A woman stated "You have to stop." Then they moved under the windows on Red Road "He didn't hear… People are asking []. We can't stop." At the end at least some of them entered the building..

1660.   2/27/2025, 12:25PM Dula in ap. B2 not loud "We lost. He don't stop. [] CIA []." and later at 12:30PM "Can't believe. We []."

1661.   2/28/2025, 3:23PM while he was working on interference with his legal cases file students came under Plaintiff's windows on Cedar lane and were loud "Stop." 4:20PM Defendants' man in B2 "He don't believe. We stopped." later "He didn't stop." At 4:37PM Dula(?) in B2 "Kalin []. He don't believe." 4:38PM "… Kalin ..."

1662.   3/2/2025, 10:41AM Plaintiff detected 3-10 V/m on the floor behind desk varying. Defendants' man in ap. B2 commented not loud "We lost. Can't stop." Temperature inside dropped further to 59F. Plaintiff found swellings on his right hand, and next to his left eye. B2 man continued "Kalin won't stop. He can't believe." 2:15PM after Plaintiff started working on UN CCPR Defendants' man under Plaintiff's windows on Cedar lane "Have to stop. They don't know how to stop him." Cesar Naranjo came to the man.

1663.   3/4/2025, 11:50AM Defendants' man in ap. B2 "Bulgarian stop []." Immediately after Plaintiff started Olympus talking stopped for a while, then at 12:02PM the man in B2 "… to stop.. If Bulgarian stops we can stop." Defendants in B2 knocked. "Stop." 12:09PM "Can't stop. We [] figure out.." 12:12PM "Kalin..." 12:14PM "We can not stop harassing… Stop Kalin… We have.." Volume increased – moved above toilet. 12:25PM the loudspeaker moved above the room after Plaintiff downloaded multiple comments on UN CCPR, Articles 9, 12, 17 and more, then Plaintiff started playing chess online. 12:26PM Defendants n B2 again got above the toilet "Kalin.. stopping..."

1664.   3/7/2025, 6:19PM Defendants' woman and three boys "Afraid of FBI.. Don't believe we stopped." Plaintiff stopped TV, made video. About 8:40PM Dula in B2 "He stopped."

1665.   3/8/2025, about 9AM Defendants awakened Plaintiff with strong beams. Since then Defendants' woman talked under Plaintiff's windows "Have to stop… Think for yourself." 10:29AM Plaintiff detected 1033 V/m max at his head. Defendants' woman in building corridor commented "You need to stop." Followed walking in ap.A1. Plaintiff played music during the day. At 3:52PM Dula in a pause between songs "We can not stop him."

1666.   3/10/2025, 12:53PM Dula on loudspeaker "to have him stop.. Can't believe him. We got to destroy him."

1667.   3/13/2025, 8:42AM Plaintiff was still working when Dula in ap.B2 commented "He wants to stop. .. Lost ..."

1668.   3/15/2025, after Plaintiff searched and downloaded articles about power and obedience at 3:34PM Dula commented "He won't stop. We lost power."

1669.   3/16/2025, 10:49AM Dula in B2 (Plaintiff's window open) "Can't harass. Stop." Followed loud knocks on the pipe passing through Plaintiff's room.

1670.   3/17/2025, 11:35AM students came under the windows, a schoolgirl loud "Oh my god." "He stole it." They returned "Keep going." In building corridor Holy Name guard neighbor commented "Nobody stopped []."

1671.   3/18/2025, 9:57AM Defendants' man in B2 "Kalin []." 10AM in B2 Dula? "Stop to harass []. We don't stop." About 10:24PM Defendants awakened Plaintiff, a group of students came under his windows on Cedar lane and talked loud "They hide." "He wants to stop."

1672.   3/19/2025, 10:42AM while Plaintiff was in toilet Defendants man under the windows "We try to stop."

1673.   3/22/2025, about 12:55AM Defendants' man on Cedar lane "[] to stop."

1674. 3/26/2025, 2:27PM students came under windows on Cedar lane "How to stop this?"

1675. 3/27/2025, about 11:40AM while Plaintiff was at kitchen sink, TV on, Defendants' man came under his windows and challenged – not loud – "What are you doing? Have to stop."

1676. 3/29/2025, about 10:01AM while Plaintiff was scanning Defendants' woman nearby "Have to stop. And I said have to school …" He detected 1038 V/m on his head.

**(5) Defendants obstruct Plaintiff's work on, or filing of petitions.**

1677. Plaintiff's "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury".[132]

1678. The day after Plaintiff was laid off by Gyro (3/21/2016) he looked for employment lawyers and related legal documents in Internet. Defendants in ap.B2 commented "If he keeps going on like this we'll need to set another one." And warned him "Can't pursue." (3/24/2016) "You can not pursue them." (3/25/2016, ECF No.8-1 at 41). At the same time Defendants were explicit that they are FBI and police ("We are FBI." Id. "He definitely knows how to fight police." 4/1/2016 – as Plaintiff's preparation of a lawsuit against Gyro is 'fight[ing] police' that shows Defendants' nexus to Gyro New York).

1679. After researching in Internet about filing a suit (3/22/2016) Plaintiff started working on materials for Gyro case on or about 4/3/2016. A few hours later Defendants made explicit warning to Plaintiff "We need you to stop." (4/3/2016). As Plaintiff continued working they planned to "confuse him" (4/13/2016), and started to persuade him that he "Can't sue them." (4/26/2016).

_(i) Defendants interfere with, and retaliate to Plaintiff's work on petitions and related materials._

1680. In addition to Defendants' surveillance and pressure campaigns (detailed above in (a)) aiming to suppress, punish and deter Plaintiff from working on and/or filing of petitions, Defendants actively prevent him from obtaining legal or expert counsel, obstruct his collection of evidence, and have subjected Plaintiff to many-years long and ongoing degrading treatment. In part Defendants' actions are intended to slow Plaintiff down (5/14/2017 "We get slow his power.

---

132 _Bery v. City of New York III_, Nos. 1620, 1621 and 1782 (2d Cir. Oct. 10, 1996) quoting _Elrod v. Burns_, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690 (1976) (quotation marks omitted)

Always trigger him." ECF No.8-1 at 163; 11/10/2022 at FBI New York "Delay Kalin." ECF

No.8-2 at 2012; 1/20/2023 "Have to slow [him]." ECF No.8-1 at 82). They were explicit they

can't let Plaintiff go on with collecting evidence, or with his litigation *Dimitrov I.* See for

example Defendants' statements on 12/29/2017, 7/24/2023, or 4/15/2024 ("Stop. Consider it

done."). See also above Defendants' pressure campaigns.

1681. 12/29/2017, after Plaintiff measured 60F inside his apartment (heating off) at 10:35AM Defendants in ap.B2 commented "We can't let him continue. We have to destroy []." ECF No.8-1 at 215.

1682. 7/24/2023, a day before Plaintiff filed *Dimitrov I* he had worked without sleeping on the complaint. At 10:26AM Defendants' woman in car parked under his windows talked and after Plaintiff made a video responded "He didn't stop." 12:48PM Raphael Pimienta, Marlene Dula, John Doe and others came near Plaintiff's windows: "Lets set up []. Set up. We can not let him (go)." "How to [] the team?" ... "Can't lose." "We need strike this stuff.".. "Let Kalin to push."

1683. 4/15/2024, after the previous day Plaintiff sent two emails to experts in regards to his legal case against Defendants, at 6:58AM Defendants' Gerrardo Rossel, supposedly from ap. A1, talked in building corridor "We want to stop." At 11:40AM three schoolboys came under Plaintiff's windows "Have to stop that. How to stop… I stopped TU. They moved away." Later other(?) students came under the windows, mentioned Plaintiff's name "Kalin" (11:50AM), and commanded him "Stop. Consider it done." (12:18PM).

1684. Defendants' efforts to prevent Plaintiff's legal case against Gyro include, but are not limited to,

legal notice at Gyro prohibiting talks about the involvement of 'police' with Plaintiff after he was

terminated (ECF No.8-1 at 40); Defendants' deletion of case evidence such as Plaintiff's email

job applications from the period of 2016-2018 (evidence for his diligent efforts to remedy the

situation), Defendants explicitly warned Plaintiff to not sue Gyro – including at FBI New York

Field office on 11/8/2017, and more.

1685. A significant part of this complaint is related to Defendants' efforts to prevent, obstruct, and

retaliate to Plaintiff's preparation, work, initiation, and filings in *Dimitrov I*. To mention a few –

Defendants disrupted (created problems) the filing of Plaintiff's summons for the case, Township

of Teaneck unreasonably denied Plaintiff's request for waiver of service but their lawyers filed

demonstratively notice of appearance before being served (ECF No.9), and more.

<u>(ii) Defendants interfered and/or prevented Plaintiff to file petitions with FBI New York and Teaneck police.</u>

1686.    Plaintiff visited the public areas in the FBI New York Filed Office building at 26 Federal Plaza, New York, NY 10278 on 11/8/2017 with intention to file in person a report for civil rights violations, and on 11/10/2022 with intention to file in person his Administrative claims under FTCA. Plaintiff followed the established procedures to file a report by choosing to do that in person[133], and to 'present the claim to the appropriate federal agency'.[134]

1687.    FBI is the appropriate agency to receive both, but FBI / JTTF New York thwarted Plaintiff's attempt to file the report (he was chilled and has never filed a report with the FBI), and prevented Plaintiff to file in person his administrative claims. After Plaintiff sent his claims with USPS FBI New York did not acknowledge the receipt, nor responded to the claims. But Plaintiff received a notice from USPS that the package to the FBI New York with his claims was delivered on 11/14/2022 at 1:36 PM (see Exhibit Emails from USPS).

1688.    In both occasions while Plaintiff was near or inside the building Defendants' agents were expecting him and provoked, intimidated, demonstrated the surveillance, and interrupted him.

1689.    11/8/2017, a plain clothes FBI agent directed the officer at the FBI entrance on the lobby who spoke with Plaintiff "Give him trouble." and "No-go for him." ECF No. 8-1 at 45-46.

1690.    11/10/2022, when Plaintiff was preparing his Administrative claims under the FTCA in Teaneck Defendants' agents in his building talked about the need to 'suppress' him. At the FBI NY building Defendants waited for him and actively prevented Plaintiff to file in person his Administrative claims. "Delay Kalin.", "Can not receive." An FBI officer ('FBI' written on his bullet-protection vest) asked a plain clothes agent "Tell me what you need []." the agent responded "Stop. Reframe." After Plaintiff explained a few times what he wants to file agents directed: "Don't accept that. Must drive crazy." ECF No. 8-2 at 2012.

1691.    Defendants have interfered with Plaintiff's filing of reports and/or relevant evidence with Teaneck police, or with his visits to police. For example:

1692.    9/11/2012, Defendants attempted to prevent Plaintiff's first report with Teaneck police, and talked to him when he walked to the police "Don't go." "Don't go." ECF No. 8-1 at 20.

---

133 "To file a color of law complaint, contact your local FBI office by telephone, in writing, or in person." https://www.fbi.gov/investigate/civil-rights as accessed on 11/8/2017 and on 7/13/2020.

134 "before a claimant can file suit, he or she must first present the claim to the appropriate federal agency." *American United Transportation Inc. v. Western Reg. Union et al*, No. 21-CV-3985 (MKB) (E.D.N.Y.. Nov. 1, 2021) (citing 28 U.S.C. § 2401(b))

1693.    3/12/2020 at about 5:17PM Plaintiff went to Teaneck Police to inquire about police actions after his report from 3/5/2020. When Plaintiff was near police station he started a recording and Defendants started talking to him "Stop this. Than []" "Press stop." "Not game []" "Press stop.", and after Plaintiff left the building "Get him.".. "Get him to forget." "He won't stop []." "He needs-- stop []" "You must stop." "Got hostage []." ECF No.8-1 at 132.

1694.    Defendants intercepted / blocked Plaintiff's email to Teaneck police officer Ruscingno providing information about a report and included audio recording as evidence. On 2/24/2022 while Plaintiff was preparing the email to the police officer Defendants came and talked in building corridor near his apartment "If you have a problem []." and later "not involve police". ECF No.8-1 at 334. Plaintiff sent his email and later found that the CC of his email was received with 14 minutes delay – showing intrusion with the communication. On Monday, 2/28/2022 Plaintiff sent a second email to the officer who then acknowledged the receipt, and wrote that a report is "generated" and Plaintiff should expect a detective to contact him. This report has never been investigated. In the afternoon the USPS carrier came and talked in building's corridor "I didn't do it. .. police... I am sorry." ECF No.8-1 at 338. Exhibit emails.

1695.    Notably on 11/28/2024 Plaintiff found that Defendants deleted his emails to Teaneck police from 2/24/2022 and 2/27/2022 form his Yahoo account.

1696.    Due to Defendants' demonstrative interference and deliberate indifference to his reports Plaintiff has not filed reports with Teaneck police about most of the incidents listed in the complaint.

*(b) Defendants' policy or practice to ignore, not investigate or obstruct otherwise the petitions Plaintiff filed.*

1697.    Since 2012 Defendants' persistent and widespread practice in regards to Plaintiff's petitions includes but is not limited to (1) no investigation, no response, and no contact with Plaintiff in that regard; or (2) providing deliberately inadequate response, reframing, minimizing or otherwise obstructing the petitions. In the last three years since Plaintiff complained explicitly about that practice (see his Notice of claims, Administrative claims to FBI, *Dimitrov I*) Defendants continue the conduct without change, but for Teaneck police proforma investigation of Plaintiff's two reports from 2024. Based on that this policy/practice is practically endorsed by the municipalities of Teaneck and New York City, the DOJ NSD, and FBI policy-makers. Defendants' policy-makers are deliberately indifferent to Plaintiff's rights, and/or fail to supervise or train their subordinates See above, and also, for example IV.8(b)(2)(v)(B).

1698.    Due to Defendants interference other parties also follow the same policy / practice in regards to Plaintiff's petitions (for example NYC Sheriff's Office, EEOC, Plaintiff's landlord, and more).

**(1) Defendants policy to ignore Plaintiff's petitions – no investigation of the claims, no response, and no contact with him in that regard.**

1699.    After on 11/10/2022 FBI/JTTF New York had thwarted Plaintiff's attempt to present in person his Administrative claims under the FTCA (ECF No.8-2 at 5910 *et seq.*), he sent them with USPS. The FBI New York refused to acknowledge Plaintiff's claims, and he received only the USPS' notice of delivery to the FBI New York on 11/14/2022 at 1:32PM. The FBI ignored the claims – there was no response, no investigation, no formal denial, Defendants have not ceased their conduct violating the constitution and laws, nor they contacted Plaintiff in regards to his claims. Plaintiff sent his second administrative claims to the FBI Headquarters on 8/29/2024, which again were not investigated, and were inadequately denied (see more bellow). Apart from that FBI did not contacted Plaintiff in regards to his claims.

1700.    Teaneck police did not investigate any of Plaintiff's reports he had made till 2024.

1701.    Apart from acknowledging the receipt the Township of Teaneck ignored Plaintiff's Notice of claims filed on 11/11/2022 – there was no response, no investigation, not contact with Plaintiff in that regard, no change of the unlawful conduct, but for retaliation (see for example events on 1/20/2023 with the participation of uniform Teaneck Police officers, and more). Later (7/31/2023) Teaneck Municipality deliberately ignored Plaintiff's request for waver of service for *Dimitrov I* – no response, although its lawyers filed Notice of Appearance on 9/18/2023 (ECF No.9). Apart from violation of its duty under Rule 4 of the Federal Rules of Civil Procedure to cooperate in saving unnecessary expenses of serving a summons and complaint, this is demonstration of malice, and puts unnecessary burden on Plaintiff. Similarly Plaintiff's emails to Teaneck Manager, the Mayor, and officer Strickland on 7/16/2024 and 9/25/2024 in relation to his police reports in 2024 had no response (apart from the exchange in regards to officer's email address).

1702.   Apart from acknowledging the receipt the City of New York ignored Plaintiff's Notice of claims filed on 11/11/2022 – there was no investigation, no contact with Plaintiff in that regard, no ceasing of the violations, no response, but for Defendants' retaliation. The NYC Law Department and the City Counsel did not respond to Plaintiff's request for information from 8/2/2023.

1703.   Other government agencies also followed the same policy / practice in regards to Plaintiff and the petitions he filed. For example:

1704.   Derek Smith Law Group, then representing Plaintiff, filed a charge against Gyro et al with the EEOC on 12/1/2016. Defendants' deleted the confirmation email by EEOC which also provided the number of the charge. Plaintiff found out the deletion on 3/27/2017, and sent an email-request to EEOC for information about his charge number. Apart from the automatic email-acknowledgment of the request EEOC has never responded, and later Defendants deleted the automatic email-response too (ECF No.8-2 at 1851). After in August 2017 Derek Smith Law Group stopped representing Plaintiff (at least in part due to Defendants' interference), he sent an email to EEOC (See Defendants' interference with Plaintiff's lawyers 1718 et seq.), but EEOC has never responded to Plaintiff. On 11/12/2018 Plaintiff filed a FOIA request to EEOC for all materials in regards to his charge against Gyro et al. The EEOC's response did not include all information, and later the EEOC sent to Plaintiff Notice of Right to Sue only for Gyro Communication Limited although it had issued all necessary notices as it became obvious after Gyro produced the EEOC FOIA response to Gyro et al.

1705.   Plaintiff's written request from 10/15/2018 to NYC Sheriff's Office about serving of process information in regards Motion to dismiss (*Dimitrov v Gyro et al.*, 18-cv-3600, SDNY 2019) was ignored – no response.  ECF No.8-2 at 2013.

1706.   Similarly ignored are Plaintiff's letters to Attorney General 10/7/2024, to DOJ NSD 11/1/2024, his complaints with DOJ Office of Inspector General from 10/11/2024 and 11/1/2024, and more.

1707.   Private parties acting in concert also followed the same policy in regards to Plaintiff and ignored his complaints, and communications. Defendants' influence in that regard was obvious in a few occasions. See for example IV.10(a)(i) interference with lawyers (see the no-response / no-contact policy of Paul Campson) and experts ("Do not answer any email." 10/10/2024), Plaintiff's landlords, and more. Same is the Court's conduct in regards to Plaintiff – for example the lack of response to Plaintiff's filings in *Dimitrov I* for about two years – see IV.10.

1708.   In the light of the above Defendants' failure to investigate the violations of the US Constitution and laws in regards to Plaintiff is apparent.

### (2) Defendants' obstruction of Plaintiff's petitions after the start of Dimitrov I.

1709.   Since the initiation of *Dimitrov I* Defendants have continued their policies and practices in regards to Plaintiff's petitions – ignoring, not investigating, and similar, but with significant modification in their approach. For example Teaneck police responded to Plaintiff's two reports in 2024 (although inadequately and ignored/misconstrued his claims), Plaintiff's FOIA requests were answered inadequately after 5 years delay (DHS OIG, 2020-IGFO-00140, on 4/29/2025), or more notably 3 years earlier (FBI No. 1666051-000 and NFP-172149, filed 4/22/2025, answered on 8/20/2025 despite writing to Plaintiff on 5/21/2025 "Your request is currently in the complex request small processing track, and the estimated date of completion for your request is April, 2028."), and the FBI also inadequately but responded to Plaintiff's administrative claims form 8/29/2024 (see bellow).

1710.   To the extend the FBI response of Plaintiff's FOIA request from 4/22/2025 is full it clearly shows that the FBI did not referred Plaintiff's report for constitutional violation part of his FOI/PA request and Appeal from 2020, to the extend it was referred verbally they have done no investigation, did not contacted the FBI New York, did not contacted in written any person in the

FBI in regards to Plaintiff's requests, did not make any notes in regard to his requests and appeal, and more.

(i) The FBI New York re-framed and minimized Plaintiff's claims for civil rights violations on 11/8/2017, and his administrative claims on 11/10/2022, in order to prevent him from filing them in person.

(ii) The FBI re-framed and minimized Plaintiff's administrative claims from 8/29/2024 in its final response dated 3/6/2025.

1711.    The substantive response is two sentences long, and reads as follow: "We have received notice of the filing of a Civil Suit with the Southern District of New York, filed on July 25, 2023 (Dimitrov v. The United States of America Et. Al., Civil Action No. 1:23-cv-6451. As a result of the commencement of a lawsuit, this office has determined that the administrative claim is hereby denied." Re: Administrative Tort Claim of Kalin Dimitrov, March 6, 2025, Civil Litigation Unit II, Office of the General Counsel, Federal Bureau of Investigation

1712.    There are a few notable problems with the FBI response, including but not limited to (1) the purpose of Plaintiff's administrative claims is not notifying FBI about the litigation Dimitrov I, they are not notice of a suit as the response implies; (2) Plaintiff's administrative claims are about the events after the start of *Dimitrov I*, and although the facts which are basis for that litigation are entirely relevant, the factual basis for his second administrative claims is different (even if they are continuation of Defendants activities); (3) the requirement to file administrative claims before initiating a lawsuit is to allow government to investigate the claims for 6 months, but based on the FBI response it is clear that there was no investigation at all; and (4) even if FBI believed Plaintiff's administrative claims from 8/29/2024 are notification about *Dimitrov I* they responded with delay of more than 6 months – even in that frame Defendants delay and obstruct Plaintiff.

(iii) Teaneck police responded to Plaintiff's police reports from 4/26/2024 and 7/16/2024.

1713.    See above Teaneck Public Schools, IV.4

**(3) Defendants' policy / practice about Plaintiff's petitions as applied to his legal actions – see IV.10.**

*(c) Defendants' retaliation to Plaintiff's preparation, work, and filing of petitions.*

**(1) Defendants have subjected Plaintiff to systematic degrading treatment in retaliation to his petitions and petition-related activities. (See IV.11.)**

**(2) In retaliation Defendants have interfered substantially with Plaintiff's economic prospects and employment.**

1714.    In 2012 Defendants thwarted Plaintiff's intention to start a business (Idea-hunters), and their dissemination of false derogatory narratives about Plaintiff in practice precluded any business activity. Defendants interfered with Plaintiff's employment at Gyro New York, and East House Creative. See ECF No.8-2 at 2115 *et seq.*.

1715.    Since 2016 Plaintiff has been unemployed due to Defendants and parties acting in concert's substantial interference with his employment prospects. In 2017 alone Plaintiff applied to about 290 job recruitment offers for work in the Creative Department of various advertising agencies but in accord to Defendants' statement from 12/27/2016 ("You will never find a new job. I promise you." (ECF No.8-1 at 121)) he didn't get even an interview with an employer. That is in time when "companies invest more in their branding and marketing efforts [and b]ecause of this hiring upswing, highly skilled professionals are in short supply. Unemployment rates in the creative field remain below the national average, and job opportunities outnumber qualified candidates."[135] And the "[d]emand remains strong for skilled professionals, and unemployment rates in the creative field continue to trend below the national average."[136] Furthermore, in the context of their constant and provocative surveillance, Defendants made multiple explicit statements demonstrating their interference with Plaintiff's employment prospects, and/or that they are those who 'give' a job to him. See ECF No.8-1 at 161-162, and ECF No.8-2 at 2115-

---

135 *2017 Salary Guide*, The Creative Group, A Robert Half Company, created on 8/29/2016
136 *2018 Salary Guide*, The Creative Group, A Robert Half Company, created on 9/12/2017

2127. Examples of Defendants' statements in regards Plaintiff's employment prospects from the

materials he processed after the filing include:

1716.    "We have to find him job." (Defendants in ap. G2) and "He didn't consider []." (Defendants
in ap. B2 while Plaintiff was preparing as email a job-application on 1/5/2017); "He doesn't
believe it ended with Gyro." (Defendants in B2 when Plaintiff was preparing for an interview
with a recruiter on 1/9/2017); "He knows we'll mess this." (Defendants in ap.B2 after a co-
worker offered low-level job to Plaintiff on 1/20/2017); "Find him work." (Defendants under
the windows on 2/24/2017, 10 minutes after Plaintiff stopped working on noise-harassment
video exhibit); "[He] can not find a job." (a Teaneck police officer and another Defendants'
man in a car talking for a while about Plaintiff near his windows on 6/26/2017); "Get
employed and they'll got to stop." (Defendants' man in a car talked to Plaintiff on 7/6/2017);
"Still have no job." (Defendants commented on 9/25/2017 while Plaintiff was working on the
case factual history which, among other things, included some of the examples on ECF No.8-
1 and 8-2 mentioned above).

1717.    Defendants have hacked and applied on behalf of Plaintiff to lower level positions, interfered

with recruiting agencies (see Creative Circle, The Creative Group, Solomon Page, and more), job

offers Plaintiff received from those agencies were either lower level jobs or inadequate to

Plaintiff's qualifications. And more. In time Defendants pushed Plaintiff out of the job marker.

## 10. Defendants conspire to prevent Plaintiff from attending and/or having fair hearing as a party and witness before a court of law.

*(a) Defendants actively prevent Plaintiff to have his legal actions before the court, and to
have a fair hearing before the court, by (i) preventing Plaintiff to obtain legal or expert
counsel, (ii) restricting his ability to uncover legal claims by not investigating his reports
and petitions, (iii) preventing or obstructing him to obtain or preserve evidence for the
violations, (iv) subject Plaintiff to degrading treatment, (v) retaliate and pressure him to
stop, and (vi) obstruct or slow down the filing of his petitions.*

### (i) Defendants actively prevent Plaintiff from obtaining legal or expert counsel for his lawsuits.

1718.    After 8/24/2016 Plaintiff searched for lawyers for his legal cases against Defendants and against

Gyro et al. In response on 9/6/2016 Defendants claimed that they 'classified' Plaintiff's case or

the case materials, and will make him 'fight by himself'. Later same day NYCLU declined

meeting Plaintiff, and on 9/8/2016 Louis Morrison, a Manhattan based employment lawyer,

declined taking his case against Gyro (after the call Defendants warned Plaintiff "You can't sue

them.".. "Can't let it happen." "You lose.").

1719.    9/6/2016, while Plaintiff was preparing materials for his case for ACLU Defendants planned near his windows to classify his case and make him fight 'by himself' ("...fights by himself". "We can classify this.".. "Make sure we already have that.") Plaintiff went to ACLU's New York office in Manhattan (NYCLU), but NYCLU declined meeting him. Defendants followed Plaintiff on the streets in Manhattan and commented "We can't stop him. He will continue." (ECF, No.8-2 at 2102).

1720.    9/7/2016 Plaintiff called and left voice mail to Louis Morrison, a Manhattan based employment lawyer. Defendants commented "Case is closed.", and later "We must get within. We created (him).".. "One Bulgarian."

1721.    9/8/2016 Morrison recognized that Plaintiff "have a case" against Gyro but refused to take it. After the call Defendants warned "You can't sue them.".. "Can't let it happen." "You lose." (ECF, No.8-2 at 2103).

1722.    Plaintiff went to Bulgaria, and while he was at JFK New York, and then on the plane flying to

Europe (9/11/2016) Defendants accessed and deleted thousands of files from his laptop (then

connected to Internet), including deletion of evidence for his Gyro case. Plaintiff found the

deletion after he returned home and filed a police report, which has never been investigated.

Defendants overtly tried to "distract him", and threatened "You will never find peace. We'll never

stop teasing." ... "Learn your lesson." (10/9/2016).

1723.    9/11/2016 Defendants hacked and deleted thousands of files (including files related to his case against Gyro et al) from Plaintiff's computer (ECF, No.8-2 at 1847, 2015).

1724.    10/7/2016 Teaneck police cars and a rangers' car came under Plaintiff's windows ('Domestic problem.'), after that workers commented under Plaintiff's windows "He is trying to prosecute us. That's why…" Later Defendants: "Have to stop."..."We didn't distract him." (10/7/2016) "Keep him hostile." (10/8/2016) Defendants talked to Plaintiff "You will never find peace. We'll never stop teasing.", and later same day while Plaintiff was checking his archives to find what was deleted from his computer: "Learn your lesson." (10/9/2016).

1725.    Plaintiff kept searching for employment lawyer and on 10/25/2016 signed in Manhattan a retainer

with Derek Smith Law Group for his case against Gyro. Defendants commented "CIA talks too

much.".. "[Plaintiff] intends to sue us." (10/26/2016); "He wants to hit Gyro.".. "He wants to

destroy us." (10/28/2016).

1726.   In the period between 4/23/2017 and 5/23/2017 Defendants deleted all emails between Derek

Smith Law Group and Plaintiff from his computer (Thunderbird) and his Yahoo Inbox (ECF

No.8-2 at 1853, 2105). About a week later, on 5/30/2017 Derek Smith made clear that they

substantially changed their position in regards pursuing Plaintiff's case against Gyro et al in a

federal court (ECF No.8-2 at 2106). Four things in combination demonstrate Defendants'

interference and thwarting of Derek Smith Law Group's representation of Plaintiff:

1727.   (1) Derek Smith's change of mind became clear after Defendants deleted the previous email

correspondence between them and Plaintiff. On 4/6/2017 (before the deletion) Derek Smith's

Cabaceiras was planning to request a 'Right-to-sue' letter from EEOC because "[t]he goal would

always be -- as is the goal with all our clients -- to get into Federal Court with supplemental city

and state claims". On 5/30/2017 however it became clear Cabeceiras did not send request to

EEOC, and that Derek Smith does not want to pursue Plaintiff's case in court because it is "a

difficult claim to sustain in Federal Court"; (2) Derek Smith's treatment of Plaintiff since then has

been unfavorable – Plaintiff sent an email-request for a meeting on 5/30/2017 which was ignored.

Plaintiff called on 6/16/2017 and set a meeting, and at the meeting on 6/21/2017 he had similar

treatment; (3) The Defendants were present at Derek Smith's office on 6/21/2017 (Plaintiff was

referred then as a "cop enemy"), and (4) The following events clearly showed Defendants

interference (for example Defendants' statements that Plaintiff "can not sue", the pattern of

lawyers who stopped responding to Plaintiff, Defendants' presence in Plaintiff's meeting with

another lawyer, and more).

1728.   Defendants' statements before the Derek Smith's overt refusal to file Plaintiff's case with a

federal court also indicate their interference. For example after Plaintiff talked with Defendants in

ap.G2 on 5/14/2017 Defendants said, among other things "We compare little legal push." (ECF

No.8-1 at 163). In light of the following events they referred to the 'new' Derek Smith position in regards to Plaintiff's Gyro case.

1729.    In the period between the Cabeceiras' email from 5/30/2017 and the meeting at Derek Smith on 6/21/2017 Defendants explicitly warned Plaintiff to stop working on the case and that they will fight him: "You've got to stop." (5/31/2017); "Can't sue." (6/10/2017); on the day of the meeting with Derek Smith Defendants in ap.B2 awakened Plaintiff with hammering on his ceiling and commented "He can't sleep. Fighting []." (6/21/2017).

1730.    On 6/21/2017, while Plaintiff was waiting in Derek Smith Law Group's Manhattan office before the meeting with Cabeceiras, Defendants and staff talked about him in his presence "That's a cop-enemy?"..."Gyro have (that)."..  "Let the Gyro push him."..."Tell him [he] lost." (ECF No.8-1 at 102.1, 102.5, and ECF No.8-2 at 2107). At the meeting Cabeceiras tried to convince Plaintiff that the case against Gyro is bad – he pressed Plaintiff on the fact that he did not explicitly complained to Gyro for national origin discrimination which makes the case weak (despite the EEOC position that use of legal terminology is not necessary for making a valid complaint to an employer), claiming wrongly that: Plaintiff complained to non-decision makers, that the relevant events are bared by statute of limitations, that Plaintiff has no retaliation claim, and more. Cabeceiras stated that Derek Smith will not bring the claim with federal court and would refer Plaintiff to another New York based lawyer – Paul Campson. According to Cabeceiras Campson and Derek Smith had been exchanging a lot of cases.

1731.    After getting home from the meeting with Derek Smith on 6/21/2017 Plaintiff sent an email about his Gyro case to Paul Campson (ECF No.8-2, 2108). Campson has never responded nor contacted Plaintiff otherwise despite Derek Smith's claims that Campson wants to represent him (the only exception was when Plaintiff called Campson from a different phone number, but after Campson realized who is calling he said he would call back and terminated the call). Plaintiff sent emails to

Campson also on 7/13/2017, 7/27/2017, and 8/4/2017 (Plaintiff copied Derek Smith's Cabeceiras in a few of them), and called him on 8/1/2017.

1732.    In August 2017 Plaintiff contacted several lawyers about his case against Gyro et al. In that period Defendants demonstrated the activities against Plaintiff are the FBI and/or police activities (see 8/8/2017 for example), started to use DE overtly, and among other things interfered with his search for lawyers (for example they were present at his meeting with a lawyer in Manhattan on 8/10/2017).

1733.    On 8/7/2017 after Plaintiff researched online employment lawyers Defendants in ap.B2 (the apartment above Plaintiff) commented that he is "finding a new lawyer." Plaintiff called Robert Wisniewski, Manhattan based employment lawyer, and set a meeting. Defendants in B2 commented "Can't stop him." Defendants were present and interfered with Plaintiff's meeting with Wisniewski on 8/10/2017: the 'staff' knew Plaintiff's name before he presented himself, then talked in his presence: "Arrest Kalini.".. "FBI will find and catch." … "Gyro have to stop. So let Kalin []." … "Punish him. How to game?". Wisniewski refused to listen the details of the Gyro case, and requested all relevant materials. Later Plaintiff canceled the second meeting.

1734.    On 8/11/2017 Plaintiff called Gregory Calliste – a lawyer at Manhattan's Phillips and Associates – about the case against Gyro. Calliste stated he is interested in the case, and will contact soon Plaintiff to set a meeting. After that Calliste stopped answering Plaintiff's calls and email (this is the third or fourth lawyer (if counting Campson) stating interest in representing Plaintiff, and shortly after that stop responding or refusing the case, pattern showing the Defendants' interference. See also Defendants relevant statements – explicit intent to stop Plaintiff, and the lawyers bellow. (ECF, No.8-2 at 2110)

1735.    Plaintiff called Cotchett, Pitra and McCarty on 8/15/2017 and presented his case. On 8/16/2017 Plaintiff received a mail that Cotchett, Pitra and McCarty would not take his case.

1736.   Plaintiff called Pitta LLC on 8/15/2017 and on 8/24/2017. Each time Plaintiff left his phone

number for a follow-up call to discuss his case with a lawyer or paralegal as promised, but Pitta

has never called back – the same pattern showing Defendants' interference (additional to

Defendants' explicit statements in that regard). (ECF, No.8-2 at 2111-2112).

1737.   In parallel to all of the above Defendants subjected Plaintiff to sleep deprivation, repeated

provocations, threats, and variety of attacks (including DE). See IV.11, and more. Plaintiff

stopped searching for lawyers for his case against Gyro et al, and was forced to prepare and file

lawsuit(s) as a pro se litigant.

1738.   Plaintiff has searched for relevant to *Dimitrov I* **experts** but Defendants interfered and continue to

interfere overtly with that (for example they stated in that regard "Do not answer any email."

10/10/2024).

1739.   Between 4/1/2024 and 2/11/2025 Plaintiff contacted about 100 experts, human rights activists and

organizations in regards to his case against Defendants. Defendants' intention to interfere was

overt since the first email (4/1/2024): "We have to stop that man."… "You have to stop." Then

Dula was explicit that the activities against Plaintiff are governmental: "[You are] not stopping

the United States". The next day a NJ State agent threatened to "extradite" Plaintiff (43).

Defendants were also explicit in regards to their retaliation (for example: "We have to fight that

shit." 4/4/2024; "How to set him up to stop?" Later Dula in building's corridor "fight", 4/7/2024;

"Have to punish Kalin. Sue if he is such a high brow." 8/7/2024, USPS carrier under Plaintiff's

windows).

1740.   Defendants retaliated by 'hacking' Plaintiff's email accounts / computer, blocked his emails,

deleted experts' response(s) (in one occasion it was in front of Plaintiff's eyes), and deleted files

from his computer (on 8/18/2024 Plaintiff found Bar-Tal articles were deleted, then Ralph and

Dula responded "Hacking did not work." "Have to push.".. "Fight."; on 10/29/2024 Plaintiff

found they deleted his letter to Attorney General Garland – one of the files he sent to experts).
After Plaintiff had sent an email to an expert Defendants threatened that they will arrest him
(4/7/2024, 4/9/2024), hammered on his ceiling (4/27/2024, 4/28/2024), and pressured Plaintiff to
stop (for example on 4/15/2024 Defendants' Gerardo Rossell( A1) in front of Plaintiff's door "We
want to stop." then students came under the windows "Have to stop that. How to stop…?"..
"Kalin…"… "Stop. Consider it done."; 4/27/2024 Defendants' Dula in ap. B2: "Have to stop.
Can't touch him... Kalin … "; 6/13/2024 "Tell Kalin.. can not fight."). While Defendants'
surveillance of Plaintiff has been overt for long time, in relation to his emails they deliberately
showed that they are watching his screen (for example on 10/10/2024 while Plaintiff was
searching for contact info of the Center for Constitutional Rights students came under his
windows and commented "Now you send them all."; on 11/18/2024 Plaintiff sent emails to about
45 human rights law experts based in UK and Belgium. About 30 minutes later students came and
stayed under Plaintiff's windows commenting that he is "annoying". "He sent to everyone.").

1741.    Among other things Defendants interrupted Plaintiff and his communications, including by
blocking his emails – some of the recipients did not receive them. For example on:

1742.    1/27/2025, while Plaintiff was preparing and sending emails (then he sent emails to Brennan
Center for Justice, Center for Economic and Social Rights, Columbia University's Human
Rights Institute, Professor Soohoo and Professor Davis – directors of CUNY Human Rights
& Gender Justice Clinic) his computer's Windows upgraded and became very slow, at about
3:05PM and 3:12PM Defendants rang Plaintiff's doorbell, then Ralph talked in corridor
about him ("Kalin"); 3:20PM students came and threw / kicked rocks under Plaintiff's
windows and shouted "Watch out. Watch out."; at 3:22PM while USPS carrier was in the
corridor of the building talking about "police", more students came under Plaintiff's
windows and talked loud "to stop" him; at 3:29PM and 3:32PM pipe bangs; students
screamed under his windows ("I don't care."); about 4PM two girls with badges came and
knocked to Plaintiff's door only. Minutes after the last email was sent (at 4:30PM)
Defendants in ap. G2 talked for a couple of minutes about stopping Plaintiff ("Kalin…"
"How to stop?").

1743.    2/5/2025, 4:35PM Plaintiff called Brennan Center for Justice in regards to his email from
1/27, and the young woman he spoke with said she is the one who manages the email
account but she does not remember receiving such email. Then she checked and said she
can't find the email. Plaintiff forwarded the email, and till now he got no response.

1744.    Defendants were explicit they will prevent any response to Plaintiff after he had sent by email a copy of his letter to AG Garland to HRW, NYCLU, Brennan Center for Justice, and Center for Constitutional Rights on 10/10/2024 ("Do not answer any email."). In general, except some automatic responses of persons on leave, and Mr. Abhrams response, Plaintiff received no answer or Defendants deleted them (as on 2/11/2025).

1745.    Brief history of events related to Plaintiff's search for experts since 2024 is as follows:

1746.    On 4/1/2024 Plaintiff sent his first email to an expert in regards to his case against Defendants – to Mr. Lyon. Later same day Defendants' man patrolled around Plaintiff's apartment – at 7PM in building's corridor he talked about Plaintiff "We have to stop that man." At 7:50PM he returned under Plaintiff's windows: "You have to stop." Defendants Dula also commented at 8:02PM "Psycho… won't stopping… not stopping the United States". The next day a NJ State government agent stated in building corridor they will "extradite Kalin.. Hitting the bad guy." (See above IV.2).

1747.    4/4/2024, 4:47PM Plaintiff sent an email to Dr. Veronika Nagy, Assistant Professor in Criminology at the Law Department of Utrecht University. Shortly after that Defendants actively pressured him – at about 5:22PM students came under Plaintiff's windows and talked loud about him ("Kalin"). A few minutes later Defendants' Dula in building corridor also commented "Kalin is fishing. … emergency checking. [It] wasn't them. We have to presume []." 5:51PM Defendants woman in corridor "We have to fight that shit."

1748.    4/7/2024 Plaintiff sent an email to Dr. Scott Robbins (Machine Learning, Ethics, and Counter-Terrorism). At 1:54AM, 4/8/2024 Defendants man came under Plaintiff's windows on Cedar lane "How to set him up to stop?" At about 12:30PM Dula in building's corridor talked about the "fight". About 2:15PM Ralph and a woman talked near the windows about Plaintiff. "He can't hear it.." Later Ralph entered the building's corridor laughing loud, then said quietly "He didn't forget. Assemble a team to arrest."

1749.    4/9/2024, 9:02PM Plaintiff sent an email to Adam Molnar, Assistant Professor, Postdoctoral Fellow, Surveillance Studies Centre (Queen's University). About two hours later, at 11:13PM Defendants (one of them Lea from ap.A3) in building corridor commented "Kalin won't stop." Woman on speaker "We are the people. How we arrest that..?"… "It's a set up." In the morning next day Defendants' Lea, ap. A3 talked in building's corridor "Have to stop. They call New York.." After Plaintiff started audio recording on his phone Fusion Z, she stopped and entered ap.A3 quietly.

1750.    4/14/2024, 2:12AM Plaintiff sent an email in regards to his case against Defendants to Marnie Ritchie, Assistant Professor of Communication at Pacific Lutheran University, her work is on US national security, domestic surveillance, and the Global War on Terror. And at 7:22AM Plaintiff sent an email to Dr. van der Heide, Assistant professor at Leiden University, works on terrorism. Next day Defendants' Gerardo Rossell in front of Plaintiff's door "We want to stop." Later on 4/15/2024 students came under Plaintiff's windows talking "Have to stop that. How to stop…?".. "Kalin…"… "Stop. Consider it done."

1751.    4/21/2024, 9:19PM Plaintiff sent an email to van Leyenhorst, Senior Programma Medewerker Aanpak Radicalisering & Extremisme, Supervisor VERA-2R training,

Netherlands Instituut voor Forensische Psychiatrie en Psychologie. Next day at 4:39AM Defendants man in ap.B2 commented "We lost."

1752.    4/22/2024, 3:03PM Plaintiff sent an email to Ms. Amna A. Akbar, Moritz College of Law.

1753.    4/26/2024 Plaintiff sent an email in regards to his case against Defendants to Paul Gill, Professor at University College London's Department of Security and Crime Science. A minute later 5:25PM Defendants commented in front of Plaintiff's door "Can't provoke." They seemed to entered ap. A1. Plaintiff stated for the record the date and time, they laughed "Reversal." This is after Defendants provoked Plaintiff since about 1PM and he filed a police report against group of students one of who threw a rock toward Plaintiff.

1754.    4/27/2024 Plaintiff sent an email in regards to his case against Defendants to Caitlin Clemmow, Department of Security & Crime Science, University College London, London, UK. And in the evening same day Plaintiff sent an email to Dr Rich Evans, criminology author. In the morning next day while Plaintiff was in toilet Defendants' Dula in B2 commented "Have to stop. Can't touch him…. Kalin … " At 11:09AM, about 10 minutes later Defendants in ap. B2 knocked multiple times above Plaintiff. He reacted "My friend stop provoking." In response Defendants in B2 hammered on his ceiling. Plaintiff spoke louder "Hey stop knocking." B2 kept knocking. Plaintiff reacted "Ha, ha I'll make you knock for 5 minutes. So pathetic." Dula in B2 responded "Mocking…"

1755.    4/28/2024. 11:22PM Plaintiff sent an email in regards to his case against Defendants to Christopher Dean, Registered Forensic and Practitioner Psychologist with the Health and Care Professions Council, a Chartered Psychologist and Associate Fellow of the British Psychological Society. At 12:03AM, 4/29/2024 Defendants in B2 slammed, and minutes later hammered on Plaintiff's ceiling.

1756.    5/9/2024, Plaintiff sent an email in regards to his case against Defendants to Elizabeth E. Joh, criminal law, constitutional law, and policing at the U.C. Davis School of Law. About 3PM Defendants' man from B2 came under Plaintiff's windows talking "Can't hit him." A minute later after 4-5 slams Defendants in ap. B2 hammered on Plaintiff's ceiling.

1757.    5/21/2024, Plaintiff sent an email in regards to his case against Defendants to START, A Department of Homeland Security Emeritus Center of Excellence led by the University of Maryland.

1758.    6/13/2024, 10:24PM while Plaintiff was reading and preparing an email to Ruth Blakeley, School of Politics and IR, University of Kent Defendants in B2 hammered on his ceiling. At 10:30PM Plaintiff sent the email. About 11:25PM while Plaintiff was downloading articles about psychological torture Defendants' woman at distance commented "Kalin believe."

1759.    6/14/2024, 12:30AM Defendants' man in a car parked on Red Road challenged "We can't stop." About 12:48PM Defendants' Christine, Jamaican food truck near Plaintiff's windows said "Tell Kalin.. can not fight."

1760.    7/29/2024, Plaintiff sent an email in regards to his case against Defendants to Benjamin Ducol, Presearch manager at the Centre for the Prevention of Radicalization Leading to Violence (CPRLV); Christine H. Neudecker, Rutgers University, Newark, NJ, USA; and Dr. Garth Davies, Associate Professor in the School of Criminology at Simon Fraser University. About 4PM got to Teaneck Creek, while Plaintiff was finding place for his bicycle on Flycke Str. a kid asked "What's the stressor?" (4:05PM) Plaintiff started working on tortuous interference. A group with kids gathered on benches next to him, left for a while, then returned staying nearby. At 4:39PM the group passed Plaintiff saying loud "Why don't pursue him?" About 4:45PM Defendants' woman commented "We have to stop." … "Kalin". About 5:10PM they left the park.

1761.    8/7/2024, Plaintiff sent an email in regards to his case against Defendants to Joshua Sinai, Department of Intelligence and Global Security, Capitol Technology University. About 4:30PM Plaintiff was in toilet playing on his phone. USPS carrier under his window commented "Have to punish Kalin. Sue if he is such a high braw." She entered the building talking.

1762.    8/8/2024, Plaintiff sent an email in regards to his case against Defendants to Human Rights Watch – New York Committee (nycommittee@hrw.org). Minutes before that at 7:13AM while Plaintiff was searching for email addresses in Internet Holy Name guard neighbor came under Plaintiff's windows "This is hostile." 1:16PM while Plaintiff was in toilet Defendants man came under the window threatening "It's not a game. We are [] to set up." Plaintiff jumped and looked through his windows but the man was hidden. Plaintiff challenged inside his apartment "Why so afraid? Hiding, talking.. Not convincing.." 10:34PM Defendants man under Plaintiff's windows on Cedar lane "You lost."

1763.    8/12/2024, Plaintiff sent an email in regards to his case against Defendants to Max Abrahms, Associate Professor of Political Science. Abrahms responded in an hour – the only response.

1764.    8/18/2024, 11:21PM Plaintiff sent an email in regards to his case against Defendants to Ataria, and at 12:22AM, 8/19/2024 Plaintiff sent an email to prof. Bar-Tal in regard his litigation against Defendants. While he was preparing to send it looked through Bar-Tal articles and found that multiple of them were deleted from his computer. By Defendants. On 8/20/2024, 11:50AM Ralph and Dula(?) "All []. Hacking did not work." Dula entered quietly ap. B2. "Have to push.".. "Fight."

1765.    10/10/2024, Plaintiff sent an email in regards to his case against Defendants and his letter to AG Garland to HRW, NYCLU, Brennan Center for Justice, and Center for Constitutional Rights. At 2:38PM while Plaintiff was searching for contact info of the Center for Constitutional Rights student came under his windows "Now you send them all." About 5:50PM Plaintiff was taking a bath. Defendants talked nearby "How to make him stop?" 5:56PM Dula commented "Bad ass. Bad one. Bad one." Teaneck police car on speaker under Plaintiff's windows "Is there anyone on the roof?" About 6:10PM Defendants couple under Plaintiff's windows "Do not answer any email." "He did provide []."

1766.    10/11/2024, Plaintiff sent an email in regards to his case against Defendants and his letter to AG Garland to DHS Office for Civil Rights and Civil Liberties and ADL. Two minutes later 12:52PM Defendants woman under Plaintiff's windows "You are bad. Hope they knock your ass."

1767.    10/29/2024, Plaintiff sent an email in regards to his case against Defendants to Joh – different content. Plaintiff found that Defendants deleted the copy of his letter to AG Garland from his computer, and he had to copy it again to sent it as attachment.

1768.    11/12/2024, Plaintiff sent an email in regards to his case against Defendants to about 30 persons human rights advocates, international human rights law experts in Human Rights Watch, Yale, Columbia University. Plaintiff sent an email in regards to his case against Defendants to Khawaja

1769.    11/18/2024, Plaintiff sent an email in regards to his case against Defendants to about 15 UK based international human rights law experts, and to about 30 international human rights law experts based in Belgium. About 11:30AM students came and stayed under Plaintiff's windows commenting Plaintiff is "annoying". "He sent to everyone."

1770.    1/27/2025 and 2/5/2025 – see above.

1771.    2/11/2025, 1:30PM Plaintiff called professor Joh and left voice mail. Defendants in ap. B2 commented "We lost that." Plaintiff forwarded his email in regards to his case against Defendants to prof. Joh.

1772.   2/20/2025, Plaintiff was looking at his Yahoo app when an email from UCL Davis (prof. Joh's employer) disappeared – Defendants deleted it in front of his eyes. 10:29AM Defendants in B2 commented "He believe…" "We [] to stop []." Later at 10:33AM "Completely stopped." Plaintiff checked his other emails – there was no email from UCLA Davis. 10:39AM Defendants man in B2 "He believe. He [] to push." 10:45AM Defendants in B2 hammered on the ceiling – not loud.

**(ii) Defendants prevented or significantly slowed down the discovery of Plaintiff's legal claims with their policy and practice to ignore and not investigate his reports and complaints.**

1773.   Plaintiff filed a report with Teaneck police on 9/11/2012 for the organized threats, pebbles at his windows and other conduct of Defendants in 8/2012-9/9/2012, but then he had no idea who and why targeted him other than because they considered him a Bulgarian fagot, and a threat. (See ECF, No. 8-1.B). Plaintiff had insufficient information about the perpetrators and, consequently, about the applicable legal grounds – he had no 'complete and present cause of action'.

1774.   Defendants significantly impeded Plaintiff's abilities to discover what are his legal claims because they do not investigate his petitions (exception, which proves the principle, are the proforma investigations of Plaintiff's reports filed in 2024 with Teaneck police). See failure to investigate IV.8(b)(2)(v)(B). Plaintiff started discovering his legal claims with significant delay and slowly since about June 2016 when he started working on case materials (see above IV.10(a) (i)), and only after his visit to the FBI New York on 11/8/2017 he realized that it is the FBI that leads the activities against him.

1775.   Furthermore Defendants suppressed the evidence Plaintiff provided, for example, by intercepting his emails (as his email from 2/24/2022 to Teaneck police officer Ruscingno which contained an audio recording and information related to a Plaintiff's police report (see ECF No. 8-1, 334, 338)), or not entering in the police system Plaintiff's handwritten statements and evidence materials which were part of his reports with Teaneck police (as for example with his report from 9/11/2012, ECF, No.8-1 at 20). Defendants did not want to preserve that evidence let alone searching for more.

**(iii) Defendants prevent or obstruct Plaintiff to obtain or preserve evidence for their violations.**

1776.   Defendants actively prevent Plaintiff to obtain case-relevant information and evidence by (1) evasion and retaliation to his lawful recording of events; (2) precluding in practice Plaintiff from obtaining objective witnesses (by dissemination of false and defamatory information about him, setting Defendants' agents as neighbors of Plaintiff, utilizing CVE and anti-gang programs with wide participation of community and other non-government parties); (3) by acting under cover identities, which is only for the purpose of evading and/or obstructing Plaintiff's claims – Defendants' demonstrative conduct proves that; and (4) deliberately mislead and/or distract him.

<u>(1) Defendants' evasion and retaliation to Plaintiff's lawful recording of relevant events.</u>

1777.   In all relevant time Plaintiff's right to record governmental officials in public space, and his right to record matters of public interest have been well established. Plaintiff's recording of events is lawful under 18 U.S.C. §2511 (2)(d), and under the laws of both New York[137] and New Jersey[138]: recordings are made in his presence, the recorded events concern matters of significant public interest, and the records are with apparent communicative purpose and audience: Plaintiff's records are intended to expose crime, and governmental oppression, inefficiency and misconduct.

1778.   Plaintiff keeps handwritten log of events with increasing detail since the end of 2014, and has made photos, audio and/or video records of relevant events in his apartment in Teaneck, NJ, and relevant events occurring at the area adjacent to his building in front of his windows (including the streets next to his building), or in public space as parks, streets, and the public space of governmental or private buildings. Plaintiff's detection and recording of EMF almost always is inside his apartment. In a few rare occasions he measured EMF in his building public areas – corridor and laundry room.

---

137 N.Y. Penal Law § 250.00(1); N.Y. Penal Law § 250.05 as quoted in *Laws on Recording Conversations in All 50 States*, Matthiesen, Wickert & Lehrer, S.C., LAST UPDATED 3/10/17
138 N.J. Stat. Ann. § 2A:156A (West 2012) as quoted in *Reporter's Recording Guide*, The Reporters Committee for Freedom of the Press, 2012

1779.    A demonstration of his records' communicative purpose and intended audience is the fact that the case-specific factual material in Plaintiff's complaints with the federal court of Southern District of New York filed in 2018 and 2023 is almost entirely based on his records (including handwritten logs of events). Similar is the case with Plaintiff's Administrative claims with the FBI under the FTCA from 11/10/2022 and 8/29/2024; and his other petitions.

1780.    That is explicitly stated in Plaintiff's complaint against Defendants: he started to record regularly events in his presence since 2015, and since about May 2016 continuously in response to Defendants abusive conduct (ECF, No. 1, at 251). Furthermore the use of records as base for the factual statements was indicated by the fact that the speech quoted in the complaint is transcription (*Id.*, n.5). Plaintiff mentioned a few times that he made or worked on case-related recordings / transcripts (see *Id.*, at 58, 59, 185, 221, 257, 281, and 302). All of that shows that Plaintiff has intended his records to serve as evidence, their intended message is exposing crime, and governmental oppression, inefficiency, and misconduct.

1781.    Plaintiff also provided a few times audio recordings, videos, and/or transcripts to Teaneck police, and/or to the Township of Teaneck's Manager as evidence for the events he has reported with the police since 2012.

1782.    Plaintiff provided two audio recordings he made on 9/7/2012 (after police officer had requested a proof in regards to his account of events) together with handwritten statement and a page with sketches and notes when he filed a report with Teaneck Police on 9/11/2012 (ECF, No.8-1, 17-18, 20). Because Plaintiff's practice of recording started as a response to the Teaneck police officer request for evidence from 9/7/2012 Plaintiff named in his archives the folder with audio and video recordings For Police – also showing the intended audience.

1783.    Plaintiff filed a report with Teaneck police in regards to the tearing of his delivery and stolen drugs, and sent by email to Teaneck Police officer Ruscingno on 2/24/2022 and 2/28/2022 a link to a relevant audio recording (ECF, No. 8-2, at 1872, 2022).

1784.    Plaintiff filed a report on 4/26/2024 with Teaneck police officer Garland, and sent to him email with a link to a video recording of the events he reported.

1785.    On 5/2/2024, 4:54PM Plaintiff sent an email to officer Garland about the ongoing abuse he is subjected with the participation of Teaneck High School students, which included a link to two audio recordings, and draft transcripts of the relevant parts of the recordings.

1786.    On 7/16/2024 after Plaintiff called Teaneck police and filed a report # 24-031055 he sent an email to officer Strickland, the Township Manager, and Township clerk with a link to video recording of the events he reported, which also included as chain-emails his previous emails with officer Garland (including the email with the transcripts).

1787.    On 9/25/2024 Plaintiff sent again an email to Township Manager and police officer Garland in relation to his police reports, and the ongoing organized harassment.

1788.    Additionally Plaintiff has sent a few of his records, and transcripts for consideration by legal and other experts in relation to his legal cases.

1789.    For example Plaintiff prepared transcripts and sent examples to NYCLU by fax and in a mail on 12/14/2017 (ECF, No.8-1, 2113). Plaintiff sent a few materials based on his records, including transcripts of some of the relevant recordings to all legal and human rights experts he contacted in 2024 and 2025 (1738 *et seq.*).

1790.    Defendants are fully aware of the purpose of Plaintiff's recordings ("Sue us.") and actively try to evade liability ("Must figure out how to talk to him." 5/13/2016).

*(A) Defendants use third parties, modify their behaviors and/or the environment at least in part with intention to evade Plaintiff's record of relevant events.*

1791.    Defendants *use third parties* (for example students) at least in part to evade being recorded. In a few occasions Defendants explicitly instructed other parties what to 'tell Kalin' (usually 'to stop'). The apparent meaning is that Defendants use other parties to talk to Plaintiff instead to talk to him themselves, but that also implies difference in power such as in the relation instructor – trainee, or superior to subordinate.

1792.    6/10/2020, 7:14AM Defendants from ap.A3 under Plaintiff's windows "They are pulling us out." "Tell Kalin stop." ECF No.8-1 at 480.

1793.    7/12/2022 Tuesday while Plaintiff was walking toward Votee Park on Queen Ann Rd. a group of high school boys (they got from the fields of Teaneck High School) walked both behind and in front of him. Defendants instructed "Tell Kalin stop." ECF No.8-2 at 2516

1794.    7/20/2022 Wednesday, while Plaintiff was working at the benches next to Provident bank 4-5 Teaneck High School boys sat next to him and suddenly became very loud. Plaintiff made a video, and their Defendants' supervisor directed what to tell: "I noticed that."... "Get a photo." "They (lost)." "Tell Kalin []." "Telling Kalin to stop." "They are stop(ing)." "Can you (talk)?" "Kalin stop. Believe." ECF No.8-1 at 116, and 8-2 at 2741 *et seq.*.

1795.    9/13/2022 Tuesday, Cesar Naranjo, super, instructed persons in a car under Plaintiff's windows: "Tell Kalin stop doing []." "You lost." "Tell him (stop)." "(Force) stop." ECF No.8-2 at 4560 *et seq.*

1796.    8/18/2023 Friday, while Plaintiff was working on his Objections to Report and Recommendations (ECF No.8) Defendants posing as clients to a food truck nearby talked with the staff for hours about Plaintiff, instructing at 3:52PM "Tell Kalin fight []... Kalin [] trying to escape and []."

1797.    9/9/2023 Saturday, 6:24PM Defendants' man near Plaintiff's windows "Tell him to stop."

1798.    2/2/2024, 8:09PM after Plaintiff worked on a transcript Defendants in ap. G2 talked about him ("Kalin") and the FBI. "Tell Kalin …"

1799.    6/14/2024, after Plaintiff worked during the night of case materials, at about 12:48PM Defendants woman at Jamaican food truck: "Tell Kalin.. can not fight."

1800.    6/21/2024, 3:48PM Defendants' man in apartment near Plaintiff "Tell Kalin stop."

1801.    7/6/2024, 11:25PM Defendants' man in ap.A6 directed "State that Kalin have it."

1802.    As an example of Defendants modifying their conduct – since about 2015, when Plaintiff started to document regularly events, Defendants *reduced significantly the use of 'fagot'* as reference to Plaintiff. And in the recent years noticeable portion of *Defendants' talking has been in Spanish* (Plaintiff does not speak Spanish).

1803.    Defendants have *started using elaborate stories or roles* to cover up the fact that their verbal conduct targets Plaintiff. For example to talk to Plaintiff they pose as clients to Yola or to Jamaican Food trucks which usually park next to Plaintiff's windows (that practice started in about the summer of 2022 when he was finalizing Notice of claims and Administrative claims to Defendants). Since May 2025 Defendants repeatedly engage in very long 'calls', walking back and forth around Plaintiff to talk in disguise to him when he is working outside. For example when Plaintiff was working on this very sentences on 7/22/2025 Defendants' man walked by and stayed(!?) behind him for about 35 minutes saying among other things "We post []. We had to stop. Hit []. Psych.. He keeps going… This is the legal authority. Kalin… Campaign…". Defendants also do "life-coaching" in Plaintiff's presence with 'advice' directed at him – see for example 5/14/2025 when Plaintiff was working in Votee Park, Teaneck, NJ, Defendants' man for about an hour gave life advises to a silent man next to Plaintiff, and at the end revealed that it was intended to stop Plaintiff from working on this very complaint. See above 705.

1804.    Defendants make *significant effort to obstruct Plaintiff's recording*. For example in many occasions when Plaintiff started his Olympus recorder Defendants stopped talking, changed the topic, switched to Spanish, or moved away.

1805.    1/7/2020, 11:07PM very loud talking in the building's corridor. Women in ap.A6 talked again about "police". Plaintiff started Olympus and they stopped talking for a while. Later continued talking about the "fight.." ECF No.8-1 at 783.

1806.    11/13/2021 Saturday, 6:13PM Plaintiff felt and immediately detected 13 mW/m$^2$ ray from ap.B2 at his head. Later after Plaintiff watched part of Colony, a movie with Ema Watson

about torture program in Chile, and was working on CIA interrogation guidelines a woman in building's corridor commented at 8:51PM "Make him uncomfortable." Plaintiff started Olympus recorder and a person commented "He is listening." and stopped talking. ECF No.8-1 at 270.

1807.   11/18/2022 Friday at about 1PM Plaintiff saw the same group of 6-7 students (from previous day) under his windows and a woman, who Plaintiff believe was their supervisor. Students went toward the Teaneck high school walking on Red Road but the woman returned again under his windows. After seeing Plaintiff on Red Road again she turned and left the area. Later students yelled under Plaintiff's windows "Can't believe." and talked there for a while (3:38PM) then talked in the lobby of Plaintiff's building commenting what "police said". The moment Plaintiff started Olympus recording in his apartment they left. ECF No.8-2 at 6024.

1808.   1/17/2023 Plaintiff started working on his Supplement to his Notices of claims. Defendants woman in the corridor commented "we messed with the wrong guy." (1:07PM) When Plaintiff started Olympus she continued talking in Spanish.

1809.   1/24/2023a USPS carrier-woman commented in building's corridor that Plaintiff is "still fighting" (4:10PM), and after Plaintiff started Olympus – she talked about a letter. ECF No.8-2 at 6017.

1810.   1/29/2023 Sunday 10:00AM a woman in ap.A3 talking "We can't stop him. Can't receive it." Floor cracks from A3. Plaintiff started Olympus recorder in building's corridor person commented "Can't talk." After that no talking. ECF No.8-2 at 6094.

1811.   1/31/2023, 9:56PM Thai woman "Kalin [] to screw it." Plaintiff was working on photo portfolio. Plaintiff started Olympus – she switched to another language. ECF No.8-2 at 6136.

1812.   7/3/2023 (ECF No.8-2 at 8522)

1813.   7/18/2023 Tuesday, 1:25PM Teaneck police car parked under Plaintiff's windows, ambulance came in front of the building. Loud noise of engine working. Defendants talked about Plaintiff in the corridor quietly ('Kalin'), but after Plaintiff started Olympus - no talking. Later at 5:35PM after Plaintiff challenged "If you are right why are you hiding?" Thai woman commented on B level "We lost." She stopped talking after Plaintiff started Olympus.

1814.   7/20/2023 Thursday, 4:32PM Defendants' person in corridor talked about Plaintiff "He is []." When Plaintiff started Olympus recording the person responded "Not good. Not good man." and stopped talking.

1815.   7/25/2023 Tuesday (the day Plaintiff started *Dimitrov I*), 10:35AM Plaintiff was finalizing Relevant History file, when in corridor woman on speaker "Kalin []. We can't stop." Plaintiff started Olympus recording – talking stopped.

1816.   8/12/2023 Saturday, after Plaintiff watched DW video about Prigojin, Youtube's algorithm loaded a video about Putin. Dula came in building's corridor and commented "Russia, Russia, always Russia." Plaintiff started Olympus recording and Dula stopped talking about Russia but continued with seemingly irrelevant talking.

1817.   9/27/2023 Wednesday, 10:11AM Plaintiff was scanning for DE when Defendants' man in building corridor talked about "security" and "Kalin". After Plaintiff started Olympus he became quiet saying "See the stitch."

1818.   10/3/2023 Tuesday, 12:50AM Defendants' man in building corridor talked how "to stop Kalin." After Plaintiff started Olympus he stopped talking.

1819.   10/19/2023 Thursday, Plaintiff was transcribing and when he wrote at 7:37PM "They want to arrest him." Defendants in ap.B2 loud commented "They don't want.." Plaintiff started Olympus recording and after that B2 were silent.

1820.  1/11/2024, 6:48PM Plaintiff was downloading legal cases deliberating about Sua Sponte and Motion to reconsider. Defendants in building's corridor commented "The guy is fighting." Plaintiff started Olympus recording – they stopped talking.

1821.  2/2/2024, 8:09PM Defendants in ap. G2 talked about Plaintiff ("Kalin") and FBI. Plaintiff started Olympus woman in G2 stated "Tell Kalin …" and stopped talking.

1822.  3/5/2024, 11:08AM while Plaintiff was working on security video loud drilling noise started near Plaintiff's windows. Men talked next to white van "Can't stop. Kalin survey." Followed knocks in building's corridor. About 11:20AM after hearing men under the windows talking "Can't harass him." Plaintiff started Olympus. They left.

1823.  4/23/2024, Defendants in ap.B2 repeatedly dragged something heavy above Plaintiff at 10:07AM, 10:41AM, 10:42AM then Dula in ap. B2 commented "He may not even (hear)." Plaintiff started Olympus and she stopped talking. At 11AM dragging again.

1824.  5/23/2024, 1:04PM Defendants' man at Jamaican food truck talked while Plaintiff was playing online "He believe we don't game." Defendants' woman in building corridor "Have to stop tracking." After Plaintiff started Olympus she stopped talking and left. The man returned to Jamaican food talked "Stop."

1825.  6/10/2024, about 2:10AM after knocking on Plaintiff's ceiling Dula in ap. B2 "You want to start a war?" she stopped talking when Plaintiff started Olympus.

1826.  7/18/2024, 11:38AM Defendants' woman in building corridor "Fight that shit." After Plaintiff started Olympus she stopped talking, and climbed the stairs.

1827.  9/5/2024, 1:05PM Defendants in corridor said "They want to stop." After Plaintiff started Olympus they switched to Spanish.

1828.  9/10/2024, 3:33PM Defendants in building corridor commented Liberty City Seven case which Plaintiff was watching about "Ha, ha.. Real set up." After Plaintiff started Olympus they left.

1829.  9/26/2024, about 8:20AM Defendants' Dula entered ap.B2 talking "We have to stop." 8:26AM Defendants' man in B2 "Kalin..." Plaintiff started Olympus they stopped talking.

1830.  10/7/2024, 10:15AM garbage truck near the windows. Talking "Kalin… Stop." After Plaintiff started Olympus talking switched to Spanish.

1831.  10/10/2024, 2:49PM Plaintiff sent an email to Mr. Dixon, Center for Constitutional Rights in regard his letter to Attorney General Garland about violations of FBI/JTTF preventive investigations. 2:52PM Defendants woman in building corridor with a man on speaker "He believes he is 100% right." Plaintiff started Olympus recording she left the building laughing.

1832.  10/14/2024, 4:43PM Plaintiff was working on UN complaint materials when Defendants in building corridor "He made a move." He started Olympus recording, Defendants woman "Play the game." Man responded quietly, after that door closed, no talking.

1833.  10/31/2024, 12:57PM Defendants' man came in front of Plaintiff's door and said "We got approval." After Plaintiff started Olympus he didn't talk, seems entered ap. A1.

1834.  11/2/2024, 10:25AM Defendants Ralph and woman in building corridor "Pass him.." "Kalin.." Plaintiff started Olympus and the woman "I told them he will not stop." and left.

1835.  11/29/2024, 1:10PM Defendants in corridor "FBI []." After Plaintiff started Olympus he switched to Spanish, but the man on speaker continued "FBI… police have to punish."

1836.  12/1/2024, 2:26AM Defendants man in building corridor "We all push." After Plaintiff started Olympus talking stopped.

1837.  12/9/2024, 5:20PM Ralph in building corridor "We've got to teach him.." After Plaintiff started Olympus he moved in the lobby. 5:30PM Ralph got back in corridor "Keep fighting."

1838.   12/18/2024, 4:35PM USPS carrier woman in building corridor talked about Plaintiff "Kalin". Plaintiff stopped TV and started Olympus, she switched on foreign language. But under Plaintiff's windows she again mentioned his name. "Kalin."

1839.   12/24/2024, 7:26AM the B2 man in building corridor "Kalin can't believe… Police was threatened..." After Plaintiff started Olympus the man returned in ap. B2. Dula(?) talked in B2 "[] to stop." The man talked above Plaintiff's corridor.

1840.   12/29/2024 till 11:01AM Plaintiff was reading in toilet when Defendants in B2 knocked, then a woman came under the windows and talked not loud "Kalin have us. It is us. It is us." Plaintiff started Olympus, she continued "We won't stop." When Plaintiff got to window to make a video she was not visible. Defendants in B2 hammered on the ceiling while Plaintiff was writing the note about the events.

1841.   1/12/2025, about 9:09AM while Plaintiff was watching TV Defendants in ap. G2 talked "We lost. He didn't hear it." Plaintiff stopped the TV and started Olympus recording. Defendants in G2 stopped talking.

1842.   1/19/2025, 9:18PM Defendants' woman in building's corridor "We got to punish him." Plaintiff stopped the TV ans started Olympus recording. She went upstairs.

1843.   1/29/2025, 11:25PM while Plaintiff was working on interference with cases Dula talked loud in ap. B2 "We stopped.. Don't believe.." Defendants' woman in building's corridor "Have to forget." Plaintiff started Olympus "He gives a shit. Gives a shit." She climbed the stairs.

1844.   2/9/2025, 7:26AM Ralph talked with a woman in building's corridor about 'gang'. After Plaintiff started Olympus they witched to Spanish. Holy Name guard came in and said "They change it. Calling me while I was asleep. International gang." Plaintiff was still working on UN complaint.

1845.   2/27/2025, 8:05PM Ralph talked in building's corridor "We have no power." After Plaintiff started Olympus he and a woman talked loud in Spanish.

1846.   3/4/2025, 11:50AM Defendants man in ap. B2 "Bulgarian stop []." Immediately after Plaintiff started Olympus talking stopped. 12PM Dula in B2 "allow Kalin []." Talking on loudspeaker, reduced as volume.

1847.   3/6/2025, 6:25PM Ralph loud "What Kalin did.. This guy is sick." Soon after Plaintiff started Olympus Ralph stopped talking."Kalin set. all right. OK." Plaintiff was playing online.

1848.   3/14/2025, 8:57PM Holy Name guard in building corridor "We have no power." When Plaintiff started Olympus talking stopped.

1849.   And more.

1850.   Defendants have started *messaging Plaintiff by talking or playing content on speaker* – frequently since 2021. Among other things this is demonstration that Defendants' conduct against Plaintiff is not a local activity, persons at other locations are simultaneously engaged; or things are prepared in advance: recorded or found the proper content, and played next to Plaintiff. For example on:

1851.   2/28/2017 police officer with group of students (having an "inspiration day"), and Defendants inside the building talked next to Plaintiff for a while, then at 1:03PM played under his windows on speaker "Destroy one Bulgarian."

1852.   6/2/2021 Plaintiff worked on this Notice of claims, when at 6:35PM a Teaneck Police car passed under his windows on Cedar lane, and the officer said on speaker "Give other options." ECF No.8-1 at 136.

1853. 11/20/2021 at about 10:38PM when Plaintiff worked on relevant history a police car (blue-red lights on) stopped under Plaintiff's windows on Cedar lane, and the officer said on speaker "Have to stop him." At 11:07PM Defendants' man in building corridor warned "Fucking stop." He returned later talking on a call "Is he really cost you so much?" ECF No.8-1 at 183..

1854. 4/29/2021, 6:18PM in corridor a woman on speaker talked about "hostages". ECF No.8-1 at 526.

1855. 6/18/2021 Defendants' women passing by Plaintiff in Votee Park, Teaneck played on speaker a recording saying "hostage". ECF No.8-2 at 2167.

1856. 10/1/2021 Friday, 8:03PM when Plaintiff returned home in the corridor Defendants woman commented that "Somebody scared him." And a person on speaker responded "working on that." ECF No.8-2 at 1973.

1857. 10/29/2021, 1:53AM Defendants' person played on speaker one sentence only "Think you can have a stop." ECF No.8-1 at 266.

1858. 12/3/2021 Plaintiff was working on relevant history for ap.A3 when at 11:03PM Defendants person got outside and then back in the building corridor playing on speaker one sentence: "Fuck off." ECF No.8-1 at 274.

1859. 1/5/2022 Wednesday, Plaintiff worked on timeline of events till 3:28AM. At about 1AM Defendants' man played on speaker something inside the corridor, got outside of the building but quickly returned playing stuff on speaker. ECF No.8-1 at 284.

1860. 2/17/2022 Thursday, at 3:20-3:26AM a person under Plaintiff's windows listened on speaker music similar to previous days. ECF No.8-1 at 327.

1861. 4/24/2022 Sunday Defendants' men in ap.A4 commented Plaintiff's earlier conversation with Bulgarian relatives. A person on speaker said "He knows we survey, why talk for Russia?" ECF No.8-2 at 2069.

1862. 5/5/2022, 5:03PM Ralph and Gerardo (A1) talked in Spanish. Defendants' person on speaker mentioned Plaintiff ("Kalin") when Plaintiff went in his corridor. Then Ralph interrupted the conversation, and Gerardo entered ap. A1. 5:09PM Defendants man close to Plaintiff's windows commented "Can't fight." ECF No.8-1 at 404.

1863. 7/22/2022 at about 10:20PM Defendants' woman entered the building talking with another woman on speaker and commented "He didn't make a friend." "He is not a soldier." "Oh." ECF No.8-2 at 2840.

1864. 8/5/2022 Friday, 3:20PM Plaintiff was in Phelps park when a Teaneck police car parked next to him (parking was almost empty), a bit later the officer spoke with tennis players. [man on loudspeaker from police car] "Private land []." "Get him []." "That we []." "Got to pay." ECF No.802 at 3197 *et seq*.

1865. 8/8/2022 Monday, when Plaintiff was walking back home high school girl and 2 boys in front of house on Cranford Pl., the street next to Teaneck High School talked about him ("Kalin"). A bit later on Red Road a schoolboy played on his phone on speaker "Kalin". ECF No.8-2 at 3284.

1866. 9/23/2022 Friday, Teaneck police cars blocked Cedar lane next to Plaintiff's windows, and an ambulance parked on Red Road from which two men got out, looked at Plaintiff who made video through his window. "Stop. Let Kalini []." "[on speaker] How could you stop that []?" ECF No.8-2 at 4874 *et seq*..

1867. 10/4/2022 Tuesday, 4:25PM USPS carrier in the building talked about Plaintiff ("Bulgarian"), person on speaker "They lost." They kept talking on foreign language. ECF No.8-2 at 5212.

1868.    10/5/2022 Wednesday, 4:17PM Defendants' man on speaker played under Plaintiff's windows "Kalin wants []." ECF No.8-2 at 5304.

1869.    10/28/2022 Friday, 5:49PM USPS carrier talked in foreign language in building's corridor. The person on speaker said Plaintiff's name "Kalin" 2 times. USPS truck #2217008 ECF No.8-2 at 5853.

1870.    11/5/2022 Saturday, Defendants in ap.B2 knocked repeatedly on Plaintiff's ceiling. Then Defendants played a woman on speaker under his windows "They can not suppress him." (8:23AM). ECF No.8-2 at 5906.

1871.    11/10/2022 Plaintiff went to FBI New York Field office intending to hand-deliver his Administrative claims under the FTCA and there agents and officers commented "What Bulgarian must remove?" "We have stopped." "Ask Bulgarian []." "Who stopped? Did I [stop]?"... "Global harass." "Glad to harass." Man on speaker "How to [harass]?" ECF No.8-2 at 5913.

1872.    12/14/2022 Wednesday, Plaintiff worked on public national security materials till 5AM. Defendants awakened Plaintiff at about 8AM when Dula ('D') and about 6 other Defendants talked in building corridor about him. A man on speaker participated: "Get arrest." ECF No.8-2 at 5977.

1873.    12/29/2022 Thursday. Defendants awakened Plaintiff at 8:17AM and a bit later in building's corridor Defendants' Thai-woman and a man on speaker talked about Plaintiff ("Kalin") and the "abuse". ECF No.8-2 at 5997.

1874.    1/7/2023 for about half an hour since 2:30AM Defendants' person in the car parked under Plaintiff's windows on Red Road spoke with its speakers very loud. Earler Defendants' Thai-woman got off from the car. ECF No.8-2 at 6004.

1875.    1/31/2023 Tuesday, 5:13PM Plaintiff was working on First Amendment materials when a man in the corridor commented "He (is) suing.." A woman was on the speaker. "We don't believe." The same man under Plaintiff's windows "I don't believe he wants to sue us." ECF No.8-2 at 6132.

1876.    6/5/2023 Monday, 3:41PM Plaintiff was working on *Dimitrov I* complaint when 3 Defendants' women in Votee passed him teasing him 'Where are police, FBI? Ha, ha, ha…' Plaintiff didn't manage to make a video or photo of them because of issue with the phone miniSD card. 4:03PM Defendants' man sat on table next to Plaintiff and played on speaker 'He got no camera. .. Assault weapon…' A few persons arrived almost at the same time and sat each on other tables. ECF No.8-2 at 8041-42.

1877.    6/9/2023 Friday, 5:37PM USPS talking with another woman on speaker "Kalin…" Plaintiff was working at that moment on material including that USPS carrier. Plaintiff started Olympus she responded "Kalin [] recording. But can you use it?" ECF No.8-2 at 8111.

1878.    1/5/2024, 9:45AM Defendants in ap.B2 hammered on Plaintiff's ceiling, and started playing recording about Plaintiff on speaker ("Kalin" at about 10:02AM).

1879.    1/6/2024, 7:47PM Defendants in ap.B2 talked/played on speakers "Completely lost… Stop…" 7:52PM "Bulgarian stopped…" "We lost."

1880.    1/11/2024, 2:20PM Dula and Defendants man on speaker in B2 talked about Plaintiff ("Kalin.."). In building corridor Defendants Ralph and Lazarius (not correct name) commented. Ralph "They got to do what they got to do… Police shut the []."

1881.    2/9/2024, 5PM USPS carrier woman and a woman on speaker talked about Plaintiff ("Kalin").

1882.    2/15/2024, while Plaintiff was scanning Defendants in ap.B2 played a record on speaker "Completely stop."

1883.  2/17/2024, 10AM-10:20AM Defendants in B2 again playing on loudspeaker messages among other "Can't stop. Don't believe."

1884.  2/21/2024, 8:48PM Dula on recording played on loudspeakers in B2 "FBI… Didn't stop. … Can't harass now."

1885.  2/24/2024, 7:49AM Plaintiff was awakened by strong knock on the ceiling from Defendants in B2. Since then they started playing a recording on loudspeaker for about an hour. Including: "Can't stop. .. Can't believe… Have to stop… Kalin…" Defendants in ap.B2 also knocked strong a few times on Plaintiff's ceiling above his corridor.

1886.  2/25/2024, 10:06AM Dula on speaker in B2 "Bulgarian… Can not stop. Do You []? They stopped. You can't believe."

1887.  3/5/2024 when Plaintiff got home (8:45PM) Defendants in B2 talked on loudspeaker "Can't believe." 8:48PM "Why they don't stop doing this? We moved. Stopped." 8:50PM Defendants in ap. B2 hammered on Plaintiff's ceiling. Not loud. 8:51PM B2 "He doesn't stop monitoring." Plaintiff challenged inside his apartment "You are crazy. Speaking on loudspeakers and saying simultaneously you stopped, and you will never stop." Talking in B2 stopped.

1888.  3/7/2024, 8:21AM when Plaintiff was scanning Defendants man on loudspeakers again "Can't stop… Kalin believe..."

1889.  3/12/2024, 4:45PM USPS came under the windows talking "We really want to stop." Plaintiff made photos – two USPS carriers – one the regular Indian woman who pointed at Plaintiff when he got to his windows.. "He has to stop." 4:56PM Defendants woman on speaker under the windows "He got to stop."

1890.  3/18/2024, 11:20AM while Plaintiff was scanning Defendants' man in ap. B2 on loudspeaker "Stop... Kalin []." 11:31AM "Can't believe."

1891.  3/20/2024, about 5PM USPS carrier, speaking with person on speaker talked about Plaintiff ("Kalin"). "This is New York. Not []." "It is criminal." Then talked in Spanish.

1892.  3/21/2024, 4:48PM USPS carrier with woman on speaker again talked about Plaintiff. "Kalin… New York.." Plaintiff started Olympus "You think Kalin can hit it right?"

1893.  3/26/2024, 2:43PM Defendants' man entered the building. Woman on speaker "Having speaker Kalin can []."

1894.  4/9/2024, 1:02AM Ralph in building's corridor "Bulgarian lost." Plaintiff started Olympus. Defendants' man on speaker "You must []. you must [] a team." Ralph "That I can do." … After Plaintiff sent an email to Mr. Molnar, at 11:13PM Defendants (one of them Lea from ap.A3) talked in building in corridor "Kalin won't stop." Woman on speaker "We are the people. How we arrest that []?"

1895.  4/11/2024, 5:05PM the USPS carrier woman again talked with a woman on speaker about Plaintiff ("Kalin"). He started Olympus. "Don't know what to expect."

1896.  4/20/2024, 5:46PM the USPS carrier talked about Plaintiff ('Kalin') and the "police". The woman on speaker "OK. Tell the police []."

1897.  4/26/2024, 4:59PM USPS carrier and the woman on speaker commented in building's corridor "Kalin must []."

1898.  5/10/2024, 8:50AM Dula in ap. B2 on speaker "Kalin believe…" .. "Let Kalin []."

1899.  5/11/2024, 10:52PM Defendants in ap. B2 awakening Plaintiff with hammering on Plaintiff's ceiling three serials him. Defendants' man on speaker in B2 commented "He didn't believe.. We harass. He wants [] to stop."

1900.  5/17/2024, 4:50PM USPS carrier under Plaintiff's windows with woman on speaker talking "They can not stop." "They are not dated." 5:36PM Defendants woman on speaker in building corridor "Bulgarian…" After Plaintiff started Olympus she talked about 'falsifying'.

8:21PM Defendants man in building corridor again talked with a woman on speaker "I can't believe we stopped." "Let Kalin []." Plaintiff was playing online.

1901.    5/19/2024, 11:33AM Defendants woman "He can't prove that you are employee." Defendants man in building corridor played on speaker, then a man on speaker said to the effect of "Kalin has police."

1902.    5/23/2024, 1:45PM, USPS carrier man – not the usual carrier – played on speaker in the building corridor "Let Kalin []."

1903.    5/25/2024, 2:12PM Defendants woman under Plaintiff's windows "Have to stop." A woman on speaker talked about Plaintiff ("Kalin").

1904.    6/10/2024, 7:39PM Defendants' group in building corridor, Ralph was one of them, "Cannot stop Kalin." "Ha, ha, ha.." Plaintiff stopped his TV and started Olympus. They kept talking about him ("Kalin"), including a person on speaker but they stopped being loud. Followed a slam.

1905.    6/26/2024, 11:08AM when Plaintiff was playing online Defendants played a woman on speaker under his windows "That guy plays a lot." When Plaintiff looked, he saw Yola food truck was parked under his windows on Cedar lane. 11:11AM she returned under Plaintiff's windows talking on phone(?) "It's fine. It's fine. [] can't sleep."… "Don't hear. Kalin…"

1906.    6/28/2024, about 11AM Defendants woman on speaker "Can't stop… Harass." from Yola direction. After Plaintiff started Tascam DR 07 talking stopped.

1907.    7/13/2024, 10:40AM Dula(?) talked on speaker in ap.B2 in ongoing monologue "Can't harass." 10:49AM "To stop… He didn't believe." 10:48AM "We lost. Can't believe."

1908.    7/19/2024, About 11:45PM Plaintiff got home holding the phone. A loud group passed behind him talking about him "getting a job". Man on speaker said loud "Recording".

1909.    8/1/2024, About 2:50PM Defendants woman passed under Plaintiff's windows playing on speaker "We have to stop that."

1910.    8/11/2024, 11:26AM Dula(?) in ap. B2 sounding as on loudspeakers "Completely stop that. Harass..."

1911.    8/14/2024, Plaintiff got next to Provident bank, Cedar lane, Teaneck, NJ. 2:34PM woman on speaker speaking in Spanish also talked about Plaintiff ("Kalin"). "Can't push.." 2:44PM woman on speaker continued "Police will have him stop." 2:45PM "Kalin.. police … take advantage." 3:08PM Defendants man behind Plaintiff played on speaker a woman "Psycho []. Give up." 3:48PM Plaintiff noticed that Defendants man who had been behind Plaintiff moved to the other side – now playing again woman talking in Spanish on speaker repeating "Kalin". He listen, this was not a call. But playing. 5:50PM a bit earlier a woman sat benches nearby and started playing on speaker videos in Spanish. That was prevalent tactic for the day – playing stuff on speaker. Also notable – there were many people on the benches, much more than usual.

1912.    8/15/2024, 8:25PM after Plaintiff moved to area with lights on (getting dark and keyboard not lighten) – between the fields. There were a few couples waiting for the kids. One of them played a woman on speaker "Kalin []. It's working. It's working. [] together."

1913.    8/23/2024 Friday, 3:08PM Defendants man behind Plaintiff challenged "No sleep. No sleep… I set up. Is set up []." then talked about Israeli visitors. "Should I bring it up?" woman on speaker "Yea, bring it up." He left when Plaintiff moved to the bench facing him with intention to make a video.

1914.    8/25/2024, 7:17PM Defendants played nearby on speaker a woman saying "Kalin have to []."

1915.    8/26/2024, Since about 12:15PM Defendants in B2 talked on speaker, at one point mentioning Plaintiff ("Kalin").

1916.   8/30/2024, 10:50AM Defendants woman in B2 on speaker "we lost. Can't…" Talking continue not very intelligible.

1917.   9/5/2024 about 3:14PM Defendants woman on speaker at distance "Kalin…"

1918.   9/11/2024, 3:40PM a uniformed Bergen Sheriff's deputy talked at the corner of Red Road and Cedar lane opposite to Plaintiff's windows walking back and forth "He can't continue." Plaintiff made photos from inside of his apartment, and the deputy commented "… compromised." 3:47PM he played on speaker "Trying to stop." and left walking on Cedar lane.

1919.   9/21/2024, 10:38AM Defendants women and a man on speaker in building corridor "Kalin.." Plaintiff started Olympus "That's a different angle.." "Bad day." "We won't stop." (the second woman came downstairs joining the woman with the phone). They left the building.

1920.   9/28/2024, 11:15AM Defendants man in B2 on loudspeaker "We won't harass.." 11:32AM he kept talking "Arrest him. But we won't stop." and at 11:33AM "Kalin..."

1921.   10/2/2024, 4:43PM Plaintiff was on the benches working on revisions of the letter when Defendants played a woman on speaker "Kalin.."

1922.   10/4/2024, 4:53PM Ralph, Defendants man on speaker in building corridor "Can you fight?" "How to fight?" "They lost. They need []."

1923.   10/6/2024, 10:20AM Dula on loudspeaker "Kalin to set up []. New York []." 10:23AM "We won't stop.. Arrest." 10:25AM "We lost Kalin… We lost that." 10:33AM "New York []. Let Kalin stop." 10:34AM Dula "We don't stop." 10:36AM "Kalin… Stop fighting you man."

1924.   10/9/2024, 8:19AM Defendants man on loudspeaker in ap. B2 repeated "stop" after slamming in B2.

1925.   10/10/2024, 2:49PM Plaintiff sent an email to Mr. Dixon, Center for Constitutional Rights in regard his letter to Attorney General Garland about violations of FBI/JTTF preventive investigations. 2:52PM Defendants woman in building corridor with a man on speaker "He believes he is 100% right." About 5:50PM Plaintiff was taking a bath. Defendants talked nearby "How to make him stop?" 5:56PM Dula commented "Bad ass. Bad one. Bad one." Teaneck police car on speaker under Plaintiff's windows "Is there anyone on the roof?"

1926.   10/18/2024, 9:59AM Defendants man in B2 talking on loudspeakers "Don't believe. Can't push." 10:12AM talking moved above the room. 10:26AM "Kalin.."

1927.   10/19/2024, about 9AM Defendants awakened Plaintiff. Defendants man in B2 on speaker "We lost. Completely stop." talking was ongoing till 9:35AM, and Dula also talked.

1928.   10/27/2024, 10:34AM Defendants man in B2 on speaker again. 10:38AM "Push him."

1929.   11/4/2024, 8:37AM Defendants man in B2 on speaker "Can't believe. Can't stop him." Talking ongoing.

1930.   11/5/2024, 9:58AM Defendants woman on speaker in building corridor "They should stop." 10:02AM she again talked "Can't see []. He is not afraid."

1931.   11/7/2024, about 7:07AM Defendants awakened Plaintiff. Defendants' Dula talked on loudspeaker in ap.B2 "Kalin… Kalin..."

1932.   11/11/2024, 1:38PM while Plaintiff was working on the exhibit for hammering from B2 Defendants man and woman on speaker "He is out of control." Plaintiff started Olympus recording they stopped talking.

1933.   11/29/2024, 1:10PM Defendants in corridor "FBI []." After Plaintiff started Olympus he switched to Spanish, but the man on speaker continued "FBI… police have to punish."

1934.   12/9/2024, 10:10AM SUV played on speaker a woman "How to stop?"

1935.   12/16/2024, Defendants in B2 on loudspeaker recording(?) 9:28AM "Stop..." 9:31AM "Completely lost…" 9:35AM Plaintiff turned his TV on talking in B2 stopped.

1936.    12/23/2024, 11:35AM while Plaintiff was scanning Defendants' man in ap.B2 on loudspeaker "We lost completely. We lost."

1937.    12/24/2024, 7:45AM Holy Name guard-neighbor talked about Plaintiff "Kalin… man not responsive. He keeps breathing but not responsive." The man in B2 moved above the room "Kalin..." ongoing talking on speaker.

1938.    1/26/2025, 7:09PM While Plaintiff was working on risk assessment Defendants in ap.G2 talked again "They don't use Kalin []." Plaintiff started Olympus. They talked about "police". Since about 7:12PM talking in G2 sounded like on loudspeaker, and continued till 7:31PM.

1939.    1/27/2025, 5:56PM Defendants women in building's corridor and a man on speaker commented "He doesn't forget." "Yea. He cares."

1940.    2/6/2025, 8:00AM Defendants awakened Plaintiff, loud talking in ap.\B2 on loud speaker "We stopped. Lost [] Kalin stopped." After Plaintiff looked at the clock volume reduced,.

1941.    2/12/2025, 9:16AM Defendants in ap.B2 on loud speaker "to stop… stop…"

1942.    2/18/2025, about 9:50PM while Plaintiff was working on the complaint – torture – Defendants talked on loudspeaker for a while in ap. B2. At about 9:56PM "harass"… 9:58PM "Kalin.." 10:04PM "Can't stop. Can't believe it." 10:18PM "Kalin.." "We lost. He don't believe."

1943.    2/21/2025, 10:36AM Defendants in ap. B2 on loudspeaker "Kalin will stop."

1944.    2/22/2025, USPS carrier woman – after Plaintiff got his delivery talked with woman on phone speaker "He didn't say hi." Indeed Plaintiff nodded to USPS carrier.

1945.    3/4/2025, 12PM Dula in B2 "allow Kalin []." Talking on loudspeaker, reduced as volume. 12:02PM man in B2 "… to stop.. If Bulgarian stops we can stop." Defendants in B2 knocked. "Stop." 12:09PM "Can't stop. We [] figure out.." 12:12PM "Kalin..." 12:14PM "We can not stop harassing… Stop Kalin… We have.." Volume increased – moved above toilet. 12:25PM the loudspeaker moved above the room after Plaintiff downloaded multiple comments on UN CCPR, Articles 9, 12, 17 and more, then Plaintiff started playing chess online. 12:26PM again above the toilet "Kalin.. stopping…" 4:24PM man on speaker "Bulgarian…"

1946.    3/10/2025, 12:53PM Dula on loudspeaker "to have him stop.. Can't believe him. We got to destroy him."

1947.    3/15/2025, 10:25AM Defendants in B2 on speaker "Kalin [].. We lost that."

1948.    3/16/2025, 10:05AM when Plaintiff got up and removed his earplugs Defendants in B2 hammered Plaintiff's ceiling, and started playing a recording? of Defendants man on loudspeaker till about 10:30AM.

1949.    3/29/2025, 2:55PM Defendants in B2 playing on loudspeaker "Kalin believe FBI…" "Know Bulgarian… Bulgarian… We do harass." Talking continue.

1950.    To prevent/obstruct Plaintiff's video recording or making photos of the Defendants coming under his windows when the day light declines and during the night, they deliberately kept the *street light* next to his building off for 8 years (all other streetlights nearby worked). This started in 2016, when Plaintiff began to use regularly Blue Iris security software with two cameras, and was 'fixed' on 7/8/2024. That among other things shows the Township of Teaneck's involvement.

1951.    Defendants and parties in concert have started *walking and acting in areas outside Plaintiff's camera view* (Plaintiff's system is based on Blue Iris security software) when they provoked, and harassed him. As for example on:

1952.    2/12/2024, 11:41AM school boys stayed under Plaintiff's windows outside camera view talking not loud "We can't protect him." "Kalin dies." 11:51AM school boys again "Died last night." They walked on the rocks evading camera.

1953.    4/26/2024, 3:57PM Defendants woman under Plaintiff's windows on Cedar lane (not in camera view) challenged "This guy is the evident threat."

1954.    6/12/2024, about 12:50PM students came under Plaintiff's windows challenged "Can't ask you to fight." then "Dumb ass. Dumb ass." They made loud noise as of keys clanks, walked on the rocks under the windows – evading the camera. Again "Fight."

1955.    9/24/2024, 1:16PM students came and stayed under Plaintiff's windows at the corner od Cedar lane and Red Road – evading the camera. Shouted, talked about the "harass[ment]" of Plaintiff "Kalin.."

1956.    1/16/2025, 12:06PM school girl walking on the rocks under Plaintiff's windows (evading the camera) commented "Try to stop. We have []."

1957.    3/16/2025, 3:04PM Ralph and Defendants' woman talked loud at the corner of Red Road and Cedar lane – under the windows but away from camera view. "Don't stop." "FBI…" "No money []."

1958.    Defendants evasions included also stopping or reducing the intensity of DE beams targeting Plaintiff while he was scanning, removing the tenants' list from corridor right after Plaintiff filed Notice of claims and administrative claims on 11/10-11/11/2022 and more.

*(B) Defendants demonstratively accessed Plaintiff's computer(s), phones, and accounts, and deleted evidence and other files, turned off remotely the computer with Blue Iris security software, and more.*

1959.    Defendants repeatedly deleted Plaintiff's emails, files, and information which is evidence for his legal cases or is private from his computers, phones and web accounts.

1960.    As for example on 3/23/2016 (videos made with his security camera), 9/11/2016 (thousands of files, including evidence for his case against Gyro), 11/11/2016 (emails from Yahoo), 12/16/2016 (all emails in Yahoo inbox before 12/2016), 1/4/2017, 1/10/2017, 1/11/2017 and 1/16/2017 (Yahoo emails), 3/27/2017 (EEOC's confirmation email for filing a charge against Gyro et al), 4/5/2017 (all emails in the inbox of his abv.bg email account), between 4/23/2017 and 5/23/2017 (all email correspondence between Derek Smith Law Group and Plaintiff on Yahoo), 1/10/2018 (Plaintiff's portfolios on his personal website), 3/1/2018 (recordings of Defendants on his laptop), 11/18/2018 (job applications before April 2017, evidence for litigation against Gyro et al), 1/22/2019 (an email from Gyro lawyers), 4/22/2020 (files on laptop), 10/15/2021 (Viber message), 2/11/2022 (AT&T texts on his phone), 2/2/2023 (Plaintiff's portfolio on his website), 6/5/2023 (all photos and videos on his

phone - Fusion Z), 7/26/2023 (the PDF copies of the emails to and from Pro Se Unit of S.D.N.Y. about the initiation of *Dimitrov I*), 9/22/2023 (PDFs of USPS status of his delivery to the FBI New York), 8/19/2024 (expert articles), 8/26/2024 (folder with photos), 10/29/2024 (copy of the letter to AG Garland on his computer), 11/15/2024 (one of the emails fro 24 seven talent agency where the Defendants impersonation of Plaintiff), 11/28/2024 (emails to Teaneck police from 2/24/2022 and 2/27/2022 form his Yahoo account), 12/15/2024 (Plaintiff's info on Facebook was edited – Defendants deleted from his work history Gyro, and from his Linkedin Profile deleted his post with the article he published on Fortune magazine website), 2/20/2025 (email from UCL Davis (prof. Joh's employer) was deleted in front of Plaintiff's eyes), and more.

1961.    Especially notable in regards to the Defendants' role in the deletion are their statements about his reports about the deletion and requests information to be restored: "We should not respond."[139] (11/11/2016, Defendants in ap.B2; and the same on 1/11/2017, Defendants in ap.B2).

1962.    Defendants interrupted the recording with Plaintiff's security camera(s) by remotely turning off his PC Eee (the computer with Blue Iris security software) which then was constantly connected to Internet. The claim that this is result of a remote action is based on the fact that when Plaintiff restarted the PC it started normally without blue screen or any other notice indicating a problem, nor there was a prompt to start the computer in Save Mode (as it is usual when there is an issue). Defendants' comments also implied it is their intrusion as for example "He got it." (11/13/2017, 6:00AM Defendants in B2 after Plaintiff restarted the PC Eee and Blue Iris).

1963.    Defendants turned Plaintiff's PC Eee off (and Blue Iris running on it), for example, on 11/23/2016, 4/20/2017, 6/25/2017 (two times), 8/23/2017, 8/24/2017, 8/25/2017, 9/6/2017, 9/12/2017, 11/9/2017, 11/13/2017, 1/21/2018, 2/13/2018, 6/28/2018, 12/31/2020, 5/23/2021, 2/12/2022, 3/29/2022, 10/29/2022, 11/9/2022, 5/24/2023, 7/17/2023, 9/14/2024, 3/10/2025 (after Plaintiff turned on Internet), 3/11/2025, and more.

1964.    In relation to Defendants hacking and fraudulent online activities against Plaintiff worth noting that they sent job applications for low level jobs on his behalf using his email (2/2/2023, ECF No.8-2 at 6170), they fraudulently created an email account on Plaintiff's behalf which was used for a while by a person writing in foreign language (see 3/24/2025), and when he was at the FBI

---

[139] As well as in regards to the Defendants' interference with Plaintiff's job search "Don't respond." (2/2/2023 Thursday, after Plaintiff sent job application to Creative Circle)

New York on 11/8/2017 Defendants have explicitly provoked and teased him to "Hack the agency." (ECF No.8-1 at 45). See a few more 'hacking' examples bellow.

1965.    2/22/2016, Plaintiff received an email from Google, that his site for idea-hunters was hacked.

1966.    10/10/2016 Monday, 12:08PM in preparation of a police report Plaintiff uploaded on Youtube a video showing his folders in comparison with archived versions of the deleted files on 9/11/2016. Defendants came under his windows and threatened "We'll hack it." After Plaintiff filed a report with Teaneck Police for his computer being hacked and information stolen and deleted, he called Citibank to warn them about the third party access to his credit card information. They said they are monitoring (7:09PM). After the call Defendants commented "He shut us all.", and started knocking as at 8:17PM, 8:23PM, 8:37PM, 8:46PM, 8:52PM and continued without Plaintiff making notes. 9:29PM Defendants commented "We knocked that out."

1967.    12/8/2017, Plaintiff's Pinterest account was hacked.

1968.    2/8/2019, Plaintiff found his email account on abv.bg was hacked and his password changed.

1969.    2/18/2022 Friday, 11:39AM some students returned under Plaintiff's windows. One of them "Hack him."

1970.    3/20/2022 Sunday, Plaintiff's website was hacked – redirected to 'host suspended'.

1971.    5/24/2023 Wednesday, Plaintiff's PC was hacked – icons on the desktop were green, with 'V' over each, and Plaintiff's PC Eee (with running Blue Iris) was turned off remotely.

1972.    8/19/2024 Plaintiff found that case-related expert articles on his computer were deleted. The next day 8/20/2024 at 11:50AM Ralph and Dula commented "Hacking did not work." Dula entered quietly ap. B2. "Have to push.".. "Fight."

*(C) In retaliation Defendants demonstrate their knowledge that Plaintiff records events, ridiculed him, and claimed that Plaintiff is a spy holding them hostage.*

1973.    Apart from their other means to obstruct or evade Plaintiff's record, Defendants demonstrate their knowledge that Plaintiff records events (for example commenting him "Records anyone." "Freak." 6/30/2020), and repeatedly talked that they 'can't talk'. While in that context 'can't talk' means intention to not being recorded, it is also demonstration of the surveillance on Plaintiff, and ridicules him. 'Don't talk' is also a direction to other parties, and implies hierarchy of the participants, a structure.

1974.    3/20/2017 Monday, 1:43PM students came under Plaintiff's windows "Can't talk." "Surveillance."

1975.    5/10/2017 Defendants followed Plaintiff on the streets of Teaneck "You have Bulgarian." "We don't forget." "Don't talk." "All sort of blame." ECF No.8-1 at 852.

1976.    5/20/2017, Defendants in Phelps Park, Teaneck, NJ "Don't talk. New York give []. New York forgive this." ECF No.8-1 at 113.

1977.    5/19/2017, Defendants under Plaintiff's windows responded "A set up." "Don't talk." ECF No.8-1 at 164.

1978.   11/5/2017 Sunday, about 10:40PM Defendants talked at distance "Can't talk here." "Why?"

1979.   2/26/2020 at Teaneck Municipality "Don't talk." ECF No.8-1 at 54.

1980.   9/11/2021 at 7:16PM students came under Plaintiff's windows and shouted "Don't talk." ECF no.8-2 at 1896.

1981.   10/16/2021 Saturday, Defendants' man came under Plaintiff's windows and talked about the "team". Then at 4:33PM "don't talk. They lost." ECF No. 8-1 at 262.

1982.   11/10/2021 Wednesday, Plaintiff was working on a transcript when at 3:44PM Loomer and USPS carrier talked in building's corridor "Don't talk."  ECF No. 8-1 at 268.

1983.   12/9/2021 Thursday, Defendants targeted Plaintiff's eyes with DE beams. Students came under Plaintiff's windows and teased "lose an eye." "Don't talk." (about 11:35AM). ECF No.8-1 at 1791.

1984.   8/11/2022 Thursday, "Don't talk, we push." ECF No.8-2 at 3355.

1985.   1/29/2023 Sunday, 10:00AM Defendants' woman in ap.A3 "We can't stop him. Can't receive it." Plaintiff started Olympus recorder Defendants' person in building corridor commented "Can't talk." After that no talking.

1986.   6/30/2023 Friday, about 4:15AM man in B2 "We can't talk." after Plaintiff finished archiving his files and was wrapping timeline of events' work.

1987.   7/20/2023 Thursday (five days before initiation of *Dimitrov I*), "Having Kalin to push." At about 10:45PM same Defendants' man returned under Plaintiff's windows "Can't talk."

1988.   8/10/2023 Thursday, 10:09PM Defendants in front of the pub "Can't talk."

1989.   9/20/2023 Wednesday, 9:58AM Defendants' man and woman talked under Plaintiff's windows "Don't talk." "[] fight." "Kalin…"

1990.   9/26/2023 Tuesday, while Plaintiff was scanning students talked loud "Don't talk."

1991.   9/27/2023 Wednesday, 9:06AM Defendants awakened Plaintiff with painful rays at his right calf. He detected 986 V/m at head. Defendants' man in B2 commented "We don't talk."

1992.   10/20/2023 Friday, 4:50PM Plaintiff started working in handwritten on privacy cases. Defendants in B2 dragged something above him. 4:56PM Dula in B2 "Can't talk." She walked heavily above Plaintiff. "We believed he stopped."

1993.   6/20/2024, 4:11PM when Plaintiff was preparing to go outside the same persons again talked in building corridor "Preparing []. .. Can't talk." They switched to Spanish.

1994.   6/24/2024, 4:38PM USPS carrier in building corridor "Полиция ['police' in Bulgarian] fights Kalin." Later she talked about the "recording".

1995.   7/2/2024, Plaintiff stared Tascam DR07 Defendants responded "Right now recording.." (2:02PM) "He will never respond."

1996.   7/8/2024, 6:03PM after Plaintiff scanned for DE Defendants' man in B2 not loud "Can't talk."

1997.   8/11/2024 10:22AM Defendants' woman talked under Plaintiff's windows "Kalin… They made him of zen, and I was what shit is this?" After that she talked under the windows about taxes. Then commented "Probably got that recorded."

1998.   8/24/2024, 9:50PM Defendants commented while Plaintiff was working on FBI materials "How can we fight that?" "Can't talk. Bulgarian…" Some of them entered the building.

1999.   Notable are the events on 2/5/2015 when Defendants still have not changed completely their

conduct due to Plaintiff's lawful record of events, as well as a few other events in regard to

Defendants' demonstration of the surveillance on Plaintiff, the contact and dissemination of

Plaintiff's information between the parties, and more.

2000.    2/5/2015, 8:15PM Defendants came under his windows after Plaintiff had started Blue Iris recording and responded "We are just waiting you to turn it off." Plaintiff responded "Nice try." 8:30PM Defendants' man in ap.B2 commented "Not trying."
2001.    5/13/2016, 12:09PM Defendants commented "Must figure out how to talk to him." 12:37PM "He obviously recorded all. He is very keen on this."
2002.    9/29/2016, about 9:50PM Defendants commented "The guy keeps recording."
2003.    8/5/2017, Plaintiff passed Teaneck cinema on Cedar lane. Four high school students in front commented him "He is recording." Plaintiff stopped, they reacted "He must have heard recording." "Sent it to mam and dad." [Plaintiff had sent a few video exhibits he worked on in that period of time to relatives in Bulgaria].
2004.    6/30/2020, 2:34AM Defendants came under Plaintiff's windows: "Records anyone." "Freak."
2005.    7/27/2021 Tuesday, near Teaneck High School a group of six students passed Plaintiff 4 times, and each time made sudden noises. Plaintiff decided to make a video with his phone and they commented: "That's good.. life info. Recording.."

2006.    Defendants developed the false narrative that Plaintiff is a spy who holds them hostages. (IV.8(a)

(1)(ii)). See also 1307 *et seq.*, 'hostages' 393 *et seq.*.


*(D) Defendants retaliate with noise harassment, pebbles at Plaintiff's windows, or DE attacks to Plaintiff's record of events.*

2007.    Defendants retaliate with noise harassment, pebbles at his windows, or DE attacks to Plaintiff's

records which are more limited in time as for example making notes, or his scanning for EMF.

2008.    For example Defendants interrupt and retaliate to Plaintiff's actions in that regard – on 8/29/2022,

11:02AM Plaintiff was scanning with EMF scanner inside his apartment when Defendants' man

and woman under his windows threw pebbles at his windows(?) and commented "You don't

prove anything. Have Kalin stop." On 9/9/2022 after he made a video recording of them

Defendants' agents talked under Plaintiff's windows that he 'Can't prove--'.

2009.    Similarly when Plaintiff was making notes about the events Defendants in apartments B2, G2 or

under his windows knocked or targeted him with focused directed energy beams. For example on

4/17/2023 at 2:47AM there were 2 pops from ap.A3. After Plaintiff made a note there was a thud

on his ceiling from B2. Later after Plaintiff did EMF scanning and made a note at 11:02AM –felt

and detected a laser-focused ray from B2 at his chest. On 4/19/2023 at 8:50AM Plaintiff did EMF scanning and while he was writing a note – a slam from B2. Later same day at 6:30PM Defendants' woman talked in corridor. When Plaintiff made a note about that – thud on his ceiling from B2. On 4/20/2023 at 2:28AM there were knocks on the floor from G2. A louder knock followed after Plaintiff started writing a note. On 4/21/2023 at about 9:10AM there was a knock (pebble-at-window kind) on Plaintiff's windows. After Plaintiff wrote a note about that – thuds from B2.

<u>(2) Defendants prevent Plaintiff to have objective witnesses.</u>

2010.    Defendants have been repeatedly concerned with what they or Plaintiff can prove, and threatened and challenged him in that regard. Those considerations of eventual legal challenges, as well as taking measures to evade eventual claims for entrapment and other legal challenges, are part of any investigation planning. Defendants were explicit about that in a few occasions:

2011.    8/3/2013, Defendants talked under Plaintiff's windows that he is "hiding". "It's him." "That's how we fucking prove." "We will get him." ECF No.8-1 at 1822.

2012.    5/14/2017, "We can't screw up here." "Designer []." "Have to prove this." ECF No.8-1 at 163.

2013.    12/5/2018, Defendants in corridor "They can prove." ECF No. 8-1 at 640.

2014.    9/7/2019, Defendants in ap.A3 "We got proof."… "Are you you to hand in police няма свидетел ['have no witness' in Bulgarian]?" … "Can not prove. Have to punish." ECF No.8-1 at 476.

2015.    12/21/2019, 9:47PM Defendants loud in ap.A3 "police… we don't know..." "Bulgarian… no witnesses.."

2016.    8/30/2021, about 9:40PM Plaintiff was working on this Relevant History when Defendants outside challenged "Can not prove." ECF No.8-1 at 673.

2017.    9/22/2021 Cesar Naranjo "They really thought Kalin can't prove anything." ECF No.8-1 at 537.

2018.    2/18/2022, "Freedom net, Kalin says this." "Easy to prove. Bulgarian everyday-- ..." "Have to stop (us)." "Then to stop Kalin." ECF No.8-1 at 328.

2019.    8/29/2022, "You don't prove anything. Have Kalin stop." ECF No. 8-2 at 2009.

2020.    9/9/2022, 'Can't prove--' ECF No. 8-2 at 2009.

2021.    9/23/2022, "How to let him prove?" "Want Kalin pass []." .. "Can you prove? Have to prove [] stop." ECF No.8-2 at 4880-4881, 4900.

2022.    1/20/2023, Teaneck police officers, and Defendants in the building "He set to prove. Bulgarian продава ['sell' in Bulgarian]?" … "To let Kalin to prove." "Yes. (Pull) it through. Speaking to let me--" "Reason to have fight. Dare to stop." ECF No. 8-1 at 84, 91.

2023.    4/13/2023 Thursday, 2:04AM Defendants' man and woman talked for a while under Plaintiff's windows "Kalin… think he proved []." ECF No.8-2 at 7327.

2024.    6/3/2023 Saturday, about 8:40AM Defendants in ap.B2 hammered on Plaintiff's ceiling. Defendants' women under his windows threatened "Got to shoot." "I can prove that. We've got to win." ECF No. 8-2 at 7995.

2025.    2/14/2024, 6:50PM Ralph shouted in building's corridor again. "Can't prove." After that he came in front of Plaintiff's door.

2026.    3/31/2024, 12:30AM Defendants' man under Plaintiff's windows "He didn't prove that." At that time Defendants' men in front of the pub on Cedar lane talked about Plaintiff ("Kalin").

2027.    5/19/2024, 11:33AM Defendants' woman "He can't prove that you are employee." Defendants' man in building corridor played on speaker a man who said to the effect of "Kalin has police."

2028.    Defendants' actions in practice precluded Plaintiff from obtaining objective witnesses. They disseminated false and defamatory information about him (IV.12); they have engaged communities and businesses utilizing CVE and anti-gang programs, securing the support and/or participation of Plaintiff's landlords, utility providers, and more (see IV.8(b)(2)(iii)); and isolate and alienate Plaintiff (IV.12, IV.10(a)).

2029.    In time Defendants set their agents as 'neighbors' to Plaintiff. The neighboring apartments (ap.A1 and A3 on the same floor, ap.B2 above, and ap.G2 bellow Plaintiff's) are used for sound and DE attacks on him. The landlords removed the noise insulation between Plaintiff's apartment and ap.G2 (12/23/2016, ECF No.8-1 at 172) and ap.A3 (July 2019, ECF No.8-1 at 474) and Defendants talked to him through the walls. That practice from ap.G2 and A3 significantly reduced since Plaintiff worked on transcripts of his audio recordings of such talks made before or about 2021. See ECF No.8-1 at 148 *et seq*.

2030.    After Gyro New York laid off Plaintiff in March 2016 Defendants put a legal notice in the office directing co-workers to not talk about police' involvement with Plaintiff (ECF No.8-1 at 40).

2031.    Defendants approached Plaintiff's relatives both in the US and in Bulgaria in regards to him, which detrimentally altered the relationships. One Plaintiff's cousin in Bulgaria refused to make a declaration about his knowledge of relevant events stating as a reason fear from retaliation, but for about two years after that repeatedly teased and provoked Plaintiff about gays and liberalism, promoted fascist ideas, and support for guns See ECF No.8-1 at 828, and more.

(3) Defendants withhold information and act undercover only to evade liability.

2032.   Defendants apparently withhold information with intention to obstruct eventual legal challenges

by Plaintiff. For example after Plaintiff filed his Notice of claims 11/10-14/2022 Defendants

immediately removed the public tenants' list in his building which has been there for more than

11 years (as Plaintiff personally witnessed), and since then there has been no public list of

tenants. Per Plaintiff's knowledge and belief the removal is related to his argument that

Defendants used Leonardo A. Ona as a cover identity to rent ap.G2 (he was listed as tenant of G2

for about 5 years in a row) while in reality multiple and changing Defendants inhabited the

apartment (see ECF No. 8-1 at 152-153).

2033.   Defendants shockingly denied obvious facts. For example when Plaintiff approached Defendants

in ap.G2 on 7/6/2016 they denied slamming doors and accused Plaintiff instead (ECF No.8-1 at

157). Similarly on 7/7/2016 Dula, ap.B2 and Swaby (who had stated earlier under Plaintiff's

windows "We are FBI." 3/25/2016) accused Plaintiff of inventing the knocks from ap.B2 (ECF

No.8-1 at 811). Then Dula repeatedly denied obvious facts – as for example that she leaves in B2

and even asked Plaintiff what is B level (although she had lived there for 5 years according to her

own statements) Id., Dula denied hitting Plaintiff's ceiling and even hearing any hits, but then

also overtly provoked him when Plaintiff was walking back home (11/19/2018, after talking with

Plaintiff she knocked very strong, slammed a door in ap.B2 and challenged: "Can you feel

[that]?" ECF No.8-1 at 449). Due to Defendants interference landlords also denied obvious facts

and made false claims. For example in 2015 despite Plaintiff's audio recordings of the noise on

pipe system, they claimed no one heard them, falsely claimed that they had sent a person to check

that in Plaintiff's apartment but Plaintiff's security system have recorded no one inside. After

2020 the super – Cesar Naranjo – also falsified and minimized Plaintiff's complaints about noise,

and more.

2034.    Plaintiff requested information in regards to his legal cases from NYC Legal Department

(8/2/2023), and from NYC Sheriff's office (10/15/2018, ECF No.8-2 at 2013) but his

communications were ignored, which among other things is withholding of relevant information.

2035.    Defendants' demonstrative conduct proves that they are *acting undercover[140] only for the purpose*

*of evading liability*. The very purpose of being undercover is to not reveal the identity as

government agent – something which Defendants demonstrated to Plaintiff overtly. There are

many examples of such demonstrative conduct, see above IV.1 and following.

(4) Defendants deliberately mislead Plaintiff and create distractions.

**(iv) Defendants' degrading practices in retaliation to Plaintiff's preparation and filing of
petitions.**

2036.    At least in part Defendants' degrading treatment of Plaintiff is punishment for his preparation,

work and filing of petitions. For example Defendants increased the intensity of sleep deprivation

of Plaintiff in retaliation to him starting regular record of relevant events in the end of 2014. That

increased again after he started working on legal and case materials (April 2016), and again later

in retaliation to his contact with multiple New York-based lawyers (August 2017). Similarly since

April 2016 Defendants' sound attacks on Plaintiff increased significantly and became regular

conduct during the day. And since August 2017 Defendants have started regular DE attacks on

Plaintiff in retaliation to him pursuing his case against Gyro et al, contacting New York-based

lawyers, and working on case materials. They have escalated the DE attacks since the day

Plaintiff went to the FBI New York Field Office (11/8/2017), and later the intensity increased

---

140 Undercover policing is part of any preventive / proactive investigation. *Combating organized crime: A study on
undercover policing and the follow-the-money strategy*, Edwin W. Kruisbergen, 2017, ISBN: 978 90 5383 228 8
("Proactive policing focuses on gathering evidence about the current and future behaviour of offenders. It
includes methods of investigation such as wiretapping, surveillance, the use of informers and undercover
policing."). See also *Breaking the Law to Enforce It: Undercover Police Participation in Crime*, Elizabeth E.
Joh, Stanford Law Review, 62 STAN. L. REV. 155 (2009) "[U]ndercover operations are [] used widely among
police departments of varied sizes. Likewise, undercover operations are usually used as an initial course of action
rather than as a means used when others have failed [and] involve both officers and civilian informants acting as
secret agents... [F]acilitative [operations] attempt to encourage the commission of an offense [and t]he role that
undercover agents play [] depends on whether they are posing as accomplices or as easy victims. [] Instances in
which undercover police officers have faced prosecution are rare."

multiple times in retaliation to his work on case materials, including on this very complaint. For example after Plaintiff worked on this and the sections above, Defendants' DE attacks during the night on 8/24/2025 were so strong (charged his body up to 930 V/m) that he stopped breathing for short time (see respiratory failure as a result of exposure to electricity bellow), he couldn't get to sleep and moved to at least 3 different locations to evade the DE beams.

2037.    See IV.11, ECF Nos.8-1 and 8-2.D and E, Exhibit Defendants' hammering from ap. B2 1/1/2021-3/1/2025, and more.

**(v) Defendants' retaliation and pressure to stop Plaintiff from working on, filing and/or pursuing his lawsuits.**

2038.    In retaliation to Plaintiff's preparation, working and/or filing of lawsuits since about 2015 Defendants subject him to many years long influence campaign to "stop" him (1307 *et seq.*), to degrading treatment and psychological torture, and orchestrated his abuse and harassment (IV.11).

2039.    Defendants' noise harassment increased significantly since Plaintiff started working on his legal cases in 2016. The intensity of sound attacks on Plaintiff from Defendants in apts. A3, B2 and G2, as well as from the Defendants near Plaintiff, including when he is outside, are related to his work on legal and case related materials. For example since Plaintiff started finalizing the complaint for *Dimitrov I* (June 2023), and then initiated *Dimitrov I* (7/25/2023) Defendants in ap. B2 have started hammering on his ceiling almost every days (increased as number of days with hammering per month a few times), and till the end of 2024 they hammered on the ceiling for about 500 days (see IV.11, Exhibit Hammering from ap.B2 2021-3/1/2025).

2040.    Defendants' DE attacks on Plaintiff have started (were noticeable) since August 2017 when he re-started the search for lawyers and kept working on his legal cases. The use and intensity of their DE attacks increased in response to Plaintiff's visit to the FBI New York on 11/8/2017, and later to his other legal acts. See IV.11. B.

2041.    As part of the Defendants' pressure on Plaintiff to stop he receives 'special treatment' (1/9/2019,

ECF No.8-2 at 1980): Defendants follow the same policy/practice in regards to his petitions and

communications – no response, no investigation, or in the rare occasions of response they

minimize and/or misrepresent his claims. See IV.9. Furthermore Defendants do not respond to

Plaintiff's communications, as for example to his formal request for information to the NYC

Counsel on 8/2023, NY Sheriff's Office on 10/15/2018, or to Plaintiff's request for waiver of

service to Teaneck was ignored even though Teaneck appointed a counsel (ECF No.9); and when

Defendants do respond it is apparently inadequate – see FBI 3/6/2025.

2042.    Notable is the Defendants' retaliation to Plaintiff filing his Objections to Report and

Recommendations (ECF No.8) on 8/28/2023. Since then Teaneck Schools' students harassment,

threats and assaults significantly increased in parallel to Teaneck police and other Defendants'

conduct against Plaintiff. See IV.4.(c)(vi).

2043.    Defendants do not cease those policies and practices but reaffirmed and continue that conduct

regardless of Plaintiff's petitions. See IV.9. To the extend that government Defendants' policy-

makers claim lack of knowledge despite the persistent many-years-long practices in regards to

Plaintiff and his multiple petitions about those violations – they are deliberately blind, and

apparently fail to train or supervise their subordinates.

(1) Defendants' conduct since the end of March 2016 is in significant part punishment for
Plaintiff's preparations and work on his legal cases.

2044.    Defendants retaliation, and active prevention of Plaintiff's legal action against Gyro et al was

apparent since he was laid off. When Plaintiff looked for legal materials and lawyers in New York

City Defendants warned him "Can't pursue." (3/24/2016) "You can not pursue them." (3/25/2016,

ECF No.8-1 at 41). The FBI and police ("We are FBI." Id. "He definitely knows how to fight

police." 4/1/2016) were explicit about their intent to 'torture' Plaintiff ("Can't even torture

him."… "Can't even harass him." (3/29/2016) "How we terrorize him?" (3/30/2016, ECF No.8-1

at 1823)). Since 3/25/2016 Defendants started slamming adjacent to Plaintiff doors and substantially increased their knocking on his apartment's floor (from ap.G2, ECF No.8-1 at 155 et seq.), on his ceiling (from ap.B2, ECF No.8-1 at 446 et seq.), pipes (ECF No.8-2 at 1912 et seq.), and later on the walls (from ap.A3, ECF No.8-1 at 474 et seq.). Defendants have also terrorized Plaintiff by demonstratively inhibiting his sleep with noise, and turning off the heating (Their explicit statements in that period include: "Keep him up all night pays off." 4/1/2016); "He didn't feel it.".."We can't wake him up." (4/3/2016) "We worked all night. Mother fucker you can't sleep." (4/5/2016) "Wake him up." (4/17/2016) "We cut his sleep in half." (5/5/2016)

2045.    A few hours after Plaintiff started working on a graphic for the case Defendants, talking next to his apartment in Teaneck, NJ, explicitly stated their want to prevent a legal action, demonstrating among other things the constant surveillance on him including in Newark, NJ. "We need you to stop." (4/3/2016) Defendants kept commenting Plaintiff's work including in distant locations "[Plaintiff is] suing them." (4/6/2016) "He is trying to sue them." (4/13/2016 at USCIS Newark, NJ) "Can't sue them." (4/26/2016) (Defendants talked also about "confus[ing] him" (4/13/2016)). In that period Defendants talked explicitly and directly to Plaintiff that he is under surveillance "We watch." (4/9/2016), or indirectly addressed him "Keep watching him." (4/11/2016).

2046.    Defendants' sound attacks on Plaintiff, which additionally to the above include ringing on Plaintiff's doorbell (ECF No.8-2 at 1921), calls (ECF No.8-2 at 1923 et seq.), yelling next to Plaintiff (ECF No.8-2 at 1891 et seq.), and more, are continuous and ongoing practice with some variation of the intensity and actors since then.

2047.    On 8/24/2016 Plaintiff started to work on materials about the Defendants and his potential suit, searched, and contacted lawyers about his cases (9/6/2016-9/8/2016). Defendants retaliation was immediate, they interfered ("You can't sue them.".. "Can't let it happen." (9/6/2016) "Case is closed." "We must get within. We created (him)."..  "One Bulgarian…" (9/7/2016)), the lawyer

Plaintiff called didn't take the case against Gyro, NYCLU declined meeting Plaintiff. On 9/11/2016 Defendants hacked and deleted thousands files, including files relevant to his suit against Gyro et al, from Plaintiff's computer while he was on a flight to Europe (with Bulgaria as final destination). (ECF, No.8-2 at 1847.) When Plaintiff returned from Bulgaria Defendants were very provocative: "Fight Teaneck.".. "If you don't say a word obviously we'll keep on." (10/1/2016); they referred to Plaintiff as a robber ("Bulgarian [].") "Robbing a robber is needed." 10/6/2016). When Plaintiff discovered the deletion Defendants were explicit about their intention to distract him. In the morning of 10/7/2016 police and rangers' cars were under his windows. Plaintiff made photo and persons commented "He is trying to prosecute us. That's why…" and later Defendants "Have to stop."..."We didn't distract him."

2048. Defendants were blatantly explicit about their goals in regards Plaintiff on 10/8/2016: "Keep him hostile.", and on 10/9/2016 they talked to Plaintiff: "You will never find peace. We'll never stop teasing.", and later same day while Plaintiff was checking his archives to find what was deleted from his computer: "Learn your lesson."

2049. On Monday 10/10/2016 Plaintiff uploaded a video about the deleted files and Defendants responded "We'll hack it." Same day Plaintiff filed a report with Teaneck Police about the hacking and deletion of files from his computer – the report has never been investigated. (ECF, No.8-2, at 2015).

2050. For the events after that see other sections of this complaint, ECF Nos.8-1 and 8-2, Timeline of events, and more.

(2) Defendants retaliate to Plaintiff's work on FBI, JTTF, or related to FBI/JTTF materials.

2051. Defendants' immediate response while Plaintiff was working on FBI or JTTF materials include a few repeating behaviors. For example during that time (a) Defendants confirmed their identity as JTTF (12/4/2022, 8/21/2024 ("Kalin gets it.")); (b) Defendants were explicit "We have to stop

him." (4/16/2021), to 'disrupt' Plaintiff (7/16/2024), "Have to punish Kalin. Sue if he is such a

high brow." (8/7/2024); (c) they stated their intention to suppress and harass him (11/21/2020,

1/2/2021, 4/10/2021, 7/16/2024, 9/2/2024 ('disturb'), 9/9/2024); (d) threatened and warned

Plaintiff (11/14/2020, 1/14/2021 (getting warrant, 'crush'), 7/19/2024, 7/22/2024 ("We didn't

really threatened."..."Don't leave the building." "We didn't even harass."), 9/2/2024 ('arrest'),

8/24/2025 ('Ignore FBI.')); (e) assaulted him (7/16/2024); (f) demonstrated the surveillance on

Plaintiff (11/13/2020, 1/3/2021, 3/3/2021, 12/4/2022, 12/19/2024); (g) Defendants in aps.A1 and

A3 knocked on Plaintiff's walls (11/13/2020, 1/4/2021, 12/3/2022 in coordination with B2 and

overt provocations), Defendants in ap.B2 also knocked, hammered, dragged things, or slammed

door(s) (12/3/2022, 12/4/2022, 9/6/2024, 9/9/2024); and more.

2052.    11/13/2020, Plaintiff was downloading materials from the FBI Vault website when at
7:29PM Defendants in ap.A3 knocked on his wall. Plaintiff reacted "Hey, stop knocking."
Defendants' man responded "FBI []."

2053.    11/14/2020, Plaintiff worked on FBI materials till 1:20AM. At 1:42PM Defendants came
under his windows and threatened "Shoot to get him…"

2054.    11/21/2020, Plaintiff was working on Congressional Reports and Patriot Act provisions. At
4:50PM USPS woman commented in building's corridor "Can't suppress."

2055.    11/27/2020, Plaintiff downloaded materials about Patriot Act and worked on FBI materials
till 7:15PM. In that period Ralph talked in corridor about the CIA (4:03PM).

2056.    1/2/2021, Plaintiff worked on FBI materials till 12:27AM. Later Defendants' women in
ap.A3 harassed him: at about 6:20PM they talked he is "activated.." Giggled for a long time,
and talked loud. After Plaintiff applauded in his apartment one of them commented they
"Can't harass."

2057.    1/3/2021, till 12:29AM Plaintiff worked on FBI documents about Carter Page. Defendants in
ap.A3 commented: "Page.. can't touch that. Make an exit.."

2058.    1/4/2021, Plaintiff was working on FBI AG Guidelines when at 5:53PM Defendants in ap.A3
knocked on his wall. Plaintiff responded in his apartment "Stop. Call JC for insulation." A3
talked in response, and continued. At 9PM Plaintiff again talked to them: "You should call
JC. Noise is stronger on your side, if you are normal person and not harasser why you
tolerate that?" Defendants' woman in ap.A3 commented "They lied to me. It's not police."

2059.    1/10/2021, after Plaintiff worked on FBI Domestic Investigation Guidelines Defendants in
G2 commented at 2:24AM "He didn't believe that."

2060.    1/14/2021, Plaintiff worked on FBI materials till 7:51PM. At 2:55PM Defendants threatened
near his windows "They'll fight to pass the warrant." Defendants in ap.A3 began making
noise – dragging something at 6:05PM, 6:13PM, then slammed loud door(s). Plaintiff
repeated "Call JC for insulation." Defendants' woman in ap.A3 commented: "I can't
control…" And later at 7:32PM in building corridor Defendants advised "Crush that."

2061.    2/26/2021 Friday, Plaintiff worked on JTTF materials till 3:06AM. In that period at 12:25AM Defendants came under Plaintiff's windows and played on speaker "I need back up."

2062.    2/28/2021 Sunday, while Plaintiff was still working on JTTF materials (he worked till 1:35AM) Defendants in ap.B2 warned him at 12:20AM "Have to stop." "Stop." Later same day at 7:58PM Defendants in ap.A3 talked about Plaintiff and his work. Among other things they instructed "Stay alert. Kalin… Bulgarian… hostages."

2063.    3/3/2021 Wednesday, while Plaintiff was still working on JTTF materials at 6:35PM Defendants in ap.A3 commented "We've got to hold that operation." After that Plaintiff found that after 3 days his rent-related bank transfer had appeared on his bank-account activity page – the delay is extremely unusual, as transfers usually appear instantaneously after being made. Defendants' interference became apparent after Plaintiff made a video of his Citibank online account at about 7:30PM. Then Dula and Ralph responded in corridor near his door "Bullet proved it." "Situation is bad." Plaintiff opened his door but then Dula and Ralph were visible.

2064.    4/10/2021, Plaintiff worked on FBI Counterterrorism materials till 7:06PM. At 9:42PM Defendants' woman came near Plaintiff's windows and commented "Like cancer... we can't suppress.."

2065.    4/16/2021, Plaintiff was working on counterterrorism materials ("diffusion" strategy) when at about 8PM Defendants in ap.A3 talked about him "... it has to be New York... he'll not take it... (reference to job offer?!) We have to stop him."

2066.    5/17/2021, 11:47PM Plaintiff was working on Terrorism materials (FBI and JTTF). Defendants came under Plaintiff's windows and talked to him "How [to] stop? You know what we're doing.."

2067.    12/3/2022 Saturday, 6:37PM Plaintiff was studying M.German's FBI book when Defendants attacked him with DE rays at his back and head. He put aluminum plate as shield, and Defendants in ap.B2 started hitting his ceiling from B2 (6:37PM, 6:39PM, 6:47PM loud, 6:48PM, and 6:52PM), and dragged something heavy above him (6:46PM). Defendants ignored Plaintiff's request "Please stop doing this.", and kept knocking strong on the ceiling (6:54PM, 6:55PM). Then at 7:02PM Defendants' woman came under Plaintiff's windows on Cedar lane, teased him "Can't stop this.", and entered the building. Defendants in ap.A3 started knocking on Plaintiff's wall (7:09PM, 7:12PM stronger), and made loud metallic noise of drop and knocks at 7:13PM. After that Defendants threw rocks under Plaintiff's windows (7:17PM) and (the same?) woman provoked Plaintiff "You can't (fight) that." Followed a slam and heavy walking in ap.B2 at 7:25PM. Plaintiff worked on FBI books till 7:45PM.

2068.    12/4/2022 Sunday, Plaintiff studied FBI books till 2:16AM. In the morning Defendants awakened him and till 9:01AM a person run up and down building stairs, slammed door. Defendants' man and Dula talked in ap.B2 about FBI. "We lost. .. Stop." "Can't believe." After repeating slamming and walking in B2 at 9:47AM Dula stated in building's corridor "Am I Joint [Terrorism Task Force/JTTF]?" and slammed two times door(s). In Plaintiff's notice of claims from 11/10/2022 he described Dula as a JTTF officer.

2069.    12/7/2022 Wednesday, 7:05AM Defendants in ap.B2 talked about Plaintiff "Can't crash him." Later at 7:56PM while Plaintiff was preparing briefs based on materials for JTTF and FBI Dula commented "You do not know that."

2070.    12/8/2022 Thursday, Plaintiff worked on FBI books till 3:57AM. After awakening Plaintiff, at 9:30AM Dula in corridor commented "No power. We lost it. What happened?" ... "What is going on?" 2:02PM Defendants' man entered the building talking about Plaintiff

("Bulgarian") and directed to "Sign every piece." About 9:50PM Plaintiff was working on case-related materials when Dula talked about him again ("Kalin").

2071.   7/16/2024, after Plaintiff worked on FBI materials till 3:37AM group of high school boys came at 12:42PM under Plaintiff's windows, shouted (including shouting at him), falsely accused him of exposing himself, one of them got a rock and threatened to throw it at Plaintiff while he was on a call with the police. Later same day, at 3:36PM-4:16PM during the scheduled Best Pest's visits in apartments to sanitize the building the super Cesar Naranjo and the other parties talked near Plaintiff's apartment about him before, during and after the terminators' visit in his apartment. They talked about the FBI, the "agents", talked about "caus[ing] disruption", and made explicit statements that they "harass" Plaintiff (apart from naming him, they referred to him as "Bulgarian" and "fagot"). "How do you want arrest?"..."Press Kalin (they) have to arrest him." ... "They have to give him to stop.".. "He must be stopped." They knocked loud on Plaintiff's door repeatedly – first the super, then the two terminators one after another – demonstration of the special treatment Plaintiff received – he didn't hear similarly repeated and loud knocks on other apartment's doors. 9:10PM while Plaintiff studied FBI related materials Defendants' woman came under his windows and teased that this is "Same old. Same old."

2072.   7/19/2024, 2:45PM Defendants in ap. B2 hammered on Plaintiff's ceiling above his corridor. At 4:44PM Defendants in G2 knocked on Plaintiff's floor, and Defendants in ap. B2 hammered on his ceiling (above his corridor) and again at 4:50PM and 8:03PM. A bit later, at 8:16PM Defendants in ap. G2 hammered on Plaintiff's floor – right under him. At 9:11PM Plaintiff got to work outside next to Provident bank on Cedar lane. 10:00PM Plaintiff was working on AG guidelines for the FBI national security investigations when next to Plaintiff came yelling group of high school boys, and crossed Cedar lane risky – car horn. At 11:03PM Defendants' man sat near Plaintiff and talked (on phone?) for a while: "If you can't control yourself don't do it." ... 'that person… control…" About 11:45PM Plaintiff walked home holding his phone. A loud group passed behind him talking about Plaintiff "getting a job", while man on speaker said loud "Recording". 11:51PM Plaintiff got out again and while walking  Defendants' man in a car on Red Road passing him by warned "You have to go back motherfucker." The car stopped in front of a house on Red Road, but no one got out.

2073.   7/22/2024, about 6:02PM after Plaintiff worked on "fear and insecurity" in FBI related materials Defendants' couple came under his windows on Cedar lane and provoked him "Fight. [] that kind of marketing." Then Defendants attempted to intimidate Plaintiff with shouting from a passing car (see the repeating patterns in that period) at 6:56PM, and commented at about 7:02PM "We didn't really threatened." Later at 10:00PM three Defendants' men came in front of the building and warned "Don't leave the building." "We didn't even harass."

2074.   8/7/2024, Plaintiff was working on FBI materials when at 8:05AM and 8:16AM Defendants in B2 hammered on his ceiling, and commented "Can't believe.. Can't stop.." At 8:34AM Defendants' man in B2 moved right above Plaintiff and repeated "Can't believe." Later same day (1:21PM) Plaintiff sent an email to Mr. Sinai in regard his litigation against Defendants. At about 4:30PM USPS carrier threatened under his window "Have to punish Kalin. Sue if he is such a high brow."

2075.   8/21/2024, Plaintiff worked on brief for JTTFs till 5:35AM. Later at 3:09PM Defendants' woman and Jamaican food' Christine talked about Plaintiff for about 20 minutes: "Can't stop… Psych." "Psych.. Kalin." "Spy. They had control." ... "Bad Kalin. Bad." Then talked about the "big fight." "Fight Kalin. Can't stop." "Fight." "Police can not even arrest him. All big bad." … "[] to stop." ... "Try to stop Kalin." At 9:20PM while Plaintiff was working on

JTTF materials Defendants came under his windows on Red Road and provoked "Kalin gets it." About half an hour later Defendants' man came under Plaintiff's windows on Cedar lane and talked about stopping him.

2076.   9/2/2024, about 2:05PM Plaintiff went to work on JTTF brief in Votee Park, Teaneck, NJ. Leaving his building (through the back door as he threw his garbage) he turned on Red Road and saw in front of the entrance Ralph and a Defendants woman talking. Plaintiff started a video recording, and when passing them the woman said "Arrest stopped." A bit later while he was walking on Queen Ann Defendants' woman shouted at him from passing a car "Shot the fuck up." Plaintiff entered Votee Park and saw a group of high school girls stayin in front of him on the alley. When he was getting close one of them directed "Get ready." Plaintiff started video recording and they were quiet until he passed them and said not loud "Have to stop." Plaintiff worked on JTTF till 3:10PM on a meadow between trees. After returning for short in his apartment at 4:48PM Plaintiff went to Phelps park and worked on JTTF till 7:30PM. In that time at 7:07PM Defendants women came near him talking "He is not disturbed." .. "Kalin have []." A few minutes later a boy came behind Plaintiff kicking a ball, made some loud expletives. More persons came near Plaintiff. 7:23PM Defendants' woman again talked about Plaintiff ("Kalin").

2077.   9/6/2024, about 1:17PM Defendants' man came at Jamaican food truck near Plaintiff's windows and talked about him "How Bulgarian stop this []?" .. "He doesn't believe." Plaintiff worked on JTTF brief till 5:37PM. Meanwhile at 2:59PM Defendants in ap. B2 hammered on his ceiling. About 3:25PM the man from 1:17PM returned at Jamaican food, and Christine commented "We ended like this. We were trying to stop." Plaintiff went to work on benches next to Privident bank, Cedar lane. At 4:44PM Defendants' woman and a kid sat in front and talked about him "Kalin… Have to stop.." At 6:46PM Plaintiff was back at home when Christine, Jamaican food, and Defendants' couple talked about Plaintiff "Kalin []." "[] police set up." 7:26PM Christine "Can't harass him." 7:44PM Defendants man "How to push stop? [] suspect." Minutes after Plaintiff stopped working on JTTF at about 9:30PM Defendants' man  came under his windows and directed him "You forgive it out. Now all you have to do is talk to []. Fraud." At 9:34PM Plaintiff made time and date statement for the record and in retaliation Defendants in ap. B2 hammered on his ceiling.

2078.   9/7/2024, Plaintiff continued working on JTTF till 3:22AM. Meanwhile at about 12:40AM Defendants' man came under his windows and said loud "Shit. Don't you learn?" In the morning, at 11:09AM while Plaintiff was scanning Defendants under his windows "We are FBI." and left. Later same day 6:39PM Defendants' man commented Plaintiff is "Trying to sue. Not a cool guy." At 11PM Plaintiff was working on JTTF materials, when he was interrupted by a talk in front of his door. He saw Teaneck police officers talking with Defendants in ap. A1 "He has to stop." At 11:20PM Defendants came under Plaintiff's windows and said loud "I have to fight and I do not want to do it."

2079.   9/8/2024, Plaintiff kept working on JTTF briefs till 3:35AM. Meanwhile at 2:13AM loud group came under his windows saying among other things "Can't stop." They entered a car parked near Plaintiff's windows and left.

2080.   9/9/2024, Plaintiff worked on JTTF till 5:36PM. In that period at about 3:20PM Cesar Naranjo, super, entered ap. A3 and talked "[] can't hear." ... "We harass.." At 3:46PM Defendants kicked rocks under the windows and warned "Have to stop." Later, at 4:30PM Defendants in ap. B2 hammered on Plaintiff's ceiling.  5:18PM students came under the windows and shouted, then quietly commented "We don't harass." After that they screamed and left.

2081.    12/7/2024, 6:49PM Plaintiff was working on an FBI brief when Defendants directed in building corridor "Do not stop." At that time students came under Plaintiff's windows "Bad, bad guy." 7:16PM when Plaintiff stopped working on the FBI brief students(?) again came under his windows "Now stop."

2082.    12/9/2024, Plaintiff worked on a brief about FBI till 10:59PM. In the morning next day (12/10/2024, 10:24AM) Defendants' woman came under his windows and talked to Plaintiff "All is because you are fucking us." She left immediately when Plaintiff went to the window with intention to make a photo.

2083.    12/19/2024, 6:01PM when Plaintiff started working on FBI brief Ralph and another Defendants' man talked in building corridor "Kalin don't stop."

2084.    8/24/2025, Plaintiff was working on Broad Str., Teaneck when at about 5PM Defendants' man sat on the bench next to him and talked for an hour non stop. Among other things and precisely when Plaintiff was working on the FBI / JTTF section he talked about FBI a few times and warned at one point to "ignore FBI".

2085.    And more.

(3) Defendants have started social pressure campaign to 'stop' Plaintiff since he began working on the legal cases in 2016. See IV.9(a)(4).

**(vi) Defendants obstruct Plaintiff to file legal action(s).**

2086.    Defendants obstructed Plaintiff's preparations for a legal action. For example Plaintiff filed about 8 formal police reports with Teaneck police, only the two filed in 2024 had police response, which was inadequate – police minimized/ignored Plaintiff's claims, and more (see 4/26/2024, and 7/16/2024). That, together with Defendants thwarting Plaintiff's efforts to obtain legal and expert counsel, and the degrading treatment they subjected Plaintiff significantly delayed him to discover his legal claims, and eventually filing the appropriate legal actions. See IV.9.

2087.    Defendants directly prevented Plaintiff to follow the requirements by law before filing a lawsuit (even if temporary). For example Plaintiff visited the FBI New York Filed Office building at 26 Federal Plaza, New York, NY 10278 on 11/10/2022 with intention to file in person his Administrative claims under FTCA. Defendants (FBI / JTTF New York) prevented him to do that – among other things they overtly said "Can not receive." .. "Stop. Re(frame)." … "End conversation. He needs to act.".. "You have Kalin stop." ECF No.8-2 at 5910 et seq.. The FBI officers at the lobby made Plaintiff to repeat 20 times the name of the statute (FTCA), three times asked Plaintiff on whose behalf he wants to file administrative claims, intimidated and threatened

240

him, and more. At the end they claimed only one person in the office knows about FCTA and he/she was not in the office so they can not receive Plaintiff's claims. Plaintiff sent his administrative claims by certified mail with USPS. Plaintiff received only notice from the USPS about the delivery to FBI New York on 11/14/2022. See IV.9.

2088.    Defendants obstructed Plaintiff in regards to the initiation of *Dimitrov I*. For example Defendant New York City ignored Plaintiff's written communication to the Legal Department in regards filing a Request for Waiver of service for *Dimitrov I* on 8/2/2023. Defendants Teaneck, NJ refused to grant Plaintiff's Request for Waiver of service of process for *Dimitrov I* – Teaneck gave no response to Plaintiff, but appointed a lawyer for the case (ECF No.9). See IV.9.

**(vii)  Defendants' conduct have chilled Plaintiff.**

2089.    Because of the Defendants' officers and agents harassment and abuse of Plaintiff he did not report majority of incidents stated in this Complaint.

2090.    For example despite the consideration, preparations, and visit to the FBI New York on 11/8/2017 Plaintiff has never filed a report with the FBI for civil rights violations due to Defendants' actions, nor he reported or complained to the NJ State Attorney General (he researched the internet for contact with NJ AG on 1/9/2018), nor to the DOJ Civil Rights Division (Plaintiff worked on a letter to DOJ on 1/3/2018). Due to Defendants' abuse and retaliation Plaintiff did not filed a Supplement to his Notice of claims, stopped searching for lawyers and eventually stopped searching for experts counsel (last email was at the beginning of 2025) due to significant Defendants' interference. And more. Defendants' conduct have undeniable chilling effects on Plaintiff's speech, which by itself is evidence of what a reasonable person would do. See ECF No. 8-2 at 6010 *et seq.*.

*(b) Defendants[141] interfere with the federal court of the Southern District of New York (S.D.N.Y.), and its proceedings in regards to Plaintiff to deny him fair hearing.*

2091.    The totality of circumstances show that Defendants influenced and/or intruded, and continue to influence and intrude on the court of S.D.N.Y. in regards to Dimitrov v. The United States of America et al, 1:23-cv-6451 (S.D.N.Y., 7/25/2023) (the 'case' or 'ECF' for court's documents) currently in litigation, and in the previous Plaintiff's legal action - Dimitrov v. Gyro et al, 1:18-cv-3600 (S.D.N.Y., 4/23/2018) ('Gyro case' or 'Gyro ECF' for court documents). Defendants' influence and/or intrusion is shown by (a) Defendants' acts and statements demonstrating knowledge of the court's decisions, some times even before they were published; (b) the degrading treatment of Plaintiff in the court; (c) the court's application of judicial standards and proceedings in unfair way, including unreasonable delays which harm Plaintiff (especially considering that Defendants activities against Plaintiff have not stopped and are ongoing); and (d) the S.D.N.Y. treatment of Plaintiff's cases fits the Defendants policy and/or practice in regards all other Plaintiff's petitions, reports, notices and other forms of grievances he expressed to the government. These points are presented in more details bellow.

**(i) Defendants have shown their influence over the court with their actions and/or statements showing knowledge of the S.D.N.Y. proceedings in regards to Plaintiff's cases, sometimes even before they occur or got public. For example:**

2092.    Right after the discovery hearing before Judge Freeman for his Gyro case on 4/17/2019 Plaintiff went to the S.D.N.Y. Record Management (in the same building), and requested a copy of audio records of the hearing. A man came and spoke with the court's staff member before she prepared a CD with the records for Plaintiff (CD named 2019.04.17_1336). When Plaintiff got home he found that the CD has the recordings of the first half of the hearing only. The next day Plaintiff went to S.D.N.Y. and requested the records again, and after talking with a man (the same man?) the same staff member prepared a new CD for Plaintiff (2019.04.18_1318). Plaintiff got home and found that again he received only a part of the recordings of the hearing. To the extend that the man who interfered with the court's services to Plaintiff was not a court staff, he is either Defendants' agent or acting as their agent in the court's building. In Teaneck, NJ Defendants (in the full meaning of the term) commented the events under Plaintiff's windows talking about the "audio.." (5:45PM, 4/18/2019), and later after Plaintiff started searching for legal cases with objections to court's ruling they

---

141 'Defendants' here and in this subsection refers to both the FBI and JTTF New York (which includes among other parties the NYPD).

commented "He's going after the Judge." (9:47PM, 4/18/2019). Plaintiff did not pursue the mater in regards to recordings further because an official transcript of the hearing was filed on ECF on 4/19/2019 (Gyro ECF, No.92).

2093.    Judge Cave's Report and recommendation to dismiss the case was filed with ECF (ECF, No.7, "Report") on Monday, 8/14/2023 at 12:15PM. Before the Report was finalized and published Defendants' Pimienta stated in building's corridor "We stopped Kalin. Really. I don't get [sued]." (10:25AM), and after the Report was filed Pimienta went to Lomo food truck (parked near Plaintiff's windows) wearing red t-shirt with the text 'Let it go' on it, and yelled toward Plaintiff's windows "Watch that. Watch that." (12:40PM). Later same day Defendants at Lomo commented "He didn't believe." "We got him.", and after Plaintiff made a photo of them from inside his apartment, including of a woman wearing a Bergen County t-shirt, she responded "Can't persuade. Kalin will never stop." (3:45PM). Another Defendants' agent commented under the windows "No calls, no money, no shame…" After Plaintiff challenged inside his apartment "That's all? Why stop? Why hiding?" he responded "Didn't convince him." (4:15PM).

2094.    On 8/27/2023 Sunday when Plaintiff stopped working on his Objections to the Report and Recommendations Defendants' woman and a man commented next to his windows "We suppress that." Plaintiff filed his Objections the next day (ECF, No. 8). Till now (for more than two years) the court has not responded – in practice Plaintiff's Objections are 'suppressed'.

2095.    9/21/2023 Thursday, 4:49PM Defendants' woman 'client' of Jamaican food truck which is near Plaintiff's windows talked very loud "We want you to leave home. There is no conspiracy, no nothing." Then talked quieter with Jamaican food's Christine. Later 4:59PM "Kalin", "have legal. You gotta go." Christine "That game."

2096.    9/27/2023 Wednesday, 5:12PM after Plaintiff filed with ECF a letter-motion for extension of time to serve summons in Dimitrov v. the USA a USPS carrier talked about Plaintiff in building's corridor ("Kalin") later stating "Kalin []. They estimated that."

2097.    3/4/2025, 8:22AM after Plaintiff checked his case on PACER Defendants woman with a dog, the same woman from the previous days, in building corridor "You have to believe that ended."

**(ii) The Defendants' influence on S.D.N.Y. is inferred because the judicial standards, rules, and proceedings are repeatedly applied to Plaintiff's legal actions in unfair way, and put him unreasonably in disadvantage.**

<u>(1) The S.D.N.Y. unequal treatment of the Plaintiff's legal actions in comparison to other similar cases is contrary to the principle of "[e]quality before courts and tribunals [which] requires that similar cases are dealt with in similar proceedings." (General Comment No. 32: Article 14: Right to equality before courts and tribunals and to a fair trial. Human Rights Committee, CCPR/C/GC/32, 23 August 2007, at 14). For example the court's appointment of a judge to Plaintiff's Gyro case took longer than any similar case filed with S.D.N.Y. since Plaintiff's filing in the next about 6 months; the court keeps the case against the Defendants at its initial stage for more than 25 months while average time for disposition of a civil case with S.D.N.Y. is 5.6 months; and more.</u>

2098.    As a criteria for a comparison with Plaintiff's case against Gyro et al is used the time till a case is

assigned to a Judge – in that way the particular circumstances of each case are supposedly not

playing role in the proceedings. Plaintiff's case against Gyro et al. (*Dimitrov v. Gyro et al*, 18-cv-3600 (S.D.N.Y. 4/23/2018)) has the longest period of time till a judge was appointed (36 days) in comparison to 70 similar employment cases filed against private employers with S.D.N.Y. between 4/23/2018 (since the initiation of the Gyro case) and 10/9/2018. See Exhibit. Notable is that there was no action on his case for 59 days after the denial of Plaintiff's IFP application (S.D.N.Y. Pro Se Intake Unit had told Plaintiff to wait (see Gyro ECF, No. 12) which later became an issue in regards to the service of process – see bellow).

2099.    According to the U.S. courts' statistics published on https://www.uscourts.gov for the 12-months period till September 30, 2023 the median time in S.D.N.Y. from filing of a civil case and its disposition is 5.6 months. (United States District Courts — Judicial Caseload Profile, p.11). Notable is that for the same period 6,587 of the civil cases with S.D.N.Y. (64% of the total number of civil cases) were terminated before pretrial with median time for disposition 5.5 months (Table C-5. U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending September 30, 2023, p.1). In comparison the Plaintiff's case against Defendants (*Dimitrov v. The United States of America et al*, 1:23-cv-6451 (S.D.N.Y. 7/25/2023)) is still in its very initial stage (no service of process) for more than two years.

2100.    21 cases categorized in PACER as Civil rights – Other, similar to the Plaintiff's case against the Defendants, were assigned to Judge Rearden between 1/1/2023 and 8/29/2024 (including Plaintiff's). In 10 of them service of process was done in time period up to 3 months since the initiation (including one case with an IFP request). From the other 10 cases, 3 were dismissed (2 voluntarily), 1 was transferred to another court, and for 6 Plaintiff has no information about service of process. In comparison service of process in Plaintiff's case has not even started in 26 months since the initiation of the legal action – a striking difference in comparison. See Exhibit

Plaintiff's case also is the only case between them in which the court did not respond to a filing for period of more than two years, and where the Court was silent in regards to a filing it was for a much shorter period. In regards to the complexity of the case, and other considerations see the argument bellow. The pending decision on Report and Recommendation, and the Plaintiff's Objection (ECF, Nos. 7, and 8) prevents Plaintiff, among other things, to serve the summons on Defendants, and to proceed with the litigation.

2101.    The court / court's Pro Se Unit proceedings in regards to the summons in Plaintiff's cases are contrary to the Federal Rules of Civil Procedure, Rule 4(b) ("On or after filing the complaint, the Plaintiff may present a summons to the clerk for signature and seal. If the summons is properly completed, the clerk must sign, seal, and issue it to the Plaintiff for service on the defendant. A summons—or a copy of a summons that is addressed to multiple Defendants—must be issued for each defendant to be served."), and opposite to the court acceptance of many cases where summons are filed together with the complaint, or soon after.

2102.    As mentioned above S.D.N.Y. Pro Se Intake Unit did not accept Plaintiff's summons, and had told Plaintiff to wait for a Judge order in order the summons in his Gyro case to be issued (see Gyro ECF, No. 12) which became an issue when the case was reassigned to Judge Woods. Judge Woods issued an Order to show case on 7/30/2018 (Gyro ECF, No. 10) because "Plaintiff has failed to file proof of service as to any Defendant in this action." Later the court gave new deadlines for serving of process in response to Plaintiff's Letter (Gyro ECF, Nos. 12, and 14), and the summons were issued without specific court order.

2103.    In Plaintiff's case against the United States et al Defendants directly interfered with Plaintiff's efforts to get the summons issued, and with the court's Pro Se Intake Unit. Under Defendants influence the court did not issued all summons, those issued were wrong, than obstructed Plaintiff's efforts to correct them – including when Plaintiff went to the court's building with

printed proposed summons (then Defendants agents were in the court too). Relevant events

include the following:

2104.    On 8/2/2023 Wednesday Plaintiff went to 500 Pearl Str., Manhattan, an S.D.N.Y. building, with printed summons for the case against the USA et al. Guards there commented that he "looks scared". "This is federal building after all." Plaintiff was referred to 40 Foley, another S.D.N.Y. building, Room 105 – Pro se intake unit.There Plaintiff spoke with a man in Pro Se Unit room. Plaintiff said that he had paid the court fee, and after the man refused to accept the summons, Plaintiff asked 'Should I wait for the court to provide the summons?' Pro Se man said to the effect of "Yes. You will have a notice or you can call. When the Judge is assigned the case can proceed. If the court finds the case is sufficient the case may proceed." And he said that after the order Plaintiff "has to provide the summons then. But [Plaintiff] has to wait for the notice about this." A second man there – Defendants agent or person acting as their agent – remained hidden the entire time, and listened all that with a headset on (Plaintiff saw his hands removing headset when he was leaving and the internal door was open), and approved quietly of the handling of Plaintiff "Good. OK." No other persons were in the room. Plaintiff was leaving the building when guards commented him at the checking area that he is "hungry". "They were giving him fast (treatment)." About 4:20PM (about 15 minutes later) Plaintiff was in the small park between S.D.N.Y. buildings and the FBI Field Office building, and called Pro Se Unit after reading again Federal Rules of Civil Procedure, Rule 4(b) in regards to issuing summons. Surprisingly a woman answered. Plaintiff told her that he spoke with a person from Pro Se who said Plaintiff can not provide summons then, and gave the case number. The connection was not good, she said that if Plaintiff wants to get to the court he can get the summons, and he said to her that in 5 minutes he will be there. The woman Plaintiff had spoken on the call was waiting at the check area with the guards (surprisingly the guards were different too), and told Plaintiff she cannot give him summons because no judge is assigned to the case. (Judge Rearden was assigned on 8/8/2023). Defendants prevented Plaintiff to "present a summons" in accord to Rule 4(b), and he returned home – the Defendants man, who usually patrol under Plaintiff's windows, was waiting in front of 7/11 and asked him for cigarette. At 11:22PM Defendants' woman on Cedar lane commented while Plaintiff was researching dockets in S.D.N.Y. about summons – when they are issued and similar. "That Kalin is very special."

2105.    On 8/7/2023 Monday, 2:53AM Plaintiff filed a Request for summons to FBI, Dula, Pimienta with an email to the Pro Se Intake Unit (ECF, No. 4). The Request was posted by Pro Se Unit with delay of two days on Wednesday 8/9/2023, 11:06AM (according to email notification from NYSD_ECF_Pool@nysd.uscourts.gov). Meanwhile Plaintiff sent a Request for waiver of service to Township of Teaneck (on 7/31/2023), and intended to sent such to NYC, but his communication in that regard to the NYC counsel from 8/2/2023 has never been answered.

2106.    On 10/5/2023 Thursday, after an order from Magistrate Judge Cave (ECF, No. 11) summons for the United States, NYC, and Teaneck were issued with no address, not mentioning the other Defendants on case title, and a line 'See the attachment'. The summons to Dula, Pimienta, and the John and Jane Does' Defendants were not issued (Plaintiff was told later by Pro Se Intake Unit that for Doe defendant's summons would be issued after identifying them). About 4PM Plaintiff called S.D.N.Y. Pro Se Unit, and after a lot of efforts the woman he spoke with said all issued summons are invalid and new one will be issued. In about 20 minutes long call she said she would speak with her supervisor in regards to summons to Dula, and Pimienta, that Plaintiff should add himself the addresses in the summons, she said

no two addresses, nor email can be put in the summon, but this did not explain why the addresses themselves were removed from Plaintiff's proposed summons. She was not pleasant to deal with, when Plaintiff asked her does it mean he should edit the summons – adding addresses, she was short of calling him names, repeating "Oh my god. Oh my god." Then she denied seeing 'See attached', later said she saw that line, and told Plaintiff he should not use those summons, that they need to be redone. After the call ended, at 4:29PM Defendant Marlene Dula commented in building's corridor "Shit." She came under Plaintiff's windows and commented "Almost let me go." This is another example of the Defendants demonstrative surveillance on Plaintiff, apart from showing the Defendants intention to interfere with the summons. New summons were filed a bit later on ECF while the old were deleted.

(2) Magistrate Judge Cave's Report and Recommendation to dismiss Plaintiff's action Dimitrov v. the United States of America et al, 1:23-cv-6451 (S.D.N.Y., 7/25/2023) (ECF, No. 7) shows the Defendants influence on the court. Such influence is inferred by the Report's apparent but otherwise unreasonable bias against Plaintiff, including its material misrepresentation of the Plaintiff's claims; apparent legal errors in regards to the application of standards for review of a pro se complaint, for a frivolous case, and for dismissal under F.R.C.P., Rule 8, as well as the erroneous position of the Report that any broad conspiracy claim is frivolous; and the questionable preparation and filing of the Report as timing. All those infer Defendants influence on the court, because otherwise it would mean that Judge Cave (and Judge Rearden) are incompetent and/or biased against Plaintiff.

2107.    One business day after Judge Rearden referred Plaintiff's case to Magistrate Judge Cave for

"General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and

settlement)" (ECF No. 5, from Friday 8/11/2023), on Monday 8/14/2023 Judge Cave filed Report

and recommendation to dismiss Plaintiff's legal action against the Defendants (Dimitrov v. the

United States of America et al, 1:23-cv-6451 (S.D.N.Y., 7/25/2023) ECF No. 7). That suggests

that the case was supposedly read, analyzed, decided, comparable legal cases were found, and the

Report was written by Judge Cave in one day. To the extend it is because the case is simple, and

consequently one day is sufficient for all that there is no possibility the misrepresentations in the

Report of the Plaintiff's claims to be unintentional. To the extend the case is indeed complex –

that means the decision against Plaintiff was made before analyzing the complaint (there is

apparent lack of time for a proper analysis). However, regardless of the evaluation of complexity

of the case, the fact that the court's decision on the Report, and on Plaintiff's objections (ECF

No.8) is pending after two years or more than 730 days, renders the one day spent on Report's

analysis (or even if we generously ad the weekend – three days) obviously inadequate, and points to external influence on the decision. Because there is no base for bias and/or malice toward Plaintiff from Judge Cave or from Judge Rearden the Defendants' influence on the court is inferred. To state the opposite means that both Judge Cave and Judge Rearden are incompetent and/or biased against Plaintiff.

2108.   The Report is contrary to the standard due for pro se pleadings which requires interpretation that raises the "strongest claims that they suggest"1. However the Report's interpretation of Plaintiff's claims searches and creates the weakest claims that can be raised based on small portions selected from the complaint. The bias against Plaintiff is clear when the claims-as-presented-in-the-Report are compared to his actual claims (see ECF No.8, table on pages 2-11, and p.33-36), and even better to the complaint and the incorporated Relevant history (ECF Nos.1, 8-1 and 8-2). That shows that the Report was not intended as a report2 of what are the Plaintiff's claims, but as a base for the recommendation to dismiss the case, and to present Plaintiff as delusional and/or irrational. If it is not because of Defendants' influence on the court, than Judge Cave doesn't know how to apply the proper standard.

2109.   The Report's material misrepresentation of the Plaintiff's complaint "subverts the integrity of the court itself." The Report does not even mention all Plaintiff's counts, let alone providing any analysis and reasoning why they are to be dismissed (Judge Cave seems to completely missed the 'legal theory' of the complaint as presented in its 17 counts); it omits most of the Plaintiff's arguments; mixes paragraphs and concepts without rational; quotes portions out of context; and compares the complaint to cases that are inadequate as comparators.

2110.   The Report implies that Plaintiff's claim for a broad conspiracy by itself is irrational and frivolous and that is apparently wrong. If that claim was not made because of the Defendants influence, then Judge Cave shockingly lacks knowledge, or is deliberately blind about the

common Defendants practice to act in task forces3, and implement programs as CVE or anti-gang programs4 which involve many parties (including businesses, communities, schools, and more). Any subject of such activities apparently faces multiple government agencies (federal, state, and local), and private parties acting in concert against him/her. Consequently when those activities violate the US constitution and laws they are de jure and de facto conspiracy which can be, as in Plaintiff's case, a criminal conspiracy under 18 U.S.C. §241.

2111.   Similarly the Report implies that claims based on the Defendants' use of directed energy (sound waves, electricity, or electromagnetic radiation, referred bellow as 'DE') against Plaintiff are irrational ignoring the fact that weapons using DE have been public for a while, and recently were again in the public domain in relation to the 'Havana syndrome'. The effects of electricity on human body, and the health effects from radiofrequency radiation exposure are also in public knowledge. Based on the above a claim about DE attacks is apparently not frivolous. See IV.11.B.

2112.   The Report is clearly erroneous in regards to its recommendation to dismiss the case because "the Complaint... is prolix and violative of Rule 8 [and] should be dismissed on this independent ground." ECF No.7, p.6. Absent Defendants' influence to explain such recommendation, that would mean that Judge Cave is incompetent[142] and/or biased against Plaintiff.

        (3) Judge Rearden has not ruled on the Report and the Plaintiff's Opposition to the Report and Recommendations (ECF, No.8) for more than two years, and in practice unreasonably denies Plaintiff access to the court, a fair hearing, and remedy for the violations he claimed. That further supports the inference of Defendants influence on the court unless Judge Rearden is indeed biased against Plaintiff.

2113.   Judge Rearden has to determine if Plaintiff's claims in Dimitrov v. the United States of America et al, 1:23-cv-6451 (S.D.N.Y., 7/25/2023) are frivolous, and permit the case to proceed with service of process (serving summons on Defendants), or if all claims are frivolous to dismiss the case.

---

142 See Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (a case quoted in the Report where the court was explicit that "the dismissal for noncompliance with Rule 8 without leave to amend [is] an abuse of discretion."

2114.    "[A]t the initial stage of a litigation, the Plaintiff's burden is "minimal" -- he need only plausibly allege facts that provide "at least minimal support for the [claim]." " Vega v. Hempstead Union Free School Dist., 14-2265-cv, 801 F. 3d 72 (2d Cir. 2015) (quoting Littlejohn, 2015 WL 4604250, at *8.) In reviewing the complaint court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus et al. 551 U.S. 89, 127 S.Ct. 2197 (2007) PER CURIAM "As the Court held in Twombly, 550 U. S. 544, the pleading standard Rule 8 announces does not require "detailed factual allegations," but... a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." Id., at 570." Ashcroft v. Iqbal, 556 U. S. 662 (2009)

2115.    "An action is "frivolous" when either: (1) "the 'factual contentions are clearly baseless,' such as when allegations are the product of delusion or fantasy;" or (2) "the claim is 'based on an indisputably meritless legal theory.' " Nance v. Kelly, 912 F.2d 605, 606 (2d Cir.1990) (per curiam) (quoting Neitzke v. Williams, 490 U.S. 319, 327, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989)).[] A claim is based on an "indisputably meritless legal theory" when either the claim lacks an arguable basis in law, Benitez v. Wolff, 907 F.2d 1293, 1295 (2d Cir.1990) (per curiam), or a dispositive defense clearly exists on the face of the complaint. See Pino v. Ryan, 49 F.3d 51, 53 (2d Cir.1995)." Livingston v. Adirondack Beverage Company, No. 1091, Docket 96-9301 (2d Cir., 1998) "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them. [A] complaint may not be dismissed, however, simply because the court finds the Plaintiff's allegations unlikely." *Denton v. Hernandez*, 504 U.S. 25 (1992)

2116.    "The Court is obliged to []construe pro se pleadings liberally, Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they suggest," Triestman v. Fed. Bureau of Prisons, 470 U.S. 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original)." John L. Peterec-Tolino v. Ace American Insurance Co., 20-CV-5354 (LLS), 2020 WL 5211045 (S.D.N.Y., 8/28/2020) Furthermore, "the court [] must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party or parties have been served and have had an opportunity to respond". Miller EX v. Primo et al, 5:22-CV-0680 (BKS/ML), 2022 WL 16556060 (N.D.N.Y., Sept. 29, 2022); "Sua sponte dismissal of a pro se complaint prior to service of process is a "draconian device"". *Benitez v. Wolff*, 907 F.2d 1293 (2d Cir., 1990) PER CURIAM; similar in *Pittman v. Billings, et al*., 5:20-CV-422 (GLS/ATB) 2020 WL 2079440 (N.D.N.Y. Apr. 30, 2020), and more.

2117.    In the light of the fact that the Report was prepared and filed in one business day Judge Rearden's silence on Plaintiff' Opposition for more than 730 days (two years) and counting is obviously unreasonable.

2118.    Because of the Plaintiff's Opposition to the Report a dismissal by Judge Rearden will allow him to raise an appeal. In that context the unreasonable delay of Judge Rearden's decision on the Report and the Opposition make perfect sense as continuation of the Defendants' policy/practice to suppress Plaintiff and his petitions (Defendants activities against Plaintiff have never ceased,

including Defendants' efforts to "convince" Plaintiff to stop since the initiation of the litigation on 7/25/2023, including explicit statements in that regard; the Defendants' many-years-long practices and policies in regards to Plaintiff and his petitions; and more).

(4) Judge Rearden has ignored Plaintiff's letter from 7/24/2024 (ECF, No.14) asking for ruling on his opposition to Report and Recommendation (ECF, No. 8), and other relief due to the ongoing harm he suffers from Defendants activities.

2119.    The Court has not responded in any way to Plaintiff's letter to Judge Rearden from 7/24/2024 (ECF, No.14). After this letter the Court is aware about the harm to Plaintiff caused by the Defendants activities since the initiation of *Dimitrov I*, and the lack of any actions by the Court indicates at least its deliberate blindness in that regard.

(5) The court's unjustified delays violate the due process. Furthermore because the court is aware of the ongoing injury to Plaintiff (see ECF, No.1, 251, No.8-1 and 8-2, No.14), that amounts to acceptance and compliance with the Defendants policies and practices violating Plaintiff's civil rights by remaining willfully blind to them.

2120.    To the extend the complexity of the case is stated as a justification for the delays – that would be admission that Judge Cave's Report (ECF, No. 7) is inadequate and with apparent bias against Plaintiff. Admission that the Report was not intended as a true report and analysis of the Plaintiff's claims (it was supposedly done for one business day) but as a necessary step before a decision to dismiss the case which had been made in advance. But even if the complexity of Plaintiff's case is an issue relevant to the Judge Rearden's pending decisions – more than two years is a very long and more than enough time for consideration. Plaintiff found no other case in the category Civil Rights – Others (as the Plaintiff's case) which was assigned to Judge Rearden in the period of 1/2023-8/2024, and in which the court did not respond or act for prolonged time.

2121.    Plaintiff's interest in the litigation against Defendants is obvious – he has been and is in serious hardship due to Defendants' activities (see principle of evaluating the constitutionality of the proceedings in the US Fourth Report listing Supreme Court cases initiated by government).

2122.    To the extend government has legitimate governmental interest for the activities against Plaintiff, the governmental interest in conducting these court hearing shall also be very strong because then Plaintiff will be on the record, and any falseness in his statements can be scrutinized.

2123.    The court as independent and impartial institution shouldn't have had interest in the case other then providing the due process including the administrative interests in handling effectively the proceedings. There is no reason for the denial of hearing for Plaintiff's case apart from silencing, suppressing, and as punishing him for his legal actions. Therefore by (de facto) not allowing the adversary hearings in Plaintiff's case the US violates both CCPR, Art. 14.1 and the US constitution (due process), and shows Defendants' influence on the court.

**(iii) Degrading treatment and the intimidation of Plaintiff when he was in the court's buildings or on a call with the Pro Se Unit. For example:**

2124.    On 4/6/2018 Friday Plaintiff went for a meeting with S.D.N.Y. Legal Clinic in Manhattan in regards to his Gyro case. Legal Clinic actively discouraged him to pursue his case against Gyro before they knew the facts about the case. Plaintiff left to them documents listing relevant to the case facts for consideration. On 4/17/2018 Tuesday when Plaintiff went to S.D.N.Y.. Legal Clinic for a second meeting they claimed that his appointment was rescheduled. Plaintiff had to go to the clinic on the next day, and they again were not supportive – they said to the effect of "you may have a case, but we can't do anything".

2125.    On 6/12/2019 Plaintiff went to pay the filling fee for his case against Gyro with S.D.N.Y.. A uniform security at the building was expecting (recognized) him, and commented when Plaintiff approached "Should I lock the entrance for this guy?" At that moment there was no one else but Plaintiff in that area.

2126.    Plaintiff had Discovery hearing before Judge Freeman on 4/19/2019 Dimitrov v. Gyro et al, 1:18-cv-3600 (S.D.N.Y.), see ECF, Nos. 92-93 (Transcript of the hearing and a Notice of filing of Official transcript filed the same day – 4/19/2019 Friday). Plaintiff visited S.D.N.Y. on or about 4/22/2019 Monday, went to S.D.N.Y. Records Management and worked on it, making notes. The guards at the entrance of the court's building in Manhattan demonstrated that they know him, and commented "Gyro can't stop." (Plaintiff's notes, DSC_8797.jpg)

2127.    On 8/2/2023 Wednesday the guards at 500 Pearl Str., Manhattan, an S.D.N.Y. building, challenged that Plaintiff "looks scared". "This is federal building after all." And the guards at 40 Foley, another S.D.N.Y. building commented that the Plaintiff is "hungry". "They were giving him fast treatment." Notable was that when Plaintiff returned to the building about 20 minutes later all guards were replaced. In the Pro Se Intake Unit room the staff refused to accept the proposed summons Plaintiff wanted to file – contrary to Rule 4(b) of the Fed. Rules of Civil Procedures – and tried to misled him about the procedure (saying Plaintiff has to wait for order from the Judge and then file summons). A second man staying hidden monitored and approved the one dealing with Plaintiff, and to the extend he was not a Defendants agent or person acting as their agent he was a court staff member. Regardless of

that Pro Se unit acted in detrimental to Plaintiff way then. (See above more details about those events.)

2128.    On 9/14/2023 Thursday Plaintiff went to S.D.N.Y. Records Management (3d floor, Room 370), and worked on dockets of civil rights cases since beginning of 2023. While he was there the staff talked a few times about him ("Kalin"). In that period of time a man came who claimed he had been arrested for a crime and searched for his case documents, without knowing the case number. Staff was very kind to him in comparison to dealing with Plaintiff. The man sat next to Plaintiff while they searched, then walked behind Plaintiff and sat next to him on his right side, then talked intimidating Plaintiff. Per Plaintiff's knowledge and belief that man was a Defendants agent or acting as their agent.

2129.    The events on 10/5/2023 Thursday relevant here are described in details above in 2106. Then Plaintiff called S.D.N.Y. Pro Se Unit, and the woman he spoke with was very unpleasant during the about 20-minutes-long call. When Plaintiff asked her additional questions, she was short of calling him names, repeating "Oh my god. Oh my god." Then she denied seeing on the summons the things Plaintiff described, but later she admitted that she did see those things and that summons should be redone.

2130.    On 8/29/2024 Plaintiff went to S.D.N.Y. Records management and worked on dockets of civil rights cases till 2:39PM. For the first time security of the court building made no remarks in regards to Plaintiff. When he got in Records Management a staff member, a man inside talked about Plaintiff ("Kalin") as the "poor bastard" who "have to stop". However after a call he stopped talking. Plaintiff left S.D.N.Y., and when he approached and passed by the FBI building DHS FPS officers followed him for a while till he reached the corner on Broadway, a man asked "Everything OK?" after that they talked quietly.


**(iv) The S.D.N.Y. treatment of Plaintiff and his legal actions matches Defendants' policy and practice in regards to him and his petitions. See more above at C.(1)**

2131.    Defendants' conduct in regards to Plaintiff's reports, complaints, and other verbal or written

petitions (or any other Plaintiff activity) demonstrates that there is a policy / practice to prevent,

ignore, minimize, or obstruct them (by demonstrated lack of good will, detrimental interpretation

if any, and more. See above IV.9, and more). Furthermore other parties also follow the same

policy in regards to Plaintiff and his communications and complaints. See for example Plaintiff's

complaints with DOJ OIG, his communications to Attorney General, to DOJ NSD, and more.

2132.    The conduct of the Court's staff aiming to chill Plaintiff's research in its Records Management,

and his visits to the court in general is consistent with the Defendants' efforts to prevent

Plaintiff's legal actions. The court's Pro Se Unit conduct in regards the summons in Plaintiff's

cases matches Defendants' actions aiming to prevent Plaintiff from fulfilling all legal

requirements for his legal actions (see administrative claims with the FBI, ECF, No.1, 8-1).

2133.    The court minimizes Plaintiff's complaint as demonstrated by the Report and Recommendation (ECF, No.7). Instead of searching for its strong points the Report construed the complaint as something delusional and irrational, significantly reduced its meaning, and misrepresented its claims. Similarly in the Plaintiff's case against Gyro et al. Judge Woods order from 6/25/2019 (Gyro ECF, No.110) construed detrimentally Plaintiff's objections (Gyro ECF, No.97); erroneously claimed that Judge Freeman did not denied Plaintiff's Motion to correct/amend transcript, Gyro ECF. No. 77 ignoring a text order (Gyro ECF. No. 89) which explicitly stated "Plaintiff's motion is denied"; and contradicted Federal Rules of Civil Procedure, Rule 26(a)(1) (A) as interpreted at the 2000 Committee Notes on Rule 26.

2134.    In totality of circumstances the court shows bad will toward Plaintiff, ignores his motions, letters, and obstructs his case against Defendants. For example the court ignored Plaintiff's motion to issue summons to named Defendants (ECF, No. 4) and did not list the named Defendants in the initial versions of the issued summons. The court's unreasonable lack of response to Plaintiff (ECF, Nos., 8, 14) for very long time (the response is still pending) in practice thwarted Plaintiff's case against Defendants, which considering the ongoing harm, is very detrimental to Plaintiff.

2135.    The Court has no legitimate interest in obstructing Plaintiff's legal actions but submits to the executive branch's goal to suppress Plaintiff's legal actions and to evade responsibility. Plaintiff's case against Defendants would not open the door for large number of similar litigations, nor Defendants would be limited in any way in their legitimate pursuit of any legal goals.

**(v) Because of the Defendants' direct and/or indirect interference with S.D.N.Y. the court is neither independent nor impartial in regards to Plaintiff and his legal actions.**

2136.    Defendants interfere with the court's proceedings in Plaintiff's legal actions with continuous influence, pressure, and/or disruption of both (a) Plaintiff and his work on legal materials and filings (see above), and (b) the court. That in effect makes the Court neither independent nor impartial, and violates the fundamental fairness in regards to Plaintiff's legal actions. There is

huge disparity of power in Plaintiff's case, which is further amplified by Defendants' deliberate actions to obstruct Plaintiff's legal actions.

2137.  The international law is clear: "States should take specific measures guaranteeing the independence of the judiciary, protecting judges from any form of political influence in their decision-making…" *General Comment No. 32: Article 14: Right to equality before courts and tribunals and to a fair trial*. Human Rights Committee, CCPR/C/GC/32, 23 August 2007, at 19. "Fairness of proceedings entails the absence of any direct or indirect influence, pressure or intimidation or intrusion from whatever side and for whatever motive." Id. at 25. "An important aspect of the fairness of a hearing is its expeditiousness." Id. at 27.1

2138.  In the US "impartiality and fairness are guaranteed by the Due Process clause. … because the "appearance of evenhanded justice... is at the core of due process", Mayberry v. Pennsylvania, 400 U.S. 455, 469 (1971) (Harlan, J., concurring), the Court has held that even decision makers who in fact "have no actual bias" must be disqualified if there might be an appearance of bias. Morrissey v. Brewer, 408 U.S. 471, 485-86 (1972). See also Goldberg v. Kelly, 397 U.S. 254, 271 (1971)." *Initial reports of States parties due in 1993: United States of America*. 24/08/94. CCPR/C/81/Add.4.

2139.  De facto Defendants' interference systematically frustrate Plaintiff's access to courts: in addition to Defendants' demonstrative interference and retaliation to Plaintiff's work on case-related and legal materials and filings since 2016 (see IV.11, IV.9, and more), the court holds Plaintiff's lawsuit against Defendants at a very initial stage (before serving the summons) and does not allow it to proceed for more than two years and counting.

2140.  Regardless of the Defendants' motivation there is no exception that could justify the intrusion on Plaintiff's right to fair hearing by competent, impartial, and independent court.[143] Defendants' interference with the federal court of Southern District of New York in regards to Plaintiff's cases violates the US Constitution, multiple laws, and CCPR, Art. 14. There is no applicable exception that can make lawful the Defendants' interference with Plaintiff's right to petition the government.

---

143 See *General Comment No. 32: Article 14: Right to equality before courts and tribunals and to a fair trial*. Human Rights Committee, CCPR/C/GC/32, 23 August 2007 (referring to *Gonzalez del Rio v. Peru*, Communication No. 263/1987, Human Rights Committee, 28 October 1992).

### 11. Defendants conspire to systematically degrade Plaintiff, including by deliberate infliction of physical and mental pain and suffering for 13 years and ongoing.

2141.    Defendants[144] subject Plaintiff to degrading treatment with different intensity in time, and cause him physical and mental pain or suffering which continue for more than 13 years. Defendants' conduct degrading Plaintiff is planned, coordinated, and the effects amplify each other and accumulate in time.

2142.    Defendants' practices towards Plaintiff resemble post-war UK 'internal security' techniques "designed to make the detainee "feel that he is in a hostile atmosphere, subject to strict discipline, and completely isolated, so that he fears what may happen next;" Id.11"[145]

2143.    Physical pain and suffering caused by Defendants include, but is not limited to, the pain and suffering inflicted by their attacks on Plaintiff with directed energy ('DE') (repeating electric shocks, first degree burns, and more); or the combination effects due to the reduction of his pain-threshold from the 8-years long sleep deprivation of Plaintiff, as well as its physical effects. See bellow A and B. Defendants inflict mental pain or suffering on Plaintiff with threats to kill or destroy him, subjecting him to sleep deprivation, interfere with his senses, sound and DE attacks, attack his identity, humiliate, ostracize him, sabotage and frustrate his activities, and more. See bellow A-C, and IV.12. The degrading effect and the distress from other Defendants' activities is presented in the other sections.

2144.    In addition to the above the degrading treatment of Plaintiff includes also his alienation, discrimination, sabotage of his activities and economic prospects (loss of incomes), his victimization, and more. Defendants deny in practice healthcare to Plaintiff (see interference with

---

144 'Defendants' in this subsection means all government agents and officers (in the broad meaning of those words), and persons acting under their direction, or with their knowledge and approval.

145 *Memorandum For John A. Rizzo, Acting General Counsel, Central Intelligence Agency Re: Application of the War Crimes Act, the Detainee Treatment Act, and Common Article 3 of the Geneva Conventions to Certain Techniques that May Be Used by the CIA in the Interrogation of High Value al Qaeda Detainees*, Office of the Principal Deputy Assistant AttomeyGenera1, July 20; 2007

primary physicians), interfere with the dental services he receives in terms of quality, and obstruct his legal means to address his grievances (IV.9-10).

2145. Defendants' conduct is 'degrading' because it humiliates or debases Plaintiff, demonstrates lack of respect and diminishes his dignity, arouses fear, anguish or inferiority.[146] Furthermore it causes physical and/or mental pain and suffering to Plaintiff, and at certain periods Defendants' practices individually or in combination constitute inhuman treatment or torture because they are deliberate, cause intense suffering, and even injure Plaintiff's body.[147]

### A. Defendants deprive Plaintiff *of* getting enough sleep as part of their concerted efforts to systematically degrade and harm him.

2146. Defendants deprive Plaintiff of sleep[148] in parallel to their other activities against him since 2013, and the effects have accumulated in time[149]. In addition Defendants increased the intensity of sleep deprivation (number of interruptions[150] per night, reducing the amount of Plaintiff's sleep time, changing his sleep cycle[151]) in retaliation to his start of regular record of relevant events in

---

146 *Guide on Article 3 of the European Convention on Human Rights*, ECHR, Updated on 31 August 2024
147 Id.
148 "[S]leep deprivation indicates getting less than the required amount of sleep, which typically between 7 and 9 h of sleep per night for adults (Hirshkowitz et al., 2015)." *The Common Effects of Sleep Deprivation on Human Long-Term Memory and Cognitive Control Processes.* Kim T, Kim S, Kang J, Kwon M and Lee S-H (2022) Front. Neurosci. 16:883848. doi: 10.3389/fnins.2022.883848 ("Kim et al, 2015"). Sleep deprivation is a common method of degrading treatment. See for example *CIA Comments on the Senate Select Committee on Intelligence Report on the Rendition, Detention, and Interrogation Program*, Central Intelligence Agency, Washington D.C. 20505, 27 June 2013 ("sleep deprivation [was] categorized as standard techniques at the time and did not require Headquarters permission for each use… In some instances the only technique used was sleep deprivation".)
149 "Conditioning techniques [as sleep deprivation] are not designed to bring about immediate results. Rather, these techniques are useful in view of their "cumulative effect…, used over time and in combination with other interrogation techniques and intelligence exploitation methods." Id. At 5." *Memorandum For John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of United Sates Obligations Under Article 16 of the Convention Against Torture to Certain Techniques that May Be Used in the Interrogation of High Value al Qaeda Detainees*, Office of Legal Counsel, DOJ, May 30, 2005.
150 "In horizontal sleep deprivation… [t]he position is sufficiently uncomfortable to detainees to deprive them of unbroken sleep…" *Memorandum For John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of 18 U.S.C. §§ 2340-2340A to Certain Techniques That May Be Used in the Interrogation of a High Value al Qaeda Detainee*. Office of Legal Counsel, DOJ, May 10. 2005, n.15.
151 The US' use of sleep deprivation disrupts subject's sleep cycle through sleep adjustment (setting the sleep time), and/or sleep management (controlling the length of sleep). See in prisoner context *Inquiry Into the Treatment of Detainees in U.S. Custody. Report of the Committee on Armed Services*, United States Senate, Nov. 20, 2008 ("The September 14, 2003 CITP-7 policy authorized both sleep management and sleep adjustment for interrogations, defining the former as "adjusting the sleep times of a detainee" and the latter as "4 hours of sleep per 24 hour period… ""all daily activities should be on random schedules" and should, among other things "disrupt prisoner sleep cycles."")

the end of 2014, again after he started working on legal and case materials (April 2016), and later in retaliation to his contact with multiple New York-based lawyers (August 2017). See IV.10, and IV.11. B, ECF No. 8-2 at 1983-1989, and more. As a result of Defendants' actions Plaintiff suffers chronic sleep deprivation for about 8 years and ongoing.

2147. Defendants apparently deprive Plaintiff of sleep in order to weaken him, to make him disoriented and compliant[152], to degrade his cognitive functions such as thinking, planning, and other[153] (see

152 Sleep deprivation is degrading treatment used to "weaken the subject and wear down his resistance". *Memorandum For John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of 18 U.S.C. §§ 2340-2340A to Certain Techniques That May Be Used in the Interrogation of a High Value al Qaeda Detainee.* Office of Legal Counsel, DOJ, May 10. 2005. See also *Memorandum For John A. Rizzo, Acting "General Counsel, Central Intelligence Agency Re: Application of the.War Crimes Act, the Detainee Treatment Act, and Common Article 3 of the Geneva Conventions to Certain Techniques that May Be Used by the CIA in the Interrogation of High Value al Qaeda Detainees,* Office of the Principal Deputy Assistant AttomeyGenera1, July 20; 2007, ("Memo Art.3 of the Geneva Convention, 2007") n.27.), to "induce control, dependency, complia[n]ce, and cooperation," including by disorienting the subject (*Inquiry Into the Treatment of Detainees in U.S. Custody. Report of the Committee on Armed Services,* United States Senate, Nov. 20, 2008 ("many FBI agents described a program of sleep disruption employed by the military as designed to disorient detainees and thereby obtain their cooperation...")).

153 Kim et al, 2015 ("Sleep deprivation [] is also considered to be critically related to the decline of a range of cognitive functions… Previous studies have found that sleep deprivation [] negatively affects cognitive control processes. Sleep-related changes in cognitive control are important because such changes can affect our overall goal-dependent behaviors. [] disturbances in the sleep-wake cycle or sleep deprivation adversely affect cognitive functions, including long-term memory and cognitive control processes [so] the modulation of circadian rhythms by controlling zeitgebers is likely to affect our cognitive functions… [The] causal relationships between sleep loss and mental disorders, including ADHD, depression, bipolar disorder, and schizophrenia, have been reported." (references omitted));

*Neurocognitive Consequences of Sleep Deprivation*, Namni Goel, Hengyi Rao, Jeffrey S. Durmer, and David F. Dinges, Semin Neurol. 2009 Sept.; 29(4): 320–339. doi:10.1055/s-0029-1237117 ("Goel et al, 2009") ("Divergent skills involved in decision making that are affected by sleep loss include assimilation of changing information, updating strategies based on new information, lateral thinking, innovation, risk assessment, maintaining interest in outcomes, mood-appropriate behavior, insight, and communication and temporal memory skills… Both aging and sleep deprivation appear to reliably slow cognitive "throughput.".. Implicit to divergent thinking abilities is a heavy reliance on executive functions that require the prefrontal cortex. Executive function can be defined as "the ability to plan and coordinate a willful action in the face of alternatives, to monitor and update action as necessary and suppress distracting material by focusing attention on the task at hand." [] Deficits in cognitive performance requiring working memory result in difficulty determining the scope of a problem due to changing or distracting information, remembering the temporal order of information, maintaining focus on relevant cues, maintaining flexible thinking, taking inappropriate risks, having poor insight into performance deficits, perseverating on thoughts and actions, and having problems making behavioral modifications based on new information... Attention tasks appear to be particularly sensitive to sleep loss… Sleep deprivation impairs visual short-term memory and limits its capacity… The role of sleep loss in consolidation of emotional (negative and positive) memories and in emotional processing has also been studied with fMRI. In one study, sleep deprivation deteriorated recollection of both neutral and positive stimuli, but not negative stimuli." (references omitted));

*Sleep Deprivation, Sleep Disorders, and Chronic Disease.* Ramos AR, Wheaton AG, Johnson DA. Prev Chronic Dis 2023;20:230197. DOI: https://doi.org/ 10.5888/pcd20.230197 ("Studies consistently highlight the association between 1) dimensions of sleep and sleep disorders and 2) mental, behavioral, and developmental disorders… Inadequate sleep disrupts critical neural processes and impairs cognitive functioning (14,15). Altering these processes provides a mechanistic link through which insufficient sleep contributes to the onset or worsening of mental health, brain disorders, and chronic diseases... Insufficient sleep among adolescents is associated with poor mental health, including depressive symptoms and suicidal thoughts. [] The odds of insomnia were higher

Defendants' explicit statements that they want to 'slow him down', 'delay', 'suppress', 'depress' him), and to demonstrate their of control over the situation[154] (see Defendants provocative campaign "You can't stop us." see IV.9(a)(3)).

2148.    The US acknowledged that sleep deprivation is degrading treatment which can become psychological torture (especially in combination).[155] And in addition "some detainees might experience transient "unpleasant physical sensations from prolonged fatigue, including such symptoms as impairment to coordinated body movement, difficulty with speech, nausea, and

among students who had depression, had symptoms of ADHD, and were employed."). … Affected cognitive functions lead to increased errors – failure to respond in time or responding to wrong stimulus – which is more pronounced in chronic sleep deprivation (daily sleep amount is less than required during at least three months).

Goel et al, 2009 ("Sleep deprivation increases the risk of human-error-related accidents, with such accidents estimated to have an annual economic impact of $43 to $56 billion. Cognitive performance variability involving both errors of omission (i.e., behavioral lapses evident as failure to respond in a timely manner to a stimulus) and errors of commission (i.e., responses when no stimulus is present or to the wrong stimulus) is a primary consequence of sleep deprivation. A hallmark feature of cognitive variability is lapsing (i.e., brief periods of half a second to many seconds of no response). Lapses are often so brief, they cannot be detected in behavior without a special test, such as the Psychomotor Vigilance Test.41,53 As lapses increase in frequency, they increase in duration, and ultimately they can result in a full-blown sleep attack (i.e., no spontaneous recovery by the subject). Both acute total sleep deprivation and chronic partial sleep deprivation can produce a high rate of lapsing that ultimately progresses to full and sustained sleep onset during goal-directed behavior (e.g., motor vehicle operation).

Wake state instability occurs when sleep-initiating mechanisms repeatedly interfere with wakefulness, depending on the severity of sleep deprivation, making cognitive performance increasingly variable and dependent on compensatory mechanisms.53,54 The ability of the sleep-deprived subject to engage in motivated behavior (e.g., walking) to compensate for or mask the cognitive effects of sleep loss is well recognized.55,56 However, such a compensatory effort to resist sleep ultimately cannot prevent intrusions of sleep initiation into wakefulness. In addition to reports of sleep-deprived subjects "semi-dreaming" (likely hypnagogic reverie) while engaged in verbal cognitive tasks,57,58 first-person reports exist of healthy sleep-deprived people falling asleep while ambulating in dangerous environments.59 Thus, state instability evident in the cognitive performance and biobehavioral signs (e.g., slow eyelid closures60–64) of sleep-deprived subjects, as reflected by the occurrence of microsleeps or sleep attacks, is directly related to increased variability in cognitive performance. The concomitant increase in errors of commission can also reflect an increased compensatory effort to resist sleep (i.e., trying to stop lapses by overresponding). Both cognitive errors of omission and of commission during sleep loss increase with time on task.

Experiments in the past 10 years have found that chronic sleep restriction results in more rapid cumulative increases in cognitive performance errors than subjective measures of fatigue and mood, and the effects are in proportion to the dose of sleep and chronicity of restriction,68,70–73 although rapid versus gradual restriction of sleep can influence the rate of accumulation of cognitive deficits.")

154 "The effectiveness of the program depends upon persuading the [subject], early in the application of the techniques that he is dependent on the interrogators and that he lacks control over his situation. Sleep deprivation [] is crucial to reinforcing that the detainee can improve his situation only by cooperating…" *Memo Art.3 of the Geneva Convention*, 2007. Conditioning techniques as sleep deprivation are used "to "demonstrate to the [detainee] that he has no control over basic human needs." Background Paper at 4. This "creates... a mindset in which [the detainee] learns to perceive and value his personal welfare, comfort, and immediate needs more than the information he is protecting." Id." *Memorandum For John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of United Sates Obligations Under Article 16 of the Convention Against Torture to Certain Techniques that May Be Used in the Interrogation of High Value al Qaeda Detainees*, Office of Legal Counsel, DOJ, May 30, 2005.

155 *Memorandum For John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of United Sates Obligations Under Article 16 of the Convention Against Torture to Certain Techniques that May Be Used in the Interrogation of High Value al Qaeda Detainees*, Office of Legal Counsel, DOJ, May 30, 2005 ("In their discussion of Indonesia [] the [State Department] reports list as "[p]sychological torture" conduct that involves "food and sleep deprivation,"… Iran (counting sleep deprivation as either torture or severe prisoner

blurred vision." Id. at 37; see also id. 37-38."[156] "[n.44] [S]ome studies have noted that extended total sleep deprivation may have the effect of reducing tolerance to some forms of pain in some subjects."[157] "[E]xtended sleep deprivation [] may involve a more substantial risk of physical distress…" [158]

2149.    In September-October 2013 Teaneck police, and FBI overtly interfered with Plaintiff's sleep:

2150.    In the night of 9/19/2013 Plaintiff was awakened by a phone call. A bit later, at 1:50AM Teaneck police officers rang his doorbell, and when Plaintiff opened the building's door they went to upper floors. Some of the officers returned under his windows and talked about Plaintiff "the shadow guy doesn't participate", while another officer knocked on his door. When Plaintiff opened his door the officer said he knocked "just to check" and left. After that Plaintiff couldn't sleep. ECF No.8-1 at 33.

2151.    9/21/2013 Sunday, 7AM and at 7:20AM Plaintiff's doorbell rang awakening him, and an officer stated to him he got "Wrong address." ECF No.8-2 at 1921.

2152.    10/13/2013 at 2:30AM about 6 uniform Teaneck Police and FBI/JTTF officers woke Plaintiff up with knocks and noise. Plaintiff saw three Teaneck police cars and officers under his windows demonstratively talking about him (in 13 minutes they mentioned his name "Kalin" 9 times, his ethnicity and national origin "Bulgarian" 17 times; and said a few sentences in Bulgarian, as for example: "Насилствен вход ['Forced entry']." or "Ние говорим за теб ['We're talking about you']." They spoke about using a directed energy weapon to interrupt Plaintiff's sleep "Bring plasma." "That's the time giving a nightmare.") ECF No.8-1 at 34.

2153.    In the period 2013 – 2015 Defendants repeatedly awakened Plaintiff during the night with calls

(see ECF No.8-2 at 1923, IV.11). Since about February 2015 – after Plaintiff started a handwritten

log of relevant events (at the end of 2014), and increased his use of Blue Iris security software,

and Olympus recorder – Defendants have began to keep Plaintiff awake, or interrupt his sleep

---

abuse); Syria (discussing sleep deprivation and "having cold water thrown on" detainees as either torture or "ill-treatment").") *Memorandum For John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of 18 U.S.C. §§ 2340-2340A to Certain Techniques That May Be Used in the Interrogation of a High Value al Qæðø Detainee.* Office of Legal Counsel, DOJ, May 10. 2005 ("[n.50] We note that the court of appeals in Hilao v. Estate of Marcos, 103 F.3d 789 (9th Cir, 1996), stated that a variety of techniques taken together, one of which was sleep deprivation, amounted to torture. The court, however, did not specifically discuss sleep deprivation apart from the other conduct at issue, and it did not conclude a that sleep deprivation alone amounted to torture.... Finally, we note that the Committee Against Torture of the Office of the High Commissioner for Human Rights, in Concluding Observations of the Committee Against Torture: Israel, U.N. Doc. A/52/44, at § 257 (May 9, 1997), concluded that a variety of practices taken together, including "sleep deprivation for prolonged periods," "constitute torture as defined in article 1 of the [CAT]." See also *United Nations General Assembly, Report of the Committee Against Torture, U.N. Doc. A/32/44 at J 56* (Sept. 10, 1997) ("sleep deprivation practiced on suspects... may in some cases constitute torture"). The Committee provided no details on the length of the sleep deprivation or how it was implemented and no analysis to support its conclusion.").

156 *Memorandum For John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of United Sates Obligations Under Article 16 of the Convention Against Torture to Certain Techniques that May Be Used in the Interrogation of High Value al Qaeda Detainees*, Office of Legal Counsel, DOJ, May 30, 2005

157 *Memorandum For John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of 18 U.S.C. §§ 2340-2340A to Certain Techniques That May Be Used in the Interrogation of a High Value al Qaeda Detaine*e. Office of Legal Counsel, DOJ, May 10. 2005..

158 Id.

regularly with knocks, pops, pipe bangs/clanking, loud talk, electronic beeps, and similar. Since the end of March 2016 in retaliation to Plaintiff starting to work on his legal cases Defendants demonstratively intensified their interference with Plaintiff's sleep overtly talking about that under his windows:

2154.    "Keep him up all night pays off." (4/1/2016); "He didn't feel it."..."We can't wake him up." (4/3/2016) "We worked all night. Mother fucker you can't sleep." (4/5/2016) "Wake him up." (4/17/2016) "We cut his sleep in half." (5/5/2016)); "He can't feel that."..."He can't sleep." (10/15/2016 after awakening Plaintiff during the night a few times); "Wake up." (10/16/2016); "He can't sleep." (10/17/2016 at 3:43AM after awakening Plaintiff); "He don't sleep." and after Plaintiff slept for a couple of hours "He sleeps too much." (10/19/2016).

2155.    When in August 2017 Plaintiff started reaching to New York-based lawyers for his legal case against Gyro Defendants explicitly talked that their purpose is to "deteriorate" (8/17/2017), "suppress" (8/23/2017), "annoy" Plaintiff (8/31/2017), and make him "stop" (8/1/2017, 8/6/2017, 8/7/2017, 8/18/2017). In that regard since the end of August 2017 Defendants have started using DE against Plaintiff overtly (initially for sleep deprivation only. See 1718 *et seq.*, IV.11.B) in addition to all other activities. Defendants confirmed that that was their intention on 8/24/2021 when while Plaintiff was working on the effect of DE on his sleep pattern at 9:40PM Defendants in ap.B2 commented: "We thought we'll crush him." ECF No.8-2 at 1988.

2156.    Defendants continue to deprive Plaintiff of sleep every day, including when he is in Bulgaria, for many years and counting, regardless of his reports, notices and lawsuit(s) against Defendants.

**(1) Defendants deliberately deprive Plaintiff of sleep in order to ruin his health, and deteriorate his cognitive functions (thinking, planning, and more).**

2157.    At least in part Defendants use sleep deprivation as an attack on Plaintiff's mental health[159]. They expressed a few times explicitly their intention to deteriorate Plaintiff's cognitive functions and mental health ('depress him', 'slow him down' as for example on 5/14/2017, 11/10/2022, 1/20/2023 (ECF No.8-1 at 82, 163; No.8-2 at 5909, 5913), 8/15/2024 ("Kalin... depress...")), and

---

[159] Sleep deprivation "is associated with poor mental health, including depressive symptoms and suicidal thoughts" *Sleep Deprivation, Sleep Disorders, and Chronic Disease*. Ramos AR, Wheaton AG, Johnson DA. Prev Chronic Dis 2023;20:230197. DOI: https://doi.org/ 10.5888/pcd20.230197

labeled Plaintiff "crazy" in obvious effort to discredit and otherwise diminish him and his claims, and to trigger Plaintiff's response.

2158.    Defendants repeatedly paint Plaintiff as crazy including by responding to their own false accusations and fabrications (6/30/2013, 5/20/2017, 11/10/2021), directly saying that Plaintiff is crazy (9/8/2017), including because he did not react (9/9/2017, 4/11/2018). Defendants were very direct in some occasions "Drive Kalin crazy." (5/25/2024).

2159.    6/30/2013, Defendants fabricated a threat by Plaintiff (to 'destroy' Defendants) and declared him crazy under his window: "It's crazy that Bulgarian (can destroy us)." "No one can destroy (us)." "...Talk (a lot)."... "They'll get him." "Bulgarian is a crazy one." "Crazy one."

2160.    5/20/2017 Saturday, Plaintiff went to Phelps Park, Teaneck, NJ Defendants followed him there. Same pattern as the previous example but this time fabricated threat was that Plaintiff is a murderer: "Have the power. How to arrest []? Crazy." "They have no call." "Raise to detective." "We don't forget Kalini kill." See more at ECF No.8-1.

2161.    7/31/2017 Monday, Defendants under Plaintiff's windows "Blue Iris hear us." "Yea?" "We didn't know." Plaintiff reacted in his apartment: "Are you OK? Are you crazy?" "(We) activated you." A few minutes later (11:39PM) they repeated "Blue Iris hears us." "Crazy."

2162.    9/8/2017 When Plaintiff passed Teaneck cinema group in front commented him "Can't survive." About 9PM Plaintiff was home when Defendants on G2 commented he is "Crazy." Defendants in B2 "He can't survive."

2163.    9/9/2017, 8:20AM-8:50AM after Plaintiff looked through his window Defendants in G2 started knocking on the floor and challenged "Pretend you don't hear. Crazy."

2164.    10/4/2017 When Plaintiff got out of the building Defendants' man from G2 was waiting in front. They exchanged "Hi". Behind Plaintiff the man commented "Crazy."

2165.    1/6/2018 Plaintiff attended a Political Forum meeting. Lauren talked to Plaintiff and called him "square". Then talking with somebody else she stated "This guy is crazy."After the meeting Plaintiff spoke with Lin, a participant, asking for Chinese currency. After that talk a person asked Lin: "Why you speak with him?"

2166.    4/9/2018 Monday When Plaintiff returned from shopping at the building's door he met a woman with two kids. Woman: "That's the crazy one."

2167.    4/11/2018 Wednesday, About 7AM knock from G2 and talking "Can you hear this?" At 3:38PM; 3:39PM; 4:05PM; and 5PM Defendants in ap.G2 knocked on Plaintiff's floor. 6:30PM Defendants came under windows said loud "Crazy". 6:52PM slam in G2.

2168.    5/2/2018 Wednesday, 11:45AM under Plaintiff's windows "Bulgarian.." After 12PM talking under windows: "Crazy.." "Homicide.."

2169.    8/7/2017 NYC Sheriff's Office the staff member who took Plaintiffs documents and forms commented inside the office: "Crazy… They said hold him."

2170.    9/5/2019, 3-3:30PM students "Camera?" Plaintiff challenged "yes send the kids to talk." Outside "crazy."

2171.    11/27/2019, 11:18PM Plaintiff challenged in his apartment. Defendants responded "Crazy."

2172.    2/24/2020, 12:55PM two women in front of Plaintiff's windows on the opposite side of red road: "Crazy.. over there.."

2173.    10/23/2020, 8:15PM yelling and knocks from Defendants in ap.A3. Plaintiff talked to then, they responded with a slam, and provoked. "Bulgarian crazy.." Laughed in building corridor.

2174.    7/21/2021 Wednesday, 12:48AM after Plaintiff stopped working on EMF-materials Defendants near his windows warned "Turned that down." "Crazy shit."

2175.    8/11/2021 Wednesday, 5:51PM while Plaintiff was making photos of his handwritten notes of relevant events Defendants came under his windows and commented he is "Crazy about it."

2176.    9/15/2021 Wednesday, 3:34PM Plaintiff was working on his resume, cover letter, and uploaded his website-revisions preparing to apply for Publicis Associate Creative Director. Defendants in ap.A1 started knocking right behind him, and repeated at 3:56PM. Plaintiff "What are you doing?" Knocks repeated at 4:58PM; 5:05PM; 5:15PM; 5:46PM – Plaintiff "Please stop."; 6:18PM, Plaintiff "Stop doing this. 3 hours." 6:25PM students came under his windows and provoked he is "Crazy."

2177.    11/10/2021 Wednesday, 8:47PM Defendants came under Plaintiff's windows on Cedar lane and talked to him "Crazy bad ass. You think could destroy all?"

2178.    11/12/2021 Friday, 2:17AM Defendants came under Plaintiff's windows "Going crazy."

2179.    12/4/2021 Saturday, 1:34PM after Plaintiff attended Dharma Drink meeting students came under his windows and mocked "Either way wrong. He just didn't express it." Repetition of one of the Plaintiff's points from the meeting. When Plaintiff looked through his windows student responded he "Looks crazy."

2180.    1/13/2022 Thursday, 12:11PM Defendants' woman on Cedar lane "hitting police. You crazy shit… my life."

2181.    3/25/2022 Friday at 3:05PM "Bad ass." ... "Crazy."

2182.    4/25/2022 Monday, 4:20PM a woman and child shouted in building corridor. Ralph and USPS carrier woman talked about Plaintiff "Can't fight them." "Crazy."

2183.    7/4/2022 Monday, 4:01PM Defendants sat next to Plaintiff in Votee park, Teaneck, and talked about him ("Kalin") "Crazy man."

2184.    7/11/2022 Monday, 1:38PM Defendants in ap.A1 or A6 "Crazy. " "We not get to the []." "Can't believe." "We forget (Kalin)."

2185.    7/25/2022 Monday, 5:59PM two Defendants' women talked in building corridor "We got the Bulgarian to []." "We get fresh [] fresh." They entered a black SUV. While Plaintiff was making photos, Ralph commented in building's corridor he is "Crazy."

2186.    10/4/2022 Tuesday, 10:06PM three Defendants' persons talked about Plaintiff, a woman "Kalin [is] crazy."

2187.    12/16/2022 Friday, 5:45PM Plaintiff was working on FBI materials when Defendants' man in corridor commented "Crazy." Plaintiff was writing a note about that when Defendants in B2 knocked on his ceiling. Defendants' man in B2 "You lost, we lost. OK?… FBI approved."

2188.    1/24/2023 Tuesday, 12:57PM students came under Plaintiff's windows walking on the rocks "Crazy dude. Kalin []."

2189.    7/18/2023 Tuesday (a week before Plaintiff started *Dimitrov I*), 11:30AM Loomer(?) and Ralph "We can't stop that." "Crazy." 11:39AM Defendants' woman in building's corridor "Don't need to be scared of him. Justice []." 9:10PM two Defendants' women "He got police. [] shot." "We don't push that." "Crazy"

2190.    9/8/2023 Friday, 12:37AM Defendants in front of the pub "Let Kalin have []." Plaintiff made photos when Defendants' man at the opposite side of Cedar lane commented "Crazy."

2191.    1/11/2024, 6:58PM Ralph shouted in building's corridor, and after Plaintiff started Olympus he commented "I'll knock him off tomorrow. He is crazy."

2192.    5/21/2024, 12:55PM students came under Plaintiff's windows "I have to witness crazy. When I came at the door []." They walked on the rocks under the windows.

2193.  5/25/2024, about 1:40AM – 1:47AM Plaintiff worked on a bench at the buss stop on Cedar lane near his building and near the pub. Defendants in front of the pub talked to "provoke" him. "Drive Kalin crazy." "I am working on that. Go get him."

2194.  7/2/2024, 2:07PM Defendants' men at Yola food truck next to Plaintiff's windows "Kalin have to [] people." ... "We are responsible. He is fucking crazy."

2195.  8/30/2024, 5:54PM Christine from Jamaican food and Defendants' man "Didn't consider police stopped." "Protected []." ... "How Kalin die..?" "That shit is so crazy."

2196.  10/9/2024, about 3:30PM Plaintiff went to USPS Teaneck on Palisade Avenue to send copy of his AG letter to the FBI Headquarters and to NSD DOJ. In the USPS office Defendants' man came and asked the staff about Plaintiff. She responded "He has done nothing crazy so far." After Plaintiff sent the letter she did not say 'bye' or something else as usual.

2197.  2/23/2025, about 6:30AM Holy Name guard talked loud under Plaintiff's windows. "More likely to fight []. He is crazy. Keep trying." Another man responded not as loud "I will."


**(2) Defendants overtly demonstrate their intend to deprive Plaintiff of (enough) sleep apparently to make him hostile and provoke him.**

2198.  Defendants regularly tease Plaintiff that he 'can not sleep', or commented that he 'doesn't sleep' after awakening him, or after they had kept him awake during the night. Those remarks are provocative demonstration that Defendants watch him, and deprive him of sleep. Their intention to provoke him was very clear after 11/3/2016, when Plaintiff started transcribing recordings of Defendants for his legal case. Then Defendants awakened him by turning the heating off (getting cold inside), and/or with knocks, and for about two weeks mixed the provocative comments about Plaintiff's sleep with comments whether he heard the knocks or felt the cold.

2199.  When Defendants awakened Plaintiff or while/after knocking Defendants in ap.B2 teased him "He can't hear any.." 11/6/2016, "He can't hear that. We can't assume." while knocking on 11/7/2016, "Can't hear." 11/8/2016, "He didn't hear." 11/9/2016, "Can not sleep." 11/16/2016, "He didn't heard that."..."He didn't sleep well." 11/18/2016, "He fall asleep." 11/22/2016, "He can't hear that." 11/23/2016, "We wake him up. [] sleep." 11/27/2016, "He didn't hear." 12/16/2016.

2200.  "He don't have to sleep." (1/3/2017 after awakening Plaintiff with strong knocks); "He can't sleep." (1/26/2017 Defendants in ap.G2 knocked on Plaintiff's floor); "He can't sleep." (Defendants in ap.G2 after knocking all night, 2/23/2017, ECF No.8-1, 162); "Can't sleep." (Defendants in ap.B2, 3/1/2017); "Can't sleep." (after a knock, 3/2/2017); "He don't sleep." (Defendants in ap.B2 on 3/15/2017 at about 6:30AM. After that Defendants in ap.G2 knocked, then made noise of snow-cleaning under Plaintiff's windows although there was no new snow fall); "We wake him." (Defendants in ap.G2 after awakening Plaintiff with strong knocks) and later "Can't sleep." (3/25/2017); "No more sleep." (Defendants under Plaintiff's windows on 4/2/2017, then in the period of 6:00AM-8:00AM repeatedly knocked. ECF No.8-1, 1988).

2201.   "Can't sleep." (4/7/2017, About 1:33AM); "He can't sleep." (5/8/2017, Defendants in B2 when Plaintiff went to toilet in the morning); "He can't sleep." (5/10/2017, Defendants in B2 at about 4:00AM (ECF No.8-1, 119, ECF No.8-2, 1988)); About 7:12AM Defendants hammered on Plaintiff's ceiling (B2) then at about 10:03AM "He can't sleep. Fighting [him]." (6/21/2017, the day Plaintiff had a meeting with Derek Smith Law Group – more details about the meeting itself in ECF No.8-2 2107) "He can't sleep." (6/27/2017, about 7:20AM Defendants near windows); Plaintiff "barely even sleeps." (7/20/2017 Defendants in ap.G2 knocked on Plaintiff's floor and then commented); "He can't sleep." (8/4/2017 after at about 1:40AM Plaintiff got up and worked on his tablet Defendants in B2 commented and knocked on his ceiling); "A long sleep." (8/16/2017); "Sleep." (8/18/2017, 12:50AM)

2202.   Since 9/7/2017 Defendants have started using a combination of DE and sound attacks to awaken and/or keep Plaintiff awake for hour(s) since he got in bed, before or at about dawn, and again early in the morning. After awakening Plaintiff Defendants repeatedly provoked him including by commenting that he "can't sleep" (9/27/2017, 10/16/2017, 10/21/2017, 10/29/2017); that he "can't stop" them (9/14/2017), "Can't fight." (10/1/2017), and that he "have to stop" working on his case (9/8/2017, 10/5/2017). Defendants' use of DE led to significant changes in Plaintiff's sleeping pattern since 9/19/2017.

2203.   Since 9/21/2017 Plaintiff used cardboard plate with aluminum folio stuck to it as a shield under the bed (but not grounded, and with relatively small size, so effects were not significant). From about 10/8/2017 Plaintiff used rubber plates on the bed for insulation but that could neither shield from an electric field (EF), magnetic field (MF), nor from an electromagnetic field (EMF). Also Plaintiff tried to evade / reduce the effects of DE attacks by (1) sleeping at places other than his bed (for example in his corridor 10/23/2017), (2) sleeping over wooden plate and pillows (since 10/24/2017), and (3) sleeping with earplugs since about that time.

2204.   "He was asleep." (9/18/2017 Defendants in B2 commented after awakening Plaintiff with focused pushes at head); "He can't sleep." (9/27/2017, about 12AM); "Till he forgets how to sleep." (10/2/2017, 7AM-10AM Defendants kept Plaintiff awake with knocks. Then at 11:25AM students under Plaintiff's windows teased); About 7:30AM Defendants rang Plaintiff's doorbell. Later "They don't let him sleep." (10/16/2017 Plaintiff met the super and another man who commented behind him); "He doesn't sleep." (10/21/2017, about 3:40AM); "Can't sleep." (10/29/2017, after at about 12:44AM Defendants yelled under Plaintiff's windows).

2205.    Defendants' regular remarks about Plaintiff's sleep reduced as frequency since about 2018.

2206.    1/14/2018 at 6:49AM Defendants repeatedly knocked and commented "Can't hear it." The same thing at 8PM – after serial of knocks Defendants in B2 commented: "Can't hear it. Can't believe."

2207.    4/14/2018 Saturday, 10:20AM after Plaintiff's alarm Defendants in ap.B2 commented "Not oversleeping."

2208.    On 4/29/2018 Sunday, 1:16AM ap.B2 knocked. Since about 6:30AM there were laser-focused rays at Plaintiff's eyes, ears, and pushing at the right eye. At 11:14AM ap.B2 commented: "He didn't sleep well." 5/4/2018 Friday, Plaintiff was awakened at about 7:30AM by laser focused rays and hammering. Later he was awakened again and at 11:45AM students under his windows commented: "Still sleeps."… "Crush him." 6/25/2019, about 7:30AM and 9:30AM knocks and talking from G2. About 10AM knocks continue. Outside comments: "Can't sleep." When Plaintiff got up the knocks stopped. On 9/16/2019, 11:36AM after yelling students commented "He hardly sleep." ECF No.8-2 at 1988.

2209.    Although reduced as frequency Defendants' provocative comments in regards to the sleep

deprivation of Plaintiff have never stopped. For example on:

2210.    4/17/2021, 9:30AM after knocks on Plaintiff's ceiling Dula in B2 "Have to believe he can not sleep."

2211.    4/19/2021, between 1:56AM and 6:30AM repeating knocks on Plaintiff's heater (its pipe). At 6:20AM and 6:35AM Defendants in B2 knocked on Plaintiff's ceiling. After loud pipe noise at about 9AM Defendants in B2 commented "He didn't hear."

2212.    8/24/2021, when Plaintiff was working on his sleep patterns and RF beams in Defendants in B2 commented at 9:40PM "We thought we'll crush him."

2213.    8/31/2021 Tuesday, till 12:51PM Defendants threw 'pebbles' at Plaintiff Cedar lane's windows. He was still in bed when students came under his windows "Sleep bro." "I mean he has a right to sleep."

2214.    2/25/2022 Friday, 3:49AM Defendants awakened Plaintiff with DE at his head. His ears were ringing, he had headache, dry eyes, and detected 500 V/m max. Defendants in B2 commented "He didn't sleep."

2215.    4/22/2022 Friday, after Defendants awakened Plaintiff a few times during the night at about 3:15PM students came near Plaintiff's windows "He can't sleep."

2216.    6/24/2022 Friday, 8:12PM Defendants teased "He can't even sleep."

2217.    7/28/2022 Thursday, "Can not sleep." "He didn't stop (Kalin)."

2218.    10/4/2022 Tuesday, 8:25PM Defendants under Plaintiff's windows "He forget to sleep."

2219.    10/30/2022 Sunday, 10:12AM Defendants awakened Plaintiff with DE beams and knocks from ap.A3. After Plaintiff scanned for DE Defendants' man in ap.A6 commented "He got that beat." Another man "Fall a sleep too."

2220.    1/21/2023 Saturday, about 10:29PM Defendants' man in B2 directed "not allow him to sleep."

2221.    2/6/2023 Monday, 9:18AM Dula in B2 talked about Plaintiff ("Kalin"), 9:29AM knock from B2. After Plaintiff scanned for DE Defendants' woman in ap.A3 teased "Can't sleep. You lost."

2222.    3/3/2023 Friday, 11:59PM after Plaintiff was awakened by intensive electric tingling a group was loud under Plaintiff's windows "We could []." "Let Kalin sleep."

2223.    3/7/2023 Tuesday, about 7:54AM Defendants awakened Plaintiff with electric shocks at his heart. Defendants' man in B2 teased "Can't sleep."

2224.    4/22/2023 Saturday, 8:04AM Defendants awakened Plaintiff with burning focused DE beams at his face and right shoulder. Detected 519 V/m there, and about 400 V/m at the hand over his face. About 510 V/m at the right cheek. Defendants' man in ap.G2 "Can't sleep."

2225.    5/4/2023 Thursday, on his flight to Sofia, Bulgaria Plaintiff mostly slept. Persons sitting next to him and behind him changed. A man commented in Bulgarian "The monster sleeps. And we talked about him all evening." Plaintiff felt a few focused pushes and burning rays as the plain landed at about 8:54PM Bulgarian time.

2226.    7/22/2023 Saturday (3 days before Plaintiff started *Dimitrov I*), 9:14AM Defendants in B2 hammered on his ceiling. Plaintiff felt focused short pushes at the right side of his chest. 9:23AM loud puff – garbage truck under Plaintiff's windows. Immediately when Plaintiff started making photos the truck left. 9:35AM man in B2 commented "He wasn't sleeping. He []." About 10:00AM hammering from B2 on Plaintiff's ceiling – more than 30 knocks. 10:20AM the moment Plaintiff's alarm started – a knock from B2

2227.    8/5/2023 Saturday, 2:14AM Defendants in front of the pub "Contact CIA." "Yea, yea.." They mentioned Gyro (previous employer of Plaintiff) then talked about "fight.." 2:41AM "He can never sleep." "Awake.."

2228.    8/10/2023 Thursday, 11:54PM Defendants in front of the pub "Kalin []" "Can't sleep."

2229.    8/13/2023 Sunday, 9:17AM Defendants' man in B2 – recording? - "Hostile to police.. I police.. we suppress…" 9:19AM hammering from B2 4 serials last one when Plaintiff was writing the note. 9:24AM man in B2 "Kalin" … 9:41AM Plaintiff 'slept' on the chair in front of sink. A man on Cedar lane commented: "He can not sleep." After the previous note in about 5 minutes 4 pipe bangs.

2230.    9/8/2023 Friday, 12:05AM woman on speaker "Can not sleep… Tell Kalin." persons in front of the pub 12:09AM "Fight police… Kalin []."

2231.    2/11/2024, 11:05AM Defendants' woman came under Plaintiff's windows on Cedar lane while he was scanning "He can't sleep but []."

2232.    2/14/2024, about 11:50AM Defendants in B2 awakened Plaintiff with DE, students came under his windows and shouted. B2 commented "He didn't hear."

2233.    2/23/2024, 1:55PM Plaintiff saw three men (later fourth man showed), one of them the JC Realty 'plumber' they commented "Have to push." "He hardly sleeps." "Expect []."

2234.    4/26/2024, 3:53AM Dula in ap. B2 commented "He believes he can not sleep."

2235.    6/26/2024, 11:11AM Defendants' woman returned under Plaintiff's windows talking on phone(?) "It's fine. It's fine. [] can't sleep."… "Don't hear. Kalin…"

2236.    8/23/2024 Friday, 3:08PM Defendants' man behind Plaintiff challenged "No sleep. No sleep… I set up. Is set up []." then talked about Israeli visitors. "Should I bring it up?" woman on speaker "Yea, bring it up." He left when Plaintiff moved to the bench facing him with intention to make a video. 4:12PM Defendants' woman repeating loud "Set up. Set up. Why we are doing this?" She is with the man from 3:08PM who returned sitting in front of Plaintiff with two kids.

2237.    10/30/2024, about 9:30AM while Plaintiff was in toilet Defendants' woman sang under the window "Stand up. Don't sleep like that."

2238.    11/24/2024, about 2PM while Plaintiff was taking a bath Defendants' man under his window challenged "He can't sleep." About 5:55PM while Plaintiff was doing his laundry on G-level woman on phone in corridor "He can't sleep."

2239.    12/12/2024, 7:15AM Defendants' woman under Red Road windows after Plaintiff was awakened "Can't sleep. That you got to feel." "Stop."

2240.    12/14/2024, 10:34AM Plaintiff was working on 5/11/2022 when Defendants in ap.G2 commented that he "Cannot sleep."

2241.    3/10/2025, about 9:45AM while Plaintiff was in toilet Defendants' man in B2 not loud "He didn't sleep. We can't push him."

2242.    3/13/2025, 6:44AM Defendants awakened Plaintiff with knocks from ap. B2. Dula challenged "Can not sleep."

2243.    Since 2017 Defendants' practices of depriving Plaintiff of enough sleep have changed significantly his sleep pattern in terms of the sleeping routine, sleep-hours, location, and more.

*B. Defendants have deliberately directed energy beams (DE) at Plaintiff, whether in public or his apartment, in order to contact him and/or his chattels, and cause harm, pain and suffering, and/or substantially diminish his capacities for many years.[160]*

2244.    The knowledge about DE (electromagnetic, electric or magnetic field/radiation (respectively 'EMF', 'EF', 'MF'); particles; or audio waves), induction of electricity, effects of electricity on human body (depending on the current and its frequency effects include unpleasant tingling, painful shocks with or without having muscular control, muscular contractions, ventricular fibrillation, and death), as well as the health effects from radiofrequency[161] radiation exposure (such as electro/nerve stimulation, and rapid heating – the effect used in microwave ovens) which had made necessary the FCC regulations, are public knowledge.[162] Weapons using focused EMF, plasma, sonic, or laser beam have also been public for a while[163], and recently were in the public

---

160 See also ECF No.1 at 306 et seq., and ECF No.8-1 at 980 et seq..

161 Radiofrequency is a frequency range withing the electromagnetic spectrum.

162 "All of these guidelines [ICNIRP 2010,325 IEEE Std C95.1-2005,326 and more recently, Health Canada Safety Code 6 (2015)] are aimed at prevention of electrostimulation due to RF electric fields induced internally within the human body in the presence of an external electromagnetic field outside the body—the primary human reaction to electromagnetic field energy at these frequencies. " *FCC 19-126* "Adverse neural stimulation effects mentioned by these standards include acute effects such as perception of tingling, shock, pain, or altered behavior due to excitation of tissue in the body's peripheral nervous system. Applications in these frequencies include wireless power transfer technologies associated with charging electrical vehicles." *FCC 19-126*, n.328.

163 For example LRAD's "deterrent" tone (as a sound weapon) was used against a civilian population in 2009, when the Pittsburgh Police Department deployed and fired LRADs in connection with crowd control policing around the G-20 Summit. 2014 NYPD used LRAD on Garner protesters (see The New York Times, *Concerns raised over shrill device New York Police used during Garner Protests*, Dec 12, 2014). Active Denial System ("ADS") or the so-called 'heat ray' was developed about 25 years ago (2000) and announced publicly around 2007. (paraphrasing AP's article from Sep 17, 2020, *Feds considering using 'heat ray' on DC protesters*). And directed energy weapons 'according to The New York Times, [are] capable of being held in one's hand' CNN, Sep 2, 2018, Microwaves suspected in 'sonic attacks' on US diplomats in Cuba and China, scientists say.

domain in relation to the 'Havana syndrome'. Similarly the use of electricity and burning for torture is well known for many years.[164]

2245.    "It is well recognized that there are established biophysical mechanisms that can lead to health effects as a consequence of exposure to sufficiently strong fields. For frequencies up to, say, 100 kHz the mechanism is stimulation of nerve and muscle cells due to induced currents and, for higher frequencies, tissue heating is the main mechanism. These mechanisms lead to acute effects."[165] "Nonthermal health effects are, e.g., alterations of the blood flow in the limbs and alterations in the brain and heart functions related to intense SMF exposure, or, e.g., pain due to the stimulation of the nerves, involuntary contractions of the muscles, and alterations of the cardiac rhythm in case of high exposure levels to ELF-MF. Thermal health effects are due to an excessive temperature increase of the biological tissue, possibly resulting in thermal burns involving the whole body or specific body districts (e.g., thermal eye damage with cataracts or skin burns) after intense exposure to high frequency fields. [] intermediate frequencies can induce both types of effects."[166]

2246.    Defendants also know with certainty that a DE beam with sufficient power directed at Plaintiff will penetrate the walls, ceiling, floor, or windows of Plaintiff's apartment, and will charge the objects in its path (including Plaintiff's body or certain locations on his body), could induce electric current(s) in those objects, cause rapid heating / burning at targeted location, and more. In fact "[p]olice officers often use handheld" Stingray (used here and bellow as umbrella term for 'cell simulators') which emit DE, and "searched nearby homes by transmitting spoofed cell tower signals through the walls."[167] And as Marc Polymeropoulos, CIA, stated Stingray-kind of devices can harm a person when they "tuned up the juice too much".[168]

---

164 See *Memorandum for John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of United Sates Obligations Under Article 16 of the Convention Against Torture to Certain Techniques that May Be Used in the Interrogation of High Value al Qaeda Detainees*, Office of Legal Counsel, DOJ, May 30, 2005 ("[State Department Reports condemned torture practices of] Pakistan ([] burning with cigarettes, electric shock); Uzbekistan (electric shock, [])... much of the alleged abuses discussed in the reports appears to involve either the indiscriminate use of force, see, e.g., Kenya, or the targeting of critics of the government, see, e.g., Liberia, Rwanda."); *Classifying the Torture Experiences of Refugees Living in the United States*, Hooberman, Rosenfeld, Lhewa, Rasmussen, and Keller, Journal of Interpersonal Violence, Volume 22 Number 1, January 2007 1-16 ("Types of physical assault include, but are not limited to [] electric shock, burning,…"); and more.

165 EU, Scientific Committee on Emerging and Newly Identified Health Risks, SCENIHR, *Possible effects of Electromagnetic Fields (EMF) on Human Health*, 21 March 2007.

166 *Occupational Exposure to Electromagnetic Fields and Health Surveillance according to the European Directive 2013/35/EU*, Modenese, Gobba, Int. J. Environ. Res. Public Health 2021, 18, 1730

167 *Andrews v. Baltimore City Police Department et al*, No. 18-1953 (4th Cir., 3/27/2020). See also *U.S. v. Patrick*, No. 15-2443. 842 F.3d 540 (7th Cir., 2016), and other Stingray related cases.

168 "Polymeropoulos wondered if the Russians had inadvertently injured him while trying to collect the data in his phone remotely. It was the kind of thing all intelligence services did, the Americans included. Polymeropoulos figured the Russians had just "turned up the juice too much."" *The Mystery of the Immaculate Concussion,* Julia Ioffe, GQ, Oct 20, 2020

2247.    Since 8/25/2017 Defendants' use of DE against Plaintiff is overt in a sense that the effects on Plaintiff (pain and suffering due to electric shocks, significantly charging specific locations, burns, unpleasant tingling ('needles' sensations), involuntary muscle fibers' contractions, and more) have become apparent as result of application of external force. Initially Plaintiff determined that by putting his hand at the attacked location on his body and found that the effects 'moved' on the hand in demonstration that the source is external. Later (since May 2018) he detected the DE using variety of detectors/meters – LawMate RD-10, K-68 RF detector, GQ Multi-field EMF 390(v2) meter (see ECF No.8-1 at 983), Craftsman Digital Multimeter 82141, and Sound Level Meter SLM-25.

2248.    Defendants have started the overt use of DE against Plaintiff in retaliation to his multiple contacts with lawyers, and his work on case materials for his legal actions against Defendants in August 2017, and since then they have never stopped (apart from some relatively short pauses). Among other things in August 2017 Defendants also disrupted Plaintiff's search for lawyers (see 1718 *et seq.*), demonstrated that they are FBI/police (8/2/2017, 8/4/2017, 8/10/2017), explicitly stated that their purpose is to "deteriorate" (8/17/2017), "suppress" (8/23/2017), "annoy" Plaintiff (8/31/2017), and make him "stop" (8/1/2017, 8/6/2017, 8/7/2017, 8/18/2017). Defendants were also explicit about their intent to use DE against Plaintiff "You need some beam tonight." (8/12/2017).

2249.    8/1/2017, Plaintiff called Paul Campson - the lawyer DSLG referred him to. Only after Plaintiff used his T-mobile phone (not the phone number he gave to Derek Smith) Campson responded, but interrupted the call saying he'd call back (Campson has never called him). Plaintiff called again a 4:42PM, and left a voice mail Defendants in B2 commented "We can't stop him."

2250.    8/2/2017, till 10:45PM Plaintiff worked on transcript of 9/7/2012 recording, and case summary based on his transcripts related to Defendants' violations of First Amendment. Defendants in B2 after a slam "He really got police." (about 10:30PM).

2251.    8/4/2017, about 12:30AM, after Plaintiff worked on his correspondence with lawyers Defendants "He knows how to fight cops."

2252.    8/6/2017, Plaintiff worked on First Amendment materials till about 5:57PM. Defendants "Can not prove []." "You have to stop."

2253.   8/7/2017, "Finding a new lawyer." (Defendants in B2 after Plaintiff searched for lawyer) and after Plaintiff called and set a meeting with a lawyer Robert Wisniewski reacted "Can't stop him."

2254.   8/10/2017, Plaintiff met the lawyer Robert Wisniewski in his office at Manhattan, NYC. Before the meeting Plaintiff was made to wait half an hour and Defendants and office staff talked about him, about Gyro, police and the FBI. ECF No. 8-2 at 2109.

2255.   8/12/2017, Defendants came near Plaintiff's windows and clearly stated their intent to use DE against him "You need some beam tonight."

2256.   8/17/2017, at 10:01AM Defendants "Deteriorate that []."

2257.   8/18/2017, while Plaintiff was working on First Amendment legal materials "You have to stop this."

2258.   8/23/2017, while Plaintiff worked on Fifth Amendment materials "We already suppressed that."

2259.   8/31/2017, after Defendants knocked and slammed multiple times while Plaintiff was playing chess on his phone in toilet 11:30PM-12:00AM they commented "Can't annoy him."

2260.   Defendants' use of DE is apparent by (1) the effects on Plaintiff and objects on the beams' path (electric charge and discharges up to electric shock levels, pain, burns, involuntary muscle fibers contractions, and more) – they are consistent with the known DE effects, including the injuries on Plaintiff's body; (2) DE beams, induced electricity, or electric charges have been detected and documented by Plaintiff's EMF and sound meters/detectors, and are far above the normal; (3) DE beams repeatedly target/follow Plaintiff in general, and specific location(s)[169] on his body, they change in response to his locations and activities (using DE as punishment); and (4) Defendants have made a few statements about using DE, or implied such use.

2261.   Defendants are fully aware of the electric shocks, burning, swellings and/or other effects caused by their use of DE against Plaintiff – both from their surveillance on Plaintiff, and from his petitions, including *Dimitrov I*. Despite that Defendants' use of DE against Plaintiff continue without remedy, and even intensified in retaliation.

---

169 Accuracy is core feature of DE, especially to lasers – see *Directed Energy Weapons. Physics of High Energy Lasers (HEL)*, Bahman Zohuri, Springer International Publishing. Switzerland 2016 ("Practically invisible when fired, silent, capable of pinpoint accuracy, and traveling at the speed of light, laser weapons would seem to offer unparalleled advantages over conventional weapons.")

**(1) Defendants' DE attacks on Plaintiff, and a few of their effects are regularly detected and documented since May 2018.**

2262. Since May 2018 Plaintiff has been using variety of detectors and meters as LawMate RD-10, K-68 RF detector, GQ Multi-field EMF 390(v2) meter (see ECF No.8-1 at 983), Craftsman Digital Multimeter 82141, and Sound Level Meter SLM-25 to detect and document Defendants attacks. Plaintiff also uses the cameras on his phones, Canon Ti4, Blue Iris-based security system, and makes handwritten notes to document those attacks and their effects.

2263. As illustration of Defendants' detected and documented use of DE against Plaintiff see the events on 4/29/2025 (after Defendants targeted his head from ap.A3 the right side of head was charged 1002 V/m max – about 10 times higher than 30 minutes before, while the left side was charged less – demonstration of the direction of the DE attack), or on 7/23/2025 (after Defendants targeted Plaintiff's head with DE beam its electric charge increased about 13 times (from 79 V/m up to 1022 V/m)). In both examples the existence of external energy sources which caused pain, electric shocks, and abnormal electric charge at limited location(s) on Plaintiff's body (detected and documented), and the fact that those sources are at Defendants in aps.A3, G2, and B2 (and outside), is obvious. Especially considering the above together with the other evidence in that regard – as Defendants' statements for example, and more.

2264. 4/29/2025, 5:26PM Plaintiff was working on the bed feeling pressure at head, before that focused beam at his back. He detected 1025 V/m max at the right side of his head, 1036 v/m on the left side of head, but those were isolated discharges – head mostly was less than 100 v/m. 5:42PM Plaintiff moved on his chair to evade the DE beams and scanned his head. Then it was charged less than 100 V/m but for back of the head: 132 V/m max. 6:57PM Defendants from ap.A3 targeted Plaintiff with DE – he had been feeling pressure and tingling at the right side of his head, and detected 1002 V/m max there, 681 V/m max on the left side of head. Found swelling on his right elbow.

2265. 7/23/2025, 8:13AM not feeling DE beams Plaintiff scanned with GQ for the electric charge at his head and detected 79 V/m max, his legs were charged less than 100 V/m but for his left thigh which was 487 V/m max. After the scanning Plaintiff felt burning beams at his head and at the left side of the chest from ap.G2 direction which continued for a while. At 9:04AM in the same conditions, same location as he was at 8:13AM Plaintiff scanned again and detected 1022 V/m max electric charge at his head (about 13 times higher than at 8:13AM); 1029 V/m left shoulder and chest max, continuously discharges were above 500 V/m; 906 V/m max at his left leg; 835 V/m max at his right leg (about 8 times higher than at 8:13AM).

At 9:11AM Plaintiff heard persons talking near his windows about him ("Kalin"), and saw 2 Teaneck police cars, and utilities trucks parked on Cedar lane at the corner with Red Road – near his windows. A bit later the number of cars and officers increased. Plaintiff made a few photos. After Plaintiff lied down again, at 9:28AM Defendants' man came under his windows and said "Don't we-- don't we-- We have stopped that. Stop." When Plaintiff got up again and sat at 10:43AM his GQ Multi Field Meter detected short DE beam with power density of 34419 mW/m$^2$ (about 17 times higher than FCC regulations) which was directed at him from Defendants in ap.B2 (scanner was next to Plaintiff pointing at B2).

(i) Absent Defendants' DE attacks the electric charge of Plaintiff's body is bellow 100 V/m.

2266.   In majority of cases Plaintiff scanned his body after feeling the effects of Defendants' DE attacks – burning, pain, pressure and/or more. However in a few occasions he scanned with idea to establish the charge of his body when he did not feel the immediate effects of DE attacks – that charge is referred here as the 'base-level'. Please note that in all cases quoted here (unless specifically stated) Plaintiff used the same GQ Multi-field EMF 390(v2) meter, and measurements were taken on body surface.

2267.   Plaintiff found that the base-level electric charge of his head (when there was no DE attacks) is mostly bellow 100 V/m. For example the maximum charge at Plaintiff head was 65 V/m (2/1/2025, 9:08AM); 110 V/m max (3/2/2025, 6:37PM); less than 100 V/m (3/11/2025, 10:30AM); 74 V/m max (3/12/2025, 11:17PM); less than 100 V/m, but for back of head 132 V/m max (4/29/2025, 5:42PM). See Timeline of events.

2268.   Similarly all other locations on Plaintiff's body such as chest (front and back), belly, or legs were charged bellow 100 V/m. See for example:

2269.   1/1/2023 Sunday, about 10:19AM Plaintiff's back was charged 193 V/m max, and all other body locations – less than 100 V/m. ECF No.8-1 at 1397.

2270.   1/13/2023 Friday, 4:38AM Plaintiff scanned his body and detected mostly less than 100 V/m on his legs, about 200 V/m at his butt, 164 V/m max at his head. At 9:39AM Plaintiff's left side of head was 986 V/m, but the right side of head and all other body locations were charged less than 100 V/m. ECF No.8-2 at 6009.

2271.   1/17/2023 Tuesday, 8:57AM scanning the body Plaintiff detected 318 V/m on his left cheek, 210 V/m at neck, and all other locations were less than 100 V/m. ECF No.8-1 at 1405.

2272.   1/18/2023 Wednesday, 8:08AM, Plaintiff detected 118 V/m at head, while all other areas on body were less than 100 V/m. At 11:11AM his body was charged less than 100 V/m but for 199 V/m at heart and about 150 V/m left cheek. ECF No.8-1 at 1406.

(ii) Defendants' attacks on Plaintiff with focused DE beams led, among other things, to the abnormal electric charge of certain locations on his body – up to about 1040 V/m or more than 10 times higher than the base-level, and up to about 33 times higher than the FCC limits[170] of exposure of general public to EF.

2273.    The unusually high charge of certain locations on Plaintiff's body is apparently result of Defendants' use of focused DE beams to attack him – the highest values detected exceed 1000 V/m, which is about 400 times higher than the average EF in Plaintiff's apartment, and about 17 times higher than the charged also above the FCC limits Plaintiff's floor and bed. See Exhibit Electric field and charges detected in Plaintiff's apartment in 12/2020-2023. A few more recent examples follow.

*(a) Examples of abnormal electric charge (about 1000 V/m or more) at the surface of Plaintiff's body from the beginning of 2025.*

2274.    1/31/2025, 10:12PM Defendants targeted Plaintiff with DE – he felt pressure at his head/eyes. Earlier too, and Plaintiff moved to evade the beams. He detected 1025 V/m at his eyes[171], and area was charged continuously above 100 V/m. He detected 1031 V/m max at the top of his head.

2275.    2/2/2025, 1:40AM Defendants awakened Plaintiff with clanks on the heater, very dry eyes, 754 V/m at eyes, 1043 V/m max at head.

2276.    3/2/2025, after Defendants prevented Plaintiff to get asleep with DE attacks at 10:12AM Plaintiff scanned his face and even after he washed himself his head was charged 1034 V/m max. At 10:14AM same scanning results. At 10:15AM again scanning his head Plaintiff detected max 1038 V/m and till 10:26AM the head was continuously charged above 700 V/m continuously, with more than 1000 V/m peaks.

2277.    3/3/2025, 3:40PM Defendants targeted Plaintiff with laser-focused rays at his top of head. Detected 809 V/m max there, but charge was not continuous. Pain however continued.

2278.    3/8/2025, 10:29AM 1033 V/m max at head. Defendants' woman in building corridor warned "You need to stop."

2279.    3/10/20254:25PM burning rays at Plaintiff's back, electric shocks at head, Scanning with GQ Plaintiff detected peaks from ap.B2 more than 10 mW/m², and 969 V/m max on his head.

2280.    3/11/2025, 11:45PM Plaintiff was feeling strong tingling and detected 982 V/m max at his feet, and continuously more than 400 V/m at right foot. Left foot was charged 1030 V/m max, continuously more than 600 V/m.

2281.    3/12/2025, 12:45PM Defendants targeted Plaintiff's head with DE and feeling pressure at top of his head Plaintiff detected there 1034 V/m. 6:54PM again focused pushes at right side of chest while Plaintiff was working on CAT argument. He detected 994 V/m max, charge was continuously more than 600 V/m. At 7:58PM after Plaintiff moved in front of the wardrobe

---

170 FCC regulates industries to limit the exposure of general public to radiofrequency radiation to prevent health and sensory effects (47 CFR § 1.1310). Based on the FCC limits the limit for permitted exposure to EF used as reference here is 27.5 V/m.

171 The charge of eyes is measured on the eye-lips.

Defendants again targeted his right side of chest. Plaintiff detected 1024 V/m max on the hand he put there, and continuous more than 500 V/m discharge. Similar scanning results on the chest itself.

2282.    3/18/2025, 3:03AM DE beams – Plaintiff was feeling tingling and detected 1015 V/m max at his feet, 1023 V/m max at the right side of his chest. One of the DE peaks was so strong Plaintiff involuntarily stopped breathing for a while.

2283.    3/19/2025, 7:46AM Defendants awakened Plaintiff with DE – dry eyes, ringing ears, he detected 730 V/m max at his eyes, 1033 V/m max on his head.

2284.    3/28/2025, 11:21AM pressure at Plaintiff's head. He detected 1029 V/m there, repeated discharges above 200 V/m.

2285.    3/29/2025, about 10:01AM Defendants awakened Plaintiff with light knocks, DE – dry eyes. He detected 922 V/m at his left eye, 715 V/m right eye. Earlier GQ detected 34419 mW/m² from Rd Road direction. While Plaintiff was scanning Defendants woman nearby "Have to stop. And I said have to school …" He detected 1038 V/m on his head.

2286.    3/30/2025, 3:51AM Defendants awakened Plaintiff after about 2 hours with DE – dry eyes and nose. 936 V/m max on his eyes, 319 V/m on the nose detected. 1030 V/m head other locations.

2287.    4/25/2025, 6:10PM Defendants targeted Plaintiff with DE beam – later he detected there 1009V/m max and continuous discharge above 800 V/m. His second and third (at 6:15PM) scanning there – similar results but max up to 1030 V/m.

2288.    4/29/2025, 5:26PM Plaintiff was working on the bed feeling pressure at head, and detected 1025 V/m max at the right side of his head, 1036 v/m on the left side of head

### (b) Defendants' attacks apparently disrupt the normal distribution of the electric charges within Plaintiff's body, charge certain locations with electricity, and induce electric currents.

2289.    "Electrostatic induction[172] [] is a redistribution of electrical charge in an object, caused by the influence of nearby charges… the mobile charges move under the influence of the external charge until they reach the surface [] and collect there, where they are constrained from moving "[173]

2290.    "Conductors (of finite dimensions) moving through a uniform magnetic field, or stationary within a changing magnetic field, will have currents induced within them. These induced eddy currents [] consume a considerable amount of energy and often cause a harmful rise in temperature."[174]

2291.    Defendants' use of focused DE beams is apparent especially in cases when for example small

area on Plaintiff's head is charged many times higher than the areas around it. Such redistribution

of electric charges in Plaintiff's body can not be caused in another way. For example on

1/18/2023 the targeted location was charged 6 times higher than the corresponding area; on

---

172 See *Physics Tutorial_ Charging by Induction*, https://www.physicsclassroom.com as accessed on 1/26/2021 ("Induction charging is a method used to charge an object without actually touching the object to any other charged object.")

173 *Electrostatic induction*, Wikipedia, Sep 2017 (footnote added)

174 *Electromagnetic induction*, Wikipedia, October 2017

4/29/2025 it was about 2 times higher; on 5/19/2025 targeted location was charged more than 9 times higher than the area near it.

2292.    1/18/2023 Wednesday, 9:36PM feeling electric shocks at the left side of his head Plaintiff detected 739 V/m there, and about 120 V/m at the right side of head. A bit later his second scanning of the same areas showed slight decrease of the difference: 518 V/m left, 163 V/m right side.

2293.    Similar were the events on 4/29/2025 – see above, or 5/5/2025 (bellow).

2294.    5/19/2025, 7:35AM Defendants awakened Plaintiff with focused DE ray at the top-right side of his head. He detected 918 V/m at top-right side of head, and less than 100 V/m on the left side.

(iv) Defendants directed at Plaintiff DE beams with abnormal pressure and/or radiation – EF, MF or EMF.

2295.    Plaintiff's GQ meter repeatedly detected DE beams with power density of 34419 mW/m$^2$, which is about 17 times higher than the FCC limits for exposure. There are a few more abnormal things about that as, for example, the fact that the detected maximum power density from different directions is exactly the same – 34,419.445 mW/m$^2$. On 1/28/2025 when GQ was right next to Plaintiff's phone (2-3 cm) the detected maximum power density at that proximity was 200-400 mW/m$^2$, while 34419 mW/m$^2$ (which is about 86 times higher) was detected at least 2 meters distance from the floor of ap.B2. The significance of the above is clear because in principle EF, MF or EMF rapidly reduce with distance[175], but for lasers[176]. See more at Exhibits for EF, MF, and EMF.

2296.    Also significant, even though it is not accurate because it's above the range of SLM 25 (30~130dBA), is the detection of very high pressure from Defendants in ap.B2 (SLM 25 usually pointed toward B2) for a short time.

---

[175] "The electric field from an appliance falls rapidly with distance from the appliance, just as the magnetic field does. The magnetic field from an appliance typically merges into the background magnetic field within a metre or two. With electric fields, except in those few homes very close to a source of high electric field, there is no background field from sources outside the home." *Extremely Low Frequency Fields*, World Health Organization 2007

[176] "Laser radiation is emitted over a wide range of the electromagnetic spectrum from the ultraviolet region through the visible spectrum to the infrared region, but rarely in microwave or other wavelength ranges." *LASER SAFETY MANUAL For Columbia University New York State Psychiatric Institute Barnard College*, April 2021. "laser light is directional [in] a very tight beam [and because it] is coherent, it stays focused for vast distances, even to the moon and back." *How Lasers Work*, Lawrence Livermore Nat. Lab., https://lasers.llnl.gov/education/how_lasers_work.

2297. 1/28/2025, Plaintiff detected 34419 mW/m$^2$ floor level from A3. Notable GQ has been right next to Plaintiff's phone and max detected at certain moments was 200-400 mW/m$^2$.

2298. 3/7/2025, 6:25AM Defendants awakened Plaintiff with pushes, pops on heater. Detected 34419 mW/m$^2$ from A1 at Plaintiff's head.

2299. 3/8/2025, 9:59AM SLM detected abnormal pressure 1306 dB

2300. 3/9/2025, 9:58AM SLM detected abnormal pressure 621 dB.

2301. 3/13/2025, 12:32AM detected 34419 mW/m$^2$ from B2 while sitting on the bed and working on timeline of events 2024.

2302. 3/16/2025, 2:29PM SLM detected abnormal pressure – 1340 dB.

2303. 3/17/2025, about 1:40PM abnormal pressure of about 660 dB detected by SLM. 9:11PM Defendants in B2 hammered on Plaintiff's again, then DE push at Plaintiff's right knee. 9:14PM 34419 mW/m$^2$ detected from B2. It got cold inside – no heating.

2304. 3/18/2025, 5:51AM SLM detected abnormal pressure about 2200 dB.

2305. 3/19/2025, 3:31PM detected 34419 mW/m$^2$ from Red Road – bed level.

2306. 3/23/2025, 5:32PM SLM detected abnormal pressure 925 dB.

2307. 3/24/2025, 3:22AM Defendants awakened Plaintiff – he was feeling too hot. GQ detected before that 34419 mW/m$^2$ from ap.A1 floor level.

2308. 3/25/2025, 10:14PM back home 34419 mW/m$^2$ from ap.B2 at Plaintiff.

2309. 3/29/2025, about 10:01AM Defendants awakened Plaintiff with light knocks, DE – dry eyes. He detected 922 V/m at his left eye, 715 V/m right eye. Earlier GQ detected 34419 mW/m$^2$ from Rd Road direction. While Plaintiff was scanning Defendants woman nearby "Have to stop. And I said have to school …" He detected 1038 V/m on his head.

2310. 3/30/2025, 5:25AM Defendants awakened Plaintiff again with very dry eyes, ringing ears. Earlier 34419 mW/m$^2$ detected from B2.

2311. 5/15/2025, 8:12AM SLM abnormal reading 1645 dB pressure.

2312. 7/23/2025, when Plaintiff got up again and sat at 10:43AM his GQ Multi Field Meter detected short DE beam with power density of 34419 mW/m$^2$ (about 17 times higher than FCC regulations) which was directed at him from Defendants in ap.B2 (scanner was next to Plaintiff pointing at B2).

2313. Especially notable is that Defendants and parties in concert targeted Plaintiff with similarly very strong focused beams at other locations, as for example while he was in Bulgaria (8/31/2025) he detected at his head continuous focused EF of more than 1000 V/m.

(v) Defendants' DE attacks have charged with electricity and /or induced electric currents in certain objects (bed, chair), or locations in Plaintiff's apartment. The EF from Defendants in ap. G2 and/or B2 penetrating into his apartment is also above the FCC limits.

2314. Due to Defendants' DE attacks in correspondence to Plaintiff's work in preparation of his Complaint with the S.D.N.Y. the electric charge of his bed's during 2023 increased: his bed was predominantly charged in 50-60 V/m range in January (about 2 times higher than FCC limits), since March it was in the range of 60-70 V/m, and since July – 70-80 V/m range. The high

electric charge of Plaintiff's bed forced him to change the place he sleeps, and to shield himself (putting grounded aluminum plates on the bed). See Exhibits for EF, MF, EMF. ECF No.8-1 and 8-2, and more.

2315.    The EF from Defendants in ap.G2 and B2, or from other directions detected within Plaintiff's apartment demonstrates that it is emitted neither from regular appliances nor wiring – as physics' principles dictate the EF strength is constant, and independent from electric consumption. However the EF detected from G2 changes significantly in time with periods when detected EF above the FCC limits invade Plaintiff's apartment up to 80 cm above the floor (as on 5/9/2025). That indicates that the source(s) emit very strong EF directed at Plaintiff considering both that EF is easily shielded, and that the thickness of the floor (59 cm). Similarly the EF from ap. B2 changes: for example in 2022 the EF from ap.B2 measured at about 2 meters above floor (area above head level when staying straight) was between 3 V/m and up to 65 V/m (2.3 times higher than FCC limits).

2316.    The timing and pattern of change of ap.G2 and B2's EF shows that it is in retaliation to Plaintiff's legal actions. For example the timing of the G2's EF increase since the middle of June 2022 followed relatively accurately Plaintiff's work on his Notice of claims and Administrative claims with the Defendants, and after the filing (on or about 11/10/- 11/11/2022) the above-the-limits EF from G2 continuously penetrated Plaintiff's apartment up to 25-45 cm above the floor till about the start of holidays. As an illustration about the EF from ap.B2 – on 3/8/2023 when Plaintiff started working (again) on exhibits for the swellings he had had due to Defendants' directed energy attacks for about 24 hours the EF from ap.B2 at two meters above floor was 60 V/m (the days before and after that EF there was less than 5 V/m). Another example is the continuously-above-the-limits EF from ap.B2 since June 2023 when Plaintiff started finalizing the court documents for this action. There is coordination between G2 and B2 as indicated by, for example,

the increase of EF (above the limits) from ap.B2 and decrease of EF from G2 for about two

months since July 25, 2023 when Plaintiff started *Dimitrov I*. See Exhibits for EF, MF, EMF. ECF

No.8-1 and 8-2, and more.

2317.   7/7/2024, 11:21AM Plaintiff detected 54 V/m on the floor behind desk, 5 cm up 24-35 V/m
        varying. While Plaintiff was scanning a Defendants' woman warned "Stop. Can not stop []."
2318.   4/7/2025, 11:22AM in front of the mirror …. EF was 45 cm above floor 24-33 V/m varying.
2319.   5/9/2025, 12:20PM EF in front of the mirror was 25-34 V/m varying at <u>80 cm</u> above the
        floor.
2320.   And more.

**(2) DE beams target Plaintiff, and specific locations on his body repeatedly.**

2321.   Notable in that regard are the events on 5/7/2025 because the same location – on Plaintiff's back

next to his heart – was targeted at the same day both inside the apartment and outside.

2322.   4/25/2025, 6:10PM Defendants targeted Plaintiff with DE beam – electric shocks at his left
        hip. He moved 4-5 times to evade the focused beam, beam followed him. Later he detected
        there 1009V/m max and continuous discharge above 800 V/m. His second and third (at
        6:15PM) scanning there – similar results but max up to 1030 V/m.
2323.   5/5/2025, 9:04PM DE attacks targeted a few days including then Plaintiff's back-next-to-
        heart area with focused rays, and right shoulder. Plaintiff detected 1024 V/m max, and
        continuously above 500 V/m there. For comparison Plaintiff's back at kidneys level was
        charged max 178 V/m but mostly was less than 100 V/m.
2324.   5/7/2025, Plaintiff worked on the complaint on Broad Street bench between the Teaneck
        Municipality and Jewish Center of Teaneck till about 10PM. While there Defendants targeted
        him with focused beams at his back-heart (same location had been targeted while Plaintiff
        was at home earlier), and his eyes. 10:15PM when he got back home Plaintiff scanned his
        back-heart level and detected it was charged 1026 V/m max, and more than 100 V/m
        continuous, and his eyes were charged 1018 V/m max and more than 100 V/m continuously.
        10:18PM Plaintiff scanned his back again it was about 580 V/m max.

2325.   Plaintiff's eyes and head in general are regular targets of Defendants' focused DE attacks, and for

different periods Defendants targeted also his knees, shoulders, hips, kidneys, and buttocks. And

less frequently – his heart. See ECF No.8-1 and 8-2, and more.

**(3) Defendants have made a few explicit and implicit statements about using DE against
Plaintiff since 2013.**

2326.   In comparison to other concepts, Defendants are very restrained to talk directly about DE in

Plaintiff's presence. That makes the exceptions more notable, as for example their statements on

8/12/2017 ("You need some beam tonight."), 6/23/2020 ("Hot ray?" "All that. Got us."), or on

6/7/2024 ("They put him in the microwave."). See examples bellow:

2327.    10/13/2013 at 2:30AM uniform Teaneck Police and FBI/JTTF officers awakened Plaintiff and talked about him under his windows: "Bring plasma."[177] "That's the time giving a nightmare." ECF No.8-1 at 34.

2328.    8/12/2017 Defendants came near Plaintiff's windows and threatened him "You need some beam tonight."

2329.    10/6/2017, about 11:00PM Plaintiff felt strong electric tingling, but didn't react. Defendants commented "He doesn't feel it because he has work."

2330.    10/22/2017 electric shocks at 9:40AM, Plaintiff moved at the other side of the bed, and Defendants in B2 commented "He is trying to escape." Electric shocks continued till Plaintiff got up.

2331.    10/23/2017, 4:56AM Defendants again awakened Plaintiff, and commented in ap. B2 "He don't feel it."

2332.    4/27/2018 Friday, 10:27PM after Plaintiff moved to evade a directed energy beams Defendants in ap.G2 commented: "He felt it." ECF No.8-1 at 1802.

2333.    5/10/2018 Thursday, 10:40AM Plaintiff was scanning with RF detector when Defendants' person came under his windows and commented "No credentials. WiFi []." At 11:26AM when Plaintiff detected burst of rays students came under his windows and mocked "Vibrate." ECF No.8-1 at 881.

2334.    6/14/2018 at about 7:30AM Plaintiff was awakened by strong beams but did not react, and Defendants in ap.B2 commented: "He doesn't feel it." ECF No.8-1 at 1802.

2335.    10/31/2019 feeling strong beams of directed energy at his head and kidneys Plaintiff moved a few times in an attempt to evade them. Defendants came under his windows and teased "All around we track you." ECF No. 8-1 at 130.

2336.    6/23/2020 after 5:34PM Defendants (Ralph included) in building corridor discussed Plaintiff, and among other things spoke about the use of a 'hot ray': "Can't harass him. Done a research.".. "Hot ray?" "All that. Got us." (Plaintiff had been using for a while his new and better RF detector: K-68.) ECF No.8-1 at 58.

2337.    8/5/2020 at about 11PM Defendants in building corridor, including Ralph, talked about Plaintiff, an antenna and radio frequency (RF). "Eight [of] those is going to do the antenna." A man stated: "The RF." ECF No.8-1 at 59.

2338.    9/14/2020, 11:55PM Plaintiff challenged "I know you'll not go away. Stopping the rays for 2 days doesn't count as positive step. I know you." Defendants in ap.B2 responded "We lost it." ECF No. 8-1 at 210.

2339.    12/31/2020, 1:28PM Plaintiff was researching in Google 'electromagnetic shielding' when a few Defendants' men came under his windows and commented "Trying to shield []." ECF No.8-1 at 1802.

2340.    8/24/2021, 9:40PM Plaintiff was working on RF beams affecting his sleep when Defendants in ap.B2 commented "We thought we'll crush him." ECF No.8-1 at 210.

2341.    9/4/2021 Saturday, 8:57PM Plaintiff started working on health attacks/Havana syndrome materials and Defendants' woman near the windows commented to "take it seriously." Later (9:31PM) Defendants' man commented "Police could have this." ECF No.8-1 at 674.

2342.    10/11/2021 Monday at 9:49AM Plaintiff felt burning at his head and on the hand he put there (detected a 4-6 mW/m2 ray from A1). Then at 10:10AM he felt and detected focused rays

177 See *Wave*, Wikipedia, as on 23 January 2021 ("plasma waves [] combine mechanical deformations and electromagnetic fields".)

280

from ap.A1 at his left hip, and from Red Road at his left shoulder. A bit later (10:17AM) Defendants came under his windows on Cedar lane and commented it "burn like hell." ECF No.8-1 at 260.

2343.   10/14/2021 Thursday, 3:57PM after feeling rays Plaintiff made photos of his back. Students came under his windows and commented "He gets it, right?" ECF No.8-1 at 870.

2344.   11/24/2021 Wednesday Plaintiff was feeling strong rays, and detected 104 mW/m$^2$ next to the wall with ap.A1. At 9:05AM Peter Loomer (B1) in building corridor warned "Get out of the walls." ECF No.8-1 at 1802.

2345.   11/27/2021 Saturday, 10:20AM Defendants awakened Plaintiff with DE – he had dry eyes, nose and mouth, and found a swelling inside one of his nostrils blocking the air. After Plaintiff put an aluminum plate next to his head Defendants in ap.B2 responded: "We stopped." ECF No. 8-1 at 210.

2346.   12/9/2021, 11:35AM Defendants awakened Plaintiff and he felt DE rays targeting his head/eyes. Students came under his windows and teased: "lose an eye." ECF No.8-1 at 874.

2347.   2/2/2022 Wednesday, 7:51AM while Plaintiff was scanning fro DE Defendants in ap.B2 commented "We need to stop."

2348.   4/11/2022 Monday, 10:24AM Plaintiff was awakened by strong pain at head and pressure, and with ringing ears. While Plaintiff was scanning for DE ap.B2 commented quietly "Can't stop." ECF No. 8-1 at 312.

2349.   11/21/2022 Monday, Dula acknowledged the targeting of Plaintiff's eyes with focused DE beams. "How to [] to stop?" Dula: "The eyes push. You catch him." ECF No.8-1 at 1804.

2350.   12/7/2022 Wednesday, Defendants awakened Plaintiff with DE and at 6:20AM he detected 902 V/m discharge at his nose, about 300 V/m at eyes. 6:49AM Plaintiff found 3 swellings on his forehead; and a swelling on his right buttock. 7:05AM Defendants in ap.B2 commented "Can't crash him." ECF No. 8-11 at 1805.

2351.   12/18/2022 Sunday, 8:52AM Defendants awakened Plaintiff again with electric shocks at head and kidneys, detected 955 V/m at his head and hand over it. Defendants in ap.B2 commented "We can't stop." and talked about using a device to hit Plaintiff with directed energy ('2000 Watts'). "Your device?" "Set different []. Then I move Kalin to stop." Dula: "Use the five skin. Do not fall." "Kalin said []. Let Kalin forgive this []. They can flip. … Can I get to punish [him]? … We are back pain." … "Hit him with stronger--" Dula: "I think police would have him." Knock simultaneously. "Two thousand Watt []." "(Scanning) your best []." "End that in blood." ECF No.8-1 at 1806.

2352.   6/7/2024, 1PM-7PM Plaintiff worked on the DE – EMF report for his case in Phelps Park, Teaneck, NJ when Defendants playing tennis talked about him. "FBI… We didn't stop him." Then a couple sat next to Plaintiff, and the man was unusually loud "This has high energy. High energy." They looked simultaneously at Plaintiff for reaction. After they left Defendants woman talked nearby about "Activating Kalin." Then Defendants playing tennis again talked about Plaintiff "They put him in the microwave."

2353.   1/17/2025, 11:39AM three schoolboys came under Plaintiff's windows saying "Lasers destroy people." A bit later student continued "You wanna stop." "Destroy []."

**(4) Defendants have started using DE against Plaintiff while he was outside his apartment since he went for the first time to the FBI New York Field Office building on 10/31/2017.**

2354.   10/31/2017 Plaintiff went to the FBI New York building, but the building was closed. DHS federal security protection guards commented behind him "The guy obviously doesn't care." Plaintiff attended a symposium in Manhattan. In the pause between the parts Defendants

there commented him "They survey []." "One Bulgarian." Defendants targeted Plaintiff with laser-focused burning rays at his back – kidneys and head. And also when Plaintiff was at the bus stop.. First noted time outside Plaintiff's apartment use of DE against him.

2355.    Notable are recent examples as on 5/7/2025 (see above), 8/25/2025 while Plaintiff flied to Bulgaria, or when he was there (8/27/2025, 8/31/2025).

**(5) The effects of Defendants' use of DE on Plaintiff**

2356.    Defendants' attacks on Plaintiff with DE beams (1) inflict immediate pain and/or long-lasting injury and pain by electric shocks from rapid charge / discharge, with induced electric currents, or burn him due to the rapid heating. Long-time injuries also occurred from the Defendants' targeting of specific locations on Plaintiff's body for prolonged time; (2) cause to Plaintiff significant physical and mental suffering (apart from the pain and injuries) such as ongoing unpleasant tingling ('needles' sensation), pressure, involuntary muscle contractions, deteriorate his mental functions (tiredness, blank-state), and more; and (3) interrupt and disrupt Plaintiff's legal activities (including his work on legal and case materials), and prevent him to rest and sleep. See ECF No.8-1 at 1005 *et seq.*. Exhibits for EF, MF, EMF, Timeline of events and more.

_(i) Defendants' attacks on Plaintiff with DE inflict immediate pain and/or long lasting injury and pain._

2357.    The pain[178] Plaintiff experience due to Defendants' DE attacks is frequent and everyday event for many years. In a few cases the harm on Plaintiff's skin caused by focused DE beams is visible as (1) red spots and/of swellings with varying individual size from 1-2 mm up to 2.5 cm, which fade usually in about couple of hours; or (2) long lasting pigmentation at small areas. See Exhibits of Spots and swellings. There are two biophysical mechanisms of those injuries: a burn due to rapid tissue heating, and/or induced urticaria.

---

178 Note that sleep deprivation amplifies the pain / reduces the pain threshold (see above IV.11.A).

*(a) Defendants burn Plaintiff with focused DE beams with frequency above 100 kHz[179].*

2358.    The oval red spots and swellings on Plaintiff's body appearing after a Defendants' attack with DE

beams, in addition to the very focused painful burning sensations during and after that, indicate

that those are first degree burns caused by, most probably, laser beams (as a laser beam heats

forward, while at its rear regions are cool[180]).

2359.    "Burns commonly occur by direct or indirect contact with heat, electric current, radiation, or
chemical agents. … First-degree burns affect only the outer layer of the skin. They cause
pain, redness, and swelling. [Notably h]ow much pain you have is unrelated to the level of
burn. The most serious burns can be painless." *Burns: MedlinePlus Medical Encyclopedia*,
National Institutes of Health / National Library of Medicine,
https://medlineplus.gov/ency/article/000030.htm as accessed on 10/29/2023.

*(b) Defendants' DE attacks induce urticaria / hive at the targeted area on Plaintiff's body.*

2360.    Defendants' DE beams also caused urticaria – small swelling(s) with varying individual size from

1-2 mm up to 2.5 cm at the targeted area on Plaintiff's body. "It is quite easy to diagnose

[urticaria] based on clinical appearance and anamnesis."[181] Urticaria is a disease with rapid

appearance of itchy red plaques/wheals on the skin which typically fade within 24 hours, but has

profound impact on quality of life.[182] There are a few kinds of induced / physical urticaria which

include solar urticaria caused by exposure to electromagnetic waves[183]: UV and/or visible light,

heat contact urticaria caused by localized heat, or vibratory urticaria caused by vibrations.[184] As in

---

179 EU, Scientific Committee on Emerging and Newly Identified Health Risks, SCENIHR, *Possible effects of
Electromagnetic Fields (EMF) on Human Health*, 21 March 2007. See also *Occupational Exposure to
Electromagnetic Fields and Health Surveillance according to the European Directive 2013/35/EU*, Modenese,
Gobba, Int. J. Environ. Res. Public Health 2021, 18, Int. J. Environ. Res. Public Health 2021, 18, 1730 ("Thermal health effects [of exposure to EMF] are due
to an excessive temperature increase of the biological tissue, possibly resulting in thermal burns involving the
whole body or specific body districts (e.g., thermal eye damage with cataracts or skin burns) after intense
exposure to high frequency fields. [] intermediate frequencies can induce [such] effects.")
180 *Effects of Directed Energy Weapons*, Philip E. Nielsen, National Defense University, 1994, p.155-156.
181 *Diagnosis and treatment of urticaria in primary care*. Melek Aslan Kayiran, Necmettin Akdeniz. North Clin
Istanb 2019;6(1):93-99 doi: 10.14744/nci.2018.75010
182 See for exam[ple *Urticaria*. T. Zuberbier, Allergy 2003: 58: 1224–1234; *A Review of International
Recommendations for the Diagnosis and Management of Chronic Urticaria*. Lisa A. Beck, Jonathan A. Bernstein
and Marcus Maurer. Acta Derm Venereol 2017; 97: 149–158. *Chronic urticaria: Diagnosis and management*.
David A. Khan. Allergy and Asthma Proceedings 29:439 –446, 2008; doi: 10.2500/aap.2008.29.3151
183 *Physical Urticaria*. Marina Abajian & Agnieszka Młynek & Marcus Maurer. Curr Allergy Asthma Rep (2012)
12:281–287
184 *Urticaria*. T. Zuberbier, Allergy 2003: 58: 1224–1234 (Table 1. Classification of urticaria on the basis of its
duration, frequency and causes. Modified according to Zuberbier et al. (4)).

the Plaintiff's case, an individual wheal in induced urticaria typically lasts between 30 minutes to 2 hours.[185] See ECF No.8-1 at 1007 *et seq.* and more.

*(c) Pigmentation at the most targeted with DE areas on Plaintiff's body.*

2361.   Skin pigmentation is known biological effect of exposure to DE in visible and ultra-violet specter[186]. When Plaintiff arrived in the US in 2011 he had no areas with pigmentation on his head. But since Defendants started regular DE attacks on Plaintiff at some of the most frequently targeted areas on his head – top, top-left and top-right side of head, and the area next to his right eye – brown up to dark-brown spots have formed and are constantly present. Notably after Plaintiff's Notice of claims the pigmentation started to fade. ECF No.8-1 at 1017.

2362.   Based on the above it is clear that, if not the sole cause, Defendants' DE attacks play significant role for the appearance of those spots.

(ii) Defendants' attacks on Plaintiff with DE cause significant physical and mental suffering.

2363.   The suffering caused on Plaintiff by Defendants' DE attacks is significant as duration and intensity. It is persistent for more than 7 years and ongoing, and in a few occasions its intensity raises to the level of 'severe'[187]. In a few occasions Defendants' DE attacks were so strong that Plaintiff stopped breathing. That effect ('respiratory failure') is a cause of death in exposure to electric current above 1000 volts[188]. DE effects are amplified due to the sleep deprivation of Plaintiff (reduction of his pain threshold), and other Defendants' practices in combination.

185 Chronic urticaria: Diagnosis and management. David A. Khan. Allergy and Asthma Proceedings 29:439 –446, 2008; doi: 10.2500/aap.2008.29.3151

186 See *Laser Hazards-General | Environmental Health and Safety,* Copyright ©2017 Oregon State University. Almost identical are the bio-effects listed in *LASER SAFETY MANUAL For Columbia University New York State Psychiatric Institute Barnard College,* April 2021,

187 "We [] believe that "severe physical suffering" under the statute means a state or condition of physical distress, misery, affliction, or torment, usually involving physical pain, that is both extreme in intensity and significantly protracted in duration or persistent over time. Accordingly, judging whether a particular state or condition may amount to "severe physical suffering" requires a weighing of both its intensity and its duration." *Memorandum For John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency Re: Application of 18 U.S.C. §§ 2340-2340A to Certain Techniques That May Be Used in the Interrogation af a High Value al Qaeda Detainee.* Office of Legal Counsel, DOJ, May 10. 2005. "We conclude that under some circumstances "severe physical suffering" may constitute torture even if it does not involve "severe physical pain."" *Memorandum For James B. Comey Deputy Attorney General Re: Legal Standards Applicable Under 18 U.S.C. §§ 2340-2340A.* Office of Legal Counsel, DOJ, December 30, 2004.

188 *Forensic Medicine and Toxicology. Oral, Practical & M.C.Q.*, R. Karmakar. p.141.

284

2364.  Defendants' DE attacks on Plaintiff have repeated detrimental effects on his senses. In many cases when Defendants target his ears that induces tinnitus (as for example on 1/12/2025, 3/17/2025, 3/19/2025, 3/21/2025, 3/26/2025, 3/30/2025, and more), and/or Plaintiff's hearing is reduced (as for example on 1/11/2025, 1/14/2025, 2/4/2025, and more) – depending on the intensity of the DE beams the effect is for about half an hour up to a couple of weeks. Similarly very often his vision got blurred, and his eyes are irritated and dry. See ECF No.8-1 at 1018 *et seq.,* and more.

2365.  For example on 8/22/2025 while Plaintiff is working on these very sentences Defendants attacked his right eye with a focused beam at 8:56AM. Feeling pressure and pain Plaintiff detected 924 V/m there, and for comparison – his left eye was charged about 6 times less: 162 V/m max. Earlier same day Defendants awakened Plaintiff with DE beams, and feeling his eyes significantly irritated at 6:20AM he detected at both eyes 1029 V/m max, and constant charge above 500 V/m.

2366.

2367.  Very often as result of DE attacks Plaintiff felt strong unpleasant tingling ('needles' sensation).

2368.  "Sensory effects ... are mainly related to relevant SMF [static magnetic fields] and ELF-MF exposure, include [] tingling sensation due to the stimulation of the nerves, and others."[189]

2369.  The DE attacks on Plaintiff deteriorate his mental functions (causing mental fatigue, blank-state, and more). It is apparent that the external induction of electric currents in Plaintiff's head will affect his brain's electric activity (the currents in brain are weak).[190] As it is not possible to detect the currents inside Plaintiff's brain as indicator are used here the current detected on the surface of his skin. Notable is that at one occasion after strong DE attacks the maximal electric current detected on the surface of Plaintiff's top of head was 113 times higher than normal. Considering

---

[189] *Occupational Exposure to Electromagnetic Fields and Health Surveillance according to the European Directive 2013/35/EU*, Modenese, Gobba, Int. J. Environ. Res. Public Health 2021, 18, 1730

[190] "The electricity generated inside the body serves for the control and operation of nerves, muscles, and organs. The nervous system plays a fundamental role in nearly every body function. Basically, a central computer (the brain) receives internal and external signals and (usually) makes the proper response…. The rhythmical action of the heart is controlled by an electrical signal initiated by spontaneous stimulation of special muscle cells located in the right atrium. … If you place electrodes on the scalp and measure the electrical activity, you will obtain some very weak complex electrical signals. These signals are due primarily to the electrical activity of the neurons in the cortex of the brain." *Electricity within the Body, Medical physics Lecture 4*, Kawther Hussien, PDF created 2/10/2021 (stating also that the magnetic field surrounding the brain is "about $1 \times 10^{-13}$ tesla (T). This is almost one-billionth of the earth's magnetic field." (which is about 0.5 mG))

that the oscillating electric voltages of brain waves are 'just a few millionths of a volt' that is substantial interference (measured in hundred thousands times).[191]

2370.    4/13/2025, about 15 minutes after Plaintiff started working on Defendants' interference with his lawsuits Defendants (B2 direction) attacked him with very strong focused beam at top of the head. At 12:08PM Plaintiff scanned and detected there 1021 V/m (GQ), and electric current max 0.226V (with Craftsman Digital Multimeter 82141), and although continuous the current reduced during the scanning. He also detected electric current on his cheeks but lower between 0.111 V and about 0.160 V.

2371.    8/22/2025, while not experiencing the symptoms of an DE attack Plaintiff detected electric current at the top of his head max 0.002V (Craftsman 82141).

2372.    Plaintiff experience a range of other effects due to Defendants' DE attacks as repeated severe pain, headache, dizziness, dislocation of his knees (usually after attacks on his knees), he has temporary difficulty walking, and more. As well as involuntary muscle contractions (experienced as poking / focused pushing) – but in a form of very localized contractions of small number of muscle fibers. See Exhibits.

*C. Defendants orchestrate and act in concert to subject Plaintiff to systematic harassment and abuse (hostile environment).*

2373.    Harassment is the "most common types of torture"[192].

2374.    Defendants' deliberate harassment of Plaintiff is everyday conduct since about 2013, and the amount of relevant events and accumulated effects of their 13 years long and ongoing conduct is significant. Even facially neutral events are relevant because, for example, they are based on Plaintiff's protected characteristics, or are caused by Defendants' persons who had made derogatory comments about him in the past.[193]

---

191 *Technological Basics of EEG Recording and Operation of Apparatus*, Priyanka A. Abhang et al, in Introduction to EEG- and Speech-Based Emotion Recognition. 2016. Note that the frequency of induced current has significant impact on the function by itself. See also *Chapter 12: Electrical Stimulation of Neural Tissues: The Fundamentals*, Janardan Vaidyanathan. National Institute of Industrial Engineering, Mumbai, India ("The resting membrane potential [of a neuron] is approximately 70 mV (millivolts)".)

192 *Classifying the Torture Experiences of Refugees Living in the United States*, Hooberman, Rosenfeld, Lhewa, Rasmussen, and Keller, Journal of Interpersonal Violence, Volume 22 Number 1, January 2007 1-16 ("reported by 291 of 325 participants, 89.5%").

193 ""Facially []neutral incidents may be included... among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex.." Id. At 378.." Moll v. Telesector Resources Group, Inc., Nos. 12-4688-cv, 13-0918-cv (2d Cir. 2014). "[P]rior derogatory comments by a co-worker may permit an inference that further abusive treatment by

2375.    Defendants explicitly stated they want to 'harass', 'break', 'stop', and 'destroy' Plaintiff. As part of Defendants' efforts in that regard they act to weaken Plaintiff physically (by sleep deprivation, sabotage of his access to healthcare services, and more); to obstruct him and his activities in retaliation to his petitions, lawful collection of evidence and similar (by interruption, evasion, punishment – DE and sound attacks on Plaintiff, assaults, and more); to intimidate him with demonstration that Defendants have full control over him (including but not limited to, by controlling his environment and utilities: hot water, heating, Internet, access and control over Plaintiff's accounts with applications as Viber, Skype, Facebook, Gmail, Yahoo; his job and business prospects; ability to cause and causing him harm; to ostracize him, policy of preventing, or ignoring his petitions, subjecting him to messaging campaign to chill him out ("We won't stop." "You can't stop us." and more. See ECF, No. 8-1, 14)) and more.

2376.    The control of Plaintiff's environment, including '[t]reatment, rewards, punishment, and anything else associated' with him, is essential in Defendants' efforts to radicalize and entrap him, and accords with the US policies in regards to persons in its control.[194]

2377.    Defendants were explicit about their intention to make Plaintiff hostile for example on 10/8/2016 "Keep him hostile."

2378.    8/13/2023 Sunday, 9:17AM-9:24AM Defendants' man in ap. B2 "Hostile to police.. I police.. We suppress… Kalin…"

2379.    7/7/2024, after his cousin in Bulgaria provoked Plaintiff in regards to the US Supreme court decision about President's immunity, and about European Union, Plaintiff went to work outside. Defendants came next to him and commented "I expected (him) hostile but he was kind… activated…" "Kalin.." "Working on lap[top]."

2380.    Defendants act with both knowledge about the physical and mental suffering and pain caused to Plaintiff due to their activities, and with the specific intent to cause pain and suffering as punishment for his legal actions and to coerce him to stop. Their statements demonstrate they

---

the same person was motivated by the same []bias manifested in the earlier comments." *Richardson v. Manhattan N.Y. City Transit Auth.*, No. 17-2281 (Summary Order) (2d Cir. 2018) (quoting *Raniola v. Bratton*, 243 F.3d 610, 622 (2d Cir. 2001)).

194 "To effectively carry out its intelligence exploitation mission, TF 170 and its interagency collaborators need to be in full control of the detainees' environment. Treatment, rewards, punishment, and anything else associated with a detainee should be centrally orchestrated by the debriefing team responsible for obtaining information from that detainee." *Inquiry Into the Treatment of Detainees in U.S. Custody*. Report of the Committee on Armed Services, United States Senate, Nov. 20, 2008

consciously desire the effects – Plaintiff's suffering and harm. Even if some of them have applied techniques without that specific desire, they have knowledge, and it is reasonable and easy to predict that the conduct would cause suffering and paint to Plaintiff.

2381. Defendants' specific intent is shown in (1) the explicit statements in regard Defendants' intention to 'torture', 'terrorize', 'punish', 'trigger', 'harass', 'press' Plaintiff; (2) Defendants' demonstrative conduct as for example their demonstrative surveillance on Plaintiff (see effects of monitoring on behavior), sharing the derogatory and false information about Plaintiff as 'Bulgarian criminal, spy, terrorist, fagot' hitting police, and more; (3) threats to Plaintiff that Defendants would kill him ("kill him", 'he won't survive', 'we don't forget'…), put him in hospital, or more. Defendants apparently are able to do that – see for example the UN Human Rights Committee suggestions to the USA Reports under CCPR in regards use of lethal force by law enforcement in the USA; (4) Defendants knowledge about the effects of their activities on Plaintiff either through their surveillance and/or Plaintiff's complaints (see Teaneck Police officers demonstrating knowledge about Plaintiff's "pain", "suffering" on 1/20/2023); (5) Defendants do not stop those activities with knowledge of the harm on Plaintiff, and act deliberately to cause the harm. (Deliberate blindness).

2382. Due to the accumulation effect (continuation for many years), and the combination effect (enhancement of the experienced pain by interference of effects from various techniques) the pain or suffering Defendants cause to Plaintiff is significant.

2383. The result of all Defendants behaviors mentioned above is very hostile to Plaintiff environment based on discrimination, retaliation and malice.

2384. Defendants' harassment of Plaintiff is planned and coordinated: different parties at different locations know Plaintiff (name, ethnicity, how he looks, and more), and pursue the same goals – to disturb, stress him out, oppress him. That clearly shows the dissemination of Plaintiff's

information and Defendants' preparations in advance – they say phrases and words in Bulgarian, follow common narratives about him, they play prepared psychological games ('mocking game', ' turn-off game', they follow 'storyboards' – see explicit statement in that regard by Teaneck police officers and Defendants' agents on 1/20/2023); the participants have 'roles', and more.

2385.   3/20/2024 Defendants' man mocked Heart Sutra. Plaintiff saw that Jamaican food truck was parked under is windows on Cedar lane. The man continued "Don't worry. Little cosplay. That's all." "This is [] he is on."

2386.   10/14/2024, Plaintiff was working on UN complaint materials when at 4:43PM Defendants in building corridor "He made a move." "Play the game." Dula in ap. B2 quietly commented "He didn't believe."

2387.   10/31/2024, 1:36PM Plaintiff was working on DE attacks when two Defendants men walking on Cedar lane came under his windows "We got to push him back. Take that shit back." "Lets play."

2388.   In addition Defendants' harassment shows their organization – in a few instances there were Defendants' agents who supervise the activities, comment events and/or give instructions to the parties (as for example to 'start', 'stop', 'tease', 'mock', 'push' or 'harass' Plaintiff).

2389.   Defendants' harassment have apparent pattern. (1) The events are in close proximity to Plaintiff regardless of the location (including in Bulgaria (see ECF No.8-1.C.7)). Defendants secure that by getting access to rooms or offices next to Plaintiff in Englewood Cliff, NJ (see ECF No.8-2 at 2139-2140), in Manhattan, NYC (Gyro NY (see his litigation against Gyro et al.), Derek Smith Law Group New York (ECF No.8-2 at 2107), Wishniewski office (ECF No.8-2 at 2109)), neighboring apartments (ECF No.8-1.C.4), and more (ECF No.8-2.E.3).

2390.   (2) In every instance Defendants identify Plaintiff as the target either verbally, through behavioral clues, or both. Apart from saying his name ('Kalin') they have used key words including Plaintiff's ethnicity ('Bulgarian'); words related to his professional career ('Gyro', 'East House' – both were his employers, Gyro also in its quality as a party in Dimitrov v. Gyro et al., 18-cv-3600, S.D.N.Y.), or profession ('advertising', 'Photoshop', 'designer'). Defendants have made some words 'key words' by priming Plaintiff through repetition and conditioning, such as for

example 'police (pursue him)', 'press/push him', 'stop', 'fagot' (the use of 'fagot' significantly decreased after Plaintiff started to regularly document events), and more. They have used also words and phrases in Bulgarian (for example Teaneck police officers on 10/13/2013 at 2:30AM stated "Ние говорим за теб [We're talking about you]." ECF No.8-1 at 34), and have used information from the surveillance of Plaintiff to commented his recent activities and more in demonstration that among other things they talk about him (see ECF No.8-1 at 119 et seq.). Behavioral clues include talking to Plaintiff, looking at him while talking between themselves, pointing or turning toward him, following him, timing their speech to be only next to him, and more. A few of Plaintiff's identification clues, both verbal and behavioral, are context dependent.

2391. (3) Defendants identify themselves as either government agents ('police', 'FBI', 'agents'), or as acting in coordination with the government. Such demonstration became more subtle since Plaintiff started to document events regularly.

**(1) Defendants are provocatively explicit about the harassment of Plaintiff, and their intention to destroy, break, crush, and ruin him.**

2392. Defendants are explicit about terrorizing, mocking, harassing, teasing, pushing, and triggering Plaintiff. As for example on 3/30/2016 ("How we terrorize him?" "Mock. Mock."); 4/20/2017 ("Start pushing harder.." "Harass him.".. "Pushing Bulgarian []." "Bulgarian can't push that."..."We have to push him.".. "We'll have to get him."); on 4/21/2017 ("Tease him." "Bulgarian qualified that.".. "Crush (him)." "Have the police to push."); 5/10/2017 ("Can I push? Can I stop?".. "We all destroy him."); 5/14/2017 ("Punish him.".. "We compare little legal push." "We get slow his power. Always trigger him.".. "We'll get him."); 5/20/2017 ("Push him till (death)."); 4/21/2018 ("Torture him"); 3/6/2020 (at 1:42PM, under Plaintiff's windows "Punish him." "Fights police."); 8/15/2020 (knocks and comment in ap.A3 "Have to push." And later under Plaintiff's windows "Figure how to push [him]."); on 4/6/2021 (at 6:32PM, corridor "Figure how to push him."); on 7/11/2021 (Plaintiff was working on case materials persons under

his windows "We have to push." Two hours later they returned "Have to punish [him]. We don't forget." and at 10:59PM "Can't believe we fight []."); or on 8/27/2021 (at 12:50AM persons outside of Plaintiff's building "Fight the Bulgarian one", a bit later noise started from A3). ECF No.8-1 at 1823.

(i) Defendants overtly talk about the harassment of Plaintiff since 9/7/2012.

2393.    Since 2012 Defendants and parties in concert repeat the same message(s) or directions to harass Plaintiff, as for example Teaneck police officers (10/13/2013, 7/28/2022, 1/20/2023, ), the USPS carrier to Plaintiff's building (for example on 7/14/2021), Defendants in ap. A1, A3, A6, B2, including Marlene Dula and Ralph Pimienta, and more. They act in apparent coordination, and among other things demonstrate the surveillance on Plaintiff (as for example on 5/17/2017).

2394.    After Plaintiff's notice of claims (11/10-11/11/2022) Defendants' demonstrative conduct included overt statements that "Police harass Kalin." (11/21/2022), "Let police harass to get him." (12/18/2022), "Tell police to stop that.".. "Can't harass." (8/30/2024).

2395.    In regards to who is behind Plaintiff's harassment Defendants said also that "New York harass." 11/14/2021; when Plaintiff was at the FBI New York Field Office building Defendants said it is "Global harass." 11/10/2022; Dula implied that it is the FBI 2/21/2024; Defendants talked about the FBI, the "agents" and said that they "harass" on 7/16/2024; Dula again "FBI to stop… Can't harass." 10/6/2024; or "Kalin believe FBI []… We do harass." 3/29/2025.

2396.    Defendants have used cognitive dissonance and provoked Plaintiff by saying that they 'can't harass' while harassing him, as for example on 12/23/2017 (knocks, turned off his lights), 1/25/2018 (knocked), 7/14/2021, 9/9/2021, 1/13/2024, 3/8/2024 (hammered), 5/14/2024 (awakened Plaintiff with a call), 7/1/2024 (knocked, played music), 7/27/2024 (talking loud), or on 3/16/2025 (loud knocks).

2397.    See examples bellow.

2398.    9/7/2012, "Threat to believe." "Harass." ECF no.8-1 at 844.

2399.    10/13/2013 (police officers under Plaintiff's windows), 6/17/2015, 10:15PM ("Can't harass him."), 4/20/2017 ("Start pushing harder.." "Harass him."), 4/21/2017 ("Can't harass him. Stop []."), 11/8/2017 ("Harass. Let's push." "Harass him."), 12/23/2017 (Manhattan, Political Forum, after harassing Plaintiff: "We can't harass him."), 1/12/2018, 1/25/2018, 12/5/2018, 9/7/2019 (in A3), 10/23/2019 ("Happy harasser" Port Authority Midtown), 12/5/2019, 12/15/2019, 3/25/2020 (in A3) 5/30/2020, 6/23/2020 ("Harass.".. "Harass to get []." corridor), 9/22/2020 (in A3), 10/1/2020, 1/2/2021 (in A3), 1/9/2021, 1/18/2021, 2/17/2021 ("Can't believe we lost. Can't harass." in building's corridor, and later in ap.A3 "harass." "Gyro done [that]."), 2/24/2021 (in ap.G2 "Destroying []. Can't harass."), 4/25/2021 (in A3), 6/3/2021 (in B2), and 7/14/2021 (USPS woman carrier "We can't harass him."). ECF No.8-1 at 825.

2400.    5/17/2017 at about 6:28PM when Plaintiff got out of his apartment Defendants in building's corridor talked about harassing him in order "to get arrest." He left the building and Defendants' woman announced "They harass. Game on." others followed Plaintiff on the streets "Kalin..." "Make a proof." ECF No.8-1 at 112.

2401.    12/23/2017, after Plaintiff spoke with relatives in Bulgaria about American exceptionalism as interesting subject to analyze. Under his windows Defendants' person commented: "We're going to suppress that." Plaintiff went in Manhattan for a Political Forum meeting on the subject of American exceptionalism. At the meeting Plaintiff was ignored. After that Plaintiff went to a restaurant with the group, and while he visited the restroom there one of the group turned his light off, knocked on the door, and commented: "We can't harass him." ECF No.8-2 at 2156.

2402.    1/25/2018, 8AM Plaintiff was writing a note about the strong knocks from ap.B2 a bit earlier when ap.B2 knocked on his ceiling and commented "Can harass." ECF No.8-1 at 455.

2403.    7/30/2018 Monday, 12:24AM "Ignoring us." (after a slam from ap.G2 while Plaintiff was watching a movie), at 2:32PM "Can't stop [us]." (comment outside after slams and knocks from G2), at about 6:50PM "Harass him." (outside the building, followed knocks from ap.G2 and ap.B2 while Plaintiff worked on Summons for his case against Gyro. Last knock for the day was at 11:14PM by G2.); ECF No.8-1 at 165.

2404.    3/6/2020, while Plaintiff talked with Verizon Defendants commented "Bet Kalini obey." "Story board. Harass []." "Have Kalin []." "He is convincing. No 'I have been punished', getting crazy." ECF No.8-2 at 2078.

2405.    6/23/2020, after 5:34PM Defendants in building's corridor talked about Plaintiff "Do not arrest." "Harass.".. "Harass to get []." ECF No.8-1 at 58.

2406.    9/22/2020, 12:58PM Defendants in ap.A3 knocked on his wall, Plaintiff reacted "I suspect you are participant [in the harassment]. Knocks on the wall are not usual". After that when Plaintiff was in the bathroom there were knocks, pipe bangs, and Defendants' man in ap.A3 stated "Harass.." ECF No.8-1 at 503.

2407.    4/25/2021, 11:55PM Plaintiff was in the bathroom when Defendants in ap.A3 knocked next to him. Plaintiff "Stop this." A man in ap.A3 responded "harass". ECF No.8-1 at 524.

2408.    6/3/2021, about 12:55AM, a man in ap.B2 "We need to push." (After that for about 10 minutes there were repeating peaks of a RF beam from ap.B2 (>10 mW/m2)), "Harass" (12:15PM same day with a knock and later a slam from B2), and "We lost." (the man in ap.B2 at 12:50PM while Plaintiff was working on a legal material) ECF No.8-1 at 210.

2409.    A repair in ap.A1 was used to "harass" Plaintiff. For example on 6/3/2021, 10:46AM there were several slams from A1, repeated at 11:55AM and 12:12PM. At 12:15PM ap.B2 knocked on Plaintiff's ceiling and talked to "harass" him. Then at 12:42PM – a slam in B2.

12:50PM a man in ap.B2 commented: "We lost." There were knocks from ap.A3 at 4:06PM and 4:31PM (a strong knock). At 4:40PM Ralph and Cesar talked in building's corridor in Spanish. ECF No.8-1 at 571.

2410. On 7/14/2021 at 3:52PM a USPS woman carrier talked with Defendants woman on speaker about Plaintiff ("Kalin") saying among other things "We can't harass him." ECF No.8-1 at 66.

2411. 9/9/2021 Thursday at 11:46AM Plaintiff's phone rang. Defendants in ap.B2 commented "Can't harass." Later Plaintiff received a letter from JC Realty containing the receipt from 9/3 showing $25 remain to be paid (see more at 2060). While Plaintiff was showing the letter to his camera in ap.B2 commented "We can not push this. We can not start." ECF No.8-1 at 253.

2412. 10/18/2021 Monday, 11:29AM Defendants building's corridor "Harass, harass to forget." Followed a few slams in the corridor. ECF No.8-2 at 2001.

2413. 11/14/2021, after Plaintiff worked on counterterrorism materials Defendants (including Ralph Pimienta and Cesar Naranjo) talked about him under his windows about the FBI, CIA, Bulgarian Ministry of internal affairs, and about his harassment: "Consider we arrest him. So Kalin []. "Didn't arrest that. New York harass." ECF no.8-1 at 74.

2414. On 12/6/2021 Monday at 6:45AM when Plaintiff started working on ap.A3 in this very document there was a pipe bang from A3. At 6:57AM ap.A3 knocked, at 6:59AM there were unusual knocks close to Plaintiff's windows and a woman commented "We can not even harass." ECF No.8-1 at 550

2415. On 12/17/2021 Friday, 11:33AM students under Plaintiff's windows commented "Can't harass."after he awakened and turned off his alarm. ECF No.8-1 at 952.

2416. 7/12/2022, students following Plaintiff on the street "Don't stop harass []." ECF No.8-2 at 2529. "Can we harass the Bulgarian?" Id. at 2543.

2417. 7/28/2022, Teaneck Police officer sat on a close by bench talking with a little girl and a man "Don't harass that []." ECF No.8-2 at 2950.

2418. 8/1/2022, students in Votee Park, Teaneck, NJ. "Harass. Don't have victims." ECF No.8-2 at 3102.

2419. 8/30/2022 Tuesday, 10:15AM Plaintiff was feeling rays at his kidneys when 2 women talked in building's corridor "Don't harass him. I've got to []. Don't harass him." Plaintiff detected rays from B2, G level and A3. ECF No.8-2 at 4023.

2420. 9/13/2022, 11:15PM persons in front of the pub on Cedar lane "Can't harass the Bulgarian." After that they (a woman and 2 men) walked on Cedar lane but when Plaintiff was ready to make photos started walking very fast and turned right. ECF No.8-2 at 4599.

2421. 10/14/2022 all events are relevant. See ECF No.8-2 at 5514 *et seq.* (for example at 3:42PM a group of mid school boys and a girl yelled "Get out of my property." then entered the building, yelled inside, and got upstairs. Defendants in ap.B1 "Do harass him. Don't let [].").

2422. 11/10/2022 at the FBI New York Field Office building in regards to Plaintiff "Global harass." "Glad to harass." Man on speaker "How to [harass]?" "All burning campaign. But identity have this." ECF No.8-2.G.

2423. 11/21/2022, Defendants in ap.B2 talked about Plaintiff and his notices "Arrest []... Can't stop harassing." ECF No.8-2 at 5954. "Stop completely. That has to []." Dula: "Harass him to let him (put). Use this." Id at 5958. Dula: "Police harass Kalin. Няма лошо ['Nothing bad is done' in Bulgarian]." Id at 5959.

2424. 12/14/2022, in corridor Defendants' Loomer "How I to push Kalin?".. Ralph "That was not Kalin." Dula "Have to talk. Harass him." ECF No.8-2 at 5977.

2425.    12/18/2022, Defendants near Plaintiff "We don't do stop.".. "Let police harass to get him." ECF No.8-2 at 5981.

2426.    1/20/2023 (about two months after Plaintiff filed his Notice of claims) Defendants, including uniform Teaneck police officers, planned to 'fight' Plaintiff. "Bullet. Then harass." "To get him stop." … ECF no.8-1 at 81 *et seq.*.

2427.    2/12/2023, Defendants in ap.A3 "Can't harass. [] Kalin." "We can not stop." ECF No.8-2 at 6337.

2428.    3/13/2023, about 7:45PM Plaintiff was working on recording 2/17/23 when Dula in ap.B2 commented "He wants to destroy us." Plaintiff started recording with Fusion. Dula and a man in ap.B2 reacted "[] can't do it. Harass." ECF No.8-2 at 6827.

2429.    5/24/2023 Wednesday 11:44AM loud students under Plaintiff's windows "harass… will not stop." School girl screamed 11:45AM, walking on rocks under the windows. ECF No.8-2 at 7797.

2430.    6/17/2023 Saturday, 3:37PM 5 students sat next to Plaintiff on benches next to him, yelled then commented 'harass him'. ECF No.8-2 at 8236.

2431.    8/10/2023 Thursday, 10:21PM in front of pub talked about "Kalin" and "harass". 10:49PM "Fight here []" "Shot." "Kalin []."

2432.    8/19/2023 Saturday, 8:57PM persons under and near Plaintiff's windows "Hope Kalin heard." "We don't harass." "Don't believe." 8:58PM "Threat to kill."

2433.    9/13/2023 Wednesday12:24PM Plaintiff was working on SONY video, the same students under Plaintiff's windows on Cedar lane "fight" and later "Don't harass." Man in blue t-shirt and shorts "One person. They got nothing… No money…" Plaintiff left his window open students loud "The window, the window…" Teaneck Police car left. Plaintiff noticed van with workers, G level door was opened. The man in blue returned, but hide when Plaintiff got to the windows with his Canon.

2434.    9/24/2023 Sunday, 8:52PM Defendants' man in ap. B2 "We lost. Kalin []." he continue – sounded again as on loudspeaker. "Harass…"

2435.    9/28/2023 Thursday, 9:07PM Dula commented "He wants to stop." and "firearms. That could bring respect." 9:11PM "Can't harass… Can't stop… Kalin stopped." later "We push.. I don't believe. Kalin won't forget. Tell Kalin … Bulgarian []…. Arrest."

2436.    10/14/2023 Saturday, about 6:00PM while Plaintiff was taking a bath USPS person talked in corridor "Harass him." A3 started knocking light but right next to Plaintiff, when Plaintiff at one point knocked in response there was exchange of knocks.

2437.    1/2/2024, 4:37PM persons in corridor "Fucker lived []." "Total harassment." After that Emily (?) entered ap.A6 while the young man in ap.A3.

2438.    1/5/2024, 12:18PM while Plaintiff was working on exhibit – graphic of hammering two women with a child cart talked under Plaintiff's windows for a while "Harass… Can't stop.." "Apologize."

2439.    1/8/2024, before 10:58AM Ralph loud in building's corridor "He don't believe we stopped." "He hit the government. Have to go. In about a week they will decide." A woman repeated at least 2 times Plaintiff's name "Kalin". Ralph talked lout about "shoot[ing Plaintiff]" "He will never stop." "Harass then." "Do you think he heard this?" After talking repeated knocks in building's corridor.

2440.    1/12/2024, 1:29AM Thai-woman yelling under Plaintiff's windows on Red Road "Fight.. harass … to stop…" Man commented "Have to stop."

2441.    1/13/2024, 3:39AM detected 34419 mW/m$^2$ from B2. Defendants' man in B2 commented "Can't harass."

2442.    1/26/2024, 11:53PM after Plaintiff was working on transcript 1/8/2024 Defendants' woman under his windows on Cedar lane "Can't harass."

2443.    2/2/2024, 12:01PM while Plaintiff was in toilet Thai woman talked "Can't harass." and stopped talking when he moved Olympus recorder to record her.

2444.    2/9/2024, 6:06PM Plaintiff was working on investigation when Dula in B2 repeated exactly what Plaintiff was writing then "push, press…" then talked about "harass[ment]". 6:31PM Dula "He… to stop." and hit the Plaintiff's ceiling.

2445.    2/21/2024, 8:48PM Dula on recording played on loudspeakers in B2 "FBI… Didn't stop. … Can't harass now."

2446.    2/23/2024, 1:10PM Defendants man in B2 "Can't harass."

2447.    3/5/2024, about 11:20AM after hearing men under the windows talking "Can't harass him." Plaintiff started Olympus. They left.

2448.    3/8/2024, 1:03AM after Plaintiff challenged in his apartment "I thought you stopped." Defendants in ap. B2 hammered on Plaintiff's ceiling. Plaintiff responded "I believe you already. You stopped." 1:09AM Defendants man in G2 commented "Really can't harass."

2449.    3/12/2024, 1:33PM Defendants woman in A3 (or B2 talking above A3) talked not loud "Can't believe… to stop." Then talked about the "FBI". Then at 1:35PM "Kalin… Can't (harass)."

2450.    3/23/2024, 6:15PM Defendants man from ap.B2 talked in building's corridor. USPS carrier also talked. "We can't harass."

2451.    4/27/2024, 3:58PM when Plaintiff started working on advertising materials Defendants women talked next to his windows on Cedar lane "Fight… Harassing []." "We all []."

2452.    5/3/2024, about 11PM Defendants in front of the pub on Cedar lane "Can't stop Kalin… Harass []." 11:23PM "We can't stop."

2453.    5/11/2024, 10:52PM Defendants in ap. B2 hammered on Plaintiff's ceiling three serials awakening him. Defendants' man on speaker in B2 commented "He didn't believe.. We harass. He wants [] to stop."

2454.    5/13/2024, 9:44AM before the truck left Defendants woman under the windows on Cedar lane "Can't stop. Have to harass."

2455.    5/14/2024, about 12PM Defendants awakened Plaintiff with a call (no voice mail left). Defendants in B2 commented "Can't harass him." Previous day Plaintiff watched AG and FBI hearing about AI, threats using texts, and social media.

2456.    5/19/2024, 12:01AM Defendants in ap. B2 hammered on Plaintiff's ceiling. Not loud. Man on speaker ongoing talking in B2. 12:43AM Dula? In B2 "What Kalin did.. harassing…" ongoing monologue. 1:00AM Defendants in B2 again talked about "harassing". Talking continued till about 1:10AM.

2457.    5/20/2024, 9:50PM Defendants men "Do you need backup?" when Plaintiff got in front of his building entrance. "They want to stop." "Can't harass… hang himself."

2458.    6/15/2024, 12:19AM Defendants' man continued talking about Plaintiff "Kalin.." 12:45AM "We can't harass."

2459.    6/16/2024, 11:01PM Plaintiff worked on the bench at the buss stop on Cedar lane near his apartment. 11:38PM men in front of pub commented "Surveil.." "Harass.." "They are not sure if (he records)."

2460.    6/23/2024, 6:57PM while Plaintiff was working on EF from ap. B2 in 2022 Defendants woman on Cedar lane under Plaintiff's windows "Have to stop that." 7:19PM (same?) woman in building corridor "Kalin []." A man responded "Ah?" No more talking. 7:31PM Defendants' woman came again under Plaintiff's windows on Cedar lane commented getting away "We can't harass him."

2461.  6/28/2024, about 11AM Defendants' woman on speaker "Can't stop… Harass." from Yola direction. After Plaintiff started Tascam DR 07 talking stopped.

2462.  6/30/2024, 6:50PM while Plaintiff was in toilet Defendants' man near his window "We have to stop that. Harass. Have to stop."

2463.  7/1/2024, till 9AM Defendants in G2 knocked on the floor right under Plaintiff, Defendants in B2 played on loudspeaker a recording. Defendants woman talked next to Plaintiff's windows "Fight." and a bit later "Don't harass. We can't harass."

2464.  7/2/2024 Two Defendants' women passing Plaintiff in the park "Kalin… Can't harass." Plaintiff moved to a table under a ceiling next to building at center of the park. About 5 minutes later the whole football team came at the tables. Very loud. About 40 minutes later their coach came talked "Alone he can be harmed." They left leaving some stuff. On nearby table there were four Spanish speaking persons. They became very loud and played music very loud. After Plaintiff made a video of them they left. About an hour later the football coach and three men talked behind Plaintiff that "he has no protection. No protection." They stayed behind Plaintiff for a while, then went to the football field.

2465.  7/6/2024, 11:25PM Defendants' man in ap.A6 directed "State that Kalin have it." 11:44PM Defendants in front of the pub "We can't harass."

2466.  7/8/2024, 11:30PM Plaintiff got on Broad street and worked on Nuisance but sitting on the grass as there were 2 girls on the benches where he usually works. And it is related to the street light for his keyboard. 11:37PM the girls they talked quietly about Plaintiff "Kalin.. can't harass." 11:40PM a bit louder " bullet…" "Kalin didn't [] stop. Bye, bye." 11:41PM "I… stop." "Won't stop." 11:53PM "Kalin…" 11:54PM "All Teaneck is soo []. Soo []. Kalin …"

2467.  7/9/2024, 12:39PM Defendants' women at Yola teased "Can't harass."

2468.  7/12/2024, 11:26PM in corridor Defendants continue "Can't harass." "Back up."

2469.  7/13/2024, 10:40AM Dula talked on speaker in B2 ongoing monologue "Can't harass." 10:49AM "To stop… He didn't believe." 10:48AM "We lost. Can't believe." 11:21AM Defendants in B2 not loud "Completely out of character. Kalin…" Defendants man under Plaintiff's windows "Stop there and harass." 1:10PM after Plaintiff talked with Ognian, his cousin in Bulgaria, about police deterrence among other things Defendants near Plaintiff's windows commented "Can't harass."

2470.  7/16/2024, 3:36PM-4:16PM the scheduled for the same day Best Pest's visit to sanitize the building. The super Cesar Naranjo and the other parties talked near Plaintiff's apartment about him before, during and after the terminators' visit in his apartment talked about the "FBI", the "agents", talked about "caus[ing] disruption", and made explicit statements that they "harass".

2471.  7/22/2024, 10:00PM three Defendants men talked in front of the entrance "Don't leave the building." "We didn't even harass."

2472.  7/23/2024, 10:46PM Plaintiff was still working on transcript of 7/16/2024 Defendants commented under the windows "Kalin… Can't harass."

2473.  7/27/2024, group was loud under Plaintiff's windows "We can't protect him." Plaintiff did not react and they commented "Can't harass."

2474.  7/28/2024, 12:34AM Defendants stayed under Plaintiff's windows on Cedar lane next to car playing loud music. They laughed loud, screamed occasionally, shouted from time to time ("Fucker.. Harass..") at least till about when Defendants' men in front of the pub commented "We can not fight. Kalin have …"

2475.  8/11/202411:26AM Dula(?) in ap. B2 sounding as on loudspeakers "Completely stop that. Harass…"

2476.  8/14/2024, 3:54PM Defendants' man now in a call commented "Can't harass."
2477.  8/15/2024, 2:52PM USPS carrier entered the building corridor talking "We can not stop. Harass." After Plaintiff started Olympus "Can't stop." and left the building.
2478.  8/17/2024, 10:06PM Defendants woman under Plaintiff's windows talked not loud "We can't harass."
2479.  8/29/2024, 6PM he kept talking "Kalin… police…" 6:07PM after woman (Christine?) talked about "harass[ment]", the man "Have to really stop."
2480.  8/30/2024, 12:57PM Plaintiff detected 22-32 V/m on the floor behind desk varying. In front of the mirror floor was charged 54-56 V/m varying, 15 cm up 22-36 V/m varying. Defendants' man (Jason from ap. G2) under Plaintiff's windows "If you want to stop harassment []." 7:56PM Defendants' woman under Plaintiff's windows "Tell police to stop that." Same woman has been under windows a few times earlier. She entered the building after that. 8:01PM Defendants woman at distance from the windows "Can't harass."
2481.  8/31/2024, since about 10AM Defendants' man in B2 talked "Kalin…" He was still on 11:27AM "We can't harass." 11:31AM ".. to stop Kalin… Harass… to stop."
2482.  9/6/2024, 7:26PM Christine "Can't harass him."
2483.  9/8/2024, 11:20AM Defendants' Dula in ap. B2 "We can't harass. Kalin []."
2484.  9/9/2024, about 3:20PM Cesar Naranjo, super, entered ap. A3. "[] can't hear." 3:25PM "We harass.." 5:18PM students came under the windows and shouted, then quietly commented "We don't harass." After that they screamed and left.
2485.  9/11/2024, about 11:20AM group of students came under Plaintiff's windows, stayed for a few minutes there. "He wants to destroy us… Harass."
2486.  9/23/2024, 11:38AM the students returned under the windows and challenged "We are fighting." 11:41AM students "Have to stop." "We []." 11:44AM Defendants man in ap. B2 talked among other things "And we harass."
2487.  9/24/2024, 1:16PM students came and stayed under Plaintiff's windows at the corner od Cedar lane and R Road – evading the camera. Shouted "Noo" Talked about "harass[ment]" of Plaintiff … "Kalin.."
2488.  9/26/2024, 11:34AM two students came under Plaintiff's windows one said loud "Mey day. What do you want?" He was loud only then. 11:36AM they returned under the windows not loud talking "Harass." 11:57AM school girls came "Fight Kalin. Have to stop."
2489.  9/27/2024, about 2:26PM when Plaintiff was working in a letter about wrongful activities of the FBI / JTTF, Christine, Jamaican food, loud talking with Defendants woman "Let me go." 3:18PM students came under Plaintiff's windows walking on the rocks (evading camera view,) challenged "Charging convenient people." 3:20PM the same students returned and shouted under the windows, then not loud "Harass []." 3:21PM Christine "You want to stop."3:30PM Defendants woman talked on phone about Plaintiff "Kalin.." students stayed and walked on rocks again. 3:51PM school boy under Plaintiff's windows "We won't stop."
2490.  9/28/2024, 11:15AM Defendants man in B2 on loudspeaker "We won't harass.." 11:32AM he kept talking "Arrest him. But we won't stop." and at 11:33AM "Kalin…"
2491.  10/6/2024, Defendants in B2 talked. Dula "Kalin.." 9:55AM "We don't stop that." … "FBI to stop… Can't harass." "Say Kalin… You say …" 9:58AM Dula "Kalin.." 9:59AM Defendants man in B2 "Set up." 10AM Dula "Kalin set up []."
2492.  10/17/2024, 11:40AM students came under Plaintiff's windows and shouted while he was in toilet. Then talked not loud "Harass." Defendants man said to them "Move it up." They left. But again shouted under the windows. A bit later at distance "Fagot."
2493.  10/21/2024, 1:03PM Defendants' man in B2 "Can't harass." 9:56PM Defendants woman on Cedar lane under the windows "Don't harass." Defendants man and woman in building

corridor "He is still losing.." Plaintiff was preparing file for video transcript of 9/7/2012 recording. 9:58PM Defendants "Can't believe we can't stop (him)."

2494.   10/27/2024, 10:03AM Defendants man next to Plaintiff's windows "Can't harass."

2495.   12/11/2024, 11:40AM very loud group of students came under Plaintiff's windows. A girl screamed. A bit later a few returned under the windows talking about the "harassment".

2496.   1/3/2025, 6:17AM Defendants' man in B2 talked "Can't provoke [] stop... We can't harass."

2497.   1/21/2025, 10:48PM Dula and man in B2 "He didn't believe… Harass. Can't stop… Kalin…" mixed with unintelligible talking. Talking continued till 11:30PM.

2498.   2/3/2025, 12:11PM Plaintiff made on camera (Blue Iris) visible the distance between GQ and his phone. Defendants man in ap. B2 commented quietly "We can't harass." 12:39PM Defendants commented "He don't get it. We have to push."

2499.   2/6/2025, 9:22PM Dula in ap. B2 commented "We can not harass him" 9:27PM Defendants knocked on the pipe passing through Plaintiff's apartment. 9:38PM Defendants in B2 hammered.9:51PM B2 knocked.

2500.   2/7/2025, 10:57PM Defendants' woman talked on Cedar lane at distance "Can't harass." Additional to the docket work Plaintiff then researched scientific publications about dental crowns. Removal of portion of the nearby tooth has never been mentioned in any of them.

2501.   2/18/2025, about 9:50PM while Plaintiff was working on the complaint – torture – Defendants talked on loudspeaker for a while in ap. B2. At about 9:56PM "harass"… 9:58PM "Kalin.." 10:04PM "Can't stop. Can't believe it." 10:18PM "Kalin.." "We lost. He don't believe."

2502.   2/22/2025, about 12:30AM while Plaintiff was in toilet Defendants' man and woman talked at some distance "We can't harass him." About 7:00AM Defendants' man on Cedar lane commented "We harass."

2503.   3/4/2025, 12:02PM man in B2 "… to stop.. If Bulgarian stops we can stop." Defendants in B2 knocked. "Stop." 12:09PM "Can't stop. We [] figure out.." 12:12PM "Kalin..." 12:14PM "We can not stop harassing… Stop Kalin… We have.." Volume increased – moved above toilet. 12:25PM the loudspeaker moved above the room after Plaintiff downloaded multiple comments on UN CCPR, Articles 9, 12, 17 and more, then Plaintiff started playing chess online. 12:26PM again above the toilet "Kalin.. stopping…"

2504.   3/9/2025, about 9:30AM Dula(?) under Plaintiff's windows "We repeat we lost, we lost.. Guy hear that… Why not arrest him?" "Kalin fights []." 9:39AM after a pause woman "Harass.."

2505.   3/16/2025, 10:49AM Dula in B2 (Plaintiff's window open) "Can't harass. Stop." Followed loud knocks on the pipe passing through Plaintiff's room.

2506.   3/18/2025, 9:02AM awakened Plaintiff detected about 260 V/m on his hands max. Defendants' man in B2 commented "We can't harass. Can't believe." talking continued – recording? Plaintiff recited read Buddhism. 9:43AM B2: "Kalin…" and knocked. 9:57AM man in B2 "Kalin []." 10AM B2 Dula? "Stop to harass []. We don't stop."

2507.   3/22/2025, 3:59AM Defendants' man in B2 started talking "Harass… Gyro…"

2508.   3/29/2025, 2:55PM Defendants in B2 playing on loudspeaker "Kalin believe FBI…" "Know Bulgarian… Bulgarian… We do harass." Talking continue.

2509.   And more.

(ii) Defendants also talked overtly about destroying Plaintiff.

2510.    Although not that frequent as 'harassment' Defendants overtly talked they want to destroy

Plaintiff: "Destroy one Bulgarian." 2/28/2017; "We all destroy him." 5/10/2017 (among other

things demonstrating the coordination between parties); "To destroy (Kalin)." "Can't survive

that." 11/21/2022; "Have to shoot. Torture him." "Destroy him." 7/4/2024; "We got to destroy

him." 3/10/2025, and more.

2511.    Defendants were also explicit that they want to destroy Plaintiff's work on his legal case(s)

against them as for example on 4/29/2023, 3/28/2024, 7/4/2024, or 10/1/2024.

2512.    They used again the verbal structure creating cognitive dissonance a few times ('can't destroy',

but actively harassing Plaintiff).

2513.    12/1/2016. after midnight Defendants in ap.G2 knocked on the pipes of Plaintiff's heater and
shouted (12:30AM-1:30AM), then provoked "Bulgarian doesn't care." In the morning
awakening Plaintiff Defendants knocked under his windows and commented in ap.B2 "We
can't ruin him." (9:50AM). Later (11:36AM) Teaneck High School students came under
Plaintiff's windows and teased him "He keeps watching us." Plaintiff did not react and
Defendants in ap.B2 commented "Can not push him." Plaintiff got out and on the street a
student on a bicycle shouted behind him "Boom." In Stop and Shop, Teaneck, Defendants
referred to Plaintiff "We have a wolf." When he got home Defendants in ap.B2 commented
"Can't destroy [him]." (4:40PM). After he watched Game of Thrones Defendants came under
Plaintiff's windows and threatened "When we get you we'll torture you like this." (about
6:55PM). ECF No.8-1 at 213.851.

2514.    2/28/2017, 12:46PM while THS students with an officer were having "inspiration day" under
Plaintiff's windows at 1:03PM on speaker played "Destroy one Bulgarian."

2515.    5/10/2017, Defendants followed Plaintiff on the streets of Teaneck, including two high
school girls and a boy "We all destroy him." ECF No.8-1 at 852.

2516.    5/14/2017, after 4PM Plaintiff ("C") spoke with Jean ("J") and her 'brother' while persons
hiding inside building's G level "Passive.." "Sexuality." "Kalin is strong." After a strong
slam in ap.G2 they continued "Let's do it." "Destroy the []." ECF No.8-1 at 163.

2517.    12/1/2016, when Plaintiff got home at 4:40PM ap.B2 commented "Can't destroy []." About
6:55PM Plaintiff watched Game of Thrones. Outside commented "When we get you we'll
torture you like this." ECF No.8-1 at 213.

2518.    Plaintiff worked on materials for this case in December 2016 and for several days heating
was barely working. On 12/29/2017 Plaintiff measured inside 60F, and at 10:35AM ap.B2
commented "We can't let him continue. We have to destroy []." Later temperature was still
low – 64F floor level. ECF No.8-1 at 215.

2519.    2/1/2022 Tuesday, 8:14AM Defendants' person came under Plaintiff's windows at the corner
of Cedar lane and Red Rd and stated "Can't believe we can't destroy one Bulgarian." ECF
No.8-1 at 311.

2520.    10/11/2022 Tuesday, 11:35PM while Plaintiff was in bathroom Defendants' woman came near his windows and stated "Destroy him." ECF No.8-2 at 5484.

2521.    10/17/2022 Monday, 1:36PM Defendants' persons talked in front of Plaintiff's door about a fridge. Plaintiff started reciting Heart Sutra they responded "destroy." "Call the super." and left. ECF No.8-2 at 5679.

2522.    10/18/2022 Tuesday, 11:22AM students came and talked under Plaintiff's windows about the "people" and to "destroy" Plaintiff. ECF No.8-2 at 5691.

2523.    11/21/2022 Monday, multiple persons in ap.B2 and outside talked about Defendants' response to Plaintiff's work on this case after he filed his Notice of claims including explicitly stating they have to "stop" him by not allowing him to rest. "We have arrest." … "To destroy (Kalin)." "Can't survive that." ECF No.8-2 at 5952-53,

2524.    4/29/2023 Saturday, 3:29AM Defendants' man near Plaintiff's windows "How to destroy (that)?" Plaintiff was working on EMF section in relevant history. ECF No.8-2 at 7630.

2525.    8/18/2023 Friday, Defendants at Lomo (food truck parked near Plaintiff's windows) talked about Plaintiff for hours, commented at 11:39AM "Kalin" … "destroy". "Bulgarian []. Catch him."

2526.    2/15/2024, about 11:45AM, 11:50AM group of students staying under Plaintiff's windows. At first shouted very loud, then not loud "Let Kalin die." Some of them yelled again. 12:47PM Defendants in building's corridor "Destroy him."

2527.    3/6/2024, 11:43AM school girl talked about "fight" under the windows. "They (can't prove)." 11:53AM Defendants man came and stayed for a while at the corner under Plaintiff's windows talking seemingly on phone. "Can't destroy.. Fucked up." A group of students passed under windows talking occasionally loud.

2528.    3/7/2024, 11:55AM school boy came under the windows on Cedar lane "Destroy you."

2529.    3/28/2024, about 7:50PM Plaintiff started working on expert letter. Defendants' man in B2 commented "We should have destroyed that."

2530.    6/21/2024, 11:01PM Defendants' men in front of the pub on Cedar lane talked about Plaintiff ("Kalin") and about "destroy[ing]". (11:10PM)

2531.    7/4/2024, 5:50PM while Plaintiff was preparing a PDF file with photos of his lease signed to send it to his landlords Defendants woman in building corridor talked "Want to destroy this-- His science project. Yes. A lot of people got disappointed." 5:59PM she continued "Have to shoot. Torture him." Plaintiff stopped his TV. "Destroy him." The patrolling man under the windows, crossed Cedar lane. 6:04PM Defendants man at distance "We have to crush him."

2532.    7/23/2024, 9:59AM school girls came under Plaintiff's windows "Fight. Fight." 10:29AM Defendants man with a kid in cart talked under Plaintiffs windows "How to destroy?" 2:06PM women/girls under windows "Stop. Stop. Stop." "How to fight?"

2533.    8/27/2024 (two days before Plaintiff sent his Administrative claims to FBI Headquarters), 4:30PM-6:30PM Plaintiff took a bath. Defendants under the window – Ralph, women commented "I believe it is fake." "He did it before." After Plaintiff clapped hands Ralph stayed nearby talking. About 7:45PM Defendants man "Trying to destroy []."

2534.    10/1/2024, 5:24PM after Plaintiff stopped working on a recording for the case Defendants man and woman in building corridor "Push. Stop that." "If we can't destroy it []."

2535.    1/8/2025, 11:33AM Plaintiff was scanning when students came under his windows and commented "destroy.." "Can't believe."

2536.    1/17/2025, 11:39AM three schoolboys came under Plaintiff's windows saying "Lasers destroy people." A bit later student continued "You wanna stop." "Destroy []."

2537.    3/10/2025, 12:53PM Dula on loudspeaker "to have him stop.. Can't believe him. We got to destroy him."

2538.    3/21/2025, 1:08PM students came under Plaintiff's windows. The boy who earlier talked under the windows "Arrested by police.." and B2 commented then "He didn't hear that." again talking "How to destroy that?" Girls screamed under the windows only. 11:50PM Plaintiff was working on UN complaint when Defendants' man on Cedar lane under his windows commented "You can't destroy []."

2539.    And more.

2540.    Related to the above Defendants talked a few times they want to break Plaintiff. While 'breaking' Plaintiff refers to Defendants' concept of breaking resistance, as it is used it is also a synonym of destroy. And as concepts closely related to 'destroying/breaking' Plaintiff Defendants also overtly talked to 'crush' and 'ruin' Plaintiff. For example:

2541.    In October 2012 Defendants' woman frequently came and spoke or pretended to speak on phone under Plaintiff's windows. She repeated "I'll do anything to break him…"

2542.    1/30/2015 Friday, 8:07AM? "Got the freak. I'll break [him]."

2543.    11/8/2016 ap.B2 commented when Plaintiff was preparing to go and vote "Can't ruin. He is going to vote." ECF No. 8-1 at 119.

2544.    12/16/2016, 10:01AM Defendants came under Plaintiff's windows "Break the Bulgarian." 10:20AM "He didn't hear."

2545.    12/1/2016, 12:30AM-1:30AM knocks on the heater and yelling in ap.G2 "Bulgarian doesn't care." Plaintiff worked on his case against Gyro et al. when at 9:50AM there was a knock outside, and Defendants in ap.B2 commented "We can't ruin him." ECF No. 8-1 at 213.

2546.    4/21/2017, "Tease him." "Bulgarian qualified that." .. "Crush (him)." "Have the police to push." ECF No.8-1 at 1823.

2547.    5/4/2018 Friday, 11:45AM Plaintiff was still in the bed and students commented under his windows: "Still sleeps."… "Crush him." ECF No. 8-1 at 880.

2548.    8/24/2021, 9:40PM Defendants in ap.B2 "We thought we'll crush him." (when Plaintiff was working on RF beams and his sleep pattern. ECF No. 8-1 at 210

2549.    8/28/2021 Saturday at 5:01PM there was repeating noise from B2, and knocks from A3. Plaintiff was working on the history of case-relevant events when at 8:33PM person in building's corridor commented: "We stopped." And Dula commented in B2: "We have to crush." ECF No. 8-1 at 250.

2550.    7/6/2022 Wednesday, 5:12PM as Plaintiff was preparing to go outside kids under his windows "Crush him." 5:16PM Plaintiff saw Oscar Bermudez, previous super, who said after turning on Cedar lane "Bulgarian can []." ECF No.8-2 at 2307-8.

2551.    9/9/2022 Friday, 10:25PM after Plaintiff started working on relevant history men commented in front of the pub (Cottage Bar) "He don't stop." A woman talked "Kalin" while he made photos. After that 3 persons walking from the pub's direction passed under Plaintiff's windows on Cedar lane "Set up." 4357.10:36PM persons continued talking in front of the pub "Crush." ECF No.8-2 at 4356.

2552.    9/10/2022 Saturday, 3:07 m Crush Kalin. ECF No.8-2 at 4451.

2553.    10/4/2022 Tuesday, "You police him []." "Going []. Can't crush." 8:27PM minutes later groups/Jewish families were passing under Plaintiff's windows on Cedar lane talking about him. "Crush. Do not stop." ECF No.8-2 at 5233-34, 5256.5261.

2554.    10/9/2022 Sunday, about 5:15PM Plaintiff started working on relevant history and a group of students talked under his windows on Cedar lane "Crush []". "We lost." ECF No.8-2 at 5389.

2555.    10/14/2022 Friday, 11:45AM Plaintiff went to throw his garbage and met Peter Loomer who suddenly was very talkative with Plaintiff. They met Cesar Naranjo and Oscar Bermudez who were replacing a fridge from upper floors. Cesar claimed it is no power for the whole area. Another neighbor – the Holy Name security guard who exchanged a few times before that greetings with Plaintiff also was outside the building. When Plaintiff entered the building they commented behind him "Can't crush him." ECF No.8-2 at 5515.

2556.    10/22/2022 Saturday, about 5:40PM Defendants' woman and a man talked next to his windows. "How to crush that?" "Probably shoot." ECF No.8-2 at 5751.

2557.    12/7/2022 Wednesday. Plaintiff worked till about 5:04AM, and Defendants targeted him with DE. He found 8 small swellings on his face (around his eyes and forehead) and a swelling on his right buttock (6:49AM). A bit later Defendants in ap.B2 commented "Can't crush him." ECF No.8-2 at 5970

2558.    10/15/2022 Saturday, 8:34PM Plaintiff was working on swellings in result of DE attacks on him when schoolboys came under his windows "You want all these?" 8:43PM Emily and Defendants' man entered ap. A6. Man "How to break him?" ECF No. 8-2 at 5650-51.

2559.    1/5/2023, Defendants in ap.B2 commented "Can not crush. Didn't (perceive it)." (10:04PM). ECF No.8-2 at 6002.

2560.    1/9/2023, Plaintiff was in his restroom (3:18PM) persons kicked rocks under his windows a few times and challenged "Crush him." ECF No.8-2 at 6005.

2561.    4/17/2023 Monday, 1:05PM a group of schoolboys came under Plaintiff's windows loud (one of them was regular). After passing the windows they were quiet and commented that Plaintiff 'hear us.' The same group returned under the windows "Break this dude." And again returned again under the windows at 1:15PM. ECF No. 8-2 at 7393-94.

2562.    6/18/2023 Sunday, 5:50PM Plaintiff started working Ralph in building's corridor commented "Can not crush." ECF No.8-2 at 8266.

2563.    8/28/2023 Monday, 10:07PM Defendants' men in front of the pub "We can't brake him. Gotta break him." 10:48PM they continue but quieter then before talking about "Gyro".

2564.    3/24/2024, about 8:25AM while Plaintiff was making photos Defendants' man in B2 "He has to stop." And a man under his windows commented "Can't crush."

2565.    4/26/2024, 1:04PM a group of 5-6 students came under Plaintiff's windows and talked for about a minute while Plaintiff was in toilet "Have to break this one. Pretty bad." "They thought []."

2566.    7/4/2024, 6:04PM Defendants' man at distance "We have to crush him."

2567.    9/14/2024, 9:56PM Defendants man at distance commented "Didn't stop. Can't crush him."

2568.    11/9/2024 about 10:45AM after Defendants' man in ap. A6 commented "Can't believe they can't stop that." the person from 8:20AM again talked under Plaintiff's windows "They told us to crush (him)."

2569.    12/13/2024, 10AM after Plaintiff's alarm Defendants "Have to crush him." Plaintiff saw two garbage trucks parked under his windows.

2570.    2/20/2025, about 1:11PM while Plaintiff was in toilet a girl commented under the window "We couldn't break him." At that time Plaintiff was working on interference with legal cases file. Earlier Defendants deleted in front of his eyes email-response from UCLA Davis – seems to be response to his email to professor Joh.

2571.    3/2/2025, after 11:30AM while Plaintiff talked with his parents on Skype Ognian called them, his father talked with him "Because of Kalin..." When later Ognian talked with

Plaintiff he was lying down and stopped the call soon after. After that Plaintiff started SNL, Defendants' woman commented in building corridor "Couldn't crush him."

2572.    And more.

### (2) Defendants systematic induction of distress to Plaintiff.

2573.    Experiencing daily stressors is associated with increased physical symptoms as headache, nausea, cold symptoms, and those with more daily symptoms tend to report developing chronic conditions such as pain, autoimmune disorders, and functional disability; and tend to report more daily stressors. *Combined Effects of Cumulative Stress and Daily Stressors on Daily Health*, B. Haight, et al, Health Psychology, American Psychological Association 2023, Vol. 42, No. 5, 325–334. Chronic stressors are associated with poor health and earlier mortality. *Id*. Cumulative stress is result of exposure and appraisal of chronic stressors from variety of life domains (such as work, relationships, financial, perceived deprivation, discrimination, neighborhood), and is particularly detrimental to health. *Id*. The level of cumulative stress influences physiological responses to daily stressors. *Id*.

2574.    Defendants have subjected Plaintiff to high level of everyday stress, and their activities include variety of chronic stressors (repeating hammering for example, the everyday DE attacks causing pain and other effects, regular shouting, barking dog, and more). Defendants deliberately stress Plaintiff out, and their verbal conduct shows their intention – since 2012 they overtly talk to "press / oppress" and otherwise disturb Plaintiff. A few examples of Defendants talking specifically about stress include:

2575.    6/29/2017, in Phelps Park, Teaneck after talking with Plaintiff Robert commented "I want to stress him."

2576.    9/13/2017, about 10:30AM Defendants in B2 commented Plaintiff "Can't stress him out."

2577.    9/9/2020, 8:48PM Defendants came under Plaintiff's windows and talked about "stress". ECF No.8-1 at 743.

2578.    8/16/2021 Monday, 3:04AM Plaintiff started working on NYPD materials. Defendants came under his windows and talked about "stress.."

2579.    1/3/2023 Tuesday, 12:35PM 2 times pipe bangs while Plaintiff read in rest room. Defendants' man talked loud about a bank account in building's corridor, then quietly "I couldn't stress him."

2580.    1/29/2024, about 2:50PM Defendants' woman in building corridor "We need to stress him."

2581.    7/29/2024, about 4PM when Plaintiff went to Teaneck Creek near the entrance a group of kids with a few adults stayed. A kid asked "What's the stressor?" Plaintiff started working on a bench when the group with kids gathered on benches next to him. They left, then returned and stayed nearby. At another kid asked loud at about 4:39PM "Why don't pursue him?" The group passed Plaintiff. Later at about 4:45PM Defendants' woman commented "We have to stop." … "Kalin..."

2582.     1/6/2025, about 11:40AM while Plaintiff was waiting on the bus stop on Cedar lane near his building when a group of high school students talked quietly "stress him out" and then passed him talking unnaturally loud.

2583.   Defendants use to multiple psychological techniques to make Plaintiff uncomfortable, and escalate his stress including but not limited to threats, sleep deprivation, assaults, sound and DE attacks. Their practices are in accord with the US practices in regards to its detainees.[195]

   (i) Defendants methodically attack Plaintiff with variety of sounds.

2584.   Since 2013 Defendants make sounds with apparent intention to disturb, stress, intimidate, and provoke Plaintiff. Defendants' sound attacks on Plaintiff include (a) shouting – loud talking, roars, screams; (b) variety of sudden noises utilizing the building pipe system like pipe bangs, clanking, pops, cracks; (c) knocks on Plaintiff's walls, floor, and ceiling, including regular hammering; (d) repeated slams next to Plaintiff; (e) ringing Plaintiff's doorbell; (f) phone calls including during the night; (g) loud music; and more. Their conduct forms a clear pattern of targeting Plaintiff with noise regardless of the location he is.

2585.   Sound attacks are integral part of the US strategies for treatment of individuals in its control. Those strategies "use various types of sound [which] would be used to "activate and confuse auditory sensors" resulting in "heart-rate increase and increased stress leve1s.'"[196] and are intended to 'induce control [and] compliance'.[197] Notably 'exposure to loud noises' was classified as a torture practice.[198]

---

195 Sensory overload tactics used in regards to persons in control by the US is a stress tactic intended to induce control and compliance, and include "manipulation of the environment (hot, cold, wet...)… temperature regulation [and creating] "discomfort"… the plan said that the "interrogation team will make detainee feel psychologically uncomfortable, emotionally uncomfortable, assert superiority over detainee, escalate stress, play loud music, and continue to condition detainee to menial tasks." *Inquiry Into The Treatment Of Detainees In U.S. Custody*. Report of The Committee on Armed Services, United States Senate, Nov. 20, 2008

196 *Inquiry Into the Treatment of Detainees in U.S. Custody.* Report of The Committee on Armed Services, United States Senate, Nov. 20, 2008, p.143, 221

197 "tactics [are] designed to "induce control, dependency, complia[n]ce, and cooperation," including [] sensory overload… - loud music or temperature regulation … [T]he memo recommended the "imaginative but legal use of non-lethal psychological techniques (i.e., battlefield noises/chaos, barking dogs, etc.)" as well as stress techniques such as sensory overload (shouting, gun shots, white noise, machinery noise)". Inquiry Into the Treatment of Detainees in U.S. Custody. Report of the Committee on Armed Services, United States Senate, Nov. 20, 2008

198 "Stress to the senses, which included [] exposure to loud noises …" *Classifying the Torture Experiences of Refugees Living in the United States*, Hooberman, Rosenfeld, Lhewa, Rasmussen, and Keller, Journal of

2586.  Due to Plaintiff's recording and his other legal actions in the context of living in residence building Defendants can not use very frequently without plausible cover story the same sounds. Necessity to use large number of perpetrators, or when using the same persons they play 'enemies' to Plaintiff as decoy in Defendants activities to channel his eventual illegal response – as for example Ralph Pimienta, or students as a group.

2587.  Defendants' regular **shouting**, screaming and yelling next to Plaintiff is one of their "stress techniques"[199] used to interrupt and provoke Plaintiff. That is continuous practice although there are some periods with reduced frequency of use. ECF No.8-2 at 1891-1907. Exhibit Timeline of events. Multiple Defendants participate, but screaming is mostly by students. See a few recent examples bellow. Note that students acted under the supervision of Teaneck Schools' staff.

2588.  8/13/2025, Plaintiff worked on this complaint next to Teaneck High School. Large group of schoolgirls with a few teachers/trainers was on the field at distance. At 10:11AM girls started screaming and continued till about 10:14AM. A bit later woman talked "Let Kalin…" and they started screaming again. When Plaintiff started a video recording they simultaneously stopped, run and gathered together. At about 10:41AM schoolgirls started leaving the field, all were quiet, some talked about Plaintiff ('Kalin'). A schoolboy and a girl sat behind Plaintiff, at one point the boy shouted "My hair." before or after that they talked normally.

2589.  8/20/2025, Plaintiff worked on this complaint in Votee Park, Teaneck. The high school football team came next to him, they were very loud, two of them fought next to Plaintiff. After they left two men (seemingly the trainers of the junior team) commented near Plaintiff that he "don't give a shit."

2590.  8/22/2025, about 3PM Plaintiff passed by Teaneck High School fields, there was a large group of schoolgirls with a few adults seemingly in repetition for opening of the school year. Girls started yelling behind Plaintiff repeating words from what he had worked on in the park "No shut up." "Mock." "Hey." Plaintiff ignored them, and they sang "Fly baby fly." This is after Plaintiff bought a ticket to Bulgaria on 8/20/2025.

2591.  **Hammering** is apparently deliberate conduct. Defendants systematically hammer on Plaintiff's floor, ceiling, walls, or near him with intention to disturb, harass, and provoke him: they repeatedly talked about "harassing" or "upsetting" him, they have been explicitly provocative and refused to take notice of Plaintiff's complaints, and more.

---

Interpersonal Violence, Volume 22 Number 1, January 2007 1-16
199 "stress techniques such as... sensory overload [by] shouting … yelling" *Inquiry Into the Treatment of Detainees in U.S. Custody*. Report of the Committee on Armed Services, United States Senate, Nov. 20, 2008

2592.   Since 2019 hammering is mostly from Defendants in ap.B2, and dramatically increased in May-July 2023 in apparent retaliation to Plaintiff's work on the complaint for *Dimitrov I*, and in retaliation to his work on relevant court filings, and case materials. Till the end of 2024 Defendants in B2 hammered almost every day – about 500 days in a row. Furthermore the repetition of hammering within a single day has also increased substantially: in 2023 Defendants' repeated hammering within one day was about 4.5 times more frequent than in 2022, and in 2024 hammering was even more frequent than in 2023 (and about 6 times more frequent than in 2022). See Exhibit Hammering on Plaintiff's ceiling from Defendants in ap.B2.

2593.   Defendants intentionally and systematically (for long periods of time it is everyday conduct) **knock** on Plaintiff's ceiling (from ap. B2), his floor (ap. G2), his walls (ap.A1 and A3), in the building corridor near his apartment, they hit the road sign under or next to his windows or similar at different time day and night. Plaintiff filed three written complaints for noise violations to JC Realty – the landlord, and make multiple verbal complaints with the super – Cesar Naranjo. All of those were without any effect – ignored or suppressed due to Defendants interference. Furthermore, a few times Defendants knocked under the cover of a landlord's repairs in neighboring apartments, landlords removed the noise insulation between G2 and A3, and supported otherwise the harassment. See ECF No.8-2 at 2030-2047, Exhibit Timeline of events, and more.

2594.   Defendants' practice of large trucks, most regularly branded 'public work' or garbage trucks to park under Plaintiff's windows, staying there with running engines, making occasionally loud puffs, and other noise, is in accord with the US practices. Machinery noise is explicitly mentioned as psychological strategy.

2595.   About 10 days after Plaintiff's notice of claims / administrative claims from 11/10-11/11/2022 Defendants put a dog in ap.G2 (despite the landlords' no-pets policy) and for about a year there

was regular **barking** from G2. ECF No.8-2 at 5945 *et seq.* The landlord/super knew (super occupy ap.G3 and apart from Plaintiff those on G level directly experience that noise) but did not do anything in that regard. Plaintiff called about that noise to Cesar Naranjo, super, on 12/17/2022 who said that JC Realty office knows about the problem, but dog(s) in ap.G2 continued barking often till 10/22/2023, and since then (apart from two weeks in January 2024) there have been rarely any barking.

2596.    Based on the timing of the barking, the fact that Defendants have obviously been using ap.G2 against Plaintiff since 2016 ('feds'), including their use of cover to rent the apartment, and the lack of response from landlord (see JC Realty threats to sue tenants and guests for smoking for comparison) that is another technique used by Defendants to distress, degrade and provoke Plaintiff. See ECF No.8-1 at 152 *et seq.*.

2597.    **Loud music** is one of the techniques Defendants use to make Plaintiff uncomfortable, escalate stress. *Inquiry Into The Treatment Of Detainees In U.S. Custody.* Report Of The Committee On Armed Services, United States Senate, Nov. 20, 2008. Defendants used regularly music in ap.G2 since September 2016 till about the end of 2017. See ECF No.8-1 at 152 *et seq.*. After that Defendants have not used loud music as harassment regularly from the neighboring apartments with a few notable exceptions. Due to Plaintiff's record of events there is no cover story that can diminish eventual Plaintiff's complaints.

2598.    Defendants have been using also **high frequency sounds**, threw **pebbles** at Plaintiff's windows and eventually his AC, rang his **doorbell** (see the sting operation in the beginning of 2025 when police officers acted under cover as USPS carriers), and **called** Plaintiff (calls as disturbance are known FBI disruption method). See ECF No.8-1 and 8-2, and more.

(*ii*) Defendants regularly threaten and assault Plaintiff.

2599.    Apparent intention to make Plaintiff suffering. Explicit threats in combination with DE attacks, pebbles at windows, rocks thrown at him or at/under his windows.

*(a) Defendants explicitly threatened to kill Plaintiff.*

2600.    Defendants talked since 2012 about killing Plaintiff. Their intention to persuade Plaintiff of his imminent killing was shown in their comments of his reaction after the threat, whether "he believe/didn't believe" (12/5/2019, 8/28/2021, 9/24/2021, 11/9/2022, 8/19/2023).

2601.    Threats to kill Plaintiff were made mostly by unknown Defendants' agents. Other parties making such threats include Teaneck public schools' students (9/6/2012, 5/24/2016, 2/20/2017, 10/17/2022, 10/6/2023, 2/7/2024, 1/9/2025, 3/21/2025), uniform Teaneck police officers and FBI (10/13/2013), Marlene Dula (B2) or Defendants' man in ap.B2 (11/30/2016, 12/23/2016, 1/31/2022, 8/30/2022, 7/26/2023 (the day after the beginning of *Dimitrov I*), 9/16/2024), by Defendants' Ralph (Raphael) Pimienta (he was present in a few of the other occasions too) (3/4/2022, 3/18/2022, 8/24/2022). A few times Defendants threatened that police would kill Plaintiff (5/14/2017, 9/18/2021, 7/25/2023 (the initiation of *Dimitrov I*)). Notable as timing are Defendants' threats to kill Plaintiff grouped in three days around the time he commenced *Dimitrov I* (7/22/2023, 7/25/2023 (initiation of *Dimitrov I*), 7/26/2023).

2602.    Defendants threats to kill Plaintiff were made under his windows (9/6/2012, 9/7/2012, October 2012, 8/3/2013, 10/13/2013, 1/31/2017, 5/14/2017, 4/21/2018, 8/28/2021, 8/29/2021, 9/24/2021, 4/21/2022, 8/30/2022, 9/23/2022, 10/17/2022, 7/25/2023, 8/19/2023, 10/6/2023, 2/7/2024, 9/16/2024, 1/9/2025, 3/21/2025), in Teaneck public parks (11/3/2016, 2/20/2017, 5/14/2017, 4/13/2018, 9/18/2021), in other public space (2/20/2017, 5/10/2017, 5/25/2024, 7/20/2024), in building corridor (3/17/2017, 3/4/2022, 3/18/2022, 8/24/2022, 10/13/2022, 11/9/2022), in ap.B2 (12/23/2016, 1/31/2022, 7/26/2023), in ap.A3 (8/29/2021), in ap.A1 (9/24/2021), in Stop and

Shop, Teaneck (5/24/2016), in the offices next to East House Creative office in Englewood Cliffs (11/25/2012, 11/26/2012, in the summer of 2013).

2603.    9/6/2012 Thursday, around lunch time about 20 students came under Plaintiff's window yelling: "Hope you are dead." "We'll kill you." "This is it. Turn in." ECF No.8-1 at 15.

2604.    9/7/2012, Defendants came near Plaintiff's windows and threatened "Kill him []. Post." "He got to feel octopus. Shadow over time." Transcript 1st_recording.mp3, 0:30-0:31. "Only kill. We only have (that) []." Id. at 2:32. See also ECF No.8-1 at 17.

2605.    October 2012, Defendants' woman frequently came under Plaintiff's windows repeating "I'll do anything to break him... They are going to kill him.. I'll destroy him. I am committed to this." Timeline of events

2606.    11/25-11/26/2012 Plaintiff did a freelancing gig at East-House Creative, 120 Sylvan Ave, suite 108A, Defendants' John, a Korean man in the office at 108B yelled that he is offering an award somebody to kill "him", repeating in essence the threats against Plaintiff made in Teaneck. He also yelled at somebody on the phone: "Shame on you. Why you haven't killed him? If you can not appear strong how you'll scare any NY garbage coming? I will kill him myself." ECF No.8-2 at 2139.

2607.    Summer of 2013 when Plaintiff worked at East House office. John spoke loud about "killing" for days and Plaintiff called Englewood police. ECF No.8-2 at 2139.

2608.    8/3/2013, Defendants under Plaintiff's windows "We do not kill this one." "May be fuck, man. Ha, ha.." Later same day "We have to kill him."… "Kill himself." "Should I go have the Police (come)?" "Yes." Woman: "It's all neighbor (coming)." ECF No.8-1 at 1822.

2609.    10/13/2013 at 2:30AM Police officers from three police cars and FBI, a few times talked about killing Plaintiff. Transcript PoliceUnderMyWindowTeaneck.MP4 at 2:05, 2:55, 6:34. ECF No.8-1 at 34.

2610.    4/23/2015, 7:41AM "We['re] trying to kill him. Relax." Timeline of events

2611.    5/24/2016, four students yelled right next to Plaintiff in Teaneck, then in Stop and Shop staff at cashier desk talked to a man behind Plaintiff: "Why you just not kill him? He's like animal..." ECF No.8-2 at 2171.

2612.    11/3/2016, Plaintiff went to Phelps park, Teaneck doing exercises when Defendants' man came and threatened him "They will do it in New York. They'll kill him." and a bit later "Can't believe we can't push him." Timeline of events

2613.    11/4/2016 Friday, 10:55AM Defendants "They will kill him?" Timeline of events

2614.    11/30/2016, about 8:44AM Defendants in ap.B2 "I'll kill him myself."

2615.    12/23/2016, 9:27PM Defendants in ap.B2 walked heavily commented "We need to kill this."

2616.    1/31/2017 Tuesday at 1:18AM Defendants under Plaintiff's windows: "Cops pursue him to kill him." ... "He needs a hostage." ECF No.8-1 at 1822.

2617.    2/20/2017 Wednesday, school girls when Plaintiff was outside "Chasing him." Later at Teaneck's park "Have to kill him. Hey you."

2618.    3/10/2017 Friday, about 11:15AM Defendants "Rainman. Mother fucker. Can't kill [him]."

2619.    3/17/2017 Friday, about 11:18PM Defendants talking in the building about Plaintiff "They'll kill him anyway."

2620.    5/10/2017 Wednesday, different parties followed Plaintiff "Kill him with…" "We can't destroy.." ECF No.8-1 at 852.

2621.    5/14/2017 Sunday, Plaintiff approached through his windows the "neighbors" from G2. Later Defendants threatened "Police could have kill him." … "We better than kill." "Got approval." ECF No.8-1 at 163.

2622.   5/28/2017 Sunday, 10:20-10:26PM "Shoot to kill." … "They will kill []."

2623.   9/13/2017, 7:08PM Defendants "Just kill him. We can not distract him."

2624.   12/2/2017, 7:46PM Defendants "Kill that."

2625.   4/13/2018 Friday, Plaintiff went to park Teaneck, NJ sitting on table. A young man came and behind him "You want it in the ass." His group went to the basketball field. Plaintiff went there too. They commented "He's like forensic []." "Rape and kill him." Plaintiff made a video of them with his tablet. And they left. ECF No.8-2 at 2166.

2626.   4/21/2018 Saturday, three Defendants' persons in front of the building's entrance, one of them Jane from ap.G2, talked after Plaintiff opened his window and made a video "Keep harass." "Not good to kill him." MOV_0339.mp4 at 0:33-0:36.

2627.   4/29/2018 Sunday, 12:40AM Jean from G2 "[Do] not forgive him." – exact repetition of line from the transcript on which Plaintiff was working. She and others hid at the entrance and continued "He'll continue mocking." "Just kill him." Plaintiff went outside and saw one of those persons is a neighbor.

2628.   4/5/2019, 11:59PM Defendants outside "Bulgarian..." "They'll kill him.."

2629.   9/7/2019 after 10:30PM Defendants in ap.A3 talked about Plaintiff "Have to kill."... "Empire states have lost a few Bulgarians." "Kalin abuse? And they know Kalin problem.".. "And united is how I kill you." ECF No.8-1 at 476, Transcript of 190907_6786.mp3.

2630.   12/5/2019 Thursday, Teaneck firefighters in Plaintiff's building "Can you kill the []?"... "*Театър* ['theater' in Bulgarian]" "At least Kalin listen []." "Soon he'll believe in []." ECF No.8-1 at 52.

2631.   8/28/2021 Saturday, Defendants near Plaintiff's windows "Found the body.. Can't arrest." "Can't believe." "You killed []. You are dead. You are dead." ECF No.8-1 at 535.

2632.   8/29/2021 Defendants in ap.A3 moving out "And they push. And then kill []." Transcript of 210829_8630.mp3 ECF No.8-1 at 535.

2633.   9/18/2021 Saturday, when Plaintiff was in Phelps Park, Teaneck, NJ there was a large group sitting next to him. A man threatened him "I'll kill this one." Later a police officer came. The same man commented "Black officer kills us all." When Plaintiff was leaving he commented "He didn't hear we are against police."

2634.   9/24/2021 Friday, 10:51PM Defendants came under Plaintiff's windows "He don't forget." "Snatch." A bit later they moved(?) in ap.A1 commenting that Plaintiff "didn't believe." "How to do that?" "Have to kill." ECF No.8-1 at 601.

2635.   1/31/2022 Monday, 8:02AM Defendants awakened Plaintiff with DE rays at his left hip, and kidneys from B2 and G2 direction. Defendants in ap.B2 hammered on his ceiling and two men commented "non stop." "Have to kill.." ECF No.8-1 at 310.

2636.   3/4/2022 Friday, 12:40PM Ralph in building corridor talked "to oppose.. not Bulgarian… get killed." ECF No.8-1 at 342.

2637.   3/18/2022 Friday, 8:33PM Ralph and Cesar Naranjo talked in the building's corridor. When they got upstairs Ralph said "Guy thinks he can't be killed." and entered ap.B2 – multiple steps in B2. ECF No.8-1 at 356.

2638.   4/21/2022 Thursday, 6:22PM when Plaintiff stopped his shower Defendants' man and woman under his windows threatened "They'll kill []." A bit later Ralph entered ap.A1 with a slam. ECF No.8-1 at 390.

2639.   8/24/2022 Wednesday, 6:56PM Ralph and two Defendants' women were in the building's lobby and said among other things "Don't want many Europeans to be killed." They laughed loudly entering the corridor and went to ap.B2 – multiple steps there. ECF No.8-2 at 3863.

2640.   8/30/2022 Tuesday, 11:58AM Plaintiff made a video of Dula and Ralph talking with another person in a car near to his windows. D "They sum Kalin have to go []." "I haven't scan []."

"They did []." D "They kill []. (Safety problem). And I am telling this to []. We (need) to look at that. That they are--" ECF No.8-2 at 4036-39.

2641.    9/23/2022 Friday, 6:03PM after an hour the blockade (then PSE&G truck and another car (branded) were at the crossroad of Cedar lane and Red Road) was still on and Plaintiff made a video. Another ambulance parked under Plaintiff's windows on Cedar lane with engine working, at distance some firefighters(?) were sitting on chairs along Cedar lane, others stayed. While Plaintiff was recording Defendants' persons commented: "The army can kill to stop." "You can approve." "They lost, you (lost)." "Kalini needs to get arrested." ECF No.8-2 at 4918-21.

2642.    10/13/2022 Thursday, 9:00PM Plaintiff was working on material about Cesar Naranjo and Oscar (supers) when a woman talked on upper floor "We got to kill []." ECF No.8-2 at 5504.

2643.    10/17/2022 Monday, 5:03PM four students came under Plaintiff's windows walking on the rocks (evading his camera) and threatened "I'll kill him eventually." ECF No.8-2 at 5683.

2644.    11/9/2022 Wednesday (a day before Plaintiff sent Notice of claims and Administrative claims with the FBI) at 4:22PM Plaintiff was working on radicalization when Loomer and Ralph commented "Haven't killed []" "Police fights." Plaintiff started Olympus recorder and they quietly got upstairs. One of them commented that Plaintiff "Don't believe."

2645.    7/22/2023 Saturday (three days before Plaintiff initiated *Dimitrov I*) Defendants talked in front of the pub on Cedar lane about Plaintiff, and at 10:36PM Defendants' man talked about "killing him" ... 'heart attack'.

2646.    7/25/2023 Tuesday at 7:06PM, after Plaintiff initiated *Dimitrov I*, three Defendants' men crossed Cedar lane under Plaintiff's windows. One of them threatened loud "Fucker thinks police can not kill him. Same day." They stayed at the opposite side of Cedar lane. Plaintiff made photos – one of them was the Defendants' man who regularly patrols under his windows, who evaded his camera a few days earlier.

2647.    7/26/2023 Wednesday, about 7:16PM Defendants' man in B2 threatened "They'll kill him." Plaintiff had been working on the transcript of 12/14/2022 recording.

2648.    8/19/2023 Saturday, 8:57PM Defendants' persons near Plaintiff's windows "Hope Kalin heard." "We don't harass." "Don't believe." .. "Threat to kill."

2649.    10/6/2023 Friday, 11:47AM loud students under the windows "I know this man. [] kill."

2650.    2/7/2024, 3:46PM while Plaintiff was working on threat assessment materials school girls and boys came under his window "We could have killed him."

2651.    5/25/2024, 8:31PM Defendants' man came next to Plaintiff, yelled toward him about "suing… I'll kill him." and left again.

2652.    7/20/2024, about 1:45AM Plaintiff was walking back home when he passed a parked car with two men in. One of them said "I'll kill you. Walk. Walk." Plaintiff looked at the car and the driver said to him "It's OK. No problem." Plaintiff nodded and continued.

2653.    9/16/2024, 11AM-11:08AM while Plaintiff was in toilet Defendants' Dula threatened under his window to "kill [him] outside."

2654.    1/9/2025, 3:25PM and 3:52PM students(?) came under Plaintiff's windows after he wrote about Defendants' threats to "kill him", and talked about "funeral" and shouted "Boom. Boom."

2655.    3/21/2025, about 7:55PM students came under Plaintiff's windows and shouted "Kill him."

2656.    Defendants also repeatedly talked about shooting Plaintiff.

2657.  In the evening of 12/15/2012 Plaintiff was playing chess on his notebook when a group talked under his windows "What he's playing? This is not a game. I'll shoot him through."... "Secured the perimeter." ECF No. 8-1 at 119.

2658.  7/18/2015 Saturday at about 11:30PM Teaneck police officers stated under Plaintiff's windows "We can't even shoot him." ECF No. 8-1 at 38.

2659.  9/15/2019, 3:55PM a black car parked under Plaintiff's window Ralph spoke with a person inside and stated "Bulgarian []. Have to shoot []." During the night a person repeated "Have to shoot him." (9/16/2019, 12:30AM). ECF No. 8-1 at 643.

2660.  12/15/2019 "If I shoot Kalin promise that Kalin материали ['materials' in Bulgarian] –" ECF No. 8-1 at 53.

2661.  4/6/2020 there were repeating drops in ap.A3 at 2:44PM; 3:50PM; 4:15PM and later, then at about 4:38PM Ralph stated again (9/15/2019) in building's corridor: "Have to shoot." ECF No. 8-1 at 650.

2662.  5/26/2021 Dula and young woman presenting herself as Dula's daughter talked with them later and thanked them. See more about ap.B2 at C.4.2) making a lot of noise in the building's corridor. They commented "He didn't fight us." "Shoot." "Ha, ha, ha." ECF No. 8-1 at 62.

2663.  Saturday 10/2/2021 Plaintiff at Phelps Park, Teaneck moved to sit at a table under the trees and six persons in the dogs' corner talked about him (in earshot distance) "Kalin []." "Can't even shame him." "Shoot." ECF No.8-2 at 2168.

2664.  10/6/2021 Wednesday, feeling pressure at his head Plaintiff moved a few times till 11:15PM to evade the beams, and moved again at 11:28PM. He detected a focused ray from ap.B2 which stopped, but a ray from A1- Cedar lane started, and a man under Plaintiff's windows commented "Hopefully shoot []." ECF No.8-2 at 1831.

2665.  1/31/2022 Monday, 5:23PM Ralph and 2 women talked in building's corridor, then went to the 'lobby' between entrance doors. R: "Got to shoot." ECF No. 8-1 at 689.

2666.  10/22/2022 Saturday.Later at about 5:40PM after Plaintiff stopped his shower a woman and a man talked next to his windows, there were car-door closing noise. "How to crush that?" "Probably shoot." 5751

2667.  11/21/2022 Monday Defendants gathered in ap.B2. Dula: "Really gets страх ['fear' in Bulgarian] (of what we have). .. I shoot Bulgarian." They repeatedly talked about setting Plaintiff or setting some events in regards him ('arrest' him) – 'set/setting' was repeated 16 times in about 7 minutes. For example in the exchange Loomer asked "Do you want to shoot [him]?" m2 "How?" mB "Arrest []. .. Can't stop harassing." ECF No.8-2 at 5953-54.

2668.  2/20/2023 Monday 11:57AM Ralph and a woman talked about Plaintiff ('Kalin') in building's corridor. Then they got upstairs where Ralph talked with Loomer foe a while. "He won." "She is working out." "I don't know." "Can't activate him." They talked also about "shooting" and Ralph reacted loud "Oh-- They shoot." ECF No.8-2 at 6493.

2669.  6/3/2023 Saturday About 8:40AM about 10 thuds on ceiling – hammering from B2. 2 women under Plaintiff's windows commented "Got to shoot." "I can prove that. We've got to win." ECF No.8-2 at 7995.

2670.  6/10/2023 Saturday, About 4PM a Jewish family passed Plaintiff on Broad Street while he worked there commented "Have to shoot. There is no time." ECF No.8-2 at 8125.

2671.  8/17/2023 Thursday, about 7:00PM 2 girls at distance "Shoot". 7:07PM a man at distance "Shoot".

2672.  7/4/20245:59PM she continued "Have to shoot. Torture him." Plaintiff stopped his TV. "Destroy him." The patrolling man under the windows, crossed Cedar lane. 6:04PM Defendants man at distance "We have to crush him."

2673.    8/16/20244:20PM a group near Plaintiff's windows "We won't shoot."Knocks simultaneously on Plaintiff's floor.

2674.    8/29/2024Defendants Jason in ap. G2 talked all night. 2:30AM-2:37AM "Kalin… It's going national." "Kalin won't forget." Later 2:39AM "OK. I'll write a motion…" 2:48AM "See if we can push." 2:51AM "Shot over []." "Kalin hear.." 2:53AM "You report but []. Kalin won't stop. Rather dead then []. Shoot the fucker."

2675.    1/27/202510:41AM Defendants man under Plaintiff's windows on Cedar lane "They still want to shoot (him)." A bit later Plaintiff saw under his windows Swaby.

*(b) Defendants explicitly threatened Plaintiff that he will not survive, and will die.*

2676.    Since Plaintiff watched online the TV show Designated Survivor (end of 2016, beginning of 2017) Defendants have adopted the concept of surviving, and repeated that Plaintiff will 'not survive' as euphemism for killing him, or challenged him to 'survive'.

2677.    In a few occasions Defendants' were explicit about the reason why they threatened that Plaintiff 'won't survive' – because of commencing a lawsuit or filing Notice of claims with NYC, and Teaneck/ Administrative claims with the FBI (4/23/2018, 11/21/2022, 12/14/2022 (Dula mocked that 'nobody noticed' Plaintiff he won't survive)); for his work on case-related and legal materials (4/28/2018, 5/24/2021, 7/23/2022, 9/14/2022, 1/9/2024, 8/25/2024); or in response to Plaintiff challenging inside his apartment (12/29/2017). Defendants commented Plaintiff's reaction to the threat 'He didn't believe.' (4/23/2018), and threatened and challenged him to survive after harassing him with noise (3/3/2017, 9/14/2022, 1/26/2024).

2678.    Notable in terms of the FBI New York role are Defendants' threats that Plaintiff will 'not survive' made at the FBI New York Field Office building (11/8/2017), or after he passed the building (4/23/2018 – same messaging to Plaintiff in Teaneck and in Manhattan, NYC).

2679.    1/6/2017, 6:46PM Defendants' person under Plaintiff's windows "Do not expect you can survive." ECF No. 8-1 at 125.

2680.    1/21/2017, 3:54PM a Teaneck High School student came under Plaintiff's windows "You can't survive" ECF No. 8-1 at 125.

2681.    3/3/2017, Defendants in ap. G2 knocked repeatedly on Plaintiff's floor for about 3 hours and warned "Can't survive. Stop." ECF No. 8-1 at 125.

2682.    11/8/2017, Defendants at FBI New York Field Office building commented Plaintiff "Can't survive." ECF No. 8-1 at 125.

2683.   12/29/2017 at about 11PM Plaintiff challenged in his apartment "Criminals why are you hiding?" Defendants in ap.B2 responded "You can't survive." ECF No. 8-1 at 215.

2684.   4/23/2018 Monday, Plaintiff was preparing to file his case against Gyro et al. with S.D.N.Y. when students rang his doorbell at 11:37AM, and threatened under his windows at 12:27PM "He wouldn't survive." Defendants in ap.B2 (heavy walking above) commented at 1:25PM "He didn't believe." "Bulgarian.." After Plaintiff filed the complaint with S.D.N.Y. Defendants followed him in Manhattan talking "Can't survive." .. "Bulgarian killed himself." ECF No. 8-1 at 857.

2685.   4/28/2018 Saturday at about 7PM Plaintiff found in a recording mentioning of 'ICE' and Defendants' person came under his windows and said "Pretty bad." At 11PM Defendants in B2 threatened "Can't survive." ECF No. 8-1 at 211.

2686.   10/3/2019 at 1:50AM Defendants shouted "Survive." ECF No.8-2 at 1893.

2687.   5/24/2021, 5:42PM Plaintiff started working on Notice of claims. Defendants' woman came under Plaintiff's windows and challenged "Have to survive." In building's corridor Ralph reacted "What happened?" ECF No. 8-1 at 669.

2688.   7/23/2022, about 8:30PM Plaintiff was working on Michael German's book about FBI when Defendants' woman/girl came under his windows and threatened he "Can't survive." ECF No.8-2 at 2849.

2689.   9/14/2022 Wednesday, 6:34PM Plaintiff was working on relevant history file about Defendants in ap.B2 when there were loud pipe clanks, two students came under his windows and said "Can't survive." "Punching." ECF No.8-2 at 4620.

2690.   11/21/2022 Monday, (about 10 days since Plaintiff sent his Notice of claims and Administrative claims) Defendants in ap.B2 "Can't survive that." Dula: "Having Kalin on top." "Police stopped." ECF No.8-2 at 5953.

2691.   12/14/2022 Wednesday at about 9:24AM Plaintiff heard Ralph and Dula talking in building's corridor that he "will not survive. Nobody noticed him that." "He can't hear." In the afternoon Defendants' persons came under his windows and challenged Plaintiff "to survive". ECF No.8-2 at 5977-78.

2692.   6/14/2023 Wednesday, 10:53AM Defendants' man and woman talked under Plaintiff's windows he "survived direct attack." ECF No.8-2 at 8184.

2693.   9/22/2023 Friday, about 12:55PM students came under Plaintiff's windows and threatened "You can't survive." At 1:08PM a group of about 10 students came under Plaintiff's windows walking on rocks and stayed for about 5 minutes.

2694.   1/9/2024, 3:22PM Plaintiff was still working on the recording from 1/8 when person threatened under his windows on Cedar lane "You won't survive."

2695.   1/26/2024, about 9:30AM Defendants in ap. B2 hammered on Plaintiff's ceiling. Drilling noise, heavy walking. After Plaintiff made previous note at about 9:50AM Defendants came under his windows and teased "Have to survive."

2696.   6/11/2024, about 1PM students came under Plaintiff's windows on Cedar lane "No chance he would survive." About 1:10PM the students returned under the windows and stayed for about 5 minutes provoking Plaintiff. "Recording? Hope he got high quality." And when they were leaving "We didn't stop."

2697.   6/17/2024, about 12:10AM back in home Plaintiff continued working when two school boys came under his windows "He stole it." "He can't survive." They made three thuds.

2698.   7/20/2024, 11:18AM students came under Plaintiff's windows, a schoolboy "Can't survive." Girls laughed loud.

2699.   8/25/2024, 12:59PM while Plaintiff was scanning Defendants' men came under his windows and talked not loud "You have to stop.".. "Disrespect… He will survive." "FBI…"

2700.   9/15/2024, 2:27PM when Plaintiff got next to Providence bank Defendants' 'homeless' man was there, and talked about "punishing … to stop." Plaintiff worked in handwritten on AG guidelines when at 2:31AM the man challenged "Survive that. A survivor.."

2701.   10/25/2024, 1:00PM Defendants' man challenged under Plaintiff's windows "Survive."

2702.     Defendants use other synonyms to killing Plaintiff, threatening him that he will die.

2703.   9/6/2012, around 2PM a group of about 20 Teaneck High School students yelled under Plaintiff's windows "Hope you are dead." "We'll kill you." ECF No. 8-1 at 15.

2704.   9/21/2015, Plaintiff was back in Teaneck, NJ and when he walked on a street school girls he met commented him: "He is not afraid to be." ECF No. 8-1 at 956.

2705.   7/1/2019, about 9PM – "You will be dead." (under Plaintiff's windows) ECF No.8-2 at 1822.

2706.   9/16/2019, 11:36AM students yelled and commented under Plaintiff's windows "He hardly sleep." Girls "You gonna die." A bit later (11:43AM) students stated "Have to fight." ECF No. 8-1 at 947.

2707.   8/28/2021, About 11:17PM there was a distant talking "Found the body.. Can't arrest." "Can't believe." "You killed []. You are dead. You are dead." ECF No. 8-1 at 535.

2708.   12/4/2021, 2:37AM "Drop dead.

2709.   3/18/2022 Friday, 4:16PM a woman with 3 kids (the same woman had passed the windows talking a few times before that) under Plaintiff's windows stated that there is "80% chance he might be dead." ECF No. 8-1 at 356.

2710.   5/9/2022 Monday, When Plaintiff entered the Park a man next to him "You couldn't get all agents." Later another man next to Plaintiff "I thought he will die." ECF No. 8-1 at 408.

2711.   12/18/2022 Sunday, Defendants threatened Plaintiff directly – m2 "He is dead." mA6 "Take an enemy. Kalin forget it." ECF No.8-2 at 5982.

2712.   1/24/2023, 12:57PM students walked on the rocks commenting "Crazy dude. Kalin []." Later a student yelled under Plaintiff's windows on Cedar lane "Where is that negar?" A group of students talked "Can't stop. Probably should die." ECF No.8-2 at 6017.

2713.   9/18/2023 Monday1:04PM students under Plaintiff's windows "Can't stop [us]." Plaintiff checked only the swelling on jhis hand disappeared. School girl commented "He is not dead."

2714.   2/12/2024, 11:41AM school boys stayed under Plaintiff's windows outside camera view talking not loud "We can't protect him." "Kalin dies." 11:44AM school girls under the windows "not even fights." A boy again "Die." 11:51AM school boys again "Died last night." They walked on the rocks evading camera. 12:00PM Dula in B2 commented "He don't believe."

2715.   2/15/2024, About 11:45AM, 11:50AM group of students staying under Plaintiff's windows. At first shouted very loud, then not loud "Let Kalin die." Some of them yelled again. 12:47PM Defendants in building's corridor "Destroy him."

2716.   7/13/2024, About 7PM when Plaintiff stopped his shower Defendants' man under his window commented "Stop… Die."

2717.   8/30/2024, 5:54PM Christine, Jamaican food, and Defendants' man "Didn't consider police stopped." "Protected []." 5:56PM "How Kalin die..?" "That shit is so crazy." The man left.

**(3) Defendants deliberately and systematically humiliate or debase Plaintiff, showing disrespect and diminishing his dignity.**

2718.    Defendants methodically diminish Plaintiff (his qualities, skills, ethnicity, status), diminish what he did or planned to do (as his communications, requests, petitions re-framed as lacking any value, and more), and demonstrate variety of hostility, and lack of care about his rights or feelings. In significant number of cases Defendants' demonstrative disrespect to Plaintiff is in the context of, or in parallel with their false narrative about him as Bulgarian criminal / spy / terrorist / fagot hitting police. See IV.12.

      (i) Defendants demonstratively diminish Plaintiff's status, and deliberately reduce the value of what he does, aims, or knows.

2719.    In general most of the Defendants' conduct toward Plaintiff diminish him and reduce the value of what he do, aim, know and more. For example Defendants' policy, practice of ignoring Plaintiff's petitions and communications (see IV.9) among other things is demonstration that they consider his claims as lacking value, and him as not worthy of a response. Furthermore Defendants apparently aim to prevent any recognition of worth to him – they for example deleted / prevented any response to Plaintiff in the context of his search for experts at least in part for that reason (see IV.10).

2720.    Almost all parties Plaintiff has got in contact with followed the policy to ignore or otherwise diminish him, even if that meant to change previously established relations. At least in part this is due to Defendants' dissemination of the false narrative about Plaintiff as Bulgarian criminal, terrorist, fagot hitting police, and Plaintiff being marked for disruption (for example CVS staff commented a notice on their screen about 'disruption' of Plaintiff before providing medicine to him on 6/19/2024.). See Exhibit Timeline of events, and more.

(ii) Defendants explicitly called Plaintiff names with apparent intention to humiliate and provoke him.

2721.   Defendants deliberately mock Plaintiff's masculinity, and treat him as a gay/woman (including the related statements that they will 'fuck' him) which is intended as insult and disrespect (see above IV.8(a)). Closely related to that is Defendants' referral to Plaintiff as a 'bitch'. In addition to that Defendants also referred to Plaintiff as a 'fucker' or used 'fuck/fucking' as demonstration of disrespect to him. For example:

2722.   1/27/2017 Plaintiff was transcribing a recording of Teaneck Police officers and FBI from 2013, when at 4:37PM Defendants in ap.G2 commented "We have that." "Original is, all units fucked up you." ECF No.8-1 at 161.

2723.   5/14/2017 Plaintiff made photos and confronted Defendants in ap.G2 about slamming doors. J [yelling]: "(Maturing) little fuck. Fucking taking picture." ECF No.801 at 163.

2724.   4/23/2018 Monday (the day Plaintiff filed with S.D.N.Y. his case against Gyro et al), Defendants awakened him at 7:40AM with knocks on the heater's pipe, and a bit later shouted "Fuck you." ECF No.8-1 at 217.

2725.   10/27/2020 Plaintiff sent by email to JC Realty noise complaint against Defendants in ap.A3. Later same day Defendants came under Plaintiff's windows and talked "We lost the mother fucker." ECF No.8-1 at 506.

2726.   6/27/2020 Plaintiff was playing Command and Conquer online when at about 2AM Defendants' man under his windows confronted that "This is not a game mother fucker." ECF No.8-1 at 119.

2727.   5/7/2021 Dula in ap.B2 teased "We love you... Fuck you." Then at 9:16PM, 9:19PM, 9:58PM, 10:22PM (light), 10:25PM and 10:33PM Defendants in ap.B2 knocked on Plaintiff's ceiling. ECF No.8-1 at 452.

2728.   5/19/2021, 12:31AM under windows "Oh my God! New Jersey. Mother fucker." Plaintiff was reading legal cases from New Jersey. ECF No.8-1 at 119.

2729.   9/24/2021 Friday Plaintiff continued his research about the meaning of 'government official/agent' and at 5:07PM a school girl came and yelled under his windows "You are fucking liar." ECF No.8-1 at 255.

2730.   12/3/2021 Friday Plaintiff was working on relevant history for Defendants in ap.A3 when when at 11:03PM Defendants person got outside and back in the building playing on speaker: "Fuck off." ECF No.8-1 at 274.

2731.   3/2/2022 Wednesday 12:12PM students came and shouted under Plaintiff's windows "[] fucker." ECF No.8-1 at 340.

2732.   3/18/2022 Friday At 12:57PM another group of students yelled under the windows. Plaintiff asked them through his window "Why are you yelling? What's going on?" A student responded "Are you a crack-head?" A high school student on bike arrived and talked with Plaintiff, and another student stated "This is public space, I can do whatever I like." Plaintiff responded: "It doesn't matter that it is public space." The first group of students (from 12:25PM) returned close to Plaintiff's windows laughing and commented "They gave him 'fuck you'." ECF No.8-1 at 356.

2733.   3/29/2022 Tuesday 9:53PM Plaintiff was working on materials about Defendants in ap.B2, when Defendants man and woman talked loud in building's corridor. "Clear this mother

fucker." "The enemy." 10:02PM loud laugh under his windows. Plaintiff laughed and challenged "Clowns." 10:03PM the persons entered the building commenting "He shrug it. Can't believe." ECF No.8-1 at 367.

2734.    4/25/2022 Monday, 12:41PM Plaintiff was watching Jonny Depp's testimony, under his windows a man "Masturbating freak." Woman "Yea." 1:15PM after Depp made statements about his finger being cut students under the windows "Give him a finger." "Fucking stop." ECF No.8-1 at 394.

2735.    1/20/2023 Teaneck police officers and Defendants agents in the building referred to Plaintiff as 'fucker'. "Getting to fucker."… "Set the fucker." ECF No.8-1 at 82, 86.

2736.    And more.

(iii) Defendants play psychological games to humiliate and provoke Plaintiff.

2737.    Defendants' degrading conduct is planned, and they play prepared in advance psychological games to humiliate and provoke Plaintiff such as the 'mocking game' (explicitly naming it like that on 4/23/2018, 8/29/2022, 10/21/2022), 'shift game' (2/28/2017), 'shut up game', and more.

2738.    In addition to their "shut up game" (5/14/2017), which apparently aims to thwart Plaintiff's free expression, Defendants explicitly told Plaintiff to 'shut up'. For example students told directly or indirectly Plaintiff to 'shut up' on 11/3/2017, 8/17/2021, 8/17/2023, and 4/26/2024. In a few occasions Defendants responded to Plaintiff to 'shut up' when he challenged them inside his apartment (5/15/2016, 7/27/2017, 8/4/2021). Defendants told Plaintiff to 'shut up and pay your rent' when he researched NJ law about landlord-tenant contracts demonstrating, among other things, the surveillance on Plaintiff (7/17/2022). Notable are events on 4/26/2024 when students threw a rock toward Plaintiff, and told Plaintiff to 'Shut up'. Seemingly Defendants have stopped that 'game' since then.

2739.    5/15/2016, 3:30PM Plaintiff challenged in his apartment "Speak. You belong to mental institution." Defendants responded "Shut up bitch."

2740.    5/14/2017, Plaintiff spoke with Defendants in ap.G2 (Jean and her 'brother') while other Defendants agents were hiding in G level. At one point they said actions against Plaintiff are are "Shut up game." ECF No.8-1 at 163.

2741.    7/27/2017 Thursday, About 11:15PM Plaintiff challenged "You can not fake it. Turn yourself in." Defendants responded "Shut up."

2742.    11/3/2017 Friday, 11:30AM students under the windows "Shut up." And later "Can you lie?" a phrase from the TV show Plaintiff watched previous evening.

2743.   11/8/2017 Wednesday, Plaintiff went to FBI New York Field Office in Manhattan. When he left the building Defendants "We stopped the Bulgarian." "Stop (the) []." "Misjudgment." "Going (to stop)." "Shut up."

2744.   1/1/2018 at 4:49PM Defendants in ap.G2 shouted "Shut up." ECF No.8-2 at 1893.

2745.   8/4/2021 Wednesday, 11:10PM after Defendants in ap.A3 knocked on his wall Plaintiff challenged inside his apartment "What is going to be – let me influence you or knock 100 times more." Defendants under his windows responded "Shut up."

2746.   8/17/2021 Tuesday, 5:44PM, 2 students on bikes yelled under Plaintiff's windows "Shut up."

2747.   7/11/2022 Monday, 1:12 Ralph "Gotta shut up." ECF No.8-2 at 2441.

2748.   7/17/2022 Sunday, 11:22PM Plaintiff was researching NJ law and case law about landlords-tenants. A man commented under his windows "Shut up and pay your rent." ECF No.8-2 at 2700.

2749.   8/17/2023 Thursday, 1:14AM schoolgirls on Cedar lane "Have to stop." "Oh []." While Plaintiff was writing the note "Kalin [].". They returned under his windows a minute later and shouted "Shut up."

2750.   8/18/2023 Friday, 4:32PM Defendants and Lomo's man near Plaintiff's windows "We need to stop." "Are we still []?" "Shut up."

2751.   4/26/2024, 1:12PM students returned under the windows talking about "the role they have." "Like a shadow." They threw a rock under the windows. Plaintiff started video recording with his Sony opening the window, and one of them threw a rock toward him. Plaintiff asked him "My friend what are you doing?" the student told him to "Shut up."

2752.   In regards to Defendants' efforts to shut Plaintiff up, see their other practices degrading Plaintiff, and IV.12, IV.9.

## 12. Defendants deliberately and systematically attack Plaintiff's reputation and identity.

2753.   Defendants and parties in concert ('Defendants') falsely paint Plaintiff as an anti-government radical, a Bulgarian criminal / terrorist / spy (IV.7, 390 *et seq.* and more), Bulgarian 'fagot' (IV.8) who hits the police/government and holds Defendants hostage. That narrative, among other things, is Defendants' counter-narrative to Plaintiff's true account of relevant events as given, for example, in his petitions, and provides legitimate gloss on their otherwise unlawful discriminatory, and retaliatory actions against him. An average person would believe Defendants' many-years-long repeated statements that Plaintiff is a terrorist, hostage-taker, a threat, because they are public authorities[200] which supposedly know more and have undisclosed to public facts

---

200 "[P]olice officers were found to have the highest credibility in P/CVE communication. … [M]ost studies have found that highly credible sources are more persuasive among audiences and usually they lead to more behavioral compliance than a low-credibility source" *Don't kill the messenger: Perceived credibility of far-right former extremists and police officers in P/CVE communication*, D. Koehler, G.Clubb, J. J. Bélanger, M. H.

about Plaintiff. Although the only thing that is true is that Plaintiff is Bulgarian as ethnicity and national origin.

2754. Defendants' dissemination in public of that false information about Plaintiff significantly injured his economic prospects, his ability to associate for expressive conduct, exposed him to hatred and hostility, and more. The society is highly concerned with crime and terrorism, and the harm from Defendants' falsely labeling Plaintiff as such is apparent – he is deprived from resources, with no incomes, ostracized and isolated for many years.

2755. In addition to their apparent intention to discredit Plaintiff Defendants (a) attack his reputation in public and in his presence to inflict mental suffering, to humiliate, distress, and provoke him (they want Plaintiff to hear them); (b) disseminate the false and/or derogatory information about him to isolate, alienate, deprive him of resources, as well as to convince other parties to join the activities; and (c) suppress his true account of relevant events and systematically attack his identity in effort to trigger identity crisis.

*(a) Defendants have accused falsely Plaintiff of serious crimes in public since 2013.*

2756. Defendants said in public that Plaintiff is a 'threat', and repeatedly talked in his regard about law enforcement measures such as to 'investigate' or 'arrest' him. (See IV.9, and more.) They have accused Plaintiff falsely of murder, even claimed that he killed a police officer, claimed that he is Bulgarian mob, a thief, (bank) robber, that he is a fraud or committed fraud, that he is terrorist who holds them hostage, and similar, talking in public and in his presence at almost every locations Plaintiff goes. Defendants' persons, who in vast majority of cases are unknown to Plaintiff, demonstrate knowledge about him – how he looks, his name, his Bulgarian ethnicity and national origin, and act in accord to the Defendants narratives about Plaintiff.

2757. Defendants are fully aware of the falsity of those accusations – (1) Defendants' activities continue for so many years that it is certain that they had checked and found nothing to support those

---

Becker, M. J. Williams, Studies in Conflict and Terrorism, January 2023

allegations long time ago – otherwise Plaintiff would have faced formal charges; (2) Plaintiff has

been under Defendants' constant and demonstrative surveillance for most of the time he has been

in the US, if not since the time he arrived in 2011; (3) there are multiple Defendants' statements

which show that they know there is no factual basis for any of those accusations (they stated for

example that they 'made him', and the need to 'set up', 'stage', 'frame' him); and (4) there are

multiple Defendants statements showing that those accusations are means they use to

'destroy/ruin' him, to stop his petitions and other legal actions, to force Plaintiff to respond and

entrap him, and to 'push/ press/ oppress/ tease/ trigger' him.

**(1) Defendants know that there is no factual basis for accusing Plaintiff of crimes.**

2758.    Defendants knew the 'Kalin problem' for a long time, including the abuse and violations of the

US constitution and laws.

2759.    For example on 9/7/2019 Defendants in ap.A3 talked New York knows the problem: "Empire
states have lost a few Bulgarians." "Forgiving." "Kalin abuse? And they know Kalin
problem." ECF No.8-1 at 476.

2760.    10/29/2019 Plaintiff attended a public Teaneck Municipality Council meeting. A group of
Council members and Township Manager Dean Kazinci passed by him and one of the group
said nodding toward Plaintiff "The Cedar lane problem." (Plaintiff's apartment is at the
corner of Cedar lane and Red Road.) At the meeting no Cedar lane problem was discussed.
ECF No.8-1 at 51.

2761.    In the light of that knowledge the fact that they have planned and attempted to "stage", "set up"

Plaintiff to get him,  for many years, shows that Defendants know they have no factual basis for

their accusations of crime. Defendants even admitted that they "made him" (see 880 et seq.).

*(b) Defendants systematically attack Plaintiff's identity.*

2762.    An identity is who you are to others: the stories about you told by yourself and/or others, or the

meanings defining your role in the society.[201] Normal identity is formed by the experiences of

---

[201] *Discourse and identity*, Bethan Benwell & Elizabeth Stokoe, Edinburgh University Press Ltd 2006 ("For
    narrative analysts, identity is constructed in the stories we tell about ourselves; in fact we are 'storied selves'. ..
    constructionist theories treat the term 'identity' itself as a socially constructed category: it is whatever people
    agree it to be in any given historical and cultural context.); *Identity Theory*, Jan E. Stets and Richard T. Serpe in
    *Handbook of Social Psychology*, 2ed ed., Editors DeLamater and Ward, Springer 2013 ("Generally, we consider
    an identity to be a shared set of meanings that define individuals in particular roles in society (for example,

uniqueness, stability of self-esteem, and capacity to regulate emotional experiences.[202] According to Defendants' radicalization models an identity crisis is a significant factor in the process of radicalization (see IV.7 (a)(1)(ii)).

2763.    Defendants have created for Plaintiff several of the triggers for identity crisis as listed in some radicalization models (see IV.7.threat (a)(1)(ii)), specifically alienation, discrimination, lost employment (Gyro et al), and blocked economic prospects. Defendants also have been attacking Plaintiff's self esteem for many years by humiliating or otherwise degrading him (see above IV.11), and more. Specific forms of identity attacks are presented bellow.

2764.    Defendants deliberately ignore and suppress Plaintiff's account of events, his self-narrative, and label him[203] falsely as threat, Bulgarian criminal, fagot and more (IV.8(a)).

**(1) Defendants have ruined Plaintiff's social image, and defined detrimentally the stories and meanings others attach to him, with their false and defamatory narrative(s) about him as a Bulgarian criminal, terrorist, spy, and 'police enemy' (see above at (a)).The effect on Plaintiff and his prospects is significant in any possible way – financially, socially, emotionally, or otherwise.**

**(2) Defendants' systematic isolation and alienation of Plaintiff, and their deliberate efforts to create conflicts.**

2765.    Defendants have orchestrated systematic isolation and alienation of Plaintiff motivated by retaliation ('stop' campaign); discrimination based on Plaintiff's national-origin, ethnicity, perceived sexual orientation; and personal malice ('This is personal.' Teaneck police officer

---

parent, worker, spouse, or teacher role identity), as members of specific groups in society (for example, a church, book club, or softball group identity), and as persons having specific characteristics that make them unique from others (for example, an athletic or artistic person identity). Thus, people have many identities (James, 1890), and they are of different shares kinds (Burke & Stets, 2009).").

202 See above n.70 Meloy, Mohandie, Knoll, Hoffman, The Concept of Identification in Threat Assessment, 2015

203 "the fairly recent view of identity or self as something constructed via storytelling (see Bruner 1990; Chanfrault-Duchet 2000; Kerby 1991; Linde 1993; Somers 1994). … As a notion that individuals construct who they are and how they see themselves by making meaning of available resources (i.e., social roles and personal attributes), identity shares common conceptual ground with self-narratives. However, identities as traditionally conceived are not narratives. Rather, labeling theorists have represented deviant identities as marks or stigmata, or, more realistically, as a criminal record. A label, not a story, is imposed, and the consequences of that label form the basis for one's identity. Indeed, part of the actor's problem with labeling is that others deny her or his stories altogether, constructing the individual instead as one-dimensional— as only the label (Garfinkel 1956)." *What Is the Story?*, Lois Presser and Sveinung Sandberg, in *Narrative Criminology: Understanding Stories of Crime*, New York University Press, 2015

1/20/2023) (IV.8). See ECF No.8-2.E.3, Timeline of events. Defendants' purpose is apparently to exclude Plaintiff from the society, to prevent him to form friendly connections, to suppress his expression, and make others hostile toward him.

2766.   Plaintiff social activities – as for example his attendance and participation in meet up groups, all of which are formed for expressive purposes – constitute neither security nor safety threat. Those groups are not threat (they would be canceled if they were), do not holding extreme views, nor they incite or support violence.

2767.   For example Defendants have questioned persons who spoke with Plaintiff in his presence – which is warning that it is dangerous to talk with Plaintiff, demonstrating that he is a person of interest to Defendants, and is provocative demonstration of their efforts to isolate and alienate him. See more in IV.7.

2768.   Targeting Plaintiff there is no wide public interest involved apart from the institutional interest to boost 'terrorism' rates, scare further the public with false/fabricated 'terrorist/crime' threat. That is related to Defendants' financing, and power. Unless that is legitimate public interest that is waste of public funds, time, energy, suppressing convenient persons (friendless, single, isolated, immigrant from certain ethnicity, national-origin, with perceived sexual orientation gay).

(i) Defendants create conflicts and distrust toward Plaintiff.

2769.   Defendants create conflicts and distrust toward Plaintiff by (1) disseminating false defamatory narrative(s) about him, (2) showing the police/FBI interest in him, and (3) systematically humiliating, shaming, or otherwise degrading him. That is among the FBI long-known strategies to disrupt its targets.

2770.   One of the purposes of an FBI intelligence investigation is to create conflict, animosities, distrust, and exploit the hostility for the disruption of the target.[204] To do that the FBI

---

[204] ""[O]ne of the purposes of the counterintelligence Program is to foster factionalism and discontent...""
(COINTELPRO) Black Extremist 100-448006, Fed. Bureau of Investigation, ("FBI 100-448006"), page 53-57:
Letter 3/18/1968. "In other words, it is hoped that the dissemination of this [information] will result in internal
strife, distrust and disorder within the NOI itself." Id., p.57, Memorandum 2/21/1968. "In July 1968, the field
offices were further prodded by FBI headquarters to: (2) instigate "personal conflicts or animosities" between

disseminated information to discredit its opponents[205], or its targets to media or through sources available to the government with careful attention "to insure the targeted group is disrupted, ridiculed, or discredited".[206] FBI fabricated accusations[207], including by creating links to communism[208], or just by demonstrating the FBI's interest in subject's activity[209] In that regard "Every avenue of possible embarrassment must be vigorously and enthusiastically explored."[210] Dissemination of such fabricated information also targeted the family of a subject with intention to create conflict and distraction.[211] See ex-FBI agent Mike German statements in regards to lack of restrictions in effect on FBI (JTTF) to use COINTEL methods after 9/11 – IV.1. FBI.

2771.    **Creating conflict with police in general**.

2772.    (1) Defendants deliberately act to make Plaintiff hostile towards police and to persuade him to see police as a threat (see for example 5/14/2017, Id. at 163 "Police could have kill him."… "Police is investigating him.", or 1/20/2023, ECF No.8-1 at 81 *et seq*. "Do not bite police [is] still a threat."). Defendants efforts in that regard include the demonstrative participation of uniform police officers in the activities against him, the police support to other parties, police ignoring and/or obstructing Plaintiff's reports, and explicit threats that police would kill him (5/14/2017, 9/18/2021, 7/25/2023 (initiation of *Dimitrov I*)).

2773.    (2) Defendants have disseminated the narrative that Plaintiff hits police in public and, at least in a few occasions, in his presence. Such statements were made by variety of Defendants and/or parties in concert, apparently to degrade, humiliate, intimidate, and to provoke reaction. In all

New Left leaders;.. (9) exploit the "hostility" between New Left and Old Left groups;" Church Report 1976, p.89. "The Bureau also encouraged "gang warfare" between violent groups." Id., p.217.

205 Church Report 1976, p.239.

206 FBI 100-448006, p. 3-5. See also Id., p.26-27: Letter 11/28/1967 ("The Bureau feels that this incident affords an excellent opportunity to exploit this situation by counterintelligence action that will discredit and disrupt the []...")

207 FBI 100-448006, p.114: Letter 11/28/1967; Id., p.121-122: Letter 3/28/1968

208 "One field office noted that "effectively tabbing as communists or as communist-backed the more hysterical opponents of the President on the Vietnam question in the midst of the presidential campaign would be a real boon to Mr. Johnson." For example, a Midwest lawyer running for City Council was targeted because he and his firm had represented "subversives". The Bureau sent an anonymous letter to several community leaders which decried his "communist background" and labelled him a "charlatan."" Church Report 1976, p.248.

209 FBI 100-448006, p. 91-92: Memorandum 3/20/1968 ("Bureau authority is requested to contact [] to explore with him the possibilities of action … No direct suggestions will be made; however, it is believed an indicated interest in the activities of [] by this office will adequately indicate to [] that some actions should be taken."). See also Id., p. 82-86.

210 Church Report 1976, p.16 quoting Memorandum from C. D. Brennan to W. C. Sullivan, 5/22/68..

211 "One technique used in COINTELPRO involved sending anonymous letters to spouses intended, in the words of one proposal, to "produce ill-feeling and possibly a lasting distrust" between husband and wife, so that "concern over what to do about it" would distract the target from "time spent in the plots and plans" of the organization." Church Report 1976, p.216.

those occasions Defendants demonstrated the surveillance of Plaintiff, their coordination and the dissemination of derogatory information about him. The parties talking about that include police officers (10/13/2013; 10/20/2016), and FBI/JTTF agents (10/13/2013, 11/8/2017).

2774. What Defendants have referred to as 'hitting' or 'fighting' is 2 categories: (1) Plaintiff's preparation, work on legal and case-materials related to Defendants, and filing petitions to government (8/24/2016, 3/9/2018, 6/17/2018, 10/1/2019, 3/25/2020, 6/5/2020, 3/2/2021, 8/26/2021, 3/21/2022, 1/8/2024, 8/25/2024), and (2) fabricated, false and outrageous accusations that Plaintiff hit or even killed an officer (6/30/2013, 10/13/2023, 5/20/2017, 1/27/2018). Defendants also stated that as a reason to "punish" Plaintiff (8/2/2019, 3/6/2020).

2775. Notable is the significant pause of the talking on the theme 'Plaintiff is hitting/fighting police' since June 2022 (when he was preparing Notice of claims with Defendants, later filed on or about 11/11/2022), with two exceptions: on 1/8/2024 (a few months after he initiated the litigation *Dimitrov I*) they modified it into "He hit the government.", and on 8/25/2024 "Kalin is fighting police." (3 days before Plaintiff filed his second Administrative claims with the FBI). Also notable is the Defendants' statement that Plaintiff is 'hostile to police' on 8/13/2023.

2776. 6/30/2013, 10:09AM under Plaintiff's windows Defendants talked: "It's crazy that Bulgarian can destroy us." "No one can destroy (us)." "They'll get him." "Bulgarian is a crazy one." "Crazy one." A person in ap.B2 commented Plaintiff's reaction: "Bulgarian lost that []." Persons under the windows continued: "We will need a shot at them." "True." []. "Lost debating." "True?" Car door closed. "Ah?" "The turn-off game." "Hope we did (that)." "All he's got: nightmares." ECF No.8-1 at 100.

2777. 10/13/2013, Teaneck police officers talked under Plaintiff's windows about him and stated that "he shot police." ECF No.8-1 at 34.

2778. 8/24/2016, when Plaintiff for the first time started working on materials for his case against Defendants a Teaneck police officer came under Plaintiff's windows "Which guy try to hit us?" ECF No.8-1 at 124.

2779. 10/20/2016, Teaneck police officers under Plaintiff's windows after he made photos "He keeps on fighting." ECF No.8-1 at 43.

2780. 5/20/2017, Defendants followed Plaintiff to Phelps Park, Teaneck, NJ and talked about him – they mentioned Plaintiff's name ('Kalin') about 9 times in 5 minutes. "We don't forget Kalini kill." "Kalin believe." "We have Kalin []" "Arrest." Among other things they accused a few times Plaintiff that he 'killed police officer' as in: "Kalin killed []." "Police." "Knowing [] forget. Killed police officer." ECF No.8-1 at 113.

2781.    Apparent provocation – staff members in Sears, Hackensack, NJ on 1/27/2018, whether being Defendants or parties acting in concert, talked in regards to Plaintiff that "He hit an officer." (ECF No.8-1 at 102.6). Plaintiff requested them for 8-8.5" shoes but they brought him 9". He thanked and was about to leave, when one of them said there are 8" from that model. Then accused him implicitly that he fraudulently changed price labels – when Plaintiff did not react they commented: "He didn't got here to talk."

2782.    In the airport in Munich, Germany on 3/9/2018 Defendants and/or parties in concert commented him "He hits police.".. "How much we'll wait for you?" Later came to sit next to him talking about legal cases while he worked on materials for Gyro case. ECF No.8-1 at 127.

2783.    6/17/2018 at about 9:30AM Defendants under his windows "He fights New York police." (previous day Plaintiff worked on legal materials for his case against Gyro et al.) ECF No.8-1 at 48. Implying concerted actions between Gyro and 'police'.

2784.    6/18/2018, families, and children in uniforms in Phelps Park, Teaneck commented Plaintiff "He watches police." ECF No.9-1 at 102.6. Plaintiff as fighting police implicit meaning.

2785.    on 6/19/2018 when Plaintiff took a photo of envelope outside postal boxes addressed to G3: "Freak got the feds." ECF No.8-1 at n.60. Again implicitly meaning Plaintiff fights 'feds', and showing the 'feds' were/are in ap.G3 (the apartment of the super).

2786.    8/2/2019, Defendants in Teaneck, NJ commented "Have to punish him. He hits police." (ECF No.8-1 at 102.6), after Plaintiff had gone to Manhattan and deposited checks from the settlement of *Dimitrov v. Gyro et al.*, 18-cv-3600 (S.D.N.Y. 2018). Another example of Defendants implying that Gyro was closely connected to NYPD.

2787.    10/1/2019, Plaintiff was working on videos from his security cameras when at 10:51PM Ralph and another man commented under his windows he is "fighting police.." ECF No.9-1 at 646.

2788.    12/31/2019, Plaintiff worked on his online portfolio. Defendants in ap.A3 or ap.A6 challenged "Hit police." "Why stop?" ECF No.8-1 at 649.

2789.    3/6/2020, Defendants under his windows "Punish him." "Fights police." ECF No.8- at 1823.

2790.    Since 3/20/2020 Plaintiff started preparing FOIA requests. On 3/25/2020 Defendants in ap. commented that he is "fighting police". ECF No.8-1 at 485.

2791.    4/20/2020, while Plaintiff was working on DHS materials in FOIA context Defendants in ap.A3 commented "We thought he wants to hit the police." ECF No.8-1 at 480.

2792.    6/5/2020 Plaintiff was working on transcript of an audio recording Defendants in ap.A3 knocked on the wall, and after at 3:12PM Plaintiff knocked in retaliation they responded that he is "hitting police" ECF No.8-1 at 480. This was after students 'paraded' under Plaintiff's windows monitored by Defendants who commented "Have to prove that we are the enemy."

2793.    3/2/2021, Plaintiff worked on JTTF materials during the night. At 4:10PM he was dancing in his apartment and Defendants commented in the building's corridor: "As if he doesn't fight police." ECF No.8-1 at 663.

2794.    8/26/2021, when Plaintiff started working on relevant history file Defendants under his windows reacted "You want to fight." (10:07PM), and while he was working Defendants commented he is "a person [that] destroy cops". ECF No.8-1 at 102.6.

2795.    10/2/2021, two persons walked slowly in front of Plaintiff at Phelps Park, Teaneck, and when he passed them the man commented him "[He] hits police. How to provoke him?" Plaintiff sat on a bench in the park and a bit later two mid school boys stomped behind him and yelled "Fight". ECF No.8-2 at 2168.

2796.    1/13/2022 Thursday, at 12:11PM Defendants woman on Cedar lane commented Plaintiff under his windows is "hitting police. You crazy shit… my life." ECF No.8-1 at 292.

2797.   3/21/2022 Monday, after working on timeline of events Plaintiff went shopping in Target. On the line before a cashier Defendants behind him commented that Plaintiff "hits police." ECF No.8-1 at 359, 701.

2798.   6/19/2022, about 8PM while Plaintiff was working on a bench next to Provident bank on Cedar lane, Teaneck, NJ a family talked next to him. The man talked about Plaintiff "He fights police." Plaintiff looked at them and the oldest girl "What are you looking at?" Plaintiff did not respond. They moved behind Plaintiff and Plaintiff made a video of them. Man "He is confident." ECF No.8-1 at 434.

2799.   8/13/2023 Sunday, 9:17AM- 9:24AM Defendants' man in ap.B2 "Hostile to police.. I police.. we suppress… Kalin..." And hammered on Plaintiff's ceiling including when Plaintiff was writing the note.

2800.   1/8/2024, before 10:58AM Ralph loud in building's corridor "He don't believe we stopped." "He hit the government. Have to go. In about a week they will decide." Defendants' woman repeated at least 2 times Plaintiff's name ("Kalin"), while Ralph talked lout about "shoot[ing Plaintiff]. He will never stop." "Harass then." "Do you think he heard this?"

2801.   8/25/2024, 6:38PM while Plaintiff was working on Administrative claims to the FBI (filed on 8/29/2024) in Votee Park, Teaneck NJ group of Defendants passed at least five times Plaintiff, talked loud on the alley next to him, and said "Kalin is fighting police."

2802.   A narrative variation and explicit admission that Defendants know the purpose of Plaintiff's lawful activities is that he 'wants to sue the police'.

2803.   For example on 8/7/2018 while Plaintiff was in the NYC Sheriff's Office in regards Dimitrov v. Gyro et al. 18-cv-3600 SDNY, a person commented: "He wants to sue the police."

2804.   5/29/2020, Plaintiff was reading *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present* when at 11:41AM a Teaneck police officer sitting in a car parked under his windows challenged "Sue the police."

## 2805.   **Creating conflict with Teaneck public Schools' students**.

2806.   (1) Defendants supervise and direct students conduct against Plaintiff (see for example the 'inspiration day' on 2/28/2017). They regularly use students to deliver 'messages' to Plaintiff, apparently feed them with the false narrative of Plaintiff as Bulgarian criminal, fagot etc., and share with them surveillance information about him (they mock, comment Plaintiff's reaction/lack of reaction, and more).

2807.   (2) Since 2016 students regularly come under Plaintiff's windows, or next to him when he is outside (even overtly followed him (see for example 5/10/2017, ECF No.8-1 at 852)) to "fight" him. They act in coordination with Defendants to humiliate, shame Plaintiff, threatened him

multiple times, regularly using fighting words, and urging to 'fight', throwing rocks under the windows and even towards Plaintiff, shouting, screaming and more.

**2808.**    **Creating conflict in the building.**

2809.    (1) Defendants have put their agents as Plaintiff's neighbors, or in other apartments, and use cooperating parties in the building as their agents to regularly attack (sound and DE attacks) and otherwise frustrate Plaintiff, including by verbal assaults; noise such as slams, knocks on Plaintiff's walls, ceiling, floor, or on pipes passing through Plaintiff's apartment, yelling in neighboring apartments or the building corridor, playing loud music; complaining against Plaintiff; weaponizing building's utilities and pipe system; using directed energy, and more. See ECF No.8-1 at 148 *et seq*.

2810.    Defendants in ap. G2 till 2019 – apparently provocative enemies, 'parallel enemies', explicit talking. Defendants in ap.A3 apparently provocative 2019-2021. Defendants in ap.B2 – years long and ongoing. Defendants in ap. A1 occasionally. See Cesar 2015, contact with Ralph and Dula, and more.

2811.    Especially notable are Defendants agents in the building who are not in apartments adjacent to Plaintiff's as (a) Raphael Pimienta ('Ralph') who has been active against Plaintiff for many years but he became less active since Plaintiff's letter to Judge Rearden from 7/24/2024 (ECF No.14); and (b) John Doe, Holy Name security guard-neighbor who became apparently active since about the time Ralph reduced his overt provocations in 2024.

2812.    (2) Defendants act in concert with the landlords / the supers of the building. See IV.8 (b)(2)(iii) (B). Landlords do not enforce contractual obligation to ensure 'quiet enjoyment', but treat Plaintiff differently.

2813.    **Creating conflict in public groups**. Toastmasters, Dharma Drink, more – part of Defendants efforts to ostracize and alienate Plaintiff.

2814.  **USPS** as enemy – 2024 almost every day talking, carrier overt conduct, then beginning of 2025 I believe sting – officers in USPS uniform rang on Plaintiff's door.

**(3) Defendants' demonstrative surveillance of Plaintiff sets how others see his social role(s), and as he sees / experiences his role in the society. In that regard and among other things this is an attack on Plaintiff's identity.**

2815.  "individual is "a reality fabricated by this specific technology of power..." [which is] "exercised...through permanent mechanisms of surveillance and control" (2003b: 87)."
*Foucault, Surveillance and the Law of the Outside*, Peter Fitzpatrick, Philipp Kender, Surveillance & Society 2015, 13(2): 314-318

2816.  There are many examples of explicit or implicit demonstration of the surveillance given above.

**(4) Defendants have set issues with Plaintiff's identity and "re-named" Plaintiff.**

2817.  As part of disrupting Plaintiff (creating problems to interrupt or destroy his activities) Defendants have created situations in which he had an identity problems, as for example with his Social Security Number (Rel.,E.1.2.1). Defendants also used variations of his name or nicknames ('Kalini', 'Kevin', 'Iron man'). However those kind of attacks on Plaintiff stopped.

**(5) Defendants have destroyed Plaintiff's career as an advertising Art/Creative Director.**

2818.  Defendants destroyed Plaintiff's more-than-15-years-long career as an Art or Creative Director, at least in part as retaliation to Plaintiff's preparation for a lawsuit against Defendants. And as pointed above a job loss or blocked employment opportunities are triggers for identity crisis.

2819.  For Defendants' interference with Plaintiff's employment contracts see Dimitrov v. Gyro et al., 18- cv-3600 S.D.N.Y.. In the process of that litigation Plaintiff's ex-colleague Ms. Greenwald on 3/31/2019 stated that after Plaintiff's termination a notice to its employees was put at Gyro New York's office to not talk about the role of police (NYPD/JTTF) in regards to Plaintiff.

2820.  In demonstration to the nexus with Gyro Defendants have made a lot of efforts to deter Plaintiff to start a law suit ("Can not sue them" FBI agents and uniform officers on 11/8/2017, FBI New York building), and more. ECF No.1 at 278.

2821.  Defendants keep talking about Gyro, as for example on 11/21/2022 (about a week after Plaintiff had sent his Notice of claims) Defendants talked in ap.B2. John Doe (ap.B2) ('mB') stated: "Gyro have saved Kalin. Completely stop their (push)." "Call Gyro. Can't believe."

… mB "Can you stop []?" "Gyro have that. Gyro have (that)." mB "He wasn't going to stop." Dula: "To have stop that. Police have that." ECF No.1 at 278.

2822.    Since 2016 Plaintiff has been unemployed due to Defendants and parties acting in concert substantial interference with his employment prospects. In 2017 alone Plaintiff applied to about 290 job recruitment offers for work in the Creative Department of various advertising agencies but in accord to Defendants' statement from 12/27/2016 ("You will never find a new job. I promise you." (ECF No.8-1 at 121)) he didn't get even an interview with an employer. That is in time when "companies invest more in their branding and marketing efforts [and b]ecause of this hiring upswing, highly skilled professionals are in short supply. Unemployment rates in the creative field remain below the national average, and job opportunities outnumber qualified candidates."[212] And the "[d]emand remains strong for skilled professionals, and unemployment rates in the creative field continue to trend below the national average."[213] Furthermore, in the context of their constant and provocative surveillance, Defendants made multiple explicit statements demonstrating their interference with Plaintiff's employment prospects, and/or they are those who 'give' a job to him. See ECF No.8-1 at 161-162, and ECF No.8-2 at 2115-2127. See also Defendants' statements in that regards as:

2823.    "We have to find him job." (Defendants in ap. G2) and "He didn't consider []." (Defendants in ap. B2 while Plaintiff was preparing as email a job-application on 1/5/2017); "He doesn't believe it ended with Gyro." (Defendants in B2 when Plaintiff was preparing for an interview with a recruiter on 1/9/2017); "He knows we'll mess this." (Defendants in ap.B2 after a co-worker offered low-level job to Plaintiff on 1/20/2017); "Find him work." (Defendants under the windows on 2/24/2017, 10 minutes after Plaintiff stopped working on noise-harassment video exhibit); "[He] can not find a job." (a Teaneck police officer and another Defendants' man in a car talking for a while about Plaintiff near his windows on 6/26/2017); "Get employed and they'll got to stop." (Defendants' man in a car talked to Plaintiff on 7/6/2017); "Still have no job." (Defendants commented on 9/25/2017 while Plaintiff was working on the case factual history which, among other things, included some of the examples on ECF No.8-1 and 8-2 mentioned above).

---

212 *2017 Salary Guide*, The Creative Group, A Robert Half Company, created on 8/29/2016
213 *2018 Salary Guide*, The Creative Group, A Robert Half Company, created on 9/12/2017

**(6) Defendants attack Plaintiff's sexual orientation and impute homosexuality to him.**

2824.    Opposite to the way Plaintiff is and how he defines himself – as a straight male, Defendants'

continuously attack his sex / sexual orientation using the whole range of obscenity in regards to

how they perceive his sexual orientation (gay), including showing lustful thoughts and

humiliation (rejection) of Plaintiff. Sexual orientation/gender play significant part of a social

identity[214], and Defendants degrading treatment in that respect is an attempt to trigger identity

crisis in Plaintiff. See IV.8(a)(2).

# V. COUNTS

**COUNT 1: Defendants violated the First and Fourteenth Amendments of the US Constitution, and Art.1, §§8-9 of the New York State Constitution** (Against Defendants USA/FBI, the City of New York (under 42 U.S.C. §1983, §§1985-1986, NYS Const.), Township of Teaneck (under 42 U.S.C. §1983, §§1985-1986), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities (under 42 U.S.C. §§1985-1986))

2825.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and in ECF No.1, Count 1, as if fully set forth herein.

2826.    Defendants and parties in concert ('Defendants') act in concert to interfere or deprive Plaintiff of

his right to petition the government (IV.9). Defendants act consistently to disrupt Plaintiff's

preparation, work, or filing of petitions. Their conduct includes, but is not limited to (1)

demonstrative surveillance of Plaintiff as suppression and deterrence; (2) a social pressure

campaign to persuade Plaintiff that he can not sue them, and to deter him from working on or

filing petitions; (3) retaliatory pressure campaign since Plaintiff had filed his Notice of

claims/Administrative claims on or about 11/10-11/11/2022 to persuade and provoke Plaintiff that

his petitions 'can't stop' them, and that they 'won't stop'; (4) pressure campaign to persuade

Plaintiff to 'stop' preparing, working on, or filing petitions; and (5) obstruction of Plaintiff's work

---

214 *Collective Social Identity: Synthesizing Identity Theory and Social Identity Theory Using Digital Data,* Davis, Love, and Fares, Social Psychology Quarterly 82(3), June 2019

on, or filing of petitions by interference and retaliation in general, and specifically interfering

and/or preventing Plaintiff to file petitions with the FBI New York and Teaneck police.

2827.   Defendants retaliate to Plaintiff's preparation, work, and filing of his petitions by subjecting him

to degrading treatment, interfering with his economic prospects (loss of incomes), and more.

2828.   Defendants actively prevent Plaintiff's legal actions including by (but not limited to) restricting

his ability to uncover legal claims by not investigating his reports and other petitions, preventing

him to obtain legal or expert counsel, preventing or obstructing him to obtain or preserve

evidence for the violations, or otherwise obstruct his work including by retaliation, intimidation,

and degrading treatment. IV.10(a).

2829.   Furthermore Defendants have policy or practice to ignore, not investigate or obstruct otherwise

the petitions Plaintiff did filed. Their practice in regards to Plaintiff's petitions includes but is not

limited to (1) no contact with Plaintiff, no investigation, and no response to most of his petitions;

or (2) deliberately inadequate response, reframing, and minimizing his complaints.

2830.   Defendants have interfered and retaliate to Plaintiff's expressive conduct as for example (1) his

lawful collection of information, including information as evidence for his litigation(s), for

dissemination to public (see 2136 *et seq*. for the Defendants' obstruction); (2) his association with

others for political, social, economic, religious, and cultural purposes. Defendants interfered in

particular with his attendance of meetings and participation in groups for the purpose of

expression of views, ideas, and other similarly protected conduct (IV.12); and (3) his private

communications (deletion, blocking of emails).

2831.   Defendants failed to remedy the violations of Plaintiff's First and Fourteenth Amendments rights,

nor they made efforts to prevent further injury despite having undeniable knowledge about the

violations. Furthermore Defendants retaliated and keep retaliating to Plaintiff's exercise of his

rights for more than 13 years and counting.

2832.   There is no public interest in Defendants' restrictions on Plaintiff's liberties. Defendants seek to carry impermissible goal, by masking their discrimination, retaliation and malice toward Plaintiff under legitimate disguise by fabricating a false criminal/terrorist/spy threat. Plaintiff does not represent 'clear and present danger' – his conduct is not violent or unlawful, does not encourage, support or accept violence or any illegal acts, nor it suggests any probability of evil acts. His conduct is apparently not anti-governmental even if government is a side in the case at hand.

2833.   Based on their conduct which continue for 13 years and is ongoing Defendants' 'compelling' or 'significant interest' in Plaintiff's case is not fighting crime and terrorism but to prevent Plaintiff to make public their violations, and to 'punish' him for his speech.

2834.   Defendants' conduct significantly affected Plaintiff's conduct and chilled him out – due to their interference he has never filed a report with the FBI, in majority of cases he did not report to Teaneck police incidents listed in the complaint, and more.

2835.   Because of the continuous nature of Defendants' unlawful practices, and because Defendants' unlawful practices were permitted by supervisors and policymakers to continue unremedied for so long as to amount to an unlawful policy, custom or practice, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

2836.   As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 2: Defendants violated the Fourth and Fourteenth Amendment of the US Constitution and Art.1, §12 of the NYS Constitution** (Against Defendants USA/FBI, the City of New York (under 42 U.S.C. §1983, §§1985-1986, NYS Const.), Township of Teaneck (under 42 U.S.C. §1983, §§1985-1986), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities (under 42 U.S.C. §§1985-1986))

2837.   Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and in ECF No.1, Count 2 as if fully set forth herein.

2838.   Defendants have intruded on Plaintiff's person, home, and effects without legitimate reason and

justification for 13 years and ongoing. Defendants' searches and seizures are not reasonable both

as scope and manner of execution regardless of whether they had a warrant or not.

2839.   Even if Defendants had legitimate reasons at the beginning, on 9/7/2012 they knew that Plaintiff

is not a threat, but started law enforcement and community actions against him regardless. Acting

without probable cause Defendants threw at Plaintiff variety of false accusations, and never

individualized what Plaintiff is guilty of (apart of course of working and filing petitions, and of

his other lawful conduct).

2840.   Nor Defendants actions are reasonable as scope – they are massive waist of resources for 13 years

and ongoing (see Exhibit Letter to Attorney General Garland, 10/7/2024). Defendants escalated

the issues, and use extreme force, including subjecting him to prohibited by the international law

degrading treatment such as sleep deprivation, DE attacks, and more.

2841.   Defendants' intrusion on Plaintiff's privacy interests, his economic interests and similar is

massive. At the same time there is no public interest in Defendants' searches and seizures of

Plaintiff's person, house, papers and effects. Defendants seek to carry impermissible goal, by

masking their discrimination, retaliation and malice toward Plaintiff under legitimate disguise by

fabricating a false criminal/terrorist/spy threat.

2842.   Plaintiff does not represent 'clear and present danger' – his conduct is not violent or unlawful;

does not encourage, support or accept violence or any illegal acts; nor it suggests any probability

of evil acts. His conduct is apparently not anti-governmental even if government is a side in the case at hand. Based on their conduct which continue for 13 years and is ongoing Defendants' 'compelling' or 'significant interest' in Plaintiff's case is not fighting crime and terrorism but to prevent Plaintiff to make public their violations, and to 'punish' him for his speech.

2843. Defendants surveillance on Plaintiff for 13 tears and ongoing is search under the Fourth Amendments. The surveillance is implicit in everything Defendants undertook against Plaintiff. Defendants demonstratively followed Plaintiff, otherwise demonstrate the surveillance. IV.9(a) (1). Defendants' interference with Plaintiff's possession of his private emails, and his files stored on his private computer and laptops is seizure under the Fourth Amendment.

2844. Defendants deliberately placed Plaintiff in fear of unreasonable loss of possession and control of his person (placed him without protection under the law while threatening to arrest or kill him, making police a threat to him, subjecting him to DE attacks and other degrading treatment), of his house (Defendants efforts to deprive him from residence in the US, IV.8(b)(2)(iii)), and of unreasonable loss of possession and control of his papers and effects (Defendants deletion of files and communications, and more).

2845. Plaintiff has never consented to Defendants' searches or seizures.

2846. As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 3: Defendants violated the Due Process Clause of the US Constitution (5th And 14th Amendment) and the Due Process Clause of the NYS Constitution** (Against Defendants USA/FBI, the City of New York (under 42 U.S.C. §1983, §§1985-1986, NYS Const.), Township of Teaneck (under 42 U.S.C. §1983, §§1985-1986), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities (under 42 U.S.C. §§1985-1986))

2847.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and ECF No.1, Count 3 as if fully set forth herein.

2848.    Defendants abuse their power by using it to oppress and harm Plaintiff acting neither with legitimate reasons, nor in service of legitimate governmental objective – but to punish him for exercising his constitutional rights, and more. Defendants act with apparent discriminatory animus (see Counts 4-5), and deprive Plaintiff of rights such as the right to be free from (a) unjustified intrusions on his personal security, (b) unreasonable governmental investigation and entrapment, (c) degrading treatment including intentionally inflicted physical pain and injuries, and psychological torture, and (d) to be free in choosing residence.

2849.    Apart from the substantive due process scrutiny, Defendants' actions should have been implemented in a fair manner in accord with the procedural due process. Instead Defendants deny Plaintiff fundamental procedural fairness, and their conduct is a gross abuse of government authority – rather than fighting crime and terrorism, they continue a baseless, outrageous, out-of-control investigation of Plaintiff for more than 13 years and ongoing in order to punish and radicalize him.

2850.    Defendants have breached their respective duties to properly and fairly enforce the laws, rules, policies, practices, procedures and/or customs in accordance with the constitution, and caused harm to and violated Plaintiff's rights as set forth in this Complaint.

2851.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 4: Defendants violated Plaintiff's right to equal protection guaranteed under Fifth and Fourteenth Amendments of the US Constitution, Art. I, §11 of the NYS Constitution, and 42 U.S.C. §§1981, 1983, 1985-1986.** Claim against Defendants USA/FBI, the City of New York (under 42 U.S.C. §1983, §§1985-1986, NYS Const.), Township of Teaneck (under 42 U.S.C. §1983, §§1985-1986), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities (under 42 U.S.C. §§1981, 1985(3)-1986, NYS Const.).

2852.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 4 as if fully set forth herein.

2853.    Defendants have been acting in concert to subject Plaintiff to unlawful oppression, and selective treatment. Defendants' activities against Plaintiff are motivated, at least in part, by his race, ethnicity, national origin, sex, perceived sexual orientation, citizenship status, and/or are in retaliation to his conduct protected under the constitution and laws.

2854.    Defendants have singled out, and treat Plaintiff selectively. Their selective and unreasonable treatment of Plaintiff in comparison to similarly situated others is motivated by discrimination, retaliation, and/or malice – their conduct intends to injure him. Defendants reaffirmed Plaintiff's selection multiple times in the last 13 years and counting, and they continue their conduct without correction even after his reports, complaints, and legal actions.

2855.    Defendants deny Plaintiff equal protection under the law by (1) not holding accountable to the law, nor enforcing the law in regards to the US agencies, entities, or persons' unlawful and/or unreasonable policies or practices against Plaintiff; (2) actively preventing Plaintiff to hold them accountable in a court of law; and (3) applying selectively the law in regards to Plaintiff at least in part because of his race/national origin, sex, legal alien status till 2016, and in retaliation to his protected conduct.

2856.    Defendants deprive Plaintiff from his right to be equal before the court and his right to a fair hearing by interfering with his preparation, filing, and work on his legal actions and related materials; and by interfering with the court and the court procedures in regards to Plaintiff's legal

actions. Consequently S.D.N.Y. is neither impartial, nor independent in regards to Plaintiff and his legal actions.

2857.    Defendants apply facially neutral laws and policies in intentionally discriminatory and/or retaliatory manner against Plaintiff.

2858.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 5: Defendants violated 42 U.S.C. § 1981A(A)(1)** (Against Defendants the City of New York (under § 1983), Township of Teaneck (under § 1983), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities)

2859.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 5 as if fully set forth herein.

2860.    Defendants have discriminated Plaintiff on the base of his race: white Eastern European with Bulgarian ethnicity, ancestry and national origin. Defendants have discriminated against Plaintiff by significantly interfering with his right to sue; by preventing him to give evidence or suppressing the evidence he provided; by interfering with his right to make and enforce contracts.

2861.    Defendants have discriminated against Plaintiff by creating severe and pervasive hostile environment based on Plaintiff's protected characteristics, and have significantly altered the conditions of his life, and his enjoyment of his tangible and intangible properties.

2862.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 6: Defendants violated 42 U.S.C. § 1983** (Against Defendants the City of New York, and Township of Teaneck)

2863.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and in ECF No.1, Count 6 as if fully set forth herein.

2864.    Pursuant to municipal policy/practice/custom municipal actors as Teaneck police, Teaneck Board

of education, Teaneck public schools, NYPD (including NYPD officers in JTTFs), as well as

NYC and Teaneck officials, and other parties acting in concert and under color of law have

deprived Plaintiff of rights, privileges, or immunities secured by the Constitution and laws.

2865.    Defendants have deprived Plaintiff from rights under the First, Fourth, Fifth and Fourteenth

Amendments of the Constitution (Counts 1-4), and rights under 42 U.S.C. §§1981, 1985-1986

(Counts 5, 7-8).

2866.    Defendants have orchestrated and *conspired to isolate and discredit Plaintiff* in public.

2867.    Defendants have orchestrated and *conspired to neutralize Plaintiff's activities* and to punish him

for his prior activities by using government policies for illegal purposes – motivated by

discrimination and retaliation, and with the knowledge that the allegations against him are

baseless. That includes Defendants et al.'s conduct aiming to disrupt Plaintiff's preparation and

presentation of petitions. See Counts 1, 7, and more.

2868.    Defendants have orchestrated and *conspired to prevent Plaintiff from obtaining relief* including by

suppressing facts and creating a 'conspiracy of silence'. See Counts 1,7, 8, and 14.

2869.    Defendants have orchestrated and *conspired to coerce Plaintiff into crime* including by creating

false incriminating evidence against him, labeling him a Bulgarian 'criminal/terrorist/spy/fagot',

introducing extreme views in regards to violence, creating very hostile and abusive environment,

provoking Plaintiff 13 years and ongoing, and more.

2870.    Defendants had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of

his constitutional rights, but they have chosen to not do so, they actively participate in the

violations of his rights, or substantially contribute to the circumstances within which Plaintiff's rights were violated.

2871.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 7: Defendants violated 42 U.S.C. § 1985(2)** (Against Defendants USA/FBI, the City of New York, Township of Teaneck, and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta ('Ralph'), as well as number of Jane and/or John Doe (decision-makers) in their individual capacities)

2872.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 7 as if fully set forth herein.

2873.    Defendants act in concert to deter Plaintiff from attending the courts of the US (both as a party and witness), and interfere and obstruct the due course of justice with intent to deny him the equal protection under the laws (see Counts 1, 4, 6).

2874.    Defendants interfered with the course of Plaintiff's litigation against Gyro et al, and with *Dimitrov I*. Additionally to the above Defendants have been making a lot of efforts to obstruct Plaintiff's preparation and work on his legal cases. Defendants' conduct apparently affected Plaintiff's legal cases.

2875.    Defendants have demonstrated their racial animus against Plaintiff – a white Eastern European with Bulgarian ethnicity, ancestry and national origin, strait male perceived as feminine and gay, a legal-alien till April 2016.

2876.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 8: Defendants violated 42 U.S.C. § 1986** (Against Defendants USA/FBI, the City of New York, Township of Teaneck, and against Marlene Dula, as well as number of Jane and/or John Doe (decision-makers) in their individual capacity)

2877.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 8 as if fully set forth herein.

2878.    Defendants et al.' actions in concert have deprived and continue to deprive Plaintiff from rights under the laws and constitution in violation of §1985. See Counts 1-5, and 7. Defendants have the power to prevent or help preventing the wrongful acts, they have had many years to deliberate and remedy the wrongs, but intentionally chose not to do that. Instead Defendants allowed the wrongful conduct to continue for more than 13 years (and ongoing) regardless of Plaintiff's complaints and efforts to address the issues.

2879.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 9: United States of America (FBI) injured Plaintiff** (claims under the Federal Tort Claims Act ('FTCA'))

2880.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 9 as if fully set forth herein.

2881.    The acts and events set forth constitute negligent and wrongful acts and omissions of agents and employees of the U.S. Government, inter alia, discrimination, assault, battery, defamation, infliction of emotional distress, civil conspiracy, tortuous interference, nuisance, and trespass while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to Plaintiff in accordance with the laws of the New York State and the State of New Jersey.

2882.    Defendant's decisions about Plaintiff's investigation and its methods are discretionary but go far beyond defendant's discretionary authority by deliberately violating Plaintiff's constitutional

rights and his rights under the laws. Defendant has no discretion to create and execute discriminatory, unconstitutional policies and practices (in this case in violation of the First, Fourth, Fifth and Fourteenth Amendments), in violation of federal statutes (42 U.S.C. §§1981, 1985, 1986), or its regulations (for example the FBI violate the well settled principles against entrapment in AG's Guidelines on FBI Undercover Operations, May 3, 2002. V.B). All of that precludes the application of discretionary function exception in this case.

2883.    Additionally because Defendant's agents and officers are investigative or law enforcement officers of the United States Government and their tortuous conduct is within the scope of their office and employment the "law enforcement proviso" effectively overrides discretionary function exception, as well as the intentional tort exception.

2884.    Plaintiff's claims would not impede the FBI's proper functions or operations, because Plaintiff's claims are about 13-years-long and ongoing Defendant's conduct which is improper, without legitimate reasons, and without rational nexus to public safety, to terrorism or crime prevention.

2885.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 10: Assault.** Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta in their individual capacities

2886.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 10 as if fully set forth herein.

2887.    Defendants assaulted Plaintiff by deliberately putting him in fear of harmful contact or physical injury including by, but not limited to, direct and indirect threats in the context that government wants to 'kill', 'destroy', 'get' him because they consider him Bulgarian criminal, terrorist, spy, fagot who hits police.

2888.    Defendants have the apparent ability to carry out their threats (as evidenced in the cases of

extracted false confessions, or police killings in the news, for example), and in the circumstances

set in this Complaint any reasonable person would fear imminent harmful contact and/or physical

injury. Plaintiff's belief that Defendants are fully capable to carry out their threats is demonstrated

in his response to the threats: he filed a police report, set 24/7 working security system, he

document regularly events, makes constant efforts to prevent eventual harm, and more.

2889.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms,

for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 11: Battery** – Against Defendants USA/FBI (under FTCA),  and against Marlene
Dula, and John Doe (ap.B2) in their individual capacities

2890.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and in ECF No.1, Count 11 as if fully set forth herein.

2891.    Defendants' regular wrongful physical contacts with Plaintiff and his effects are intended to harm

and/or deeply upset them. Plaintiff has never consented with the contacts, and has made

significant efforts to evade them.

2892.    Defendants have used deliberately directed energy to contact Plaintiff and his effects which have

resulted in multiple non-permanent physical injuries and caused significant pain.

2893.    There are no circumstances in Plaintiff's case which make necessary or reasonable the use of

such force by Defendants apart from their discriminatory, retaliatory and malicious motives.

2894.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms,

for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 12: Defamation** – Against Defendants USA/FBI (under FTCA), and against Marlene Dula, and John Doe (ap.B2) in their individual capacities

2895.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and ECF No.1, Count 12 as if fully set forth herein.

2896.    Defendants deliberately invaded Plaintiff's interest in a reputation and good name by making

public statements that exposed him to public hatred, contempt, ridicule or disgrace, and induced

evil opinion of Plaintiff in substantial number of community.

2897.    Defendants' statements are defamation per se because they charge Plaintiff with serious and

specific crimes. Defendants have made repeatedly statements about Plaintiff as not-masculine,

referred to him as a 'woman'/'she', and a 'fagot' (perceived sexual orientation). Such imputation

of homosexual behavior to Plaintiff is also defamation per se.

2898.    Defendants implied and explicitly stated that Plaintiff is a 'crazy', 'psych", and mentally ill.

2899.    In the context of Defendants discriminatory animus against Plaintiff as an Eastern European

(from an ex-communist country) – one of the reasons for his wrongful investigation – they have

commented a few times Plaintiff as a 'Russian' or fabricated a connection to Russia, referred to

Plaintiff as a 'communist' or showed their animus indirectly.

2900.    Those statements from Defendants' agents and officials are made with the knowledge of their

falsity and/or with complete disregard about the truth – they are made in pursuit of their goal to

harm, radicalize, and entrap Plaintiff by constant provocations. Absent any criminal conduct by

Plaintiff Defendants' dissemination of the false narrative serve no public interest.

2901.    Plaintiff is a private person, and Defendants' defamation deprived him of friendly intercourse in

society, harmed his economic prospective, caused substantial stress and mental suffering, and

alienated him. Defendants' statements have discredited Plaintiff in his social life, and are

substantial factor for Plaintiff to be subjected to ostracism, sabotage, and contempt, as well as to

suffer economic harm – unemployment (employers' background check renders Plaintiff beyond employment), and lack of business opportunities (distrust is not a base for business relations).

2902.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 13: Infliction of Emotional Distress** – claims against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta ('Ralph') in their individual capacities.

2903.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 13 as if fully set forth herein.

2904.    Defendants USA/FBI, the City of New York, and Township of Teaneck have apparent power to damage Plaintiff's interests, and in order to harm him they have engaged in extreme and outrageous conduct which exceeds any reasonable bounds of decency. For 13 years and ongoing Defendants and parties acting as their agents have deliberately acted against Plaintiff to cause, and indeed have caused serious mental distress, which no reasonable person should have to endure.

2905.    Defendants have deliberately subjected Plaintiff to systematic and coercive campaign of continuous harassment and verbal abuse (including sound and directed energy attacks, psychological torture, victimization, and more), prolonged physical pain, disruption of his senses, death-threats, constant surveillance, 'patrolling' under Plaintiff's windows, disruption of services, deterioration of living conditions, and more.

2906.    Defendants' conduct violates the laws and constitution. Consequently because there is no legitimate justification for the conduct public policy can not bar the claim, nor Defendants are allowed to achieve their goals by deliberate infliction of emotional distress.

2907.　Plaintiff's live course changed significantly due to Defendants conduct. Defendants' conduct caused in many cases physical injury to Plaintiff (due to the use of directed energy), sleep deprivation, continuous stress and anxiety, he is unemployed (Defendants disrupted Plaintiff's career in advertising), with no incomes. Living under threat, and under continuous harassment by Defendants, Plaintiff's self-esteem, sense of personal power and control over the events have been significantly diminished. He records events in his presence since 2015, has been running non stop a security software with 3 cameras (in different configurations) at home since about May 2016, started to records himself at home since about 2017. Because of the Defendants' conduct he didn't launch his business in 2012-2013, stopped searching for job after the litigation with Gyro and the overt interference from Defendants, stopped searching for legal representation after 2018. All of that is evidence for the severe mental distress Plaintiff suffers.

2908.　As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 14: Civil Conspiracy** – Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta ('Ralph') in their individual capacities

2909.　Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and ECF No.1, Count 14 as if fully set forth herein.

2910.　Defendants act in concert, consciously, and in agreement about their general purpose – to disrupt, harm, radicalize and entrap Plaintiff, even though they might perform different functions, or different parts of the plan. Defendants act in coordination with each other and direct third parties to follow a common scheme, common design which follows their model(s) of radicalization process. Each of the Defendants aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in taking the wrongful actions and other wrongdoings against Plaintiff complained herein. Each of the Defendants acted with an awareness of his/her/its

primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

2911.    Defendants know that the conduct is a breach of duty owed to Plaintiff: duty for conducting reasonable investigation, duty to minimize the harm, duty to not harm Plaintiff's rights under the constitution and laws, and despite that knowledge each defendant has given substantial assistance and/or encouragement to others. Defendants have assisted, and/or directed third parties to advance the commission of torts, to harm Plaintiff, and conceal Defendants' participation.

2912.    Defendants are in apparent position of authority and their suggestive words plant the seeds of action against Plaintiff. As a result Plaintiff's social activities are sabotaged, he faces ostracism and alienation, and among other things his economic prospects are significantly harmed.

2913.    Knowing about the violations of the constitution and laws Defendants are deliberately silent and take not action to remedy the conduct – which is substantial assistance to achieving the conspiracy goals.

2914.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 15: Tortuous Interference** – Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities

2915.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and ECF No.1, Count 15 as if fully set forth herein.

2916.    Defendants interfered with Plaintiff's business, profession, and contracts, deliberately harming his protected interests without proper justification.

2917.    Defendants deliberately interfered with Plaintiff's contract with the landlords Tower Management Service (till February 2020), and JC Realty Management/Red Road LLC (since March 2020), and

that resulted in breach of contract: landlords have not enforced contractual obligations in regards securing 'quiet enjoyment' of the premises and ignored or minimized Plaintiff's complaints, they have treated him differently then other tenants in detrimental way, changed the terms and conditions of the contract, withheld convenience information, and more.

2918.    In similar way Defendants interfered with Plaintiff's contracts with Optimum, Verizon, and Viber, with Citibank, Derek Smith Law Group, Summit Dentistry and Advanced Endodontics, and more.

2919.    Defendants interfered with Plaintiff's employment contracts, and significantly disrupted Plaintiff's employment opportunities.

2920.    As result of Defendants' interference Plaintiff suffered actual damages such as loss of his incomes, career, business and economic prospects, his contracts' terms and conditions deteriorated, and more. As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 16: Nuisance** – Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta in their individual capacities

2921.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and ECF No.1, Count 16 as if fully set forth herein.

2922.    Defendants' conduct is characterized by a pattern of repeating objectionable acts for many years. Defendants acting in concert on the public areas adjacent to Plaintiff's building which are in front/under Plaintiff's windows, as well as in the building's corridor have interfered substantially and offended public morals, endangered the safety in the area, and interfered with the convenience and comfort of considerable number of people in the building and on Cedar lane and Red Road streets. Defendants speak in those areas obscenities referring to Plaintiff as a 'bitch', 'fagot', 'total ass', stating "Fuck you." and more (that also is violation of Teaneck Township

Code ('TTC'), Sec. 26-22[215]). Defendants also regularly make sudden and/or continuous loud noises in those areas.

2923.    Defendants et al. substantially interfere with the public right to use public areas as public parks, public areas with benches, streets, and similar by making deliberately sudden and unnecessary loud sounds, talking loud, playing music next to Plaintiff, and other conduct targeting Plaintiff (also in violation of TTC, Sec. 21-15, and Sec. 26-22). Defendants' objectionable conduct is continuous, deliberate, and substantially disrupts Plaintiff's use and enjoyment of those public areas, and results in inconvenience, discomfort and distress to all present.

2924.    Plaintiff suffer special loss from Defendants' conduct described above, he suffers the most in comparison to other members of the community because he is (one of) the closest to those activities, the conduct is directed at him, and intends to disturb him, ruin his comfort, and harm his health and safety. The cumulative harm due to the proximity and the time Plaintiff has been exposed to that conduct is also unique to him than to random persons in those public areas (especially in regards to area next to his apartment as random persons are in those areas for very limited time than Plaintiff). Because of the above the harm Plaintiff suffers is different in kind from the community in large.

2925.    Defendants have interfered substantially with Plaintiff's private rights to use and enjoy his apartment. Defendants have deliberately made noise in the area right in front of Plaintiff's windows, in the corridor, neighboring apartments, on the Plaintiff's walls, floor, ceiling, and pipes with the intention those sounds to enter his property and disturb him, harm him emotionally and mentally, ruin the peace and quiet, interrupt him, provoke him, and more.

2926.    Defendants' objectionable conduct is continuous with clear pattern of deliberate and substantial disruptions of Plaintiff's use and enjoyment of the apartment. Defendants are liable for their invasion of Plaintiff's interests in his apartment on 805 Red Road, Teaneck, NJ because they have

---

215 "No person shall utter any loud, profane, obscene, indecent, lewd, abusive or offensive language in any public place."

had plenty of opportunities to abate the nuisance but chose not to, even after Plaintiff filed his Notice of claims and his Administrative claims under the FTCA.

2927. As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 17: Trespass** – Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta in their individual capacities

2928. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 17 as if fully set forth herein.

2929. Defendants have deliberately used and use directed energy to go into Plaintiff's apartment and get in contact with him and his chattels which results in harming him, and have substantially diminished his ability to use and enjoy his properties for many years.

2930. Defendants intentionally and without Plaintiff's consent interfered with Plaintiff's intangible properties and his use and enjoyment of those chattels. For example Defendants interfered with Plaintiff's email accounts with Yahoo.com, gmail.com, and more. Defendants significantly and deliberately changed the conditions and quality of those Plaintiff's properties, including by destroying the information in his email or hosting accounts, or stored on his computers/laptops which in effect is dispossession of those information.

2931. Defendants' conduct described above injures Plaintiff, puts him in danger of further physical injury, and causes distress, discomfort and inconvenience.

2932. As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

## VI. PRAYER FOR RELIEF

2933.  Plaintiff respectfully request that this Court enter judgment in his favor and against Defendants for the following relief:

2934.  Awarding compensatory damages to compensate Plaintiff for what he suffered and will continue to suffer: the loss of income, bonuses, benefits, other compensation, and other pecuniary losses; emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses. The amount of compensatory damages would be determined at trial.

2935.  Awarding punitive damages as Defendants' conduct has been malicious, deliberate, willful, wanton, outrageous, with reckless indifference to Plaintiff's federally protected rights and conducted with full knowledge of the law; and in order to deter Defendants from engaging in any such further unlawful conduct. The amount of punitive damages would be determined at trial.

2936.  Awarding Plaintiff his costs, expenses and fees in this action; and

2937.  Awarding Plaintiff such further reliefs as the Court may deem just and proper.

## VII. DEMAND FOR JURY TRIAL AND PLAINTIFF'S CERTIFICATION

2938.  Plaintiff demands a jury trial on all claims that are triable by jury even though the FTCA claims are to be tried by the court (28 U.S.C. § 2402).

2939.  I declare under penalty of perjury that to the best of my knowledge and belief the foregoing is true and correct.

Dated: 9/5/2025
Respectfully submitted,

__/S/_____
Kalin Dimitrov
805 Red Road, Apt. A2
Bergen County, Teaneck, NJ 07666
Telephone: +1 646 378 8286
Email: kdcase2023@gmail.com

*Plaintiff, proceeding pro se*