## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

KALIN G. DIMITROV,

Plaintiff

-against-

THE UNITED STATES OF AMERICA, THE CITY OF NEW YORK, TOWNSHIP OF TEANECK, MARLENE DULA, JOHN DOE (Ap.B2), RAPHAEL PIMIENTA, AS WELL AS NUMBER OF JANE AND/OR JOHN DOE (DECISION-MAKERS)

Defendants.

Civil action
25-CV-7420

JURY TRIAL DEMANDED

# COMPLAINT
## [with removed quotes and factual text-blocks, and factual footnotes, everything else preserved, including the punctuation]

I, Kalin G. Dimitrov ("Plaintiff"), proceeding *pro se* for my complaint against the Defendants named above (collectively "Defendants") allege as follows:

1. This action arises under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. As well as under 42 U.S.C. §§1981, 1983, 1985, 1986, Federal Tort Claims Act (28 U.S.C. §2671, *et seq*.), the Constitution of the State of New York, and state and common law of the State of New York and the State of New Jersey.

## I. JURISDICTION AND VENUE

2. This Court has subject matter **jurisdiction** over Plaintiffs' claims under 28 U.S.C. §§1331, 1332(a), 1343(a), and 1346(b).This Court has supplemental jurisdiction under 28 U.S.C. §1367(a) over Plaintiff's claims arising under the state law of the State of New York and the State of New Jersey. The Court has also jurisdiction under 28 U.S.C. §1361 to compel an officer or employee

of the United States or any agency thereof to stop and/or prevent further violations of Plaintiff's rights.

3.    The Court may grant injunctive and declaratory relief for the constitutional violations alleged here pursuant to 5 U.S.C. §702 (which waives the sovereign immunity of the United States with respect to any action for injunctive relief under 28 U.S.C. §1331), 28 U.S.C. §2201 (which confers jurisdiction to issue declaratory judgments), and Federal Rules of Civil Procedure 57 and 65. Furthermore the Court has the authority to hold unlawful and set aside Defendants' actions under 5 U.S.C. §706 as Defendants' actions are contrary to Plaintiff's constitutional rights, an abuse of discretion, not supported by evidence and unwarranted by the facts, and not in accordance with the law.

4.    This Court is a proper **venue** for this action under 28 U.S.C. §1391(b), (e)(1), and under 28 U.S.C. § §1402(b) because significant part of the acts or omission complained herein occurred in this district.

## II. PARTIES

5.    Plaintiff Kalin G. Dimitrov is a heterosexual male, born and raised in Bulgaria, Bulgarian as ethnicity and ancestry, and at all relevant times: a legal alien till 4/13/2016 and a citizen since then. Plaintiff is a resident of Bergen County, NJ, not a member of any party or any action/front organization of a political party. Plaintiff is established advertising Art Director, with more than 15 years experience, some of which in the offices of big international advertising agencies as Publicis, TBWA, and more.

6.    Defendant the United States of America ('USA' or 'US') is the federal government, the proper defendant under 28 U.S.C. §2671, *et seq*. for Plaintiff's claims arising from acts and omissions of the FBI and JTTF agents and officers as stated in the Complaint (JTTFs' policy and program

management, its oversight and review are the responsibility of FBI, and its operational activities are supervised by FBI Supervisors).

7.    Defendant the City of New York ('NYC') is a municipality organized and existing under the laws of the State of New York. Defendant City of New York maintains the New York Police Department ('NYPD'), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the New York City Charter and Administrative Code, acting under the direction and supervision of the City of New York.

8.    Defendant the Township of Teaneck ('Teaneck') is a municipality organized and existing under the laws of the State of New Jersey. The government of Township of Teaneck is managed and supervised by its Council and Manager, and includes Teaneck Police Department ('TPD'), Teaneck Board of Education (the supervisor of Teaneck public schools), and more.

9.    Defendant Marlene Dula ('Dula') is NYPD officer in a Joint Terrorism Task Force ('JTTF') occupying the apartment in Teaneck above Plaintiff (ap.B2), and the person involved in the activities against Plaintiff since the beginning.

10.    Defendant John Doe (ap.B2) is a man present in ap.B2 almost every day at least since 2016, and active participant in the activities against Plaintiff. According to Plaintiff's knowledge and belief that man most probably is Lloyd Swaby (ap.B6), self-identified FBI agent, who stated to Plaintiff he was with Dula in ap.B2 in a few occasions.

11.    Defendants Raphael Pimienta ('Ralph', ap.D3) is NYPD officer and active participant in the activities against Plaintiff since about 2016.

12.    The unspecified number of Defendants Jane Doe and John Doe (decision-makers) are persons at Defendants USA/FBI, NYC, and Teaneck who  are making policy and practice decisions about Plaintiff.

## III. ADMINISTRATIVE PREREQUISITES

13.    Plaintiff filed Administrative claims under the Federal Tort Claims Act dated 8/29/2024 with the FBI via certified mail. The Administrative claims were received by the FBI Headquarters, 935 Pennsylvania Avenue, NW Washington, D.C. 20535-0001 on September 3, 2024.

14.    Plaintiff received on 3/12/2025 the FBI denial of his Administrative claims dated 3/6/2025.

## IV. STATEMENT OF FACTS

15.    This case is about the outrageous abuse of the Defendants' law enforcement and counterterrorism powers used to harm, degrade, provoke and entrap Plaintiff in the last 13 years and ongoing. Plaintiff have become a subject of Defendants' activities (overtly since 2012) because FBI/JTTF agents considered him a 'Bulgarian fagot', a 'threat'. After they threatened to kill him and threw pebbles at his windows Plaintiff recorded them and on 9/11/2012 filed a report with Teaneck police. In retaliation Defendants escalated the case characterizing Plaintiff falsely as 'Bulgarian criminal/terrorist/spy/fagot' hitting police, and since then have acted in violation of the US Constitution and laws to 'suppress' and 'destroy' him with the knowledge that there is neither criminal nor anti-government activities on his side.

16.    In response Plaintiff initiated a legal action against Defendants: *Dimitrov v The United States et al*, 23-cv-6451 (S.D.N.Y. 7/25/2023) (ECF[1] No.1) (referred bellow as '*Dimitrov I*'), but after more than two years Judge Rearden's decision on the Report and recommendation (ECF No.7) and Plaintiff's objections (ECF No.8) is still pending. Meanwhile Defendants' abuse continue without remedy, their efforts to 'suppress' and 'destroy' Plaintiff now include the obstruction of *Dimitrov I,* and their conduct since the initiation of *Dimitrov I* is the reason for this litigation. Because Defendants' actions are continuation of their activities addressed in *Dimitrov I*, all relevant facts since 2012 are relevant to this action.

---

1    Here and bellow ECF refers to the electronic case filings in *Dimitrov v. The United States of America et al,* 1:23-cv-6451 (S.D.N.Y., 7/25/2023)

17.  Since 2013 Defendants policies, practices, customs in regard to Plaintiff are (a) consistent, widespread, and continue for many years, which implies the constructive knowledge and endorsement by their policy-making officials; (b) Defendants policy-makers have never ceased or investigated the violations Plaintiff complained about, and they continue with their approval; and (c) Defendants policy-makers are deliberately blind to Plaintiff's rights, and/or fail to train and supervise their subordinates.

18.  Defendants' use of communities, schools, and other parties to 'suppress' Plaintiff shows that they utilize CVE[2] and/or similar programs to disrupt his economic prospects, discredit him by disseminating false narrative(s) (including that he is a criminal)[3], subjecting him to many-years-long campaign intended to cause mental pain and suffering and provoke reaction[4], and more.

19.  Defendants act in concert[5], aiding and abetting each other in their pursuit of harming Plaintiff, and are jointly liable as co-conspirators, including for the acts of other parties acting in agreement and coordination.

20.  Defendants' activities against Plaintiff are framed as an FBI/JTTF preventive investigation[6]: (a) they present Plaintiff as a threat (a gloss of legitimacy on their discriminatory and retaliatory animus, and malice toward him); (b) Defendants investigate Plaintiff[7] for 13 years (and ongoing) without criminal or anti-government grounds – the duration alone shows that this is framed, at least in part, as counterterrorism measures[8] which are under the purview of the FBI and its JTTFs; (c) they make significant efforts to entrap Plaintiff and/or to 'exclude and remove' him from the USA by fabricating links to crime, and subjecting him to regular provocations, discrimination,, degrading treatment, and influence campaigns ('messages', social pressure, and similar) to

2
3
4
5
6
7
8

radicalize him; and (d) based on the totality of facts Defendants' overarching goal is the disruption of Plaintiff[9] by getting him in prolonged conflicts, incapacitate him with unresolved problems, and keep him in a state of frustration and distress.

### 1. The Federal Bureau of Investigations is a leading party in the activities against Plaintiff.

21.    Defendants have demonstrated to Plaintiff that the activities against him are FBI (and its JTTFs) activities by (a) identifying themselves or other participants as FBI; (b) showing the FBI support/ approval; (c) the apparent nature and participation in the activities are under the authorities, responsibilities, and organization of the FBI and its JTTFs; and (d) the FBI is deliberately blind to the violations Plaintiff reported – showing at minimum support and approval of those activities.

*(a) FBI agents and participants identifying themselves or other parties as 'FBI', 'agents' or 'feds' act in concert against Plaintiff.*

*(b) Defendants have shown to Plaintiff that the activities against him are FBI activities or are supported / approved by the FBI.*

*(c) The apparent nature and participants in the activities against Plaintiff show they are under the authority, responsibility, and coordination of the FBI and its JTTFs.*

**(i) Defendants activities against Plaintiff are framed as counterterrorism investigation.**

22.    Defendants falsely designate Plaintiff as a threat: as a (potential, suspected) terrorist and/or suspect for related crimes (see IV.7). FBI is the primary agency investigating such threats.[10] The duration of Defendants' activities also shows that they are framed as counterterrorism measures (see above n.8).

9

10

**(ii) FBI investigations are usually conducted in concert with other agencies, or by JTTFs or other joint task-forces.[11] Many of the other participants in the activities against Plaintiff are traditional JTTF members or partners such as police, USPS, sheriff departments, private security, utility companies, universities, and more.**

23.    FBI and the other parties have been in contact and act in coordination against Plaintiff. As many

of the participants are members or partners with JTTFs they had been and are in established

contact and coordination within the framework of FBI's JTTFs, and/or within the framework of

the existing anti-gang or CVE programs. For example USPS is member of the national JTTF;

NYPD is substantially involved in JTTF New York (furthermore the NYPD actions in New

Jersey is well known); and sheriff departments, private security, utility companies, universities

are regular members or partners with JTTFs.

**(iii) Defendants' efforts to 'exclude and remove' Plaintiff from the apartment and the US are measures under the FBI/JTTF authority. (See IV.8(b)(2)(iii))**

**(iv) The methods Defendants use against Plaintiff (including violations of the constitution) are a modernized form of the FBI methods from COINTEL era.**

**(v) The retaliation to Plaintiff's legal actions is in accord with long-time existing FBI practices to silence anyone who "dares to question its motives or performance", and to place "higher value on maintaining image rather than rooting out wrong."[12]**

**(vi) In further support – the FBI New York / JTTF New York had conducted operation on Plaintiff's street months before he moved in[13].**

*(d) Despite its "authority and responsibility to investigate all violations of federal law that are not exclusively assigned to another federal agency"[14], and "its responsibility to uphold and protect the civil rights"[15] the FBI remains deliberately blind to the violations Plaintiff reported verbally om 11/8/2017, and in his two Administrative claims with the FBI on 11/10/2022 and 8/29/2024. That is at minimum support and approval.*

24.    The FBI has duty to guarantee Plaintiff's rights under the US constitution and laws[16] including by

ceasing, investigating and providing effective remedy for the violations. The FBI has failed to

---

11
12
13
14
15
16

7

intervene with the ongoing constitutional violations in the activities against Plaintiff, and FBI's supervisors have failed specifically in regards to the FBI and JTTF's activities despite Plaintiff's repeating complaints (see IV.8, IV.9). Similarly the FBI failed to investigate, and to bring to justice the violators regardless of the variety of applicable and relevant US criminal statues. At minimum this is conscious avoidance because FBI should have investigated its own activities, and/or activities it approved (even if only by allowing them to continue for years, let alone its own role in them). See IV.9(b).

**2. The NJ State and Teaneck Municipality's knowledge and participation in the activities against Plaintiff.**

25.    Plaintiff is not a public person, but both the NJ State (Bergen County) and Teaneck Municipality knew him and his grievances before his Notice of claims to Township of Teaneck (11/11/2022). This by itself shows their knowledge and participation of Defendants' activities against him.

26.    In that regard a few events are notable: Teaneck Council members and Township Manager Dean Kazinci knew Plaintiff ("The Cedar lane problem." 10/29/2019), the NJ Assemblyman Gordon Johnson knew Plaintiff (2/26/2020); Bergen County Sheriff's deputies/staff participated in the activities against Plaintiff for example on 6/9/2021, 11/27/2022, and 9/11/2024; a New Jersey State government employee threatened to extradite Plaintiff on 4/2/2024; the NJ Congressman Josh Gottheimer's staff acted in concert with Defendants against Plaintiff (8/13/2024); Teaneck firefighters and ambulance/first responders "Suspect Kalin." (3/29/2025).

**3. Teaneck police is one of the main parties in the activities against Plaintiff.**

27.    Teaneck police participation began with Plaintiff's report from 9/11/2012. A few points demonstrate the police involvement: (a) the police did not investigate Plaintiff's report from 2012 and concealed the events; (b) till 2024 Teaneck police did not investigate any report Plaintiff filed with them, and in 2024 Plaintiff filed two reports which police only superficially addressed; (c)

since 2013 uniform police officers overtly participate in the activities against Plaintiff; (d) multiple parties in the activities identified themselves or others as police; (e) Defendants stated Teaneck police' participation in the activities; and (f) Teaneck police does not enforce the law in regards to those harming Plaintiff and to his case.

*(a) Teaneck police didn't investigate and concealed the events Plaintiff reported on 9/11/2012 (see ECF No.1 at 26, and No. 8-1 at 20).*

28.    Plaintiff went to Teaneck police in the morning of 9/7/2012 after the events on previous day. The officer he spoke with said that police had not authorized such activities, and requested a proof from Plaintiff. Later same day Plaintiff recorded his first audio recording of Defendants, in which they said that all law enforcement agencies will join them, including the police in three days. When Plaintiff filed police report on 9/11/2012 (four days later) his report has never been investigated, the materials he provided to police – audio recordings, sketches, handwritten statement – were not entered in police system, but for officer's misleading description of a small part of Plaintiff's complaint.

*(b) Teaneck police did not investigate any report Plaintiff filed till 2024. Furthermore with exception of the report from 1/9/2019 neither Plaintiff's handwritten statements nor the other materials he provided to police were entered in the police records system,. After the initiation of Dimitrov I Plaintiff filed two reports with the police in 2024. In both cases police was not willing to investigate further, and ignored (didn't even saved) some of the records Plaintiff provided as evidence.*

*(c) Teaneck police overtly participate (with uniform officers) in the activities against Plaintiff since 2013.*

*(d) Defendants in plain clothes identified themselves or other parties as police.*

*(e) Parties acting in concert against Plaintiff stated Teaneck police participation.*

*(f) Teaneck police does not enforce the law in regards to activities in regards to Plaintiff, including the local law. See IV.8.*

### 4. The participation of Teaneck Public Schools and their students[17], and Defendants' abuse of CVE, anti-gang and/or another similar program.

29.    Teaneck schools participation in the activities against Plaintiff is demonstrative since 9/6/2012 when a whole class of high school students came under his windows (ECF No.8-1 at 15) acting then in coordination with the FBI/JTTF New York – see IV.7(b)(i). The students' participation increased significantly since 2017 (see IV.4), and again after Plaintiff filed his Objections to Report and Recommendations (ECF No.8) on 8/28/2023, but in general has been low in the summers – further confirmation that students' actions against Plaintiff are both school-related and Defendants-related activity.

30.    The schools and other youth organizations involvement is shown also by the participation of Teaneck High School football coach and assistants (7/2/2024), Teaneck Youth Advisory board (10/29/2019, ECF No.8-1 at 51), Board of Education staff (6/17/2024, 5/7/2025 man in a Board of Education truck "Kalin… Police will stop."), and that is significant as Plaintiff has no contact otherwise with any of them. Although Teaneck Municipality with its boards, including Teaneck

---

17   See also ECF No.8-1.C.6.

Board of education, has been under formal notice (Plaintiff sent Notice of claims on 11/11/2022) they not only have never ceased schools and students' participation (notably Defendants used also students not from Teaneck – see for example 4/26/2024 (if what Teaneck police detective said on 7/2/2024 is true)) but, as shown in the examples above, participated in those activities.

31.    According to the US strategy, schools and youth agencies are among the organizations responsible for addressing gangs and countering violent extremism (CVE) with local implementation of "state-of-the-art practices in gang prevention, intervention, and suppression" with the support of "integrated Federal, state, and local resources".[18] Defendants provide intervention training, and offer opportunities to students to develop "intervention skills".[19]

32.    Teaneck schools and their students have no reason to act against, or even interact with Plaintiff (especially that frequently) other then as part of the Defendants activities against him. Plaintiff's building is not associated with the schools, he has not attended the schools or any of their events, he visited Teaneck High School buildings only to vote, and he has not been in contact with students apart from the harassment and provocations he is subjected by them.

*(a) Teaneck Public School students' actions against Plaintiff are framed as anti-gang, and/or CVE training.*

**(1) Defendants frame in part the activities against Plaintiff as training exercise(s) and their statements suggest that activities with participation of students are CVE and/or anti-gang training[20].**

33.    Notable in that regard are the events on 4/22/2024 when three students commented Plaintiff "Gay… Have no shame.." "Is that Kalin?"; or on 3/12/2025 when a schoolboy talked "I don't know the message. I don't know." In both cases it is apparent that students have no personal agenda or knowledge in regards to Plaintiff, but 'shame' him or have (forgotten) 'message' to him – demonstration that that is a planned activity in which they are told what to say to Plaintiff.

------

18
19
20

11

**(2) Defendants' activities represent in part a CVE intervention – they disseminate derogatory counter-narratives to discredit Plaintiff, suppress him with demonstrative surveillance, subject him to messaging campaigns with the participation of students and other community parties intended to influence him, and more.**

(i) Defendants' formulation and dissemination of false narrative(s) about Plaintiff apparently aim to discredit him, and resembles the first step in a CVE intervention – formulation of a narrative which 'undermine the legitimacy, credibility and appeal' of its target[21].

34.     Based on the Defendants' frequent use of of related concepts their prevalent narrative about

        Plaintiff is that he is a Bulgarian criminal / terrorist / spy (see IV.7(b)(ii)(2)(A), IV.12, and more),

        Bulgarian 'fagot' (IV.8(a)(2)) who hits the police/government (2773 et seq.) and holds Defendants

        hostage. Defendants' narrative about Plaintiff falsely paints him as an anti-government radical, as

        a legitimate subject of Defendants' counterterrorism and CVE activities. Defendants' conduct is

        intended to force Plaintiff to respond.[22]

(ii) Defendants' demonstrative surveillance of Plaintiff with the participation of schools/students and community parties is by definition one of the CVE and anti-gang strategies for social control. The US CVE strategy utilizes the OJJDP anti-gang model which includes as a suppression strategy the close monitoring or supervision of its targets by government agencies, schools, and community-based agencies.[23]

35.     In addition to their demonstrative surveillance of Plaintiff Defendants have explicitly stated that

        they aim to suppress Plaintiff in a few occasions. Defendants' goals are obvious as it is well

        known that people change their behavior in response to external expectations, monitoring and

        evaluation.[24]

36.     Students' role in that regard is to demonstrate the surveillance by making remarks on Plaintiff's

        activities (at home or other locations), following him on the streets (in a few occasions under the

        direct supervision of Defendants), or responding / retaliating to his actions. Among other thing

---
21
22
23
24

this shows that the information about Plaintiff's actions is accessible in real time to students –
either directly or indirectly – which is another demonstration of the coordination between
Defendants and Teaneck schools' students.

(iii) Defendants' social pressure campaign against Plaintiff follows CVE 'mosaic of engagement'
approach.

37.    Defendants subject Plaintiff to many-years-long messaging campaigns, which are planned to
persuade him that he can't sue Defendants (IV.9(a)(2)), that he has to stop (IV.9(a)(4)), move out
of his apartment and the US (IV.8(b)(2)(iii)), and more. They are construed on well-known
psychological mechanisms for building a mental schema/brand[25] by repetition of messages
organized around a central concept[26], and using conditioning to create desired attitude and
response – an approach consistent to CVE's "mosaic of engagement" approach[27] (see IV.7).

38.    Defendants and parties in concert ('Defendants') use a CVE messaging approach which utilizes
"direct person-to-person efforts" and is mostly "one-way (or "broadcast only")".[28] Students have
been delivering threats, provocations and other messages to Plaintiff in that way, and at one
occasion a student explicitly stated that she is "not broadcasting. I am genuine." ECF No.8-1 at
370). Because all messages to Plaintiff are intended as one-way communication all interactions
with Plaintiff are generally evaded (as for example on 12/20/2016, 2/27/2017, 2/15/2018,
11/14/2018, 8/19/2021, 11/8/2021. See Defendants' directions in general "Do not interact."
3/22/2025). If evasion was not possible communicated message was denied (for example on
3/1/2017, or 8/5/2025) or Plaintiff's questions ignored (see March 2022 or 8/5/2025). Those
actions show among other things the malice expressed in the planned systematic harassment,
psychological abuse and provocations of Plaintiff.

---

25
26
27
28

39.     Defendants have been explicit that they give messages to Plaintiff, and their actions are at least in part intended as a 'message' to him. For example:

40.     Students are regular participants in Defendants' messaging campaigns to Plaintiff. See more details bellow, as for example at IV.8.

*(b) Defendants subject Plaintiff to regular provocations / sting operation(s) in a few of which students act as his enemies and/or potential victims.*

41.     In order to 'develop evidence/intelligence' incriminating Plaintiff Defendants have been provoking him and using 'sting' operations to encourage and create the conditions for him to commit offense[29] (they manufacture the conditions for radicalization since 2012). In that regard Defendants deliberately create conflicts (overtly 'fighting' Plaintiff, or claiming that Plaintiff fights them, which is FBI disruption – see 114), fabricate 'enemies' to Plaintiff (see 2769), challenge him with fighting words (see IV.11), and more. Defendants' intent to provoke Plaintiff to respond is explicit in many of their statements (as for example 'he didn't hear', 'he didn't respond', and more. On 9/12/2020 around 4:45PM Plaintiff turned his TV on after a group talking under his windows passed a few times. "Nothing happened." A guy "That's the hard part. You expect him to react.").

42.     It is well known that school students are used as decoys in sting operations "when 'police create the situation[,] the opportunity [for the subject] to commit a crime and in that kind of operations 'juveniles are often used as surrogates or "minor decoys"... because of their special status as juveniles.'[30] Teaneck police works in close cooperation with Teaneck schools, mentors high school students, hosts Police Academy in the summer.[31] In his presentation at Teaneck Leadership on 5/20/2024 Chief of Police McGurr stated that Teaneck police indeed uses students as decoys in its sting operations.

---

29
30
31

**(1) Defendants' deliberate efforts to create conflicts between Plaintiff and certain parties.**

43.    Defendants deliberately create conflicts between certain parties and Plaintiff which, among other things, further supports that the FBI has leading role in the activities against Plaintiff because creation of conflict(s), hostility and discontent has been known for a long time as one of the purposes of FBI operations and are used to disrupt the targets.[32]

44.    Defendants for many years try to manufacture conflicts for Plaintiff with police, the government in general, students, and/or certain certain persons who they explicitly referred to as 'enemies' or 'threats' to Plaintiff (7/16/2024 "We developed threat." after Plaintiff filed police report against group of students. See more at 166). Or they stated that Plaintiff is a threat to them. Defendants do not talk overtly about that but there are a few examples of such statements.

45.    Defendants' apparently manufactured 'enemies' (they have no meaningful contact and no reason to be hostile toward Plaintiff other than as taking part in Defendants' activities) include but are not limited to (1) Ralph Raphael Pimienta (see ECF No.8-1 at 638 *et seq*. and more); (2) Teaneck Public Schools / students (although there were certain periods in which individual students were regularly engages, in general they act as a group with collective identity ('we'). See also ECF No.8-1 at 839 *et seq*.); (3) Defendants' agents in apartments adjacent to Plaintiff's – although they share walls with him, which could be interpreted as a continuous contact with Plaintiff, they regularly and deliberately make noise to harass, attack him or allowed their premises to be used to attack Plaintiff with DE, provoke him, and more. That includes Marlene Dula and other in ap.B2, Defendants in ap.G2, in ap.A3, and ap.A1; (4) the police and the US government in general (see bellow explicit statements of Defendants intent police to be a threat to Plaintiff, and more); (5) large and anonymous group of parties in the activities against Plaintiff that harass, threaten, and otherwise attack Plaintiff regardless of the location – their acts are result of Defendants'

---

[32]

dissemination of false and defamatory information about Plaintiff as a threat, a Bulgarian criminal/terrorist/spy/fagot/crazy hitting police, and holding Defendants hostage.

**(2) Teaneck students play the role of enemies to Plaintiff – they threaten, assaulted, and mocked him.**

46.     Defendants aim to make students as a group (they usually harass Plaintiff in groups, and talk often from collective identity position - "we") an 'enemy' and threat to Plaintiff. Defendants explicitly stated "We developed threat." (7/16/2024) after Plaintiff filed police report against group of students who threatened to throw a rock at him and falsely accused him of showing his privates. In the context of events that has two meanings: the threat of students attacking Plaintiff, and/or police believing students false accusations. In both cases the purpose is Plaintiff to be scared, to fear.

47.     In relation to that students participate in Defendants degrading treatment of Plaintiff. To humiliate and degrade Plaintiff Defendants and parties in concert ('Defendants') referred to him among other things as a "bitch". For example students said that on 4/2/2017, 8/19/2022, 4/20/2023, 7/26/2023, 4/5/2024, and 5/28/2024. Defendants involved students in the so called "shut up game" (5/14/2017). For example students told directly or indirectly Plaintiff to 'shut up' on 11/3/2017, 8/17/2021, 8/17/2023, and 4/26/2024. The events on 4/26/2024 are noteworthy: then one of the students threw a rock toward Plaintiff, and told Plaintiff to 'Shut up' (see 154). In a few occasions students deliberately threatened to call police on Plaintiff. And more.

**(3) Students also serve as decoys provoking Plaintiff's response.**

48.     Students are regular participants in Defendants messaging campaigns as for example the social pressure to push Plaintiff out of his apartment and the US. IV.8.

*(c) Teaneck schools and their students act against Plaintiff in coordination and agreement with Defendants.*

49.     Students act in coordination, agreement, and under the supervision of Defendants; and push

points from their defamatory narrative about Plaintiff.

50.     The coordination and agreement with Defendants is clear from the timing of students'

participation increased. For example students became very involved in Defendants' activities

against Plaintiff in 2017, then again after Plaintiff filed his Objections to Report and

Recommendation (ECF No.8) on 8/28/2023 (see also 8/18/2023, "Gave Kalin the assault."), and

during 2024 when Plaintiff kept working on his case. Especially notable in that regard are the

evens in 2024 presented bellow in IV.4.(c)(vi).

**(1) Defendants give instructions to students in regards to Plaintiff.**

51.     Defendants instructed students what role to play, what to threaten ("threat Kalin that we are going

to arrest (him)."), and more. All of that demonstrating that students act under the direction of

Defendants. For example:

**(2) Coordination of messaging between students and Defendants.**

52.     Defendants' verbal conduct shows the coordination between them and parties in concert – all use

the same narrative about Plaintiff at different locations by different parties. That is demonstrative

dissemination of the false narrative about him, and Plaintiff's identity information.

(i) In order to create conflict with police Defendants (students included) repeatedly threatened to
call police on Plaintiff.

53.     One of Defendants' goals in terms of creating conflict was to convince Plaintiff that police is a

threat to him – see explicit statement from 1/20/2023 ("Do not bite police [is] still a threat." a

uniform police officer after visiting Plaintiff. ECF No.8-1 at 81 *et seq.*). Multiple times

Defendants and parties in concert explicitly said in Plaintiff's presence that they would call, and

in a few cases called police on him, however with exception of 1/20/2023 in those occasions

police did not approach him. In a few cases Defendants and/or parties in concert followed the

same pattern – students (2/27/2017, 5/10/2017) or families(?) (5/10/2017) followed Plaintiff on the streets talking about him, and when he stopped they threatened to 'call police'.

54.   In 2017 students activities against Plaintiff increased. They followed him on the streets of Teaneck (including under overt direction by Defendants) and threatened to contact police in regards to Plaintiff.

**(3) Students participate in the degrading, distressing Plaintiff. For example on:**

**(4) Demonstrative surveillance and coordination**

55.   Teaneck High School students overtly followed and provoked Plaintiff on the streets, as for example on 2/27/2017 (ECF No.8-1 at 850), 3/1/2017 (Id. at 904), 4/2/2017 (Id., 905), 5/10/2017 (Id., 852), or provoked, shouted, screamed, threw rocks, and more under his windows as on 1/27/2017 ("Come and get me." Id., 902), or on 3/31/2017 (a group of students shouted and screamed for about 10 minutes only under Plaintiff's windows). In a few of those occasions the coordination with and/or the directions from Defendants were explicit as for example on 2/27/2017 (notable is that then, after Plaintiff made a note about the students, Defendants threatened him for keeping record on relevant events "You'll get real problems."), or on 5/10/2017. On 2/28/2017 Defendants' officer supervised the students under Plaintiff's windows, talked with Defendants' person in the building, while another on speaker was explicit about their intention to "Destroy one Bulgarian." (ECF No.8-1 at 851). On 6/5/2017 students demonstrated that they yell under Plaintiff's windows under Defendants' direction – they came under the windows "We have to say something loud." and shouted "Hey." About 10 minutes later they returned and shouted "Hey" again. The intention students to interfere and provoke Plaintiff was overt: "Give up.".. "Fight Kalin." (students on 3/20/2017 while Plaintiff worked on a video exhibit of Defendants' yelling).

**(5) Students participate in Defendants' coordinated efforts to awaken Plaintiff.**

**(6) The escalation of the harassment and Plaintiff's two reports against students with Teaneck police in 2024.**

56.  After Plaintiff filed his Objections to Report and Recommendations (ECF No.8) on 8/28/2023 in retaliation Teaneck Schools' students activities against Plaintiff significantly increased in parallel to Teaneck police and other Defendants' conduct, and continued till about end of July 2024. In that period Plaintiff filed two reports against groups of students with Teaneck police – on 4/26/2014 and 7/16/2024 – for similar conduct. At that time students played 'roles', and assaulted Plaintiff – threw a rock toward him (4/26/2024), threatened to 'punch' him (5/28/2024), 'slap' him (5/29/2024), to make Plaintiff 'feel the threat' (4/26/2024). Teaneck police officers also threw rock(s) under Plaintiff's windows (5/24/2024). Defendants implied that the "the entire [police] station" came to fight Plaintiff on 5/31/2024 after challenging him to fight ("Wanna fight?").

57.  The organization and planning of the assaults on Plaintiff by students was demonstrated by their abrupt stop since 6/1/2024. On 6/6/2024, 1:15PM students came under Plaintiff's windows saying "We stopped. We stopped." "Can't believe." "Oh my god." Then the activities restarted on 6/11/2024. Students and Defendants in the building had the same message "We didn't stop." (6/11/2024 students), "Pressure can't stop." (6/12/2024, 9:20AM Defendants). On 6/12/2024 Defendants' Ralph and others reacted after Plaintiff made a video of the students "They fucked." A bit later students (on bicycles) "They lost." and rode back and forth under Plaintiff's windows.

58.  Among other things Defendants used group(s) seemingly from different town to harass Plaintiff (on 6/13/2024 they didn't know where they are, but knew and fished Plaintiff: "Careful. Takes you hostage." "He is the guy." "Careful."... "We couldn't fish him."). After that students' participation again reduced significantly till 7/2/2024 when Teaneck police detective in call with Plaintiff told him that the students he filed report against on 4/26/2024 were not recognized, so nothing can be done. Same day, 7/2/2024, Defendants' assaults with the participation of students

started again. Then Teaneck High School football coach and his assistants(?) talked about Plaintiff "Alone he can be harmed." About an hour later the coach and three men talked behind Plaintiff that "he has no protection. No protection." They stayed behind Plaintiff for a while, then went to the football field.

59.    The coordinated efforts between the Defendants and students to assault, scare, and provoke Plaintiff to respond ("He never fights back." 5/30/2024; "Wanna fight?" 5/31/2024; "He needs to fight." 6/3/2024; "Can't ask you to fight." "Dumb ass. Dumb ass." "Fight." 6/12/2024; "We couldn't fish him."..."He didn't believe. They did body around because of you.".. "Pussy." 6/13/2024; "Fight. Shot that []." 7/2/2024), and eventually to arrest him are obvious ("Can't arrest." 6/14/2024).

60.    After students threatened to 'slap' Plaintiff (5/29/2024) Defendants in Votee park, Teaneck threatened him to "pick a place he visits many times and do it to stop him." Then a schoolgirl asked Plaintiff in the park "Are you not afraid?" Their knowledge in advance of the threats to Plaintiff (which happened at another place not long before that), who he is is another demonstration of planning and coordination between students and Defendants in their activities toward Plaintiff. Defendants woman commented in the park "Kalin fights many people." - demonstrative surveillance and dissemination of Plaintiff's information (5/29/2024)

61.    Coordination and supervision over students by Defendants is shown also by Defendants' woman patrolling nearby during the time students were next to Plaintiff (4/26/2024), Holy Name guard watching in front of the building on both 4/26/2024 and 7/16/2024 when Plaintiff filed police report.

**5. The regular participation of USPS carrier(s) in the activities against Plaintiff.**

62. The United States Postal Services is a federal government agency, a member of the national JTTF[33]. It has its own police and secret units (see the news in May 2025 about USPS police actions against immigrants), and monitors social media.

*(a) USPS carrier(s) serving Plaintiff's building intentionally disturb and provoke him.*

63. Especially notable are the events between 1/11-1/27/2025 when different persons wore USPS uniform and rang regularly Plaintiff's doorbell (one of them a Teaneck police officer Plaintiff knew by face) in an apparent sting operation to provoke Plaintiff's adverse reaction.

*(b) USPS carrier(s) are in contacts with Defendants in the building, act in coordination with Defendants, and regularly talk about Plaintiff.*

64. USPS carrier(s) are in regular contact with Defendants' Pimienta ('Ralph'), Dula, and others in regard to Plaintiff, and talked about him in building corridor (Plaintiff's floor) at least since 2019 and ongoing.

65. The USPS carriers' conversations near Plaintiff are demonstration of the coordination between the parties acting against him (see for example the comment on Plaintiff's behavior and Dental Center of Hackensack on 2/22/2025 and 2/24/2025), of the dissemination of information from Plaintiff's surveillance, and are intended to harass, intimidate, and provoke him. Plaintiff is the person who was the most frequently mentioned (if any other was mentioned at all) in the USPS calls/conversations regardless of the fact that he rarely has been in contact with the carriers. That by itself is demonstration of the USPS participation in the activities against Plaintiff.

**6. Other known parties in the activities against Plaintiff.**

66. Task forces are bodies with participation of multiple government agencies with different jurisdiction, and the subjects of their activities consequently face large variety of agencies acting

---
[33]

against them. Accordingly there are multiple agencies acting in concert against Plaintiff which are not named here as their direct participation in the activities was limited, but they are included in the factual history.

67.  Defendants a few times talked about CIA as a participant in the activities against Plaintiff. CIA is a traditional member of JTTFs and as such part of the activities. However Plaintiff has no evidence for the CIA direct participation other than statements by the Defendants. To the extend Plaintiff has claims against CIA, because Defendants didn't investigate his reports and complaints they have prevented him till now to discover any.

68.  Known, recognized and/or mentioned by name in the complaint participants include (but not limited to):

69.  Peter Loomer (ap.B1) who identified himself as Teaneck police (officer?) in the period 2013-2014, before Plaintiff even knew his name. ECF No.8-1 at 717 *et seq.*. He moved out from the building on or about 10/23/2023 – two months after the initiation of *Dimitrov I*.

70.  Marlene Dula, named tenant in ap.B2 was identified by others as an officer, as CIA (ECF No.8-1 at 752), she was jointly identified by Swaby as FBI, and acted in coordination with FBI New York for example on 11/9-11/10/2022. Defendants in B2 were referred as 'evaluation team' in 2013, and she indirectly identified herself as NYPD and JTTF officer (ECF No.8-1 at 206, No.8-2 at 5930). Considering the multiple characteristics Plaintiff per personal knowledge and believe states that she is a JTTF officer. See ECF No.8-1 at 205 *et seq.*.

71.  John Doe, man in ap.B2 who is regularly present, talk inside the apartament and apparently participate in all activities against Plaintiff from ap.B2. Swaby was regular in ap.B2 at least in 2016 and is the most probable person to be John Doe in ap.B2

72. Swaby (ap.B6) identified himself as FBI ("We are FBI." ECF No.8-1 at 810), Plaintiff saw him in uniforms of Public Safety Officer, and of a security guard at Frederick Dickinson University. See ECF No.8-1 at 809 *et seq.*.

73. Raphael Pimienta (Ralph) was identified by others as police officer, per Plaintiff's knowledge and belief he is a NYPD officer acting under cover. ECF No.8-1 at 638 *et seq.*.

74. John Doe 2, regularly in a Holy Name security guard uniform, living in Plaintiff's building for several years. He regularly monitored the students activities under Plaintiff's windows, including in both incidents in 2024 when Plaintiff filed reports with Teaneck police. He became active in 2024 when Ralph reduced his overt actions against Plaintiff.

75. Cesar Naranjo, super of the building since 2020, identified himself to Plaintiff as local government employee (a second job, see ECF No.8-1 at 745), ECF No.8-1 at 737 *et seq.*.

**7. Defendants identify and investigate Plaintiff as a threat at first motivated (at least in part) by overt discriminatory animus ("Bulgarian fagot", see ECF No.8-1 at 13, 18), and since 9/11/2012 also in retaliation to his petitions and legal actions.**

76. With their actions Defendants aim to 'develop' Plaintiff to become the threat they falsely claim him to be. See for example Defendants' statements in that regard on 9/7/2012 "He got to feel the octopus. Shadow over time. He is no threat." "Push [Plaintiff] to stay threat." (Transcript of 1st_record.mp3 at 0:31-0:34, and 0:40); or on 7/16/2024 "We developed threat."

*(a) Defendants' threat assessment and management of persons who are potential threat. "[A]nyone who challenges the government's theories or tactics [is] a potential target of its counterterrorism efforts."[34]*

---

34

**(1) Threat indicators used for an assessment are part of threat assessment / radicalization models which shifted the law enforcement focus on 'intent'[35], at a point before any criminal activity occurred[36].**

77.     There are multiple radicalization models such as the influential NYPD model 2007-9, the FBI model as of 2011[37], the "pathway to violence" (Calhoun & Weston, 2003; Fein et al., 1995; Meloy, Hart, et al., 2014), or TRAP-18, which combines different approaches, including the 'pathway to violence', and is in use by the JTTFs (ECF No.8-1 at n.3).

78.     In most of the radicalization models two stages/main factors for radicalization are always present in some form – grievance and identity crisis, so they are presented in more detail bellow. Grievance also corresponds to the drivers for violent extremism as per the FBI[38].

(i) Perceived grievance and injustice – the first phase or one of the factors for radicalization.

(ii) Identity[39] crisis and new self-identification – the second phase in NYPD and FBI models, related to the second phase in ICJ model: Social pressure.

(iii) Anti-Terrorism Advisory Council at the U.S. Attorneys' Offices, DOJ, compiled a set of pre-incident indicators.

**(2) Management of a threat includes controlling/containing the person of concern, using in that regard the existing social systems and community policing.**

**(***3***)** *Radicalization is highly disputed concept but despite that is used widely in FBI and other agencies' threat assessment and management, and CVE programs.*

79.     The risk of error when designating a person as a threat is very high, and even in the face of an apparent errors the US resists changing its activities. Recent and popular example is the case of *Kilmar Armando Abrego Garcia et al., v. Kristi Noem*, No.: 8:25-cv-00951-PX (D.C.Mer., 3/31/25) Dkt No.11 where government admitted "an administrative error" but deported him regardless. Other examples in that regard include:

---

35
36
37
38
39

*(b) Defendants designated and keep unreasonably to designate Plaintiff and his activities as threat.*

**(i) Before his report with Teaneck police on 9/11/2012 Defendants identified Plaintiff as a threat at least in part because of his Bulgarian ethnicity and national origin, and because they perceived him as a gay.**

80.     Plaintiff registered a trade name, and in August 2012 left East House Creative with intention to start a business. Then Defendants significantly increased their actions against him referring to him as a "threat" and 'Bulgarian fagot'. ECF No.8-1 at 11 *et seq.*. To the extend Plaintiff's intention to start business incited the Defendants' activities – this is apparently arbitrary in comparison to the treatment of any other person starting legal business in the US. To the extend in 2012 Defendants acted in pursuit of permissible goals (fighting crime and terrorism) their conduct was excessive and unlawful (threats to kill Plaintiff, throwing pebbles at his windows...).

81.     On 9/6/2012 at about 11PM, right after Plaintiff got in bed, the FBI / JTTF New York staged a police raid – they created the impression that police is coming to his apartment. A few cars stopped under Plaintiff's windows, multiple people talked "Did you get the police tag?" "Hey John get in line." One of them yelled "We got you. Turn yourself in. Game is over." Plaintiff did not react and after a period of silence they departed. Till then Plaintiff had not suspected that the activities against him are government activities, and accordingly that the government consider him a threat. The next day Plaintiff went to Teaneck police (then police denied any knowledge and participation). ECF No.8-1 at 15-18.

82.     On 9/7/2012 after Plaintiff went to Teaneck police, the FBI/JTTF New York agents came under his windows and talked about involving "local powers", that "they have helped the agent." They claimed they still had not 'launched' community actions against Plaintiff but got the agreement of 'all LEA [Law Enforcement Agency]', including from the 'police' and 'CIA' to join them. Note that one of the agents/officers explicitly said that Plaintiff is "no threat", while another that they have to "push [him] to stay threat." See ECF No.8-1 at 17-18. Transcript of 1st_record.mp3.

83.   Later same day in the late evening Defendants again came under Plaintiff's windows saying that he is a "threat [because] he went straight to police", talking about being "agents" from "different state", and referred to him as a "Bulgarian enemy", and "fagot". ECF No.8-1 at 18.

84.   In support that the activities then were FBI / JTTF New York activities (in addition to the events that followed) is the fact that the FBI New York (JTTF) arrested a man on his street about 3 blocks away months before Plaintiff moved in (ECF No.8-3).

85.   From the above it is clear the FBI/JTTF New York continued acting with the knowledge that Plaintiff is not a threat, and identifying him by his ethnicity, national origin and perceived sexual orientation showing that these, plus retaliation, were significant factors for their actions.

**(ii) Since Plaintiff's report with Teaneck police on 9/11/2012 Defendants deliberately 'develop intelligence' that he is a threat – acting not only with discriminatory animus, but also in retaliation and with malice. Since then Defendants disseminate false and/or derogatory information about Plaintiff, including false accusations of serious crimes, fabricated statements on his behalf, demonstratively survey, harm, and provoke him while denying him protection under the law with apparent intention to manufacture incriminating response(s), and more.[40]**

86.   Using "the enormous scale of resources devoted to the search for domestic terrorists, the virtual nonexistence of constraints on the conduct of investigations and the gathering of evidence, and the disposition [] to err on the side of arresting and charging the innocent"[41] Defendants significantly expanded their actions against Plaintiff. Based on their conduct which continue for 13 years and ongoing Defendants' 'compelling' or 'significant interest' in Plaintiff's case is not reduction of crime, and fighting terrorism, but under the disguise of legitimate interests to degrade and discredit him in retaliation, discrimination, and malice, and to prevent Plaintiff to make public their violations of the US constitution and laws.

87.   Since his report on 9/11/2012 Defendants and parties in concert ('Defendants') have initiated a few many-years-long and ongoing campaigns against Plaintiff with apparent continuity (see

---

40
41

bellow). Defendants' approach in regards to Plaintiff is, or is the same as, the CVE 'mosaic of engagement' approach – they act with local community partners, share information about the status of the program, and focus on the 'programmatic continuity'.[42] However the fact that Defendants act opposite to key points of a CVE intervention as, for example, to "enhanc[e] trust in the authorities"[43], is just another evidence for their animus and malice toward Plaintiff.

(1) Defendants designate Plaintiff as a threat but admitted in a few occasions that they "made him". They have also shown that the threat at least in a few occasions is Plaintiff's preparation, work, and filing of legal actions.

88. Since Plaintiff's police report on 9/11/2012 Defendants have demonstratively and falsely framed Plaintiff and his actions as threat. That includes even Plaintiff's playing of chess, as for example on 12/15/2012. Plaintiff was playing chess on his notebook when a group of Defendants came under his windows and threatened him "What he's playing? This is not a game. I'll shoot him through."... "Secured the perimeter." (ECF No.8-1 at 119).

89. Based on all relevant events per Plaintiff's knowledge and belief Defendants falsely frame his lawful evidence gathering as surveillance (threat indicator IV.7(a)(1)(iii). See also 1776 *et seq.*), and his petitions as demonstrated intention to attack the government[44].

*(A) Defendants overtly referred to Plaintiff as a threat, but admitted that they 'made him'.*

90. Defendants explicitly stated that Plaintiff is a 'security threat' (see 7/30/2016 – although negative the statement shows consideration of him as a 'security threat', 10/17/2019), and that meaning of threat is implicit when uniform NYPD officers (2014-March 21, 2016) or Teaneck police and the FBI (3/4/2020) talked about Plaintiff as a threat, or when Defendants talked explicitly about law enforcement measures as to 'investigate', or 'arrest' Plaintiff (3/4/2020, 1/8/2024, 10/10/2024). That meaning is further emphasized by labeling Plaintiff an "enemy" (6/21/2017 ("cop enemy"), 9/7/2019 ("New York enemy"), 12/1/2019, 12/30/2019, 7/19/2020, 2/17/2021, 3/12/2021,

---

42

43

44

8/24/2023), or "terrorist" (11/30/2017, 12/30/2024 (note almost the same phrasing in 7 years distance)).

91.   Defendants were clear in a few occasions that by 'threat' they meant Plaintiff's work and/or filings for his legal actions with S.D.N.Y. (6/21/2017, 2/17/2021, 9/7/2021 ("He become a massive threat."), 7/24/2023, 8/24/2023).

92.   Defendants are developing Plaintiff as a threat. As their statements demonstrate they "made him." (9/5/2017, 10/9/2021 (indirectly), 4/15/2022, 6/21/2024, 10/24/2024), "We created him." (9/7/2016), "They created him." (3/22/2017), "They started all this." (3/24/2020), "We made it." (7/16/2021, 8/31/2021). Especially notable are the events on 7/16/2024 when Defendants were explicit that (a) they deliberately "developed threat" (whether Plaintiff as a threat to students, the opposite, or police as a threat to Plaintiff as they "believed" the students), and (b) that this threat-development was known and monitored by other parties "They don't think that. Have to game."

93.   About Defendants' deliberate misrepresentation of Plaintiff as a criminal threat see bellow false accusations of serious crimes IV.7(b)(ii)(2)(A).

*(B) Demonstrating their interest in Plaintiff Defendants color him a threat.*

94.   Defendants deliberately demonstrate their interest in Plaintiff in his presence. For example they questioned the persons who Plaintiff had spoken with which, apart from ruining his standing in society (implying that it is dangerous to talk with Plaintiff, or that he himself is dangerous), is very provocative – demonstrative efforts to isolate and alienate him, and surveillance.

95.   Defendants demonstrate their interest in Plaintiff by publicly saying that they pursue / investigate Plaintiff. See for example ECF No.8-1 at 27 listing a few Defendants' statements in that regard made till October 2022. More recent examples are bellow:

96.     Apart from their related verbal conduct Defendants have been acting toward Plaintiff as a threat in public since 2012. For example they (a) do test runs on his apartment, (b) demonstratively survey Plaintiff, or (c) call police on him.

97.     Defendants have done a few times test runs on Plaintiff's apartment. The first time was when FBI/JTTF New York created the impression of a "police" raid on 9/6/2012 (see above 300). In 2013 there were a few test runs done with uniform Teaneck police officers – see police checking on Plaintiff in the night of 9/19/2013 (ECF No.8-1 at 33), or the events in the night of 10/13/2013 when police awakened Plaintiff with several police cars parked under his windows, about 6 uniform police officers, and a few FBI agents (Id. at 34). Most recent was Teaneck police run on 4/22/2025, 11:28PM when 5 police cars came under Plaintiff's windows on Cedar lane and Red Road for about a minute, officers got out, and then left. As there was no reason, no incident, as the duration also shows this was a try-run, a training intended to intimidate Plaintiff.

98.     Defendants deliberately demonstrate the surveillance on Plaintiff and do it in public. Since his police report from 9/11/2012 Defendants for example have overtly followed Plaintiff in New York City, New Jersey, and in his flights to Bulgaria. Defendants in almost every location Plaintiff goes demonstrate they know him and/or know his relatives, profession or employment history; they develop the false accusations and degrading narrative about him while following the same verbal constructs (repetition of key words, playing certain psychological "games"), and/or include bits of his recent activities. Examples are many.

99.     Defendants called or stated they will call police on Plaintiff (see IV.(c)(2)(i)). Notable is the 911-call which was the pretext for Teaneck police intrusion in Plaintiff's apartment on 1/20/2023 (ECF No.8-1 at 81 *et seq.*).

*(C) Defendants portrait Plaintiff as a threat under the purview of the FBI / JTTF.*

100.    The duration of Defendants' activities against Plaintiff and other facts (see for example bellow IV.7(b)(ii)(2)(a)) show that at least in part the activities are framed as counterterrorism measures which are under the purview of the FBI and its JTTFs.

101.    To the extend part of Defendants' activities against Plaintiff are framed as anti-gang actions, they also are under the purview of the FBI.

102.    "[T]he FBI is often seen as one of the primary agencies involved in investigating gangs".[45]
        (2) Defendants fabricate legitimate reasons to keep treating Plaintiff as a threat.

103.    In absence of factual base for Defendants' actions against Plaintiff, their 'intelligence development' is fabrication of reasons to designate and treat him as threat. This is based on their conduct: (a) Defendants have invented what Plaintiff said or did, (b) they interpreted with bad faith what he actually said or did, and/or (c) set him up to manufacture verbal and/or other response which could justify their activities. All of that has been ongoing for more than 13 years.

*(A) According to Defendants' false narrative about Plaintiff, he is a radical individual (as it is defined by the FBI – one "who encourage, condone, justify, or support the commission of a violent act or other crimes against the U.S. government, its citizens".[46]), and they accused him of serious crimes.*

104.    Defendants falsely claimed for example that Plaintiff wants to 'destroy' them (implying that this is what Plaintiff said), and that he even gave them a death warning (9/7/2019, 1/13/2023). Both Dula (3/13/2023) and students (9/11/2024) claimed that Plaintiff wants to destroy *them* (using the same language "He wants to destroy us."), and similarly unrecognized Defendants talked under Plaintiff's windows (6/30/2013), but they were more inclusive in another occasion "That guy wants to destroy all." (6/17/2024).

---

45
46

105.     The timing of a few Defendants' statements shows what they mean by 'destruction' – Plaintiff

working on JTTF and/or FBI materials (8/31/2021, 11/10/2021), or saving court materials

(7/26/2023 – the day after he started *Dimitrov I*, 8/5/2023).

106.     To the extend Defendants incite Plaintiff to use such language in order to manufacture

incriminating response (that is among the FBI tactics[47]) this shows their efforts to entrap him.

107.     Defendants and parties in concert (jointly referred as 'Defendants') falsely accuse Plaintiff of

serious crimes in public and in his presence since 2013. Bellow are listed examples from 105

days in which Defendants made such statements, however most of the collected evidence hasn't

been processed.

108.     Defendants accused Plaintiff of **murder**, claiming he is involved in 'homicide' (see bellow), and

even that he "shot/killed police officer" (10/13/2013, 5/20/2017, 11/4/2020). Such claims were

made on 10/13/2013 (first recorded instance) by uniform Teaneck police officers and FBI, but

Defendants stopped making those accusations since September 2024 (last noted instance was

from 9/25/2024). The related narrative that Plaintiff is 'hitting police' is presented at 509 *et seq.*.

Defendants talked about Plaintiff as a murderer predominantly under or near his windows

(10/13/2013, 11/9/2016, 11/30/2016, 6/8/2017, 9/2/2017, 5/2/2018, 6/27/2021, 7/17/2021,

8/14/2021, 8/28/2021 ("Found the body.. Can't arrest."), 7/23/2023, 8/10/2023, 9/28/2023), but

also in Stop and Shop, Teaneck, NJ (5/16/2015), in his building corridor (10/19/2021, 11/9/2022),

in Phelps Park, Teaneck, NJ (5/20/2017), and in ap.B2 (9/25/2024).

109.     Defendants claimed that Plaintiff is '**Bulgarian mob/mobster**'. That accusation was used mostly

between September 2012 and the end of 2013.

110.     Defendants accused Plaintiff of being a '**terrorist**', 'lone wolf' (summer 2013), who holds them

'**hostages**' (first mentioned by Teaneck police officers on 10/13/2013) after Boston marathon

bombing. In one occasion Defendants even referred to Plaintiff as a 'ticking bomb' (2/18/2022).

---
47

After 2013 Defendants rarely referred to Plaintiff directly as 'terrorist' (11/30/2017, 4/24/2023, 12/30/2024), or 'wolf' (12/1/2016), but have significantly developed the theme of being held "hostages", especially in relation to Plaintiff's use of Blue Iris security software, and his other means to record relevant events (photos, audio, video recordings, handwritten log), as well as in regards to his work on the legal cases. In that regard Defendants commented that they 'talk too much' as for example on 11/14/2016, 3/23/2017, and more. Related to being hostage is Defendants' accusation that Plaintiff "blackmail" them. (3/7/2024).

111.   Defendants persistently talk that Plaintiff holds them "hostage" in different locations and for many years. Defendants talked about that predominantly under or near his windows (summer 2013, 10/13/2013, 1/3/2015 1/15/2015 10/21/20168/21/2017, 7/24/2019, 8/30/2021, 11/6/2021, 1/31/2022, 5/8/2022, 3/24/2023 8/27/2023 9/21/2023 9/22/2023 9/28/2023 3/19/2024, 6/13/2024, 7/25/2024, 8/15/2024, 1/25/2025, 1/30/2025); in the building corridor (1/20/2023, 2/22/2024); Defendants said that in ap.A3 (3/5/2021, 2/28/2021, 3/24/2020, 4/14/2021, 4/29/2021, 3/10/2022,12/18/2022); in ap.B2 (4/18/2021, 3/6/2022, 5/2/2022, 7/2/2022, 9/23/2023, 10/10/2023, 6/23/2024); in parks (6/18/2021, 8/10/2024); in offices next to East House Creative (4/26/2016); or in the FBI New York Field office building in Manhattan (11/8/2017).

112.   Recognized parties talking about "hostages" include uniform Teaneck police officers (10/13/2013, 10/21/2016, 1/20/2023), FBI / JTTF officers (11/8/2017, 1/20/2023), Defendants' Marlene Dula (4/18/2021, 5/2/2022, 7/2/2022, 10/10/2023); Defendants' Ralph Pimienta (9/7/2021, 3/6/2022, 3/10/2022); students (9/28/2023); Defendants' Peter Loomer (11/6/2021).

113.   Defendants also referred to Plaintiff as a **spy**, and try to link him to Russia. See IV.8(a)(1)(ii).

114.   Defendants claimed that Plaintiff is a '**bank robber**' or '**robber**' in general mostly in 2013, the last time Plaintiff noted such claim against him was on 6/30/2020.

32

115.  Defendants repeatedly accused Plaintiff of **theft**. They talked about that next to Plaintiff's

windows (8/3/2013, 6/17/2024, 3/17/2025), in ap.B2 (11/21/2022), next to him when he was

outside (10/28/2017, 8/15/2020, 7/28/2024) including in Target, Hackensack, NJ (7/5/2016,

7/21/2018). In a few cases accusations were made by students (10/28/2017, 6/21/2023,

6/17/2024, 3/17/2025).

116.  Defendants accused Plaintiff of being/committing **fraud** (12/17/2012, 9/22/2020 ("Bulgarian

fraud"), 7/12/2024, 9/6/2024), and made related accusations as for example that Plaintiff has fake

ID (or imply that by unnecessary checks of his ID) (3/15/2015, 6/21/2017, 1/7/2022), or created

'problems' with Plaintiff's SSN (11/21/2013, 1/28/2016, 9/1/2017).

117.  In a few case there was a pattern – Defendants made the accusations, and when Plaintiff did not

react they commented that he 'didn't believe' (9/2/2017, 8/28/2021, 11/9/2022).

118.  Defendants have made all those accusations with the knowledge of their falsity. For example they

know the purpose of Plaintiff's records, but falsely claim Plaintiff holds them hostage.

*(B) Defendants deliberately misinterpret Plaintiff's words and actions in detrimental to him way*
*– an expression of their animus and malice toward Plaintiff.*

119.  The purpose of <u>Plaintiff's lawful search, collection (including lawful record of relevant events),</u>

<u>and dissemination of case-relevant information</u> is well known by Defendants at least due to his

petitions which are overtly based on that information (including his police reports, legal notices,

lawsuits, and other petitions since 9/11/2012. Furthermore Defendants have demonstrated that

they know the purpose of these activities (see for example their explicit statements that Plaintiff

'can't sue them' at IV.9(a)(2)) but interpret them apparently intentionally as terrorism, as Plaintiff

holding them 'hostage' (see their false accusations at 390 *et seq*.). Defendants' repressive actions

escalated in retaliation to Plaintiff's regular documentation of relevant events, his use of Blue

Iris-based security system, and his preparations, work on, and filing of petitions – additional

proof that this is what they interpret as a threat. In relation to that see for example the 1st and 2s

pre-incident indicators, "monitor or record activities" and "seeking information" (283-284), which are broad, and can be used to interpret lawful acts as indication for terrorism/crime when there is animus and/or malice).

120.  Defendants' conduct after Plaintiff had filed a report with Teaneck police on 9/11/2012 is framed (at least in part) as counterterrorism measures, and that infers that they misinterpreted his police report and his recording as attack on the government (which is further supported by their later narrative that he 'hits police' and more). After Plaintiff's police report from 9/11/2012 Defendants not only did not ceased, but did the opposite – they amplified their unlawful actions against Plaintiff, and later reaffirmed again and again his designation as a threat.

121.  Defendants have explicitly presented Plaintiff as a cop-enemy hitting police without factual basis and with deliberate misinterpretation of his preparations for lawsuit(s) against Defendants since 2016. This is related of their narrative that Plaintiff 'holds [them] hostages', and illustrates that they frame him as an anti-government radical to justify their abuse. This is also part of Defendants' methods to disrupt Plaintiff – to create conflicts in this case with police (see 131 et seq.).

122.  Different parties have explicitly said in regards to Plaintiff and in his presence that he "hits/fights/ sues police", including uniform Teaneck police officers (8/24/2016, 5/29/2020), students (5/14/2018, 6/18/2018, 5/15/2020, 10/2/2021 (together with Defendants)), Defendants' Pimienta ('Ralph') (1/8/2024), and multiple unknown to Plaintiff Defendants' agents/officers or parties in concert. That shows dissemination of the information about Plaintiff (they know him), coordination of the messages to him, and among other things that activities against him are 'police' activities.

123.  In terms of location Defendants have made such statements under or next to Plaintiff's windows (8/24/2016, 5/14/2018, 6/17/2018, 3/6/2020, 5/15/2020, 5/29/2020, 1/13/2022, 7/24/2023,

8/31/2023, 9/8/2023), in ap.A3 – neighbor to Plaintiff (12/31/2019, 4/20/2020, 6/5/2020, 8/26/2021), in building corridor on Plaintiff's floor (3/2/2021, 1/8/2024), in Derek Smith Law Group's office in Manhattan, NYC (6/21/2017), in Sears, Hackensack, NJ (1/27/2018), in the airport in Munich, Germany (3/9/2018), in Phelps Park, Teaneck, NJ (6/18/2018, 10/2/2021), in the NYC Sheriff's Office (8/7/2018), in Target, Hackensack, NJ (3/21/2022), next to Provident bank on Cedar lane, Teaneck, NJ (6/19/2022).

124. Notable is that, after on or about 3/27/2022 Plaintiff drafted a paragraph (which later became paragraph 102.6 in ECF No.8-1) listing examples of Defendants statements that he 'hits police' Defendants no longer say that in his presence. Just before (7/24/2023) and after Plaintiff initiated *Dimitrov I* Defendants commented again that he "fights police" (8/31/2023, 9/8/2023) with one notable variation – that he "fights the government" (1/8/2024), but since 1/8/2024 Plaintiff haven't noted another instance of Defendants talking about him hitting/fighting police or government even though they continue to use "hit" and "fight" in regards to him). This is another demonstration of the coordination between parties – their verbal conduct toward Plaintiff is planned.

125. A few direct examples show Defendants' intentional misinterpretation of Plaintiff's conduct.

126. Defendants' bad faith interpretation of Plaintiff's complaints is mirrored in his lawsuits. See for example IV.10(b)(ii)(2).

*(C) Defendants set Plaintiff up to manufacture verbal and/or other response which could justify their activities. That includes demonstratively harming Plaintiff to make him hostile toward the US and its agencies, and to develop him as a threat by deliberately creating the conditions for his radicalization.*

127. In addition to harming and provoking Plaintiff for many years (see for example IV.8, IV.11, IV.12) Defendants have made multiple demonstrative statements showing that the pain and suffering he has been experiencing are caused by them or with their approval, aid and support. Obviously Defendants aim in that way to fuel Plaintiff's "perceptions of government or law

enforcement overreach, [while damaging his] socio-political conditions" – two of the main drivers for extremism according to the FBI (see n.63) – and make him hostile toward the US and its agencies. Furthermore, Defendants regularly expose Plaintiff to violent narratives ('terrorize him' – 2392 *et seq.*; 'fight', 'kill him' and more at 2600 et seq.), which is a radicalization factor.

128.    As illustration to their demonstrative intention to harm and provoke Plaintiff Defendants explicitly stated their intention to torture, terrorize, harm and oppress him, and were explicit that this is at least in part retaliation to Plaintiff's petitions (for example they commented "They want him straggle." on 8/30/2024 – the day after he had sent his second Administrative claims to the FBI), and inducement of illegal response by Plaintiff ("We don't stop. Fight." 3/20/2025). In some occasions the timing of such statements shows that by torture they mean Defendants' sound attacks on Plaintiff (slams, knocks, shouting, loud music, and similar next to him) as on 3/29/2016, 3/30/2016, or 3/11/2022. Defendants have increased a lot their sound attacks on Plaintiff in retaliation to him considering a lawsuit in the end of March 2016, and a bit later on his work on petitions. See 2584 *et seq.*. In almost all other occasions when Defendants talked overtly about the 'torture' it meant punishment for Plaintiff's work on case materials (9/14/2024), or for his documentation of events (7/4/2024), or was used as a threat to disrupt his work on petitions. Related to that is Defendants explicit statement in regards to Plaintiff to "Make him uncomfortable." 11/13/2021.

129.    In similar way Defendants overtly directed, planned, and threatened to 'push / press / suppress / hit' Plaintiff, and acted on their threats. See 880 *et seq.*. Such demonstrative conduct apparently aims to provoke Plaintiff and make him hostile toward Defendants.

130.    Defendants deliberately obstruct the legal means for resolution of Plaintiff's grievances. They interfere with Plaintiff's petitions, deny him protection under the law (see IV.8-9), and that has significant role in their design to radicalize Plaintiff.

131.    In regards to Defendants' deliberate setting of conditions to radicalize Plaintiff see also IV.10-12,
        IV.8.

*(c) Defendants abuse threat assessment and management processes in regards to Plaintiff.*

132.    Because Defendants have designated Plaintiff as a threat since 2012, their activities against him
        are in essence threat management (see above IV.7(a)(2)). However it is apparent that the
        functions of threat management – to control / contain a person of concern using existing social
        systems and community policing, and to provide support and guidance to help the person of
        concern – are either abused or ignored in regards to Plaintiff. The broad definitions of threat
        indicators, Defendants' policy 'to err on a side of safety' (768) which permits targeting innocent,
        and similar, make possible such abuse.

133.    To the extend Defendants' activities against Plaintiff aim to control and contain him – Defendants
        use existing social systems and community policing to suppress his legal activities, and deny him
        fundamental rights protected by the US constitution and laws, including the international law –
        see IV.8, IV.10-11, and more.

134.    To the extend that Defendants claim they really believe/d Plaintiff is a person of concern – they
        have never engaged in any activity that resembles 'support and guidance to help' him for 13 years
        and ongoing. That is another evidence for their animus and malice without even considering the
        fact that they deliberately harmed and keep harming Plaintiff / creating more grievances.

135.    Furthermore Defendants have implemented in regards to Plaintiff threat management strategies
        with the highest level of pressure available before taking law-enforcement action – arresting him.
        Based on Defendants' conduct they use both '3rd party control or monitoring', and 'warning or
        confront' strategies (see above 292).

*(d) Defendants unreasonably designate Plaintiff as a threat for many years.*

136.    Defendants' use of false accusations, their efforts to set Plaintiff up and to eventually entrap him, and more, for 13 years and counting clearly show that they have no legitimate reasons to designate him as a threat  (see 390 *et seq.*, IV.8, and more). To the extend Defendants use Plaintiff's grievances as a reason, they deliberately misuse the radicalization models which provide a range of opportunities for abuse (see above (a)(3)). Grievances are not the sole factor for radicalization, otherwise each political party in opposition, for example, should be considered as a threat to the government / subjects to counterterrorism operations because of their opposition to (certain) actions by the party in charge. The means used to address those grievances separate those who are threat from those who exercise their legal rights, but that is true only if we follow the rule of law.

*(e) Defendants has always aimed to disrupt Plaintiff because he is Bulgarian legal resident, who they considered to be gay, because they held malice against him, and escalated their action as punishment for his petitions and other lawful actions.*

137.    Based on the totality of circumstances Defendants' overarching goal has always been the disruption of Plaintiff by subjecting him to regular disturbance, continuous unlawful pressure, degrading treatment, and inciting prolonged conflicts, frustration and distress (IV.8, IV.11-12). Defendants have not aimed to resolve any legitimate problems, as Plaintiff has not created any, but they do the opposite – they create problems for him, then prevent or obstruct his legal means to address the grievances, and repeatedly provoke him in apparent effort to incite illegal response(s) (see IV.9-10, and more).

**8. Defendants have been acting in concert to subject Plaintiff to unlawful oppression, and selective treatment motivated, at least in part, by discriminatory and/or retaliatory animus, and malice since 2012.**

138.    Defendants' conspiracy(s) to deprive Plaintiff from equal protection under the law, and to deprive him from residency in the US, to entrap him, and/or to oppress him otherwise, started in or about the summer of 2012 and was initially between FBI, NYPD/JTTF New York, and Teaneck public schools (Defendants referred themselves as 'agents', indicating they are law enforcement agents ("Arrest must stop?") from a 'different state' who would involve 'local powers'; while students amplified Defendants' threats to 'kill' Plaintiff) (IV.7(b)(i), ECF No.8-1 at 15 *et seq*.). The number of parties acting in concert increased significantly after Plaintiff filed a report for organized harassment and threats with Teaneck police on 9/11/2012 (ECF No.8-1 at 20-21, see above IV.1-6), and since then Defendants' acts in pursuit of those unlawful goals have never ceased. Defendants act consciously, and in agreement about their general purpose even though they might perform different functions, or different parts of the plan.

   *(a) Defendants' activities against Plaintiff are motivated, at least in part, by his race, ethnicity, national origin, sex, perceived sexual orientation, citizenship status, and are in retaliation to his protected under the constitution and laws conduct.*

139.    Defendants' persistent, widespread and regular derogatory remarks about Plaintiff's protected characteristics clearly show their discriminatory animus, the dissemination of information, and the coordination between parties. Defendants' remarks are not based on their personal knowledge of Plaintiff: he is socially isolated – especially since 2020 (COVID-19), not a public figure, he does not identify himself in public verbally or otherwise as a Bulgarian (unless specifically asked about his origin), nor manifests deliberately in any way his other protected characteristics, nor he knows vast majority of the parties. Remarks are apparently based on disseminated in advance information, and Defendants' choice of information to spread – Plaintiff's Bulgarian ethnicity and national origin, legal alien till 2016, perceived as gay – shows the significance of these characteristics for their perception of Plaintiff.

140.    Defendants retaliation to Plaintiff's exercise of his rights – to his preparation and filing of

petitions, including lawful search for evidence and similar expressive conduct – is also explicitly

shown in multiple occasions. Defendants have talked about the 'punishment' of Plaintiff, 'the

lesson' he has to learn, their whole 'stop' campaign and similar. See bellow IV.8(a)(4).


**(1) Plaintiff is a white Eastern European with Bulgarian ethnicity, ancestry and national origin. As Bulgarian he grew up with specific culture, language, history, music, and customs.**

(i) Defendants regularly identify Plaintiff by his ethnicity/national origin regardless of the location, and make derogatory remarks in that regard such as 'Bulgarian fagot', 'Bulgarian mob', 'Bulgarian enemy' (see for example ECF No. 8-1 at 18, 29, 32, 328; and ECF No.8-2 at 2141).

141.    Defendants' persistent and frequent use of "Bulgarian" as reference to Plaintiff demonstrates the

importance of his race/ ethnicity/national origin for their perception of him. Since the initiation of

*Dimitrov I* the use of 'Bulgarian' in Plaintiff's presence has significantly decreased, but when

Defendants used it it was almost always in negative context. For example Defendants talked to

the effect of 'Catch the Bulgarian' (8/18/2023, 11/18/2024), 'arrest Bulgarian' (9/28/2023,

7/16/2024), 'Bulgarian is bad ass' (9/13/2023), 'Bulgarian fagot' (7/16/2024), 'Bulgarian harass'

(3/7/2024), 'Bulgarian lost.' (4/9/2024), or 'Sick Bulgarian.' (11/9/2024). See Exhibit Timeline of

events 2023-2025

(ii) Defendants have implied / fabricated links between Plaintiff and Russia, and referred to him as 'communist' in relation to Bulgarian history and culture. In that regard Defendants also referred to Plaintiff's lawful collection of evidence as 'spying', and to him as a "spy".

142.    Defendants talked about Russia and Russian(s) in relation to Plaintiff multiple times (4/2/2018,

3/4/2020, 12/21/2021, 4/24/2022, 8/10/2022, 11/10/2022, 2/18/2022, 8/12/2023, 8/13/2024,

9/14/2024), implied a connection with the "Russian mob" (4/2/2018, 12/18/2022 (explicitly

"fish[ing]" a response from Plaintiff)), they put a Russian speaking 'neighbor' in ap.A3 since

2021, and talked in Russian to him directly or indirectly (3/4/2020, 3/11/2022, 7/16/2022,

10/8/2022, 7/14/2023).

143.    In relation to that Defendants asserted that Plaintiff is a 'spy'. Assertions were made by different

parties, including Teaneck Public Schools' students, Defendants' agents from Plaintiff's building

(as for example the named Defendants in *Dimitrov I* Dula and Pimienta), and others.

144.    In significant number of occasions the timing of Defendants' assertions that Plaintiff is a spy

shows that they are in response to his gathering and working on evidence. For example

Defendants called Plaintiff spy after he worked on timeline of case-relevant events (2/8/2022,

5/14/2024), transcripts (3/11/2022, 9/25/2024), on security camera videos – whether archiving or

collecting/preparing them for exhibits (6/13/2023, 12/12/2024), on an exhibit (9/22/2024), or

while he made photos (2/17/2022, 8/11/2023). That points also to the demonstrative surveillance

of Plaintiff, and the coordination between Defendants. Especially notable in that regard are the

events on 9/25/2024 – the reaction was about 20 minutes after Plaintiff had sent by email an

audio recording of students and Defendants planning an action against him, and its draft transcript

to the Teaneck's Town Manager, the clerk and to Teaneck police officer Strickland.

145.    Explicit public statements about Plaintiff as a 'spy' were made for example on:

146.    Also related to the above is that Defendants referred to Plaintiff as a "communist" at least in two

occasions: on 6/21/2017 at the Derek Smith Law Group's office in Manhattan ("Bulgarian is a

communist." ECF No.8-2 at 2107); and on 12/15/2019 in Plaintiff's building ("Communist."

"They're not found. Get it." "If I shoot Kalin promise that Kalin материали ['materials' in

Bulgarian]-- They []?"… " [] don't forget: communist." Transcript 191215_7035.mp3 at 13:58-

59, and 14:33. ECF No.8-1 at 53).

**(2) Plaintiff is a strait male.**

147.    Defendants regularly challenge Plaintiff's masculinity by referring to him as a woman and 'fagot'

in demonstration of how they perceive him and of their animus. Despite the significant decrease

since Plaintiff has started to document regularly relevant events (Defendants seemingly instructed

to mock Plaintiff with 'non-gay' remarks as, for example, on 11/21/2022) they have kept making diminishing remarks about his masculinity, including by referring to him in public as 'she', 'bitch', 'darling', 'fagot', "fag", 'freak', in apparent effort to ridicule, shame and humiliate him. Till about the end of 2022[48] Defendants also used feminized version of Plaintiff's name "Kalini" (see examples in ECF No.8-1 and 8-2), commented that he is 'girly' (12/15/2019, 9/17/2020, 9/3/2022), or "feminine" (7/5/2016). Defendants have sent on Plaintiff's address women's magazines addressed to Megan Cooper (landlord's staff member) as for example on 6/3/2015 (about four years after Plaintiff moved in). Notable is the same treatment of Plaintiff in Bulgaria (see 5/25/2022). See also the events on 7/16/2023 (days before Plaintiff filed the complaint in *Dimitrov I*) at ECF No.8-2 at 2636 *et seq.*; 8/31/2023; or on 5/14/2025 in Votee park, Teaneck in which Defendants implied that what Plaintiff is doing is feminine, not what a 'real man' would do (see Timeline of events).

148.    Among other things Defendants and parties in concert referred to Plaintiff as a "bitch" multiple times at different locations, as for example under or next to his windows (5/15/2016, 8/18/2022, 8/23/2022, 9/9/2022, 4/20/2023, 7/26/2023, 5/28/2024), when following him in Teaneck, NJ (4/2/2017, 4/5/2024), in ap.G2 (6/23/2017), in building corridor (8/22/2022), in Teaneck parks or benches in public (8/19/2022, 5/25/2024, 5/28/2024, 8/14/2024). Different parties made such statements – for example students said that on 4/2/2017, 8/19/2022, 4/20/2023, 7/26/2023, 4/5/2024, and 5/28/2024.

**(3) Plaintiff was a legal alien since he arrived in the US on 2/6/2011, and became a citizen on 4/13/2016.**

149.    Defendants' animus based on Plaintiff's citizenship status is intertwined with their animus based on his Bulgarian race, ethnicity, national origin (see above IV.8(a)(1)), and is shown also in their deliberate efforts to alienate and push Plaintiff out of the US (see bellow (b)(iii)). A few more

---

48

examples of Defendants explicitly saying that Plaintiff does 'not belong here', and should not 'move from Bulgaria' are given bellow.

**(4) Defendants' actions against Plaintiff are at least in part punishment in retaliation to his lawful conduct and exercise of constitutional rights.**

150. Defendants' conduct is punishment of Plaintiff without judicial adjudication of guilt (Fifth Amendment of the US Constitution)[49], and on that basis alone is unlawful. Defendants explicitly talk about their activities against Plaintiff as punishment. For example on 9/7/2019 Defendants gathered in ap.A3 and talked about Plaintiff for about an hour saying among other things that they "Have to punish [him]." And that they are, and they should "Be the punishment." ECF No. 8-1 at 476. Transcript of 190907_6786.mp3 at 0:14, and 9:28.

151. Defendants acted in coordination and demonstratively talked about punishing Plaintiff in his presence, as for example on 5/14/2017 (coordination between ap.G2 and other parties, Teaneck police timely appearance), 5/17/2017 (organized overt surveillance of Plaintiff by multiple persons), 9/7/2019 (coordination between ap.A3 and other parties, including the man who later became regular in ap.A6), 3/11/2021 (coordination between ap.A3 and B2 (Dula), noise harassment), 4/22/2021, 7/11/2021 (coordination between ap.B2 and Defendants under Plaintiff's windows), 5/11/2022 (coordination between Verizon workers, and Teaneck police officers), 6/4/2023 (talking from the position of collective identity – "we", "FBI", coordination between ap.B2 and Defendants under Plaintiff's windows), 7/29/2023 (coordination between parties in a car and Defendants' patrolling agent under Plaintiff's windows), 4/15/2024 ("we"), 5/20/2024 ("we"), 7/6/2024, 1/19/2025 ("we"). In relation to that Defendants supervised and explicitly directed parties to "punish" Plaintiff (5/14/2017, 9/7/2019, 11/29/2024 (implying that the FBI is saying that to police)).

---

49

152.    In a few occasions Defendants were explicit about the reasons to punish Plaintiff – because
        Plaintiff is 'hitting/fighting police' (8/2/2019, 2/22/2020, 3/6/2020); or, as the timing of
        Defendants' statements shows, because he was working on case-related or legal materials, or filed
        complaint (9/13/2020, 3/11/2021, 7/11/2021, 2/17/2022, 2/18/2022, 2/24/2022, 3/28/2022,
        8/17/2022, 7/25/2023, 5/8/2024, 5/20/2024, 7/6/2024). And in a few occasions Defendants
        immediately or very soon after their statements punished Plaintiff by knocking on his walls
        (ap.A3), slamming door(s) (ap.G2), or hammering/hitting/dropping something heavy on his
        ceiling or playing loud music (ap.B2) as for example on 5/14/2017, 3/6/2020, 3/11/2021,
        7/12/2021, 6/13/2022, 5/20/2024, 7/1/2024, 11/14/2024, and 1/19/2025.

153.    Defendants also explicitly said that they will 'make [Plaintiff] regret it' in a couple of occasions,
        and even talked about the 'revenge':

154.    Defendants' persistent talking about punishing Plaintiff, and their conduct show that this is
        Defendants' policy / practice in regards to Plaintiff and his lawful activities. The supervisors and
        policy-makers knowledge and reaffirmation of Plaintiff's 'punishment' was especially notable
        after Plaintiff had sent Notice of claims to New York City and Township of Teaneck, and
        Administrative claims with the FBI New York on or about 11/10/2022. On 11/21/2022
        Defendants themselves were expecting that their activities against Plaintiff would be stopped –
        Dula said in regards to Plaintiff "To oppress the man []. It could be the last they fucking talk."
        Transcript 221121_9990.mp3 at 3:12-14. But the activities continued without any remedy.

        (i) Defendants' retaliation to Plaintiff's exercise of his rights aims to inhibit his rights. That was
        also explicitly demonstrated by their 'stop-Plaintiff' social influence campaign and more. See
        IV.9-10.

        *(b) Defendants have singled out, and treat Plaintiff selectively in comparison to other
        similarly situated for 13 years and counting.*

155.    Defendants treat Plaintiff differently from other similarly situated persons without legitimate
        rational basis. Furthermore Defendants reaffirm and continue that treatment for 13 years and

counting despite Plaintiff's complaints, petitions and legal actions, and precisely because of the adverse effects on him. Among other things this shows their intention to injure him.

156.    Plaintiff has neither witnessed nor knows another person who Defendants subject to such systematic oppression, regardless of whether he compares himself to a person who lived or still lives in his building, in his community, neighborhood, town or area in more than 14 years since he has been in the US. All Defendants' decision-makers and supervisors know about the selective treatment of Plaintiff (undeniably since his Notice of claims, administrative claims, legal actions, and other petitions). Furthermore, Defendants' policies/practices aim to produce such different treatment. They are in contact and act in coordination with each other, use common methods, follow the same policies/ practices depriving Plaintiff from his rights under the US Constitution and laws, and more – all of that in demonstration of an organized conspiracy.

**(1) Similarly situated to Plaintiff comparators.**

157.    (i) In regards to Plaintiff's rights, benefits, and privileges under the US Constitution and laws: in all relevant time any law abiding citizen or legal alien in the US who is not Eastern Europeans, not Bulgarians as ethnicity, ancestry, and national origin, nor strait males who are considered feminine and/or gay, is similarly situated to him.

158.    All US persons who petition the government, and are not Bulgarians as ethnicity, national origin, or strait males who are considered feminine and/or gay, or were/are legal aliens or naturalized citizens, are similarly situated to Plaintiff. Including all victims of crime who reported it to the police, the FBI and/or other relevant agency.

159.    Plaintiff is similarly situated to all private persons in the US who lawfully monitor their property – business or residential, and/or the adjacent public area because of concerns for crime by using any of the existing security systems, and are not Bulgarians as ethnicity, national origin, or strait males who are considered feminine and/or gay, or were/are legal aliens or naturalized citizens. As

for example Plaintiff's landlord JC Realty, who have cameras toward the corridor and the entrance of the building including the pedestrian area and street visible though the glass.

160.    Plaintiff is similarly situated to all US persons who lawfully gather / record information as evidence for the government agencies or before a court of law, or for dissemination to the public by other means, and who are not Bulgarians as ethnicity, national origin, or strait males who are considered feminine and/or gay, or were/are legal aliens or naturalized citizens, are similarly situated to Plaintiff. For example any such party in a lawsuit, a journalist, researcher, or artist (a photographer or writer for example) is similarly situated in that regard to Plaintiff.

161.    (ii) In regards to the enjoyment of legal rights, benefits, and privileges under the local law, and to the enjoyment of services of the local government, similarly situated to Plaintiff are all residents in Teaneck, NJ, and all persons in the jurisdiction of Teaneck municipality and the police who are not Eastern Europeans, not Bulgarians as ethnicity, ancestry, and national origin; nor strait males who are considered feminine and/or gay; nor legal aliens (at least during the time Plaintiff had that status). Per Plaintiff's knowledge based on statistics not available at present there were about 17 Bulgarians (from about 40,000 residents) in Teaneck, NJ in or about 2013.

162.    (iii) Similarly situated to Plaintiff in regards to his residency in the building on 805 Red Road, Teaneck, NJ (contractual obligations, conditions, legal rights, and similar) are all residents in his building in Teaneck who are not Eastern Europeans, not Bulgarians as ethnicity, ancestry, and national origin, nor strait males who are considered feminine and/or gay, nor legal aliens (at least during the time Plaintiff had that status). (Note that a few of them are Defendants' agents or acting in concert with Defendants). For example no one in Plaintiff's building has been subjected to such treatment by Defendants other than him – neither, for example, the long-time Plaintiff's neighbor Emanuel Ajaz (Indian ethnicity, a tenant in ap.A1 for about 9 years (till 2021)), nor Ms

Robin Wilson (African-American, a tenant in ap.A3 for about 8 years (till 2019)) (apart from Plaintiff none is white Eastern Europeans with Bulgarian ethnicity, ancestry, and national origin).

**(2) Defendants deliberately and systematically treat Plaintiff differently than similarly situated others by (i) not providing police protection; (ii) orchestrating the hostile to Plaintiff environment, including repeated attacks on him and his reputation regardless of the location; (iii) conspiring to deprive Plaintiff from residence in the US; (iv) to entrap him, and/or (v) do not hold accountable to law those acting against him.**

(i) Defendants' law enforcement agencies deny protection to Plaintiff by (a) not enforcing the law in regards to his petitions and complaints with their policy / practice to not investigate (in majority of cases) and/or to obstruct, minimize, misrepresent his petitions; and (b) not protecting Plaintiff against intentional discrimination and retaliation.

(ii) For many years Defendants act in concert to create hostile to Plaintiff environment regardless of the location.

163.    Defendants and parties in concert ('Defendants') have created severe and pervasive hostile environment based on Plaintiff's Bulgarian ethnicity, ancestry, and national origin; his sex; citizenship status; and as retaliation to his lawful activities. Defendants' everyday conduct significantly altered the conditions of his life, his enjoyment of his tangible and intangible properties, and includes, but is not limited to, verbal abuse and intimidation (threats, derogatory remarks, provocations, dissemination of defamatory narrative (see IV.12, IV.7 (b)(ii)(2)(A), ECF No.8-1.C.2, and more), assaults, regular sound attacks (knocks on Plaintiff's walls/ceiling/floor, threw pebbles at his windows, yelled under the windows or next to Plaintiff when outside, directed energy beams at him and his apartment (charging among other things Plaintiff's body up to 1036 V/m), and more. See IV.11.B; ECF No.8-1.D and No.8-2.E.1.1.

(iii) Defendants conspire to deprive Plaintiff from residence in the US.

164.    Abusing their powers Defendants cause physical and mental suffering and pain to Plaintiff for many years (see IV.11), at least in part with intention to exclude and remove him from his apartment and the US.

165. FBI / JTTF investigations can take "measures [such as] excluding or removing persons involved in terrorism or espionage from the United States".[50] An FBI/JTTF preventive investigation is "successful" when its subject is pushed out of the US, and targeting suspects in that regard (regardless of their actual innocence or guilt) is approved.

166. Police strategies to prevent crime such as person-based predictive policing can also aim to "extract individuals likely to commit crimes from certain areas" and subject them to "punitive attention" in all relevant time.[51]

*(A) Defendants pressure Plaintiff to 'go away', 'move out' from his apartment and the US.*

167. In parallel to their other activities Defendants have engaged in social pressure[52] campaign to push Plaintiff out of his apartment in Teaneck, NJ, and from the US since he started working on legal cases in 2016. Defendants have made many explicit statements with the same message Plaintiff to 'get out', 'go away' (see 770 *et seq.*), or that they will 'evict', 'extradite' him (as on 8/5/2020, 4/2/2024, 12/7/2024). That message was delivered by different parties at different locations – demonstration of the planning and organization behind the messaging (see CVE mosaic of engagement 307). See above (a)(3), and IV.11. They were explicit that they act to extradite Plaintiff because of his petitions (9/6/2023). At least in a few occasions that was intended also as provocation – this is demonstrated by Defendants' comments on lack of response by Plaintiff ('he didn't believe/perceive/see/get it') as for example on 7/25/2018, 4/20/2022, 1/21/2023, 6/15/2023, 9/22/2023, 4/6/2024.

168. Most frequently Defendants' agents who talked about that were unknown to Plaintiff. Teaneck public schools' students are the second most-frequent party delivering that message (12/12/2017, 2/15/2018, 4/10/2018, 11/25/2019, 6/18/2021, 2/10/2022, 2/14/2022, 4/20/2022, 10/14/2022, 9/8/2023, 9/22/2023, 10/17/2023, 2/26/2024, 5/11/2024, 1/21/2025, 3/14/2025, 3/28/2025).

---

50
51
52

Notable are the statements by a NJ state government agent (4/2/2024), Defendants' Raphael (Ralph) Pimienta (8/5/2020, 1/8/2024, 9/14/2024, 10/30/2024), or Marlene Dula (4/6/2024).

169.   Defendants and parties in concert have made such statements in Washington, D.C (4/29/2017), on the streets in Teaneck, NJ (5/17/2017, 9/22/2023), under or near Plaintiff's windows (10/6/2017, 12/12/2017, 2/15/2018, 4/10/2018, 11/25/2019, 9/19/2020, 3/1/2021, 4/29/2021, 11/3/2021, 2/10/2022, 2/14/2022, 4/20/2022, 9/3/2022, 10/14/2022, 6/15/2023, 6/16/2023 9/14/2023, 9/21/2023, 10/17/2023, 2/26/2024, 4/29/2024, 5/11/2024, 6/6/2024, 6/21/2024, 7/25/2024, 9/14/2024, 10/3/2024, 11/29/2024, 1/21/2025 3/14/2025 3/28/2025), in ap.G2 (7/6/2016, 5/14/2017, 7/4/2018), Defendants in ap.A3 (in 2020 they were referred as 'extraction team', ECF No.8-1 at 148) (1/3/2021, 4/14/2021 6/21/2024), in ap. B2 (4/6/2024, 10/5/2024), in building corridor (8/5/2020 3/4/2022, 4/20/2022 1/21/2023. 9/14/2024, 1/8/2024, 4/2/2024, 10/30/2024), Defendants in parks/public benches (6/18/2021 9/8/2023 8/23/2024 9/14/2024), or in Stop and Shop, Teaneck, NJ (7/25/2018).

*(B) Defendants interfered with the contracts between Plaintiff and his landlords.*

170.   Defendants interfered with the contracts between Plaintiff and his landlords (Tower Management till February 2020, and JC Realty since March 2020), and act in concert with the landlords to disrupt and push him out of the apartment and the US (see ECF No.8-2 at 2053 *et seq.)*. In result landlords do not carry out the contracts with Plaintiff in good faith, or directly violate the contractual promise of "quiet enjoyment". Landlords' participation is more subtle since the initiation of *Dimitrov I* but for the statements of the super and other JC Realty staff.

171.   (1) In relation to Defendants' sound attacks on Plaintiff Tower Management / supers removed the noise insulation between Plaintiff and Defendants in ap.G2 (ECF No.8-1 at 172) and ap.A3 (Id. at 474). Plaintiff made a few times requests to landlords to install sound insulation but his requests were ignored – see 9/13/2020 (in a letter to JC Realty sent by email), 9/17/2020 (ECF No.8-1 at

744), 9/22/2021 (Id. at 777), and more. At the same time JC Realty in practice ignored Plaintiff's notices of noise violations by Defendants in ap.B2 (5/7/2021 (ECF No. 8-1 at 452), 6/5/2023 (Exhibit email)) and A3 (10/27/2020, ECF No.8-1 at 506). JC Realty's Michele referred the mater to Cesar Naranjo, the super, who instead tried to convince Plaintiff that the noise was not from ap.B2 – continuation of Defendants' blatantly false denials. Considering the super's remarks they didn't take or took only proforma actions in response. ECF, No.8-2 at 2046. Furthermore landlords participated in the noise harassment of Plaintiff with repeated noisy "repairs" in the neighboring apartments almost always without giving notice to him. ECF, No.8-2 at 2030 *et seq.*.

172.    (2) Defendants utilize building's pipe system to harass Plaintiff with noise (pipe clanks, bangs (water-hammer), water-running noise) – all that with the knowledge and support, if not with the participation of the landlords. For example when this kind of harassment started in 2015 Tower Management, the landlord then, ignored Plaintiff's complaints for repeating for hour(s) pipe clanks with almost exact frequency (for example once every 4 minutes and 30 seconds or similar), claimed no one else heard that despite the audio recordings of the noise which Plaintiff made and sent to them (2/17/2015. ECF No.8-2 at 1914) – the landlord followed Defendants' practice of shocking denial of apparent facts (see Defendants' denials of the slams and knocks by ap.G2 and B2 in 2016 and later, and even blaming Plaintiff). See ECF No.8-2 at 1910 *et seq.*.

173.    (3) Defendants utilize the building utilities to disrupt (disturb and create problems for) Plaintiff. Defendants' manipulation of temperature – turning the heating or the hot water on/off, extremes in both direction: very hot or cold – is a known tactic of degrading treatment – see IV.11. See ECF No.8-2 at 2048 *et seq.*. For example Defendants manipulated the heating in his apartment: there was no heating on 11/9-11/10/2017, 11/12/2017, and 12/3/2017, then heating was very strong (12/5/2017). On 12/29/2017 Defendants: "We can't let him continue. We have to destroy []." They turned off the heating in Plaintiff's apartment (ECF No.8-2 at 2051). In the beginning of

2018 no heating for three days – temperature inside was 50F (1/5-1/7/2018 Id.), then heating was very strong – 82F floor level with the window open (1/12/2018 Id.). And more.

174. (4) Defendants and landlords act in coordination to disrupt Plaintiff's rent payment and/or push him out of the building and the US. See ECF No.8-2 at 2058 *et seq.*.

175. (5) Landlords ignored Plaintiff's complaints against Defendants in ap.B2, A3, and ap.G2 (note the cover Cesar offered for the Defendants in ap.G2 then).

176. (6) Cesar Naranjo, super of the building since March 2020, acts as agent of the Defendants – he participates, provide support and access, for example, to Teaneck Public Schools' students to harass Plaintiff in the building (as for example on 2/17/2023). ECF, No.1 at 260. In demonstration of his association and coordination with Defendants he talked multiple times about police, the FBI, and CIA in regards to Plaintiff. As for example on:

177. The coordination between Cesar Naranjo and Defendants is apparent: he participates in the defamatory narratives about Plaintiff as Bulgarian criminal/terrorist/spy who holds Defendants hostage, in the pressure on Plaintiff to stop, in threats that police 'will get rid of' him (6/20/2024), and more. For example on:

*(C) Defendants' efforts to 'evict' and/or 'extradite' Plaintiff, include installing their agents[53] in his building and/or acting in the adjacent apartments.*

178. Defendants' actions against Plaintiff from the neighboring apartments and/or inside the building are at least in part intended to push him out of the apartment and the US. They have put their agents in the building and either replaced or secured his neighbors' cooperation and participation (see for example the participation of Ajaz (ap.A1) in the last years before he moved out). Defendants have rent under cover ap.G2 (apartment under Plaintiff), their 'evaluation team' in ap.B2 (apartment above) moved in the building at about the same time as Plaintiff, and after Ms Robin moved out Defendants put their agents in A3 (one of the two apartments next to Plaintiff).

---

53  Note that Plaintiff uses 'agent' here and elsewhere in its general meaning of Defendants employee or party acting in coordination with, under the direction of, or under the control of Defendants.

See ECF No.8-1 at 148 *et seq.*. Defendants' direct energy and sound attacks on Plaintiff, and other kinds of harassment and provocations from those apartments are briefly addressed in IV.11, Exhibits about EF, MF, and EMF, Exhibit Hammering from B2 2021-3/1/2025, and more.

179.    In addition to identifying themselves as FBI, CIA, police, and similar, or being identified as such by others, Defendants in the building were referred as 'unit(s)' ("there are four units in the building" 2013; "all units fucked up you... Don't move from Bulgaria." 1/27/2017; "All units []. Over their heads." 8/1/2023; "all units" 10/3/2023; or 5/2/2024), 'the squad' ("I believe to help this squad." 1/20/2023; "The squad []. I warned him – go back from where he [came]." 8/17/2023), as an 'evaluation team' (Defendants in ap.B2 in 2013), or 'extraction team(s)' (Defendants in ap.A3 in 2020, and later 1/20/2022)[54], and more. See ECF No.8-1 at 86, 100, 148, 161, 299; Timeline of events and more. All of those show the organization and coordination between the parties in the activities against Plaintiff, as well as their common goals including to push him "back from where he [came]".

*(D) There is no exception that can justify Defendants' denial (in practice) of Plaintiff's right to freely chose residence by their activities pushing him out of his apartment and the US.*

180.    As Plaintiff's residence do not pose any threat, the Defendants' activities to push him out of his residence in Teaneck and the US in general are by nature punitive acts. Even only on that ground those activities are unlawful because they constitute extrajudicial punishment before adjudication of guilt in accord to the due process of law. And considering the lack of any legitimate threat from Plaintiff any Defendants' action against Plaintiff's freedom of movement and residence is obviously not proportional.

181.    To the extend Defendants claim that the interference with Plaintiff's right to free movement and choice of residence is due to national security they apparently misconstrue (a) his legal activities (as for example his preparation for, and filing petitions with government agencies) as threat or

---

54

attack on the government, or (b) those activities are threat because of Plaintiff's status (race, national origin, ethnicity, sex, ect.), or (c) combination of the previous two. Any one of these considerations is unlawful and unreasonable. How Plaintiff's free movement and choice of residence endanger the US existence, the US capacity to protect its territory, political independence, and state secrets? Note that the activities started long before Plaintiff started working on his legal cases, but quickly escalated since then.

182. To the extend Defendants raise the argument that Plaintiff is threat to the public order – how his conduct of following the law (filing petitions, and similar lawful activities) can be against the public order, considering that the public order is based on the laws and respect of human rights?

183. To the extend Defendants raise the argument for public safety how exactly Plaintiff is "real and significant risk to the safety of persons (to life or security of person) or a similar risk of serious damage to property"? If Defendants claim Plaintiff did something illegal, engaged in criminal activity, this is a fabrication, misrepresentation, or combination of those. If they claim those are true why they didn't charge Plaintiff?

184. To the extend Defendants bring any legitimate purposes that make necessary the US activities against Plaintiff's residence at his Teaneck's apartment, and in the US in general – there are either not applicable to Plaintiff's case (Plaintiff's residence is in residential area, no military objects nearby (per Plaintiff's knowledge)), or are either fabrications, misrepresentations, or some combination of those two.

185. There is simply no true and legitimate answer to the questions how the exclusion of Plaintiff will make the public more safe, how the national security will be protected, or how the US activities to push him out of the US are appropriate in order to achieve any legitimate purpose.

(iv) Defendants have been acting in coordination to entrap Plaintiff for 13 years an ongoing.

186.    Entrapment is abuse of the process of detection and enforcement by government officials who instigate an illegal act on the part of otherwise innocent persons in order to lure them and punish them.[55] Because undercover activities can easily be misused to entrap an innocent, the Attorney General's guidelines explicitly prohibit that for the FBI / JTTFs undercover operations and/or their confidential informers.[56]

187.    Defendants' efforts to entrap Plaintiff have been obvious since 2013. In order to link him to crime, and/or to incite him to act illegally Defendants deliberately harm and provoke Plaintiff, including by developing and disseminating false accusations of serious crimes, degrading him, creating conflicts, and at the sane time preventing or obstructing his petitions and denying him protection under the law for many years and ongoing. See IV.7, IV.12. To the extend Defendants are not successful in that direction entrapment is used as a frame to analyze their due process violations.

*(A) Plaintiff is an innocent person – he has no criminal history, nor he was engaged in criminal activities before or when Defendants started their inducement. And after 13-years-long and ongoing Defendants' pressure and provocations Plaintiff has still not committed a crime – a demonstration that he has never been 'ready to commit crime' at the first place.[57]*

*(B) Defendants' inducement of Plaintiff to commit crime[58] is abuse of their powers: they not only create opportunities for Plaintiff to commit a crime (for example by giving him 'enemies'), but play psychological games to manipulate and provoke him to do that, create the conditions for his radicalization, and their efforts in that regard far exceed the two-years period which the courts considered improper.[59]*

188.    Based on totality of facts the goals of the Defendants' activities against Plaintiff can be viewed in three levels of abstraction: Defendants' end goal is to radicalize Plaintiff and provoke incriminating action which would be sufficient evidence by itself or in accumulation to prosecute him (apart from the case facts, that is also supported by the general definition of an investigation

55
56
57
58
59

as 'gathering evidence to prosecute', or 'developing intelligence' to otherwise incapacitate the target). Absent any factual base for investigation of Plaintiff Defendants have been setting the conditions to develop him as a threat (the case facts match Defendants' radicalization models in reverse – models are used to create, not to detect a threat). The second level goals are for setting those conditions which include (a) developing profound grievances, (b) inducing identity crisis, (c) induction of constant stress and frustration, (d) expose him to regular violent narratives, and more. And the third-level goals are related to Defendants' concrete policies and practices in regards to Plaintiff intended to develop (a) profound grievances – demonstratively harming and provoking Plaintiff for many years, subjecting him to systematic degrading treatment, alienation and discrimination, sabotage of his social activities, disrupting his economic prospects, and more; (b) to induce identity crisis – subjecting Plaintiff to years-long social pressure campaigns utilizing social influence strategies, attacks on Plaintiff's reputation, his sex and sexual orientation, suppression of his personal narrative, imposing criminality and homosexuality and labeling him accordingly, setting identity problems, and more; (c) to induce stress and frustration – subjecting Plaintiff to systematic degrading treatment with different levels of intensity[60], and regular provocations utilizing psychological reactance strategies, conditioning[61], or induction of cognitive dissonance; or (d) to expose regularly Plaintiff to violent narratives – subjecting him to messaging campaigns which include repetition of threats, fighting words, and more, and among other things utilize psychological priming[62]; and (e) to provoke Plaintiff's illegal response – precluding all legal means for resolution and relief by preventing, obstructing, retaliating to his legal actions in response to Defendants' activities, and setting him up with 'enemies'.

189.  Those practices and strategies overlap in time and are not necessarily different as they aim to achieve certain higher-level goal(s) in combination. For example Defendants' demonstrative

---

60

61

62

harmful conduct toward Plaintiff which continue for years, apart from causing physical and/or mental suffering, is obviously intended to make him hostile toward the government and to "develop a profound grievance, a sense of anger and resentment at an undeserved injustice", which is the first phase or one of the fundamental factors for radicalization, and a driver for extremism according to the FBI[63]. See Defendants' overt participation in IV.1-6, IV.11-12, or their explicit statement on 10/8/2016 ("Keep him hostile."). And at the same time that conduct can be punishment for Plaintiff's legal actions, provocation, and more.

190. Defendants' demonstrative conduct includes variety of behaviors as for example (1) the demonstrative surveillance and dissemination of information about Plaintiff, which apart from suppressing him is apparently provocative; (2) explicit statements about the harassment of Plaintiff (IV.11.C); (3) regular attacks on Plaintiff's identity – imputing homosexual orientation, treating his as a woman (IV.8), imposing false narrative of him as criminal and more (390 *et seq.*) while suppressing / replacing his personal narrative/identity with theirs, destroying his career as advertising Art/Creative Director (IV.12(b)(5)), and more; (4) demonstrative interference and sabotage of Plaintiff's job opportunities, social life including events for his expressive actions, search for legal and expert counsel (1718 *et seq.*); or (5) overt entrapment – Defendants talked in Plaintiff's presence they will 'set up', 'frame' him, setting conflicts, and more (IV.8, IV.12).

191. Defendants deliberately develop Plaintiff's 'perceptions of government or law enforcement overreach' with explicit statements and conduct, including with active prevention and/or obstruction of his petitions (see IV.9-10). That among other things apparently aim to either 'crush' Plaintiff (see 2510 *et seq.*), or to provoke illegal reaction (psychological reactance theory). Defendants' use of controlling language and high magnitude threats, their explicit persuasion efforts, and negative categorization of Plaintiff for many years (even positive categorization arises reactance, let alone negative)[64] – all those are factors increasing the reactance. See for

---

63  See above 280 *et seq.* grievance, FBI
64

example Defendants' categorizations of Plaintiff in their false accusations of crime at 390 *et seq.*, or their messaging campaigns as for example the one to 'stop Plaintiff' (1307 *et seq.*).

192. Because Plaintiff is not involved in any illegal activities Defendants' investigation uses a range of covert techniques "designed to link [him] to the criminal enterprise"[65]. Defendants make false accusations of serious crime (390 *et seq.*), provoking Plaintiff by creating conflicts and 'enemies' for him to engage with (IV.12), including by deliberate demonstration that he is subject of government activities (see FBI/JTTF/police and more), and more.

193. Based on the above Defendants use their radicalization / threat assessment and management models, and related psychological strategies and tactics to 'develop' and radicalize Plaintiff – they deliberately set the conditions for him to develop the perceptions, and motivations which are drivers for extremism, and/or factors for radicalization.

194. Defendants' 13-years-long and ongoing inducement is outrageous abuse of power by its duration alone[66], but is especially outrageous in the totality of circumstances in Plaintiff's case (his lack of criminal history and of predisposition to crime, his exercise of constitutional rights in response to Defendants' actions, their active prevention of his petitions, and more)[67].

*(C) Defendants' explicit verbal conduct shows their intent to entrap Plaintiff.*

195. Defendants do not just create opportunities for Plaintiff to commit offense but provocatively demonstrate to him that their activities are intended to push, press, suppress and get him – they have repeated many times in his presence that they 'have to push/press/oppress/suppress' him since 2012. Among other things that conduct explicitly shows their intentional selective treatment of Plaintiff, as well as the intent to entrap him.

196. Defendants' verbal conduct alone is demonstration that Plaintiff's oppression and provocation is their policy / practice. Defendants have explicitly stated in his presence, and repeated for years

---

65
66
67

57

that they 'terrorize', 'harass', 'push', 'press', 'oppress', 'set up', 'frame' Plaintiff, and similar (see IV.7 (b)(ii)(2), IV.11.C).

197.     Defendants talked overtly about pushing Plaintiff frequently since about April 20th, 2017 – the time of Defendants' deletion of Plaintiff's emails with lawyers, Derek Smith Law Group's new position that they do not want to bring Plaintiff's suit in federal court in May 2017, and more. Their talking decreased since then, but in March 2020 Defendants again started talking frequently and overtly about pushing Plaintiff (in March 2020 multiple Defendants' activities intertwined: their efforts to evict Plaintiff, including the stolen check with his rent, the increased price of his Internet by Optimum, the sabotage of his installation of Verizon FIOS, and more). Defendants further increased their prompts to push Plaintiff in September 2022 when Plaintiff worked to finalize his notice of claims and administrative claims to the FBI, and again since 7/12/2023 till the end of September 2023 when Plaintiff finalized, filed his complaint for Dimitrov I (ECF No.1, 7/25/2023), and then worked and filed his Objections to Magistrate Judge Cave Report and Recommendation to dismiss the case (ECF No.8, 8/28/2023).

198.     Similar increase of prompts to push Plaintiff happened when he was finalizing his second administrative claims with the FBI, sent them to the FBI Headquarters (8/29/2024), and Defendants explicit 'push' continued till the end of October 2024.

199.     Defendants' demonstrative conduct is intended to provoke Plaintiff and 'get him'.  "We have to push him." .. "We'll have to get him." (4/20/2017), "Push him till (death)." (5/20/2017), "Blame." (4/23/2018), (3/6/2020), "Push." "Go get him." (7/12/2022), "Have to get him." (9/10/2022), "We've got to push. [] is by oneself." "Suppress him." (9/17/2022), "Everyday push. He is taking hostages." (7/23/2023, two days before start of *Dimitrov I*), "We need to push back." (3/19/2024, Plaintiff was working on a letter to experts. Same on 6/26/2024, ), "You got to understand. We

got to push." (8/16/2024), "He got to stop… Fight." ... "Can't stop him… Jail." "Can push that on

some level." (9/12/2024), "Little pushing…" "Torture." (9/14/2024), "We all push." (12/1/2024),

200.     In a few occasions Defendants' sting was obvious: kids (8/31/2024) or student(s) (2/20/2024)

came under Plaintiff's windows and provoked him, while Defendants watched all that including

Plaintiff's reactions, and commented the 'push'; or on 9/14/2024 when Ralph demonstratively

partnered with others to meet Plaintiff when going outside with song repeating "You have to

move."

201.     In the occasions Defendants talked overtly about pushing Plaintiff they were explicit that

FBI/CIA/police/New York push Plaintiff (4/21/2017) "They [FBI, CIA] can kidnap." "We've

already pushed (that)." (9/7/2019), (10/14/2019), "Have the police to push.".. "New York push."

(6/23/2020), "New York pushed him." "New York will get him."… "Bulgarian []." "They hate

him." "The FBI love." (8/25/2021), (11/2/2021), "So FBI push." (11/14/2021), "Push police to

get []." (7/12/2022), (10/4/2022), "Harder push him." "Have police to push." (11/10/2022 at FBI

New York), "He got police. [] shot." "We don't push that." (7/18/2023, a week before Plaintiff

started *Dimitrov I*), "We didn't push []." ... "Getting enforcement. Got police." (8/18/2023), "We

have police stop." .. "New York []." .. "Let Kalin believe. We want []. We pushed a lot. May be

[]." "FBI []... Kalin will going to stop." (9/14/2023), "We push.. Kalin won't forget. Tell Kalin …

Bulgarian []. Arrest." Talked about the FBI, then: "We didn't push… Can't stop (him). Kalin []

New York." (9/28/2023), (2/12/2025), and more.

202.     Defendants threatened that they push Plaintiff in order to create reason to 'kill him' (9/7/2012)

203.     Defendants hacked Plaintiff to push him (8/20/2024).

204.     Defendants were explicit that they push Plaintiff by harassing him (for example on 4/20/2017,

11/8/2017, 2/9/2024), or prompting to push Plaintiff they used DE against him (for example on

1/1/2018, 6/3/2021, 9/5/2021, 4/7/2022, 8/15/2022), or explicitly deprived him of sleep

(3/10/2025). Defendants in ap.A3 knocked on Plaintiff's wall, slammed door(s), and prompted to push him (for example on 3/26/2020, 4/11/2020, 4/11/2020, 8/15/2020, 4/19/2021, 8/25/2021), Defendants in ap.B2 hammered on Plaintiff's ceiling, knocked, and/or made other noise and commented that they push Plaintiff or provoked that they "can't push him" (as for example on 1/15/2024, 1/16/2024, 2/9/2024, 3/15/2024, 5/11/2024, 8/22/2024, 12/20/2024), Defendants' man from ap.A6 slammed the door talking about 'pushing' Plaintiff (8/26/2024), Defendants and parties in concert also shouted next Plaintiff and commented "That's how to push him." (9/3/2023), (8/16/2024), "Stop" and commented to the effect of "Kalin already have that. So why we need to push?." (9/18/2024).

205.    Defendants were explicit that at least in part they push Plaintiff to stop his work on case-related and legal materials "We need to push." "He didn't stop." (6/9/2022),  "Push. Stop that." "If we can't destroy it []." (10/1/2024).

206.    Defendants talked about FBI's, or 'police set up' in regards to Plaintiff. "We set up.." "Enough with that. We can't protect []." "Now (recording) police. []." "Not according to the FBI." (3/4/2020), "Kalin []." "[] police set up." (9/6/2024), "FBI to stop… Can't harass." "Say Kalin… "Set up... to set arrest." (10/6/2024).

207.    Defendants have made multiple statements that they set Plaintiff up to stop him (for example on 4/23/2018, 9/13/2022, 11/21/2022, 1/20/2023, "How to set him up to stop?" 4/8/2024, 4/9/2024).

208.    Defendants were explicit about their intention to entrap him on 11/3/2024 "The only way we could do is to set up.", and their verbal conduct indirectly shows that they have no factual base for the actions against Plaintiff. Notable is that Defendants stopped talking (there is no noted instance at least till April 2025) about setting Plaintiff up since his letter to Attorney General on 10/7/2024.

209.    Defendants demonstrated complete disregard about the truth and with the knowledge of the falsity of their accusations, they blamed Plaintiff with "all sort of blame" (5/10/2017), or expressed willingness to lie (1/20/2023). Defendants overtly talked to frame and/or blame Plaintiff in order to 'completely stop' Bulgarian (4/20/2017).

210.    Defendants' intention to entrap Plaintiff was clearly shown. "Try to frame [Plaintiff]." "We have (that)." ... "They said forget anything []. He is Bulgarian []."  (8/11/2022), Defendants talked that they 'have to stop' Plaintiff, and schemed to frame him on a fictitious accusation that Plaintiff 'hurt a student'. (12/14/2022. See in that regard provocations on 8/31/2024, 2/20/2024 or the students' assaults on 4/26/2024 and 7/16/2024), Notable are the Teaneck police officers statements on 1/20/2023 who said to Defendants in the building that it is OK to set Plaintiff up (see also 5/11/2024).

211.    Defendants explicitly stated their intention to 'stage' and fabricate crime on behalf of Plaintiff to "get him" since the very beginning (9/7/2012).

(v) Defendants do not enforce nor follow the law, do not hold and prevent Plaintiff to hold accountable to the law the US persons, institutions and entities that violate the Constitution and laws with the authorization, support, acceptance, and/or implementation of the activities against him.

*(A) Defendants' activities against Plaintiff are unlawful – they violate the US Constitution (First, Fourth, Fifth, and Fourteenth Amendments), the UN conventions ratified by the US such as CCPR, CAT, and CERD, and multiple federal and local laws for more than 13 years and ongoing. See bellow (B).*

212.    There is general problem with counter-terrorism laws because the absence of a UN definition of terrorism has led to an obvious and deliberate misuse of the term and violation of human rights by states[68], and many of the state counterterrorism measures are "clear threat to the enjoyment of human rights"[69]. The US has downgraded the human rights concerns in regards to its anti-terrorism measures, and accepted and even supported hurting innocent by "over connect[ing] the

---

68

69  *Note by the United Nations High Commissioner for Human Rights*, E/CN.4/2005/103, 7 February 2005

dots" in its anti-terrorism measures[70]. After 9/11 the FBI adopted in practice 'guilty till proven

innocent' theory (see 277) regardless of the fact that the presumption of innocence of those

criminally charged is a fundamental principle[71], and essential aspect of the due process (Fifth and

Fourteenth Amendments of the US constitution)[72].

213.    To the extend the presumption of innocence and procedural rights mentioned above are in regards

to criminal Defendants, the Defendants' treatment of Plaintiff is worse than those formally

charged with crime. The Defendants' open-ended counterterrorism investigation[73] of Plaintiff

continue for more than 13 years and counting, disregards his actual innocence, and apparently

misuse the US position in regards to innocent casualties in the War on terror to intentionally harm

an innocent[74] because of their discriminatory and retaliatory animus and malice.

214.    Even if Defendants activities were or are based on law at certain time period they are motivated at

least in part by Plaintiff's race/national origin and his other protected characteristics, and are

retaliation to his exercise of rights guaranteed under the Constitution, all that in violation of US

constitution (First, Fourth, Fifth and Fourteenth Amendments), and laws (including international).

*(B) Defendants fail to cease, investigate, remedy, and/or prevent the violations of the US
Constitution and laws (including the international laws) in Plaintiff's case, and are deliberately
indifferent to the violations of Plaintiff's rights.*

215.    As the US courts have clearly established, Defendants have no discretion to violate the

constitution[75]. Furthermore, Defendants have obligation to intervene with constitutional violations

for example under 42 U.S.C. 1983, or 42 U.S.C. 1986 (obligation to interfere in a conspiracy to

violate civil rights), have obligations under CCPR, CAT, CERD and the UN Charter[76], and can

prosecute criminally the violations of some civil rights. In regards to Plaintiff's rights under

---

70
71
72
73
74
75
76

international law those rights "are already guaranteed as a matter of U.S. law, either by virtue of constitutional protections or enacted statutes"[77].

216.  By the US law Defendants' supervisors have duty to supervise and ensure that their "department, agency, or element has adequate procedures to receive, investigate, respond to, and redress complaints from individuals who allege such department, agency, or element has violated their privacy or civil liberties". 42 U.S.C. 2000ee-1(a)(3). The FBI, CIA, and other US agencies are required to have at least one senior officer who "periodically investigate and review [their own] actions, policies, procedures, guidelines, and related laws and their implementation to ensure that [they are] adequately considering privacy and civil liberties in its actions". Id.(a)(2).

217.  The international law also states explicitly that essential part of Defendants' obligations is "to ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy" and to "enforce such remedies when granted". CCPR, Art. 2.3.[78] The effective remedies include cessation of the violations, and investigation.[79]

218.  Defendants' failure to cease, investigate, remedy and prevent future violations of Plaintiff's rights is apparent violation of these duties.

219.  As pointed above despite the petitions Plaintiff filed with Defendants they are deliberately indifferent and fail to investigate the violations of his rights under multiple **federal criminal and civil statutes**. Consequently no one was brought to justice in that regard. For example:

220.  Neither the FBI, nor any other law enforcement agency (jointly referred in this section as 'LEA') investigated under 18 U.S.C. §241 the criminal conspiracy to injure, oppress, threaten, or intimidate Plaintiff in regards to his free exercise or enjoyment of rights protected by the US Constitution and laws. Plaintiff's petitions to Defendants in which he complained about being a victim of such conspiracy include his first report with Teaneck police 9/11/2012 (he filed a

---
77
78
79

handwritten statement for being a subject of organized harassment and threats, and 2 audio recordings. See Transcript of 1st recording.mp3.); his Notice of claims to New York City and Township of Teaneck filed on or about 11/11/2022; his Administrative claims with the FBI sent on 11/10/2022 and 8/29/2024; *Dimitrov I*; and more.

221.    LEA failed to investigate under 18 U.S.C. §242 Plaintiff's complaints for criminal deprivation of his rights under color of law, which he made in his petitions mentioned above (Notice of claims, Administrative claims, Dimitrov I, and other). Plaintiff also attempted to file in person a report, and verbally complained about the police involvement in the violations of his civil rights to the FBI officers in FBI New York on 11/8/2017 but then the FBI/JTTF deliberately thwarted his attempt and chilled him out. Plaintiff also verbally complained about the police knowledge and participation to Teaneck police officers as for example on 7/16/2024.

222.    LEA failed to investigate under 18 U.S.C. §249(a) Plaintiff's complaints about the deliberate injuries caused by Defendants, or for their attempts to injure him, at least in part because of his actual or perceived race, ethnicity, national origin ("Bulgarian"), gender, or perceived sexual orientation ("fagot", "freak"). Plaintiff complained for such injuries and attempts in his Notice of claims, Administrative claims to the FBI, *Dimitrov I*, and other petitions.

223.    LEA failed to investigate under 18 U.S.C. §1001(a) Plaintiff's complaints about the Defendants' materially false, fictitious, and fraudulent statements and representations about him as a Bulgarian criminal, spy, terrorist, fagot hitting police (see *390 et seq.*); about Defendants' fraudulent contract with Verizon on behalf of Plaintiff on 1/9/2019; about the counterfeiting his check to the landlords on 3/5/2020. Plaintiff complained about that in his Notice of claims, Administrative claims to the FBI, *Dimitrov I*, and filed reports with Teaneck police in that regard on 1/9/2019 (Case # 19-001685) and 3/5/2020 (Case # 20-013543).

224.    LEA failed to investigate under <u>18 U.S.C. § §1341</u> Plaintiff's complaint about Defendants' taking

and altering of his check to his landlords sent with the Postal Service. Plaintiff filed a report with

Teaneck police on 3/5/2020 (case # 20-013543) which has never been investigated (furthermore

Defendants implied that this was done by police ("Police hit him.")). See ECF, No.8-2 at 2019

and 2059; and No.8-1 at 741; and similarly about    Plaintiff's report with Teaneck police in

regards to the interference with and the harm to a USPS delivery to him on 2/23/2022 (ECF No.

8-1 at 333).

225.    LEA failed to investigate under <u>18 U.S.C. §1512</u> Plaintiff's complaints about (1) Defendants' use

of force, their attempts, and threats to use force in order to "influence, delay, or prevent [his]

testimony" Id.(a)(2)(A) in the court proceedings of his legal cases, or to "hinder, delay, or prevent

[his] communication to a law enforcement officer or judge of the United States of information

relating to the commission or possible commission of a Federal offense". Id.(a)(2)(C). See IV.10

Plaintiff's Objections to R&R, his letter to Judge Rearden, his email to officer about torn

delivery; (2) Defendants' intimidation, threats, and their other efforts to persuade him with the

same intentions in regards to his testimony Id.(b)(1), or his communication to a law enforcement

officer or Judge Id.(b)(3); and (3) about Defendants' deliberate harassment of Plaintiff with

intention to hinder, delay, prevent, or dissuade him from testifying, or reporting to a law

enforcement officer or judge. Id.(d).

226.    LEA failed to investigate under <u>18 U.S.C. §1513</u> Plaintiff's complaints about Defendants (1)

deliberately harming him and his properties, and their threats to do so, in retaliation to his

participation as a party in court proceedings, in which he testify and produce relevant documents,

and records in regards to Defendants' federal offenses (Id.(b)); or (2) his complaints about

Defendants' intentional and harmful interference with his past employment and job opportunities

in retaliation to Plaintiff's petitions to police and the FBI (thwarted on 11/8/2017) for federal offenses (Id.(e)); or (3) about the conspiracy to retaliate to Plaintiff in one of those ways (Id.(f)).

227.    LEA failed to investigate under 18 U.S.C. §1519 Plaintiff's complaints about Defendants destroying his communications, documents on his computer with intent to impede, obstruct, or influence the investigation or administration of mater under the jurisdiction of the US agencies or departments as DOJ; or about Defendants covering up, concealing Plaintiff's complaints and evidence by making misleading entries as Teaneck police in regards to Plaintiff's first report from 9/11/2012, and later.

228.    LEA failed to investigate under 18 U.S.C. §1621 Plaintiff's complaints for Defendants who for the purpose of suppressing and punishing him willfully subscribe as true material matter which they do not believe to be true but is necessary for the continuation of Defendants' activities against Plaintiff. This, at least in part, is perjury, regardless whether it is committed by non-governmental employees, because such false statements, misrepresentations and fabrications are made to and result in executive actions against Plaintiff. The US knows the falsity but continue their conduct without remedy.

229.    LEA failed to investigate under 18 U.S.C. §2261A Plaintiff's complaints for Defendants' agents placing him under surveillance and traveling interstate with intent to injure, harass, or intimidate him; and in the course of their conduct Defendants have placed Plaintiff in reasonable fear of death, or serious bodily injury, and caused to him substantial emotional distress. Plaintiff complaint about that in his petitions mentioned above, including his very first report with Teaneck police on 9/11/2012.

230.    Defendants activities violate **the local law**. For example Teaneck Township Code ('TTC'), Sec. 26-22 reads: "No person shall utter any loud, profane, obscene, indecent, lewd, abusive or

offensive language in any public place." Defendants regularly violate that, and continue to do so after Plaintiff's petitions mentioned above. See for example May 17-20, 2025 Timeline of events.

231. The FBI/JTTF' policies and/or customs in regards Plaintiff violate **the Attorney General's Guidelines for Domestic FBI Operations**, 2008 ('AG Dom.'), the **Attorney General's Guidelines on Federal Bureau of Investigation Undercover Operations**, 2002 ('AG UO'), and the **Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources**, 2006 ('AG CHS').

232. Showing the importance of the point that all FBI activities must be lawful and reasonable, the AG guidelines not only stated that at its second paragraph (AG Dom., Intro.), but repeated three times that all FBI activities (and by extension JTTF activities) must be consistent with the constitution and laws (Id. Intro.C, I.C.3, and I.D.3). In relation to that no undercover activity/operation (jointly referred bellow as 'UO') must be authorized before considering the "risk of invasion of privacy[,] any potential constitutional concerns or other legal concerns" AG UO, IV.A(3). Any such risks will make the UO sensitive, and must be approved by the FBI Headquarters ('FBI HQ') Id. IV.C(2)(n). Furthermore the application to FBI HQ for approval of such UO must explain "how any potential constitutional concerns and any other legal concerns have been addressed" Id. IV.F(2)(ii).

233. AG guidelines require the FBI to avoid "unnecessary intrusions" (AG Dom., Intro.), and to choose "the least intrusive method" feasible in a situation (Id., I.C.2a). Similarly the AG UO points that there should be minimal intrusion by an undercover operation to the extend necessary to obtain an evidence. Id. IV.B(1)(c)

234. The FBI/JTTF intrusion in Plaintiff's case is not warranted first, because there is no legitimate need for such, and second, even if intrusion was/is needed the FBI/JTTF has had 13 years and counting to consider, choose, and use less intrusive methods, but they chose to continue at each

point of time (including at the reviews and/or reauthorization of those activities, or after

Plaintiff's petitions) without remedy.

235.    According to the guidelines before starting undercover activity an FBI official must carefully

consider the risks of personal injury (for example damage to reputation, financial losses, or else),

risks of civil liability, invasion on privacy, use of restricted illegal conduct (violence, entrapment,

unlawful investigation methods), and appropriateness. AG UO, IV.A. Approval of an undercover

operation requires written determination that it is under applicable DOJ guidelines, and will be an

effective way to get evidence / information. Id. IV.B(1)(a)-(b). Undercover activities in general

shall be "carefully considered and monitored" AG UO, I, see also AG CHS, V.B.4 ("Whenever

the FBI has authorized a Confidential Human Source to engage in Otherwise Illegal Activity, the

FBI must take all reasonable steps to: a. monitor closely the activities".). Despite that the

FBI/JTTF deliberately damaged Plaintiff's reputation, caused loss of income and profits,

victimize and harm him, their activity constitute severe intrusion on his privacy, and they use

unlawful investigative methods, including ongoing efforts to entrap him.

236.    In predicated investigations after authorization the FBI/JTTF can undercover engage in

'otherwise illegal activity' – that is any undercover "activity that would constitute a violation of

Federal, state, or local law" AG UO, IV.H; that violates federal criminal laws in criminal

investigation context (AG Dom., V.C.1), or constitute a felony or lesser crime "under federal,

state, local, or tribal laws" (Id. V.C.3a); and include FBI/JTTF informant's activity "that would

constitute a misdemeanor or felony under federal, state, or local law if engaged in by a person

acting without authorization" AG CHS, I.B10-11. However there can be no authorization of

violence, nor use of unlawful investigative methods (AG Dom., V.C.4, giving as example for

unlawful methods Fourth Amendment violations "such as illegal electronic surveillance or illegal

searches"). Similar prohibitions are in AG UO, IV.H(3) (adding also a prohibition of activities

that constitute entrapment), and AG CHS V.B.3.iii (additionally prohibiting entrapment, and any obstruction of justice Id. V.B.iii.C). Although not stated explicitly – violation of the constitution can not be authorized.

237.    If the FBI/JTTF illegal activities against Plaintiff were authorized and reauthorized they violate the guidelines because among other things they violate the constitution, they are unreasonable, and intended to entrap him. To the extend those violations were not authorized the FBI knew about them (even if FBI supervising agent(s) failed to report the violations they are known to the FBI from Plaintiff's petitions), and the violations should have been stopped and investigated.

*(C) Defendants actively prevent Plaintiff to hold them accountable in a court of law. See IV.9-10.*

*(D) Defendants act with apparent malice against Plaintiff.*

238.    Defendants have explicitly stated their intention to harm Plaintiff many times since 2012, which by itself shows that this is Defendants' policy / practice. They said that they want Plaintiff to 'suffer', and that they will 'torture', 'terrorize' (see 2392 *et seq.*), 'destroy', 'kill', 'crush', 'harass' (see 2600 *et seq.*) and 'brake' him, and repeated that for years. All those concepts are related and express their intent to 'create and maintain a state of extreme fear and distress' in Plaintiff, to make him experience pain, illness, 'overwhelming disappointment or embarrassment' in order to 'crush [his] emotional strength, spirit, or resistance', and 'put an end to [his] existence' or to his activities 'by damaging or attacking' them. (New Oxford American Dictionary, 3d Ed., 2010). See IV.11.

239.    Defendants deliberately injured, and continue to injure Plaintiff despite his petitions. And they do this demonstratively while provoking Plaintiff he 'can't stop' them. (1143 *et seq.*).

*(E) Defendants' conduct described above demonstrates that the law is not enforced equally in Plaintiff's case. Furthermore there is a breach of the fundamental fairness and the equality before the law because the persons, institutions and entities that violate CCPR, CAT, CERD, the US Constitution and laws in Plaintiff's case are the agencies (the FBI, NYPD, Teaneck police), or are acting in concert with the agencies which are supposed to investigate such kind of violations, and as such they have significant stake in the case.*

240.   The FBI / JTTF have duty to guarantee Plaintiff's rights under the US constitution and laws[80]

including by ceasing, investigating and providing effective remedy for the violations. However,

despite Plaintiff's repeating complaints about the ongoing violations of his rights (see IV.9) FBI

did nothing of the above. At minimum this is conscious avoidance because FBI should have

investigated its own activities, and/or activities it approved (even if only by allowing them to

continue for years).

   (vi) Defendants have no legitimate basis for their treatment of Plaintiff (see the argument at (b)(2)
   (iii)(D).

## 9. Defendants conspire to interfere with and deprive Plaintiff from his right to petition the government.

241.   Since 2012 Plaintiff have prepared and filed multiple petitions to the government such as formal

reports with Teaneck police; administrative claims with the FBI (11/10/2022, 8/29/2024); FOIA

requests which Plaintiff asked to be also considered as reports (to the FBI (in his appeal filed 8/6

2020), to DHS ICE (5/18/2020), US Secret Service (5/11/2020), and to Interpol (7/15/2020));

written request to NYC Sheriff's Office in regards service of process for *Gyro et al.* (10/15/2018,

ECF No.8-2 at 2013); Notice of claims to New York City (on 11/11/2022 via eCLAIM (Claim

Number: 2022PI032188), acknowledged on 11/14/2022), and to Township of Teaneck (on

11/11/2022 via email to Township of Teaneck's Clerk Office, acknowledged on 11/14/2022); the

legal actions *Dimitrov v. Gyro et al*, 18-cv-3600 (S.D.N.Y. 2018) and *Dimitrov I* (7/25/2023);

emails to Teaneck Manager, the Mayor, and officer Strickland on 7/16/2024 and 9/25/2024 in

relation to Plaintiff's police reports from 2024, and the ongoing organized harassment; a letter to

---
[80]

Attorney General Garland about the violations of the FBI/JTTF from 10/7/2024 (same day he

personally delivered a copy to the USDA Office in Manhattan, NYC); online complaints with

OIG DOJ on 10/11/2024 and 11/1/2024 related to Plaintiff's AG letter; emails to DOJ NSD (one

of supervising agencies of the FBI) on 10/8/2024 and 11/1/2024, and to DHS Office for Civil

Rights and Civil Liberties on 10/11/2024 (DHS is member of JTTF) related to AG letter; a letter

to DOJ NSD from 11/1/2024 which also included his letter to AG from 10/7/2024. In all

occasions Plaintiff followed the rules and procedures in regards to the proper way to file a

petition, including being in the designated areas in the working hours of Defendants (when he

visited Defendants in person), or using designated communication channels.

242.    Plaintiff's reports with Teaneck police till 2024 were not investigated, nor the handwritten

statements and evidence he had provided were entered in the system (with exception of his 2019th

report). In 2024 Teaneck police minimized his reports (see 148 *et seq.*). Apart from denying

Plaintiff's second Administrative claims (misrepresenting the substance – see Exhibit) the FBI

has never responded in regards to Plaintiff's complaints. The Attorney General, NSD, OIG, DHS

Office for Civil Rights and Civil Liberties, the New York City and Township of Teaneck (apart

from acknowledging his Notices), NYC Sheriff's Office, Teaneck Manager and Teaneck Mayer,

have never responded or contacted otherwise Plaintiff in regards to his petitions.

243.    Since 2013 Defendants policies, practices, customs in regard to Plaintiff's petitions are (a)

consistent, widespread, and continue for many years, which implies the constructive knowledge

and endorsement by their policy-making officials; (b) Defendants policy-makers have never

ceased or investigated the violations Plaintiff complained about, and they continue with their

approval; and (c) Defendants policy-makers are deliberately indifferent to Plaintiff's rights,

and/or fail to train and supervise their subordinates.

(a) *Defendants and parties in concert ('Defendants') act consistently to disrupt Plaintiff's preparation, work, or filing of petitions since the end of March 2016. See IV.8, IV.10, IV.9(a) pressure campaigns, Timeline of events.*

**(1) Defendants' demonstrative surveillance of Plaintiff as suppression and deterrence.**

244.    Defendants' surveillance of Plaintiff has been overt for a long time and is implicit in all of their actions against him, but its demonstration since the end of March 2016, when he started to prepare lawsuit(s), is apparently intended to suppress[81] and deter him[82] (as well as to intimidate and/or provoke him). See the concept of 'punitive attention' as police strategy.

245.    Defendants have demonstrated the surveillance on Plaintiff with explicit statements in that regard (such as "Keep watching him." 4/11/2016, "Watch Bulgarian." 12/12/2016, "He knows we survey him." 12/16/2016, "Just watching him all day." "Leave this to CIA." 2/13/2017, "We watch a Bulgarian." 11/8/2017 at FBI New York, and more); by giving him timely warnings (for example "You can not pursue them." 3/25/2016, ECF No.8-1 at 41, "You can't sue them." 9/8/2016, "He got the warning. Sue the United States." 12/27/2016); by commenting Plaintiff's work on the cases (for example "We are watching how we lose." 1/1/2017, "We didn't heard that." when Plaintiff was transcribing 2/27/2017); or commenting his conduct at home (for example "He didn't complain." when on 3/30/2016 Plaintiff found he had no hot water, and later same day "We didn't know that about the President." while Plaintiff was reading about President in preparation for citizenship exam; "Bulgarian paused." 1/6/2017; "Keeps surveying." Defendants in ap.B2 when Plaintiff put a camera on his windows on 2/25/2017). In 2017 Defendants included Teaneck High School students in their overt tracking and provocation of Plaintiff in public areas, as for example on 2/27/2017 (ECF No.8-1 at 850), 5/10/2017 (Id., 852), 5/17/2017 or 5/20/2017 (Id., 112-113). See more examples bellow (for example 'can't sue them' and 'stop-Plaintiff' campaigns at 1096 *et seq.*), at ECF Nos.8-1 at 110 *et seq.*, and more.

---

81

82

246.    Defendants' demonstrative surveillance has never stopped and continue at present.

**(2) Defendants orchestrate a social pressure campaign to persuade Plaintiff that he can not sue them, and to deter him from working on or filing petitions.**

247.    In addition to their other activities Defendants have started a messaging campaign[83] that Plaintiff 'can't sue' them. Initially by 'them' they meant Gyro (although they implied that suing Gyro is 'fighting police' ("He definitely knows how to fight police." 4/1/2016)), and later 'them' apparently meant the FBI, police and Defendants in general (for example on 7/25/2023, 6/17/2024, 3/26/2025). Defendants were explicit that 'can't sue them' is a 'warning' to Plaintiff (12/27/2016).

248.    Demonstrating the surveillance Defendants explicitly talked about Plaintiff's intention to sue Gyro (11/17/2016, 11/8/2017 at FBI New York), or to sue them, saying that he would 'sue the United States' (not New Jersey, New York City, or Teaneck) (12/27/2016, 8/14/2017, 10/14/2021) which further supports that they are federal agents. After Plaintiff had started working on case materials about the Defendants, they mocked him suggesting to "Sue Gyro" (11/17/2016), "Sue us all." (11/24/2016). Defendants talked about Plaintiff suing police (11/24/2017, 8/7/2018, 5/29/2020, 6/22/2023), and suggested Plaintiff to sue "the agency." (8/21/2020), his landlord (1/24/2023), or a neighbor (6/14/2023). Since Plaintiff named in the complaint's title a few Defendants (about a month before he initiated *Dimitrov I*) they have stopped making such comments, and after Plaintiff started *Dimitrov I* on 7/25/2023 threatened "Fucker thinks police can not kill him. Same day."

249.    Since Plaintiff started working on his cases Defendants have talked explicitly about his intention to sue, or about his lawsuits in at least 44 days at different locations (including at FBI New York building). In addition Defendants disseminated the information that Plaintiff prepares lawsuits (as

---

[83] Note that Defendants' pressure campaigns are distinguishes as message, but in practice overlap, and continue in parallel.

shown for example on 4/13/2016 at Newark USCIS, 8/7/2018 New York Sheriff's Office, or on

1/15/2025 at Dental Center of Hackensack).

**(3) Since Plaintiff filed his Notice of claims/Administrative claims on or about 11/10-11/11/2022 Defendants have started a messaging campaign that his petitions 'can't stop' them, and that they 'won't stop'.**

250.   Despite Plaintiff's reports, complaints and other petitions Defendants have never stopped the

violations of his rights under the US constitution and laws, and since his notice of claims from

11/10/2022 they have been explicit that they 'won't stop'. Apart from the obvious meaning: that

Plaintiff can do nothing to stop Defendants, and they will continue to torture, harass, and degrade

him in other ways, this is demonstration of control, of their intention to keep him incapacitated,

and in a state of conflict, distress, and uncertainty, or said in the FBI language – to disrupt him.

Defendants have never made any effort to resolve the issues, nor took any positive steps which

threat management advises (for example to prevent accumulation of radicalization factors)

because their goal is the opposite. The apparent outcome Defendants pursue is to convince

Plaintiff that there is no legal means to resolve his grievances, and after developing 'profound

grievance, a sense of anger and resentment at an undeserved injustice', to trigger him by 'linking

[the] grievances to an enemy who is held responsible', and entrap him.

251.   Defendants persistently repeat in Plaintiff's presence that they/we 'can't / won't / don't stop'. In

the last about two years and a half (since 11/12/2022) there are more than 150 days in which

Defendants made such statements. See more examples in 1307 *et seq.*.

252.   In a few occasions the meaning of Defendants' statements is or can be interpreted as disapproval

of Plaintiff's acts which they want him to stop but he didn't (enhancement of the 'stop-Plaintiff'

campaign). Specifically Defendants repeatedly talked they 'can't stop' while Plaintiff was

scanning for DE, as for example on 12/1/2022, 10/23/2023 2/25/2024, 6/14/2024, 7/4/2024,

11/18/2024. Similarly Defendants repeated 'can't stop' in relation to Plaintiff's recording,

working or doing something else about his cases (7/11/2023, 7/22/2023 8/2/2023 8/16/2023 8/18/2023 8/27/2023 8/28/2023 9/2/2023 9/11/2023 9/28/2023 9/30/2023 2/19/2024, 2/28/2024, 4/30/2024, 6/16/2024, 10/17/2024, 1/30/2025, 2/5/2025, 2/8/2025, 3/14/2025, 3/25/2025).

253.    The occasions mentioned above are in addition to the Defendants' statements in which the meaning, because of the timing or more, is apparently provocation to Plaintiff who can't stop their sound attacks / hammering as for example on 11/21/2022, 12/3/2022 – very provocative, 12/21/2022 (mixed with DE), 7/6/2023, 7/23/2023, 8/17/2023, 10/8/2023, 10/18/2023, 10/21/2023, 1/8/2024, 3/12/2024, 3/14/2024, 5/11/2024, 6/16/2024, 7/5/2024, 8/10/2024, 8/26/2024, 9/8/2024, 11/28/2024, 12/20/2024, 12/27/2024, 12/29/2024, 1/26/2025, 2/10/2025. Or provoking him that Defendants won't stop the DE attacks (implicit admission of Defendants' use of DE) as for example on 11/12/2022, 12/4/2022, 12/5/2022, 12/8/2022, 12/18/2022, 12/21/2022 (mixed with noise), 1/19/2023, 5/26/2023, 6/4/2023, 7/2/2023, 10/23/2023, 1/13/2024, 2/25/2024, 2/28/2024, 5/4/2024, 6/12/2024, 6/14/2024, 7/4/2024, 7/21/2024, 8/26/2024, 12/24/2024, 2/18/2025, 3/25/2025.

254.    In a few occasions Defendants were explicit that Plaintiff can't stop FBI, or that FBI won't stop (12/21/2022 7/26/2023, 9/24/2023, 6/7/2024, 10/23/2024, 3/16/2025). Related is the statement that Plaintiff will not stop the United States, which Defendants' Dula made on 4/1/2024.

255.    In a few occasions Defendants were explicit about not stopping the harassment of Plaintiff (11/21/2022, 7/21/2023, 1/5/2024, 1/8/2024, 5/3/2024, 5/13/2024, 8/15/2024, 3/18/2025), and in some occasions they provoked they "can't stop" in response to Plaintiff's requests to them to stop knocking (7/5/2024).

256.    Defendants intention to provoke Plaintiff is clear when, after challenging Plaintiff, they explicitly urged him to 'fight', or referred to their activities as 'fight' as for example on 12/1/2022, 4/27/2023, 8/18/2023, 9/10/2023, 10/21/2023, 3/16/2024, 4/12/2024, 7/21/2024, 7/26/2024,

9/11/2024, 9/25/2024, 10/12/2024, 3/20/2025. In addition to the teasing that Plaintiff can't stop them Defendants have talked about getting approval (7/9/2023) or a warrant (1/23/2023) – apparently to intimidate him, and increase the effect of provocation.

257.    The coordination between parties is apparent by their persistent delivery of the same message to Plaintiff for about two years and a half. Furthermore coordination between parties in specific occasions was demonstrative in a few examples. As for example on 11/21/2022 (when Dula, Ralph, man from B2, Loomer and others planned to set up Plaintiff, involving police), 6/2/2023 (Teaneck high school student said that they were told that they can't stop Plaintiff), or on 3/6/2024 (in about 50 minutes period multiple parties (about 10 persons) came near Plaintiff's windows and had the same/similar message ('stop/ can't stop') in response to Plaintiff's challenge he made inside his apartment).

258.    The parties that are among the most frequent participants in that campaign are Defendants in ap. B2 (Dula and John Doe) and the students. There were a few cases when Ralph and Dula were together in the events which included such message to Plaintiff. For example Defendants' man in B2 talked about 'can't / won't / don't stop' on 6/10/2023, 7/11/2023, 7/21/2023, 9/4/2023, 10/4/2023, 2/25/2024, 3/6/2024, 5/2/2024, 5/4/2024, 5/13/2024, 10/13/2024, 10/18/2024, 11/18/2024, 11/28/2024, 12/21/2024, 1/3/2025, 2/21/2025, 3/18/2025, 3/24/2025. Dula said that for example on 11/21/2022, 12/4/2022, 9/28/2023, 10/4/2023, 10/4/2023, 1/13/2024, 2/19/2024, 2/25/2024, 3/8/2024, 3/14/2024, 4/1/2024, 4/30/2024, 5/4/2024, 6/16/2024, 9/25/2024, 10/13/2024, 10/18/2024, 12/24/2024, 1/21/2025, 1/30/2025, 3/18/2025. Ralph (Raphael) Pimienta on 11/21/2022, 4/2/2023, 7/18/2023, 8/30/2023, 1/8/2024, 2/25/2024, 3/12/2024, 10/12/2024, 10/17/2024, 3/16/2025. Students talked about 'can't / won't / don't stop' on 11/21/2022, 12/5/2022, 3/17/2023, 4/2/2023, 6/2/2023, 9/6/2023, 9/18/2023, 2/5/2024, 3/6/2024, 3/14/2024,

3/15/2024, 4/30/2024, 5/14/2024, 6/14/2024, 9/11/2024, 9/25/2024, 9/27/2024, 10/17/2024, 12/7/2024, 3/14/2025.

**(4) Defendants' pressure campaign to persuade Plaintiff to 'stop' preparing, working on, or filing petitions.**

259.     Defendants explicitly said that one of their missions is to stop Plaintiff ("Kalin to stop. Yea, that's the second mission." 9/6/2023 Wednesday, 12:44PM).

260.     Defendants frequently talk to Plaintiff to "stop" since he started working on legal cases in 2016. After his Notice of claims and Administrative claims dated 11/10/2022 there have been more than 350 days in which Defendants said to Plaintiff to stop (that is in addition to the above (3)). And since 7/23/2023 (two days before he started *Dimitrov I*) 'stop' was Defendants' message to Plaintiff almost everyday till the end of October 2023. Among other things it shows Defendants' surveillance of Plaintiff as on 8/13/2023, 8/15/2023, 8/19/2023, 9/12/2023, 9/21/2023, 9/27/2023, 10/3/2023, 1/4/2024, 2/13/2024, 3/5/2024, 8/18/2024 (almost real time dissemination), 10/3/2024, 1/10/2025, 3/15/2025. In regards to the surveillance Defendants were explicit after Plaintiff had sent his second Administrative claims with the FBI Headquarters that "They are watching." (8/29/2023).

261.     Although in significant part Defendants' 'stop' campaign pressures Plaintiff to stop gathering evidence, working on, or filing petitions to government, it is expression of their efforts to disrupt him in general[84] (the meaning of what to stop is context dependent). And the timing of Defendants' warnings / directions / comments Plaintiff 'to stop' shows their intent to stop specific Plaintiff's activities.

262.     For example Defendants apparently want to stop Plaintiff's work on case-related materials and frequently say that he has to stop (as for example on 11/24/2022, 12/10/2022, 12/11/2022, 12/14/2022, 12/22/2022, 12/24/2022, 12/28-12/29/2022 – explicit, 2/5/2023, 2/13/2023,

---

[84] For example Defendants want to stop Plaintiff from playing chess online. See 4/8/2024, 10/3/2024.

2/28/2023, 3/2/2023, 3/13/2023 (reaction to federal agents being liable), 3/29/2023, 4/17/2023,

5/25/2023, 7/7/2023, 7/16/2023, 7/18/2023, 8/1/2023, 8/13/2023, 8/15/2023, 8/18/2023,

8/19/2023, 8/31/2023, 9/26/2023, 10/2/2023, 10/3/2023, 10/20/2023, 1/8/2024, 2/4/2024,

2/19/2024, 5/16/2024, 10/1/2024 (threatened to destroy the recording/transcript), 10/17/2024,

11/5/2024, 11/7/2024, 12/7/2024, 1/6/2025, 1/22/2025, 2/17/2025, 2/23/2025, 2/28/2025).

263.    Similarly Defendants said to Plaintiff to stop his scanning for DE, making notes or photos

relevant to his cases (as for example on 1/5/2023, 1/12/2023, 2/3/2023, 2/8/2023, 2/24/2023,

3/3/2023, 3/29/2023, 5/22/2023, 7/28/2023, 8/14/2023, 9/2/2023, 9/22/2023, 10/8/2023,

10/21/2023, 10/22/2023, 10/23/2023, 1/3/2024, 2/16/2024, 2/17/2024, 3/5/2024 ("He doesn't stop

monitoring."), 3/7/2024, 3/12/2024, 3/18/2024, 3/24/2024, 4/6/2024, 4/10/2024, 5/1/2024,

7/25/2024, 8/18/2024, 8/22/2024, 9/11/2024, 10/25/2024, 11/9/2024, 12/8/2024, 1/6/2025,

1/10/2025, 3/2/2025, 3/29/2025).

264.    On 11/4/2024 Defendants overtly talked about preventing Plaintiff to file a second lawsuit against

them ("He wants to sue." .. "Have to stop.") after he sent letter/email to NSD DOJ from

11/1/2024, and earlier had filed second administrative claims with FBI (8/29/2024), letter to

Attorney General with copy to USDA Office in Manhattan (10/7/2024), emails to Brennan Center

for Justice, Human Rights Watch, and more (10/10/2024-10/11/2024).

265.    Defendants have repeatedly said that they fight Plaintiff to stop him, or just that they are fighting

him in combination with message to 'stop', and in a few occasions they were explicit they do that

to provoke him (see in that regard their comment on 6/25/2023, 8/25/2024, or on 8/28/2024 "No

reaction."). For example Defendants talked about the fight on 1/18/2023, 2/5/2023, 3/8/2023,

6/25/2023 ("He didn't fight me."), 7/24/2023, 8/18/2023, 9/13/2023, 10/23/2023 ("Fight to

stop."), 1/12/2024, 2/16/2024, 4/26/2024, 5/16/2024 ("May be they knew we are fighting him."),

6/22/2024, 7/13/2024, 7/23/2024, 7/25/2024 (day after Plaintiff filed letter to Judge Rearden,

ECF No.14), 8/21/2024 ("Fight Kalin. Can't stop."), 8/25/2024 ("Fight." "He didn't fight."),

8/29/2024 (after Plaintiff sent second Administrative claims to the FBI. "Come to fight. Fight

this."), 8/30/2024 ("Kalin fight…"), 9/6/2024, 9/26/2024, 9/12/2024 ("He got to stop… Fight."),

9/13/2024, 9/26/2024 ("Fight Kalin. Have to stop."), 9/28/2024, 10/6/2024 ("Kalin… Stop

fighting you man."), 10/24/2024, 10/31/2024, 12/13/2024, 1/6/2025, 2/23/2025.

266.  Defendants have also explicitly said that they harass Plaintiff to stop him (apparently as way to

fight him) as for example on 12/18/2022 ("Let police harass to get him."), 1/18/2023, 5/24/2023,

9/28/2023, 1/8/2024 ("Non stop we harass."), 1/12/2024, 2/9/2024, 2/21/2024, 3/12/2024,

5/11/2024, 5/20/2024 (notably suggested Plaintiff to "hang himself."), 6/28/2024, 6/30/2024

("We have to stop that. Harass. Have to stop."), 7/8/2024, 7/13/2024 (giving instructions "Stop

there and harass."), 8/11/2024, 8/29/2024, 8/30/2024, 8/31/2024, 10/6/2024, 12/12/2024 (talking

about the sleep deprivation "Can't sleep. That you got to feel."), 2/18/2025, 3/4/2025 ("We can

not stop harassing… Stop Kalin…"), 3/16/2025 (cognitive dissonance), 3/18/2025.

267.  Defendants' sound attacks (knocks, hammering, slams, shouting and similar) are specific form of

harassment used to stop Plaintiff. This is among the things shown by the timing of their

statements – they interrupt Plaintiff with noise in combination with a direct or indirect command

or remark to stop. In a few cases they were overtly provocative – see for example Dula (B2) who

made noise (loud pipe bans, repeatedly dragging something heavy) and demonstrated that that

was to provoke Plaintiff's reaction on 10/20/2023 ("See how he will respond to that.

Bulgarian…"); or see the cases of intentionally inducing cognitive dissonance – saying opposite

(we stopped, we don't provoke) to what they do (making noise and provoking). The timing of

Defendants' statements shows that they harass Plaintiff with noise to stop him, as for example on

12/6/2022, 12/10/2022, 12/11/2022, 12/22/2022, 1/18/2023, 1/24/2023, 2/10/2023, 2/14/2023,

2/17/2023, 2/27/2023, 3/3/2023, 7/11/2023, 8/2/2023, 9/22/2023 (cognitive dissonance),

10/23/2023, 12/5/2023, 1/11/2024, 2/24/2024, 3/2/2024, 3/5/2024, 4/5/2024, 5/1/2024, 5/6/2024, 5/7/2024 (dissonance), 6/20/2024, 7/1/2024, 7/16/2024, 10/9/2024, 11/9/2024, 12/12/2024, 2/8/2025, 2/23/2025, 3/4/2025, 3/16/2025 (dissonance).

268.    Similarly Defendants' directed energy (DE) attacks are one of specific forms of harassment used to stop Plaintiff – the timing of the DE attacks in combination with Defendants' direct or indirect command or remark to stop shows that. See for example 12/1/2022, 12/6/2022, 12/10/2022, 2/3/2023, 2/8/2023, 2/14/2023 (cognitive dissonance), 3/1/2023 (dissonance), 7/7/2023, 8/16/2023, 9/17/2023, 9/22/2023, 10/8/2023, 10/23/2023, 4/6/2024, 8/30/2024, 8/31/2024.

269.    The coordination between the multiple parties in Defendants' stop-campaign is clear – they are in contact and act in concert. This is shown by Defendants' remarks, for example, after Plaintiff checked ECF on 8/9/2023 ("I told them he won't stop."), or after he sent an email to DOJ NSD, and filed complaint with DOJ OIG on 11/1/2024 ("I told them he will not stop." in the morning next day), and more.

270.    Defendants' coordination is also shown by ongoing repetition of the same messages to Plaintiff by different (mostly unknown to him) parties at different locations for years. For example Defendants repeated "We have to stop…" in regards to Plaintiff on 6/12/2024 (under windows), 6/25/2024 (in ap.B2), 6/30/2024 (under windows), 7/6/2024 (in front of the pub), 7/29/2024 (in Teaneck park), 8/1/2024 (on speaker), 9/26/2024 (Dula in B2), 10/17/2024 (students under windows), 11/26/2024 (under windows), 12/30/2024 (students under windows), 1/10/2025 (under windows), and more. Another example of that kind of coordination is Defendants' repetition of questions in regards to Plaintiff such as "How to stop him?" "How do we stop him?" "How to make him stop?" They asked such questions for example on 12/11/2022 (in front of the pub), 1/12/2023 (ap.B2), 2/3/2023 (ap.A3), 2/27/2023 (B2), 3/3/2023 (ap.G2), 3/8/2023 (in corridor), 3/29/2023 (Ralph), 4/12/2023 (Ralph in corridor), 5/22/2023 (B2), 6/3/2023 (B2), 6/18/2023

(near the windows), 7/1/2023 (Thai-woman in corridor), 7/7/2023 (apartment nearby), 7/11/2023 (in front of pub), 7/24/2023 (under the windows), 8/9/2023 (near the windows), 9/2/2023 (near the windows), 9/14/2023 (near the windows), [Note the pause in messaging], 4/8/2024 (under the windows), 4/15/2024 (students under windows), 5/14/2024 (in corridor), 5/24/2024 (under windows – police officers), 6/22/2024 (in front of the pub), 7/23/2024 (under windows), 7/25/2024 (near windows), 8/14/2024 (near windows), 8/25/2024 (near the windows, Teaneck police came and parked there), 8/28/2024 (students under the windows), 9/6/2024 (near windows), 9/12/2024 (near windows), 10/3/2024 (near windows), 10/10/2024 (near windows), 10/31/2024 (under the windows), 12/9/2024 (under windows), 1/6/2025 (in corridor), 1/21/2025 (in corridor), 1/27/2025 (in ap.G2), 2/4/2025 (A3), 2/23/2025 (under windows), 3/26/2025 (students under the windows).

271.    In addition Defendants' conduct in many occasions shows the coordination between the parties. As for example the events on 11/21/2022 when Defendants (Dula, Loomer, and others) gathered in ap.B2 to talk about Plaintiff (after he had sent Notice of claims and Administrative claims on or about 11/10-11/11/2022) showing contact and coordination with Gyro and police; on 12/1/2022 Defendants (Ralph, Loomer, A1's woman and others) talked in corridor about Plaintiff, then Loomer got out and talked with person(s) in a car under the windows about the status; on 2/17/2023 Defendants (including Cesar Naranjo) acted in coordination with a group of students who shouted under Plaintiff's windows and in corridor; on 7/24/2023 Defendants (Dula, Ralph, and others) talked under Plaintiff's windows repeating statements about him made earlier during the night in front of the pub; or on 8/25/2024 parties in a car and parties under the windows talked about FBI and Plaintiff, then Teaneck police car came and a woman spoke with the officer.

272.    Especially notable are Defendants' statements in regards to the FBI and its role in the activities, which show that either the speaker is FBI agent, or that (s)he is in contact with and knows the

FBI actions (acts in concert). For example that the "FBI stopped. Really." (9/27/2023, Dula), "Stop FBI." (10/8/2023, man in ap.B2), "FBI… Didn't stop." (2/21/2024, Dula in ap.B2), "FBI" the "agents … caus[ing] disruption". "Press Kalin (they) have to arrest him." (7/16/2024, Cesar Naranjo and others), "FBI to stop…" (10/6/2024, man in ap.B2), "We can't stop. FBI []." (10/23/2024), "FBI wants him to believe we stopped." (11/30/2024, ap.B2), "Afraid of FBI.. Don't believe we stopped." (3/7/2025). Also notable is the participation of uniform Teaneck police officers (5/24/2024, 9/7/2024, 9/16/2024, 12/13/2024), and a uniformed Bergen Sheriff's deputy (9/11/2024).

273.   Although it is obvious that Defendants have never stopped – neither the surveillance, the demonstration of the surveillance, nor 'units' engaged with Plaintiff, including those delivering the message, not the attacks – they have tried to convince Plaintiff that they stopped. The intended message to Plaintiff seems to be 'stop working on petitions as we stopped' but, considering the apparent falsity this is more a provocation creating cognitive dissonance than a persuasion effort. Defendants have made such attempts for example on 2/3/2023, 2/14/2023, 3/1/2023, 3/3/2023, 3/7/2023, 6/6/2023, 8/1/2023, 8/13/2023, 2/25/2024, 3/5/2024, 3/30/2024 ("He has to believe we stopped."), 3/31/2024, 4/20/2024, 8/31/2024 (2d day after Plaintiff sent his second administrative claims with the FBI) "Police stopped.", 9/5/2024 "They want to stop.", 9/6/2024 "Fighting stopped." "We were trying to stop.", 10/7/2024 "Police stopped.", 10/10/2024 "But we stopped.", 10/11/2024 "Have to stop. The police stopped.", 11/26/2024 "We have to stop. We lost.", 11/30/2024 "FBI wants him to believe we stopped.", 1/29/2025, 2/1/2025 "We want to stop.", 2/2/2025, "He don't believe we stopped.", 2/6/2025, 2/22/2025, 2/28/2025, 3/7/2025, 3/19/2025, and more. Notable in that regard is the repetition of "Completely stopped." by Defendants in ap.B2 (in a few cases on loudspeaker) as for example on 2/14/2023, 7/10/2023,

8/18/2023, 9/17/2023, 2/15/2024, 5/27/2024, 8/2/2024, 8/11/2024, 8/16/2024, 10/19/2024, 2/20/2025.

274.    Significant as direct evidence that the Defendants' activities are retaliation to Plaintiff's petitions is the remark by Defendants' man in B2 "If Bulgarian stops we can stop." 3/4/2025.

**(5) Defendants obstruct Plaintiff's work on, or filing of petitions.**

275.    Plaintiff's "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury".[85]

276.    The day after Plaintiff was laid off by Gyro (3/21/2016) he looked for employment lawyers and related legal documents in Internet. Defendants in ap.B2 commented "If he keeps going on like this we'll need to set another one." And warned him "Can't pursue." (3/24/2016) "You can not pursue them." (3/25/2016, ECF No.8-1 at 41). At the same time Defendants were explicit that they are FBI and police ("We are FBI." Id. "He definitely knows how to fight police." 4/1/2016 – as Plaintiff's preparation of a lawsuit against Gyro is 'fight[ing] police' that shows Defendants' nexus to Gyro New York).

277.    After researching in Internet about filing a suit (3/22/2016) Plaintiff started working on materials for Gyro case on or about 4/3/2016. A few hours later Defendants made explicit warning to Plaintiff "We need you to stop." (4/3/2016). As Plaintiff continued working they planned to "confuse him" (4/13/2016), and started to persuade him that he "Can't sue them." (4/26/2016).

<u>(i) Defendants interfere with, and retaliate to Plaintiff's work on petitions and related materials.</u>

278.    In addition to Defendants' surveillance and pressure campaigns (detailed above in (a)) aiming to suppress, punish and deter Plaintiff from working on and/or filing of petitions, Defendants actively prevent him from obtaining legal or expert counsel, obstruct his collection of evidence, and have subjected Plaintiff to many-years long and ongoing degrading treatment. In part Defendants' actions are intended to slow Plaintiff down (5/14/2017 "We get slow his power.

---

[85]

Always trigger him." ECF No.8-1 at 163; 11/10/2022 at FBI New York "Delay Kalin." ECF No.8-2 at 2012; 1/20/2023 "Have to slow [him]." ECF No.8-1 at 82). They were explicit they can't let Plaintiff go on with collecting evidence, or with his litigation *Dimitrov I.* See for example Defendants' statements on 12/29/2017, 7/24/2023, or 4/15/2024 ("Stop. Consider it done."). See also above Defendants' pressure campaigns.

279. Defendants' efforts to prevent Plaintiff's legal case against Gyro include, but are not limited to, legal notice at Gyro prohibiting talks about the involvement of 'police' with Plaintiff after he was terminated (ECF No.8-1 at 40); Defendants' deletion of case evidence such as Plaintiff's email job applications from the period of 2016-2018 (evidence for his diligent efforts to remedy the situation), Defendants explicitly warned Plaintiff to not sue Gyro – including at FBI New York Field office on 11/8/2017, and more.

280. A significant part of this complaint is related to Defendants' efforts to prevent, obstruct, and retaliate to Plaintiff's preparation, work, initiation, and filings in *Dimitrov I.* To mention a few – Defendants disrupted (created problems) the filing of Plaintiff's summons for the case, Township of Teaneck unreasonably denied Plaintiff's request for waiver of service but their lawyers filed demonstratively notice of appearance before being served (ECF No.9), and more.

(ii) Defendants interfered and/or prevented Plaintiff to file petitions with FBI New York and Teaneck police.

281. Plaintiff visited the public areas in the FBI New York Filed Office building at 26 Federal Plaza, New York, NY 10278 on 11/8/2017 with intention to file in person a report for civil rights violations, and on 11/10/2022 with intention to file in person his Administrative claims under FTCA. Plaintiff followed the established procedures to file a report by choosing to do that in person[86], and to 'present the claim to the appropriate federal agency'.[87]

_____

86
87

282.    FBI is the appropriate agency to receive both, but FBI / JTTF New York thwarted Plaintiff's attempt to file the report (he was chilled and has never filed a report with the FBI), and prevented Plaintiff to file in person his administrative claims. After Plaintiff sent his claims with USPS FBI New York did not acknowledge the receipt, nor responded to the claims. But Plaintiff received a notice from USPS that the package to the FBI New York with his claims was delivered on 11/14/2022 at 1:36 PM (see Exhibit Emails from USPS).

283.    In both occasions while Plaintiff was near or inside the building Defendants' agents were expecting him and provoked, intimidated, demonstrated the surveillance, and interrupted him.

284.    Defendants have interfered with Plaintiff's filing of reports and/or relevant evidence with Teaneck police, or with his visits to police. For example:

285.    Due to Defendants' demonstrative interference and deliberate indifference to his reports Plaintiff has not filed reports with Teaneck police about most of the incidents listed in the complaint.

*(b) Defendants' policy or practice to ignore, not investigate or obstruct otherwise the petitions Plaintiff filed.*

286.    Since 2012 Defendants' persistent and widespread practice in regards to Plaintiff's petitions includes but is not limited to (1) no investigation, no response, and no contact with Plaintiff in that regard; or (2) providing deliberately inadequate response, reframing, minimizing or otherwise obstructing the petitions. In the last three years since Plaintiff complained explicitly about that practice (see his Notice of claims, Administrative claims to FBI, *Dimitrov I*) Defendants continue the conduct without change, but for Teaneck police proforma investigation of Plaintiff's two reports from 2024. Based on that this policy/practice is practically endorsed by the municipalities of Teaneck and New York City, the DOJ NSD, and FBI policy-makers. Defendants' policy-makers are deliberately indifferent to Plaintiff's rights, and/or fail to supervise or train their subordinates See above, and also, for example IV.8(b)(2)(v)(B).

287.    Due to Defendants interference other parties also follow the same policy / practice in regards to Plaintiff's petitions (for example NYC Sheriff's Office, EEOC, Plaintiff's landlord, and more).

**(1) Defendants policy to ignore Plaintiff's petitions – no investigation of the claims, no response, and no contact with him in that regard.**

288.    After on 11/10/2022 FBI/JTTF New York had thwarted Plaintiff's attempt to present in person his Administrative claims under the FTCA (ECF No.8-2 at 5910 *et seq.*), he sent them with USPS. The FBI New York refused to acknowledge Plaintiff's claims, and he received only the USPS' notice of delivery to the FBI New York on 11/14/2022 at 1:32PM. The FBI ignored the claims – there was no response, no investigation, no formal denial, Defendants have not ceased their conduct violating the constitution and laws, nor they contacted Plaintiff in regards to his claims. Plaintiff sent his second administrative claims to the FBI Headquarters on 8/29/2024, which again were not investigated, and were inadequately denied (see more bellow). Apart from that FBI did not contacted Plaintiff in regards to his claims.

289.    Teaneck police did not investigate any of Plaintiff's reports he had made till 2024.

290.    Apart from acknowledging the receipt the Township of Teaneck ignored Plaintiff's Notice of claims filed on 11/11/2022 – there was no response, no investigation, not contact with Plaintiff in that regard, no change of the unlawful conduct, but for retaliation (see for example events on 1/20/2023 with the participation of uniform Teaneck Police officers, and more). Later (7/31/2023) Teaneck Municipality deliberately ignored Plaintiff's request for waver of service for *Dimitrov I* – no response, although its lawyers filed Notice of Appearance on 9/18/2023 (ECF No.9). Apart from violation of its duty under Rule 4 of the Federal Rules of Civil Procedure to cooperate in saving unnecessary expenses of serving a summons and complaint, this is demonstration of malice, and puts unnecessary burden on Plaintiff. Similarly Plaintiff's emails to Teaneck Manager, the Mayor, and officer Strickland on 7/16/2024 and 9/25/2024 in relation to his police reports in 2024 had no response (apart from the exchange in regards to officer's email address).

291.    Apart from acknowledging the receipt the City of New York ignored Plaintiff's Notice of claims filed on 11/11/2022 – there was no investigation, no contact with Plaintiff in that regard, no ceasing of the violations, no response, but for Defendants' retaliation. The NYC Law Department and the City Counsel did not respond to Plaintiff's request for information from 8/2/2023.

292.    Other government agencies also followed the same policy / practice in regards to Plaintiff and the petitions he filed. For example:

293.    Derek Smith Law Group, then representing Plaintiff, filed a charge against Gyro et al with the EEOC on 12/1/2016. Defendants' deleted the confirmation email by EEOC which also provided the number of the charge. Plaintiff found out the deletion on 3/27/2017, and sent an email-request to EEOC for information about his charge number. Apart from the automatic email-acknowledgment of the request EEOC has never responded, and later Defendants deleted the automatic email-response too (ECF No.8-2 at 1851). After in August 2017 Derek Smith Law Group stopped representing Plaintiff (at least in part due to Defendants' interference), he sent an email to EEOC (See Defendants' interference with Plaintiff's lawyers 1718 et seq.), but EEOC has never responded to Plaintiff. On 11/12/2018 Plaintiff filed a FOIA request to EEOC for all materials in regards to his charge against Gyro et al. The EEOC's response did not include all information, and later the EEOC sent to Plaintiff Notice of Right to Sue only for Gyro Communication Limited although it had issued all necessary notices as it became obvious after Gyro produced the EEOC FOIA response to Gyro et al.

294.    Plaintiff's written request from 10/15/2018 to NYC Sheriff's Office about serving of process information in regards Motion to dismiss (*Dimitrov v Gyro et al.*, 18-cv-3600, SDNY 2019) was ignored – no response.  ECF No.8-2 at 2013.

295.    Similarly ignored are Plaintiff's letters to Attorney General 10/7/2024, to DOJ NSD 11/1/2024, his complaints with DOJ Office of Inspector General from 10/11/2024 and 11/1/2024, and more.

296.     Private parties acting in concert also followed the same policy in regards to Plaintiff and ignored

his complaints, and communications. Defendants' influence in that regard was obvious in a few

occasions. See for example IV.10(a)(i) interference with lawyers (see the no-response / no-contact

policy of Paul Campson) and experts ("Do not answer any email." 10/10/2024), Plaintiff's

landlords, and more. Same is the Court's conduct in regards to Plaintiff – for example the lack of

response to Plaintiff's filings in *Dimitrov I* for about two years – see IV.10.

297.     In the light of the above Defendants' failure to investigate the violations of the US Constitution

and laws in regards to Plaintiff is apparent.

**(2) Defendants' obstruction of Plaintiff's petitions after the start of Dimitrov I.**

298.     Since the initiation of *Dimitrov I* Defendants have continued their policies and practices in

regards to Plaintiff's petitions – ignoring, not investigating, and similar, but with significant

modification in their approach. For example Teaneck police responded to Plaintiff's two reports

in 2024 (although inadequately and ignored/misconstrued his claims), Plaintiff's FOIA requests

were answered inadequately after 5 years delay (DHS OIG, 2020-IGFO-00140, on 4/29/2025), or

more notably 3 years earlier (FBI No. 1666051-000 and NFP-172149, filed 4/22/2025, answered

on 8/20/2025 despite writing to Plaintiff on 5/21/2025 "Your request is currently in the complex

request small processing track, and the estimated date of completion for your request is April,

2028."), and the FBI also inadequately but responded to Plaintiff's administrative claims form

8/29/2024 (see bellow).

299.     To the extend the FBI response of Plaintiff's FOIA request from 4/22/2025 is full it clearly shows

that the FBI did not referred Plaintiff's report for constitutional violation part of his FOI/PA

request and Appeal from 2020, to the extend it was referred verbally they have done no

investigation, did not contacted the FBI New York, did not contacted in written any person in the

FBI in regards to Plaintiff's requests, did not make any notes in regard to his requests and appeal, and more.

(i) The FBI New York re-framed and minimized Plaintiff's claims for civil rights violations on 11/8/2017, and his administrative claims on 11/10/2022, in order to prevent him from filing them in person.

(ii) The FBI re-framed and minimized Plaintiff's administrative claims from 8/29/2024 in its final response dated 3/6/2025.

300.    There are a few notable problems with the FBI response, including but not limited to (1) the purpose of Plaintiff's administrative claims is not notifying FBI about the litigation Dimitrov I, they are not notice of a suit as the response implies; (2) Plaintiff's administrative claims are about the events after the start of *Dimitrov I*, and although the facts which are basis for that litigation are entirely relevant, the factual basis for his second administrative claims is different (even if they are continuation of Defendants activities); (3) the requirement to file administrative claims before initiating a lawsuit is to allow government to investigate the claims for 6 months, but based on the FBI response it is clear that there was no investigation at all; and (4) even if FBI believed Plaintiff's administrative claims from 8/29/2024 are notification about *Dimitrov I* they responded with delay of more than 6 months – even in that frame Defendants delay and obstruct Plaintiff.

(iii) Teaneck police responded to Plaintiff's police reports from 4/26/2024 and 7/16/2024.

301.    See above Teaneck Public Schools, IV.4

**(3) Defendants' policy / practice about Plaintiff's petitions as applied to his legal actions – see IV.10.**

*(c) Defendants' retaliation to Plaintiff's preparation, work, and filing of petitions.*

**(1) Defendants have subjected Plaintiff to systematic degrading treatment in retaliation to his petitions and petition-related activities. (See IV.11.)**

**(2) In retaliation Defendants have interfered substantially with Plaintiff's economic prospects and employment.**

302.    In 2012 Defendants thwarted Plaintiff's intention to start a business (Idea-hunters), and their dissemination of false derogatory narratives about Plaintiff in practice precluded any business activity. Defendants interfered with Plaintiff's employment at Gyro New York, and East House Creative. See ECF No.8-2 at 2115 *et seq.*.

303.    Since 2016 Plaintiff has been unemployed due to Defendants and parties acting in concert's substantial interference with his employment prospects. In 2017 alone Plaintiff applied to about 290 job recruitment offers for work in the Creative Department of various advertising agencies but in accord to Defendants' statement from 12/27/2016 ("You will never find a new job. I promise you." (ECF No.8-1 at 121)) he didn't get even an interview with an employer. That is in time when "companies invest more in their branding and marketing efforts [and b]ecause of this hiring upswing, highly skilled professionals are in short supply. Unemployment rates in the creative field remain below the national average, and job opportunities outnumber qualified candidates."[88] And the "[d]emand remains strong for skilled professionals, and unemployment rates in the creative field continue to trend below the national average."[89] Furthermore, in the context of their constant and provocative surveillance, Defendants made multiple explicit statements demonstrating their interference with Plaintiff's employment prospects, and/or that they are those who 'give' a job to him. See ECF No.8-1 at 161-162, and ECF No.8-2 at 2115-2127. Examples of Defendants' statements in regards Plaintiff's employment prospects from the materials he processed after the filing include:

304.    Defendants have hacked and applied on behalf of Plaintiff to lower level positions, interfered with recruiting agencies (see Creative Circle, The Creative Group, Solomon Page, and more), job

---

88   *2017 Salary Guide*, The Creative Group, A Robert Half Company, created on 8/29/2016
89   *2018 Salary Guide*, The Creative Group, A Robert Half Company, created on 9/12/2017

offers Plaintiff received from those agencies were either lower level jobs or inadequate to

Plaintiff's qualifications. And more. In time Defendants pushed Plaintiff out of the job marker.

## 10. Defendants conspire to prevent Plaintiff from attending and/or having fair hearing as a party and witness before a court of law.

*(a) Defendants actively prevent Plaintiff to have his legal actions before the court, and to have a fair hearing before the court, by (i) preventing Plaintiff to obtain legal or expert counsel, (ii) restricting his ability to uncover legal claims by not investigating his reports and petitions, (iii) preventing or obstructing him to obtain or preserve evidence for the violations, (iv) subject Plaintiff to degrading treatment, (v) retaliate and pressure him to stop, and (vi) obstruct or slow down the filing of his petitions.*

### (i) Defendants actively prevent Plaintiff from obtaining legal or expert counsel for his lawsuits.

305. After 8/24/2016 Plaintiff searched for lawyers for his legal cases against Defendants and against

Gyro et al. In response on 9/6/2016 Defendants claimed that they 'classified' Plaintiff's case or

the case materials, and will make him 'fight by himself'. Later same day NYCLU declined

meeting Plaintiff, and on 9/8/2016 Louis Morrison, a Manhattan based employment lawyer,

declined taking his case against Gyro (after the call Defendants warned Plaintiff "You can't sue

them.".. "Can't let it happen." "You lose.").

306. Plaintiff went to Bulgaria, and while he was at JFK New York, and then on the plane flying to

Europe (9/11/2016) Defendants accessed and deleted thousands of files from his laptop (then

connected to Internet), including deletion of evidence for his Gyro case. Plaintiff found the

deletion after he returned home and filed a police report, which has never been investigated.

Defendants overtly tried to "distract him", and threatened "You will never find peace. We'll never

stop teasing." ... "Learn your lesson." (10/9/2016).

307. Plaintiff kept searching for employment lawyer and on 10/25/2016 signed in Manhattan a retainer

with Derek Smith Law Group for his case against Gyro. Defendants commented "CIA talks too

much.".. "[Plaintiff] intends to sue us." (10/26/2016); "He wants to hit Gyro.".. "He wants to destroy us." (10/28/2016).

308.    In the period between 4/23/2017 and 5/23/2017 Defendants deleted all emails between Derek Smith Law Group and Plaintiff from his computer (Thunderbird) and his Yahoo Inbox (ECF No.8-2 at 1853, 2105). About a week later, on 5/30/2017 Derek Smith made clear that they substantially changed their position in regards pursuing Plaintiff's case against Gyro et al in a federal court (ECF No.8-2 at 2106). Four things in combination demonstrate Defendants' interference and thwarting of Derek Smith Law Group's representation of Plaintiff:

309.    (1) Derek Smith's change of mind became clear after Defendants deleted the previous email correspondence between them and Plaintiff. On 4/6/2017 (before the deletion) Derek Smith's Cabaceiras was planning to request a 'Right-to-sue' letter from EEOC because "[t]he goal would always be -- as is the goal with all our clients -- to get into Federal Court with supplemental city and state claims". On 5/30/2017 however it became clear Cabeceiras did not send request to EEOC, and that Derek Smith does not want to pursue Plaintiff's case in court because it is "a difficult claim to sustain in Federal Court"; (2) Derek Smith's treatment of Plaintiff since then has been unfavorable – Plaintiff sent an email-request for a meeting on 5/30/2017 which was ignored. Plaintiff called on 6/16/2017 and set a meeting, and at the meeting on 6/21/2017 he had similar treatment; (3) The Defendants were present at Derek Smith's office on 6/21/2017 (Plaintiff was referred then as a "cop enemy"), and (4) The following events clearly showed Defendants interference (for example Defendants' statements that Plaintiff "can not sue", the pattern of lawyers who stopped responding to Plaintiff, Defendants' presence in Plaintiff's meeting with another lawyer, and more).

310.    Defendants' statements before the Derek Smith's overt refusal to file Plaintiff's case with a federal court also indicate their interference. For example after Plaintiff talked with Defendants in

ap.G2 on 5/14/2017 Defendants said, among other things "We compare little legal push." (ECF No.8-1 at 163). In light of the following events they referred to the 'new' Derek Smith position in regards to Plaintiff's Gyro case.

311.    In the period between the Cabeceiras' email from 5/30/2017 and the meeting at Derek Smith on 6/21/2017 Defendants explicitly warned Plaintiff to stop working on the case and that they will fight him: "You've got to stop." (5/31/2017); "Can't sue." (6/10/2017); on the day of the meeting with Derek Smith Defendants in ap.B2 awakened Plaintiff with hammering on his ceiling and commented "He can't sleep. Fighting []." (6/21/2017).

312.    On 6/21/2017, while Plaintiff was waiting in Derek Smith Law Group's Manhattan office before the meeting with Cabeceiras, Defendants and staff talked about him in his presence "That's a cop-enemy?"..."Gyro have (that)."... "Let the Gyro push him."..."Tell him [he] lost." (ECF No.8-1 at 102.1, 102.5, and ECF No.8-2 at 2107). At the meeting Cabeceiras tried to convince Plaintiff that the case against Gyro is bad – he pressed Plaintiff on the fact that he did not explicitly complained to Gyro for national origin discrimination which makes the case weak (despite the EEOC position that use of legal terminology is not necessary for making a valid complaint to an employer), claiming wrongly that: Plaintiff complained to non-decision makers, that the relevant events are bared by statute of limitations, that Plaintiff has no retaliation claim, and more. Cabeceiras stated that Derek Smith will not bring the claim with federal court and would refer Plaintiff to another New York based lawyer – Paul Campson. According to Cabeceiras Campson and Derek Smith had been exchanging a lot of cases.

313.    After getting home from the meeting with Derek Smith on 6/21/2017 Plaintiff sent an email about his Gyro case to Paul Campson (ECF No.8-2, 2108). Campson has never responded nor contacted Plaintiff otherwise despite Derek Smith's claims that Campson wants to represent him (the only exception was when Plaintiff called Campson from a different phone number, but after Campson

realized who is calling he said he would call back and terminated the call). Plaintiff sent emails to Campson also on 7/13/2017, 7/27/2017, and 8/4/2017 (Plaintiff copied Derek Smith's Cabeceiras in a few of them), and called him on 8/1/2017.

314.    In August 2017 Plaintiff contacted several lawyers about his case against Gyro et al. In that period Defendants demonstrated the activities against Plaintiff are the FBI and/or police activities (see 8/8/2017 for example), started to use DE overtly, and among other things interfered with his search for lawyers (for example they were present at his meeting with a lawyer in Manhattan on 8/10/2017).

315.    On 8/7/2017 after Plaintiff researched online employment lawyers Defendants in ap.B2 (the apartment above Plaintiff) commented that he is "finding a new lawyer." Plaintiff called Robert Wisniewski, Manhattan based employment lawyer, and set a meeting. Defendants in B2 commented "Can't stop him." Defendants were present and interfered with Plaintiff's meeting with Wisniewski on 8/10/2017: the 'staff' knew Plaintiff's name before he presented himself, then talked in his presence: "Arrest Kalini.".. "FBI will find and catch." … "Gyro have to stop. So let Kalin []." … "Punish him. How to game?". Wisniewski refused to listen the details of the Gyro case, and requested all relevant materials. Later Plaintiff canceled the second meeting.

316.    On 8/11/2017 Plaintiff called Gregory Calliste – a lawyer at Manhattan's Phillips and Associates – about the case against Gyro. Calliste stated he is interested in the case, and will contact soon Plaintiff to set a meeting. After that Calliste stopped answering Plaintiff's calls and email (this is the third or fourth lawyer (if counting Campson) stating interest in representing Plaintiff, and shortly after that stop responding or refusing the case, pattern showing the Defendants' interference. See also Defendants relevant statements – explicit intent to stop Plaintiff, and the lawyers bellow. (ECF, No.8-2 at 2110)

317.    Plaintiff called Cotchett, Pitra and McCarty on 8/15/2017 and presented his case. On 8/16/2017

Plaintiff received a mail that Cotchett, Pitra and McCarty would not take his case.

318.    Plaintiff called Pitta LLC on 8/15/2017 and on 8/24/2017. Each time Plaintiff left his phone

number for a follow-up call to discuss his case with a lawyer or paralegal as promised, but Pitta

has never called back – the same pattern showing Defendants' interference (additional to

Defendants' explicit statements in that regard). (ECF, No.8-2 at 2111-2112).

319.    In parallel to all of the above Defendants subjected Plaintiff to sleep deprivation, repeated

provocations, threats, and variety of attacks (including DE). See IV.11, and more. Plaintiff

stopped searching for lawyers for his case against Gyro et al, and was forced to prepare and file

lawsuit(s) as a pro se litigant.

320.    Plaintiff has searched for relevant to *Dimitrov I* **experts** but Defendants interfered and continue to

interfere overtly with that (for example they stated in that regard "Do not answer any email."

10/10/2024).

321.    Between 4/1/2024 and 2/11/2025 Plaintiff contacted about 100 experts, human rights activists and

organizations in regards to his case against Defendants. Defendants' intention to interfere was

overt since the first email (4/1/2024): "We have to stop that man."… "You have to stop." Then

Dula was explicit that the activities against Plaintiff are governmental: "[You are] not stopping

the United States". The next day a NJ State agent threatened to "extradite" Plaintiff (43).

Defendants were also explicit in regards to their retaliation (for example: "We have to fight that

shit." 4/4/2024; "How to set him up to stop?" Later Dula in building's corridor "fight", 4/7/2024;

"Have to punish Kalin. Sue if he is such a high brow." 8/7/2024, USPS carrier under Plaintiff's

windows).

322.    Defendants retaliated by 'hacking' Plaintiff's email accounts / computer, blocked his emails,

deleted experts' response(s) (in one occasion it was in front of Plaintiff's eyes), and deleted files

from his computer (on 8/18/2024 Plaintiff found Bar-Tal articles were deleted, then Ralph and Dula responded "Hacking did not work." "Have to push.".. "Fight."; on 10/29/2024 Plaintiff found they deleted his letter to Attorney General Garland – one of the files he sent to experts). After Plaintiff had sent an email to an expert Defendants threatened that they will arrest him (4/7/2024, 4/9/2024), hammered on his ceiling (4/27/2024, 4/28/2024), and pressured Plaintiff to stop (for example on 4/15/2024 Defendants' Gerardo Rossell( A1) in front of Plaintiff's door "We want to stop." then students came under the windows "Have to stop that. How to stop…?".. "Kalin…"… "Stop. Consider it done."; 4/27/2024 Defendants' Dula in ap. B2: "Have to stop. Can't touch him... Kalin … "; 6/13/2024 "Tell Kalin.. can not fight."). While Defendants' surveillance of Plaintiff has been overt for long time, in relation to his emails they deliberately showed that they are watching his screen (for example on 10/10/2024 while Plaintiff was searching for contact info of the Center for Constitutional Rights students came under his windows and commented "Now you send them all."; on 11/18/2024 Plaintiff sent emails to about 45 human rights law experts based in UK and Belgium. About 30 minutes later students came and stayed under Plaintiff's windows commenting that he is "annoying". "He sent to everyone.").

323. Among other things Defendants interrupted Plaintiff and his communications, including by blocking his emails – some of the recipients did not receive them. For example on:

324. Defendants were explicit they will prevent any response to Plaintiff after he had sent by email a copy of his letter to AG Garland to HRW, NYCLU, Brennan Center for Justice, and Center for Constitutional Rights on 10/10/2024 ("Do not answer any email."). In general, except some automatic responses of persons on leave, and Mr. Abhrams response, Plaintiff received no answer or Defendants deleted them (as on 2/11/2025).

325. Brief history of events related to Plaintiff's search for experts since 2024 is as follows:

**(ii) Defendants prevented or significantly slowed down the discovery of Plaintiff's legal claims with their policy and practice to ignore and not investigate his reports and complaints.**

326.    Plaintiff filed a report with Teaneck police on 9/11/2012 for the organized threats, pebbles at his windows and other conduct of Defendants in 8/2012-9/9/2012, but then he had no idea who and why targeted him other than because they considered him a Bulgarian fagot, and a threat. (See ECF, No. 8-1.B). Plaintiff had insufficient information about the perpetrators and, consequently, about the applicable legal grounds – he had no 'complete and present cause of action'.

327.    Defendants significantly impeded Plaintiff's abilities to discover what are his legal claims because they do not investigate his petitions (exception, which proves the principle, are the proforma investigations of Plaintiff's reports filed in 2024 with Teaneck police). See failure to investigate IV.8(b)(2)(v)(B). Plaintiff started discovering his legal claims with significant delay and slowly since about June 2016 when he started working on case materials (see above IV.10(a)(i)), and only after his visit to the FBI New York on 11/8/2017 he realized that it is the FBI that leads the activities against him.

328.    Furthermore Defendants suppressed the evidence Plaintiff provided, for example, by intercepting his emails (as his email from 2/24/2022 to Teaneck police officer Ruscingno which contained an audio recording and information related to a Plaintiff's police report (see ECF No. 8-1, 334, 338)), or not entering in the police system Plaintiff's handwritten statements and evidence materials which were part of his reports with Teaneck police (as for example with his report from 9/11/2012, ECF, No.8-1 at 20). Defendants did not want to preserve that evidence let alone searching for more.

**(iii) Defendants prevent or obstruct Plaintiff to obtain or preserve evidence for their violations.**

329.    Defendants actively prevent Plaintiff to obtain case-relevant information and evidence by (1) evasion and retaliation to his lawful recording of events; (2) precluding in practice Plaintiff from

obtaining objective witnesses (by dissemination of false and defamatory information about him, setting Defendants' agents as neighbors of Plaintiff, utilizing CVE and anti-gang programs with wide participation of community and other non-government parties); (3) by acting under cover identities, which is only for the purpose of evading and/or obstructing Plaintiff's claims – Defendants' demonstrative conduct proves that; and (4) deliberately mislead and/or distract him.

(1) Defendants' evasion and retaliation to Plaintiff's lawful recording of relevant events.

330.   In all relevant time Plaintiff's right to record governmental officials in public space, and his right to record matters of public interest have been well established. Plaintiff's recording of events is lawful under 18 U.S.C. §2511 (2)(d), and under the laws of both New York[90] and New Jersey[91]: recordings are made in his presence, the recorded events concern matters of significant public interest, and the records are with apparent communicative purpose and audience: Plaintiff's records are intended to expose crime, and governmental oppression, inefficiency and misconduct.

331.   Plaintiff keeps handwritten log of events with increasing detail since the end of 2014, and has made photos, audio and/or video records of relevant events in his apartment in Teaneck, NJ, and relevant events occurring at the area adjacent to his building in front of his windows (including the streets next to his building), or in public space as parks, streets, and the public space of governmental or private buildings. Plaintiff's detection and recording of EMF almost always is inside his apartment. In a few rare occasions he measured EMF in his building public areas – corridor and laundry room.

332.   A demonstration of his records' communicative purpose and intended audience is the fact that the case-specific factual material in Plaintiff's complaints with the federal court of Southern District of New York filed in 2018 and 2023 is almost entirely based on his records (including

---

90  N.Y. Penal Law § 250.00(1); N.Y. Penal Law § 250.05 as quoted in *Laws on Recording Conversations in All 50 States*, Matthiesen, Wickert & Lehrer, S.C., LAST UPDATED 3/10/17
91  N.J. Stat. Ann. § 2A:156A (West 2012) as quoted in *Reporter's Recording Guide*, The Reporters Committee for Freedom of the Press, 2012

handwritten logs of events). Similar is the case with Plaintiff's Administrative claims with the FBI under the FTCA from 11/10/2022 and 8/29/2024; and his other petitions.

333. Plaintiff also provided a few times audio recordings, videos, and/or transcripts to Teaneck police, and/or to the Township of Teaneck's Manager as evidence for the events he has reported with the police since 2012.

334. Additionally Plaintiff has sent a few of his records, and transcripts for consideration by legal and other experts in relation to his legal cases.

335. Defendants are fully aware of the purpose of Plaintiff's recordings ("Sue us.") and actively try to evade liability ("Must figure out how to talk to him." 5/13/2016).

*(A) Defendants use third parties, modify their behaviors and/or the environment at least in part with intention to evade Plaintiff's record of relevant events.*

336. Defendants *use third parties* (for example students) at least in part to evade being recorded. In a few occasions Defendants explicitly instructed other parties what to 'tell Kalin' (usually 'to stop'). The apparent meaning is that Defendants use other parties to talk to Plaintiff instead to talk to him themselves, but that also implies difference in power such as in the relation instructor – trainee, or superior to subordinate.

337. As an example of Defendants modifying their conduct – since about 2015, when Plaintiff started to document regularly events, Defendants *reduced significantly the use of 'fagot'* as reference to Plaintiff. And in the recent years noticeable portion of *Defendants' talking has been in Spanish* (Plaintiff does not speak Spanish).

338. Defendants have *started using elaborate stories or roles* to cover up the fact that their verbal conduct targets Plaintiff. For example to talk to Plaintiff they pose as clients to Yola or to Jamaican Food trucks which usually park next to Plaintiff's windows (that practice started in about the summer of 2022 when he was finalizing Notice of claims and Administrative claims to Defendants). Since May 2025 Defendants repeatedly engage in very long 'calls', walking back

and forth around Plaintiff to talk in disguise to him when he is working outside. For example when Plaintiff was working on this very sentences on 7/22/2025 Defendants' man walked by and stayed(!?) behind him for about 35 minutes saying among other things "We post []. We had to stop. Hit []. Psych.. He keeps going… This is the legal authority. Kalin… Campaign…". Defendants also do "life-coaching" in Plaintiff's presence with 'advice' directed at him – see for example 5/14/2025 when Plaintiff was working in Votee Park, Teaneck, NJ, Defendants' man for about an hour gave life advises to a silent man next to Plaintiff, and at the end revealed that it was intended to stop Plaintiff from working on this very complaint. See above 705.

339. Defendants make *significant effort to obstruct Plaintiff's recording*. For example in many occasions when Plaintiff started his Olympus recorder Defendants stopped talking, changed the topic, switched to Spanish, or moved away.

340. Defendants have started *messaging Plaintiff by talking or playing content on speaker* – frequently since 2021. Among other things this is demonstration that Defendants' conduct against Plaintiff is not a local activity, persons at other locations are simultaneously engaged; or things are prepared in advance: recorded or found the proper content, and played next to Plaintiff. For example on:

341. To prevent/obstruct Plaintiff's video recording or making photos of the Defendants coming under his windows when the day light declines and during the night, they deliberately kept the *street light* next to his building off for 8 years (all other streetlights nearby worked). This started in 2016, when Plaintiff began to use regularly Blue Iris security software with two cameras, and was 'fixed' on 7/8/2024. That among other things shows the Township of Teaneck's involvement.

342. Defendants and parties in concert have started *walking and acting in areas outside Plaintiff's camera view* (Plaintiff's system is based on Blue Iris security software) when they provoked, and harassed him. As for example on:

343.    Defendants evasions included also stopping or reducing the intensity of DE beams targeting

Plaintiff while he was scanning, removing the tenants' list from corridor right after Plaintiff filed

Notice of claims and administrative claims on 11/10-11/11/2022 and more.

*(B) Defendants demonstratively accessed Plaintiff's computer(s), phones, and accounts, and deleted evidence and other files, turned off remotely the computer with Blue Iris security software, and more.*

344.    Defendants repeatedly deleted Plaintiff's emails, files, and information which is evidence for his

legal cases or is private from his computers, phones and web accounts.

345.    Especially notable in regards to the Defendants' role in the deletion are their statements about his

reports about the deletion and requests information to be restored: "We should not respond."[92]

(11/11/2016, Defendants in ap.B2; and the same on 1/11/2017, Defendants in ap.B2).

346.    Defendants interrupted the recording with Plaintiff's security camera(s) by remotely turning off

his PC Eee (the computer with Blue Iris security software) which then was constantly connected

to Internet. The claim that this is result of a remote action is based on the fact that when Plaintiff

restarted the PC it started normally without blue screen or any other notice indicating a problem,

nor there was a prompt to start the computer in Save Mode (as it is usual when there is an issue).

Defendants' comments also implied it is their intrusion as for example "He got it." (11/13/2017,

6:00AM Defendants in B2 after Plaintiff restarted the PC Eee and Blue Iris).

347.    In relation to Defendants hacking and fraudulent online activities against Plaintiff worth noting

that they sent job applications for low level jobs on his behalf using his email (2/2/2023, ECF

No.8-2 at 6170), they fraudulently created an email account on Plaintiff's behalf which was used

for a while by a person writing in foreign language (see 3/24/2025), and when he was at the FBI

New York on 11/8/2017 Defendants have explicitly provoked and teased him to "Hack the

agency." (ECF No.8-1 at 45). See a few more 'hacking' examples bellow.

_____

92

*(C) In retaliation Defendants demonstrate their knowledge that Plaintiff records events, ridiculed him, and claimed that Plaintiff is a spy holding them hostage.*

348. Apart from their other means to obstruct or evade Plaintiff's record, Defendants demonstrate their knowledge that Plaintiff records events (for example commenting him "Records anyone." "Freak." 6/30/2020), and repeatedly talked that they 'can't talk'. While in that context 'can't talk' means intention to not being recorded, it is also demonstration of the surveillance on Plaintiff, and ridicules him. 'Don't talk' is also a direction to other parties, and implies hierarchy of the participants, a structure.

349. Notable are the events on 2/5/2015 when Defendants still have not changed completely their conduct due to Plaintiff's lawful record of events, as well as a few other events in regard to Defendants' demonstration of the surveillance on Plaintiff, the contact and dissemination of Plaintiff's information between the parties, and more.

350. Defendants developed the false narrative that Plaintiff is a spy who holds them hostages. (IV.8(a) (1)(ii)). See also 1307 *et seq.*, 'hostages' 393 *et seq.*.

*(D) Defendants retaliate with noise harassment, pebbles at Plaintiff's windows, or DE attacks to Plaintiff's record of events.*

351. Defendants retaliate with noise harassment, pebbles at his windows, or DE attacks to Plaintiff's records which are more limited in time as for example making notes, or his scanning for EMF.

352. For example Defendants interrupt and retaliate to Plaintiff's actions in that regard – on 8/29/2022, 11:02AM Plaintiff was scanning with EMF scanner inside his apartment when Defendants' man and woman under his windows threw pebbles at his windows(?) and commented "You don't prove anything. Have Kalin stop." On 9/9/2022 after he made a video recording of them Defendants' agents talked under Plaintiff's windows that he 'Can't prove--'.

353. Similarly when Plaintiff was making notes about the events Defendants in apartments B2, G2 or under his windows knocked or targeted him with focused directed energy beams. For example on

4/17/2023 at 2:47AM there were 2 pops from ap.A3. After Plaintiff made a note there was a thud on his ceiling from B2. Later after Plaintiff did EMF scanning and made a note at 11:02AM –felt and detected a laser-focused ray from B2 at his chest. On 4/19/2023 at 8:50AM Plaintiff did EMF scanning and while he was writing a note – a slam from B2. Later same day at 6:30PM Defendants' woman talked in corridor. When Plaintiff made a note about that – thud on his ceiling from B2. On 4/20/2023 at 2:28AM there were knocks on the floor from G2. A louder knock followed after Plaintiff started writing a note. On 4/21/2023 at about 9:10AM there was a knock (pebble-at-window kind) on Plaintiff's windows. After Plaintiff wrote a note about that – thuds from B2.

<u>(2) Defendants prevent Plaintiff to have objective witnesses.</u>

354.    Defendants have been repeatedly concerned with what they or Plaintiff can prove, and threatened and challenged him in that regard. Those considerations of eventual legal challenges, as well as taking measures to evade eventual claims for entrapment and other legal challenges, are part of any investigation planning. Defendants were explicit about that in a few occasions:

355.    Defendants' actions in practice precluded Plaintiff from obtaining objective witnesses. They disseminated false and defamatory information about him (IV.12); they have engaged communities and businesses utilizing CVE and anti-gang programs, securing the support and/or participation of Plaintiff's landlords, utility providers, and more (see IV.8(b)(2)(iii)); and isolate and alienate Plaintiff (IV.12, IV.10(a)).

356.    In time Defendants set their agents as 'neighbors' to Plaintiff. The neighboring apartments (ap.A1 and A3 on the same floor, ap.B2 above, and ap.G2 bellow Plaintiff's) are used for sound and DE attacks on him. The landlords removed the noise insulation between Plaintiff's apartment and ap.G2 (12/23/2016, ECF No.8-1 at 172) and ap.A3 (July 2019, ECF No.8-1 at 474) and Defendants talked to him through the walls. That practice from ap.G2 and A3 significantly

reduced since Plaintiff worked on transcripts of his audio recordings of such talks made before or about 2021. See ECF No.8-1 at 148 *et seq*.

357.  After Gyro New York laid off Plaintiff in March 2016 Defendants put a legal notice in the office directing co-workers to not talk about police' involvement with Plaintiff (ECF No.8-1 at 40).

358.  Defendants approached Plaintiff's relatives both in the US and in Bulgaria in regards to him, which detrimentally altered the relationships. One Plaintiff's cousin in Bulgaria refused to make a declaration about his knowledge of relevant events stating as a reason fear from retaliation, but for about two years after that repeatedly teased and provoked Plaintiff about gays and liberalism, promoted fascist ideas, and support for guns See ECF No.8-1 at 828, and more.

   (3) Defendants withhold information and act undercover only to evade liability.

359.  Defendants apparently withhold information with intention to obstruct eventual legal challenges by Plaintiff. For example after Plaintiff filed his Notice of claims 11/10-14/2022 Defendants immediately removed the public tenants' list in his building which has been there for more than 11 years (as Plaintiff personally witnessed), and since then there has been no public list of tenants. Per Plaintiff's knowledge and belief the removal is related to his argument that Defendants used Leonardo A. Ona as a cover identity to rent ap.G2 (he was listed as tenant of G2 for about 5 years in a row) while in reality multiple and changing Defendants inhabited the apartment (see ECF No. 8-1 at 152-153).

360.  Defendants shockingly denied obvious facts. For example when Plaintiff approached Defendants in ap.G2 on 7/6/2016 they denied slamming doors and accused Plaintiff instead (ECF No.8-1 at 157). Similarly on 7/7/2016 Dula, ap.B2 and Swaby (who had stated earlier under Plaintiff's windows "We are FBI." 3/25/2016) accused Plaintiff of inventing the knocks from ap.B2 (ECF No.8-1 at 811). Then Dula repeatedly denied obvious facts – as for example that she leaves in B2 and even asked Plaintiff what is B level (although she had lived there for 5 years according to her

own statements) Id., Dula denied hitting Plaintiff's ceiling and even hearing any hits, but then also overtly provoked him when Plaintiff was walking back home (11/19/2018, after talking with Plaintiff she knocked very strong, slammed a door in ap.B2 and challenged: "Can you feel [that]?" ECF No.8-1 at 449). Due to Defendants interference landlords also denied obvious facts and made false claims. For example in 2015 despite Plaintiff's audio recordings of the noise on pipe system, they claimed no one heard them, falsely claimed that they had sent a person to check that in Plaintiff's apartment but Plaintiff's security system have recorded no one inside. After 2020 the super – Cesar Naranjo – also falsified and minimized Plaintiff's complaints about noise, and more.

361.   Plaintiff requested information in regards to his legal cases from NYC Legal Department (8/2/2023), and from NYC Sheriff's office (10/15/2018, ECF No.8-2 at 2013) but his communications were ignored, which among other things is withholding of relevant information.

362.   Defendants' demonstrative conduct proves that they are *acting undercover[93] only for the purpose of evading liability*. The very purpose of being undercover is to not reveal the identity as government agent – something which Defendants demonstrated to Plaintiff overtly. There are many examples of such demonstrative conduct, see above IV.1 and following.

(4) Defendants deliberately mislead Plaintiff and create distractions.

**(iv) Defendants' degrading practices in retaliation to Plaintiff's preparation and filing of petitions.**

363.   At least in part Defendants' degrading treatment of Plaintiff is punishment for his preparation, work and filing of petitions. For example Defendants increased the intensity of sleep deprivation of Plaintiff in retaliation to him starting regular record of relevant events in the end of 2014. That increased again after he started working on legal and case materials (April 2016), and again later in retaliation to his contact with multiple New York-based lawyers (August 2017). Similarly since

93

April 2016 Defendants' sound attacks on Plaintiff increased significantly and became regular

conduct during the day. And since August 2017 Defendants have started regular DE attacks on

Plaintiff in retaliation to him pursuing his case against Gyro et al, contacting New York-based

lawyers, and working on case materials. They have escalated the DE attacks since the day

Plaintiff went to the FBI New York Field Office (11/8/2017), and later the intensity increased

multiple times in retaliation to his work on case materials, including on this very complaint. For

example after Plaintiff worked on this and the sections above, Defendants' DE attacks during the

night on 8/24/2025 were so strong (charged his body up to 930 V/m) that he stopped breathing for

short time (see respiratory failure as a result of exposure to electricity bellow), he couldn't get to

sleep and moved to at least 3 different locations to evade the DE beams.

364.    See IV.11, ECF Nos.8-1 and 8-2.D and E, Exhibit Defendants' hammering from ap. B2 1/1/2021-

3/1/2025, and more.

**(v) Defendants' retaliation and pressure to stop Plaintiff from working on, filing and/or pursuing his lawsuits.**

365.    In retaliation to Plaintiff's preparation, working and/or filing of lawsuits since about 2015

Defendants subject him to many years long influence campaign to "stop" him (1307 *et seq.*), to

degrading treatment and psychological torture, and orchestrated his abuse and harassment (IV.11).

366.    Defendants' noise harassment increased significantly since Plaintiff started working on his legal

cases in 2016. The intensity of sound attacks on Plaintiff from Defendants in apts. A3, B2 and

G2, as well as from the Defendants near Plaintiff, including when he is outside, are related to his

work on legal and case related materials. For example since Plaintiff started finalizing the

complaint for *Dimitrov I* (June 2023), and then initiated *Dimitrov I* (7/25/2023) Defendants in ap.

B2 have started hammering on his ceiling almost every days (increased as number of days with

hammering per month a few times), and till the end of 2024 they hammered on the ceiling for

about 500 days (see IV.11, Exhibit Hammering from ap.B2 2021-3/1/2025).

367.   Defendants' DE attacks on Plaintiff have started (were noticeable) since August 2017 when he re-started the search for lawyers and kept working on his legal cases. The use and intensity of their DE attacks increased in response to Plaintiff's visit to the FBI New York on 11/8/2017, and later to his other legal acts. See IV.11. B.

368.   As part of the Defendants' pressure on Plaintiff to stop he receives 'special treatment' (1/9/2019, ECF No.8-2 at 1980): Defendants follow the same policy/practice in regards to his petitions and communications – no response, no investigation, or in the rare occasions of response they minimize and/or misrepresent his claims. See IV.9. Furthermore Defendants do not respond to Plaintiff's communications, as for example to his formal request for information to the NYC Counsel on 8/2023, NY Sheriff's Office on 10/15/2018, or to Plaintiff's request for waiver of service to Teaneck was ignored even though Teaneck appointed a counsel (ECF No.9); and when Defendants do respond it is apparently inadequate – see FBI 3/6/2025.

369.   Notable is the Defendants' retaliation to Plaintiff filing his Objections to Report and Recommendations (ECF No.8) on 8/28/2023. Since then Teaneck Schools' students harassment, threats and assaults significantly increased in parallel to Teaneck police and other Defendants' conduct against Plaintiff. See IV.4.(c)(vi).

370.   Defendants do not cease those policies and practices but reaffirmed and continue that conduct regardless of Plaintiff's petitions. See IV.9. To the extend that government Defendants' policy-makers claim lack of knowledge despite the persistent many-years-long practices in regards to Plaintiff and his multiple petitions about those violations – they are deliberately blind, and apparently fail to train or supervise their subordinates.

(1) Defendants' conduct since the end of March 2016 is in significant part punishment for Plaintiff's preparations and work on his legal cases.

371.   Defendants retaliation, and active prevention of Plaintiff's legal action against Gyro et al was apparent since he was laid off. When Plaintiff looked for legal materials and lawyers in New York

City Defendants warned him "Can't pursue." (3/24/2016) "You can not pursue them." (3/25/2016, ECF No.8-1 at 41). The FBI and police ("We are FBI." Id. "He definitely knows how to fight police." 4/1/2016) were explicit about their intent to 'torture' Plaintiff ("Can't even torture him."… "Can't even harass him." (3/29/2016) "How we terrorize him?" (3/30/2016, ECF No.8-1 at 1823)). Since 3/25/2016 Defendants started slamming adjacent to Plaintiff doors and substantially increased their knocking on his apartment's floor (from ap.G2, ECF No.8-1 at 155 et seq.), on his ceiling (from ap.B2, ECF No.8-1 at 446 et seq.), pipes (ECF No.8-2 at 1912 et seq.), and later on the walls (from ap.A3, ECF No.8-1 at 474 et seq.). Defendants have also terrorized Plaintiff by demonstratively inhibiting his sleep with noise, and turning off the heating (Their explicit statements in that period include: "Keep him up all night pays off." 4/1/2016); "He didn't feel it.".."We can't wake him up." (4/3/2016) "We worked all night. Mother fucker you can't sleep." (4/5/2016) "Wake him up." (4/17/2016) "We cut his sleep in half." (5/5/2016)

372.    A few hours after Plaintiff started working on a graphic for the case Defendants, talking next to his apartment in Teaneck, NJ, explicitly stated their want to prevent a legal action, demonstrating among other things the constant surveillance on him including in Newark, NJ. "We need you to stop." (4/3/2016) Defendants kept commenting Plaintiff's work including in distant locations "[Plaintiff is] suing them." (4/6/2016) "He is trying to sue them." (4/13/2016 at USCIS Newark, NJ) "Can't sue them." (4/26/2016) (Defendants talked also about "confus[ing] him" (4/13/2016)). In that period Defendants talked explicitly and directly to Plaintiff that he is under surveillance "We watch." (4/9/2016), or indirectly addressed him "Keep watching him." (4/11/2016).

373.    Defendants' sound attacks on Plaintiff, which additionally to the above include ringing on Plaintiff's doorbell (ECF No.8-2 at 1921), calls (ECF No.8-2 at 1923 et seq.), yelling next to Plaintiff (ECF No.8-2 at 1891 et seq.), and more, are continuous and ongoing practice with some variation of the intensity and actors since then.

374.    On 8/24/2016 Plaintiff started to work on materials about the Defendants and his potential suit, searched, and contacted lawyers about his cases (9/6/2016-9/8/2016). Defendants retaliation was immediate, they interfered ("You can't sue them.".. "Can't let it happen." (9/6/2016) "Case is closed." "We must get within. We created (him).".. "One Bulgarian…" (9/7/2016)), the lawyer Plaintiff called didn't take the case against Gyro, NYCLU declined meeting Plaintiff. On 9/11/2016 Defendants hacked and deleted thousands files, including files relevant to his suit against Gyro et al, from Plaintiff's computer while he was on a flight to Europe (with Bulgaria as final destination). (ECF, No.8-2 at 1847.) When Plaintiff returned from Bulgaria Defendants were very provocative: "Fight Teaneck.".. "If you don't say a word obviously we'll keep on." (10/1/2016); they referred to Plaintiff as a robber ("Bulgarian []." "Robbing a robber is needed." 10/6/2016). When Plaintiff discovered the deletion Defendants were explicit about their intention to distract him. In the morning of 10/7/2016 police and rangers' cars were under his windows. Plaintiff made photo and persons commented "He is trying to prosecute us. That's why…" and later Defendants "Have to stop."..."We didn't distract him."

375.    Defendants were blatantly explicit about their goals in regards Plaintiff on 10/8/2016: "Keep him hostile.", and on 10/9/2016 they talked to Plaintiff: "You will never find peace. We'll never stop teasing.", and later same day while Plaintiff was checking his archives to find what was deleted from his computer: "Learn your lesson."

376.    On Monday 10/10/2016 Plaintiff uploaded a video about the deleted files and Defendants responded "We'll hack it." Same day Plaintiff filed a report with Teaneck Police about the hacking and deletion of files from his computer – the report has never been investigated. (ECF, No.8-2, at 2015).

377.    For the events after that see other sections of this complaint, ECF Nos.8-1 and 8-2, Timeline of events, and more.

(2) Defendants retaliate to Plaintiff's work on FBI, JTTF, or related to FBI/JTTF materials.

378.    Defendants' immediate response while Plaintiff was working on FBI or JTTF materials include a few repeating behaviors. For example during that time (a) Defendants confirmed their identity as JTTF (12/4/2022, 8/21/2024 ("Kalin gets it.")); (b) Defendants were explicit "We have to stop him." (4/16/2021), to 'disrupt' Plaintiff (7/16/2024), "Have to punish Kalin. Sue if he is such a high brow." (8/7/2024); (c) they stated their intention to suppress and harass him (11/21/2020, 1/2/2021, 4/10/2021, 7/16/2024, 9/2/2024 ('disturb'), 9/9/2024); (d) threatened and warned Plaintiff (11/14/2020, 1/14/2021 (getting warrant, 'crush'), 7/19/2024, 7/22/2024 ("We didn't really threatened."..."Don't leave the building." "We didn't even harass."), 9/2/2024 ('arrest'), 8/24/2025 ('Ignore FBI.')); (e) assaulted him (7/16/2024); (f) demonstrated the surveillance on Plaintiff (11/13/2020, 1/3/2021, 3/3/2021, 12/4/2022, 12/19/2024); (g) Defendants in aps.A1 and A3 knocked on Plaintiff's walls (11/13/2020, 1/4/2021, 12/3/2022 in coordination with B2 and overt provocations), Defendants in ap.B2 also knocked, hammered, dragged things, or slammed door(s) (12/3/2022, 12/4/2022, 9/6/2024, 9/9/2024); and more.

(3) Defendants have started social pressure campaign to 'stop' Plaintiff since he began working on the legal cases in 2016. See IV.9(a)(4).

**(vi) Defendants obstruct Plaintiff to file legal action(s).**

379.    Defendants obstructed Plaintiff's preparations for a legal action. For example Plaintiff filed about 8 formal police reports with Teaneck police, only the two filed in 2024 had police response, which was inadequate – police minimized/ignored Plaintiff's claims, and more (see 4/26/2024, and 7/16/2024). That, together with Defendants thwarting Plaintiff's efforts to obtain legal and expert counsel, and the degrading treatment they subjected Plaintiff significantly delayed him to discover his legal claims, and eventually filing the appropriate legal actions. See IV.9.

380.    Defendants directly prevented Plaintiff to follow the requirements by law before filing a lawsuit (even if temporary). For example Plaintiff visited the FBI New York Filed Office building at 26

Federal Plaza, New York, NY 10278 on 11/10/2022 with intention to file in person his Administrative claims under FTCA. Defendants (FBI / JTTF New York) prevented him to do that – among other things they overtly said "Can not receive." .. "Stop. Re(frame)." … "End conversation. He needs to act.".. "You have Kalin stop." ECF No.8-2 at 5910 et seq.. The FBI officers at the lobby made Plaintiff to repeat 20 times the name of the statute (FTCA), three times asked Plaintiff on whose behalf he wants to file administrative claims, intimidated and threatened him, and more. At the end they claimed only one person in the office knows about FCTA and he/she was not in the office so they can not receive Plaintiff's claims. Plaintiff sent his administrative claims by certified mail with USPS. Plaintiff received only notice from the USPS about the delivery to FBI New York on 11/14/2022. See IV.9.

381.    Defendants obstructed Plaintiff in regards to the initiation of *Dimitrov I*. For example Defendant New York City ignored Plaintiff's written communication to the Legal Department in regards filing a Request for Waiver of service for *Dimitrov I* on 8/2/2023. Defendants Teaneck, NJ refused to grant Plaintiff's Request for Waiver of service of process for *Dimitrov I* – Teaneck gave no response to Plaintiff, but appointed a lawyer for the case (ECF No.9). See IV.9.

**(vii)  Defendants' conduct have chilled Plaintiff.**

382.    Because of the Defendants' officers and agents harassment and abuse of Plaintiff he did not report majority of incidents stated in this Complaint.

383.    For example despite the consideration, preparations, and visit to the FBI New York on 11/8/2017 Plaintiff has never filed a report with the FBI for civil rights violations due to Defendants' actions, nor he reported or complained to the NJ State Attorney General (he researched the internet for contact with NJ AG on 1/9/2018), nor to the DOJ Civil Rights Division (Plaintiff worked on a letter to DOJ on 1/3/2018). Due to Defendants' abuse and retaliation Plaintiff did not filed a Supplement to his Notice of claims, stopped searching for lawyers and eventually stopped

searching for experts counsel (last email was at the beginning of 2025) due to significant

Defendants' interference. And more. Defendants' conduct have undeniable chilling effects on

Plaintiff's speech, which by itself is evidence of what a reasonable person would do. See ECF

No. 8-2 at 6010 *et seq.*.

*(b) Defendants[94] interfere with the federal court of the Southern District of New York (S.D.N.Y.), and its proceedings in regards to Plaintiff to deny him fair hearing.*

384.    The totality of circumstances show that Defendants influenced and/or intruded, and continue to

influence and intrude on the court of S.D.N.Y. in regards to Dimitrov v. The United States of

America et al, 1:23-cv-6451 (S.D.N.Y., 7/25/2023) (the 'case' or 'ECF' for court's documents)

currently in litigation, and in the previous Plaintiff's legal action - Dimitrov v. Gyro et al, 1:18-

cv-3600 (S.D.N.Y., 4/23/2018) ('Gyro case' or 'Gyro ECF' for court documents). Defendants'

influence and/or intrusion is shown by (a) Defendants' acts and statements demonstrating

knowledge of the court's decisions, some times even before they were published; (b) the

degrading treatment of Plaintiff in the court; (c) the court's application of judicial standards and

proceedings in unfair way, including unreasonable delays which harm Plaintiff (especially

considering that Defendants activities against Plaintiff have not stopped and are ongoing); and (d)

the S.D.N.Y. treatment of Plaintiff's cases fits the Defendants policy and/or practice in regards all

other Plaintiff's petitions, reports, notices and other forms of grievances he expressed to the

government. These points are presented in more details bellow.

---

[94]

**(i) Defendants have shown their influence over the court with their actions and/or statements showing knowledge of the S.D.N.Y. proceedings in regards to Plaintiff's cases, sometimes even before they occur or got public. For example:**

**(ii) The Defendants' influence on S.D.N.Y. is inferred because the judicial standards, rules, and proceedings are repeatedly applied to Plaintiff's legal actions in unfair way, and put him unreasonably in disadvantage.**

(1) The S.D.N.Y. unequal treatment of the Plaintiff's legal actions in comparison to other similar cases is contrary to the principle of "[e]quality before courts and tribunals [which] requires that similar cases are dealt with in similar proceedings." (General Comment No. 32: Article 14: Right to equality before courts and tribunals and to a fair trial. Human Rights Committee, CCPR/C/GC/32, 23 August 2007, at 14). For example the court's appointment of a judge to Plaintiff's Gyro case took longer than any similar case filed with S.D.N.Y. since Plaintiff's filing in the next about 6 months; the court keeps the case against the Defendants at its initial stage for more than 25 months while average time for disposition of a civil case with S.D.N.Y. is 5.6 months; and more.

385.    As a criteria for a comparison with Plaintiff's case against Gyro et al is used the time till a case is assigned to a Judge – in that way the particular circumstances of each case are supposedly not playing role in the proceedings. Plaintiff's case against Gyro et al. (*Dimitrov v. Gyro et al*, 18-cv-3600 (S.D.N.Y. 4/23/2018)) has the longest period of time till a judge was appointed (36 days) in comparison to 70 similar employment cases filed against private employers with S.D.N.Y. between 4/23/2018 (since the initiation of the Gyro case) and 10/9/2018. See Exhibit. Notable is that there was no action on his case for 59 days after the denial of Plaintiff's IFP application (S.D.N.Y. Pro Se Intake Unit had told Plaintiff to wait (see Gyro ECF, No. 12) which later became an issue in regards to the service of process – see bellow).

386.    According to the U.S. courts' statistics published on https://www.uscourts.gov for the 12-months period till September 30, 2023 the median time in S.D.N.Y. from filing of a civil case and its disposition is 5.6 months. (United States District Courts — Judicial Caseload Profile, p.11). Notable is that for the same period 6,587 of the civil cases with S.D.N.Y. (64% of the total number of civil cases) were terminated before pretrial with median time for disposition 5.5 months (Table C-5. U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period

Ending September 30, 2023, p.1). In comparison the Plaintiff's case against Defendants (*Dimitrov v. The United States of America et al*, 1:23-cv-6451 (S.D.N.Y. 7/25/2023)) is still in its very initial stage (no service of process) for more than two years.

387.    21 cases categorized in PACER as Civil rights – Other, similar to the Plaintiff's case against the Defendants, were assigned to Judge Rearden between 1/1/2023 and 8/29/2024 (including Plaintiff's). In 10 of them service of process was done in time period up to 3 months since the initiation (including one case with an IFP request). From the other 10 cases, 3 were dismissed (2 voluntarily), 1 was transferred to another court, and for 6 Plaintiff has no information about service of process. In comparison service of process in Plaintiff's case has not even started in 26 months since the initiation of the legal action – a striking difference in comparison. See Exhibit Plaintiff's case also is the only case between them in which the court did not respond to a filing for period of more than two years, and where the Court was silent in regards to a filing it was for a much shorter period. In regards to the complexity of the case, and other considerations see the argument bellow. The pending decision on Report and Recommendation, and the Plaintiff's Objection (ECF, Nos. 7, and 8) prevents Plaintiff, among other things, to serve the summons on Defendants, and to proceed with the litigation.

388.    The court / court's Pro Se Unit proceedings in regards to the summons in Plaintiff's cases are contrary to the Federal Rules of Civil Procedure, Rule 4(b) ("On or after filing the complaint, the Plaintiff may present a summons to the clerk for signature and seal. If the summons is properly completed, the clerk must sign, seal, and issue it to the Plaintiff for service on the defendant. A summons—or a copy of a summons that is addressed to multiple Defendants—must be issued for each defendant to be served."), and opposite to the court acceptance of many cases where summons are filed together with the complaint, or soon after.

389.   As mentioned above S.D.N.Y. Pro Se Intake Unit did not accept Plaintiff's summons, and had told Plaintiff to wait for a Judge order in order the summons in his Gyro case to be issued (see Gyro ECF, No. 12) which became an issue when the case was reassigned to Judge Woods. Judge Woods issued an Order to show case on 7/30/2018 (Gyro ECF, No. 10) because "Plaintiff has failed to file proof of service as to any Defendant in this action." Later the court gave new deadlines for serving of process in response to Plaintiff's Letter (Gyro ECF, Nos. 12, and 14), and the summons were issued without specific court order.

390.   In Plaintiff's case against the United States et al Defendants directly interfered with Plaintiff's efforts to get the summons issued, and with the court's Pro Se Intake Unit. Under Defendants influence the court did not issued all summons, those issued were wrong, than obstructed Plaintiff's efforts to correct them – including when Plaintiff went to the court's building with printed proposed summons (then Defendants agents were in the court too). Relevant events include the following:

(2) Magistrate Judge Cave's Report and Recommendation to dismiss Plaintiff's action Dimitrov v. the United States of America et al, 1:23-cv-6451 (S.D.N.Y., 7/25/2023) (ECF, No. 7) shows the Defendants influence on the court. Such influence is inferred by the Report's apparent but otherwise unreasonable bias against Plaintiff, including its material misrepresentation of the Plaintiff's claims; apparent legal errors in regards to the application of standards for review of a pro se complaint, for a frivolous case, and for dismissal under F.R.C.P., Rule 8, as well as the erroneous position of the Report that any broad conspiracy claim is frivolous; and the questionable preparation and filing of the Report as timing. All those infer Defendants influence on the court, because otherwise it would mean that Judge Cave (and Judge Rearden) are incompetent and/or biased against Plaintiff.

391.   One business day after Judge Rearden referred Plaintiff's case to Magistrate Judge Cave for "General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and settlement)" (ECF No. 5, from Friday 8/11/2023), on Monday 8/14/2023 Judge Cave filed Report and recommendation to dismiss Plaintiff's legal action against the Defendants (Dimitrov v. the United States of America et al, 1:23-cv-6451 (S.D.N.Y., 7/25/2023) ECF No. 7). That suggests that the case was supposedly read, analyzed, decided, comparable legal cases were found, and the

Report was written by Judge Cave in one day. To the extend it is because the case is simple, and consequently one day is sufficient for all that there is no possibility the misrepresentations in the Report of the Plaintiff's claims to be unintentional. To the extend the case is indeed complex – that means the decision against Plaintiff was made before analyzing the complaint (there is apparent lack of time for a proper analysis). However, regardless of the evaluation of complexity of the case, the fact that the court's decision on the Report, and on Plaintiff's objections (ECF No.8) is pending after two years or more than 730 days, renders the one day spent on Report's analysis (or even if we generously ad the weekend – three days) obviously inadequate, and points to external influence on the decision. Because there is no base for bias and/or malice toward Plaintiff from Judge Cave or from Judge Rearden the Defendants' influence on the court is inferred. To state the opposite means that both Judge Cave and Judge Rearden are incompetent and/or biased against Plaintiff.

392.     The Report is contrary to the standard due for pro se pleadings which requires interpretation that raises the "strongest claims that they suggest"1. However the Report's interpretation of Plaintiff's claims searches and creates the weakest claims that can be raised based on small portions selected from the complaint. The bias against Plaintiff is clear when the claims-as-presented-in-the-Report are compared to his actual claims (see ECF No.8, table on pages 2-11, and p.33-36), and even better to the complaint and the incorporated Relevant history (ECF Nos.1, 8-1 and 8-2). That shows that the Report was not intended as a report2 of what are the Plaintiff's claims, but as a base for the recommendation to dismiss the case, and to present Plaintiff as delusional and/or irrational. If it is not because of Defendants' influence on the court, than Judge Cave doesn't know how to apply the proper standard.

393.     The Report's material misrepresentation of the Plaintiff's complaint "subverts the integrity of the court itself." The Report does not even mention all Plaintiff's counts, let alone providing any

analysis and reasoning why they are to be dismissed (Judge Cave seems to completely missed the 'legal theory' of the complaint as presented in its 17 counts); it omits most of the Plaintiff's arguments; mixes paragraphs and concepts without rational; quotes portions out of context; and compares the complaint to cases that are inadequate as comparators.

394.    The Report implies that Plaintiff's claim for a broad conspiracy by itself is irrational and frivolous and that is apparently wrong. If that claim was not made because of the Defendants influence, then Judge Cave shockingly lacks knowledge, or is deliberately blind about the common Defendants practice to act in task forces3, and implement programs as CVE or anti-gang programs4 which involve many parties (including businesses, communities, schools, and more). Any subject of such activities apparently faces multiple government agencies (federal, state, and local), and private parties acting in concert against him/her. Consequently when those activities violate the US constitution and laws they are de jure and de facto conspiracy which can be, as in Plaintiff's case, a criminal conspiracy under 18 U.S.C. §241.

395.    Similarly the Report implies that claims based on the Defendants' use of directed energy (sound waves, electricity, or electromagnetic radiation, referred bellow as 'DE') against Plaintiff are irrational ignoring the fact that weapons using DE have been public for a while, and recently were again in the public domain in relation to the 'Havana syndrome'. The effects of electricity on human body, and the health effects from radiofrequency radiation exposure are also in public knowledge. Based on the above a claim about DE attacks is apparently not frivolous. See IV.11.B.

396.    The Report is clearly erroneous in regards to its recommendation to dismiss the case because "the Complaint... is prolix and violative of Rule 8 [and] should be dismissed on this independent ground." ECF No.7, p.6. Absent Defendants' influence to explain such recommendation, that would mean that Judge Cave is incompetent[95] and/or biased against Plaintiff.

---

95

(3) Judge Rearden has not ruled on the Report and the Plaintiff's Opposition to the Report and Recommendations (ECF, No.8) for more than two years, and in practice unreasonably denies Plaintiff access to the court, a fair hearing, and remedy for the violations he claimed. That further supports the inference of Defendants influence on the court unless Judge Rearden is indeed biased against Plaintiff.

397.     Judge Rearden has to determine if Plaintiff's claims in Dimitrov v. the United States of America et al, 1:23-cv-6451 (S.D.N.Y., 7/25/2023) are frivolous, and permit the case to proceed with service of process (serving summons on Defendants), or if all claims are frivolous to dismiss the case.

398.     In the light of the fact that the Report was prepared and filed in one business day Judge Rearden's silence on Plaintiff' Opposition for more than 730 days (two years) and counting is obviously unreasonable.

399.     Because of the Plaintiff's Opposition to the Report a dismissal by Judge Rearden will allow him to raise an appeal. In that context the unreasonable delay of Judge Rearden's decision on the Report and the Opposition make perfect sense as continuation of the Defendants' policy/practice to suppress Plaintiff and his petitions (Defendants activities against Plaintiff have never ceased, including Defendants' efforts to "convince" Plaintiff to stop since the initiation of the litigation on 7/25/2023, including explicit statements in that regard; the Defendants' many-years-long practices and policies in regards to Plaintiff and his petitions; and more).

(4) Judge Rearden has ignored Plaintiff's letter from 7/24/2024 (ECF, No.14) asking for ruling on his opposition to Report and Recommendation (ECF, No. 8), and other relief due to the ongoing harm he suffers from Defendants activities.

400.     The Court has not responded in any way to Plaintiff's letter to Judge Rearden from 7/24/2024 (ECF, No.14). After this letter the Court is aware about the harm to Plaintiff caused by the Defendants activities since the initiation of *Dimitrov I*, and the lack of any actions by the Court indicates at least its deliberate blindness in that regard.

(5) The court's unjustified delays violate the due process. Furthermore because the court is aware of the ongoing injury to Plaintiff (see ECF, No.1, 251, No.8-1 and 8-2, No.14), that amounts to acceptance and compliance with the Defendants policies and practices violating Plaintiff's civil rights by remaining willfully blind to them.

401.    To the extend the complexity of the case is stated as a justification for the delays – that would be admission that Judge Cave's Report (ECF, No. 7) is inadequate and with apparent bias against Plaintiff. Admission that the Report was not intended as a true report and analysis of the Plaintiff's claims (it was supposedly done for one business day) but as a necessary step before a decision to dismiss the case which had been made in advance. But even if the complexity of Plaintiff's case is an issue relevant to the Judge Rearden's pending decisions – more than two years is a very long and more than enough time for consideration. Plaintiff found no other case in the category Civil Rights – Others (as the Plaintiff's case) which was assigned to Judge Rearden in the period of 1/2023-8/2024, and in which the court did not respond or act for prolonged time.

402.    Plaintiff's interest in the litigation against Defendants is obvious – he has been and is in serious hardship due to Defendants' activities (see principle of evaluating the constitutionality of the proceedings in the US Fourth Report listing Supreme Court cases initiated by government).

403.    To the extend government has legitimate governmental interest for the activities against Plaintiff, the governmental interest in conducting these court hearing shall also be very strong because then Plaintiff will be on the record, and any falseness in his statements can be scrutinized.

404.    The court as independent and impartial institution shouldn't have had interest in the case other then providing the due process including the administrative interests in handling effectively the proceedings. There is no reason for the denial of hearing for Plaintiff's case apart from silencing, suppressing, and as punishing him for his legal actions. Therefore by (de facto) not allowing the adversary hearings in Plaintiff's case the US violates both CCPR, Art. 14.1 and the US constitution (due process), and shows Defendants' influence on the court.

**(iii) Degrading treatment and the intimidation of Plaintiff when he was in the court's buildings or on a call with the Pro Se Unit. For example:**

**(iv) The S.D.N.Y. treatment of Plaintiff and his legal actions matches Defendants' policy and practice in regards to him and his petitions. See more above at C.(1)**

405.    Defendants' conduct in regards to Plaintiff's reports, complaints, and other verbal or written petitions (or any other Plaintiff activity) demonstrates that there is a policy / practice to prevent, ignore, minimize, or obstruct them (by demonstrated lack of good will, detrimental interpretation if any, and more. See above IV.9, and more). Furthermore other parties also follow the same policy in regards to Plaintiff and his communications and complaints. See for example Plaintiff's complaints with DOJ OIG, his communications to Attorney General, to DOJ NSD, and more.

406.    The conduct of the Court's staff aiming to chill Plaintiff's research in its Records Management, and his visits to the court in general is consistent with the Defendants' efforts to prevent Plaintiff's legal actions. The court's Pro Se Unit conduct in regards the summons in Plaintiff's cases matches Defendants' actions aiming to prevent Plaintiff from fulfilling all legal requirements for his legal actions (see administrative claims with the FBI, ECF, No.1, 8-1).

407.    The court minimizes Plaintiff's complaint as demonstrated by the Report and Recommendation (ECF, No.7). Instead of searching for its strong points the Report construed the complaint as something delusional and irrational, significantly reduced its meaning, and misrepresented its claims. Similarly in the Plaintiff's case against Gyro et al. Judge Woods order from 6/25/2019 (Gyro ECF, No.110) construed detrimentally Plaintiff's objections (Gyro ECF, No.97); erroneously claimed that Judge Freeman did not denied Plaintiff's Motion to correct/amend transcript, Gyro ECF. No. 77 ignoring a text order (Gyro ECF. No. 89) which explicitly stated "Plaintiff's motion is denied"; and contradicted Federal Rules of Civil Procedure, Rule 26(a)(1) (A) as interpreted at the 2000 Committee Notes on Rule 26.

408.    In totality of circumstances the court shows bad will toward Plaintiff, ignores his motions, letters, and obstructs his case against Defendants. For example the court ignored Plaintiff's motion to issue summons to named Defendants (ECF, No. 4) and did not list the named Defendants in the initial versions of the issued summons. The court's unreasonable lack of response to Plaintiff (ECF, Nos., 8, 14) for very long time (the response is still pending) in practice thwarted Plaintiff's case against Defendants, which considering the ongoing harm, is very detrimental to Plaintiff.

409.     The Court has no legitimate interest in obstructing Plaintiff's legal actions but submits to the executive branch's goal to suppress Plaintiff's legal actions and to evade responsibility. Plaintiff's case against Defendants would not open the door for large number of similar litigations, nor Defendants would be limited in any way in their legitimate pursuit of any legal goals.

**(v) Because of the Defendants' direct and/or indirect interference with S.D.N.Y. the court is neither independent nor impartial in regards to Plaintiff and his legal actions.**

410.    Defendants interfere with the court's proceedings in Plaintiff's legal actions with continuous influence, pressure, and/or disruption of both (a) Plaintiff and his work on legal materials and filings (see above), and (b) the court. That in effect makes the Court neither independent nor impartial, and violates the fundamental fairness in regards to Plaintiff's legal actions. There is huge disparity of power in Plaintiff's case, which is further amplified by Defendants' deliberate actions to obstruct Plaintiff's legal actions.

411.    De facto Defendants' interference systematically frustrate Plaintiff's access to courts: in addition to Defendants' demonstrative interference and retaliation to Plaintiff's work on case-related and legal materials and filings since 2016 (see IV.11, IV.9, and more), the court holds Plaintiff's lawsuit against Defendants at a very initial stage (before serving the summons) and does not allow it to proceed for more than two years and counting.

412.   Regardless of the Defendants' motivation there is no exception that could justify the intrusion on Plaintiff's right to fair hearing by competent, impartial, and independent court.[96] Defendants' interference with the federal court of Southern District of New York in regards to Plaintiff's cases violates the US Constitution, multiple laws, and CCPR, Art. 14. There is no applicable exception that can make lawful the Defendants' interference with Plaintiff's right to petition the government.

## 11. Defendants conspire to systematically degrade Plaintiff, including by deliberate infliction of physical and mental pain and suffering for 13 years and ongoing.

413.   Defendants[97] subject Plaintiff to degrading treatment with different intensity in time, and cause him physical and mental pain or suffering which continue for more than 13 years. Defendants' conduct degrading Plaintiff is planned, coordinated, and the effects amplify each other and accumulate in time.

414.   Defendants' practices towards Plaintiff resemble post-war UK 'internal security' techniques "designed to make the detainee "feel that he is in a hostile atmosphere, subject to strict discipline, and completely isolated, so that he fears what may happen next;" Id.11"[98]

415.   Physical pain and suffering caused by Defendants include, but is not limited to, the pain and suffering inflicted by their attacks on Plaintiff with directed energy ('DE') (repeating electric shocks, first degree burns, and more); or the combination effects due to the reduction of his pain-threshold from the 8-years long sleep deprivation of Plaintiff, as well as its physical effects. See bellow A and B. Defendants inflict mental pain or suffering on Plaintiff with threats to kill or destroy him, subjecting him to sleep deprivation, interfere with his senses, sound and DE attacks, attack his identity, humiliate, ostracize him, sabotage and frustrate his activities, and more. See

--------

96
97
98

bellow A-C, and IV.12. The degrading effect and the distress from other Defendants' activities is presented in the other sections.

416.    In addition to the above the degrading treatment of Plaintiff includes also his alienation, discrimination, sabotage of his activities and economic prospects (loss of incomes), his victimization, and more. Defendants deny in practice healthcare to Plaintiff (see interference with primary physicians), interfere with the dental services he receives in terms of quality, and obstruct his legal means to address his grievances (IV.9-10).

417.    Defendants' conduct is 'degrading' because it humiliates or debases Plaintiff, demonstrates lack of respect and diminishes his dignity, arouses fear, anguish or inferiority.[99] Furthermore it causes physical and/or mental pain and suffering to Plaintiff, and at certain periods Defendants' practices individually or in combination constitute inhuman treatment or torture because they are deliberate, cause intense suffering, and even injure Plaintiff's body.[100]

*A. Defendants deprive Plaintiff of getting enough sleep as part of their concerted efforts to systematically degrade and harm him.*

418.    Defendants deprive Plaintiff of sleep[101] in parallel to their other activities against him since 2013, and the effects have accumulated in time[102]. In addition Defendants increased the intensity of sleep deprivation (number of interruptions[103] per night, reducing the amount of Plaintiff's sleep time, changing his sleep cycle[104]) in retaliation to his start of regular record of relevant events in the end of 2014, again after he started working on legal and case materials (April 2016), and later in retaliation to his contact with multiple New York-based lawyers (August 2017). See IV.10, and IV.11. B, ECF No. 8-2 at 1983-1989, and more. As a result of Defendants' actions Plaintiff suffers chronic sleep deprivation for about 8 years and ongoing.

---
99  *Guide on Article 3 of the European Convention on Human Rights*, ECHR, Updated on 31 August 2024
100 Id.
101
102
103
104

419.    Defendants apparently deprive Plaintiff of sleep in order to weaken him, to make him disoriented and compliant[105], to degrade his cognitive functions such as thinking, planning, and other[106] (see Defendants' explicit statements that they want to 'slow him down', 'delay', 'suppress', 'depress' him), and to demonstrate their of control over the situation[107] (see Defendants provocative campaign "You can't stop us." see IV.9(a)(3)).

420.    In September-October 2013 Teaneck police, and FBI overtly interfered with Plaintiff's sleep:

421.    In the period 2013 – 2015 Defendants repeatedly awakened Plaintiff during the night with calls (see ECF No.8-2 at 1923, IV.11). Since about February 2015 – after Plaintiff started a handwritten log of relevant events (at the end of 2014), and increased his use of Blue Iris security software, and Olympus recorder – Defendants have began to keep Plaintiff awake, or interrupt his sleep regularly with knocks, pops, pipe bangs/clanking, loud talk, electronic beeps, and similar. Since the end of March 2016 in retaliation to Plaintiff starting to work on his legal cases Defendants demonstratively intensified their interference with Plaintiff's sleep overtly talking about that under his windows:

422.    When in August 2017 Plaintiff started reaching to New York-based lawyers for his legal case against Gyro Defendants explicitly talked that their purpose is to "deteriorate" (8/17/2017), "suppress" (8/23/2017), "annoy" Plaintiff (8/31/2017), and make him "stop" (8/1/2017, 8/6/2017, 8/7/2017, 8/18/2017). In that regard since the end of August 2017 Defendants have started using DE against Plaintiff overtly (initially for sleep deprivation only. See 1718 *et seq.*, IV.11.B) in addition to all other activities. Defendants confirmed that that was their intention on 8/24/2021 when while Plaintiff was working on the effect of DE on his sleep pattern at 9:40PM Defendants in ap.B2 commented: "We thought we'll crush him." ECF No.8-2 at 1988.

---

105
106
107

423.    Defendants continue to deprive Plaintiff of sleep every day, including when he is in Bulgaria, for

many years and counting, regardless of his reports, notices and lawsuit(s) against Defendants.

**(1) Defendants deliberately deprive Plaintiff of sleep in order to ruin his health, and deteriorate his cognitive functions (thinking, planning, and more).**

424.    At least in part Defendants use sleep deprivation as an attack on Plaintiff's mental health[108]. They

expressed a few times explicitly their intention to deteriorate Plaintiff's cognitive functions and

mental health ('depress him', 'slow him down' as for example on 5/14/2017, 11/10/2022,

1/20/2023 (ECF No.8-1 at 82, 163; No.8-2 at 5909, 5913), 8/15/2024 ("Kalin... depress...")), and

labeled Plaintiff "crazy" in obvious effort to discredit and otherwise diminish him and his claims,

and to trigger Plaintiff's response.

425.    Defendants repeatedly paint Plaintiff as crazy including by responding to their own false

accusations and fabrications (6/30/2013, 5/20/2017, 11/10/2021), directly saying that Plaintiff is

crazy (9/8/2017), including because he did not react (9/9/2017, 4/11/2018). Defendants were very

direct in some occasions "Drive Kalin crazy." (5/25/2024).

**(2) Defendants overtly demonstrate their intend to deprive Plaintiff of (enough) sleep apparently to make him hostile and provoke him.**

426.    Defendants regularly tease Plaintiff that he 'can not sleep', or commented that he 'doesn't sleep'

after awakening him, or after they had kept him awake during the night. Those remarks are

provocative demonstration that Defendants watch him, and deprive him of sleep. Their intention

to provoke him was very clear after 11/3/2016, when Plaintiff started transcribing recordings of

Defendants for his legal case. Then Defendants awakened him by turning the heating off (getting

cold inside), and/or with knocks, and for about two weeks mixed the provocative comments about

Plaintiff's sleep with comments whether he heard the knocks or felt the cold.

427.    Since 9/7/2017 Defendants have started using a combination of DE and sound attacks to awaken

and/or keep Plaintiff awake for hour(s) since he got in bed, before or at about dawn, and again

108

early in the morning. After awakening Plaintiff Defendants repeatedly provoked him including by commenting that he "can't sleep" (9/27/2017, 10/16/2017, 10/21/2017, 10/29/2017); that he "can't stop" them (9/14/2017), "Can't fight." (10/1/2017), and that he "have to stop" working on his case (9/8/2017, 10/5/2017). Defendants' use of DE led to significant changes in Plaintiff's sleeping pattern since 9/19/2017.

428.   Since 9/21/2017 Plaintiff used cardboard plate with aluminum folio stuck to it as a shield under the bed (but not grounded, and with relatively small size, so effects were not significant). From about 10/8/2017 Plaintiff used rubber plates on the bed for insulation but that could neither shield from an electric field (EF), magnetic field (MF), nor from an electromagnetic field (EMF). Also Plaintiff tried to evade / reduce the effects of DE attacks by (1) sleeping at places other than his bed (for example in his corridor 10/23/2017), (2) sleeping over wooden plate and pillows (since 10/24/2017), and (3) sleeping with earplugs since about that time.

429.   Defendants' regular remarks about Plaintiff's sleep reduced as frequency since about 2018.

430.   Although reduced as frequency Defendants' provocative comments in regards to the sleep deprivation of Plaintiff have never stopped. For example on:

431.   Since 2017 Defendants' practices of depriving Plaintiff of enough sleep have changed significantly his sleep pattern in terms of the sleeping routine, sleep-hours, location, and more.

*B. Defendants have deliberately directed energy beams (DE) at Plaintiff, whether in public or his apartment, in order to contact him and/or his chattels, and cause harm, pain and suffering, and/or substantially diminish his capacities for many years.*[109]

432.   The knowledge about DE (electromagnetic, electric or magnetic field/radiation (respectively 'EMF', 'EF', 'MF'); particles; or audio waves), induction of electricity, effects of electricity on human body (depending on the current and its frequency effects include unpleasant tingling, painful shocks with or without having muscular control, muscular contractions, ventricular

---

109 ..

fibrillation, and death), as well as the health effects from radiofrequency[110] radiation exposure (such as electro/nerve stimulation, and rapid heating – the effect used in microwave ovens) which had made necessary the FCC regulations, are public knowledge.[111] Weapons using focused EMF, plasma, sonic, or laser beam have also been public for a while[112], and recently were in the public domain in relation to the 'Havana syndrome'. Similarly the use of electricity and burning for torture is well known for many years.[113]

433.    Defendants also know with certainty that a DE beam with sufficient power directed at Plaintiff will penetrate the walls, ceiling, floor, or windows of Plaintiff's apartment, and will charge the objects in its path (including Plaintiff's body or certain locations on his body), could induce electric current(s) in those objects, cause rapid heating / burning at targeted location, and more. In fact "[p]olice officers often use handheld" Stingray (used here and bellow as umbrella term for 'cell simulators') which emit DE, and "searched nearby homes by transmitting spoofed cell tower signals through the walls."[114] And as Marc Polymeropoulos, CIA, stated Stingray-kind of devices can harm a person when they "tuned up the juice too much".[115]

434.    Since 8/25/2017 Defendants' use of DE against Plaintiff is overt in a sense that the effects on Plaintiff (pain and suffering due to electric shocks, significantly charging specific locations, burns, unpleasant tingling ('needles' sensations), involuntary muscle fibers' contractions, and more) have become apparent as result of application of external force. Initially Plaintiff determined that by putting his hand at the attacked location on his body and found that the effects 'moved' on the hand in demonstration that the source is external. Later (since May 2018) he detected the DE using variety of detectors/meters – LawMate RD-10, K-68 RF detector, GQ

---

110
111
112
113
114
115

Multi-field EMF 390(v2) meter (see ECF No.8-1 at 983), Craftsman Digital Multimeter 82141, and Sound Level Meter SLM-25.

435.    Defendants have started the overt use of DE against Plaintiff in retaliation to his multiple contacts with lawyers, and his work on case materials for his legal actions against Defendants in August 2017, and since then they have never stopped (apart from some relatively short pauses). Among other things in August 2017 Defendants also disrupted Plaintiff's search for lawyers (see 1718 *et seq.*), demonstrated that they are FBI/police (8/2/2017, 8/4/2017, 8/10/2017), explicitly stated that their purpose is to "deteriorate" (8/17/2017), "suppress" (8/23/2017), "annoy" Plaintiff (8/31/2017), and make him "stop" (8/1/2017, 8/6/2017, 8/7/2017, 8/18/2017). Defendants were also explicit about their intent to use DE against Plaintiff "You need some beam tonight." (8/12/2017).

436.    Defendants' use of DE is apparent by (1) the effects on Plaintiff and objects on the beams' path (electric charge and discharges up to electric shock levels, pain, burns, involuntary muscle fibers contractions, and more) – they are consistent with the known DE effects, including the injuries on Plaintiff's body; (2) DE beams, induced electricity, or electric charges have been detected and documented by Plaintiff's EMF and sound meters/detectors, and are far above the normal; (3) DE beams repeatedly target/follow Plaintiff in general, and specific location(s)[116] on his body, they change in response to his locations and activities (using DE as punishment); and (4) Defendants have made a few statements about using DE, or implied such use.

437.    Defendants are fully aware of the electric shocks, burning, swellings and/or other effects caused by their use of DE against Plaintiff – both from their surveillance on Plaintiff, and from his petitions, including *Dimitrov I*. Despite that Defendants' use of DE against Plaintiff continue without remedy, and even intensified in retaliation.

---

116

**(1) Defendants' DE attacks on Plaintiff, and a few of their effects are regularly detected and documented since May 2018.**

438.   Since May 2018 Plaintiff has been using variety of detectors and meters as LawMate RD-10, K-68 RF detector, GQ Multi-field EMF 390(v2) meter (see ECF No.8-1 at 983), Craftsman Digital Multimeter 82141, and Sound Level Meter SLM-25 to detect and document Defendants attacks. Plaintiff also uses the cameras on his phones, Canon Ti4, Blue Iris-based security system, and makes handwritten notes to document those attacks and their effects.

439.   As illustration of Defendants' detected and documented use of DE against Plaintiff see the events on 4/29/2025 (after Defendants targeted his head from ap.A3 the right side of head was charged 1002 V/m max – about 10 times higher than 30 minutes before, while the left side was charged less – demonstration of the direction of the DE attack), or on 7/23/2025 (after Defendants targeted Plaintiff's head with DE beam its electric charge increased about 13 times (from 79 V/m up to 1022 V/m)). In both examples the existence of external energy sources which caused pain, electric shocks, and abnormal electric charge at limited location(s) on Plaintiff's body (detected and documented), and the fact that those sources are at Defendants in aps.A3, G2, and B2 (and outside), is obvious. Especially considering the above together with the other evidence in that regard – as Defendants' statements for example, and more.

(i) Absent Defendants' DE attacks the electric charge of Plaintiff's body is bellow 100 V/m.

440.   In majority of cases Plaintiff scanned his body after feeling the effects of Defendants' DE attacks – burning, pain, pressure and/or more. However in a few occasions he scanned with idea to establish the charge of his body when he did not feel the immediate effects of DE attacks – that charge is referred here as the 'base-level'. Please note that in all cases quoted here (unless specifically stated) Plaintiff used the same GQ Multi-field EMF 390(v2) meter, and measurements were taken on body surface.

441.    Plaintiff found that the base-level electric charge of his head (when there was no DE attacks) is

mostly bellow 100 V/m. For example the maximum charge at Plaintiff head was 65 V/m

(2/1/2025, 9:08AM); 110 V/m max (3/2/2025, 6:37PM); less than 100 V/m (3/11/2025,

10:30AM); 74 V/m max (3/12/2025, 11:17PM); less than 100 V/m, but for back of head 132 V/m

max (4/29/2025, 5:42PM). See Timeline of events.

442.    Similarly all other locations on Plaintiff's body such as chest (front and back), belly, or legs were

charged bellow 100 V/m. See for example:

(ii) Defendants' attacks on Plaintiff with focused DE beams led, among other things, to the
abnormal electric charge of certain locations on his body – up to about 1040 V/m or more than 10
times higher than the base-level, and up to about 33 times higher than the FCC limits[117] of
exposure of general public to EF.

443.    The unusually high charge of certain locations on Plaintiff's body is apparently result of

Defendants' use of focused DE beams to attack him – the highest values detected exceed 1000 V/

m, which is about 400 times higher than the average EF in Plaintiff's apartment, and about 17

times higher than the charged also above the FCC limits Plaintiff's floor and bed. See Exhibit

Electric field and charges detected in Plaintiff's apartment in 12/2020-2023. A few more recent

examples follow.

(a) Examples of abnormal electric charge (about 1000 V/m or more) at the surface of Plaintiff's
body from the beginning of 2025.

(b) Defendants' attacks apparently disrupt the normal distribution of the electric charges within
Plaintiff's body, charge certain locations with electricity, and induce electric currents.

444.    Defendants' use of focused DE beams is apparent especially in cases when for example small

area on Plaintiff's head is charged many times higher than the areas around it. Such redistribution

of electric charges in Plaintiff's body can not be caused in another way. For example on

1/18/2023 the targeted location was charged 6 times higher than the corresponding area; on

---

117

4/29/2025 it was about 2 times higher; on 5/19/2025 targeted location was charged more than 9 times higher than the area near it.

(iv) Defendants directed at Plaintiff DE beams with abnormal pressure and/or radiation – EF, MF or EMF.

445.    Plaintiff's GQ meter repeatedly detected DE beams with power density of 34419 mW/m², which is about 17 times higher than the FCC limits for exposure. There are a few more abnormal things about that as, for example, the fact that the detected maximum power density from different directions is exactly the same – 34,419.445 mW/m². On 1/28/2025 when GQ was right next to Plaintiff's phone (2-3 cm) the detected maximum power density at that proximity was 200-400 mW/m², while 34419 mW/m² (which is about 86 times higher) was detected at least 2 meters distance from the floor of ap.B2. The significance of the above is clear because in principle EF, MF or EMF rapidly reduce with distance[118], but for lasers[119]. See more at Exhibits for EF, MF, and EMF.

446.    Also significant, even though it is not accurate because it's above the range of SLM 25 (30~130dBA), is the detection of very high pressure from Defendants in ap.B2 (SLM 25 usually pointed toward B2) for a short time.

447.    Especially notable is that Defendants and parties in concert targeted Plaintiff with similarly very strong focused beams at other locations, as for example while he was in Bulgaria (8/31/2025) he detected at his head continuous focused EF of more than 1000 V/m.

(v) Defendants' DE attacks have charged with electricity and /or induced electric currents in certain objects (bed, chair), or locations in Plaintiff's apartment. The EF from Defendants in ap. G2 and/or B2 penetrating into his apartment is also above the FCC limits.

448.    Due to Defendants' DE attacks in correspondence to Plaintiff's work in preparation of his Complaint with the S.D.N.Y. the electric charge of his bed's during 2023 increased: his bed was predominantly charged in 50-60 V/m range in January (about 2 times higher than FCC limits),

---

118
119

since March it was in the range of 60-70 V/m, and since July – 70-80 V/m range. The high

electric charge of Plaintiff's bed forced him to change the place he sleeps, and to shield himself

(putting grounded aluminum plates on the bed). See Exhibits for EF, MF, EMF. ECF No.8-1 and

8-2, and more.

449.     The EF from Defendants in ap.G2 and B2, or from other directions detected within Plaintiff's

apartment demonstrates that it is emitted neither from regular appliances nor wiring – as physics'

principles dictate the EF strength is constant, and independent from electric consumption.

However the EF detected from G2 changes significantly in time with periods when detected EF

above the FCC limits invade Plaintiff's apartment up to 80 cm above the floor (as on 5/9/2025).

That indicates that the source(s) emit very strong EF directed at Plaintiff considering both that EF

is easily shielded, and that the thickness of the floor (59 cm). Similarly the EF from ap. B2

changes: for example in 2022 the EF from ap.B2 measured at about 2 meters above floor (area

above head level when staying straight) was between 3 V/m and up to 65 V/m (2.3 times higher

than FCC limits).

450.     The timing and pattern of change of ap.G2 and B2's EF shows that it is in retaliation to Plaintiff's

legal actions. For example the timing of the G2's EF increase since the middle of June 2022

followed relatively accurately Plaintiff's work on his Notice of claims and Administrative claims

with the Defendants, and after the filing (on or about 11/10/- 11/11/2022) the above-the-limits EF

from G2 continuously penetrated Plaintiff's apartment up to 25-45 cm above the floor till about

the start of holidays. As an illustration about the EF from ap.B2 – on 3/8/2023 when Plaintiff

started working (again) on exhibits for the swellings he had had due to Defendants' directed

energy attacks for about 24 hours the EF from ap.B2 at two meters above floor was 60 V/m (the

days before and after that EF there was less than 5 V/m). Another example is the continuously-

above-the-limits EF from ap.B2 since June 2023 when Plaintiff started finalizing the court

documents for this action. There is coordination between G2 and B2 as indicated by, for example, the increase of EF (above the limits) from ap.B2 and decrease of EF from G2 for about two months since July 25, 2023 when Plaintiff started *Dimitrov I*. See Exhibits for EF, MF, EMF. ECF No.8-1 and 8-2, and more.

**(2) DE beams target Plaintiff, and specific locations on his body repeatedly.**

451.   Notable in that regard are the events on 5/7/2025 because the same location – on Plaintiff's back next to his heart – was targeted at the same day both inside the apartment and outside.

452.   Plaintiff's eyes and head in general are regular targets of Defendants' focused DE attacks, and for different periods Defendants targeted also his knees, shoulders, hips, kidneys, and buttocks. And less frequently – his heart. See ECF No.8-1 and 8-2, and more.

**(3) Defendants have made a few explicit and implicit statements about using DE against Plaintiff since 2013.**

453.   In comparison to other concepts, Defendants are very restrained to talk directly about DE in Plaintiff's presence. That makes the exceptions more notable, as for example their statements on 8/12/2017 ("You need some beam tonight."), 6/23/2020 ("Hot ray?" "All that. Got us."), or on 6/7/2024 ("They put him in the microwave."). See examples bellow:

**(4) Defendants have started using DE against Plaintiff while he was outside his apartment since he went for the first time to the FBI New York Field Office building on 10/31/2017.**

454.   Notable are recent examples as on 5/7/2025 (see above), 8/25/2025 while Plaintiff flied to Bulgaria, or when he was there (8/27/2025, 8/31/2025).

**(5) The effects of Defendants' use of DE on Plaintiff**

455.   Defendants' attacks on Plaintiff with DE beams (1) inflict immediate pain and/or long-lasting injury and pain by electric shocks from rapid charge / discharge, with induced electric currents, or burn him due to the rapid heating. Long-time injuries also occurred from the Defendants'

targeting of specific locations on Plaintiff's body for prolonged time; (2) cause to Plaintiff

significant physical and mental suffering (apart from the pain and injuries) such as ongoing

unpleasant tingling ('needles' sensation), pressure, involuntary muscle contractions, deteriorate

his mental functions (tiredness, blank-state), and more; and (3) interrupt and disrupt Plaintiff's

legal activities (including his work on legal and case materials), and prevent him to rest and sleep.

See ECF No.8-1 at 1005 *et seq.*. Exhibits for EF, MF, EMF, Timeline of events and more.

<u>(i) Defendants' attacks on Plaintiff with DE inflict immediate pain and/or long lasting injury and pain.</u>

456.    The pain[120] Plaintiff experience due to Defendants' DE attacks is frequent and everyday event for

many years. In a few cases the harm on Plaintiff's skin caused by focused DE beams is visible as

(1) red spots and/of swellings with varying individual size from 1-2 mm up to 2.5 cm, which fade

usually in about couple of hours; or (2) long lasting pigmentation at small areas. See Exhibits of

Spots and swellings. There are two biophysical mechanisms of those injuries: a burn due to rapid

tissue heating, and/or induced urticaria.

*(a) Defendants burn Plaintiff with focused DE beams with frequency above 100 kHz[121].*

457.    The oval red spots and swellings on Plaintiff's body appearing after a Defendants' attack with DE

beams, in addition to the very focused painful burning sensations during and after that, indicate

that those are first degree burns caused by, most probably, laser beams (as a laser beam heats

forward, while at its rear regions are cool[122]).

*(b) Defendants' DE attacks induce urticaria / hive at the targeted area on Plaintiff's body.*

458.    Defendants' DE beams also caused urticaria – small swelling(s) with varying individual size from

1-2 mm up to 2.5 cm at the targeted area on Plaintiff's body. "It is quite easy to diagnose

[urticaria] based on clinical appearance and anamnesis."[123] Urticaria is a disease with rapid

---

120
121
122
123

appearance of itchy red plaques/wheals on the skin which typically fade within 24 hours, but has profound impact on quality of life.[124] There are a few kinds of induced / physical urticaria which include solar urticaria caused by exposure to electromagnetic waves[125]: UV and/or visible light, heat contact urticaria caused by localized heat, or vibratory urticaria caused by vibrations.[126] As in the Plaintiff's case, an individual wheal in induced urticaria typically lasts between 30 minutes to 2 hours.[127] See ECF No.8-1 at 1007 *et seq.* and more.

*(c) Pigmentation at the most targeted with DE areas on Plaintiff's body.*

459.    Skin pigmentation is known biological effect of exposure to DE in visible and ultra-violet specter[128]. When Plaintiff arrived in the US in 2011 he had no areas with pigmentation on his head. But since Defendants started regular DE attacks on Plaintiff at some of the most frequently targeted areas on his head – top, top-left and top-right side of head, and the area next to his right eye – brown up to dark-brown spots have formed and are constantly present. Notably after Plaintiff's Notice of claims the pigmentation started to fade. ECF No.8-1 at 1017.

460.    Based on the above it is clear that, if not the sole cause, Defendants' DE attacks play significant role for the appearance of those spots.

(ii) Defendants' attacks on Plaintiff with DE cause significant physical and mental suffering.

461.    The suffering caused on Plaintiff by Defendants' DE attacks is significant as duration and intensity. It is persistent for more than 7 years and ongoing, and in a few occasions its intensity raises to the level of 'severe'[129]. In a few occasions Defendants' DE attacks were so strong that Plaintiff stopped breathing. That effect ('respiratory failure') is a cause of death in exposure to

_____

124
125
126
127
128
129

electric current above 1000 volts[130]. DE effects are amplified due to the sleep deprivation of Plaintiff (reduction of his pain threshold), and other Defendants' practices in combination.

462.    Defendants' DE attacks on Plaintiff have repeated detrimental effects on his senses. In many cases when Defendants target his ears that induces tinnitus (as for example on 1/12/2025, 3/17/2025, 3/19/2025, 3/21/2025, 3/26/2025, 3/30/2025, and more), and/or Plaintiff's hearing is reduced (as for example on 1/11/2025, 1/14/2025, 2/4/2025, and more) – depending on the intensity of the DE beams the effect is for about half an hour up to a couple of weeks. Similarly very often his vision got blurred, and his eyes are irritated and dry. See ECF No.8-1 at 1018 *et seq.,* and more.

463.    Very often as result of DE attacks Plaintiff felt strong unpleasant tingling ('needles' sensation).

464.    The DE attacks on Plaintiff deteriorate his mental functions (causing mental fatigue, blank-state, and more). It is apparent that the external induction of electric currents in Plaintiff's head will affect his brain's electric activity (the currents in brain are weak).[131] As it is not possible to detect the currents inside Plaintiff's brain as indicator are used here the current detected on the surface of his skin. Notable is that at one occasion after strong DE attacks the maximal electric current detected on the surface of Plaintiff's top of head was 113 times higher than normal. Considering that the oscillating electric voltages of brain waves are 'just a few millionths of a volt' that is substantial interference (measured in hundred thousands times).[132]

465.    Plaintiff experience a range of other effects due to Defendants' DE attacks as repeated severe pain, headache, dizziness, dislocation of his knees (usually after attacks on his knees), he has temporary difficulty walking, and more. As well as involuntary muscle contractions (experienced as poking / focused pushing) – but in a form of very localized contractions of small number of muscle fibers. See Exhibits.

---

130
131
132

*C. Defendants orchestrate and act in concert to subject Plaintiff to systematic harassment and abuse (hostile environment).*

466. Harassment is the "most common types of torture"[133].

467. Defendants' deliberate harassment of Plaintiff is everyday conduct since about 2013, and the amount of relevant events and accumulated effects of their 13 years long and ongoing conduct is significant. Even facially neutral events are relevant because, for example, they are based on Plaintiff's protected characteristics, or are caused by Defendants' persons who had made derogatory comments about him in the past.[134]

468. Defendants explicitly stated they want to 'harass', 'break', 'stop', and 'destroy' Plaintiff. As part of Defendants' efforts in that regard they act to weaken Plaintiff physically (by sleep deprivation, sabotage of his access to healthcare services, and more); to obstruct him and his activities in retaliation to his petitions, lawful collection of evidence and similar (by interruption, evasion, punishment – DE and sound attacks on Plaintiff, assaults, and more); to intimidate him with demonstration that Defendants have full control over him (including but not limited to, by controlling his environment and utilities: hot water, heating, Internet, access and control over Plaintiff's accounts with applications as Viber, Skype, Facebook, Gmail, Yahoo; his job and business prospects; ability to cause and causing him harm; to ostracize him, policy of preventing, or ignoring his petitions, subjecting him to messaging campaign to chill him out ("We won't stop." "You can't stop us." and more. See ECF, No. 8-1, 14)) and more.

469. The control of Plaintiff's environment, including '[t]reatment, rewards, punishment, and anything else associated' with him, is essential in Defendants' efforts to radicalize and entrap him, and accords with the US policies in regards to persons in its control.[135]

470. Defendants act with both knowledge about the physical and mental suffering and pain caused to Plaintiff due to their activities, and with the specific intent to cause pain and suffering as

---

133
134
135

137

punishment for his legal actions and to coerce him to stop. Their statements demonstrate they consciously desire the effects – Plaintiff's suffering and harm. Even if some of them have applied techniques without that specific desire, they have knowledge, and it is reasonable and easy to predict that the conduct would cause suffering and paint to Plaintiff.

471.    Defendants' specific intent is shown in (1) the explicit statements in regard Defendants' intention to 'torture', 'terrorize', 'punish', 'trigger', 'harass', 'press' Plaintiff; (2) Defendants' demonstrative conduct as for example their demonstrative surveillance on Plaintiff (see effects of monitoring on behavior), sharing the derogatory and false information about Plaintiff as 'Bulgarian criminal, spy, terrorist, fagot' hitting police, and more; (3) threats to Plaintiff that Defendants would kill him ("kill him", 'he won't survive', "we don't forget"…), put him in hospital, or more. Defendants apparently are able to do that – see for example the UN Human Rights Committee suggestions to the USA Reports under CCPR in regards use of lethal force by law enforcement in the USA; (4) Defendants knowledge about the effects of their activities on Plaintiff either through their surveillance and/or Plaintiff's complaints (see Teaneck Police officers demonstrating knowledge about Plaintiff's "pain", "suffering" on 1/20/2023); (5) Defendants do not stop those activities with knowledge of the harm on Plaintiff, and act deliberately to cause the harm. (Deliberate blindness).

472.    Due to the accumulation effect (continuation for many years), and the combination effect (enhancement of the experienced pain by interference of effects from various techniques) the pain or suffering Defendants cause to Plaintiff is significant.

473.    The result of all Defendants behaviors mentioned above is very hostile to Plaintiff environment based on discrimination, retaliation and malice.

474.    Defendants' harassment of Plaintiff is planned and coordinated: different parties at different locations know Plaintiff (name, ethnicity, how he looks, and more), and pursue the same goals –

to disturb, stress him out, oppress him. That clearly shows the dissemination of Plaintiff's

information and Defendants' preparations in advance – they say phrases and words in Bulgarian,

follow common narratives about him, they play prepared psychological games ('mocking game',

' turn-off game', they follow 'storyboards' – see explicit statement in that regard by Teaneck

police officers and Defendants' agents on 1/20/2023); the participants have 'roles', and more.

475.   In addition Defendants' harassment shows their organization – in a few instances there were

Defendants' agents who supervise the activities, comment events and/or give instructions to the

parties (as for example to 'start', 'stop', 'tease', 'mock', 'push' or 'harass' Plaintiff).

476.   Defendants' harassment have apparent pattern. (1) The events are in close proximity to Plaintiff

regardless of the location (including in Bulgaria (see ECF No.8-1.C.7)). Defendants secure that

by getting access to rooms or offices next to Plaintiff in Englewood Cliff, NJ (see ECF No.8-2 at

2139-2140), in Manhattan, NYC (Gyro NY (see his litigation against Gyro et al.), Derek Smith

Law Group New York (ECF No.8-2 at 2107), Wishniewski office (ECF No.8-2 at 2109)),

neighboring apartments (ECF No.8-1.C.4), and more (ECF No.8-2.E.3).

477.   (2) In every instance Defendants identify Plaintiff as the target either verbally, through behavioral

clues, or both. Apart from saying his name ('Kalin') they have used key words including

Plaintiff's ethnicity ('Bulgarian'); words related to his professional career ('Gyro', 'East House' –

both were his employers, Gyro also in its quality as a party in Dimitrov v. Gyro et al., 18-cv-

3600, S.D.N.Y.), or profession ('advertising', 'Photoshop', 'designer'). Defendants have made

some words 'key words' by priming Plaintiff through repetition and conditioning, such as for

example 'police (pursue him)', 'press/push him', 'stop', 'fagot' (the use of 'fagot' significantly

decreased after Plaintiff started to regularly document events), and more. They have used also

words and phrases in Bulgarian (for example Teaneck police officers on 10/13/2013 at 2:30AM

stated "Ние говорим за теб [We're talking about you]." ECF No.8-1 at 34), and have used

information from the surveillance of Plaintiff to commented his recent activities and more in demonstration that among other things they talk about him (see ECF No.8-1 at 119 et seq.). Behavioral clues include talking to Plaintiff, looking at him while talking between themselves, pointing or turning toward him, following him, timing their speech to be only next to him, and more. A few of Plaintiff's identification clues, both verbal and behavioral, are context dependent.

478. (3) Defendants identify themselves as either government agents ('police', 'FBI', 'agents'), or as acting in coordination with the government. Such demonstration became more subtle since Plaintiff started to document events regularly.

**(1) Defendants are provocatively explicit about the harassment of Plaintiff, and their intention to destroy, break, crush, and ruin him.**

479. Defendants are explicit about terrorizing, mocking, harassing, teasing, pushing, and triggering Plaintiff. As for example on 3/30/2016 ("How we terrorize him?" "Mock. Mock."); 4/20/2017 ("Start pushing harder.." "Harass him.".. "Pushing Bulgarian []." "Bulgarian can't push that."..."We have to push him.".. "We'll have to get him."); on 4/21/2017 ("Tease him." "Bulgarian qualified that.".. "Crush (him)." "Have the police to push."); 5/10/2017 ("Can I push? Can I stop?".. "We all destroy him."); 5/14/2017 ("Punish him.".. "We compare little legal push." "We get slow his power. Always trigger him.".. "We'll get him."); 5/20/2017 ("Push him till (death)."); 4/21/2018 ("Torture him"); 3/6/2020 (at 1:42PM, under Plaintiff's windows "Punish him." "Fights police."); 8/15/2020 (knocks and comment in ap.A3 "Have to push." And later under Plaintiff's windows "Figure how to push [him]."); on 4/6/2021 (at 6:32PM, corridor "Figure how to push him."); on 7/11/2021 (Plaintiff was working on case materials persons under his windows "We have to push." Two hours later they returned "Have to punish [him]. We don't forget." and at 10:59PM "Can't believe we fight [].");  or on 8/27/2021 (at 12:50AM persons outside of Plaintiff's building "Fight the Bulgarian one", a bit later noise started from A3). ECF No.8-1 at 1823.

(i) Defendants overtly talk about the harassment of Plaintiff since 9/7/2012.

480.    Since 2012 Defendants and parties in concert repeat the same message(s) or directions to harass

Plaintiff, as for example Teaneck police officers (10/13/2013, 7/28/2022, 1/20/2023, ), the USPS

carrier to Plaintiff's building (for example on 7/14/2021), Defendants in ap. A1, A3, A6, B2,

including Marlene Dula and Ralph Pimienta, and more. They act in apparent coordination, and

among other things demonstrate the surveillance on Plaintiff (as for example on 5/17/2017).

481.    After Plaintiff's notice of claims (11/10-11/11/2022) Defendants' demonstrative conduct included

overt statements that "Police harass Kalin." (11/21/2022), "Let police harass to get him."

(12/18/2022), "Tell police to stop that.".. "Can't harass." (8/30/2024).

482.    In regards to who is behind Plaintiff's harassment Defendants said also that "New York harass."

11/14/2021; when Plaintiff was at the FBI New York Field Office building Defendants said it is

"Global harass." 11/10/2022; Dula implied that it is the FBI 2/21/2024; Defendants talked about

the FBI, the "agents" and said that they "harass" on 7/16/2024; Dula again "FBI to stop… Can't

harass." 10/6/2024; or "Kalin believe FBI []… We do harass." 3/29/2025.

483.    Defendants have used cognitive dissonance and provoked Plaintiff by saying that they 'can't

harass' while harassing him, as for example on 12/23/2017 (knocks, turned off his lights),

1/25/2018 (knocked), 7/14/2021, 9/9/2021, 1/13/2024, 3/8/2024 (hammered), 5/14/2024

(awakened Plaintiff with a call), 7/1/2024 (knocked, played music), 7/27/2024 (talking loud), or

on 3/16/2025 (loud knocks).

484.    See examples bellow.

(ii) Defendants also talked overtly about destroying Plaintiff.

485.    Although not that frequent as 'harassment' Defendants overtly talked they want to destroy

Plaintiff: "Destroy one Bulgarian." 2/28/2017; "We all destroy him." 5/10/2017 (among other

things demonstrating the coordination between parties); "To destroy (Kalin)." "Can't survive

that." 11/21/2022; "Have to shoot. Torture him." "Destroy him." 7/4/2024; "We got to destroy

him." 3/10/2025, and more.

486.    Defendants were also explicit that they want to destroy Plaintiff's work on his legal case(s)

against them as for example on 4/29/2023, 3/28/2024, 7/4/2024, or 10/1/2024.

487.    They used again the verbal structure creating cognitive dissonance a few times ('can't destroy',

but actively harassing Plaintiff).

488.    Related to the above Defendants talked a few times they want to break Plaintiff. While 'breaking'

Plaintiff refers to Defendants' concept of breaking resistance, as it is used it is also a synonym of

destroy. And as concepts closely related to 'destroying/breaking' Plaintiff Defendants also overtly

talked to 'crush' and 'ruin' Plaintiff. For example:

**(2) Defendants systematic induction of distress to Plaintiff.**

489.    Defendants have subjected Plaintiff to high level of everyday stress, and their activities include

variety of chronic stressors (repeating hammering for example, the everyday DE attacks causing

pain and other effects, regular shouting, barking dog, and more). Defendants deliberately stress

Plaintiff out, and their verbal conduct shows their intention – since 2012 they overtly talk to

"press / oppress" and otherwise disturb Plaintiff. A few examples of Defendants talking

specifically about stress include:

490.    Defendants use to multiple psychological techniques to make Plaintiff uncomfortable, and

escalate his stress including but not limited to threats, sleep deprivation, assaults, sound and DE

attacks. Their practices are in accord with the US practices in regards to its detainees.[136]

(i) Defendants methodically attack Plaintiff with variety of sounds.

491.    Since 2013 Defendants make sounds with apparent intention to disturb, stress, intimidate, and

provoke Plaintiff. Defendants' sound attacks on Plaintiff include (a) shouting – loud talking,

roars, screams; (b) variety of sudden noises utilizing the building pipe system like pipe bangs,

---

136

clanking, pops, cracks; (c) knocks on Plaintiff's walls, floor, and ceiling, including regular

hammering; (d) repeated slams next to Plaintiff; (e) ringing Plaintiff's doorbell; (f) phone calls

including during the night; (g) loud music; and more. Their conduct forms a clear pattern of

targeting Plaintiff with noise regardless of the location he is.

492.    Sound attacks are integral part of the US strategies for treatment of individuals in its control.

Those strategies "use various types of sound [which] would be used to "activate and confuse

auditory sensors" resulting in "heart-rate increase and increased stress leve1s.""[137] and are

intended to 'induce control [and] compliance'.[138] Notably 'exposure to loud noises' was classified

as a torture practice.[139]

493.    Due to Plaintiff's recording and his other legal actions in the context of living in residence

building Defendants can not use very frequently without plausible cover story the same sounds.

Necessity to use large number of perpetrators, or when using the same persons they play

'enemies' to Plaintiff as decoy in Defendants activities to channel his eventual illegal response –

as for example Ralph Pimienta, or students as a group.

494.    Defendants' regular **shouting**, screaming and yelling next to Plaintiff is one of their "stress

techniques"[140] used to interrupt and provoke Plaintiff. That is continuous practice although there

are some periods with reduced frequency of use. ECF No.8-2 at 1891-1907. Exhibit Timeline of

events. Multiple Defendants participate, but screaming is mostly by students. See a few recent

examples bellow. Note that students acted under the supervision of Teaneck Schools' staff.

495.    **Hammering** is apparently deliberate conduct. Defendants systematically hammer on Plaintiff's

floor, ceiling, walls, or near him with intention to disturb, harass, and provoke him: they

repeatedly talked about "harassing" or "upsetting" him, they have been explicitly provocative and

refused to take notice of Plaintiff's complaints, and more.

---

137
138
139
140

496.    Since 2019 hammering is mostly from Defendants in ap.B2, and dramatically increased in May-July 2023 in apparent retaliation to Plaintiff's work on the complaint for *Dimitrov I*, and in retaliation to his work on relevant court filings, and case materials. Till the end of 2024 Defendants in B2 hammered almost every day – about 500 days in a row. Furthermore the repetition of hammering within a single day has also increased substantially: in 2023 Defendants' repeated hammering within one day was about 4.5 times more frequent than in 2022, and in 2024 hammering was even more frequent than in 2023 (and about 6 times more frequent than in 2022). See Exhibit Hammering on Plaintiff's ceiling from Defendants in ap.B2.

497.    Defendants intentionally and systematically (for long periods of time it is everyday conduct) **knock** on Plaintiff's ceiling (from ap. B2), his floor (ap. G2), his walls (ap.A1 and A3), in the building corridor near his apartment, they hit the road sign under or next to his windows or similar at different time day and night. Plaintiff filed three written complaints for noise violations to JC Realty – the landlord, and make multiple verbal complaints with the super – Cesar Naranjo. All of those were without any effect – ignored or suppressed due to Defendants interference. Furthermore, a few times Defendants knocked under the cover of a landlord's repairs in neighboring apartments, landlords removed the noise insulation between G2 and A3, and supported otherwise the harassment. See ECF No.8-2 at 2030-2047, Exhibit Timeline of events, and more.

498.    Defendants' practice of large trucks, most regularly branded 'public work' or garbage trucks to park under Plaintiff's windows, staying there with running engines, making occasionally loud puffs, and other noise, is in accord with the US practices. Machinery noise is explicitly mentioned as psychological strategy.

499.    About 10 days after Plaintiff's notice of claims / administrative claims from 11/10-11/11/2022 Defendants put a dog in ap.G2 (despite the landlords' no-pets policy) and for about a year there

was regular **barking** from G2. ECF No.8-2 at 5945 *et seq.* The landlord/super knew (super occupy ap.G3 and apart from Plaintiff those on G level directly experience that noise) but did not do anything in that regard. Plaintiff called about that noise to Cesar Naranjo, super, on 12/17/2022 who said that JC Realty office knows about the problem, but dog(s) in ap.G2 continued barking often till 10/22/2023, and since then (apart from two weeks in January 2024) there have been rarely any barking.

500.  Based on the timing of the barking, the fact that Defendants have obviously been using ap.G2 against Plaintiff since 2016 ('feds'), including their use of cover to rent the apartment, and the lack of response from landlord (see JC Realty threats to sue tenants and guests for smoking for comparison) that is another technique used by Defendants to distress, degrade and provoke Plaintiff. See ECF No.8-1 at 152 *et seq.*.

501.  **Loud music** is one of the techniques Defendants use to make Plaintiff uncomfortable, escalate stress. *Inquiry Into The Treatment Of Detainees In U.S. Custody.* Report Of The Committee On Armed Services, United States Senate, Nov. 20, 2008. Defendants used regularly music in ap.G2 since September 2016 till about the end of 2017. See ECF No.8-1 at 152 *et seq.*. After that Defendants have not used loud music as harassment regularly from the neighboring apartments with a few notable exceptions. Due to Plaintiff's record of events there is no cover story that can diminish eventual Plaintiff's complaints.

502.  Defendants have been using also **high frequency sounds**, threw **pebbles** at Plaintiff's windows and eventually his AC, rang his **doorbell** (see the sting operation in the beginning of 2025 when police officers acted under cover as USPS carriers), and **called** Plaintiff (calls as disturbance are known FBI disruption method). See ECF No.8-1 and 8-2, and more.

(*ii*) Defendants regularly threaten and assault Plaintiff.

503.    Apparent intention to make Plaintiff suffering. Explicit threats in combination with DE attacks, pebbles at windows, rocks thrown at him or at/under his windows.

*(a) Defendants explicitly threatened to kill Plaintiff.*

504.    Defendants talked since 2012 about killing Plaintiff. Their intention to persuade Plaintiff of his imminent killing was shown in their comments of his reaction after the threat, whether "he believe/didn't believe" (12/5/2019, 8/28/2021, 9/24/2021, 11/9/2022, 8/19/2023).

505.    Threats to kill Plaintiff were made mostly by unknown Defendants' agents. Other parties making such threats include Teaneck public schools' students (9/6/2012, 5/24/2016, 2/20/2017, 10/17/2022, 10/6/2023, 2/7/2024, 1/9/2025, 3/21/2025), uniform Teaneck police officers and FBI (10/13/2013), Marlene Dula (B2) or Defendants' man in ap.B2 (11/30/2016, 12/23/2016, 1/31/2022, 8/30/2022, 7/26/2023 (the day after the beginning of *Dimitrov I*), 9/16/2024), by Defendants' Ralph (Raphael) Pimienta (he was present in a few of the other occasions too) (3/4/2022, 3/18/2022, 8/24/2022). A few times Defendants threatened that police would kill Plaintiff (5/14/2017, 9/18/2021, 7/25/2023 (the initiation of *Dimitrov I*)). Notable as timing are Defendants' threats to kill Plaintiff grouped in three days around the time he commenced *Dimitrov I* (7/22/2023, 7/25/2023 (initiation of *Dimitrov I*), 7/26/2023).

506.    Defendants threats to kill Plaintiff were made under his windows (9/6/2012, 9/7/2012, October 2012, 8/3/2013, 10/13/2013, 1/31/2017, 5/14/2017, 4/21/2018, 8/28/2021, 8/29/2021, 9/24/2021, 4/21/2022, 8/30/2022, 9/23/2022, 10/17/2022, 7/25/2023, 8/19/2023, 10/6/2023, 2/7/2024, 9/16/2024, 1/9/2025, 3/21/2025), in Teaneck public parks (11/3/2016, 2/20/2017, 5/14/2017, 4/13/2018, 9/18/2021), in other public space (2/20/2017, 5/10/2017, 5/25/2024, 7/20/2024), in building corridor (3/17/2017, 3/4/2022, 3/18/2022, 8/24/2022, 10/13/2022, 11/9/2022), in ap.B2 (12/23/2016, 1/31/2022, 7/26/2023), in ap.A3 (8/29/2021), in ap.A1 (9/24/2021), in Stop and

Shop, Teaneck (5/24/2016), in the offices next to East House Creative office in Englewood Cliffs (11/25/2012, 11/26/2012, in the summer of 2013).

507.    Defendants also repeatedly talked about shooting Plaintiff.

*(b) Defendants explicitly threatened Plaintiff that he will not survive, and will die.*

508.    Since Plaintiff watched online the TV show Designated Survivor (end of 2016, beginning of 2017) Defendants have adopted the concept of surviving, and repeated that Plaintiff will 'not survive' as euphemism for killing him, or challenged him to 'survive'.

509.    In a few occasions Defendants' were explicit about the reason why they threatened that Plaintiff 'won't survive' – because of commencing a lawsuit or filing Notice of claims with NYC, and Teaneck/ Administrative claims with the FBI (4/23/2018, 11/21/2022, 12/14/2022 (Dula mocked that 'nobody noticed' Plaintiff he won't survive)); for his work on case-related and legal materials (4/28/2018, 5/24/2021, 7/23/2022, 9/14/2022, 1/9/2024, 8/25/2024); or in response to Plaintiff challenging inside his apartment (12/29/2017). Defendants commented Plaintiff's reaction to the threat 'He didn't believe.' (4/23/2018), and threatened and challenged him to survive after harassing him with noise (3/3/2017, 9/14/2022, 1/26/2024).

510.    Notable in terms of the FBI New York role are Defendants' threats that Plaintiff will 'not survive' made at the FBI New York Field Office building (11/8/2017), or after he passed the building (4/23/2018 – same messaging to Plaintiff in Teaneck and in Manhattan, NYC).

511.    Defendants use other synonyms to killing Plaintiff, threatening him that he will die.

**(3) Defendants deliberately and systematically humiliate or debase Plaintiff, showing disrespect and diminishing his dignity.**

512.    Defendants methodically diminish Plaintiff (his qualities, skills, ethnicity, status), diminish what he did or planned to do (as his communications, requests, petitions re-framed as lacking any value, and more), and demonstrate variety of hostility, and lack of care about his rights or feelings. In significant number of cases Defendants' demonstrative disrespect to Plaintiff is in the

147

context of, or in parallel with their false narrative about him as Bulgarian criminal / spy / terrorist / fagot hitting police. See IV.12.

(i) Defendants demonstratively diminish Plaintiff's status, and deliberately reduce the value of what he does, aims, or knows.

513.    In general most of the Defendants' conduct toward Plaintiff diminish him and reduce the value of what he do, aim, know and more. For example Defendants' policy, practice of ignoring Plaintiff's petitions and communications (see IV.9) among other things is demonstration that they consider his claims as lacking value, and him as not worthy of a response. Furthermore Defendants apparently aim to prevent any recognition of worth to him – they for example deleted / prevented any response to Plaintiff in the context of his search for experts at least in part for that reason (see IV.10).

514.    Almost all parties Plaintiff has got in contact with followed the policy to ignore or otherwise diminish him, even if that meant to change previously established relations. At least in part this is due to Defendants' dissemination of the false narrative about Plaintiff as Bulgarian criminal, terrorist, fagot hitting police, and Plaintiff being marked for disruption (for example CVS staff commented a notice on their screen about 'disruption' of Plaintiff before providing medicine to him on 6/19/2024.). See Exhibit Timeline of events, and more.

(ii) Defendants explicitly called Plaintiff names with apparent intention to humiliate and provoke him.

515.    Defendants deliberately mock Plaintiff's masculinity, and treat him as a gay/woman (including the related statements that they will 'fuck' him) which is intended as insult and disrespect (see above IV.8(a)). Closely related to that is Defendants' referral to Plaintiff as a 'bitch'. In addition to that Defendants also referred to Plaintiff as a 'fucker' or used 'fuck/fucking' as demonstration of disrespect to him. For example:

(iii) Defendants play psychological games to humiliate and provoke Plaintiff.

516.    Defendants' degrading conduct is planned, and they play prepared in advance psychological

games to humiliate and provoke Plaintiff such as the 'mocking game' (explicitly naming it like

that on 4/23/2018, 8/29/2022, 10/21/2022), 'shift game' (2/28/2017), 'shut up game', and more.

517.    In addition to their "shut up game" (5/14/2017), which apparently aims to thwart Plaintiff's free

expression, Defendants explicitly told Plaintiff to 'shut up'. For example students told directly or

indirectly Plaintiff to 'shut up' on 11/3/2017, 8/17/2021, 8/17/2023, and 4/26/2024. In a few

occasions Defendants responded to Plaintiff to 'shut up' when he challenged them inside his

apartment (5/15/2016, 7/27/2017, 8/4/2021). Defendants told Plaintiff to 'shut up and pay your

rent' when he researched NJ law about landlord-tenant contracts demonstrating, among other

things, the surveillance on Plaintiff (7/17/2022). Notable are events on 4/26/2024 when students

threw a rock toward Plaintiff, and told Plaintiff to 'Shut up'. Seemingly Defendants have stopped

that 'game' since then.

## 12. Defendants deliberately and systematically attack Plaintiff's reputation and identity.

518.    Defendants and parties in concert ('Defendants') falsely paint Plaintiff as an anti-government

radical, a Bulgarian criminal / terrorist / spy (IV.7, 390 *et seq.* and more), Bulgarian 'fagot' (IV.8)

who hits the police/government and holds Defendants hostage. That narrative, among other

things, is Defendants' counter-narrative to Plaintiff's true account of relevant events as given, for

example, in his petitions, and provides legitimate gloss on their otherwise unlawful

discriminatory, and retaliatory actions against him. An average person would believe Defendants'

many-years-long repeated statements that Plaintiff is a terrorist, hostage-taker, a threat, because

they are public authorities[141] which supposedly know more and have undisclosed to public facts

---

141

about Plaintiff. Although the only thing that is true is that Plaintiff is Bulgarian as ethnicity and national origin.

519.  Defendants' dissemination in public of that false information about Plaintiff significantly injured his economic prospects, his ability to associate for expressive conduct, exposed him to hatred and hostility, and more. The society is highly concerned with crime and terrorism, and the harm from Defendants' falsely labeling Plaintiff as such is apparent – he is deprived from resources, with no incomes, ostracized and isolated for many years.

520.  In addition to their apparent intention to discredit Plaintiff Defendants (a) attack his reputation in public and in his presence to inflict mental suffering, to humiliate, distress, and provoke him (they want Plaintiff to hear them); (b) disseminate the false and/or derogatory information about him to isolate, alienate, deprive him of resources, as well as to convince other parties to join the activities; and (c) suppress his true account of relevant events and systematically attack his identity in effort to trigger identity crisis.

*(a) Defendants have accused falsely Plaintiff of serious crimes in public since 2013.*

521.  Defendants said in public that Plaintiff is a 'threat', and repeatedly talked in his regard about law enforcement measures such as to 'investigate' or 'arrest' him. (See IV.9, and more.) They have accused Plaintiff falsely of murder, even claimed that he killed a police officer, claimed that he is Bulgarian mob, a thief, (bank) robber, that he is a fraud or committed fraud, that he is terrorist who holds them hostage, and similar, talking in public and in his presence at almost every locations Plaintiff goes. Defendants' persons, who in vast majority of cases are unknown to Plaintiff, demonstrate knowledge about him – how he looks, his name, his Bulgarian ethnicity and national origin, and act in accord to the Defendants narratives about Plaintiff.

522.  Defendants are fully aware of the falsity of those accusations – (1) Defendants' activities continue for so many years that it is certain that they had checked and found nothing to support those

allegations long time ago – otherwise Plaintiff would have faced formal charges; (2) Plaintiff has been under Defendants' constant and demonstrative surveillance for most of the time he has been in the US, if not since the time he arrived in 2011; (3) there are multiple Defendants' statements which show that they know there is no factual basis for any of those accusations (they stated for example that they 'made him', and the need to 'set up', 'stage', 'frame' him); and (4) there are multiple Defendants statements showing that those accusations are means they use to 'destroy/ruin' him, to stop his petitions and other legal actions, to force Plaintiff to respond and entrap him, and to 'push/ press/ oppress/ tease/ trigger' him.

**(1) Defendants know that there is no factual basis for accusing Plaintiff of crimes.**

523.    Defendants knew the 'Kalin problem' for a long time, including the abuse and violations of the US constitution and laws.

524.    In the light of that knowledge the fact that they have planned and attempted to "stage", "set up" Plaintiff to get him,  for many years, shows that Defendants know they have no factual basis for their accusations of crime. Defendants even admitted that they "made him" (see 880 et seq.).

*(b) Defendants systematically attack Plaintiff's identity.*

525.    An identity is who you are to others: the stories about you told by yourself and/or others, or the meanings defining your role in the society.[142] Normal identity is formed by the experiences of uniqueness, stability of self-esteem, and capacity to regulate emotional experiences.[143] According to Defendants' radicalization models an identity crisis is a significant factor in the process of radicalization (see IV.7 (a)(1)(ii)).

526.    Defendants have created for Plaintiff several of the triggers for identity crisis as listed in some radicalization models (see IV.7.threat (a)(1)(ii)), specifically alienation, discrimination, lost employment (Gyro et al), and blocked economic prospects. Defendants also have been attacking

---

142
143

Plaintiff's self esteem for many years by humiliating or otherwise degrading him (see above IV.11), and more. Specific forms of identity attacks are presented bellow.

527.    Defendants deliberately ignore and suppress Plaintiff's account of events, his self-narrative, and label him[144] falsely as threat, Bulgarian criminal, fagot and more (IV.8(a)).

**(1) Defendants have ruined Plaintiff's social image, and defined detrimentally the stories and meanings others attach to him, with their false and defamatory narrative(s) about him as a Bulgarian criminal, terrorist, spy, and 'police enemy' (see above at (a)).The effect on Plaintiff and his prospects is significant in any possible way – financially, socially, emotionally, or otherwise.**

**(2) Defendants' systematic isolation and alienation of Plaintiff, and their deliberate efforts to create conflicts.**

528.    Defendants have orchestrated systematic isolation and alienation of Plaintiff motivated by retaliation ('stop' campaign); discrimination based on Plaintiff's national-origin, ethnicity, perceived sexual orientation; and personal malice ('This is personal.' Teaneck police officer 1/20/2023) (IV.8). See ECF No.8-2.E.3, Timeline of events. Defendants' purpose is apparently to exclude Plaintiff from the society, to prevent him to form friendly connections, to suppress his expression, and make others hostile toward him.

529.    Plaintiff social activities – as for example his attendance and participation in meet up groups, all of which are formed for expressive purposes – constitute neither security nor safety threat. Those groups are not threat (they would be canceled if they were), do not holding extreme views, nor they incite or support violence.

530.    For example Defendants have questioned persons who spoke with Plaintiff in his presence – which is warning that it is dangerous to talk with Plaintiff, demonstrating that he is a person of interest to Defendants, and is provocative demonstration of their efforts to isolate and alienate him. See more in IV.7.

---

144

531.    Targeting Plaintiff there is no wide public interest involved apart from the institutional interest to boost 'terrorism' rates, scare further the public with false/fabricated 'terrorist/crime' threat. That is related to Defendants' financing, and power. Unless that is legitimate public interest that is waste of public funds, time, energy, suppressing convenient persons (friendless, single, isolated, immigrant from certain ethnicity, national-origin, with perceived sexual orientation gay).

(i) Defendants create conflicts and distrust toward Plaintiff.

532.    Defendants create conflicts and distrust toward Plaintiff by (1) disseminating false defamatory narrative(s) about him, (2) showing the police/FBI interest in him, and (3) systematically humiliating, shaming, or otherwise degrading him. That is among the FBI long-known strategies to disrupt its targets.

533.    **Creating conflict with police in general**.

534.    (1) Defendants deliberately act to make Plaintiff hostile towards police and to persuade him to see police as a threat (see for example 5/14/2017, Id. at 163 "Police could have kill him."... "Police is investigating him.", or 1/20/2023, ECF No.8-1 at 81 *et seq*. "Do not bite police [is] still a threat."). Defendants efforts in that regard include the demonstrative participation of uniform police officers in the activities against him, the police support to other parties, police ignoring and/or obstructing Plaintiff's reports, and explicit threats that police would kill him (5/14/2017, 9/18/2021, 7/25/2023 (initiation of *Dimitrov I*)).

535.    (2) Defendants have disseminated the narrative that Plaintiff hits police in public and, at least in a few occasions, in his presence. Such statements were made by variety of Defendants and/or parties in concert, apparently to degrade, humiliate, intimidate, and to provoke reaction. In all those occasions Defendants demonstrated the surveillance of Plaintiff, their coordination and the dissemination of derogatory information about him. The parties talking about that include police officers (10/13/2013; 10/20/2016), and FBI/JTTF agents (10/13/2013, 11/8/2017).

536. What Defendants have referred to as 'hitting' or 'fighting' is 2 categories: (1) Plaintiff's preparation, work on legal and case-materials related to Defendants, and filing petitions to government (8/24/2016, 3/9/2018, 6/17/2018, 10/1/2019, 3/25/2020, 6/5/2020, 3/2/2021, 8/26/2021, 3/21/2022, 1/8/2024, 8/25/2024), and (2) fabricated, false and outrageous accusations that Plaintiff hit or even killed an officer (6/30/2013, 10/13/2023, 5/20/2017, 1/27/2018). Defendants also stated that as a reason to "punish" Plaintiff (8/2/2019, 3/6/2020).

537. Notable is the significant pause of the talking on the theme 'Plaintiff is hitting/fighting police' since June 2022 (when he was preparing Notice of claims with Defendants, later filed on or about 11/11/2022), with two exceptions: on 1/8/2024 (a few months after he initiated the litigation *Dimitrov I*) they modified it into "He hit the government.", and on 8/25/2024 "Kalin is fighting police." (3 days before Plaintiff filed his second Administrative claims with the FBI). Also notable is the Defendants' statement that Plaintiff is 'hostile to police' on 8/13/2023.

538. A narrative variation and explicit admission that Defendants know the purpose of Plaintiff's lawful activities is that he 'wants to sue the police'.

539. **Creating conflict with Teaneck public Schools' students**.

540. (1) Defendants supervise and direct students conduct against Plaintiff (see for example the 'inspiration day' on 2/28/2017). They regularly use students to deliver 'messages' to Plaintiff, apparently feed them with the false narrative of Plaintiff as Bulgarian criminal, fagot etc., and share with them surveillance information about him (they mock, comment Plaintiff's reaction/lack of reaction, and more).

541. (2) Since 2016 students regularly come under Plaintiff's windows, or next to him when he is outside (even overtly followed him (see for example 5/10/2017, ECF No.8-1 at 852)) to "fight" him. They act in coordination with Defendants to humiliate, shame Plaintiff, threatened him

multiple times, regularly using fighting words, and urging to 'fight', throwing rocks under the windows and even towards Plaintiff, shouting, screaming and more.

**542.  Creating conflict in the building.**

543.    (1) Defendants have put their agents as Plaintiff's neighbors, or in other apartments, and use cooperating parties in the building as their agents to regularly attack (sound and DE attacks) and otherwise frustrate Plaintiff, including by verbal assaults; noise such as slams, knocks on Plaintiff's walls, ceiling, floor, or on pipes passing through Plaintiff's apartment, yelling in neighboring apartments or the building corridor, playing loud music; complaining against Plaintiff; weaponizing building's utilities and pipe system; using directed energy, and more. See ECF No.8-1 at 148 *et seq*.

544.    Defendants in ap. G2 till 2019 – apparently provocative enemies, 'parallel enemies', explicit talking. Defendants in ap.A3 apparently provocative 2019-2021. Defendants in ap.B2 – years long and ongoing. Defendants in ap. A1 occasionally. See Cesar 2015, contact with Ralph and Dula, and more.

545.    Especially notable are Defendants agents in the building who are not in apartments adjacent to Plaintiff's as (a) Raphael Pimienta ('Ralph') who has been active against Plaintiff for many years but he became less active since Plaintiff's letter to Judge Rearden from 7/24/2024 (ECF No.14); and (b) John Doe, Holy Name security guard-neighbor who became apparently active since about the time Ralph reduced his overt provocations in 2024.

546.    (2) Defendants act in concert with the landlords / the supers of the building. See IV.8 (b)(2)(iii) (B). Landlords do not enforce contractual obligation to ensure 'quiet enjoyment', but treat Plaintiff differently.

547.    **Creating conflict in public groups**. Toastmasters, Dharma Drink, more – part of Defendants efforts to ostracize and alienate Plaintiff.

548.  **USPS** as enemy – 2024 almost every day talking, carrier overt conduct, then beginning of 2025 I

believe sting – officers in USPS uniform rang on Plaintiff's door.

**(3) Defendants' demonstrative surveillance of Plaintiff sets how others see his social role(s), and as he sees / experiences his role in the society. In that regard and among other things this is an attack on Plaintiff's identity.**

549.  There are many examples of explicit or implicit demonstration of the surveillance given above.

**(4) Defendants have set issues with Plaintiff's identity and "re-named" Plaintiff.**

550.  As part of disrupting Plaintiff (creating problems to interrupt or destroy his activities) Defendants

have created situations in which he had an identity problems, as for example with his Social

Security Number (Rel.,E.1.2.1). Defendants also used variations of his name or nicknames

('Kalini', 'Kevin', 'Iron man'). However those kind of attacks on Plaintiff stopped.

**(5) Defendants have destroyed Plaintiff's career as an advertising Art/Creative Director.**

551.  Defendants destroyed Plaintiff's more-than-15-years-long career as an Art or Creative Director, at

least in part as retaliation to Plaintiff's preparation for a lawsuit against Defendants. And as

pointed above a job loss or blocked employment opportunities are triggers for identity crisis.

552.  For Defendants' interference with Plaintiff's employment contracts see Dimitrov v. Gyro et al.,

18- cv-3600 S.D.N.Y.. In the process of that litigation Plaintiff's ex-colleague Ms. Greenwald on

3/31/2019 stated that after Plaintiff's termination a notice to its employees was put at Gyro New

York's office to not talk about the role of police (NYPD/JTTF) in regards to Plaintiff.

553.  Since 2016 Plaintiff has been unemployed due to Defendants and parties acting in concert

substantial interference with his employment prospects. In 2017 alone Plaintiff applied to about

290 job recruitment offers for work in the Creative Department of various advertising agencies

but in accord to Defendants' statement from 12/27/2016 ("You will never find a new job. I

promise you." (ECF No.8-1 at 121)) he didn't get even an interview with an employer. That is in

time when "companies invest more in their branding and marketing efforts [and b]ecause of this

hiring upswing, highly skilled professionals are in short supply. Unemployment rates in the creative field remain below the national average, and job opportunities outnumber qualified candidates."[145] And the "[d]emand remains strong for skilled professionals, and unemployment rates in the creative field continue to trend below the national average."[146] Furthermore, in the context of their constant and provocative surveillance, Defendants made multiple explicit statements demonstrating their interference with Plaintiff's employment prospects, and/or that they are those who 'give' a job to him. See ECF No.8-1 at 161-162, and ECF No.8-2 at 2115-2127. See also Defendants' statements in that regards as:

**(6) Defendants attack Plaintiff's sexual orientation and impute homosexuality to him.**

554.    Opposite to the way Plaintiff is and how he defines himself – as a straight male, Defendants' continuously attack his sex / sexual orientation using the whole range of obscenity in regards to how they perceive his sexual orientation (gay), including showing lustful thoughts and humiliation (rejection) of Plaintiff. Sexual orientation/gender play significant part of a social identity[147], and Defendants degrading treatment in that respect is an attempt to trigger identity crisis in Plaintiff. See IV.8(a)(2).

## V. COUNTS

**COUNT 1: Defendants violated the First and Fourteenth Amendments of the US Constitution, and Art.1, §§8-9 of the New York State Constitution** (Against Defendants USA/FBI, the City of New York (under 42 U.S.C. §1983, §§1985-1986, NYS Const.), Township of Teaneck (under 42 U.S.C. §1983, §§1985-1986), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities (under 42 U.S.C. §§1985-1986))

555.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 1, as if fully set forth herein.

---

145
146
147

556.    Defendants and parties in concert ('Defendants') act in concert to interfere or deprive Plaintiff of his right to petition the government (IV.9). Defendants act consistently to disrupt Plaintiff's preparation, work, or filing of petitions. Their conduct includes, but is not limited to (1) demonstrative surveillance of Plaintiff as suppression and deterrence; (2) a social pressure campaign to persuade Plaintiff that he can not sue them, and to deter him from working on or filing petitions; (3) retaliatory pressure campaign since Plaintiff had filed his Notice of claims/Administrative claims on or about 11/10-11/11/2022 to persuade and provoke Plaintiff that his petitions 'can't stop' them, and that they 'won't stop'; (4) pressure campaign to persuade Plaintiff to 'stop' preparing, working on, or filing petitions; and (5) obstruction of Plaintiff's work on, or filing of petitions by interference and retaliation in general, and specifically interfering and/or preventing Plaintiff to file petitions with the FBI New York and Teaneck police.

557.    Defendants retaliate to Plaintiff's preparation, work, and filing of his petitions by subjecting him to degrading treatment, interfering with his economic prospects (loss of incomes), and more.

558.    Defendants actively prevent Plaintiff's legal actions including by (but not limited to) restricting his ability to uncover legal claims by not investigating his reports and other petitions, preventing him to obtain legal or expert counsel, preventing or obstructing him to obtain or preserve evidence for the violations, or otherwise obstruct his work including by retaliation, intimidation, and degrading treatment. IV.10(a).

559.    Furthermore Defendants have policy or practice to ignore, not investigate or obstruct otherwise the petitions Plaintiff did filed. Their practice in regards to Plaintiff's petitions includes but is not limited to (1) no contact with Plaintiff, no investigation, and no response to most of his petitions; or (2) deliberately inadequate response, reframing, and minimizing his complaints.

560.    Defendants have interfered and retaliate to Plaintiff's expressive conduct as for example (1) his lawful collection of information, including information as evidence for his litigation(s), for

dissemination to public (see 2136 *et seq.* for the Defendants' obstruction); (2) his association with others for political, social, economic, religious, and cultural purposes. Defendants interfered in particular with his attendance of meetings and participation in groups for the purpose of expression of views, ideas, and other similarly protected conduct (IV.12); and (3) his private communications (deletion, blocking of emails).

561.    Defendants failed to remedy the violations of Plaintiff's First and Fourteenth Amendments rights, nor they made efforts to prevent further injury despite having undeniable knowledge about the violations. Furthermore Defendants retaliated and keep retaliating to Plaintiff's exercise of his rights for more than 13 years and counting.

562.    There is no public interest in Defendants' restrictions on Plaintiff's liberties. Defendants seek to carry impermissible goal, by masking their discrimination, retaliation and malice toward Plaintiff under legitimate disguise by fabricating a false criminal/terrorist/spy threat. Plaintiff does not represent 'clear and present danger' – his conduct is not violent or unlawful, does not encourage, support or accept violence or any illegal acts, nor it suggests any probability of evil acts. His conduct is apparently not anti-governmental even if government is a side in the case at hand.

563.    Based on their conduct which continue for 13 years and is ongoing Defendants' 'compelling' or 'significant interest' in Plaintiff's case is not fighting crime and terrorism but to prevent Plaintiff to make public their violations, and to 'punish' him for his speech.

564.    Defendants' conduct significantly affected Plaintiff's conduct and chilled him out – due to their interference he has never filed a report with the FBI, in majority of cases he did not report to Teaneck police incidents listed in the complaint, and more.

565.    Because of the continuous nature of Defendants' unlawful practices, and because Defendants' unlawful practices were permitted by supervisors and policymakers to continue unremedied for

so long as to amount to an unlawful policy, custom or practice, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

566.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 2: Defendants violated the Fourth and Fourteenth Amendment of the US Constitution and Art.1, §12 of the NYS Constitution** (Against Defendants USA/FBI, the City of New York (under 42 U.S.C. §1983, §§1985-1986, NYS Const.), Township of Teaneck (under 42 U.S.C. §1983, §§1985-1986), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities (under 42 U.S.C. §§1985-1986))

567.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 2 as if fully set forth herein.

568.    Defendants have intruded on Plaintiff's person, home, and effects without legitimate reason and justification for 13 years and ongoing. Defendants' searches and seizures are not reasonable both as scope and manner of execution regardless of whether they had a warrant or not.

569.    Even if Defendants had legitimate reasons at the beginning, on 9/7/2012 they knew that Plaintiff is not a threat, but started law enforcement and community actions against him regardless. Acting without probable cause Defendants threw at Plaintiff variety of false accusations, and never individualized what Plaintiff is guilty of (apart of course of working and filing petitions, and of his other lawful conduct).

570.    Nor Defendants actions are reasonable as scope – they are massive waist of resources for 13 years and ongoing (see Exhibit Letter to Attorney General Garland, 10/7/2024). Defendants escalated the issues, and use extreme force, including subjecting him to prohibited by the international law degrading treatment such as sleep deprivation, DE attacks, and more.

571.    Defendants' intrusion on Plaintiff's privacy interests, his economic interests and similar is
massive. At the same time there is no public interest in Defendants' searches and seizures of
Plaintiff's person, house, papers and effects. Defendants seek to carry impermissible goal, by
masking their discrimination, retaliation and malice toward Plaintiff under legitimate disguise by
fabricating a false criminal/terrorist/spy threat.

572.    Plaintiff does not represent 'clear and present danger' – his conduct is not violent or unlawful;
does not encourage, support or accept violence or any illegal acts; nor it suggests any probability
of evil acts. His conduct is apparently not anti-governmental even if government is a side in the
case at hand. Based on their conduct which continue for 13 years and is ongoing Defendants'
'compelling' or 'significant interest' in Plaintiff's case is not fighting crime and terrorism but to
prevent Plaintiff to make public their violations, and to 'punish' him for his speech.

573.    Defendants surveillance on Plaintiff for 13 tears and ongoing is search under the Fourth
Amendments. The surveillance is implicit in everything Defendants undertook against Plaintiff.
Defendants demonstratively followed Plaintiff, otherwise demonstrate the surveillance. IV.9(a)
(1). Defendants' interference with Plaintiff's possession of his private emails, and his files stored
on his private computer and laptops is seizure under the Fourth Amendment.

574.    Defendants deliberately placed Plaintiff in fear of unreasonable loss of possession and control of
his person (placed him without protection under the law while threatening to arrest or kill him,
making police a threat to him, subjecting him to DE attacks and other degrading treatment), of his
house (Defendants efforts to deprive him from residence in the US, IV.8(b)(2)(iii)), and of
unreasonable loss of possession and control of his papers and effects (Defendants deletion of files
and communications, and more).

575.    Plaintiff has never consented to Defendants' searches or seizures.

576.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms,

for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 3: Defendants violated the Due Process Clause of the US Constitution (5th And 14th Amendment) and the Due Process Clause of the NYS Constitution** (Against Defendants USA/FBI, the City of New York (under 42 U.S.C. §1983, §§1985-1986, NYS Const.), Township of Teaneck (under 42 U.S.C. §1983, §§1985-1986), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities (under 42 U.S.C. §§1985-1986))

577.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and ECF No.1, Count 3 as if fully set forth herein.

578.    Defendants abuse their power by using it to oppress and harm Plaintiff acting neither with

legitimate reasons, nor in service of legitimate governmental objective – but to punish him for

exercising his constitutional rights, and more. Defendants act with apparent discriminatory

animus (see Counts 4-5), and deprive Plaintiff of rights such as the right to be free from (a)

unjustified intrusions on his personal security, (b) unreasonable governmental investigation and

entrapment, (c) degrading treatment including intentionally inflicted physical pain and injuries,

and psychological torture, and (d) to be free in choosing residence.

579.    Apart from the substantive due process scrutiny, Defendants' actions should have been

implemented in a fair manner in accord with the procedural due process. Instead Defendants deny

Plaintiff fundamental procedural fairness, and their conduct is a gross abuse of government

authority – rather than fighting crime and terrorism, they continue a baseless, outrageous, out-of-

control investigation of Plaintiff for more than 13 years and ongoing in order to punish and

radicalize him.

580.    Defendants have breached their respective duties to properly and fairly enforce the laws, rules, policies, practices, procedures and/or customs in accordance with the constitution, and caused harm to and violated Plaintiff's rights as set forth in this Complaint.

581.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 4: Defendants violated Plaintiff's right to equal protection guaranteed under Fifth and Fourteenth Amendments of the US Constitution, Art. I, §11 of the NYS Constitution, and 42 U.S.C. §§1981, 1983, 1985-1986.** Claim against Defendants USA/FBI, the City of New York (under 42 U.S.C. §1983, §§1985-1986, NYS Const.), Township of Teaneck (under 42 U.S.C. §1983, §§1985-1986), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities (under 42 U.S.C. §§1981, 1985(3)-1986, NYS Const.).

582.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 4 as if fully set forth herein.

583.    Defendants have been acting in concert to subject Plaintiff to unlawful oppression, and selective treatment. Defendants' activities against Plaintiff are motivated, at least in part, by his race, ethnicity, national origin, sex, perceived sexual orientation, citizenship status, and/or are in retaliation to his conduct protected under the constitution and laws.

584.    Defendants have singled out, and treat Plaintiff selectively. Their selective and unreasonable treatment of Plaintiff in comparison to similarly situated others is motivated by discrimination, retaliation, and/or malice – their conduct intends to injure him. Defendants reaffirmed Plaintiff's selection multiple times in the last 13 years and counting, and they continue their conduct without correction even after his reports, complaints, and legal actions.

585.    Defendants deny Plaintiff equal protection under the law by (1) not holding accountable to the law, nor enforcing the law in regards to the US agencies, entities, or persons' unlawful and/or unreasonable policies or practices against Plaintiff; (2) actively preventing Plaintiff to hold them

accountable in a court of law; and (3) applying selectively the law in regards to Plaintiff at least in part because of his race/national origin, sex, legal alien status till 2016, and in retaliation to his protected conduct.

586.    Defendants deprive Plaintiff from his right to be equal before the court and his right to a fair hearing by interfering with his preparation, filing, and work on his legal actions and related materials; and by interfering with the court and the court procedures in regards to Plaintiff's legal actions. Consequently S.D.N.Y. is neither impartial, nor independent in regards to Plaintiff and his legal actions.

587.    Defendants apply facially neutral laws and policies in intentionally discriminatory and/or retaliatory manner against Plaintiff.

588.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 5: Defendants violated 42 U.S.C. § 1981A(A)(1)** (Against Defendants the City of New York (under § 1983), Township of Teaneck (under § 1983), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities)

589.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 5 as if fully set forth herein.

590.    Defendants have discriminated Plaintiff on the base of his race: white Eastern European with Bulgarian ethnicity, ancestry and national origin. Defendants have discriminated against Plaintiff by significantly interfering with his right to sue; by preventing him to give evidence or suppressing the evidence he provided; by interfering with his right to make and enforce contracts.

591.    Defendants have discriminated against Plaintiff by creating severe and pervasive hostile environment based on Plaintiff's protected characteristics, and have significantly altered the conditions of his life, and his enjoyment of his tangible and intangible properties.

164

592.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms,

for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 6: Defendants violated 42 U.S.C. § 1983** (Against Defendants the City of New
York, and Township of Teaneck)

593.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and in ECF No.1, Count 6 as if fully set forth herein.

594.    Pursuant to municipal policy/practice/custom municipal actors as Teaneck police, Teaneck Board

of education, Teaneck public schools, NYPD (including NYPD officers in JTTFs), as well as

NYC and Teaneck officials, and other parties acting in concert and under color of law have

deprived Plaintiff of rights, privileges, or immunities secured by the Constitution and laws.

595.    Defendants have deprived Plaintiff from rights under the First, Fourth, Fifth and Fourteenth

Amendments of the Constitution (Counts 1-4), and rights under 42 U.S.C. §§1981, 1985-1986

(Counts 5, 7-8).

596.    Defendants have orchestrated and *conspired to isolate and discredit Plaintiff* in public.

597.    Defendants have orchestrated and *conspired to neutralize Plaintiff's activities* and to punish him

for his prior activities by using government policies for illegal purposes – motivated by

discrimination and retaliation, and with the knowledge that the allegations against him are

baseless. That includes Defendants et al.'s conduct aiming to disrupt Plaintiff's preparation and

presentation of petitions. See Counts 1, 7, and more.

598.    Defendants have orchestrated and *conspired to prevent Plaintiff from obtaining relief* including by

suppressing facts and creating a 'conspiracy of silence'. See Counts 1,7, 8, and 14.

599.    Defendants have orchestrated and *conspired to coerce Plaintiff into crime* including by creating

false incriminating evidence against him, labeling him a Bulgarian 'criminal/terrorist/spy/fagot',

introducing extreme views in regards to violence, creating very hostile and abusive environment, provoking Plaintiff 13 years and ongoing, and more.

600.    Defendants had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights, but they have chosen to not do so, they actively participate in the violations of his rights, or substantially contribute to the circumstances within which Plaintiff's rights were violated.

601.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 7: Defendants violated 42 U.S.C. § 1985(2)** (Against Defendants USA/FBI, the City of New York, Township of Teaneck, and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta ('Ralph'), as well as number of Jane and/or John Doe (decision-makers) in their individual capacities)

602.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 7 as if fully set forth herein.

603.    Defendants act in concert to deter Plaintiff from attending the courts of the US (both as a party and witness), and interfere and obstruct the due course of justice with intent to deny him the equal protection under the laws (see Counts 1, 4, 6).

604.    Defendants interfered with the course of Plaintiff's litigation against Gyro et al, and with *Dimitrov I*. Additionally to the above Defendants have been making a lot of efforts to obstruct Plaintiff's preparation and work on his legal cases. Defendants' conduct apparently affected Plaintiff's legal cases.

605.    Defendants have demonstrated their racial animus against Plaintiff – a white Eastern European with Bulgarian ethnicity, ancestry and national origin, strait male perceived as feminine and gay, a legal-alien till April 2016.

606.     As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms,

for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 8: Defendants violated 42 U.S.C. § 1986** (Against Defendants USA/FBI, the City of New York, Township of Teaneck, and against Marlene Dula, as well as number of Jane and/or John Doe (decision-makers) in their individual capacity)

607.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and in ECF No.1, Count 8 as if fully set forth herein.

608.     Defendants et al.' actions in concert have deprived and continue to deprive Plaintiff from rights

under the laws and constitution in violation of §1985. See Counts 1-5, and 7. Defendants have the

power to prevent or help preventing the wrongful acts, they have had many years to deliberate

and remedy the wrongs, but intentionally chose not to do that. Instead Defendants allowed the

wrongful conduct to continue for more than 13 years (and ongoing) regardless of Plaintiff's

complaints and efforts to address the issues.

609.     As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms,

for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 9: United States of America (FBI) injured Plaintiff** (claims under the Federal Tort Claims Act ('FTCA'))

610.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and in ECF No.1, Count 9 as if fully set forth herein.

611.     The acts and events set forth constitute negligent and wrongful acts and omissions of agents and

employees of the U.S. Government, inter alia, discrimination, assault, battery, defamation,

infliction of emotional distress, civil conspiracy, tortuous interference, nuisance, and trespass

while acting within the scope of their offices and employment, under circumstances where the

United States, if a private person, would be liable to Plaintiff in accordance with the laws of the New York State and the State of New Jersey.

612.    Defendant's decisions about Plaintiff's investigation and its methods are discretionary but go far beyond defendant's discretionary authority by deliberately violating Plaintiff's constitutional rights and his rights under the laws. Defendant has no discretion to create and execute discriminatory, unconstitutional policies and practices (in this case in violation of the First, Fourth, Fifth and Fourteenth Amendments), in violation of federal statutes (42 U.S.C. §§1981, 1985, 1986), or its regulations (for example the FBI violate the well settled principles against entrapment in AG's Guidelines on FBI Undercover Operations, May 3, 2002. V.B). All of that precludes the application of discretionary function exception in this case.

613.    Additionally because Defendant's agents and officers are investigative or law enforcement officers of the United States Government and their tortuous conduct is within the scope of their office and employment the "law enforcement proviso" effectively overrides discretionary function exception, as well as the intentional tort exception.

614.    Plaintiff's claims would not impede the FBI's proper functions or operations, because Plaintiff's claims are about 13-years-long and ongoing Defendant's conduct which is improper, without legitimate reasons, and without rational nexus to public safety, to terrorism or crime prevention.

615.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 10: Assault.** Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta in their individual capacities

616.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 10 as if fully set forth herein.

617. Defendants assaulted Plaintiff by deliberately putting him in fear of harmful contact or physical injury including by, but not limited to, direct and indirect threats in the context that government wants to 'kill', 'destroy', 'get' him because they consider him Bulgarian criminal, terrorist, spy, fagot who hits police.

618. Defendants have the apparent ability to carry out their threats (as evidenced in the cases of extracted false confessions, or police killings in the news, for example), and in the circumstances set in this Complaint any reasonable person would fear imminent harmful contact and/or physical injury. Plaintiff's belief that Defendants are fully capable to carry out their threats is demonstrated in his response to the threats: he filed a police report, set 24/7 working security system, he document regularly events, makes constant efforts to prevent eventual harm, and more.

619. As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 11: Battery** – Against Defendants USA/FBI (under FTCA),  and against Marlene Dula, and John Doe (ap.B2) in their individual capacities

620. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 11 as if fully set forth herein.

621. Defendants' regular wrongful physical contacts with Plaintiff and his effects are intended to harm and/or deeply upset them. Plaintiff has never consented with the contacts, and has made significant efforts to evade them.

622. Defendants have used deliberately directed energy to contact Plaintiff and his effects which have resulted in multiple non-permanent physical injuries and caused significant pain.

623. There are no circumstances in Plaintiff's case which make necessary or reasonable the use of such force by Defendants apart from their discriminatory, retaliatory and malicious motives.

624.     As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms,

for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 12: Defamation** – Against Defendants USA/FBI (under FTCA), and against Marlene
Dula, and John Doe (ap.B2) in their individual capacities

625.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and ECF No.1, Count 12 as if fully set forth herein.

626.     Defendants deliberately invaded Plaintiff's interest in a reputation and good name by making

public statements that exposed him to public hatred, contempt, ridicule or disgrace, and induced

evil opinion of Plaintiff in substantial number of community.

627.     Defendants' statements are defamation per se because they charge Plaintiff with serious and

specific crimes. Defendants have made repeatedly statements about Plaintiff as not-masculine,

referred to him as a 'woman'/'she', and a 'fagot' (perceived sexual orientation). Such imputation

of homosexual behavior to Plaintiff is also defamation per se.

628.     Defendants implied and explicitly stated that Plaintiff is a 'crazy', 'psych", and mentally ill.

629.     In the context of Defendants discriminatory animus against Plaintiff as an Eastern European

(from an ex-communist country) – one of the reasons for his wrongful investigation – they have

commented a few times Plaintiff as a 'Russian' or fabricated a connection to Russia, referred to

Plaintiff as a 'communist' or showed their animus indirectly.

630.     Those statements from Defendants' agents and officials are made with the knowledge of their

falsity and/or with complete disregard about the truth – they are made in pursuit of their goal to

harm, radicalize, and entrap Plaintiff by constant provocations. Absent any criminal conduct by

Plaintiff Defendants' dissemination of the false narrative serve no public interest.

631.     Plaintiff is a private person, and Defendants' defamation deprived him of friendly intercourse in

society, harmed his economic prospective, caused substantial stress and mental suffering, and

alienated him. Defendants' statements have discredited Plaintiff in his social life, and are

substantial factor for Plaintiff to be subjected to ostracism, sabotage, and contempt, as well as to

suffer economic harm – unemployment (employers' background check renders Plaintiff beyond

employment), and lack of business opportunities (distrust is not a base for business relations).

632.    As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms,

for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 13: Infliction of Emotional Distress** – claims against Defendants USA/FBI (under
FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta ('Ralph') in their
individual capacities.

633.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding

paragraphs, and in ECF No.1, Count 13 as if fully set forth herein.

634.    Defendants USA/FBI, the City of New York, and Township of Teaneck have apparent power to

damage Plaintiff's interests, and in order to harm him they have engaged in extreme and

outrageous conduct which exceeds any reasonable bounds of decency. For 13 years and ongoing

Defendants and parties acting as their agents have deliberately acted against Plaintiff to cause,

and indeed have caused serious mental distress, which no reasonable person should have to

endure.

635.    Defendants have deliberately subjected Plaintiff to systematic and coercive campaign of

continuous harassment and verbal abuse (including sound and directed energy attacks,

psychological torture, victimization, and more), prolonged physical pain, disruption of his senses,

death-threats, constant surveillance, 'patrolling' under Plaintiff's windows, disruption of services,

deterioration of living conditions, and more.

636.   Defendants' conduct violates the laws and constitution. Consequently because there is no legitimate justification for the conduct public policy can not bar the claim, nor Defendants are allowed to achieve their goals by deliberate infliction of emotional distress.

637.   Plaintiff's live course changed significantly due to Defendants conduct. Defendants' conduct caused in many cases physical injury to Plaintiff (due to the use of directed energy), sleep deprivation, continuous stress and anxiety, he is unemployed (Defendants disrupted Plaintiff's career in advertising), with no incomes. Living under threat, and under continuous harassment by Defendants, Plaintiff's self-esteem, sense of personal power and control over the events have been significantly diminished. He records events in his presence since 2015, has been running non stop a security software with 3 cameras (in different configurations) at home since about May 2016, started to records himself at home since about 2017. Because of the Defendants' conduct he didn't launch his business in 2012-2013, stopped searching for job after the litigation with Gyro and the overt interference from Defendants, stopped searching for legal representation after 2018. All of that is evidence for the severe mental distress Plaintiff suffers.

638.   As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 14: Civil Conspiracy** – Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta ('Ralph') in their individual capacities

639.   Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and ECF No.1, Count 14 as if fully set forth herein.

640.   Defendants act in concert, consciously, and in agreement about their general purpose – to disrupt, harm, radicalize and entrap Plaintiff, even though they might perform different functions, or different parts of the plan. Defendants act in coordination with each other and direct third parties to follow a common scheme, common design which follows their model(s) of radicalization

process. Each of the Defendants aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in taking the wrongful actions and other wrongdoings against Plaintiff complained herein. Each of the Defendants acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

641. Defendants know that the conduct is a breach of duty owed to Plaintiff: duty for conducting reasonable investigation, duty to minimize the harm, duty to not harm Plaintiff's rights under the constitution and laws, and despite that knowledge each defendant has given substantial assistance and/or encouragement to others. Defendants have assisted, and/or directed third parties to advance the commission of torts, to harm Plaintiff, and conceal Defendants' participation.

642. Defendants are in apparent position of authority and their suggestive words plant the seeds of action against Plaintiff. As a result Plaintiff's social activities are sabotaged, he faces ostracism and alienation, and among other things his economic prospects are significantly harmed.

643. Knowing about the violations of the constitution and laws Defendants are deliberately silent and take not action to remedy the conduct – which is substantial assistance to achieving the conspiracy goals.

644. As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 15: Tortous Interference** – Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), Raphael Pimienta, as well as number of Jane and/or John Doe (decision-makers) in their individual capacities

645. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and ECF No.1, Count 15 as if fully set forth herein.

646.    Defendants interfered with Plaintiff's business, profession, and contracts, deliberately harming his protected interests without proper justification.

647.    Defendants deliberately interfered with Plaintiff's contract with the landlords Tower Management Service (till February 2020), and JC Realty Management/Red Road LLC (since March 2020), and that resulted in breach of contract: landlords have not enforced contractual obligations in regards securing 'quiet enjoyment' of the premises and ignored or minimized Plaintiff's complaints, they have treated him differently then other tenants in detrimental way, changed the terms and conditions of the contract, withheld convenience information, and more.

648.    In similar way Defendants interfered with Plaintiff's contracts with Optimum, Verizon, and Viber, with Citibank, Derek Smith Law Group, Summit Dentistry and Advanced Endodontics, and more.

649.    Defendants interfered with Plaintiff's employment contracts, and significantly disrupted Plaintiff's employment opportunities.

650.    As result of Defendants' interference Plaintiff suffered actual damages such as loss of his incomes, career, business and economic prospects, his contracts' terms and conditions deteriorated, and more. As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 16: Nuisance** – Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta in their individual capacities

651.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and ECF No.1, Count 16 as if fully set forth herein.

652.    Defendants' conduct is characterized by a pattern of repeating objectionable acts for many years. Defendants acting in concert on the public areas adjacent to Plaintiff's building which are in front/under Plaintiff's windows, as well as in the building's corridor have interfered substantially

and offended public morals, endangered the safety in the area, and interfered with the convenience and comfort of considerable number of people in the building and on Cedar lane and Red Road streets. Defendants speak in those areas obscenities referring to Plaintiff as a 'bitch', 'fagot', 'total ass', stating "Fuck you." and more (that also is violation of Teaneck Township Code ('TTC'), Sec. 26-22[148]). Defendants also regularly make sudden and/or continuous loud noises in those areas.

653.    Defendants et al. substantially interfere with the public right to use public areas as public parks, public areas with benches, streets, and similar by making deliberately sudden and unnecessary loud sounds, talking loud, playing music next to Plaintiff, and other conduct targeting Plaintiff (also in violation of TTC, Sec. 21-15, and Sec. 26-22). Defendants' objectionable conduct is continuous, deliberate, and substantially disrupts Plaintiff's use and enjoyment of those public areas, and results in inconvenience, discomfort and distress to all present.

654.    Plaintiff suffer special loss from Defendants' conduct described above, he suffers the most in comparison to other members of the community because he is (one of) the closest to those activities, the conduct is directed at him, and intends to disturb him, ruin his comfort, and harm his health and safety. The cumulative harm due to the proximity and the time Plaintiff has been exposed to that conduct is also unique to him than to random persons in those public areas (especially in regards to area next to his apartment as random persons are in those areas for very limited time than Plaintiff). Because of the above the harm Plaintiff suffers is different in kind from the community in large.

655.    Defendants have interfered substantially with Plaintiff's private rights to use and enjoy his apartment. Defendants have deliberately made noise in the area right in front of Plaintiff's windows, in the corridor, neighboring apartments, on the Plaintiff's walls, floor, ceiling, and

---

148

pipes with the intention those sounds to enter his property and disturb him, harm him emotionally and mentally, ruin the peace and quiet, interrupt him, provoke him, and more.

656. Defendants' objectionable conduct is continuous with clear pattern of deliberate and substantial disruptions of Plaintiff's use and enjoyment of the apartment. Defendants are liable for their invasion of Plaintiff's interests in his apartment on 805 Red Road, Teaneck, NJ because they have had plenty of opportunities to abate the nuisance but chose not to, even after Plaintiff filed his Notice of claims and his Administrative claims under the FTCA.

657. As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

**COUNT 17: Trespass** – Against Defendants USA/FBI (under FTCA), and against Marlene Dula, John Doe (ap.B2), and Raphael Pimienta in their individual capacities

658. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, and in ECF No.1, Count 17 as if fully set forth herein.

659. Defendants have deliberately used and use directed energy to go into Plaintiff's apartment and get in contact with him and his chattels which results in harming him, and have substantially diminished his ability to use and enjoy his properties for many years.

660. Defendants intentionally and without Plaintiff's consent interfered with Plaintiff's intangible properties and his use and enjoyment of those chattels. For example Defendants interfered with Plaintiff's email accounts with Yahoo.com, gmail.com, and more. Defendants significantly and deliberately changed the conditions and quality of those Plaintiff's properties, including by destroying the information in his email or hosting accounts, or stored on his computers/laptops which in effect is dispossession of those information.

661. Defendants' conduct described above injures Plaintiff, puts him in danger of further physical injury, and causes distress, discomfort and inconvenience.

662. As a direct and proximate result Plaintiff has suffered and continues to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses and harms, for which he is entitled to an award of monetary damages and all other appropriate relief.

## VI. PRAYER FOR RELIEF

663. Plaintiff respectfully request that this Court enter judgment in his favor and against Defendants for the following relief:

664. Awarding compensatory damages to compensate Plaintiff for what he suffered and will continue to suffer: the loss of income, bonuses, benefits, other compensation, and other pecuniary losses; emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses. The amount of compensatory damages would be determined at trial.

665. Awarding punitive damages as Defendants' conduct has been malicious, deliberate, willful, wanton, outrageous, with reckless indifference to Plaintiff's federally protected rights and conducted with full knowledge of the law; and in order to deter Defendants from engaging in any such further unlawful conduct. The amount of punitive damages would be determined at trial.

666. Awarding Plaintiff his costs, expenses and fees in this action; and

667. Awarding Plaintiff such further reliefs as the Court may deem just and proper.

## VII. DEMAND FOR JURY TRIAL AND PLAINTIFF'S CERTIFICATION

668. Plaintiff demands a jury trial on all claims that are triable by jury even though the FTCA claims are to be tried by the court (28 U.S.C. § 2402).

669. I declare under penalty of perjury that to the best of my knowledge and belief the foregoing is true and correct.

Dated: 9/5/2025
Respectfully submitted,

___/S/_____

Kalin Dimitrov
805 Red Road, Apt. A2
Bergen County, Teaneck, NJ 07666
Telephone: +1 646 378 8286
Email: kdcase2023@gmail.com

*Plaintiff, proceeding pro se*